Eugene P. Ramirez (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Lynn Carpenter (State Bar No. 310011)
  *lynn.carpenter@manningkass.com*
Kayleigh Andersen (State Bar No. 306442)
  *kayleigh.andersen@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants, COUNTY OF
RIVERSIDE, SHAWN HUBACHECK,
and JIMMIE MCGUIRE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.L. a minor by and through the Guardian Ad Litem Kristine Llamas-Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., by and through the Guardian Ad Litem Amber Sietsinger, individually and as successor-in-interest to JOHNNY-RAY LLAMAS deceased; and CAROLYN CAMPBELL, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF RIVERSIDE; and DOES 1¬10, inclusive, <br><br> Defendant. | Case No.: 5:24-cv-00249-CAS(SPx) <br> Hon. Christina A. Snyder <br><br> **KAYLEIGH ANDERSEN'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> *Filed concurrently with* <br> *1. Notice of Motion and Memorandum of Points and Authorities;* <br> *2. Statement of Unconverted Facts;* <br> *3. Proposed Judgment* <br><br> Date:    Monday, June 23, 2025 <br> Time:    10:00 am <br> Crtrm.:  Courtroom 8D__ <br><br> *Action Filed:*    *02/01/2024* |

## **DECLARATION OF KAYLEIGH ANDERSEN**

I, Kayleigh Andersen, declare as follows:

1.      I am an attorney at law duly authorized to practice before all the courts of the State of California and in all of the United States District Courts within the Central District of California. I am a partner in the law firm of Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record herein for Defendants COUNTY OF RIVERSIDE, SHAWN HUBACHECK, and JIMMIE MCGUIRE (collectively "Defendants"). If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief herein.

2.      Attached hereto as Defendants' **Exhibit 3** is a true and correct copy of the transcript of PSAP/Dispatch Audio from April 13, 2023.

3.      Attached hereto as Defendants' **Exhibit 5** is a true and correct copy of the transcript of PSAP/Dispatch Audio from April 14, 2023.

4.      Attached hereto as Defendants' **Exhibit 7** is a true and correct copy of the transcript of Sgt. Shawn Hubacheck's bodyworn camera ("BWC") video from April 14, 2023.

5.      Attached hereto as Defendants' **Exhibit 9** is a true and correct copy of the transcript of Lt. Michael Walsh's bodyworn camera ("BWC") video from April 14, 2023.

6.      Attached hereto as Defendants' **Exhibit 11** is a true and correct copy of the transcript of Deputy Shane Day's bodyworn camera ("BWC") video from April 14, 2023.

7.      Attached hereto as Defendants' **Exhibit 14** is a true and correct copy of the transcript of audio of interview of Carolyn Campbell dated April 15, 2023.

8.      Attached hereto as Defendants' **Exhibit 16** is a true and correct copy of Plaintiffs' First Amended Complaint filed on September 27, 2024 as Docket No. 34.

9.      Attached hereto as Defendants' **Exhibit 17** is a true and correct copy of the October 23, 2024 deposition transcript of plaintiff Carolyn Campbell.

10.      Attached hereto as Defendants' **Exhibit 18** is a true and correct copy of the October 23, 20224 deposition transcript of Guardian ad Litem, Kristine Llamas-Leyva.

11.      Attached hereto as Defendants' **Exhibit 19** is a true and correct copy of excerpts from the October 24, 20224 deposition transcript of Guardian ad Litem, Amber Snetsinger.

12.      Attached hereto as Defendants' **Exhibit 20** is a true and correct copy of the December 18, 20224 deposition transcript of Shawn Hubacheck.

13.      Attached hereto as Defendants' **Exhibit 21** is a true and correct copy of the December 20, 20224 deposition transcript of Jimmie McGuire.

14.      Attached hereto as Defendants' **Exhibit 22** is a true and correct copy of the March 21, 2025 deposition transcript of Michael Walsh.

15.       On May 5, 2025, my office sent email correspondence to Plaintiffs' counsel which briefly addressed the arguments and issues to be advanced in Defendants' Motion for Summary Judgment ("Motion"). On May 7, counsel for plaintiff V.L., Benjamin Levine, and I met and conferred telephonically to discuss the anticipated Motion. Despite our extensive meet and confer, the parties were unable to resolve the issues raised in the Motion. Further, I sent follow-up emails to counsel for plaintiffs S.L. and Carolyn Campbell on May 6, 7, 12, and 13, spoke on the phone with an assistant to counsel on May 7 and 13, who advised of counsel's complete unavailability until May 14. On May 14, I spoke on the phone with counsel for plaintiffs S.L. and Carolyn Campbell, but the parties were unable to resolve the issues raised in the Motion. Attached hereto as **Exhibit 23**, is a true and correct copy of my email correspondence to Plaintiffs' counsel.

16.      Attached hereto as Defendants' **Exhibit 24** is a true and correct copy of the October 23, 2024 deposition transcript of Plaintiff S.L.

---

17.    Attached hereto as Defendants' **Exhibit 25** is a true and correct copy of the October 24, 2024 deposition transcript of Plaintiff V.L.

18.    Pursuant to Local Rule 26-3.2, the numbering of Defendants' exhibits are in sequential order beginning with **Exhibits Nos. 1, 2, 4, 6, 8, 10, 12, 13, and 15** as set forth in Investigator Jordan Merle's Declaration and **Exhibits Nos. 3, 5, 7, 9, 11, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25** as set forth in this declaration. Defendants have a total of **25** exhibits with each exhibit being referenced by the same exhibit number by all declarants to avoid duplication.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed on May 16, 2025 in San Bernardino, California.

*/s/ Kayleigh Andersen*
Kayleigh Andersen

1 | Eugene P. Ramirez (State Bar No. 134865)
  | *eugene.ramirez@manningkass.com*
2 | Lynn Carpenter (State Bar No. 310011)
  | *lynn.carpenter@manningkass.com*
3 | Kayleigh Andersen (State Bar No. 306442)
  | *kayleigh.andersen@manningkass.com*
4 | **MANNING & KASS**
  | **ELLROD, RAMIREZ, TRESTER LLP**
5 | 801 S. Figueroa St, 15th Floor
  | Los Angeles, California 90017-3012
6 | Telephone: (213) 624-6900
  | Facsimile: (213) 624-6999
7 |
8 | Attorneys for Defendants, COUNTY OF
  | RIVERSIDE, SHAWN HUBACHECK,
  | and JIMMIE MCGUIRE
9 |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| S.L. a minor by and through the Guardian Ad Litem Kristine Llamas-Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., by and through the Guardian Ad Litem Amber Sietsinger, individually and as successor-in-interest to JOHNNY-RAY LLAMAS deceased; and CAROLYN CAMPBELL, individually, <br><br>                Plaintiffs, <br><br>        v. <br><br> COUNTY OF RIVERSIDE; and DOES 1¬10, inclusive, <br><br>                Defendant. | Case No.: 5:24-cv-00249-CAS(SPx) <br> Hon. Christina A. Snyder <br><br> **INVESTIGATOR JORDAN MERLE'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** <br><br> *Filed concurrently with* <br> *1. Notice of Motion and Memorandum of Points and Authorities;* <br> *2. Statement of Unconverted Facts;* <br> *3. Proposed Judgment* <br><br> Date:    Monday, June 23, 2025 <br> Time:    10:00 am <br> Crtrm.:  Courtroom 8D__ <br><br> *Action Filed:*        *02/01/2024* |

---

**INVESTIGATOR JORDAN MERLE'S DECLARATION IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

## DECLARATION OF INVESTIGATOR JORDAN MERLE

I, Inv. Jordan Merle, declare as follows:

1.      I am employed as an Investigator for the Riverside County Sheriff's Department. I am currently assigned to the Professional Standards Bureau ("PSB") as an investigator. I have personal knowledge of the matters set forth herein below and if called upon to testify, I will competently testify hereto.

2.      In my capacity as an Investigator for the Professional Standards Bureau, I serve as a custodian of records for the Riverside County Sheriff's Department. As such, I am familiar with the policies and procedures for maintaining case-related documents and files.

3.      The Riverside County Sheriff's Department is in possession of and has maintained the following files, which include audio, video, and investigation materials, and are attached hereto as the following exhibits:

| | |
|---|---|
| **Defendants' Exhibit 1** | True and correct copy of the Star 9 video from April 14, 2023 |
| **Defendants' Exhibit 2** | True and correct copy of PSAP/Dispatch Audio from April 13, 2023 |
| **Defendants' Exhibit 4** | True and correct copy of PSAP/Dispatch Audio from April 14, 2023 |
| **Defendants' Exhibit 6** | True and correct copy of Sgt. Shawn Hubacheck's bodyworn camera ("BWC") video from April 14, 2023 |
| **Defendants' Exhibit 8** | True and correct copy of Lt. Michael Walsh's bodyworn camera ("BWC") video from April 14, 2023 |

MANNING | KASS

| Defendants' Exhibit 10 | True and correct copy of Deputy Shane Day's bodyworn camera ("BWC") video from April 14, 2023 |
| Defendants' Exhibit 12 | True and correct copy of Call Detail by RCSD for April 14, 2023 |
| Defendants' Exhibit 13 | True and correct copy of audio of interview of Carolyn Campbell dated April 15, 2023 |
| Defendants' Exhibit 15 | True and correct copy of Riverside Sheriff's Department Policy no. 300 Use of Force, dated February 16, 2023 |

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Executed on May 14, 2025

*Jordan Merle*

Inv. Jordan Merle

# EXHIBIT 1

# EXHIBIT 1



# EXHIBIT 2

# EXHIBIT 2



# EXHIBIT 3

# EXHIBIT 3

Page 1

US DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA


Case No.: 5:2024cv00249


----------------------------x

Llamas,

                    Plaintiff,

V.


County of Riverside, et al.

                    Defendants.

--------------------------------x


200. Audio. PSAP 0401323[COR 000320 - CONFIDENTIAL]



COR 001825

Page 2

**A P P E A R A N C E S**

Tim Ottieri
Officer Frank

---

Page 3

911 OPERATOR 1: 911, state your emergency.

MALE 1: Yeah. I'd like to report a felony I checked (inaudible). I know where his whereabouts are right now. They raided his house two times and they haven't been able to catch him. (Inaudible) this individual.

911 OPERATOR 1: I'm sorry, your phone is -- it's kind of difficult to understand what you're saying.

MALE 1: Oh --

911 OPERATOR 1: You want to report --

MALE 1: -- my phone is breaking out.

911 OPERATOR 1: You want to to report --

MALE 1: Okay. Just a second -- just a second. I'm in a rural area here in San Juan, California. Oh, Perris. I'm sorry. Go ahead.

911 OPERATOR 1: Okay. And you wanted to report a felon you said.

MALE 1: Yeah. Okay. Johnny Llamas.

911 OPERATOR 1: Johnny Llamas?

FEMALE 2: Are you still there.

911 OPERATOR 1: Yes, I'm here.

FEMALE 2: His name is Johnny Ray

---

Page 4

Llamas. L-L-A-M-A-S.

911 OPERATOR 1: And do you know their date of birth?

FEMALE 2: 5/5/'87.

911 OPERATOR 1: Okay. And where is he at?

FEMALE 2: He's -- he -- he's 22635 Shaw Court.

911 OPERATOR 1: What was the street name? I'm sorry?

FEMALE 2: Shaw. S-H-A-W.

911 OPERATOR 1: And like the Mead Valley area?

FEMALE 2: No, it's in Perris.

911 OPERATOR 1: Okay. And how do you know that he's there?

FEMALE 2: I just dropped off a girlfriend. So I'm taking her to the store and he was there.

911 OPERATOR 1: Okay.

FEMALE 2: And they need to hurry if they're going to come because he probably is going to take off. He's driving a dark blue Chevy Tahoe and I have the license plate for you.

911 OPERATOR 1: Okay. What is it?

---

Page 5

FEMALE 2: 7B as in boy, U as in umbrella, C as in Charlie, 580.

911 OPERATOR 1: And deputies have been looking for him, you said?

FEMALE 2: Oh, yes. This is the third time I've called on him.

911 OPERATOR 1: Okay. What is your name?

FEMALE 2: I don't want to give it.

911 OPERATOR 1: Okay. Did you see what color clothing he had on right now?

FEMALE 2: No, I didn't. The person's house that he was at, I asked whose car was that and he goes, Who do you think? I said, is it Johnny? And he goes, Yes. But he couldn't really tell me any more than that because Johnny will beat him up and he is a disabled homeless man.

911 OPERATOR 1: Okay. Do you know if he like carries weapons on him or anything like that?

FEMALE 2: Oh, yes. He's carrying weapons. He's got guns on him.

911 OPERATOR 1: Okay. Okay. We will send a deputy over there.

FEMALE 2: More than one.

---



2 (Pages 2 to 5)

COR 001826

Page 6

1  911 OPERATOR 1:  Okay.  Yeah, we'll send
2  a few.
3  FEMALE 2:  Okay.
4  911 OPERATOR 1:  Okay.  Thank you.
5  FEMALE 2:  Bye bye.
6  911 OPERATOR 2:  911, state your
7  emergency.
8  MR. OTTIERI:  I'm calling to find out
9  why the helicopter is circling my property,
10  Greenwald in Lari Mark, like the emergency sheriff
11  in the street.  I'm wondering if we should be
12  concerned.
13  911 OPERATOR 2:  Let me check with her.
14  Give me one second.  Okay.  It looks like they are
15  checking the area for someone who ran from deputies.
16  MR. OTTIERI:  Say it again.
17  911 OPERATOR 2:  I don't see it -- they
18  are checking the area for someone who ran from
19  deputies.
20  MR. OTTIERI:  Uh-huh.
21  911 OPERATOR 2:  So I don't have a
22  description here, but I would say just stay inside
23  and then call us if you do see anyone suspicious.
24  MR. OTTIERI:  Holy shit.  That's what I
25  thought.  We're all locked up but --

Page 7

1  911 OPERATOR 2:  Okay.
2  MR. OTTIERI:  I'm at 20915 if you need
3  to reach me at this number.
4  911 OPERATOR 2:  Okay.  You're in
5  Greenwald?
6  MR. OTTIERI:  Yeah.  On 20915 Lari
7  Mark.
8  911 OPERATOR 2:  Oh, okay.  And what is
9  your name?
10  MR. OTTIERI:  Tim Ottieri.
11  911 OPERATOR 2:  Okay.  What's your
12  phone number?
13  MR. OTTIERI:  And I'm all locked up and
14  I'm watching my property.
15  911 OPERATOR 2:  Okay.  And what's your
16  phone number?
17  MR. OTTIERI:  (805) 748-2965.
18  911 OPERATOR 2:  Okay.  I will let them
19  know.  And yeah, if you do see anything or anyone
20  suspicious give us a call right away, okay?
21  MR. OTTIERI:  Yeah.
22  911 OPERATOR 2:  All righty.  Thank you.
23  Bye.
24  911 OPERATOR 3:  Dispatch, this is
25  Talia(phonetic).

Page 8

1  OFFICER FRANK:  Hi, this is 5 Frank 223.
2  Can you show me 10-7, please.
3  911 OPERATOR 3:  Sure.  You've got it.
4  OFFICER FRANK:  Thank you.
5  911 OPERATOR 3:  You're welcome.  Have a
6  good night.
7  OFFICER FRANK:  You too.  Bye.
8  911 OPERATOR 3:  Bye.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1  CERTIFICATE OF TRANSCRIPTION
2  I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT
3  I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;
4  AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT
5  TRANSCRIPTION OF MY NOTES.
6  I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL
7  OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE
8  OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH
9  THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE
10  ACTION.
11  THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
12  APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
13  UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
14  CERTIFYING TRANSCRIBER.
15  DATED THIS 12TH DAY OF SEPTEMBER 2024
16
17  STEPHEN SIMPSON, TRANSCRIBER
18
19
20
21
22
23
24
25

**MAGNA** ▶
CONFIDENTIAL
LEGAL SERVICES

3 (Pages 6 to 9)

COR 001827

Page 1

## A

able
3:6
ACTION
9:9,10
ahead
3:18
al
1:10
AND/OR
9:13
APPLY
9:12
area
3:17 4:13 6:15,18
asked
5:13
ATTORNEY
9:6,8
Audio
1:15 9:3
AUTHORIZED
9:3

## B

beat
5:16
birth
4:3
blue
4:23
boy
5:1
breaking
3:13
bye
6:5,5 7:23 8:7,8

## C

C
2:1 5:2
California
1:1 3:18
call
6:23 7:20
called

5:6
calling
6:8
car
5:13
carries
5:19
carrying
5:21
Case
1:3
catch
3:6
CENTRAL
1:1
CERTIFICATE
9:1
CERTIFICATION
9:11
CERTIFY
9:2,6
CERTIFYING
9:14
Charlie
5:2
check
6:13
checked
3:4
checking
6:15,18
Chevy
4:23
circling
6:9
clothing
5:11
color
5:11
come
4:22
concerned
6:12
CONFIDENTIAL
1:15
CONNECTED

9:8
CONTROL
9:13
CORRECT
9:4
COUNSEL
9:6,8
County
1:10
Court
1:1 4:8

## D

dark
4:23
date
4:3
DATED
9:15
DAY
9:15
Defendants
1:11
deputies
5:3 6:15,19
deputy
5:24
description
6:22
difficult
3:9
DIRECT
9:13
DIRECTION
9:13
disabled
5:17
Dispatch
7:24
DISTRICT
1:1,1
driving
4:23
dropped
4:17

## E

E
2:1,1
emergency
3:2 6:7,10
EMPLOYEE
9:7
et
1:10

## F

felon
3:20
felony
3:4
FEMALE
3:23,25 4:4,7,11,14
4:17,21 5:1,5,9,12
5:21,25 6:3,5
FILE
9:3
FINANCIALLY
9:9
find
6:8
FOREGOING
9:4,11
Frank
2:3 8:1,1,4,7
FURTHER
9:6

## G

girlfriend
4:18
give
5:9 6:14 7:20
Go
3:18
goes
5:14,15
going
4:22,22
good
8:6
Greenwald



Page 2

6:10 7:5
**guns**
5:22

## H

**helicopter**
6:9
**Hi**
8:1
**Holy**
6:24
**homeless**
5:17
**house**
3:5 5:13
**hurry**
4:21

## I

**inaudible**
3:4,7
**individual**
3:7
**inside**
6:22
**INTERESTED**
9:9

## J

**Johnny**
3:21,22,25 5:14,16
**Juan**
3:17

## K

**kind**
3:9
**know**
3:4 4:2,16 5:18 7:19

## L

**L-L-A-M-A-S**
4:1
**Lari**
6:10 7:6
**license**

4:24
**Llamas**
1:6 3:21,22 4:1
**locked**
6:25 7:13
**looking**
5:4
**looks**
6:14

## M

**MALE**
3:3,11,13,16,21
**man**
5:17
**Mark**
6:10 7:7
**Mead**
4:12
**MEANS**
9:12

## N

**N**
2:1
**name**
3:25 4:10 5:8 7:9
**need**
4:21 7:2
**night**
8:6
**NOTES**
9:5
**number**
7:3,12,16

## O

**Officer**
2:3 8:1,4,7
**Oh**
3:11,18 5:5,21 7:8
**okay**
3:16,19,21 4:5,15,20
4:25 5:7,10,18,23
5:23 6:1,3,4,14 7:1
7:4,8,11,15,18,20

**OPERATOR**
3:1,8,12,14,19,22,24
4:2,5,9,12,15,20,25
5:3,7,10,18,23 6:1,4
6:6,13,17,21 7:1,4,8
7:11,15,18,22,24
8:3,5,8
**Ottieri**
2:2 6:8,16,20,24 7:2
7:6,10,10,13,17,21

## P

**P**
2:1,1
**PAGES**
9:4
**PARTIES**
9:7
**PARTY**
9:8
**Perris**
3:18 4:14
**person's**
5:12
**phone**
3:8,13 7:12,16
**Plaintiff**
1:7
**plate**
4:24
**please**
8:2
**probably**
4:22
**property**
6:9 7:14
**PSAP**
1:15

## Q

## R

**R**
2:1
**raided**
3:5

**ran**
6:15,18
**Ray**
3:25
**reach**
7:3
**really**
5:15
**RELATIVE**
9:7
**report**
3:3,12,14,20
**REPRODUCTION**
9:12
**right**
3:5 5:11 7:20
**righty**
7:22
**Riverside**
1:10
**rural**
3:17

## S

**S**
2:1
**S-H-A-W**
4:11
**San**
3:17
**saying**
3:10
**second**
3:16,17 6:14
**see**
5:10 6:17,23 7:19
**send**
5:24 6:1
**SEPTEMBER**
9:15
**Shaw**
4:7,11
**sheriff**
6:10
**shit**
6:24



COR 001829

show
8:2
**SIMPSON**
9:2,17
sorry
3:8,18 4:10
state
3:1 6:6
stay
6:22
**STEPHEN**
9:2,17
store
4:18
street
4:9 6:11
**Sure**
8:3
suspicious
6:23 7:20

**T**

**Tahoe**
4:23
take
4:23
**Talia(phonetic)**
7:25
tell
5:15
**Thank**
6:4 7:22 8:4
think
5:14
third
5:5
thought
6:25
**Tim**
2:2 7:10
time
5:6
times
3:6
**TRANSCRIBE**
9:3

**TRANSCRIBER**
9:2,14,17
**TRANSCRIPT**
9:11
**TRANSCRIPTION**
9:1,5
**TRUE**
9:4
two
3:6

**U**

**U**
5:1
**Uh-huh**
6:20
umbrella
5:2
understand
3:9

**V**

**V**
1:8
**Valley**
4:13

**W**

want
3:12,14 5:9
wanted
3:19
watching
7:14
we'll
6:1
We're
6:25
weapons
5:19,22
welcome
8:5
whereabouts
3:5
wondering
6:11

**X**

x
1:5,12

**Y**

yeah
3:3,21 6:1 7:6,19,21

**Z**

**0**

**000320**
1:15
**0401323[COR**
1:15

**1**

**1**
3:1,3,8,11,12,13,14
  3:16,19,21,22,24
  4:2,5,9,12,15,20,25
  5:3,7,10,18,23 6:1,4
**10-7**
8:2
**12TH**
9:15

**2**

**2**
3:23,25 4:4,7,11,14
  4:17,21 5:1,5,9,12
  5:21,25 6:3,5,6,13
  6:17,21 7:1,4,8,11
  7:15,18,22
**200**
1:15
**2024**
9:15
**20915**
7:2,6
**223**
8:1
**22635**
4:7

**3**

**3**
7:24 8:3,5,8

**4**

**5**

**5**
8:1
**5/5/'87**
4:4
**5:2024cv00249**
1:3
**580**
5:2

**6**

**7**

**748-2965**
7:17
**7B**
5:1

**8**

**805**
7:17

**9**

**911**
3:1,1,8,12,14,19,22
  3:24 4:2,5,9,12,15
  4:20,25 5:3,7,10,18
  5:23 6:1,4,6,6,13,17
  6:21 7:1,4,8,11,15
  7:18,22,24 8:3,5,8



COR 001830

# EXHIBIT 4

# EXHIBIT 4



# EXHIBIT 5

# EXHIBIT 5

Page 1

US DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA


Case No.: 5:2024cv00249


-----------------------------x

Llamas,

                    Plaintiff,

V.


County of Riverside, et al.

                    Defendants.

---------------------------------x



    201. Audio. Radio Dispatch 041423[COR 000328 -
                CONFIDENTIAL]



Page 2

1              FEMALE 1:   Northern Perris County Unit.

2    We're getting a priority 2 call in the 42B 22635

3    Shaw Court.   Anonymous RP advising they were just

4    97.   The location had a visual of a Johnny Llamas,

5    5587 at the location.   He was seen arriving in a

6    dark blue Chevy Tahoe, 7 Boy, Union, Charles, 580.

7    I need additional Frank times three.

8              MALE 1:   3PC (inaudible).

9              FEMALE 1:   3PC --

10              MALE 2:    536.

11              FEMALE 1:   536?

12              MALE 2:    I just took this one vehicle

13   report for the plate you just put out.

14              FEMALE 1:   536, I copy.

15              MALE 1:   (Inaudible).

16              MALE 3:    3PC 41, I'll put my call back

17   in pending and I'll be en route.

18              FEMALE 1:   3PC 41 --

19              MALE 4:   5624, show me en route as well.

20              FEMALE 1:   5624, copy.

21              MALE 1:   (Inaudible) they're en route.

22   Is there any K-9 units logged on subject?

23              FEMALE 1:   Any K-9 units monitoring

24   person.

25              MALE 1:   Yeah, possibly might be armed.



Page 3

1    Is everyone good?

2              FEMALE 1:   K-931, we're getting

3    information that Johnny Llamas is at the address off

4    of Shaw Court, 22635 Shaw.   Were you able to

5    respond.

6              MALE 1:   For myself and K-912 we're en

7    route.

8              FEMALE 1:   K-931 and 12 en route.

9              MALE 4:   5624.

10             FEMALE 1:   Go ahead.

11             MALE 4:   Just for info, Johnny Llamas

12   will run and he's made statements in the past that

13   he will die before he goes back to jail.

14             FEMALE 1:   I copy.   (Inaudible).

15             MALE 2:   5424, copy you showed

16   (inaudible) call as well.

17             FEMALE 1:   I copy.   We're attempting to

18   get him over there now.

19             MALE 1:   And 4PC 44, he might be armed

20   too.   He did a 211 last week.

21             FEMALE 1:   I copy.   The RP did advise

22   that he is known to carry weapons.   And the

23   anonymous RP is no longer 97 and Fowley.

24             MALE 1:   Start 98 (inaudible) sir.

25             FEMALE 1:   Star 98, we have several



Page 4

1  units en route to a priority 2, 22635 Shaw Court in

2  Mead Valley.  It will be Perris County 66066 to

3  reference a Johnny Llamas 5587 Frank times 3 known

4  to carry weapons.  Possibly also has a stolen

5  vehicle. Was seen at this location by an anonymous

6  RP.  Were you able to assist.

7           MALE 1:  We just set out for fuel, so

8  three, four minute before we can take off

9  (inaudible) 66.

10          FEMALE 1:  I copy, approximately 10

11 minute ETA for fuel.

12          MALE 2:   (Inaudible) and then given 787

13 point and make sure that any unit has a 40 as well

14 as spikes to use.

15          FEMALE 1:  Unit with the 40 and unit

16 with spike?

17          MALE 2:   DVC 40, 87 on Richard and

18 Theta.

19          FEMALE 1:  87 at Richard and Theta for

20 units responding.  87 Richard and Theta.

21          MALE 1:  And now it'll be 10 minutes

22 before we can take off so we take probably about 20

23 to 25.  We're refueling now.

24          FEMALE 1:  Star 98, I copy.

25          MALE 2:   We are here already.  Can we



Page 5

1  run that address for context?  And has anybody

2  called the RP yet.

3             FEMALE 1:  The RP requested to remain

4  anonymous and they're no longer there.

5             MALE 2:  (Inaudible) on that address,

6  we hit that address two weeks ago and we got 15

7  stolen cars off the property and Johnny ran from us

8  when we was over there.

9             FEMALE 1:  RPC 44, I copy.  As far as

10  the most recent contact I'm showing from 2020 for a

11  Mary Helen Castro 32471 victim of a 2735.

12  (Inaudible) confirm code for me.

13             MALE 2:  Sure.  (Inaudible) 5424.

14             FEMALE 1:  Go ahead.

15             MALE 2:  Several units that are rolling

16  into this 287 at Richard and Theta.  And do we have

17  any -- do you see or set units, or -- on right now

18  that have access to UC rights.

19             FEMALE 1:  And you said you're to

20  direct?

21             MALE 4:  5624.  I can head back to the

22  station and UC up if he needs but I'm going to

23  spell.

24             MALE 2:  Okay.  Let's go a head and do

25  that and I'll go on standby.



COR 001835

Page 6

1            MALE 1:  Okay.  5624, 1002 please?

2            MALE 4:  5624, 97 to station.

3            FEMALE 1:  I copy.  You've done any

4    dispatch.

5            MALE 1:  None.  Go ahead.

6            FEMALE 1:  I'm getting a request from

7    Harupa, if you can copy on their car to car when

8    available.  Reference a possible armed subject.

9    They're where your 106 referenced this call.

10            MALE 1:  Okay.  Copy that.  And we're

11    just about to take off here so I'd say about 10

12    minutes to your call, and we'll copy on Harupa car

13    to car.

14            FEMALE 1:  I copy.  Thank you, sir.

15            MALE 1:  It was Chalti, right?  Not

16    primary.

17            FEMALE 1:  Affirmative.  Car to car

18    Jurupa.  Repairs 3660 check.

19            MALE 1:  24.

20            FEMALE 1:  24.  Repairs 31 and 34

21    confirming 97 to 87 point.

22            MALE 1:  No, for now.

23            FEMALE 1:  I copy.

24            MALE 5:  This is 150.  I'm out with him

25    as well.



Page 7

1                    FEMALE 1:    150, I copy.

2                    MALE 2:    150 is passing us now.  K-9 is

3     passing us.  K-931, the vehicle is now westbound

4     Richard 103.

5                    FEMALE 1:    (Inaudible) that's on Shaw.

6     The vehicle now westbound Richard.

7                    MALE 6:    SR 103 --

8                    FEMALE 1:    SR 103 you cut off.

9                    MALE 6:    SR 103, attempted spikes.  They

10    were not successful.

11                   FEMALE 1:    Copy, attempted spikes not

12    successful.

13                   MALE 6:    Where'd he go.

14                   MALE 2:    536, I'm behind him.

15                   FEMALE 1:    536 (inaudible) 20.

16                   MALE 2:    Highway 74.  He's turning off

17    of river road.

18                   FEMALE 1:    Highway 74 and river.

19                   MALE 2:    We're on river (inaudible).

20                   FEMALE 1:    River (inaudible)?

21                   MALE 2:    Turning off of Mead Ave.

22                   FEMALE 1:    Turning off of Mead.

23                   MALE 1:    Channel 162, (inaudible)

24    against rolling the end.

25                   MALE 3:    Channel 18 for the helicopter.



Page 8

1          FEMALE 1:   Stern, any need direct.

2          MALE 1:   Oh, five out.

3          FEMALE 1:   Copy.   Five out.   536,

4    advisor updated 20.

5          MALE 2:   On Jarvis.

6          FEMALE 1:   Jarvis in what cross?

7          MALE 2:   Jarvis and Wallace.

8          FEMALE 1:   Jarvis and Wallace.   Advisor

9    on pursuit?

10          MALE 2:   Negative at this time.

11          FEMALE 1:   Negative on a pursuit as of

12    now.

13          MALE 1:   Any other units set up -- get

14    ready, set up spikes in case he turns around.

15    Channel 162.   Let's get some spikes on Highway 74.

16          FEMALE 1:   You need two spike at Highway

17    74.

18          MALE 1:   4PC 40, we're now here in

19    Highway 74.

20          FEMALE 1:   4PC 40, en route.

21          MALE 1:   4PC 40 en route to the station.

22    Updated 21 Garfield towards Robert Street.

23          FEMALE 1:   Garfield towards Roberts.

24          MALE 1:   1031, the driver was wearing a

25    dark hoodie, had a dog in the front seat.



COR 001838

Page 9

```
1              FEMALE 1:   Copy.   The driver was last
2    seen wearing a dark hoodie sweater with a dog in the
3    front seat.   536, do you have an updated 20?
4              MALE 2:    Negative.
5              FEMALE 1:   Did you lose the vehicle?
6              MALE 2:    I lost visual on Robert
7    Street.
8              FEMALE 1:   Vehicle loss -- correction.
9    Lost visual at Roberts.
10             MALE 1:    (Inaudible) North or South by
11   any chance?
12             FEMALE 1:   536?
13             MALE 2:    (Inaudible.)
14             FEMALE 1:   Confirming lost visual
15   northbound?
16             MALE 2:    Confirm.
17             FEMALE 1:   Lost visual of the vehicle
18   northbound Roberts.
19             MALE 2:    (Inaudible) unit at Greenwald
20   and Maurizio (ph) and Laurie (inaudible).
21             FEMALE 1:   Units at Greenwald and
22   Mauricio.
23             MALE 1:   44 ahead there.   That's where
24   they used to come out.   They've been dumping the
25   vehicles at that location too.
```



Page 10

1               FEMALE 1:  Unit with HT-04428 advise on

2    your Code Red?  Perry City unit with radio 04428

3    advise on your Code Red?  (Inaudible) 32, can you

4    advise on your HT number?

5               MALE 3:   4427 on Code 4.

6               MALE 2:   Mm-hmm.

7               FEMALE 1:  I copy.

8               FEMALE 1:  Watch commander confirming

9    you copied this HT is not logged on that hit that

10   Code Red.  04428.

11              MALE 1:  I copy.

12              FEMALE 1:  (Inaudible.)

13              MALE 3:   10-4134 what's en route.

14              FEMALE 1:  Confirm.

15              MALE 2:   Two out from the Garfield

16   westbound.  And then what's the car we're looking

17   for.

18              FEMALE 1:  It's a dark blue Chevy Tahoe.

19   License 7 Boy Union Charles 580.  Driver was wearing

20   a dark hoodie sweater and had a dog in the front

21   seat.  And it'll have a faded hood.

22              MALE 3:   (Inaudible).

23              FEMALE 1:  Copy.

24              MALE 2:   It was Garfield and Mauricio

25   last known, right.



COR 001840

1            FEMALE 1:  They -- the unit lost visual

2    northbound of Roberts.  We were trying to set up a

3    perimeter at Greenwald and Mauricio.  Unit at the

4    corner of Santa Cino and Perris advise?  On 1033,

5    five step 50, safety check?  On 1033.  Five step 50,

6    safety check?

7            MALE 3:   Code 4, 108.

8            FEMALE 1:  4 in 8.

9            MALE 1:  Perris 150.

10           FEMALE 1:  Perris 150.

11           MALE 2:   That's going for us.  We lost

12   visual of the guy.  You can drop the marker.

13           FEMALE 1:  Copy and advise.  Minimum or

14   10-34?

15           MALE 2:   Unit 10-34 we're now -- we're

16   out looking for.

17           FEMALE 1:  Copy.  It's 1034P, 10-34.

18           MALE 3:   5450.

19           FEMALE 1:  Go ahead.

20           MALE 3:   Can one of the Perris units

21   advise us if Victor has that LA sticker and cowboy

22   sticker on the rear.

23           FEMALE 1:  536, can you advise?

24           MALE 2:   Yeah.  He did have a cowboy

25   star sticker on the rear window.



COR 001841

Page 12

```
 1              MALE 3:   Negative, they didn't have a
 2   visual of the sticker.
 3              FEMALE 1:  I copy, per 174 it will have
 4   a cowboy sticker.
 5              MALE 1:  (Inaudible) 40, from the flock
 6   camera that's going to have a large cowboy sticker
 7   in the rear of the vehicle.  And then on the right
 8   bottom side of the rear window can have an LA Dodger
 9   sticker.
10              FEMALE 1:  Copy per the flock camera
11   we'll have a large cowboy sticker on the rear and a
12   right bottom side.  LA large Dodger sticker.  Perry
13   897.
14              MALE 3:   (Inaudible).
15              FEMALE 1:  Advise your primary
16   Greenwald.
17              MALE 3:   Aubrey.
18              FEMALE 1:  Copy out with the vehicle.
19   Aubrey and Greenwald.
20              MALE 1:  (Inaudible) same traffic.
21   Looks to be unoccupied.
22              FEMALE 1:  Copy.  Vehicle appears
23   unoccupied.
24              MALE 3:   134.  So we get some units
25   over there and starts setting up a wide perimeter.
```



Page 13

```
 1                 FEMALE 1:  And it's to start to Aubrey
 2   and Greenwald.
 3                 MALE 1:  5 Frank 223.  Show me out at
 4   Susan and Greenwald.  Cover this north and western
 5   premier.
 6                 MALE 2:  (Inaudible.)
 7                 FEMALE 1:  Copy.  Clearing the vehicle.
 8                 MALE 3:  We got a other unit, Mauricio
 9   Greenwald.
10                 FEMALE 1:  Unit 2, Mairicio Greenwald.
11                 MALE 3:  4PC 44.  I'm already 97 at
12   location.
13                 FEMALE 1:  4PC 4497, Mauricio and
14   Greenwald.  Unit to 74 in Watson Canyon.
15                 MALE 1:  252.  I can take that.
16                 FEMALE 1:  All right.  252 en route.
17                 MALE 2:  3697** in the area.  Be
18   moving.
19                 FEMALE 1:  I copy.
20                 MALE 2:  SR 103.
21                 FEMALE 1:  (Inaudible.)
22                 MALE 3:  (Inaudible) vehicle's clear.
23                 FEMALE 1:  Copy.  Vehicle clear and 174
24   reference speed.
25                 MALE 1:  Sheriff 174.  Any weapons in
```



Page 14

1   the vehicle?

2          FEMALE 1:  34 advise?  34 Canyon 62

3   advise if there was weapons in the vehicle?

4          MALE 3:   There's 150 -- the vehicle's

5   clear.  Three repairs 34 standby with us and we'll

6   be setting up a large perimeter around the vehicle.

7          FEMALE 1:  Copy of vehicle's clear and

8   three (inaudible) 34 standing by with the vehicle.

9   And 174 and following reference that HT that hit

10  their Code Red, it's coming from the station.

11         MALE 2:   5724.  I'm at the station.

12  I'll check on it.

13         FEMALE 1:  Copy.  Thank you.  It's going

14  to be HT radio 04428.  It's not logged.

15         MALE 1:  One minute.  Dispatch officer.

16         FEMALE 1:  I copy.

17         MALE 2:   (Inaudible) 50 units out with

18  that car, if you go straight across the street to

19  the east, Milo and Greenwald, there's two subjects

20  standing outside on the front porch.  One you can

21  just ask them see if they need to saw run somewhere.

22         MALE 3:   And 159, just for info, when

23  he initially took off back at our staging point, he

24  was being followed by a older gray colored possibly

25  Chevy Silverado.  It had like a dirt bike or



Page 15

1  motorcycle in the back of it.  So (inaudible) the

2  description I can give you at this point, but might

3  be a vehicle we can look for as well.

4            MALE 1:  Copy, gray Chevy Silverado,

5  possibly motorcycle at the back.

6            FEMALE 1:  And 174 reference showing at

7  the station, where we could afford a clearance.

8            MALE 1:  (Inaudible).

9            FEMALE 1:  Copy on units.  It's 1034.

10           MALE 1:  1031, myself (inaudible), the

11 car.  We're going to check and see if there's any

12 DOT from the footprint.

13           FEMALE 1:  K-931and 12 out with the

14 vehicle.  We'll be checking for footprints for a

15 DOT.

16           MALE 2:   Press 174.

17           FEMALE 1:  Press 174.

18           MALE 2:   We are on a map right now.  I

19 just want to confirm that -- if we have a unit at

20 the end of Aubrey Street.

21           MALE 3:   53536.

22           FEMALE 1:  53536, now at the end of

23 Aubrey Lake.

24           MALE 2:   (Inaudible) it's going to be

25 just east of Robert Street and Garfield Road.  It's



Page 16

1   for the unit.  It's -- I just need to get pulled

2   out.

3               FEMALE 1:  1PC 49.

4               MALE 1:  189.

5               FEMALE 1:  189.

6               MALE 1:  (Inaudible).

7               FEMALE 1:  I copy.  Thank you sir.

8               MALE 1:  This unit (inaudible) looks

9   like the (inaudible) pretty good.

10              FEMALE 1:  Copy.  You're requesting 1185

11  for the unit east of Robert?  Can you advise the

12  primary?

13              MALE 2:  Robert and Garfield.

14              FEMALE 1:  I copy Robert and Garfield.

15              MALE 2:  (Inaudible).

16              FEMALE 1:  344 traffic.

17              MALE 1:  Disregard.

18              FEMALE 1:  I copy.

19              MALE 2:  (Inaudible).

20              FEMALE 1:  Copy.  53536 (inaudible) been

21  advised they're en route.

22              MALE 2:  Copy.  Thank you.  Do we have

23  an EPA.

24              FEMALE 1:  Negative.  I could read Lane

25  9.  One moment.


MAGNA
CONFIDENTIAL
LEGAL SERVICES

COR 001846

Page 17

```
 1                MALE 2:   R 1931.

 2                MALE 1:  Go ahead, sir.

 3                MALE 2:   Any significant signatures

 4    around in these yard where we're standing.

 5                FEMALE 1:  53536, it'll be 30 minutes.

 6                MALE 1:  (Inaudible) the adjacent and

 7    connecting properties and a couple were past it.

 8    I've got nothing so far.  Nothing, sir.

 9                FEMALE 1:  150 or 174.  Reference the

10    call on Shaw.  We're still patched with (inaudible).

11    Did we want to keep the patch or drop it?

12                MALE 2:   Channel 162.

13                FEMALE 1:  Go ahead.

14                MALE 2:   Did anyone see the driver?

15    Just to confirm the PID that was our primary

16    suspect.

17                FEMALE 1:  536?

18                MALE 2:   Negative.  No vision on the

19    driver.

20                FEMALE 1:  104.  Did anybody see the

21    driver for a positive ID?

22                MALE 2:   (Inaudible) the driver.

23    That's Johnny LIamas.

24                FEMALE 1:  Okay.

25                MALE 1:  174, same here.  10162 copy.
```



COR 001847

Page 18

1    And then there's -- Star 9, does that perimeter look

2    pretty much good?  I saw it around this block.

3                FEMALE 1:  10931.

4                MALE 1:  (Inaudible).

5                MALE 2:   Actually you got to be a

6    little bit closer right there.  Stand right there.

7                MALE 1:  Channel 162.

8                FEMALE 1:  Go ahead.

9                MALE 1:  Based on Star 9's, video that

10   I'm watching.  I have a lot of deputies doing

11   independent searching of an armed suspect.  I

12   suggest they stay street side.

13                FEMALE 1:  For all units on the

14   perimeter reference the armed suspect, remain on

15   street side.

16                MALE 1:  (Inaudible) if you had a heat

17   signature or an indication, the suspect may be

18   nearby.  Just let Star 9.  Check it out.  And if we

19   need to follow up with a team we will.  Star 9,

20   K-931 behind the trailer.  First trailer, I'm

21   illuminating now.  On the ground we have a

22   (inaudible).  Perris 107, which unit was at and

23   where you at?

24                FEMALE 1:  31.

25                MALE 1:  We're on Greenwald just south



Page 19

1   of Roberts, that first yard.

2                   MALE 3:   (Inaudible).

3                   FEMALE 1:  Go ahead.

4                   MALE 3:   Oneleg at 95.

5                   FEMALE 1:  One leg at 95.

6                   MALE 3:   Can you show me out on PC 66?

7   I'm going to be on the perimeter at Greenwald and

8   phonetically, Mary Adam, Union Robert Ida Charles at

9   Ocean.

10                  FEMALE 1:  (Inaudible).

11                  MALE 1:  For that spot there, it's

12  looking like farm equipment or some sort of heavy

13  equipment or rocks.  I'm not getting any significant

14  resource unless he's under one of those cars in that

15  trailer.  (Inaudible).

16                  MALE 2:   526.

17                  FEMALE 1:  526?

18                  MALE 2:   (Inaudible) that a two vehicle

19  confirming, I came back to an address in

20  (inaudible).

21                  FEMALE 1:  Affirm 2018 BMW returns to a

22  Dwayne or Keisha Moore 29272 (inaudible).

23                  MALE 2:   Hey Bob, any of your guys in

24  UC cars.

25                  MALE 1:  Yeah, there's about three or



Page 20

1    four of us in UC cars.  Otherwise we've got stealth.

2                MALE 2:   Can you guys go check out that

3    address.

4                MALE 1:  Okay.  That unit down with the

5    abandoned car, is there any chance you can see a

6    footprint, possible direction out of the driver's

7    seat?  We try get this real fine speed gravel all

8    over.

9    New Speaker: Copy.  Thanks.

10               FEMALE 1:  One leg at 95?

11               MALE 3:   (Inaudible).

12               FEMALE 1:  Update your 20.

13               MALE 1:  I'm on the perimeter on the PC

14   66 file.

15               FEMALE 1:  Okay.

16               MALE 2:   Car to car, Star 9, first 174.

17   If nothing else sir, we can start breaking down the

18   perimeter, and we'll just need a UC ride to a road

19   here for a little bit and I'll need a unit to come

20   and recover theTahoe.

21               MALE 1:  Got it.  I copy direct.  I'm

22   not picking up anything.

23               MALE 2:   Thanks.  Copy sir.  Thanks for

24   your help.  To all the perimeter units you can break

25   it down and if I could have a primary 87 year



COR 001850

Page 21

1   Greenwald and Aubrey for the recovery.

2              FEMALE 1:  All units on the armed

3   subject call if you can break down the perimeter and

4   I'll be dropping a (inaudible).

5              MALE 1:  Welcome anytime (inaudible).

6              MALE 2:   Dispatch.  Thanks for help.

7              FEMALE 1:  (Inaudible) copy it.

8              MALE 1:  44.

9              FEMALE 1:  40, you're recovering the

10  vehicle.

11             MALE 1:  I affirm.

12             FEMALE 1:  Sure.

13             MALE 1:  51024.

14             FEMALE 1:  Go ahead.

15             MALE 1:  I'll be in the area of the

16  perimeter in a UC.  I'll be roving.

17             FEMALE 1:  Sure.

18             MALE 4:  (Inaudible).

19             FEMALE 1:  Go ahead.

20             MALE 4:  I believe it's 9 Ave Charles

21  Henry, 606.

22             FEMALE 1:  (Inaudible) current 2013 Ford

23  out of Perris.

24             MALE 1:  (Inaudible).

25             FEMALE 1:  Go ahead.



COR 001851

Page 22

1            MALE 1:  Can I get a 1185 please?

2            FEMALE 1:  Nothing special.  I copy.

3            MALE 1:  No special.  Thank you.

4            FEMALE 1:  Copy.  Standby.

5            MALE 1:  (Inaudible).

6            FEMALE 1:  (Inaudible).  Go ahead.

7            MALE 1:  3167 Young Victor David, 765,

8    near Highway 74 just west of Sophie.

9            FEMALE 1:  74 west of Sophie.  3PC 48.

10   It'll be a brother's tow.  29 current eight Honda at

11   a Paris, west Rodriguez.

12           MALE 1:  (Inaudible) 52497, the station.

13           FEMALE 1:  On minimum.  5PC 40, section

14   3PC 40.

15           MALE 1:  3PC 40.  Can we try to obtain

16   ETA from Brother Hill?

17           FEMALE 1:  Confirm standby.  PC 40.

18           MALE 1:  Go ahead ma'am.

19           FEMALE 1:  Brothers to advise they're at

20   22635 Shaw Court and unable to locate any deputy.

21   Can you advise about a 20.

22           MALE 1:  I'm sorry ma'am, it's going to

23   be Greenwald and Aubrey Street.

24           FEMALE 1:  Greenwald and Aubrey Street.

25   I'll advise.



COR 001852

Page 23

1                 CERTIFICATE OF TRANSCRIPTION

2    I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT

3    I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;

4     AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT

5                   TRANSCRIPTION OF MY NOTES.

6    I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL

7    OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE

8    OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH

9      THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE

10                          ACTION.

11   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

12     APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

13   UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

14                  CERTIFYING TRANSCRIBER.

15           DATED THIS 12TH DAY OF SEPTEMBER 2024

16              *Stephen Simpson*

17            STEPHEN SIMPSON, TRANSCRIBER

18

19

20

21

22

23

24

25



MAGNA ▶
CONFIDENTIAL
LEGAL SERVICES

COR 001853

# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



**MAGNA**
LEGAL SERVICES
CONFIDENTIAL

COR 001854

Page 1

**A**

**abandoned**
20:5
**able**
3:4 4:6
**access**
5:18
**ACTION**
23:9,10
**Adam**
19:8
**additional**
2:7
**address**
3:3 5:1,5,6 19:19
  20:3
**adjacent**
17:6
**advise**
3:21 10:1,3,4 11:4,13
  11:21,23 12:15 14:2
  14:3 16:11 22:19,21
  22:25
**advised**
16:21
**advising**
2:3
**advisor**
8:4,8
**affirm**
19:21 21:11
**Affirmative**
6:17
**afford**
15:7
**ago**
5:6
**ahead**
3:10 5:14 6:5 9:23
  11:19 17:2,13 18:8
  19:3 21:14,19,25
  22:6,18
**al**
1:10
**AND/OR**

23:13
**anonymous**
2:3 3:23 4:5 5:4
**anybody**
5:1 17:20
**anytime**
21:5
**appears**
12:22
**APPLY**
23:12
**approximately**
4:10
**area**
13:17 21:15
**armed**
2:25 3:19 6:8 18:11
  18:14 21:2
**arriving**
2:5
**assist**
4:6
**attempted**
7:9,11
**attempting**
3:17
**ATTORNEY**
23:6,8
**Aubrey**
12:17,19 13:1 15:20
  15:23 21:1 22:23,24
**Audio**
1:15 23:3
**AUTHORIZED**
23:3
**available**
6:8
**Ave**
7:21 21:20

**B**

**back**
2:16 3:13 5:21 14:23
  15:1,5 19:19
**Based**
18:9

**believe**
21:20
**bike**
14:25
**bit**
18:6 20:19
**block**
18:2
**blue**
2:6 10:18
**BMW**
19:21
**Bob**
19:23
**bottom**
12:8,12
**Boy**
2:6 10:19
**break**
20:24 21:3
**breaking**
20:17
**Brother**
22:16
**brother's**
22:10
**Brothers**
22:19

**C**

**CALIFORNIA**
1:1
**call**
2:2,16 3:16 6:9,12
  17:10 21:3
**called**
5:2
**camera**
12:6,10
**Canyon**
13:14 14:2
**car**
6:7,7,12,13,17,17
  10:16 14:18 15:11
  20:5,16,16
**carry**

3:22 4:4
**cars**
5:7 19:14,24 20:1
**case**
1:3 8:14
**Castro**
5:11
**CENTRAL**
1:1
**CERTIFICATE**
23:1
**CERTIFICATION**
23:11
**CERTIFY**
23:2,6
**CERTIFYING**
23:14
**Chalti**
6:15
**chance**
9:11 20:5
**Channel**
7:23,25 8:15 17:12
  18:7
**Charles**
2:6 10:19 19:8 21:20
**check**
6:18 11:5,6 14:12
  15:11 18:18 20:2
**checking**
15:14
**Chevy**
2:6 10:18 14:25 15:4
**Cino**
11:4
**City**
10:2
**clear**
13:22,23 14:5,7
**clearance**
15:7
**Clearing**
13:7
**closer**
18:6
**code**



5:12 10:2,3,5,10
  11:7 14:10
**colored**
14:24
**come**
9:24 20:19
**coming**
14:10
**commander**
10:8
**CONFIDENTIAL**
1:16
**confirm**
5:12 9:16 10:14
  15:19 17:15 22:17
**confirming**
6:21 9:14 10:8 19:19
**CONNECTED**
23:8
**connecting**
17:7
**contact**
5:10
**context**
5:1
**CONTROL**
23:13
**copied**
10:9
**copy**
2:14,20 3:14,15,17
  3:21 4:10,24 5:9 6:3
  6:7,10,12,14,23 7:1
  7:11 8:3 9:1 10:7,11
  10:23 11:13,17 12:3
  12:10,18,22 13:7,19
  13:23 14:7,13,16
  15:4,9 16:7,10,14
  16:18,20,22 17:25
  20:9,21,23 21:7
  22:2,4
**corner**
11:4
**CORRECT**
23:4
**correction**

9:8
**COUNSEL**
23:6,8
**County**
1:10 2:1 4:2
**couple**
17:7
**Court**
1:1 2:3 3:4 4:1 22:20
**Cover**
13:4
**cowboy**
11:21,24 12:4,6,11
**cross**
8:6
**current**
21:22 22:10
**cut**
7:8

**D**

**dark**
2:6 8:25 9:2 10:18,20
**DATED**
23:15
**David**
22:7
**DAY**
23:15
**Defendants**
1:11
**deputies**
18:10
**deputy**
22:20
**description**
15:2
**die**
3:13
**direct**
5:20 8:1 20:21 23:13
**direction**
20:6 23:13
**dirt**
14:25
**dispatch**

1:15 6:4 14:15 21:6
**Disregard**
16:17
**DISTRICT**
1:1,1
**Dodger**
12:8,12
**dog**
8:25 9:2 10:20
**doing**
18:10
**DOT**
15:12,15
**driver**
8:24 9:1 10:19 17:14
  17:19,21,22
**driver's**
20:6
**drop**
11:12 17:11
**dropping**
21:4
**dumping**
9:24
**DVC**
4:17
**Dwayne**
19:22

**E**

**east**
14:19 15:25 16:11
**eight**
22:10
**EMPLOYEE**
23:7
**en**
2:17,19,21 3:6,8 4:1
  8:20,21 10:13 13:16
  16:21
**EPA**
16:23
**equipment**
19:12,13
**et**
1:10

**ETA**
4:11 22:16

**F**

**faded**
10:21
**far**
5:9 17:8
**farm**
19:12
**FEMALE**
2:1,9,11,14,18,20,23
  3:2,8,10,14,17,21
  3:25 4:10,15,19,24
  5:3,9,14,19 6:3,6,14
  6:17,20,23 7:1,5,8
  7:11,15,18,20,22
  8:1,3,6,8,11,16,20
  8:23 9:1,5,8,12,14
  9:17,21 10:1,7,8,12
  10:14,18,23 11:1,8
  11:10,13,17,19,23
  12:3,10,15,18,22
  13:1,7,10,13,16,19
  13:21,23 14:2,7,13
  14:16 15:6,9,13,17
  15:22 16:3,5,7,10
  16:14,16,18,20,24
  17:5,9,13,17,20,24
  18:3,8,13,24 19:3,5
  19:10,17,21 20:10
  20:12,15 21:2,7,9
  21:12,14,17,19,22
  21:25 22:2,4,6,9,13
  22:17,19,24
**file**
20:14 23:3
**FINANCIALLY**
23:9
**fine**
20:7
**first**
18:20 19:1 20:16
**five**
8:2,3 11:5,5
**flock**



Page 3

12:5,10
**follow**
18:19
**followed**
14:24
**following**
14:9
**footprint**
15:12 20:6
**footprints**
15:14
**Ford**
21:22
**FOREGOING**
23:4,11
**four**
4:8 20:1
**Fowley**
3:23
**Frank**
2:7 4:3 13:3
**front**
8:25 9:3 10:20 14:20
**fuel**
4:7,11
**FURTHER**
23:6

---
**G**

**Garfield**
8:22,23 10:15,24
    15:25 16:13,14
**getting**
2:2 3:2 6:6 19:13
**give**
15:2
**given**
4:12
**go**
3:10 5:14,24,25 6:5
    7:13 11:19 14:18
    17:2,13 18:8 19:3
    20:2 21:14,19,25
    22:6,18
**goes**
3:13

**going**
5:22 11:11 12:6
    14:13 15:11,24 19:7
    22:22
**good**
3:1 16:9 18:2
**gravel**
20:7
**gray**
14:24 15:4
**Greenwald**
9:19,21 11:3 12:16
    12:19 13:2,4,9,10
    13:14 14:19 18:25
    19:7 21:1 22:23,24
**ground**
18:21
**guy**
11:12
**guys**
19:23 20:2

---
**H**

**Harupa**
6:7,12
**head**
5:21,24
**heat**
18:16
**heavy**
19:12
**Helen**
5:11
**helicopter**
7:25
**help**
20:24 21:6
**Henry**
21:21
**Hey**
19:23
**Highway**
7:16,18 8:15,16,19
    22:8
**Hill**
22:16

**hit**
5:6 10:9 14:9
**Honda**
22:10
**hood**
10:21
**hoodie**
8:25 9:2 10:20
**HT**
10:4,9 14:9,14
**HT-04428**
10:1

---
**I**

**ID**
17:21
**Ida**
19:8
**illuminating**
18:21
**inaudible**
2:8,15,21 3:14,16,24
    4:9,12 5:5,12,13 7:5
    7:15,19,20,23 9:10
    9:13,19,20 10:3,12
    10:22 12:5,14,20
    13:6,21,22 14:8,17
    15:1,8,10,24 16:6,8
    16:9,15,19,20 17:6
    17:10,22 18:4,16,22
    19:2,10,15,18,20,22
    20:11 21:4,5,7,18
    21:22,24 22:5,6,12
**independent**
18:11
**indication**
18:17
**info**
3:11 14:22
**information**
3:3
**initially**
14:23
**INTERESTED**
23:9
**it'll**

**4:21 10:21 17:5**
    22:10

---
**J**

**jail**
3:13
**Jarvis**
8:5,6,7,8
**Johnny**
2:4 3:3,11 4:3 5:7
    17:23
**Jurupa**
6:18

---
**K**

**K-9**
2:22,23 7:2
**K-912**
3:6
**K-931**
3:2,8 7:3 18:20
**K-931and**
15:13
**keep**
17:11
**Keisha**
19:22
**known**
3:22 4:3 10:25

---
**L**

**LA**
11:21 12:8,12
**Lake**
15:23
**Lane**
16:24
**large**
12:6,11,12 14:6
**Laurie**
9:20
**leg**
19:5 20:10
**Let's**
5:24 8:15
**LIamas**



COR 001857

17:23
**License**
10:19
**little**
18:6 20:19
**Llamas**
1:6 2:4 3:3,11 4:3
**locate**
22:20
**location**
2:4,5 4:5 9:25 13:12
**logged**
2:22 10:9 14:14
**longer**
3:23 5:4
**look**
15:3 18:1
**looking**
10:16 11:16 19:12
**looks**
12:21 16:8
**lose**
9:5
**loss**
9:8
**lost**
9:6,9,14,17 11:1,11
**lot**
18:10

---

**M**

**ma'am**
22:18,22
**Mairicio**
13:10
**MALE**
2:8,10,12,15,16,19
  2:21,25 3:6,9,11,15
  3:19,24 4:7,12,17
  4:21,25 5:5,13,15
  5:21,24 6:1,2,5,10
  6:15,19,22,24 7:2,7
  7:9,13,14,16,19,21
  7:23,25 8:2,5,7,10
  8:13,18,21,24 9:4,6
  9:10,13,16,19,23

10:5,6,11,13,15,22
10:24 11:7,9,11,15
11:18,20,24 12:1,5
12:14,17,20,24 13:3
13:6,8,11,15,17,20
13:22,25 14:4,11,15
14:17,22 15:4,8,10
15:16,18,21,24 16:4
16:6,8,13,15,17,19
16:22 17:1,2,3,6,12
17:14,18,22,25 18:4
18:5,7,9,16,25 19:2
19:4,6,11,16,18,23
19:25 20:2,4,11,13
20:16,21,23 21:5,6
21:8,11,13,15,18,20
21:24 22:1,3,5,7,12
22:15,18,22
**map**
15:18
**marker**
11:12
**Mary**
5:11 19:8
**Mauricio**
9:22 10:24 11:3 13:8
  13:13
**Maurizio**
9:20
**Mead**
4:2 7:21,22
**MEANS**
23:12
**Milo**
14:19
**minimum**
11:13 22:13
**minute**
4:8,11 14:15
**minutes**
4:21 6:12 17:5
**Mm-hmm**
10:6
**moment**
16:25
**monitoring**

2:23
**Moore**
19:22
**motorcycle**
15:1,5
**moving**
13:18

---

**N**

**near**
22:8
**nearby**
18:18
**need**
2:7 8:1,16 14:21 16:1
  18:19 20:18,19
**needs**
5:22
**Negative**
8:10,11 9:4 12:1
  16:24 17:18
**New**
20:9
**north**
9:10 13:4
**northbound**
9:15,18 11:2
**Northern**
2:1
**NOTES**
23:5
**number**
10:4

---

**O**

**obtain**
22:15
**Ocean**
19:9
**officer**
14:15
**Oh**
8:2
**Okay**
5:24 6:1,10 17:24
  20:4,15

**older**
14:24
**Oneleg**
19:4
**outside**
14:20

---

**P**

**PAGES**
23:4
**Paris**
22:11
**PARTIES**
23:7
**PARTY**
23:8
**passing**
7:2,3
**patch**
17:11
**patched**
17:10
**PC**
19:6 20:13 22:17
**pending**
2:17
**perimeter**
11:3 12:25 14:6 18:1
  18:14 19:7 20:13,18
  20:24 21:3,16
**Perris**
2:1 4:2 11:4,9,10,20
  18:22 21:23
**Perry**
10:2 12:12
**person**
2:24
**ph**
9:20
**phonetically**
19:8
**picking**
20:22
**PID**
17:15
**Plaintiff**



1:7
**plate**
2:13
**please**
6:1 22:1
**point**
4:13 6:21 14:23 15:2
**porch**
14:20
**positive**
17:21
**possible**
6:8 20:6
**possibly**
2:25 4:4 14:24 15:5
**premier**
13:5
**Press**
15:16,17
**pretty**
16:9 18:2
**primary**
6:16 12:15 16:12
17:15 20:25
**priority**
2:2 4:1
**probably**
4:22
**properties**
17:7
**property**
5:7
**pulled**
16:1
**pursuit**
8:9,11
**put**
2:13,16

————————
**Q**
————————
**R**
————————

**R**
17:1
**radio**
1:15 10:2 14:14

**ran**
5:7
**read**
16:24
**ready**
8:14
**real**
20:7
**rear**
11:22,25 12:7,8,11
**recover**
20:20
**recovering**
21:9
**recovery**
21:1
**Red**
10:2,3,10 14:10
**reference**
4:3 6:8 13:24 14:9
15:6 17:9 18:14
**referenced**
6:9
**refueling**
4:23
**RELATIVE**
23:7
**remain**
5:3 18:14
**repairs**
6:18,20 14:5
**report**
2:13
**REPRODUCTION**
23:12
**request**
6:6
**requested**
5:3
**requesting**
16:10
**resource**
19:14
**respond**
3:5
**responding**

4:20
**returns**
19:21
**Richard**
4:17,19,20 5:16 7:4,6
**ride**
20:18
**right**
5:17 6:15 10:25 12:7
12:12 13:16 15:18
18:6,6
**rights**
5:18
**river**
7:17,18,19,20
**Riverside**
1:10
**road**
7:17 15:25 20:18
**Robert**
8:22 9:6 15:25 16:11
16:13,14 19:8
**Roberts**
8:23 9:9,18 11:2 19:1
**rocks**
19:13
**Rodriguez**
22:11
**rolling**
5:15 7:24
**route**
2:17,19,21 3:7,8 4:1
8:20,21 10:13 13:16
16:21
**roving**
21:16
**RP**
2:3 3:21,23 4:6 5:2,3
**RPC**
5:9
**run**
3:12 5:1 14:21

————————
**S**
————————

**safety**
11:5,6

**Santa**
11:4
**saw**
14:21 18:2
**searching**
18:11
**seat**
8:25 9:3 10:21 20:7
**section**
22:13
**see**
5:17 14:21 15:11
17:14,20 20:5
**seen**
2:5 4:5 9:2
**SEPTEMBER**
23:15
**set**
4:7 5:17 8:13,14 11:2
**setting**
12:25 14:6
**Shaw**
2:3 3:4,4 4:1 7:5
17:10 22:20
**Sheriff**
13:25
**show**
2:19 13:3 19:6
**showed**
3:15
**showing**
5:10 15:6
**side**
12:8,12 18:12,15
**signature**
18:17
**signatures**
17:3
**significant**
17:3 19:13
**Silverado**
14:25 15:4
**SIMPSON**
23:2,17
**sir**
3:24 6:14 16:7 17:2,8



COR 001859

20:17,23
**Sophie**
22:8,9
**sorry**
22:22
**sort**
19:12
**south**
9:10 18:25
**Speaker**
20:9
**special**
22:2,3
**speed**
13:24 20:7
**spell**
5:23
**spike**
4:16 8:16
**spikes**
4:14 7:9,11 8:14,15
**spot**
19:11
**SR**
7:7,8,9 13:20
**staging**
14:23
**Stand**
18:6
**standby**
5:25 14:5 22:4,17
**standing**
14:8,20 17:4
**star**
3:25 4:24 11:25 18:1
    18:9,18,19 20:16
**start**
3:24 13:1 20:17
**starts**
12:25
**statements**
3:12
**station**
5:22 6:2 8:21 14:10
    14:11 15:7 22:12
**stay**

18:12
**stealth**
20:1
**step**
11:5,5
**STEPHEN**
23:2,17
**Stern**
8:1
**sticker**
11:21,22,25 12:2,4,6
    12:9,11,12
**stolen**
4:4 5:7
**straight**
14:18
**street**
8:22 9:7 14:18 15:20
    15:25 18:12,15
    22:23,24
**subject**
2:22 6:8 21:3
**subjects**
14:19
**successful**
7:10,12
**suggest**
18:12
**sure**
4:13 5:13 21:12,17
**Susan**
13:4
**suspect**
17:16 18:11,14,17
**sweater**
9:2 10:20

_____
**T**
_____
**Tahoe**
2:6 10:18
**take**
4:8,22,22 6:11 13:15
**team**
18:19
**Thank**
6:14 14:13 16:7,22

22:3
**Thanks**
20:9,23,23 21:6
**Theta**
4:18,19,20 5:16
**theTahoe**
20:20
**three**
2:7 4:8 14:5,8 19:25
**time**
8:10
**times**
2:7 4:3
**tow**
22:10
**traffic**
12:20 16:16
**trailer**
18:20,20 19:15
**TRANSCRIBE**
23:3
**TRANSCRIBER**
23:2,14,17
**TRANSCRIPT**
23:11
**TRANSCRIPTION**
23:1,5
**TRUE**
23:4
**try**
20:7 22:15
**trying**
11:2
**turning**
7:16,21,22
**turns**
8:14
**two**
5:6 8:16 10:15 14:19
    19:18

_____
**U**
_____
**UC**
5:18,22 19:24 20:1
    20:18 21:16
**unable**

22:20
**Union**
2:6 10:19 19:8
**unit**
2:1 4:13,15,15 9:19
    10:1,2 11:1,3,15
    13:8,10,14 15:19
    16:1,8,11 18:22
    20:4,19
**units**
2:22,23 4:1,20 5:15
    5:17 8:13 9:21
    11:20 12:24 14:17
    15:9 18:13 20:24
    21:2
**unoccupied**
12:21,23
**Update**
20:12
**updated**
8:4,22 9:3
**use**
4:14

_____
**V**
_____
**V**
1:8
**Valley**
4:2
**vehicle**
2:12 4:5 7:3,6 9:5,8
    9:17 12:7,18,22
    13:7,23 14:1,3,6,8
    15:3,14 19:18 21:10
**vehicle's**
13:22 14:4,7
**vehicles**
9:25
**victim**
5:11
**Victor**
11:21 22:7
**video**
18:9
**vision**
17:18



COR 001860

**visual**
2:4 9:6,9,14,17 11:1
 11:12 12:2

---

## W

**Wallace**
8:7,8
**want**
15:19 17:11
**Watch**
10:8
**watching**
18:10
**Watson**
13:14
**we'll**
6:12 12:11 14:5
 15:14 20:18
**we're**
2:2 3:2,6,17 4:23
 6:10 7:19 8:18
 10:16 11:15,15
 15:11 17:4,10 18:25
**we've**
20:1
**weapons**
3:22 4:4 13:25 14:3
**wearing**
8:24 9:2 10:19
**week**
3:20
**weeks**
5:6
**Welcome**
21:5
**west**
22:8,9,11
**westbound**
7:3,6 10:16
**western**
13:4
**Where'd**
7:13
**wide**
12:25
**window**

11:25 12:8

---

## X

**x**
1:5,12

---

## Y

**yard**
17:4 19:1
**Yeah**
2:25 11:24 19:25
**year**
20:25
**Young**
22:7

---

## Z

---

## 0

**000328**
1:15
**041423|COR**
1:15
**04428**
10:2,10 14:14

---

## 1

**1**
2:1,8,9,11,14,15,18
 2:20,21,23,25 3:2,6
 3:8,10,14,17,19,21
 3:24,25 4:7,10,15
 4:19,21,24 5:3,9,14
 5:19 6:1,3,5,6,10,14
 6:15,17,19,20,22,23
 7:1,5,8,11,15,18,20
 7:22,23 8:1,2,3,6,8
 8:11,13,16,18,20,21
 8:23,24 9:1,5,8,10
 9:12,14,17,21,23
 10:1,7,8,11,12,14
 10:18,23 11:1,8,9
 11:10,13,17,19,23
 12:3,5,10,15,18,20
 12:22 13:1,3,7,10
 13:13,15,16,19,21

13:23,25 14:2,7,13
 14:15,16 15:4,6,8,9
 15:10,13,17,22 16:3
 16:4,5,6,7,8,10,14
 16:16,17,18,20,24
 17:2,5,6,9,13,17,20
 17:24,25 18:3,4,7,8
 18:9,13,16,24,25
 19:3,5,10,11,17,21
 19:25 20:4,10,12,13
 20:15,21 21:2,5,7,8
 21:9,11,12,13,14,15
 21:17,19,22,24,25
 22:1,2,3,4,5,6,7,9
 22:12,13,15,17,18
 22:19,22,24
**10**
4:10,21 6:11
**10-34**
11:14,15,17
**10-4134**
10:13
**1002**
6:1
**10162**
17:25
**103**
7:4,7,8,9 13:20
**1031**
8:24 15:10
**1033**
11:4,5
**1034**
15:9
**1034P**
11:17
**104**
17:20
**106**
6:9
**107**
18:22
**108**
11:7
**10931**
18:3

**1185**
16:10 22:1
**12**
3:8 15:13
**12TH**
23:15
**134**
12:24
**15**
5:6
**150**
6:24 7:1,2 11:9,10
 14:4 17:9
**159**
14:22
**162**
7:23 8:15 17:12 18:7
**174**
12:3 13:23,25 14:9
 15:6,16,17 17:9,25
 20:16
**18**
7:25
**189**
16:4,5
**1931**
17:1
**1PC**
16:3

---

## 2

**2**
2:2,10,12 3:15 4:1,12
 4:17,25 5:5,13,15
 5:24 7:2,14,16,19
 7:21 8:5,7,10 9:4,6
 9:13,16,19 10:6,15
 10:24 11:11,15,24
 13:6,10,17,20 14:11
 14:17 15:16,18,24
 16:13,15,19,22 17:1
 17:3,12,14,18,22
 18:5 19:16,18,23
 20:2,16,23 21:6
**20**
4:22 7:15 8:4 9:3



20:12 22:21
**201**
1:15
**2013**
21:22
**2018**
19:21
**2020**
5:10
**2024**
23:15
**21**
8:22
**211**
3:20
**223**
13:3
**22635**
2:2 3:4 4:1 22:20
**24**
6:19,20
**25**
4:23
**252**
13:15,16
**2735**
5:11
**287**
5:16
**29**
22:10
**29272**
19:22

---

**3**
2:16 4:3 7:25 10:5,13
10:22 11:7,18,20
12:1,14,17,24 13:8
13:11,22 14:4,22
15:21 19:2,4,6
20:11
**30**
17:5
**31**
6:20 18:24

**3167**
22:7
**32**
10:3
**32471**
5:11
**34**
6:20 14:2,2,5,8
**344**
16:16
**3660**
6:18
**3697**
13:17
**3PC**
2:8,9,16,18 22:9,14
22:15

---

**4**
4
2:19 3:9,11 5:21 6:2
10:5 11:7,8 21:18
21:20
**40**
4:13,15,17 8:18,20
8:21 12:5 21:9
22:13,14,15,17
**41**
2:16,18
**42B**
2:2
**44**
3:19 5:9 9:23 13:11
21:8
**4427**
10:5
**4497**
13:13
**48**
22:9
**49**
16:3
**4PC**
3:19 8:18,20,21
13:11,13

---

**5**
5
6:24 13:3
**5:2024cv00249**
1:3
**50**
11:5,5 14:17
**51024**
21:13
**52497**
22:12
**526**
19:16,17
**53536**
15:21,22 16:20 17:5
**536**
2:10,11,14 7:14,15
8:3 9:3,12 11:23
17:17
**5424**
3:15 5:13
**5450**
11:18
**5587**
2:5 4:3
**5624**
2:19,20 3:9 5:21 6:1
6:2
**5724**
14:11
**580**
2:6 10:19
**5PC**
22:13

---

**6**
6
7:7,9,13
**606**
21:21
**62**
14:2
**66**
4:9 19:6 20:14
**66066**

4:2

---

**7**
7
2:6 10:19
**74**
7:16,18 8:15,17,19
13:14 22:8,9
**765**
22:7
**787**
4:12

---

**8**
8
11:8
**87**
4:17,19,20 6:21
20:25
**897**
12:13

---

**9**
9
16:25 18:1,18,19
20:16 21:20
**9's**
18:9
**95**
19:4,5 20:10
**97**
2:4 3:23 6:2,21 13:11
**98**
3:24,25 4:24



COR 001862

# EXHIBIT 6

# EXHIBIT 6



# EXHIBIT 7

# EXHIBIT 7

Page 1

BWC AUDIOS

AUDIO: 302. BWC. CONTACT W SUSPECT & CRIME SCENE BY

SGT. HUBACHEK 041423[COR 000479 - CONFIDENTIAL]

IN THE MATTER OF:

LLAMAS V. COUNTY OF RIVERSIDE, ET AL.

RB# 1298225



Page 2

1              [P R O C E E D I N G S:]

2          UNIDENTIFIED SPEAKER:  Okay.  Let's go.

3          UNIDENTIFIED SPEAKER:  We've got to move on

4    him because that house could be occupied.  Let's go.

5          UNIDENTIFIED SPEAKER:  Hey, hard cover to the

6    left.  Hard cover to the left.

7          UNIDENTIFIED SPEAKER:  We're advancing on the

8    house --

9          UNIDENTIFIED SPEAKER:  I'm taking them wide

10   over here.

11         UNIDENTIFIED SPEAKER:  Okay.  I've got middle,

12   I've got middle.

13         UNIDENTIFIED SPEAKER:  Do not move.

14         UNIDENTIFIED SPEAKER:  Gun's pointed right at

15   us.

16         UNIDENTIFIED SPEAKER:  I see it, I see it.

17   Watch that gun, watch that gun.

18         UNIDENTIFIED SPEAKER:  I got him, I got him.

19         UNIDENTIFIED SPEAKER:  I'll handcuff.  Stand

20   by.

21         UNIDENTIFIED SPEAKER:  Okay.  I've got lethal,

22   Jimmy (phonetic).

23         UNIDENTIFIED SPEAKER:  Okay.

24         UNIDENTIFIED SPEAKER:  Good backdrop for that

25   house.  Glove up.  Stand by.



Page 3

1           UNIDENTIFIED SPEAKER:  I've got lethal.  You

2   guys have got cuff.

3           UNIDENTIFIED SPEAKER:  Just hold what you've

4   got, baby.

5           UNIDENTIFIED SPEAKER:  We're good to go as

6   we're good.

7           UNIDENTIFIED SPEAKER:  Hang on, Walsh

8   (phonetic).  I'm with you.

9           UNIDENTIFIED SPEAKER:  Just stand by, Walsh.

10          UNIDENTIFIED SPEAKER:  Copy, sir.

11          UNIDENTIFIED SPEAKER:  Okay.  I'm going to

12  roll them to this way.

13          UNIDENTIFIED SPEAKER:  Yeah, good to go.

14          UNIDENTIFIED SPEAKER:  Slow down.  Here we go.

15          UNIDENTIFIED SPEAKER:  We're good.  We're

16  good.  We're good.  We're good.  Already (inaudible).

17          UNIDENTIFIED SPEAKER:  Mac (phonetic), we have

18  one detained.  Dispatch, we need medical up here ASAP.

19          UNIDENTIFIED SPEAKER:  Just check him for

20  weapons?

21          UNIDENTIFIED SPEAKER:  Yeah.  I'm looking.

22          UNIDENTIFIED SPEAKER:  Check for weapons.

23          UNIDENTIFIED SPEAKER:  Yeah.  I'll start

24  (inaudible).  Hey, I'm moving the gun.

25          UNIDENTIFIED SPEAKER:  Okay.



Page 4

1          UNIDENTIFIED SPEAKER:  Can you separate the

2  feet here?

3          UNIDENTIFIED SPEAKER:  All right.

4          UNIDENTIFIED SPEAKER:  All right.  We're good.

5          UNIDENTIFIED SPEAKER:  You hit?  You hit?

6          UNIDENTIFIED SPEAKER:  No, I'm good.

7          UNIDENTIFIED SPEAKER:  You good?

8          UNIDENTIFIED SPEAKER:  I'm good.

9          UNIDENTIFIED SPEAKER:  Okay.

10          UNIDENTIFIED SPEAKER:  Walsh, did you shoot?

11          WALSH:  I did not fire.  Hey, someone's gloves

12  --

13          UNIDENTIFIED SPEAKER:  Mason (phonetic), I

14  need patrol up to our location.

15          UNIDENTIFIED SPEAKER:  LT, I'm going to check

16  this backdrop and make sure no one got there.

17          UNIDENTIFIED SPEAKER:  We have a suspect down.

18  We have two shooters.  Two EST shooters.  All deputies

19  code 4.

20          UNIDENTIFIED SPEAKER:  Hey, how about checking

21  (inaudible) at the top.

22          UNIDENTIFIED SPEAKER:  Jimmy?

23          UNIDENTIFIED SPEAKER:  Anyone else on the

24  property, you guys don't know the property.

25          UNIDENTIFIED SPEAKER:  Did he or other EST



Page 5

1  guys en-route?  If not, I'm going to go get my phone

2  and send them.

3           UNIDENTIFIED SPEAKER:  Send what?

4           UNIDENTIFIED SPEAKER:  More units here.  EST

5  units.

6           UNIDENTIFIED SPEAKER:  I already said that on

7  the air.  They're dispatching more.

8           UNIDENTIFIED SPEAKER:  Okay.

9           UNIDENTIFIED SPEAKER:  If that's what you're

10  asking.

11           UNIDENTIFIED SPEAKER:  I'm going to go to the

12  front for medical.  You code 4?

13           UNIDENTIFIED SPEAKER:  I need --

14           UNIDENTIFIED SPEAKER:  What do you need?

15           UNIDENTIFIED SPEAKER:  Bring my unit up here.

16           UNIDENTIFIED SPEAKER:  Okay.

17           UNIDENTIFIED SPEAKER:  22250, location of OIS

18  and where we need medical.

19           UNIDENTIFIED SPEAKER:  18513.

20           UNIDENTIFIED SPEAKER:  Okay.  According to me,

21  that's not the location.  Suspect possibly at 18513

22  (inaudible).

23           UNIDENTIFIED SPEAKER:  Okay.  Dispatch, I

24  don't know if it's River or not.

25           UNIDENTIFIED SPEAKER:  Where's the firearm?



Page 6

1           UNIDENTIFIED SPEAKER:  Hey, Hook (phonetic).

2           UNIDENTIFIED SPEAKER:  Yeah.

3           UNIDENTIFIED SPEAKER:  Do me a favor.  Just

4    take the firearm.  Push it by the white fence.

5           UNIDENTIFIED SPEAKER:  Nope.  I'm rolling

6    camera.

7           UNIDENTIFIED SPEAKER:  Okay.

8           UNIDENTIFIED SPEAKER:  What do you need,

9    Walsh?

10          WALSH:  There's a blowout kit on my passenger

11   seat.

12          UNIDENTIFIED SPEAKER:  Copy that.  Tom

13   (phonetic), can you help us with that?

14          UNIDENTIFIED SPEAKER:  (Inaudible).

15          UNIDENTIFIED SPEAKER:  Jimmy, I don't have

16   one.

17          UNIDENTIFIED SPEAKER:  (Inaudible).

18          UNIDENTIFIED SPEAKER:  What's that?

19          UNIDENTIFIED SPEAKER:  What's up, sir?

20          UNIDENTIFIED SPEAKER:  Gunshot wound.

21          UNIDENTIFIED SPEAKER:  How many times?

22          UNIDENTIFIED SPEAKER:  Multiple.  I'm not

23   sure.

24          UNIDENTIFIED SPEAKER:  Okay.  I think I heard

25   two or five.



Page 7

 1            UNIDENTIFIED SPEAKER:  I was one.  At least

 2    five.

 3            UNIDENTIFIED SPEAKER:  Okay.

 4            UNIDENTIFIED SPEAKER:  (Inaudible) all?

 5            UNIDENTIFIED SPEAKER:  No.  114, medics, 97

 6    with the suspect that's down.

 7            UNIDENTIFIED SPEAKER:  (Inaudible).

 8            UNIDENTIFIED SPEAKER:  We're looking for major

 9    bleeders.

10            UNIDENTIFIED SPEAKER:  Got hit in the head, I

11    believe.  It's --

12            UNIDENTIFIED SPEAKER:  I need security up

13    here.  I need a critical incident log right here.

14            UNIDENTIFIED SPEAKER:  No idea.

15            UNIDENTIFIED SPEAKER:  Yeah.

16            UNIDENTIFIED SPEAKER:  And just checking in

17    case you are hemorrhaging.

18            UNIDENTIFIED SPEAKER:  Hey, Sanchez

19    (phonetic)?

20            UNIDENTIFIED SPEAKER:  Yes, sir.

21            UNIDENTIFIED SPEAKER:  The OIS occurred there.

22    I don't know where the shell casings are at, so you

23    need to do a critical incident log and look for the

24    casings, please.

25            UNIDENTIFIED SPEAKER:  You guys want to take



Page 8

1   over?

2           UNIDENTIFIED SPEAKER:  Yeah.

3           UNIDENTIFIED SPEAKER:  Okay.

4           UNIDENTIFIED SPEAKER:  I will wait till my

5   buddy gets back here and then --

6           UNIDENTIFIED SPEAKER:  We're still checking.

7   I got no major.

8           UNIDENTIFIED SPEAKER:  I don't see anybody

9   here.

10          UNIDENTIFIED SPEAKER:  Right.  (Inaudible).

11          UNIDENTIFIED SPEAKER:  Aziz (phonetic), I need

12  a critical incident log.

13          UNIDENTIFIED SPEAKER:  Okay.

14          UNIDENTIFIED SPEAKER:  OIS occurred right here

15  at the entrance.

16          UNIDENTIFIED SPEAKER:  Okay.

17          UNIDENTIFIED SPEAKER:  I don't know exactly

18  where, but it was 2B and Jimmy, myself and McGuire

19  (phonetic).

20          UNIDENTIFIED SPEAKER:  What do you need?

21          UNIDENTIFIED SPEAKER:  Back here.

22          UNIDENTIFIED SPEAKER:  Okay.

23          UNIDENTIFIED SPEAKER:  Yeah, it occurred at

24  the entrance to 22250.  I'm trying to find the -- our

25  exact location.



Page 9

1           UNIDENTIFIED SPEAKER:  You're on the street.

2           UNIDENTIFIED SPEAKER:  Where were you guys at

3   Serg?

4           UNIDENTIFIED SPEAKER:  Yeah, Tom, I'm looking

5   at a mailbox right here.  It's got 5-0.  There might be

6   two on this property, though, so it might be both.

7           UNIDENTIFIED SPEAKER:  That's -- it's 2240.

8   It's B20.

9           UNIDENTIFIED SPEAKER:  No, I think you're

10  right, actually.  There's mailboxes next to each other.

11  You got 4-0 and 5-0.  So --

12          UNIDENTIFIED SPEAKER:  So were you right here?

13          UNIDENTIFIED SPEAKER:  I was.  See, it's going

14  to be somewhere right here.

15          UNIDENTIFIED SPEAKER:  Okay.  I got you.

16          UNIDENTIFIED SPEAKER:  Sanchez-8 and Meissen

17  (phonetic), who would check all traffic needs to be

18  stopped along, I believe this is River.

19          We got it, Jimbo (phonetic).  Hey, did you

20  make contact with those residents or do you need to

21  have patrol do that?

22          UNIDENTIFIED SPEAKER:  I'll do this.

23          UNIDENTIFIED SPEAKER:  Can you go to the

24  safety suite, please?  Because I'm a shooter.

25          UNIDENTIFIED SPEAKER:  Yeah.



Page 10

```
 1              UNIDENTIFIED SPEAKER:  Hey, where you're at?

 2              UNIDENTIFIED SPEAKER:  John (phonetic), right

 3    here.

 4              UNIDENTIFIED SPEAKER:  Okay.  Good.  Thank

 5    you.

 6              UNIDENTIFIED SPEAKER:  Right here, right here.

 7              UNIDENTIFIED SPEAKER:  Can you guys help do

 8    make contact with these residents, please?

 9              UNIDENTIFIED SPEAKER:  Yes, sir.

10              UNIDENTIFIED SPEAKER:  Hey, our line of fire,

11    Dave, just so you know, is straight down where he's at,

12    that was our line of fire.

13              UNIDENTIFIED SPEAKER:  We'll check the house

14    to the left.  We got it.  Any others you have any

15    concern about?

16              UNIDENTIFIED SPEAKER:  Right here, where Aziz

17    is, that's our position right there.

18              UNIDENTIFIED SPEAKER:  Okay.  Go.

19              UNIDENTIFIED SPEAKER:  So, Nate (phonetic),

20    make sure everybody's blocked out on that thing,

21    including AMR.  Aziz, can you hold this for me?

22              MS. AZIZ:  I got you.

23              UNIDENTIFIED SPEAKER:  Hey, just somebody

24    confirming that the K-9's en route to a hospital.

25    Okay.  Jay, we're Code 4 over here.  If we can -- is
```



Page 11

 1  there -- there's obviously two crime scenes, so we need

 2  security over there and we need security over here.

 3          UNIDENTIFIED SPEAKER:  22240.

 4          UNIDENTIFIED SPEAKER:  So, right now, you have

 5  myself, Walsh, H-u-b-a-c-h-e-k.

 6          UNIDENTIFIED SPEAKER:  C-h-e-k?

 7          UNIDENTIFIED SPEAKER:  Yeah.

 8          UNIDENTIFIED SPEAKER:  2960.

 9          UNIDENTIFIED SPEAKER:  Walsh and McGuire.

10  Those were the first -- those were -- Jose?

11          MR. JOSE:  What's up, brother?

12          UNIDENTIFIED SPEAKER:  Our position was right

13  here, so I just need somebody to hold that.

14          MR. JOSE:  Copy that.

15          UNIDENTIFIED SPEAKER:  I don't care who.

16  She's almost done, so if we can get her relieved, if

17  you can get with Meissen or somebody.

18          UNIDENTIFIED SPEAKER:  Okay.  Copy.

19          UNIDENTIFIED SPEAKER:  I just want her to pat

20  the female suspect down just to make sure she doesn't

21  have any --

22          UNIDENTIFIED SPEAKER:  Okay.

23          UNIDENTIFIED SPEAKER:  Can you hold that

24  position for me, please?

25          UNIDENTIFIED SPEAKER:  I got you.



Page 12

```
 1            UNIDENTIFIED SPEAKER:  Jose, I'll be right
 2   back.
 3            MR. JOSE:  Yeah, I got you.
 4            UNIDENTIFIED SPEAKER:  What do you need, sir?
 5            UNIDENTIFIED SPEAKER:  All right, dude.  I got
 6   Aziz holding our position from the shooting, but she's
 7   almost done, so if we can get her relieved, that'd be
 8   great.
 9            UNIDENTIFIED SPEAKER:  Okay.
10            UNIDENTIFIED SPEAKER:  Obviously, we have a
11   crime scene over here.
12            UNIDENTIFIED SPEAKER:  Okay.
13            UNIDENTIFIED SPEAKER:  And then our OIS scene
14   is here.  He's down in front of the ambulance and he's
15   just been pronounced.
16            UNIDENTIFIED SPEAKER:  Okay.
17            UNIDENTIFIED SPEAKER:  So --
18            UNIDENTIFIED SPEAKER:  Where's the two
19   shooters at?
20            UNIDENTIFIED SPEAKER:  Me and McGuire.
21            UNIDENTIFIED SPEAKER:  So, McGuire's still
22   down here.
23            UNIDENTIFIED SPEAKER:  Okay.
24            UNIDENTIFIED SPEAKER:  We'll figure it out,
25   but --
```



Page 13

1             UNIDENTIFIED SPEAKER:  Okay.

2             UNIDENTIFIED SPEAKER:  I'm going to go get my

3    phone, so.  Sanchez is doing a critical incident log

4    here.

5             UNIDENTIFIED SPEAKER:  Okay.

6             UNIDENTIFIED SPEAKER:  We'll probably need a

7    separate one over there.

8             UNIDENTIFIED SPEAKER:  Okay.  And is that

9    scene being maintained right now?

10            UNIDENTIFIED SPEAKER:  By K-9 Cisneros, I

11   believe.

12            UNIDENTIFIED SPEAKER:  Okay.  All right.

13   We'll work on that and --

14            UNIDENTIFIED SPEAKER:  And she's in here.

15            UNIDENTIFIED SPEAKER:  Okay.

16            UNIDENTIFIED SPEAKER:  He has -- the gun is

17   obviously over there and everything, so.

18            UNIDENTIFIED SPEAKER:  Okay.

19            UNIDENTIFIED SPEAKER:  Just so you know, our

20   positioning is off this roadway, but I would like to

21   keep it aside for medical.

22            UNIDENTIFIED SPEAKER:  Okay.

23            UNIDENTIFIED SPEAKER:  So --

24            UNIDENTIFIED SPEAKER:  All right.

25            UNIDENTIFIED SPEAKER:  I'm going to get my



Page 14

1    phone.

2              UNIDENTIFIED SPEAKER:  All right.

3              UNIDENTIFIED SPEAKER:  McFadden Hoop

4    (phonetic).

5              UNIDENTIFIED SPEAKER:  You're on?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 15

1                CERTIFICATE OF TRANSCRIBER

2          I, JIMMY JACOB, do hereby certify that this

3    transcript was prepared from audio to the best of my

4    ability.

5

6          I am neither counsel for, related to, nor

7    employed by any of the parties to this action, nor

8    financially or otherwise interested in the outcome of

9    this action.

10

11

12   March 20, 2025

13   DATE                              JIMMY JACOB

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

### Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

### Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

### General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

### Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

### Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

### Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

### National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

### Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

### Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

## A

**ability**
15:4
**action**
15:7,9
**advancing**
2:7
**air**
5:7
**AL**
1:16
**ambulance**
12:14
**AMR**
10:21
**anybody**
8:8
**ASAP**
3:18
**aside**
13:21
**asking**
5:10
**audio**
1:9 15:3
**AUDIOS**
1:4
**Aziz**
8:11 10:16,21,22
    12:6

## B

**baby**
3:4
**back**
8:5,21 12:2
**backdrop**
2:24 4:16
**believe**
7:11 9:18 13:11
**best**
15:3
**bleeders**
7:9
**blocked**

10:20
**blowout**
6:10
**Bring**
5:15
**brother**
11:11
**buddy**
8:5
**BWC**
1:4,9
**B20**
9:8

## C

**C**
2:1
**camera**
6:6
**care**
11:15
**case**
7:17
**casings**
7:22,24
**CERTIFICATE**
15:1
**certify**
15:2
**check**
3:19,22 4:15 9:17
    10:13
**checking**
4:20 7:16 8:6
**Cisneros**
13:10
**code**
4:19 5:12 10:25
**concern**
10:15
**CONFIDENTIAL**
1:10
**confirming**
10:24
**contact**
1:9 9:20 10:8

**Copy**
3:10 6:12 11:14,18
**counsel**
15:6
**COUNTY**
1:16
**cover**
2:5,6
**crime**
1:9 11:1 12:11
**critical**
7:13,23 8:12 13:3
**cuff**
3:2
**C-h-e-k**
11:6

## D

**D**
2:1
**DATE**
15:13
**Dave**
10:11
**deputies**
4:18
**detained**
3:18
**Dispatch**
3:18 5:23
**dispatching**
5:7
**doing**
13:3
**dude**
12:5

## E

**E**
2:1,1
**employed**
15:7
**en**
10:24
**entrance**
8:15,24

**en-route**
5:1
**EST**
4:18,25 5:4
**ET**
1:16
**everybody's**
10:20
**exact**
8:25
**exactly**
8:17

## F

**favor**
6:3
**feet**
4:2
**female**
11:20
**fence**
6:4
**figure**
12:24
**financially**
15:8
**find**
8:24
**fire**
4:11 10:10,12
**firearm**
5:25 6:4
**first**
11:10
**five**
6:25 7:2
**front**
5:12 12:14

## G

**G**
2:1
**Glove**
2:25
**gloves**
4:11



go
2:2,4 3:5,13,14 5:1
    5:11 9:23 10:18
    13:2
going
3:11 4:15 5:1,11 9:13
    13:2,25
good
2:24 3:5,6,13,15,16
    3:16,16 4:4,6,7,8
    10:4
great
12:8
gun
2:17,17 3:24 13:16
Gunshot
6:20
Gun's
2:14
guys
3:2 4:24 5:1 7:25 9:2
    10:7

## H

handcuff
2:19
Hang
3:7
hard
2:5,6
head
7:10
heard
6:24
help
6:13 10:7
hemorrhaging
7:17
Hey
2:5 3:24 4:11,20 6:1
    7:18 9:19 10:1,10
    10:23
hit
4:5,5 7:10
hold
3:3 10:21 11:13,23

holding
12:6
Hook
6:1
Hoop
14:3
hospital
10:24
house
2:4,8,25 10:13
HUBACHEK
1:10
H-u-b-a-c-h-e-k
11:5

## I

idea
7:14
inaudible
3:16,24 4:21 5:22
    6:14,17 7:4,7 8:10
incident
7:13,23 8:12 13:3
including
10:21
interested
15:8

## J

JACOB
15:2,13
Jay
10:25
Jimbo
9:19
Jimmy
2:22 4:22 6:15 8:18
    15:2,13
John
10:2
Jose
11:10,11,14 12:1,3

## K

keep
13:21

kit
6:10
know
4:24 5:24 7:22 8:17
    10:11 13:19
K-9
13:10
K-9's
10:24

## L

left
2:6,6 10:14
lethal
2:21 3:1
Let's
2:2,4
line
10:10,12
LLAMAS
1:16
location
4:14 5:17,21 8:25
log
7:13,23 8:12 13:3
look
7:23
looking
3:21 7:8 9:4
LT
4:15

## M

Mac
3:17
mailbox
9:5
mailboxes
9:10
maintained
13:9
major
7:8 8:7
March
15:12
Mason

4:13
MATTER
1:15
McFadden
14:3
McGuire
8:18 11:9 12:20
McGuire's
12:21
medical
3:18 5:12,18 13:21
medics
7:5
Meissen
9:16 11:17
middle
2:11,12
move
2:3,13
moving
3:24
Multiple
6:22

## N

N
2:1
Nate
10:19
need
3:18 4:14 5:13,14,18
    6:8 7:12,13,23 8:11
    8:20 9:20 11:1,2,13
    12:4 13:6
needs
9:17
neither
15:6
Nope
6:5

## O

O
2:1
obviously
11:1 12:10 13:17



**occupied**
2:4
**occurred**
7:21 8:14,23
**OIS**
5:17 7:21 8:14 12:13
**Okay**
2:2,11,21,23 3:11,25
  4:9 5:8,16,20,23 6:7
  6:24 7:3 8:3,13,16
  8:22 9:15 10:4,18
  10:25 11:18,22 12:9
  12:12,16,23 13:1,5
  13:8,12,15,18,22
**outcome**
15:8

---
**P**
---
**P**
2:1
**parties**
15:7
**passenger**
6:10
**pat**
11:19
**patrol**
4:14 9:21
**phone**
5:1 13:3 14:1
**phonetic**
2:22 3:8,17 4:13 6:1
  6:13 7:19 8:11,19
  9:17,19 10:2,19
  14:4
**please**
7:24 9:24 10:8 11:24
**pointed**
2:14
**position**
10:17 11:12,24 12:6
**positioning**
13:20
**possibly**
5:21
**prepared**

15:3
**probably**
13:6
**pronounced**
12:15
**property**
4:24,24 9:6
**Push**
6:4

---
**R**
---
**R**
2:1
**RB**
1:22
**related**
15:6
**relieved**
11:16 12:7
**residents**
9:20 10:8
**right**
2:14 4:3,4 7:13 8:10
  8:14 9:5,10,12,14
  10:2,6,6,16,17 11:4
  11:12 12:1,5 13:9
  13:12,24 14:2
**River**
5:24 9:18
**RIVERSIDE**
1:16
**roadway**
13:20
**roll**
3:12
**rolling**
6:5
**route**
10:24

---
**S**
---
**S**
2:1
**safety**
9:24
**Sanchez**

7:18 13:3
**Sanchez-8**
9:16
**scene**
1:9 12:11,13 13:9
**scenes**
11:1
**seat**
6:11
**security**
7:12 11:2,2
**see**
2:16,16 8:8 9:13
**send**
5:2,3
**separate**
4:1 13:7
**Serg**
9:3
**SGT**
1:10
**shell**
7:22
**shoot**
4:10
**shooter**
9:24
**shooters**
4:18,18 12:19
**shooting**
12:6
**sir**
3:10 6:19 7:20 10:9
  12:4
**Slow**
3:14
**somebody**
10:23 11:13,17
**someone's**
4:11
**SPEAKER**
2:2,3,5,7,9,11,13,14
  2:16,18,19,21,23,24
  3:1,3,5,7,9,10,11,13
  3:14,15,17,19,21,22
  3:23,25 4:1,3,4,5,6

4:7,8,9,10,13,15,17
4:20,22,23,25 5:3,4
5:6,8,9,11,13,14,15
5:16,17,19,20,23,25
6:1,2,3,5,7,8,12,14
6:15,17,18,19,20,21
6:22,24 7:1,3,4,5,7
7:8,10,12,14,15,16
7:18,20,21,25 8:2,3
8:4,6,8,10,11,13,14
8:16,17,20,21,22,23
9:1,2,4,7,9,12,13,15
9:16,22,23,25 10:1
10:2,4,6,7,9,10,13
10:16,18,19,23 11:3
11:4,6,7,8,9,12,15
11:18,19,22,23,25
12:1,4,5,9,10,12,13
12:16,17,18,20,21
12:23,24 13:1,2,5,6
13:8,10,12,14,15,16
13:18,19,22,23,24
13:25 14:2,3,5
**stand**
2:19,25 3:9
**start**
3:23
**stopped**
9:18
**straight**
10:11
**street**
9:1
**suite**
9:24
**sure**
4:16 6:23 10:20
  11:20
**suspect**
1:9 4:17 5:21 7:6
  11:20

---
**T**
---
**take**
6:4 7:25
**Thank**



10:4
**that'd**
12:7
**thing**
10:20
**think**
6:24 9:9
**till**
8:4
**times**
6:21
**Tom**
6:12 9:4
**top**
4:21
**traffic**
9:17
**TRANSCRIBER**
15:1
**transcript**
15:3
**trying**
8:24
**two**
4:18,18 6:25 9:6 11:1
  12:18

**U**

**UNIDENTIFIED**
2:2,3,5,7,9,11,13,14
  2:16,18,19,21,23,24
  3:1,3,5,7,9,10,11,13
  3:14,15,17,19,21,22
  3:23,25 4:1,3,4,5,6
  4:7,8,9,10,13,15,17
  4:20,22,23,25 5:3,4
  5:6,8,9,11,13,14,15
  5:16,17,19,20,23,25
  6:1,2,3,5,7,8,12,14
  6:15,17,18,19,20,21
  6:22,24 7:1,3,4,5,7
  7:8,10,12,14,15,16
  7:18,20,21,25 8:2,3
  8:4,6,8,10,11,13,14
  8:16,17,20,21,22,23
  9:1,2,4,7,9,12,13,15

9:16,22,23,25 10:1
10:2,4,6,7,9,10,13
10:16,18,19,23 11:3
11:4,6,7,8,9,12,15
11:18,19,22,23,25
12:1,4,5,9,10,12,13
12:16,17,18,20,21
12:23,24 13:1,2,5,6
13:8,10,12,14,15,16
13:18,19,22,23,24
13:25 14:2,3,5
**unit**
5:15
**units**
5:4,5

**V**

**V**
1:16

**W**

**W**
1:9
**wait**
8:4
**Walsh**
3:7,9 4:10,11 6:9,10
  11:5,9
**want**
7:25 11:19
**watch**
2:17,17
**way**
3:12
**weapons**
3:20,22
**We'll**
10:13 12:24 13:6,13
**we're**
2:7 3:5,6,15,15,16,16
  4:4 7:8 8:6 10:25
**We've**
2:3
**white**
6:4
**wide**

2:9
**work**
13:13
**wound**
6:20

**Y**

**Yeah**
3:13,21,23 6:2 7:15
  8:2,23 9:4,25 11:7
  12:3

**0**

**000479**
1:10
**041423|COR**
1:10

**1**

**114**
7:5
**1298225**
1:22
**18513**
5:19,21

**2**

**2B**
8:18
**20**
15:12
**2025**
15:12
**22240**
11:3
**22250**
5:17 8:24
**2240**
9:7
**2960**
11:8

**3**

**302**
1:9

**4**

**4**
4:19 5:12 10:25
**4-0**
9:11

**5**

**5-0**
9:5,11

**9**

**97**
7:5



# EXHIBIT 8

# EXHIBIT 8



# EXHIBIT 9

# EXHIBIT 9

BWC AUDIOS

AUDIO: 346. BWC. SHOOTING. LLAMAS, J. BY LT. WALSH

041423 [COR 000523- CONFIDENTIAL]

IN THE MATTER OF:

LLAMAS V. COUNTY OF RIVERSIDE, ET AL.

RB# 1298225



Page 2

```
 1              [P R O C E E D I N G S:]

 2          UNIDENTIFIED SPEAKER:  The police vehicle.

 3          UNIDENTIFIED SPEAKER:  (Inaudible).

 4          UNIDENTIFIED SPEAKER:  Dispatch, does the RP

 5  have visual on the suspect?

 6          MR. WALSH:  Star-9, ES-7.  Hey, we got shots

 7  fired.  Suspect's near the boat.  He likely killed the

 8  dog.  We need you overhead.

 9          UNIDENTIFIED SPEAKER:  Hey, I'm with you.

10          MR. WALSH:  Hey, we need to move up.  We need

11  to move up.

12          UNIDENTIFIED SPEAKER:  Let's go.

13          UNIDENTIFIED SPEAKER:  Move.  Come back to

14  where we were at.  Where we just cleared.  Bring

15  everyone back here.  We'll be pulling out from there.

16          UNIDENTIFIED SPEAKER:  We need to see him on

17  the street so I can see if he can take off running.

18          MR. WALSH:  Hey, you got a drone that can go

19  10-8 right now?

20          UNIDENTIFIED SPEAKER:  Jimmy's (phonetic) or -

21  -

22          UNIDENTIFIED SPEAKER:  Yeah, yeah.  Mini.

23  Hey, Walt (phonetic).

24          MR. WALSH:  I need a drone 10-8.

25          UNIDENTIFIED SPEAKER:  I need your phone.
```



Page 3

1          MR. WALSH:  And everybody just hold their

2    containment positions.  Again --

3          UNIDENTIFIED SPEAKER:  Get Walt's phone, Zack

4    (phonetic).

5          MR. WALSH:  We think the suspect's at our

6    12:00 o'clock, which would be pushing more or less --

7          UNIDENTIFIED SPEAKER:  We need your phone.

8          MR. WALSH:  -- eastbound from us.

9          UNIDENTIFIED SPEAKER:  Mike (phonetic), you

10   can trade with Walt.  Okay.

11         UNIDENTIFIED SPEAKER:  He's got it.

12         MR. WALSH:  Hey, Jay (phonetic), where's Day

13   at?

14         JAY:  Day.  Hey, physically check on Day.

15   Make sure you take a round.  Physically check him.

16         MR. WALSH:  Knock (phonetic), you have a

17   visual of a medical?

18         UNIDENTIFIED SPEAKER:  Password, Walt.

19         WALT:  My password?

20         UNIDENTIFIED SPEAKER:  Yeah.

21         UNIDENTIFIED SPEAKER:  All right.  This is

22   where he's at.

23         UNIDENTIFIED SPEAKER:  (Cross talk).

24         UNIDENTIFIED SPEAKER:  Turn your lights off.

25         UNIDENTIFIED SPEAKER:  He's in the right here.



Page 4

1   In the right, right in there.

2          MR. WALSH:  Okay.

3          UNIDENTIFIED SPEAKER:  DAY:  Hey, Walt, you

4   see my laser?

5          MR. WALSH:  Hey, Day.

6          UNIDENTIFIED SPEAKER:  He's in there.

7          MR. WALSH:  I'm going to try to call your dog

8   back.

9          DAY:  I already did.

10          MR. WALSH:  You did?  Okay.

11          UNIDENTIFIED SPEAKER:  He's in the riverbed.

12          MR. WALSH:  Okay.  Which way is he moving?

13          UNIDENTIFIED SPEAKER:  Where's the airship?

14          UNIDENTIFIED SPEAKER:  Hey.  Are we sure he's

15   not on our flank?

16          UNIDENTIFIED SPEAKER:  (Cross talk).

17          MR. WALSH:  Yeah.  Hey, Donnie (phonetic),

18   confirm you're tracking that.

19          DONNIE:  Still on a drone.  Star-9's up.

20          DAY:  Could I go rescue my dog?

21          MR. WALSH:  Is he walking out?  No, no, no.

22          UNIDENTIFIED SPEAKER:  Eastbound, he's walking

23   away, back towards the house.

24          UNIDENTIFIED SPEAKER:  Running a (inaudible)

25   that position?



Page 5

1          UNIDENTIFIED SPEAKER:  Are you able to take a

2    couple of bodies and push out to where Donnie and Knock

3    are at?  We need more bodies over there.

4          UNIDENTIFIED SPEAKER:  Yeah.

5          MR. WALSH:  All right.  Star-9's overhead.

6    Let us know if you find him, Star-9.  Give us an exact

7    20.

8          UNIDENTIFIED SPEAKER:  He's so broken.

9          MR. WALSH:  Hey, just advise if he's --

10   where's he at in relation to our Bearcat?

11         UNIDENTIFIED SPEAKER:  Screwed.

12         UNIDENTIFIED SPEAKER:  One to the left, Dave

13   (phonetic).

14         MR. WALSH:  10-4.  And he's with -- there's

15   two of them with him.  Correct?  The suspect and a

16   female?  Or both of them?

17         UNIDENTIFIED SPEAKER:  Right up the nose of

18   the Bearcat in that bush.

19         MR. WALSH:  He's off the nose of the Bearcat

20   into that tree in front of us.  And we're not sure

21   where he is.

22         UNIDENTIFIED SPEAKER:  You want a nine-banger

23   (phonetic)?

24         MR. WALSH:  Not yet.  I want to wait till

25   Santa Steven's in position.



Page 6

 1              UNIDENTIFIED SPEAKER:  Hey, Ralph (phonetic),

 2    can you prep my unit so I can get the fuck out of here?

 3              MR. WALSH:  Star-9, ES-7, I just want to

 4    confirm, you do have visual?  He is hunkered down and

 5    not moving towards us or away from us.

 6              UNIDENTIFIED SPEAKER:  Hey, Jimmy.

 7              MR. WALSH:  Hey, give him some announcements.

 8    Give him some announcements.  I'm going to need some of

 9    you guys to handcuff.  Make sure he's got gloves.

10    We're going to give him some announcements and direct

11    him toward our action.  You know if it's a male or a

12    female coming out.

13              UNIDENTIFIED SPEAKER:  (Inaudible).

14              MR. WALSH:  I don't see the rod cropping, but

15    we've got elevation issues down here as far as foliage

16    is concerned.  We'll put an apprehension team.  We're

17    just tightening up our containment.  Hey, stop.

18              UNIDENTIFIED SPEAKER:  In the riverbed, come

19    out with your hands up.

20              UNIDENTIFIED SPEAKER:  What do you want?

21              MR. WALSH:  Tell him to cease the

22    announcement.

23              UNIDENTIFIED SPEAKER:  Hey, kill the

24    announcements.  Hold the announcements.  Can you put a

25    spotlight on him?



Page 7

1          MR. WALSH:  Affirm.  And can you put white

2    light on him?  Ideally, we get him to stop moving and

3    we'll work on the apprehension if we can get him to

4    stop moving.

5          UNIDENTIFIED SPEAKER:  Do you want aerial

6    platform?

7          MR. WALSH:  I don't know if he has it.  I

8    don't know if we can arrange it on him.  This is the

9    only bird for the night right here.

10          UNIDENTIFIED SPEAKER:  I can jump up there if

11    they land real quick, but we're going to lose visual.

12          MR. WALSH:  That's the problem.

13          UNIDENTIFIED SPEAKER:  But if they start

14    cracking, I mean, we can put him down.

15          MR. WALSH:  Hey, Tom (phonetic), you got a

16    status update?

17          UNIDENTIFIED SPEAKER: This is Riverside

18    Sheriff's Department.  We need both the male and the

19    female to come out of the tree line.  We can see you.

20    We know where you're at.  You need to come out with

21    your hands up.  I repeat, you need to come out with

22    your hands up.  If you do not come out, we'll release

23    another dog.  A dog may bite you.  You need to come out

24    and make yourself known to the deputies.  Drop anything

25    that you have in your hands.  Put your hands up and



Page 8

1    come out.    We have the area surrounded.

2              MR. WALSH:   Hey, can we move our Bearcat up

3    closer?

4              UNIDENTIFIED SPEAKER:   Are you staying or

5    leaving?

6              UNIDENTIFIED SPEAKER:   Got my dog.

7              UNIDENTIFIED SPEAKER:   Were he hit?

8              UNIDENTIFIED SPEAKER:   Yeah, he's hit.   And

9    I'd like to meet my dog.   This is crazy.

10             UNIDENTIFIED SPEAKER:   Is he talking about

11   this rock cropping?

12             MR. WALSH:   I'm not sure.   I was about to ask

13   him about it.   Okay.   Star 9, we're going to attempt to

14   move our Bearcat a little bit closer.   I'm going to

15   give you a laser.   Tell me if that's good.   If you can

16   see it.   Right there.   See this spot right here?

17             UNIDENTIFIED SPEAKER:   Okay.   Ready?

18             MR. WALSH:   No, no, no, not yet.   We need to

19   deploy some units over the river.   Let's go.

20             UNIDENTIFIED SPEAKER:   584, can you guys

21   (inaudible)?

22             UNIDENTIFIED SPEAKER:   I copy.   Just you might

23   still have to key up on that channel as well for all

24   advice.

25             UNIDENTIFIED SPEAKER:   I just want to state,



Page 9

1    have units located that vehicle?

2            UNIDENTIFIED SPEAKER:  (Inaudible) what's the

3    advice if the victim is located?

4            UNIDENTIFIED SPEAKER:  (Inaudible).

5            UNIDENTIFIED SPEAKER:  Yeah.

6            UNIDENTIFIED SPEAKER:  (Inaudible) going to be

7    in 18535 --

8            UNIDENTIFIED SPEAKER:  I copy.  And is anybody

9    out with the victim?  186 is asking.

10            UNIDENTIFIED SPEAKER:  319, do you have any

11    contact with the victim?

12            UNIDENTIFIED SPEAKER:  (Inaudible) contact

13    with the victim.

14            UNIDENTIFIED SPEAKER:  347128.

15            UNIDENTIFIED SPEAKER:  Copy that.

16            UNIDENTIFIED SPEAKER:  Is it (Inaudible)

17    break?

18            UNIDENTIFIED SPEAKER:  (Inaudible) 2927.

19            UNIDENTIFIED SPEAKER:  That from a hilltop or

20    channel lift?  Copy that, 2927, channel lift.

21    (Inaudible).

22            MR. WALSH:  Hey, everybody get some lethal.

23    I'm going to take -- all right, copy that.  We'll start

24    some announcements over here.  Hey, you see that gun

25    move?  He gets it.



Page 10

1            UNIDENTIFIED SPEAKER:  Fuck, we're going to

2   have a crossfire.

3            MR. WALSH:  Yeah.  Yeah.

4            UNIDENTIFIED SPEAKER:  He's off gun.  Call it,

5   LT.

6            MR. WALSH:  Call it -- hey, they're off gun.

7            UNIDENTIFIED SPEAKER:  Who is?

8            MR. WALSH:  Drop the gun.  Hey, if he budges,

9   you tack him.  Drop the weapon immediately.  Get on the

10  ground.  Drop the gun.  Get on the ground.  Don't let

11  him walk towards that.  Drop the gun.  Get on the

12  ground.  Drop the gun.  We got to move up on a unit.

13  We've got to move up on a unit.

14            Hey, where is he?  We've got to keep moving up

15  on him.  I got cover.  I got cover.  Shit.

16            UNIDENTIFIED SPEAKER:  Where, where, where?

17            MR. WALSH:  There, there, right there.

18            UNIDENTIFIED SPEAKER:  Hold, hold, hold.

19  Don't move your hands.

20            MR. WALSH:  We got shots fired and he is down.

21  Hey, we got to move on him (cross talk).

22            UNIDENTIFIED SPEAKER:  Guns in his hand.

23            MR. WALSH:  We don't want him to go to that

24  house.  Jimmy.

25            JIMMY:  Guns in his hand.


MAGNA
LEGAL SERVICES

Page 11

```
 1          MR. WALSH:  I know, I know.

 2          JIMMY:  He's pointing at us.

 3          MR. WALSH:  I know.  Let's go, let's go.

 4   We've got to move on him because that house could be

 5   occupied.

 6          JIMMY:  Let's go.

 7          MR. WALSH:  We're advancing on him because

 8   that house could be occupied.  Taking him wide over

 9   here.

10          UNIDENTIFIED SPEAKER:  Do not move.

11          MR. WALSH:  Just cover, just cover, just

12   cover.  I'll handcuff.  Stand by.

13          UNIDENTIFIED SPEAKER:  Good backdrop for that

14   house.  Glove up.  Stand by.  I'm going to glove up.

15          UNIDENTIFIED SPEAKER:  (Cross talk).

16          UNIDENTIFIED SPEAKER:  Just hold what you got.

17          MR. WALSH:  We're good, fellas.  We're good.

18          UNIDENTIFIED SPEAKER:  Hang on, Walsh.  I'm

19   with you.  Stand by, Walsh.  I can help you.  Got you,

20   sir.

21          MR. WALSH:  Okay.  I'm going to roll him to

22   this way.

23          UNIDENTIFIED SPEAKER:  Yes.  Good to go.

24          MR. WALSH:  Yeah, roll.

25          UNIDENTIFIED SPEAKER:  Here we go.
```



Page 12

```
 1              MR. WALSH:  We're good.  We're good.  We're

 2  good.  We're good.  We're good.  All right.  He's

 3  cuffed.

 4              UNIDENTIFIED SPEAKER:  Dispatch, we need

 5  medical up route ASAP.

 6              MR. WALSH:  Just check him for weapons.

 7              UNIDENTIFIED SPEAKER:  Yes.  I'm looking.

 8              MR. WALSH:  Check for weapons.

 9              UNIDENTIFIED SPEAKER:  Yeah.  I'll start

10  medical in a second.  Hey, I'm moving the gun.

11              MR. WALSH:  Yes.

12              UNIDENTIFIED SPEAKER:  Roll him over, LT.

13              UNIDENTIFIED SPEAKER:  All right.  He got

14  attacked in the face.  We got an agonal.

15              UNIDENTIFIED SPEAKER:  All right.

16              UNIDENTIFIED SPEAKER:  Separate his feet here.

17              UNIDENTIFIED SPEAKER:  All right.

18              UNIDENTIFIED SPEAKER:  All right.  We're good.

19  You hit?  You good?

20              MR. WALSH:  No, I'm good.  You good?

21              UNIDENTIFIED SPEAKER:  I'm good.

22              UNIDENTIFIED SPEAKER:  Hey, Walsh, did you

23  shoot?

24              MR. WALSH:  I did not fire.  Hey, someone's

25  gloves are behind me.
```



Page 13

1              UNIDENTIFIED SPEAKER:  LT, I'm going to check

2      this backdrop and make sure no one's back there.

3              MR. WALSH:  Okay.

4              UNIDENTIFIED SPEAKER:  Jimmy.  Did he -- are

5      other EST guys around?  If not, I'm going to go get my

6      phone and send them.

7              MR. WALSH:  Send what?

8              UNIDENTIFIED SPEAKER:  More units here.  EST

9      units.

10             MR. WALSH:  Yeah, I already said that on the

11     air.  They're dispatching more, if that's what you're

12     asking.

13             UNIDENTIFIED SPEAKER:  Okay.  I'm going to go

14     to the front for medical.  You go forward.

15             MR. WALSH:  Hey, I need the --

16             UNIDENTIFIED SPEAKER:  What do you need?

17             MR. WALSH:  Bring my unit up here.

18             UNIDENTIFIED SPEAKER:  Okay.

19             MR. WALSH:  I can start triaging this guy.

20             UNIDENTIFIED SPEAKER:  Yes, I got you.

21             MR. WALSH:  I got a blowout kit in the car.

22     Don't worry about your blowout kit.  You keep yours

23     secure.

24             UNIDENTIFIED SPEAKER:  Okay.  So, safety

25     sweep.  That house is good.  Both guys are accounted



Page 14

1   for.  There's a house up on that hill.  I didn't go

2   that way at all, and there's a house pretty deep that

3   way.

4             MR. WALSH:  You got it, buddy.

5             UNIDENTIFIED SPEAKER:  Dude.

6             UNIDENTIFIED SPEAKER:  He pointed out with

7   that gun right at us.

8             MR. WALSH:  Yeah.

9             UNIDENTIFIED SPEAKER:  Again.  I'll do the

10  medical if you want.

11            MR. WALSH:  I got no major bleeders.  I got

12  impacts, but --

13            UNIDENTIFIED SPEAKER:  Here, I got scissors.

14            UNIDENTIFIED SPEAKER:  Jimmy, just get your

15  handcuff key.

16            JIMMY:  Yes.

17            MR. WALSH:  I want to take his handcuffs off.

18            JIMMY:  Let me double-glove, because I ripped.

19            MR. WALSH:  Where's the firearm?  Hey, Hoop

20  (phonetic).

21            JIMMY:  It's over to the left.

22            MR. WALSH:  Do me a favor.  Just take the

23  firearm and push it by the white fence.

24            HOOP:  Do you need a picture or anything, or

25  are we good?



Page 15

1          MR. WALSH:  No, I'm rolling camera.  I just

2    need you to take the cuffs off when you get a cuff key.

3          HOOP:  Yes, got you, sir.

4          UNIDENTIFIED SPEAKER:  What do you need,

5    Walsh?

6          MR. WALSH:  There's a blowout kit on my

7    passenger seat.

8          UNIDENTIFIED SPEAKER:  Hey, Hoop.  I lost my

9    cuff key.  Do you have it?  You got a cuff key on you?

10   You got a cuff key, Hoopie?  Cuff key, cuff key, cuff

11   key.

12         HOOP:  I don't have one.

13         UNIDENTIFIED SPEAKER:  Yeah, mine fell out.

14         MR. WALSH:  Hey, just start cutting it,

15   Sheriff.

16         UNIDENTIFIED SPEAKER:  Yes.  I'm under this

17   guy.  All right.  Slow down, slow down.

18         MR. WALSH:  You good?  Are you good?

19         UNIDENTIFIED SPEAKER:  Yeah, I'm good.

20         UNIDENTIFIED SPEAKER:  You good?

21         MR. WALSH:  I'm going to roll him on his back.

22         UNIDENTIFIED SPEAKER:  Good to go, sir.  We

23   got one here, but --

24         MR. WALSH:  I'm not worried about that one.

25   I'm looking for an impact in the chest.



Page 16

1           UNIDENTIFIED SPEAKER:  Okay.

2           MR. WALSH:  It's got nothing here.

3           UNIDENTIFIED SPEAKER:  I think it's a

4    headshot.

5           UNIDENTIFIED SPEAKER:  Nothing here.  I'm

6    going to cut them pants off.

7           MR. WALSH:  Yeah.  I got nothing on the back.

8           UNIDENTIFIED SPEAKER:  Yeah, it's the head and

9    then you've got one on the back.

10          MR. WALSH:  Looking for major bleeders.  He

11   got hit in the head, I believe, and some legs.

12          UNIDENTIFIED SPEAKER:  Do you know how many

13   times?

14          MR. WALSH:  We're just checking for

15   hemorrhaging.

16          UNIDENTIFIED SPEAKER:  No idea.

17          MR. WALSH:  We're just checking for major

18   hemorrhaging.  And we got nothing.

19          UNIDENTIFIED SPEAKER:  Okay.

20          UNIDENTIFIED SPEAKER:  Done that, huh.  Here,

21   I'm just going to pull this shit off, LT.  All right.

22   Here we go.

23          MR. WALSH:  You guys want to take over?

24          UNIDENTIFIED SPEAKER:  Yeah.

25          MR. WALSH:  Okay.



Page 17

1            UNIDENTIFIED SPEAKER:  I'm going to wait till

2    my buddy gets back here and then --

3            MR. WALSH:  We're still checking for -- I got

4    no major.

5            UNIDENTIFIED SPEAKER:  I don't see any

6    ///injury.

7            MR. WALSH:  All right.

8            UNIDENTIFIED SPEAKER:  He's got one in the

9    buttocks.

10           MR. WALSH:  We don't have any respirations

11   either, do we?

12           UNIDENTIFIED SPEAKER:  No.

13           MR. WALSH:  All right.  We'll start some CPR

14   then.

15           UNIDENTIFIED SPEAKER:  Here, I got him.  LT, I

16   got him.

17           MR. WALSH:  You take over when I'm tired.

18           UNIDENTIFIED SPEAKER:  Okay.  Right in that

19   nostril.

20           MR. WALSH:  Tell me when you guys are ready.

21           UNIDENTIFIED SPEAKER:  If you guys want to

22   switch, let me know.

23           UNIDENTIFIED SPEAKER:  Entry wound's right by

24   that nostril.  You can see.

25           UNIDENTIFIED SPEAKER:  Nostril?  Yeah, I see



Page 18

1    it a little bit.

2           UNIDENTIFIED SPEAKER:  Yeah, you can see it.

3           UNIDENTIFIED SPEAKER:  Other than the nostril,

4    where else did you guys (cross talk)?

5           UNIDENTIFIED SPEAKER:  Buttocks.  Left or

6    right, I'm not sure, but it's right at the top of the

7    glute.

8           UNIDENTIFIED SPEAKER:  Okay.

9           MR. WALSH:  Want me to keep going?

10          UNIDENTIFIED SPEAKER:  Yes, sir.

11          UNIDENTIFIED SPEAKER:  LT, I can switch you.

12          MR. WALSH:  I'm good.  Hey, Jimmy, do me a

13   favor.

14          JIMMY:  What do you need?

15          MR. WALSH:  Speak to those neighbors behind

16   us, are they home?

17          JIMMY:  Yes.

18          MR. WALSH:  Find out their address.

19          JIMMY:  Okay.

20          MR. WALSH:  Thank you, sir.

21          UNIDENTIFIED SPEAKER:  LT, watch your hands

22   for a second.  Go for it.

23          UNIDENTIFIED SPEAKER:  Got that off there.

24   All right.  Go ahead and stop for a second.  Okay.

25   Hold on.  He's -- he's not breathing on his own, right?



Page 19

1    No signs of life, right?  He's not breathing on his

2    own?

3                UNIDENTIFIED SPEAKER:  What is that?

4                UNIDENTIFIED SPEAKER:  Affirm, I made contact

5    with our residents on the left.

6                UNIDENTIFIED SPEAKER:  No (cross talk)

7    response.

8                UNIDENTIFIED SPEAKER:  They're good,

9    everyone's accounted for.  There's a couple trailers

10   and houses deep (cross talk).

11               MR. WALSH:  Want me to keep going?  You're

12   calling it?

13               UNIDENTIFIED SPEAKER:  Yes, sir.  You want me

14   to put that out or you got it?

15               MR. WALSH:  I got it.  ES-7, subject's 10-7.

16   Your time, please.

17               UNIDENTIFIED SPEAKER:  We've got no pupilar

18   response.  He's not spontaneously breathing.

19   (Inaudible) trauma.  (Inaudible).  You want the safety

20   statement or I guess Mac (phonetic) needs to do it,

21   huh?

22               MR. WALSH:  I don't need to do it.  I saw it.

23               UNIDENTIFIED SPEAKER:  Okay, cool.  And guns

24   accounted for, LT?

25               MR. WALSH:  Guns accounted for.



Page 20

1          UNIDENTIFIED SPEAKER:  Okay.  Anything past

2     these rocks, so everything went into here.  That

3     trailer, this whole property right here is accounted

4     for.  I don't know if there's transients or what's up

5     there, but that needs a sweep.

6          UNIDENTIFIED SPEAKER:  Okay.

7          MR. WALSH:  Probably -- Pat (phonetic),

8     probably go down that driveway and just start door-

9     knocking what you can.

10          PAT:  Sounds good, sir.

11          JIMBO:  I can help Pat if you want.

12          MR. WALSH:  No, you're good, Jimbo (phonetic).

13     If you guys are going to have to leave this for a

14     moment, it's okay.

15          UNIDENTIFIED SPEAKER:  Yes, sir.

16          MR. WALSH:  Dispatch, ES-7.  What is this

17     channel patched with?  Okay.  Copy.  And are we patched

18     with any primary channels?  Okay.  We're at 10-34, and

19     we got resources on scene that are doing door-knocks

20     and checking out for possible impacts.  Mushinskie, any

21     addresses you identify that you door-knock, just voice

22     them to dispatch so they can log them.

23          Okay.  Copy.  We were going to rally some

24     additional resources to ensure that all residents were

25     Code 4 that were downrange.  But we (inaudible), so



Page 21

1    we're good.

2              UNIDENTIFIED SPEAKER:  That's -- LT.

3              MR. WALSH:  No, that's mine.

4              UNIDENTIFIED SPEAKER:  Those are my scissors,

5    but I'm just going to leave them.

6              MR. WALSH:  Okay.  10-4.

7              UNIDENTIFIED SPEAKER:  Am I good to throw this

8    in his car?

9              MR. WALSH:  That's mine, actually.

10             UNIDENTIFIED SPEAKER:  Oh, you (cross talk).

11             MR. WALSH:  (Cross talk) just going to leave

12   it there for now.

13             UNIDENTIFIED SPEAKER:  Okay.

14             MR. WALSH:  If you need to just stow your

15   rifle, Jimmy, you can put it in my car.

16             JIMMY:  Can I put it in my car, LT?

17             MR. WALSH:  What's that?

18             JIMMY:  My car is pretty far back.  Can I put

19   in there?

20             MR. WALSH:  Yeah, just leave your car where

21   it's at, though, okay?

22             JIMMY:  Okay.  Yes.

23             MR. WALSH:  Dispatch, ES-7.  I just want to

24   confirm that you've made notifications or notifications

25   or maybe 174 can advise to station -- para station



Page 22

1    admin.  Okay.  Copy.  And Dispatch, I don't know if

2    you've contacted CHU.  If not, I can 21 them.  Okay.

3    Copy.

4          Be cool.  Are you leading up the freezing the

5    various scenes, the possible scenes?  I can give

6    McFadden, after I get some info from you guys, I'll

7    just give Mac whatever's needed on that public safety.

8    That was 97.  I believe we only have one DIS scene.

9    It's right here at the target.  And the suspect did

10   engage the canine.  I don't want to assure that

11   property is frozen and clear for investigators.

12         Cisneros, which scene are you on?  All right,

13   280, if you can hold and just freeze that.  And then I

14   believe, Cisneros, you're actually at the DIS scene?

15         MR. CISNEROS:  Yeah, I do, but just not right

16   this second.

17         MR. WALSH:  Do I have anybody at the gate of

18   the property where the DIS occurred?

19         UNIDENTIFIED SPEAKER:  Hey, Walsh, there's a -

20   - GTF's (phonetic) up there.

21         MR. WALSH:  Okay.  Copy that.

22         UNIDENTIFIED SPEAKER:  GTF's up there holding

23   the scene.

24         MR. WALSH:  Okay.  I don't think so.  I think

25   since we're code 4 and we're just doing door-knocks, I



Page 23

1   think you guys can go 10-8.   10-4, you guys are 10-19.

2   I appreciate the assistance and the quick response.

3   Thank you.  Okay.

4           UNIDENTIFIED SPEAKER:  The house up top and

5   then there's a trailer parked straight back.

6           MR. WALSH:  Jimmy, when you spoke -- when you

7   spoke to them, did you get their block out?

8           JIMMY:  I didn't and I'll go do it though.

9           MR. WALSH:  No.

10          JIMMY:  Okay.

11          MR. WALSH:  You're a shooter, so, Mush, do me

12  a favor.  Get their block out if it's there.

13          MR. MUSHINKSKIE:  Yes, sir.  We talked to

14  those guys.

15          MR. WALSH:  We need their block out.

16          MR. MUSHINKSKIE:  Okay.  Good to go.

17          MR. WALSH:  If you guys could do.  I don't

18  care who does it.

19          MR. MUSHINKSKIE:  I'm pen-less, paper-less.

20          MR. WALSH:  We're kind of stuck.

21          UNIDENTIFIED SPEAKER:  I just need -- I need

22  paper.

23          UNIDENTIFIED SPEAKER:  You have paper?

24          MR. WALSH:  Here, I'll give you something.

25  There you go.  You need a pen?



Page 24

```
 1            UNIDENTIFIED SPEAKER:  Yeah.

 2            UNIDENTIFIED SPEAKER:  Pat, you need paper?

 3            PAT:  Got it.

 4            MR. WALSH:  All right.  Hey, your unit --

 5            UNIDENTIFIED SPEAKER:  We're going to have

 6   Dave with Jimmy.

 7            MR. WALSH:  Yeah.

 8            UNIDENTIFIED SPEAKER:  I'll link up with Hub

 9   for now unless there's someone who'll be watching that.

10            MR. WALSH:  Approximate ground count?

11            UNIDENTIFIED SPEAKER:  Four maybe I'm

12   thinking.

13            MR. WALSH:  I want to say some 8 to 10.  Okay.

14   I think Hub's about the same.  I know the D.O.T. -- how

15   many bad guys was the guy -- I got all that stuff.

16            UNIDENTIFIED SPEAKER:  Okay.

17            MR. WALSH:  What about the firearm that Hub

18   put is right here?  Okay.  Missed that.  Hey, do you

19   guys know the status of the dog?

20            UNIDENTIFIED SPEAKER:  No.  It was still alive

21   when Dave had him in his hand running back to the car.

22   But I don't know.  He didn't look good though.

23            MR. WALSH:  I'm going to go off camera.

24            UNIDENTIFIED SPEAKER:  All right, sir.

25
```



Page 25

1              CERTIFICATE OF TRANSCRIBER

2          I, JIMMY JACOB, do hereby certify that this

3    transcript was prepared from audio to the best of my

4    ability.

5

6          I am neither counsel for, related to, nor

7    employed by any of the parties to this action, nor

8    financially or otherwise interested in the outcome of

9    this action.

10

11

12   March 20, 2025

13   DATE                              JIMMY JACOB

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



## A

ability
25:4
able
5:1
accounted
13:25 19:9,24,25
20:3
action
6:11 25:7,9
additional
20:24
address
18:18
addresses
20:21
admin
22:1
advancing
11:7
advice
8:24 9:3
advise
5:9 21:25
aerial
7:5
Affirm
7:1 19:4
agonal
12:14
ahead
18:24
air
13:11
airship
4:13
AL
1:16
alive
24:20
announcement
6:22
announcements
6:7,8,10,24,24 9:24
anybody

9:8 22:17
appreciate
23:2
apprehension
6:16 7:3
Approximate
24:10
area
8:1
arrange
7:8
ASAP
12:5
asking
9:9 13:12
assistance
23:2
assure
22:10
attacked
12:14
attempt
8:13
audio
1:9 25:3
AUDIOS
1:4

## B

back
2:13,15 4:8,23 13:2
15:21 16:7,9 17:2
21:18 23:5 24:21
backdrop
11:13 13:2
bad
24:15
Bearcat
5:10,18,19 8:2,14
believe
16:11 22:8,14
best
25:3
bird
7:9
bit

8:14 18:1
bite
7:23
bleeders
14:11 16:10
block
23:7,12,15
blowout
13:21,22 15:6
boat
2:7
bodies
5:2,3
break
9:17
breathing
18:25 19:1,18
Bring
2:14 13:17
broken
5:8
buddy
14:4 17:2
budges
10:8
bush
5:18
buttocks
17:9 18:5
BWC
1:4,9

## C

C
2:1
call
4:7 10:4,6
calling
19:12
camera
15:1 24:23
canine
22:10
car
13:21 21:8,15,16,18
21:20 24:21

care
23:18
cease
6:21
CERTIFICATE
25:1
certify
25:2
channel
8:23 9:20,20 20:17
channels
20:18
check
3:14,15 12:6,8 13:1
checking
16:14,17 17:3 20:20
chest
15:25
CHU
22:2
Cisneros
22:12,14,15
clear
22:11
cleared
2:14
closer
8:3,14
code
20:25 22:25
come
2:13 6:18 7:19,20,21
7:22,23 8:1
coming
6:12
concerned
6:16
CONFIDENTIAL
1:10
confirm
4:18 6:4 21:24
contact
9:11,12 19:4
contacted
22:2
containment



3:2 6:17
**cool**
19:23 22:4
**copy**
8:22 9:8,15,20,23
   20:17,23 22:1,3,21
**COR**
1:10
**Correct**
5:15
**counsel**
25:6
**count**
24:10
**COUNTY**
1:16
**couple**
5:2 19:9
**cover**
10:15,15 11:11,11,12
**CPR**
17:13
**cracking**
7:14
**crazy**
8:9
**cropping**
6:14 8:11
**cross**
3:23 4:16 10:21
   11:15 18:4 19:6,10
   21:10,11
**crossfire**
10:2
**cuff**
15:2,9,9,10,10,10,10
**cuffed**
12:3
**cuffs**
15:2
**cut**
16:6
**cutting**
15:14

— **D** —

**D**
2:1
**DATE**
25:13
**Dave**
5:12 24:6,21
**Day**
3:12,14,14 4:3,5,9,20
**deep**
14:2 19:10
**Department**
7:18
**deploy**
8:19
**deputies**
7:24
**direct**
6:10
**DIS**
22:8,14,18
**dispatch**
2:4 12:4 20:16,22
   21:23 22:1
**dispatching**
13:11
**dog**
2:8 4:7,20 7:23,23
   8:6,9 24:19
**doing**
20:19 22:25
**Donnie**
4:17,19 5:2
**door**
20:8
**door-knock**
20:21
**door-knocks**
20:19 22:25
**double-glove**
14:18
**downrange**
20:25
**driveway**
20:8
**drone**
2:18,24 4:19

**Drop**
7:24 10:8,9,10,11,12
**Dude**
14:5
**D.O.T**
24:14

— **E** —

**E**
2:1,1
**eastbound**
3:8 4:22
**either**
17:11
**elevation**
6:15
**employed**
25:7
**engage**
22:10
**ensure**
20:24
**Entry**
17:23
**EST**
13:5,8
**ES-7**
2:6 6:3 19:15 20:16
   21:23
**ET**
1:16
**everybody**
3:1 9:22
**everyone's**
19:9
**exact**
5:6

— **F** —

**face**
12:14
**far**
6:15 21:18
**favor**
14:22 18:13 23:12
**feet**

12:16
**fell**
15:13
**fellas**
11:17
**female**
5:16 6:12 7:19
**fence**
14:23
**financially**
25:8
**find**
5:6 18:18
**fire**
12:24
**firearm**
14:19,23 24:17
**fired**
2:7 10:20
**flank**
4:15
**foliage**
6:15
**forward**
13:14
**Four**
24:11
**freeze**
22:13
**freezing**
22:4
**front**
5:20 13:14
**frozen**
22:11
**fuck**
6:2 10:1

— **G** —

**G**
2:1
**gate**
22:17
**give**
5:6 6:7,8,10 8:15
   22:5,7 23:24



**glove**
11:14,14
**gloves**
6:9 12:25
**glute**
18:7
**go**
2:12,18 4:20 8:19
10:23 11:3,3,6,23
11:25 13:5,13,14
14:1 15:22 16:22
18:22,24 20:8 23:1
23:8,16,25 24:23
**going**
4:7 6:8,10 7:11 8:13
8:14 9:6,23 10:1
11:14,21 13:1,5,13
15:21 16:6,21 17:1
18:9 19:11 20:13,23
21:5,11 24:5,23
**good**
8:15 11:13,17,17,23
12:1,1,2,2,2,18,19
12:20,20,21 13:25
14:25 15:18,18,19
15:20,22 18:12 19:8
20:10,12 21:1,7
23:16 24:22
**ground**
10:10,10,12 24:10
**GTF's**
22:20,22
**guess**
19:20
**gun**
9:24 10:4,6,8,10,11
10:12 12:10 14:7
**guns**
10:22,25 19:23,25
**guy**
13:19 15:17 24:15
**guys**
6:9 8:20 13:5,25
16:23 17:20,21 18:4
20:13 22:6 23:1,1
23:14,17 24:15,19

## H

**hand**
10:22,25 24:21
**handcuff**
6:9 11:12 14:15
**handcuffs**
14:17
**hands**
6:19 7:21,22,25,25
10:19 18:21
**Hang**
11:18
**head**
16:8,11
**headshot**
16:4
**help**
11:19 20:11
**hemorrhaging**
16:15,18
**hey**
2:6,9,10,18,23 3:12
3:14 4:3,5,14,17 5:9
6:1,6,7,17,23 7:15
8:2 9:22,24 10:6,8
10:14,21 12:10,22
12:24 13:15 14:19
15:8,14 18:12 22:19
24:4,18
**hill**
14:1
**hilltop**
9:19
**hit**
8:7,8 12:19 16:11
**hold**
3:1 6:24 10:18,18,18
11:16 18:25 22:13
**holding**
22:22
**home**
18:16
**Hoop**
14:19,24 15:3,8,12
**Hoopie**

15:10
**house**
4:23 10:24 11:4,8,14
13:25 14:1,2 23:4
**houses**
19:10
**Hub**
24:8,17
**Hub's**
24:14
**huh**
16:20 19:21
**hunkered**
6:4

## I

**idea**
16:16
**Ideally**
7:2
**identify**
20:21
**immediately**
10:9
**impact**
15:25
**impacts**
14:12 20:20
**inaudible**
2:3 4:24 6:13 8:21
9:2,4,6,12,16,18,21
19:19,19 20:25
**info**
22:6
**injury**
17:6
**interested**
25:8
**investigators**
22:11
**issues**
6:15

## J

**J**
1:9

**JACOB**
25:2,13
**Jay**
3:12,14
**Jimbo**
20:11,12
**Jimmy**
6:6 10:24,25 11:2,6
13:4 14:14,16,18,21
18:12,14,17,19
21:15,16,18,22 23:6
23:8,10 24:6 25:2
25:13
**Jimmy's**
2:20
**jump**
7:10

## K

**keep**
10:14 13:22 18:9
19:11
**key**
8:23 14:15 15:2,9,9
15:10,10,10,11
**kill**
6:23
**killed**
2:7
**kind**
23:20
**kit**
13:21,22 15:6
**Knock**
3:16 5:2
**knocking**
20:9
**know**
5:6 6:11 7:7,8,20
11:1,1,3 16:12
17:22 20:4 22:1
24:14,19,22
**known**
7:24

## L



**land**
7:11
**laser**
4:4 8:15
**leading**
22:4
**leave**
20:13 21:5,11,20
**leaving**
8:5
**left**
5:12 14:21 18:5 19:5
**legs**
16:11
**lethal**
9:22
**let's**
2:12 8:19 11:3,3,6
**life**
19:1
**lift**
9:20,20
**light**
7:2
**lights**
3:24
**line**
7:19
**link**
24:8
**little**
8:14 18:1
**LLAMAS**
1:9,16
**located**
9:1,3
**log**
20:22
**look**
24:22
**looking**
12:7 15:25 16:10
**lose**
7:11
**lost**
15:8

**LT**
1:9 10:5 12:12 13:1
    16:21 17:15 18:11
    18:21 19:24 21:2,16

**M**

**Mac**
19:20 22:7
**major**
14:11 16:10,17 17:4
**male**
6:11 7:18
**March**
25:12
**MATTER**
1:15
**McFadden**
22:6
**mean**
7:14
**medical**
3:17 12:5,10 13:14
    14:10
**meet**
8:9
**Mike**
3:9
**mine**
15:13 21:3,9
**Mini**
2:22
**Missed**
24:18
**moment**
20:14
**move**
2:10,11,13 8:2,14
    9:25 10:12,13,19,21
    11:4,10
**moving**
4:12 6:5 7:2,4 10:14
    12:10
**Mush**
23:11
**MUSHINKSKIE**
23:13,16,19

**Mushinskie**
20:20

**N**

**N**
2:1
**near**
2:7
**need**
2:8,10,10,16,24,25
    3:7 5:3 6:8 7:18,20
    7:21,23 8:18 12:4
    13:15,16 14:24 15:2
    15:4 18:14 19:22
    21:14 23:15,21,21
    23:25 24:2
**needed**
22:7
**needs**
19:20 20:5
**neighbors**
18:15
**neither**
25:6
**night**
7:9
**nine-banger**
5:22
**nose**
5:17,19
**nostril**
17:19,24,25 18:3
**notifications**
21:24,24

**O**

**O**
2:1
**occupied**
11:5,8
**occurred**
22:18
**Oh**
21:10
**okay**
3:10 4:2,10,12 8:13

8:17 11:21 13:3,13
13:18,24 16:1,19,25
17:18 18:8,19,24
19:23 20:1,6,14,17
20:18,23 21:6,13,21
21:22 22:1,2,21,24
23:3,10,16 24:13,16
24:18
**one's**
13:2
**outcome**
25:8
**overhead**
2:8 5:5
**o'clock**
3:6

**P**

**P**
2:1
**pants**
16:6
**paper**
23:22,23 24:2
**paper-less**
23:19
**para**
21:25
**parked**
23:5
**parties**
25:7
**passenger**
15:7
**password**
3:18,19
**Pat**
20:7,10,11 24:2,3
**patched**
20:17,17
**pen**
23:25
**pen-less**
23:19
**phone**
2:25 3:3,7 13:6



**phonetic**
2:20,23 3:4,9,12,16
    4:17 5:13,23 6:1
    7:15 14:20 19:20
    20:7,12 22:20
**physically**
3:14,15
**picture**
14:24
**platform**
7:6
**please**
19:16
**pointed**
14:6
**pointing**
11:2
**police**
2:2
**position**
4:25 5:25
**positions**
3:2
**possible**
20:20 22:5
**prep**
6:2
**prepared**
25:3
**pretty**
14:2 21:18
**primary**
20:18
**probably**
20:7,8
**problem**
7:12
**property**
20:3 22:11,18
**public**
22:7
**pull**
16:21
**pulling**
2:15
**pupilar**

19:17
**push**
5:2 14:23
**pushing**
3:6
**put**
6:16,24 7:1,14,25
    19:14 21:15,16,18
    24:18

---
**Q**
---

**quick**
7:11 23:2

---
**R**
---

**R**
2:1
**rally**
20:23
**Ralph**
6:1
**RB**
1:22
**ready**
8:17 17:20
**real**
7:11
**related**
25:6
**relation**
5:10
**release**
7:22
**repeat**
7:21
**rescue**
4:20
**residents**
19:5 20:24
**resources**
20:19,24
**respirations**
17:10
**response**
19:7,18 23:2
**rifle**

21:15
**right**
2:19 3:21,25 4:1,1
    5:5,17 7:9 8:16,16
    9:23 10:17 12:2,13
    12:15,17,18 14:7
    15:17 16:21 17:7,13
    17:18,23 18:6,6,24
    18:25 19:1 20:3
    22:9,12,15 24:4,18
    24:24
**ripped**
14:18
**river**
8:19
**riverbed**
4:11 6:18
**Riverside**
1:16 7:17
**rock**
8:11
**rocks**
20:2
**rod**
6:14
**roll**
11:21,24 12:12 15:21
**rolling**
15:1
**round**
3:15
**route**
12:5
**RP**
2:4
**running**
2:17 4:24 24:21

---
**S**
---

**S**
2:1
**safety**
13:24 19:19 22:7
**Santa**
5:25
**saw**

19:22
**scene**
20:19 22:8,12,14,23
**scenes**
22:5,5
**scissors**
14:13 21:4
**Screwed**
5:11
**seat**
15:7
**second**
12:10 18:22,24 22:16
**secure**
13:23
**see**
2:16,17 4:4 6:14 7:19
    8:16,16 9:24 17:5
    17:24,25 18:2
**send**
13:6,7
**Separate**
12:16
**Sheriff**
15:15
**Sheriff's**
7:18
**shit**
10:15 16:21
**shoot**
12:23
**shooter**
23:11
**SHOOTING**
1:9
**shots**
2:6 10:20
**signs**
19:1
**sir**
11:20 15:3,22 18:10
    18:20 19:13 20:10
    20:15 23:13 24:24
**slow**
15:17,17
**someone's**



12:24
**Sounds**
20:10
**Speak**
18:15
**SPEAKER**
2:2,3,4,9,12,13,16,20
2:22,25 3:3,7,9,11
3:18,20,21,23,24,25
4:3,6,11,13,14,16
4:22,24 5:1,4,8,11
5:12,17,22 6:1,6,13
6:18,20,23 7:5,10
7:13,17 8:4,6,7,8,10
8:17,20,22,25 9:2,4
9:5,6,8,10,12,14,15
9:16,18,19 10:1,4,7
10:16,18,22 11:10
11:13,15,16,18,23
11:25 12:4,7,9,12
12:13,15,16,17,18
12:21,22 13:1,4,8
13:13,16,18,20,24
14:5,6,9,13,14 15:4
15:8,13,16,19,20,22
16:1,3,5,8,12,16,19
16:20,24 17:1,5,8
17:12,15,18,21,23
17:25 18:2,3,5,8,10
18:11,21,23 19:3,4
19:6,8,13,17,23
20:1,6,15 21:2,4,7
21:10,13 22:19,22
23:4,21,23 24:1,2,5
24:8,11,16,20,24
**spoke**
23:6,7
**spontaneously**
19:18
**spot**
8:16
**spotlight**
6:25
**Stand**
11:12,14,19
**Star**

8:13
**start**
7:13 9:23 12:9 13:19
15:14 17:13 20:8
**Star-9**
2:6 5:6 6:3
**Star-9's**
4:19 5:5
**state**
8:25
**statement**
19:20
**station**
21:25,25
**status**
7:16 24:19
**staying**
8:4
**Steven's**
5:25
**stop**
6:17 7:2,4 18:24
**stow**
21:14
**straight**
23:5
**street**
2:17
**stuck**
23:20
**stuff**
24:15
**subject's**
19:15
**sure**
3:15 4:14 5:20 6:9
8:12 13:2 18:6
**surrounded**
8:1
**suspect**
2:5 5:15 22:9
**suspect's**
2:7 3:5
**sweep**
13:25 20:5
**switch**

17:22 18:11

---

**T**

**tack**
10:9
**take**
2:17 3:15 5:1 9:23
14:17,22 15:2 16:23
17:17
**talk**
3:23 4:16 10:21
11:15 18:4 19:6,10
21:10,11
**talked**
23:13
**talking**
8:10
**target**
22:9
**team**
6:16
**Tell**
6:21 8:15 17:20
**Thank**
18:20 23:3
**think**
3:5 16:3 22:24,24
23:1 24:14
**thinking**
24:12
**throw**
21:7
**tightening**
6:17
**till**
5:24 17:1
**time**
19:16
**times**
16:13
**tired**
17:17
**Tom**
7:15
**top**
18:6 23:4

**tracking**
4:18
**trade**
3:10
**trailer**
20:3 23:5
**trailers**
19:9
**TRANSCRIBER**
25:1
**transcript**
25:3
**transients**
20:4
**trauma**
19:19
**tree**
5:20 7:19
**triaging**
13:19
**try**
4:7
**Turn**
3:24
**two**
5:15

---

**U**

**UNIDENTIFIED**
2:2,3,4,9,12,13,16,20
2:22,25 3:3,7,9,11
3:18,20,21,23,24,25
4:3,6,11,13,14,16
4:22,24 5:1,4,8,11
5:12,17,22 6:1,6,13
6:18,20,23 7:5,10
7:13,17 8:4,6,7,8,10
8:17,20,22,25 9:2,4
9:5,6,8,10,12,14,15
9:16,18,19 10:1,4,7
10:16,18,22 11:10
11:13,15,16,18,23
11:25 12:4,7,9,12
12:13,15,16,17,18
12:21,22 13:1,4,8
13:13,16,18,20,24



14:5,6,9,13,14 15:4
15:8,13,16,19,20,22
16:1,3,5,8,12,16,19
16:20,24 17:1,5,8
17:12,15,18,21,23
17:25 18:2,3,5,8,10
18:11,21,23 19:3,4
19:6,8,13,17,23
20:1,6,15 21:2,4,7
21:10,13 22:19,22
23:4,21,23 24:1,2,5
24:8,11,16,20,24
**unit**
6:2 10:12,13 13:17
24:4
**units**
8:19 9:1 13:8,9
**update**
7:16

---
### V

**V**
1:16
**various**
22:5
**vehicle**
2:2 9:1
**victim**
9:3,9,11,13
**visual**
2:5 3:17 6:4 7:11
**voice**
20:21

---
### W

**wait**
5:24 17:1
**walk**
10:11
**walking**
4:21,22
**Walsh**
1:9 2:6,10,18,24 3:1
3:5,8,12,16 4:2,5,7
4:10,12,17,21 5:5,9
5:14,19,24 6:3,7,14

6:21 7:1,7,12,15 8:2
8:12,18 9:22 10:3,6
10:8,17,20,23 11:1
11:3,7,11,17,18,19
11:21,24 12:1,6,8
12:11,20,22,24 13:3
13:7,10,15,17,19,21
14:4,8,11,17,19,22
15:1,5,6,14,18,21
15:24 16:2,7,10,14
16:17,23,25 17:3,7
17:10,13,17,20 18:9
18:12,15,18,20
19:11,15,22,25 20:7
20:12,16 21:3,6,9
21:11,14,17,20,23
22:17,19,21,24 23:6
23:9,11,15,17,20,24
24:4,7,10,13,17,23
**Walt**
2:23 3:10,18,19 4:3
**Walt's**
3:3
**want**
5:22,24 6:3,20 7:5
8:25 10:23 14:10,17
16:23 17:21 18:9
19:11,13,19 20:11
21:23 22:10 24:13
**watch**
18:21
**watching**
24:9
**way**
4:12 11:22 14:2,3
**weapon**
10:9
**weapons**
12:6,8
**went**
20:2
**we'll**
2:15 6:16 7:3,22 9:23
17:13
**we're**
5:20 6:10,16 7:11

8:13 10:1 11:7,17
11:17 12:1,1,1,2,2
12:18 16:14,17 17:3
20:18 21:1 22:25,25
23:20 24:5
**we've**
6:15 10:13,14 11:4
19:17
**whatever's**
22:7
**white**
7:1 14:23
**wide**
11:8
**work**
7:3
**worried**
15:24
**worry**
13:22
**wound's**
17:23

---
### Y

**yeah**
2:22,22 3:20 4:17 5:4
8:8 9:5 10:3,3 11:24
12:9 13:10 14:8
15:13,19 16:7,8,24
17:25 18:2 21:20
22:15 24:1,7

---
### Z

**Zack**
3:3

---
### 0

**000523**
1:10
**041423**
1:10

---
### 1

**10**
24:13
**10-19**

23:1
**10-34**
20:18
**10-4**
5:14 21:6 23:1
**10-7**
19:15
**10-8**
2:19,24 23:1
**12:00**
3:6
**1298225**
1:22
**174**
21:25
**18535**
9:7
**186**
9:9

---
### 2

**20**
5:7 25:12
**2025**
25:12
**21**
22:2
**280**
22:13
**2927**
9:18,20

---
### 3

**319**
9:10
**346**
1:9
**347128**
9:14

---
### 4

**4**
20:25 22:25

---
### 5

**584**



8:20

|   **8** |
| :--- |

**8**
24:13

|   **9** |
| :--- |

**9**
8:13
**97**
22:8



# EXHIBIT 10

# EXHIBIT 10



# EXHIBIT 11

# EXHIBIT 11

Page 1

BWC AUDIOS

AUDIO: 300. BWC. INITIAL CRIME SCENE OF SHOOTING RE K9

BY DEP. DAY 041423[COR 000477 - CONFIDENTIAL]

IN THE MATTER OF:

LLAMAS V. COUNTY OF RIVERSIDE, ET AL.

RB# 1298225



Page 2

```
 1              [P R O C E E D I N G S:]

 2         UNIDENTIFIED SPEAKER:  -- when he finds you,

 3    he may bite you.  Surrender now and the dog will not be

 4    used.

 5              Attention in the area:  Johnny Llamas,

 6    Riverside County Sheriff's Department K-9 team.  We

 7    know you're hiding.  The area is surrounded.  You need

 8    to surrender now to the nearest deputy with your hands

 9    up and nothing in your hands.  If you do not surrender,

10    a police service dog will be used to find you.  When he

11    finds you, he may bite you.  Surrender now and the dog

12    will not be used.

13              Hi, Brian (phonetic).

14         BRIAN:  Hey.

15         UNIDENTIFIED SPEAKER:  Yo.

16         BRIAN:  I'm trying to track with you guys on

17    that property because I haven't got -- I can go over

18    there?

19         UNIDENTIFIED SPEAKER:  My recorder is on, just

20    so you know.

21         BRIAN:  So is mine.  Where exactly are you

22    guys?  The trailers are all right here, right?

23         UNIDENTIFIED SPEAKER:  I have no fucking clue,

24    dude.  I'm on this main street, we're on the one side.

25         BRIAN:  Okay.
```



Page 3

```
 1              UNIDENTIFIED SPEAKER:  I went to the two side
 2    and they -- and you can see their shoe impressions
 3    going into this field.
 4              BRIAN:  Yeah, that's what I figured.  Okay.
 5              UNIDENTIFIED SPEAKER:  And he's wearing bands.
 6              BRIAN:  Okay.
 7              UNIDENTIFIED SPEAKER:  Like a size 9.
 8              BRIAN:  Yeah.  All right, brother.
 9              UNIDENTIFIED SPEAKER:  Attention in the area:
10    Johnny Llamas, it's the Riverside County Sheriff's
11    Department K-9 team.  We know you're hiding.  The area
12    is surrounded.  You need to surrender now to the
13    nearest deputy with your hands up and nothing in your
14    hands.  If you do not surrender, a police service dog
15    will be used to find you.  When he finds you, he may
16    bite you.  Surrender now and the dog will not be used.
17              Attention in the area:  Johnny Llamas, it's
18    the Riverside County Sheriff's Department K-9 team.  We
19    know you're hiding.  You need to surrender now with
20    your hands up and nothing in your hands.  If you do not
21    surrender, a police service dog will be used to find
22    you.  When he finds you, he may bite you.  Surrender
23    now and the dog will not be used.
24              Still.  That's not them, dude.  They're not
25    just going to sit there and watch.  Do you see it?
```



Page 4

1    There's three of them on quads.  Is he in here, Ralph

2    (phonetic)?

3              RALPH:  What's that?

4              UNIDENTIFIED SPEAKER:  Do you think he's in

5    here?

6              RALPH:  (Inaudible).

7              UNIDENTIFIED SPEAKER:  What?

8              RALPH:  He's out here somewhere because he

9    knows these hills because Ray and I and G have been

10   coming out looking for him late at night, like at 8:00,

11   9:00 o'clock at night.  Because we know he stays off

12   Sean Richard (phonetic), where they lost him yesterday.

13   And Ray's been looking for a while.  Got that info.  He

14   runs that transit camp, so he's out here.  He knows

15   this shit.

16             UNIDENTIFIED SPEAKER:  Like the back of his

17   hand?  And it's thick.

18             Attention in the area:  Johnny Llamas, it's

19   the Riverside County Sheriff's Department K-9 team.  We

20   know you're hiding.  Surrender now to the nearest

21   deputy with your hands up and nothing in your hands.

22   If you do not surrender, a police service dog will be

23   used to find you.  When he finds you, he may bite you.

24             Anybody hiding in the shrubbery, you need to

25   surrender now.  We will be using a police service dog.



Page 5

1   When he finds you, he may bite you.  Anybody hiding,

2   you need to surrender now to the nearest deputy with

3   your hands up and nothing in your hands.  A police

4   service dog will be used.  He will find you and he may

5   bite you.

6           Johnny Llamas, we know you're hiding.  You

7   need to surrender now to the nearest deputy.  If you do

8   not surrender, a police service dog will be used to

9   find you.  When he -- Johnny Llamas, we know you're

10  hiding.  You need to surrender now to the nearest

11  deputy.  If you do not surrender, a police service dog

12  will be used to find you.  When he finds you, he may

13  bite you.  Surrender now and the dog will not be used.

14          Shut up.

15          Attention in the area:  It's the Riverside

16  County Sheriff's Department K-9 team.  Anybody hiding

17  in the area, you need to surrender now to the nearest

18  deputy with your hands up and nothing in your hands.

19          Johnny Llamas, we know you're hiding.  The

20  area is surrounded.  You need to surrender now to the

21  nearest deputy with your hands up and nothing in your

22  hands.  If you do not surrender, a police service dog

23  will be used to find you.  When he finds you, he may

24  bite -- he may bite you.  If you surrender now, the dog

25  will not be used.



Page 6

1          Anybody hiding in the area, it's the Riverside

2    County Sheriff's Department K-9 team.  You need to

3    surrender now to the nearest deputy with your hands up

4    and nothing in your hands.  If you do not surrender, a

5    police service dog will be used to find you.  When he

6    finds you, he may bite you.  If you surrender now, the

7    dog will not be used.

8          Johnny Llamas, it's the Riverside County

9    Sheriff's Department K-9 team.  The area is surrounded.

10   We know you're hiding.  Surrender now to the nearest

11   deputy.  If you do not surrender, a police service dog

12   will be used to find you.  When he finds you, he may

13   bite you.  Surrender now and the dog will not be used.

14          Attention in the area:  It's the Riverside

15   County Sheriff's Department K-9 team.  Anybody hiding

16   in the area, you need to surrender now to the nearest

17   deputy.  A police service dog will be used to search in

18   the area.  He will find you and he may bite you.

19   Surrender now and the dog will not be used.

20          Johnny Llamas, we know you're hiding.

21   Surrender now to the nearest deputy with your hands up

22   and nothing in your hands.  If you do not surrender, a

23   police service dog will be used to find you.  When he

24   finds you, he may bite you.  Surrender now and the dog

25   will not be used.  When he finds you, he may bite you.



Page 7

1           (Blank audio)

2           UNIDENTIFIED SPEAKER:  (Inaudible).

3           UNIDENTIFIED SPEAKER:  The trees.  Goddammit,

4    he just killed my fucking dog.  Son of a bitch.

5    Motherfucker.  Fuck.  Oh, motherfucker.  Dude, he just

6    killed my dog.  Fuck.

7           UNIDENTIFIED SPEAKER:  (Inaudible) We have no

8    reports of weak returning fire, just a suspect, and the

9    dog is possibly down.

10          UNIDENTIFIED SPEAKER:  The dog's 10-7.

11          UNIDENTIFIED SPEAKER:  A-54-8 (phonetic), copy

12   that.

13          UNIDENTIFIED SPEAKER:  Yep.  I'm fucking

14   sorry, bitch, dude.  Fuck, dude.  He just killed my

15   fucking dog.  He's in this bush, straight ahead.

16          UNIDENTIFIED SPEAKER:  Where is Rudy

17   (phonetic)?

18          UNIDENTIFIED SPEAKER:  Dead.

19          UNIDENTIFIED SPEAKER:  Ah?

20          UNIDENTIFIED SPEAKER:  Dead.  He just killed

21   my dog, dude.

22          UNIDENTIFIED SPEAKER:  You good?

23          UNIDENTIFIED SPEAKER:  No, I'm not fucking

24   good.  Well, we've got to complete the mission, dude.

25   Get your dog.



Page 8

1        UNIDENTIFIED SPEAKER:  I know, I know, I know.

2   Hey, I'm going to push up.

3        UNIDENTIFIED SPEAKER:  I need to (inaudible)

4   see the suspect around 12 o'clock.  He'll be pushing

5   more or less eastbound from us.

6        UNIDENTIFIED SPEAKER:  (Inaudible).

7        UNIDENTIFIED SPEAKER:  Goddammit, dude.

8        UNIDENTIFIED SPEAKER:  (Inaudible).

9        UNIDENTIFIED SPEAKER:  No.

10        UNIDENTIFIED SPEAKER:  You're good?

11        UNIDENTIFIED SPEAKER:  I didn't get hit, dude.

12        UNIDENTIFIED SPEAKER:  No, he's good.

13        UNIDENTIFIED SPEAKER:  All right.  This is

14   where he's at.  Devine (phonetic), he's right here.

15   Put your laser on.  To the right of here?  No, no,

16   right -- he's right in there.

17        UNIDENTIFIED SPEAKER:  (Inaudible).

18        UNIDENTIFIED SPEAKER:  Hey Donnie (phonetic),

19   we're trying to call your dog back.

20        UNIDENTIFIED SPEAKER:  I already did.

21        UNIDENTIFIED SPEAKER:  You did?

22        UNIDENTIFIED SPEAKER:  Yeah.

23        UNIDENTIFIED SPEAKER:  Okay.

24        UNIDENTIFIED SPEAKER:  He's in the riverbed.

25        UNIDENTIFIED SPEAKER:  Okay.  Which way was he



Page 9

1   moving?

2          UNIDENTIFIED SPEAKER:  It is right in front of

3   us.

4          UNIDENTIFIED SPEAKER:  Where's the airship?

5          UNIDENTIFIED SPEAKER:  Hey, sorry,

6   (inaudible).

7          UNIDENTIFIED SPEAKER:  Is Star 9 back in

8   route?

9          UNIDENTIFIED SPEAKER:  Yeah.

10         UNIDENTIFIED SPEAKER:  (Inaudible).

11         UNIDENTIFIED SPEAKER:  Hey, Donnie, confirm

12   you're tracking that?

13         UNIDENTIFIED SPEAKER:  Still on a drone.  Star

14   9's up.

15         UNIDENTIFIED SPEAKER:  Can I go rescue my dog?

16         UNIDENTIFIED SPEAKER:  No, no.

17         UNIDENTIFIED SPEAKER:  Fuck.

18         UNIDENTIFIED SPEAKER:  No, he's down.  He's

19   down.  He's going that way, back towards the house.

20         UNIDENTIFIED SPEAKER:  (Inaudible) that

21   position?

22         UNIDENTIFIED SPEAKER:  Are you able to take a

23   couple bodies and push out to where Donnie and Knock

24   (phonetic) are at?

25         UNIDENTIFIED SPEAKER:  Yeah.



Page 10

```
 1            UNIDENTIFIED SPEAKER:  We need more bodies
 2  over there.
 3            UNIDENTIFIED SPEAKER:  Yeah.
 4            UNIDENTIFIED SPEAKER:  Let's go.
 5            UNIDENTIFIED SPEAKER:  All right.
 6            UNIDENTIFIED SPEAKER:  Star 9's overhead.  Let
 7  us know if you find him, Star 9.
 8            UNIDENTIFIED SPEAKER:  Where is he at?
 9            UNIDENTIFIED SPEAKER:  Come to the left, Dave.
10            UNIDENTIFIED SPEAKER:  There's two of them
11  with him, correct, the suspect?
12            UNIDENTIFIED SPEAKER:  Right off the nose of
13  the bearcat in that bush.
14            UNIDENTIFIED SPEAKER:  He's off the nose, he's
15  bearcat.
16            UNIDENTIFIED SPEAKER:  Do you want to -- do
17  you want a 9-banger?
18            UNIDENTIFIED SPEAKER:  I want to wait.  Stan
19  and Steve are in position.
20            UNIDENTIFIED SPEAKER:  Hey, Ralph, can you
21  prep my unit, so I can get the fuck out of here?
22            UNIDENTIFIED SPEAKER:  Star 9, ES7, I just
23  want to confirm, you do have visual?  He is hunkered
24  down and (inaudible).
25            UNIDENTIFIED SPEAKER:  I'll need to send the
```



MAGNA
LEGAL SERVICES

Page 11

1    guys with the handcuffs.

2              UNIDENTIFIED SPEAKER:  Make sure he's got

3    gloves.

4              UNIDENTIFIED SPEAKER:  Is there gloves in

5    there?

6              UNIDENTIFIED SPEAKER:  I don't know.  I need

7    to call.

8              UNIDENTIFIED SPEAKER:  Hey, do you know where

9    the nearest animal hospital is?

10             UNIDENTIFIED SPEAKER:  I don't.

11             UNIDENTIFIED SPEAKER:  Fuck.

12             UNIDENTIFIED SPEAKER:  Where is Rudy?

13             UNIDENTIFIED SPEAKER:  He's fucking 10-7,

14   right here, in this bush.

15             UNIDENTIFIED SPEAKER:  Fuck.

16             UNIDENTIFIED SPEAKER:  Yeah.  Hey, where's the

17   nearest animal hospital?

18             UNIDENTIFIED SPEAKER:  (Inaudible).  I'll take

19   you there.

20             UNIDENTIFIED SPEAKER:  I'll follow you?

21             UNIDENTIFIED SPEAKER:  Yeah.  I'll look for

22   one now, but that's probably the only one open 24x7.

23             UNIDENTIFIED SPEAKER:  Can you call them?

24             UNIDENTIFIED SPEAKER:  Yeah.

25             (Blank audio)



Page 12

1                    CERTIFICATE OF TRANSCRIBER

2          I, JIMMY JACOB, do hereby certify that this

3    transcript was prepared from audio to the best of my

4    ability.

5

6          I am neither counsel for, related to, nor

7    employed by any of the parties to this action, nor

8    financially or otherwise interested in the outcome of

9    this action.

10

11

12   March 20, 2025

13   DATE                                  JIMMY JACOB

14

15

16

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



Case 5:24-cv-00249-CAS-SP    Document 43-3    Filed 05/16/25    Page 130 of 885    Page ID #:474

## A

**ability**
12:4
**able**
9:22
**action**
12:7,9
**Ah**
7:19
**ahead**
7:15
**airship**
9:4
**AL**
1:16
**animal**
11:9,17
**Anybody**
4:24 5:1,16 6:1,15
**area**
2:5,7 3:9,11,17 4:18
  5:15,17,20 6:1,9,14
  6:16,18
**Attention**
2:5 3:9,17 4:18 5:15
  6:14
**audio**
1:9 7:1 11:25 12:3
**AUDIOS**
1:4
**A-54-8**
7:11

## B

**back**
4:16 8:19 9:7,19
**bands**
3:5
**bearcat**
10:13,15
**best**
12:3
**bitch**
7:4,14
**bite**

2:3,11 3:16,22 4:23
  5:1,5,13,24,24 6:6
  6:13,18,24,25
**Blank**
7:1 11:25
**bodies**
9:23 10:1
**Brian**
2:13,14,16,21,25 3:4
  3:6,8
**brother**
3:8
**bush**
7:15 10:13 11:14
**BWC**
1:4,9

## C

**C**
2:1
**call**
8:19 11:7,23
**camp**
4:14
**CERTIFICATE**
12:1
**certify**
12:2
**clue**
2:23
**Come**
10:9
**coming**
4:10
**complete**
7:24
**CONFIDENTIAL**
1:10
**confirm**
9:11 10:23
**copy**
7:11
**correct**
10:11
**counsel**
12:6

**County**
1:16 2:6 3:10,18 4:19
  5:16 6:2,8,15
**couple**
9:23
**CRIME**
1:9

## D

**D**
2:1
**DATE**
12:13
**Dave**
10:9
**DAY**
1:10
**Dead**
7:18,20
**DEP**
1:10
**Department**
2:6 3:11,18 4:19 5:16
  6:2,9,15
**deputy**
2:8 3:13 4:21 5:2,7
  5:11,18,21 6:3,11
  6:17,21
**Devine**
8:14
**dog**
2:3,10,11 3:14,16,21
  3:23 4:22,25 5:4,8
  5:11,13,22,24 6:5,7
  6:11,13,17,19,23,24
  7:4,6,9,15,21,25
  8:19 9:15
**dog's**
7:10
**Donnie**
8:18 9:11,23
**drone**
9:13
**dude**
2:24 3:24 7:5,14,14
  7:21,24 8:7,11

## E

**E**
2:1,1
**eastbound**
8:5
**employed**
12:7
**ES7**
10:22
**ET**
1:16
**exactly**
2:21

## F

**field**
3:3
**figured**
3:4
**financially**
12:8
**find**
2:10 3:15,21 4:23 5:4
  5:9,12,23 6:5,12,18
  6:23 10:7
**finds**
2:2,11 3:15,22 4:23
  5:1,12,23 6:6,12,24
  6:25
**fire**
7:8
**follow**
11:20
**front**
9:2
**fuck**
7:5,6,14 9:17 10:21
  11:11,15
**fucking**
2:23 7:4,13,15,23
  11:13

## G

**G**
2:1 4:9
**gloves**



11:3,4
**go**
2:17 9:15 10:4
**Goddammit**
7:3 8:7
**going**
3:3,25 8:2 9:19
**good**
7:22,24 8:10,12
**guys**
2:16,22 11:1

_____
### H
**hand**
4:17
**handcuffs**
11:1
**hands**
2:8,9 3:13,14,20,20
4:21,21 5:3,3,18,18
5:21,22 6:3,4,21,22
**Hey**
2:14 8:2,18 9:5,11
10:20 11:8,16
**He'll**
8:4
**Hi**
2:13
**hiding**
2:7 3:11,19 4:20,24
5:1,6,10,16,19 6:1
6:10,15,20
**hills**
4:9
**hit**
8:11
**hospital**
11:9,17
**house**
9:19
**hunkered**
10:23

_____
### I
**impressions**
3:2

**inaudible**
4:6 7:2,7 8:3,6,8,17
9:6,10,20 10:24
11:18
**info**
4:13
**INITIAL**
1:9
**interested**
12:8

_____
### J
**JACOB**
12:2,13
**JIMMY**
12:2,13
**Johnny**
2:5 3:10,17 4:18 5:6
5:9,19 6:8,20

_____
### K
**killed**
7:4,6,14,20
**Knock**
9:23
**know**
2:7,20 3:11,19 4:11
4:20 5:6,9,19 6:10
6:20 8:1,1,1 10:7
11:6,8
**knows**
4:9,14
**K-9**
2:6 3:11,18 4:19 5:16
6:2,9,15
**K9**
1:9

_____
### L
**laser**
8:15
**late**
4:10
**left**
10:9
**Let's**

**10:4**
**Llamas**
1:16 2:5 3:10,17 4:18
5:6,9,19 6:8,20
**look**
11:21
**looking**
4:10,13
**lost**
4:12

_____
### M
**main**
2:24
**March**
12:12
**MATTER**
1:15
**mine**
2:21
**mission**
7:24
**motherfucker**
7:5,5
**moving**
9:1

_____
### N
**N**
2:1
**nearest**
2:8 3:13 4:20 5:2,7
5:10,17,21 6:3,10
6:16,21 11:9,17
**need**
2:7 3:12,19 4:24 5:2
5:7,10,17,20 6:2,16
8:3 10:1,25 11:6
**neither**
12:6
**night**
4:10,11
**nose**
10:12,14

_____
### O

**O**
2:1
**Oh**
7:5
**Okay**
2:25 3:4,6 8:23,25
**open**
11:22
**outcome**
12:8
**overhead**
10:6
**o'clock**
4:11 8:4

_____
### P
**P**
2:1
**parties**
12:7
**phonetic**
2:13 4:2,12 7:11,17
8:14,18 9:24
**police**
2:10 3:14,21 4:22,25
5:3,8,11,22 6:5,11
6:17,23
**position**
9:21 10:19
**possibly**
7:9
**prep**
10:21
**prepared**
12:3
**probably**
11:22
**property**
2:17
**push**
8:2 9:23
**pushing**
8:4
**Put**
8:15



## Q

**quads**
4:1

## R

**R**
2:1
**Ralph**
4:1,3,6,8 10:20
**Ray**
4:9
**Ray's**
4:13
**RB**
1:22
**recorder**
2:19
**related**
12:6
**reports**
7:8
**rescue**
9:15
**returning**
7:8
**Richard**
4:12
**right**
2:22,22 3:8 8:13,14
  8:15,16,16 9:2 10:5
  10:12 11:14
**riverbed**
8:24
**Riverside**
1:16 2:6 3:10,18 4:19
  5:15 6:1,8,14
**route**
9:8
**Rudy**
7:16 11:12
**runs**
4:14

## S

**S**
2:1

**SCENE**
1:9
**Sean**
4:12
**search**
6:17
**see**
3:2,25 8:4
**send**
10:25
**service**
2:10 3:14,21 4:22,25
  5:4,8,11,22 6:5,11
  6:17,23
**Sheriff's**
2:6 3:10,18 4:19 5:16
  6:2,9,15
**shit**
4:15
**shoe**
3:2
**SHOOTING**
1:9
**shrubbery**
4:24
**Shut**
5:14
**side**
2:24 3:1
**sit**
3:25
**size**
3:7
**Son**
7:4
**sorry**
7:14 9:5
**SPEAKER**
2:2,15,19,23 3:1,5,7
  3:9 4:4,7,16 7:2,3,7
  7:10,11,13,16,18,19
  7:20,22,23 8:1,3,6,7
  8:8,9,10,11,12,13
  8:17,18,20,21,22,23
  8:24,25 9:2,4,5,7,9
  9:10,11,13,15,16,17

9:18,20,22,25 10:1
10:3,4,5,6,8,9,10,12
10:14,16,18,20,22
10:25 11:2,4,6,8,10
11:11,12,13,15,16
11:18,20,21,23,24
**Stan**
10:18
**Star**
9:7,13 10:6,7,22
**stays**
4:11
**Steve**
10:19
**straight**
7:15
**street**
2:24
**sure**
11:2
**surrender**
2:3,8,9,11 3:12,14,16
  3:19,21,22 4:20,22
  4:25 5:2,7,8,10,11
  5:13,17,20,22,24
  6:3,4,6,10,11,13,16
  6:19,21,22,24
**surrounded**
2:7 3:12 5:20 6:9
**suspect**
7:8 8:4 10:11

## T

**take**
9:22 11:18
**team**
2:6 3:11,18 4:19 5:16
  6:2,9,15
**thick**
4:17
**think**
4:4
**three**
4:1
**track**
2:16

**tracking**
9:12
**trailers**
2:22
**TRANSCRIBER**
12:1
**transcript**
12:3
**transit**
4:14
**trees**
7:3
**trying**
2:16 8:19
**two**
3:1 10:10

## U

**UNIDENTIFIED**
2:2,15,19,23 3:1,5,7
  3:9 4:4,7,16 7:2,3,7
  7:10,11,13,16,18,19
  7:20,22,23 8:1,3,6,7
  8:8,9,10,11,12,13
  8:17,18,20,21,22,23
  8:24,25 9:2,4,5,7,9
  9:10,11,13,15,16,17
  9:18,20,22,25 10:1
  10:3,4,5,6,8,9,10,12
  10:14,16,18,20,22
  10:25 11:2,4,6,8,10
  11:11,12,13,15,16
  11:18,20,21,23,24
**unit**
10:21

## V

**V**
1:16
**visual**
10:23

## W

**wait**
10:18
**want**



10:16,17,18,23
**watch**
3:25
**way**
8:25 9:19
**weak**
7:8
**wearing**
3:5
**went**
3:1
**we're**
2:24 8:19
**we've**
7:24

---
Y
---

**Yeah**
3:4,8 8:22 9:9,25
    10:3 11:16,21,24
**Yep**
7:13
**yesterday**
4:12
**Yo**
2:15

---
0
---

**000477**
1:10
**041423|COR**
1:10

---
1
---

**10-7**
7:10 11:13
**12**
8:4
**1298225**
1:22

---
2
---

**20**
12:12
**2025**
12:12

**24x7**
11:22

---
3
---

**300**
1:9

---
8
---

**8:00**
4:10

---
9
---

**9**
3:7 9:7 10:7,22
**9's**
9:14 10:6
**9-banger**
10:17
**9:00**
4:11



# EXHIBIT 12

# EXHIBIT 12

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sherrif's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| Call For Service Master | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Data Source | RSO | | | | | | | | | | | |
| Call # | PC-231040046 | | Agen | PC | DArea | | Date | 04/14/2023 | | Cls-Code | | 25Z2N |
| Call-Type | SPERS | | Priority | | 2 | | Juris | | | Dispo | | R |
| Rc-Time | | 04/14/23 16:47:20 | | | Ct-Oper-ID | | N5872 | | Ct-Stat-ID | | 051 | |
| Pd-Time | | 04/14/23 16:47:30 | | | Pnd-Oper-ID | | N5089 | | Pnd-Stat-ID | | 002 | |
| Di-Time | | 04/14/23 16:51:58 | | | Dsp-Oper-ID | | N5089 | | Dsp-Stat-ID | | 002 | |
| Ar-Time | | 04/14/23 16:53:38 | | | Arr-Oper-ID | | N5089 | | Arr-Stat-ID | | 002 | |
| Cl-Time | | 04/15/23 12:51:29 | | | Cls-Oper-ID | | N7779 | | Cls-Stat-ID | | 003 | |
| 911-Time | | 04/14/23 16:47:20 | | Rd | | 062F | Tb-Map | | | | | |
| XY-Zone | | | Fd | | | XY-Actual | | | | | | |
| Loc | 22305 RIVER RD | | | | | | City | | MEAD | | | |
| Cross | X UNK | | | | | | Control | | | | | |
| Area | PC | Geo-Flag | | | Unit | MB273 | Adult | 00 | Juv | | 00 | |
| Off-1 | 4078 | | Off-2 | | | Off-3 | | | Off-4 | | | |
| Asgn-1 | | | Asgn-2 | | | Asgn-3 | | | Asgn-4 | | | |
| Beat | | 42 | | Ocal-Type | | | | Dupe-to | | | | |
| Fire | | | | Ems | | | | | | | | |
| RP-Name | | SANDRA SILVA | | | | | | | | | | |
| RP-Address | | | | | | RP-Phone | | | 9512898290 | | | |
| Next | | | | Control CADX | | | | Mast-Rel | | | | |

CONFIDENTIAL

COR 001304

Data Warehouse - Call Detail  (Fri May 17 13:46:03 PDT 2024)   Page : 2

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

## CAD Supplemental Data

| Incident No. | PC-231040046 |
|---|---|

| Data Source | Time | Terminal | Operator | Action | Text |
|---|---|---|---|---|---|
| | 04/14/2023 | | | | |
| RSO | 16:47:20 | 51 | N5872 | | NEAR:TB 837 C4/#1 HFA 30/SHORT 126/LSW BLK SHIRT BLU JEANS/#2 HMA 35/600 150/LS |
| RSO | 16:47:20 | 51 | N5872 | | W BLK SHIRT BLK PANTS//SEEN RUNNING AWAY FROM A GRY 13 TOYOTA SEDAN UNK LIC |
| RSO | 16:48:09 | 51 | N5872 | TEXTF | SUBJS APPEAR CD N RUNNING THROUGH RPS PROPERTY/MALE TOLD FEMALE TO STAY AT LOC |
| RSO | 16:48:09 | 51 | N5872 | TEXTF | REF HE WILL BE ARRESTED/PER RP POSS EVADING FROM POLICE/SUBJS HBD/NEG WPNS |
| RSO | 16:48:25 | 51 | N5872 | TEXTF | SEEN/SUBJS SEEN GOING UP THE BACK SIDE OF RPS PROPERTY IN HILLS/SUBJS ATTEMPTED |
| RSO | 16:48:25 | 51 | N5872 | TEXTF | TO HIDE IN RPS SHED/LS 10 AGO/NFI |
| RSO | 16:48:38 | 51 | N5872 | TEXTF | CHECKING W CHP FOR ANY OUTSTANDING WANTS FOR SUBJ/ |
| RSO | 16:50:21 | 51 | N5872 | TEXTF | NEG CALLS FOR CHP IN AREA MATCHING |
| RSO | 16:51:48 | 51 | N5872 | REMARK | SAME GENERAL AREA AS #PC41/UNK IF RELATED/DIFFERENT SUBJ DESCS |
| RSO | 16:51:58 | 2 | N5089 | DISP | ST98 |
| RSO | 16:53:22 | 2 | N5089 | DISP | K932-R |
| RSO | 16:53:35 | 998 | 2807 | MDTACK | K932 |
| RSO | 16:53:38 | 2 | N5089 | ARRIVE | ST98 |
| RSO | 16:54:10 | 2 | N5089 | DISP | 4PC44 |
| RSO | 16:54:12 | 998 | 1674 | MDTACK | 4PC44 |
| RSO | 16:54:50 | 2 | N5089 | DISP | 3PC41-R; AT STORY HILL DRIVE DEAD END |
| RSO | 16:54:56 | 998 | 5919 | MDTACK | 3PC41 |
| RSO | 16:55:22 | 2 | N5089 | DISP | 2PC40 |
| RSO | 16:55:24 | 998 | 2573 | BACKUP | ST98 ES7 |
| RSO | 16:55:25 | 998 | 2573 | MDTACK | ES7 |
| RSO | 16:55:34 | 998 | 6192 | MDTACK | 2PC40 |
| RSO | 16:56:44 | 11 | N6783 | DISP | K9162 |
| RSO | 16:56:51 | 998 | 3665 | MDTACK | K9162 |
| RSO | 16:56:57 | 11 | N6783 | ARRIVE | K9162 |
| RSO | 16:57:21 | 11 | N6783 | REMARK | ST98 :SUBJS WERE IN THE STREET EARLIER HOWEVER WENT INSIDE |
| RSO | 16:57:37 | 998 | 1674 | ARRIVE | 4PC44 |
| RSO | 16:57:37 | 11 | N6783 | REMARK | ST98 :ATTEMPT TO CONTACT SOMEONE ON THE PROP REF DOT FOR SUBJS |
| RSO | 16:57:46 | 11 | N6783 | REMARK | K9162 :CONTACTING A FEM AT THE PROP |
| RSO | 16:58:27 | 998 | 2573 | ARRIVE | ES7 |
| RSO | 16:58:54 | 11 | N6783 | CONTCT | ST98; IN 10 MINS |
| RSO | 16:59:41 | 11 | N6783 | REMARK | K932 :SOUTH ON THE DIRT ROAD |
| RSO | 17:00:08 | 11 | N6783 | REMARK | K9162 :FEM POINTING TWDS THE HILL |
| RSO | 17:00:17 | 11 | N6783 | REMARK | K9162 :WHERE THE SHED, WOF THE PRIMARY LOC |
| RSO | 17:00:28 | 11 | N6783 | REMARK | K9162 :WILL BE MALE AND FEM |
| RSO | 17:00:52 | 11 | N6783 | ALERT | K932; AT 27450 EAGLE CREST; STATING UTL ANYONE IN THE LAST FEW MINS |
| RSO | 17:01:23 | 11 | N6783 | REMARK | K9162 :OFFICER SAFTEY RP STATED MALE SUBJ HAD SAD HE IS GOING TO TAKE ON DE |

CONFIDENTIAL

COR 001305

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 17:01:33 | 11 | N6783 | REMARK | K9162 :DEPS AND ADVD FEM TO STAY BEH |
| RSO | 17:02:05 | 11 | N6783 | REMARK | K9162 :FEM IS BRENDA... RP STATED DEPS SHOULD BE FAMILIAR WITH HER |
| RSO | 17:02:14 | 11 | N6783 | CONTCT | K9162; IN 15 MINS |
| RSO | 17:02:29 | 11 | N6783 | REMARK | K9162 :MALE LSW BLK SHIRT BLK JEANS |
| RSO | 17:02:53 | 11 | N6783 | CONTCT | 4PC44; IN 15 MINS |
| RSO | 17:03:57 | 11 | N6783 | CONTCT | ES7; IN 15 MINS |
| RSO | 17:04:17 | 11 | N6783 | REMARK | ST98 :NORTH OF RR THERE IS A BLU DOUBLE WIDE |
| RSO | 17:04:21 | 11 | N6783 | REMARK | ST98 :WOF DEPS LOC |
| RSO | 17:04:59 | 11 | N6783 | REMARK | ST98 :22240 RIVER WHERE THE BLU DOUBLE WIDE |
| RSO | 17:05:09 | 11 | N6783 | REMARK | K9162 :RP ID'D SUBJ IS JOHNNY |
| RSO | 17:05:56 | 11 | N6783 | RELOCE | K932; TO 27450 EAGLE CREST |
| RSO | 17:06:09 | 11 | N6783 | TEXTF | ****LLAMAS,JOHNNY 05-05-1987 M H 508 170 BLK BRO // LOCAL 1032FX 3**** |
| RSO | 17:06:35 | 11 | N6783 | REMARK | ES7 :FEM IS POINTING FROM LOC --- SW TWDS EAGLE CREST OR DEAD END |
| RSO | 17:07:53 | 11 | N6783 | REMARK | ST98 :UNIT TO THE END OF STONEY HILL |
| RSO | 17:07:56 | 11 | N6783 | REMARK | ST98 :FOR THE WEST END |
| RSO | 17:08:29 | 11 | N6783 | DISPAR | PE150 |
| RSO | 17:08:53 | 11 | N6783 | REMARK | ST98 :SW OF THE LOC, THERE IS AN OLD BARN AND ROOF IS GRN |
| RSO | 17:09:07 | 11 | N6783 | REMARK | ST98 :LOOKS VACANT AT THE END OF STONEYHILL SOF RIVER |
| RSO | 17:09:13 | 11 | N6783 | CONTCT | ST98; IN 15 MINS |
| RSO | 17:09:27 | 998 | 6192 | INSERV | 2PC40 |
| RSO | 17:10:45 | 11 | N6783 | REMARK | K932 :4 ADULT MALES IN THE HOUSE DID NOT SEE ANYONE |
| RSO | 17:11:12 | 11 | N6783 | REMARK | K9162 :RIVER CANAL... POSS WHERE THE SUBJ STARTED WALKING THROUGH |
| RSO | 17:12:14 | 11 | N6783 | ALERT | PE150; AT WEST OF STONEYHILL X ON THE WEST OF THE CREEK |
| RSO | 17:12:40 | 11 | N6783 | DISPAR | PE174-R |
| RSO | 17:12:41 | 11 | N6783 | ALERT | PE174; AT ON FOOT RIVER X STONEY HILL OVERLOOKING HILL |
| RSO | 17:19:04 | 2 | N5089 | CONTCT | PE174 PE150 4PC44; TIMER OFF |
| RSO | 17:19:16 | 998 | 5402 | BACKUP | ES7 5ES85 |
| RSO | 17:19:17 | 998 | 5402 | MDTACK | 5ES85 |
| RSO | 17:19:31 | 2 | N5089 | CONTCT | ES7; TIMER OFF |
| RSO | 17:20:21 | 998 | 6096 | BACKUP | ES7 5ES88 |
| RSO | 17:20:23 | 998 | 6096 | MDTACK | 5ES88 |
| RSO | 17:20:48 | 998 | 5222 | BACKUP | ES7 5ES84 |
| RSO | 17:20:50 | 998 | 5222 | MDTACK | 5ES84 |
| RSO | 17:21:06 | 2 | N5089 | DISP | ST98-R; ASSIGNED TO #PE23104118 |
| RSO | 17:21:36 | 2 | N5089 | CONTCT | K9162; TIMER OFF |
| RSO | 17:23:49 | 998 | 4402 | BACKUP | ES7 ES280 |
| RSO | 17:23:50 | 998 | 4402 | MDTACK | ES280 |
| RSO | 17:23:51 | 998 | 5190 | BACKUP | ES7 5ES87 |
| RSO | 17:23:55 | 998 | 5190 | MDTACK | 5ES87 |
| RSO | 17:24:37 | 2 | N5089 | ARRIVE | 3PC41; TIMER OFF; AT STONYHILL RIVER |
| RSO | 17:25:07 | 2 | N5089 | ARRIVE | 4PC44; TIMER OFF; ROVING |
| RSO | 17:26:13 | 998 | 6096 | ARRIVE | 5ES88 |
| RSO | 17:28:59 | 998 | 4923 | RELOCA | PE150; AT STONYHILL DR X RIVER ROAD C4 |
| RSO | 17:32:17 | 2 | N5089 | CONTCT | 5ES88; TIMER OFF |
| RSO | 17:32:48 | 2 | N5089 | REMARK | ES7 :SUBJ GOA W GIRLF PRISCILLA |
| RSO | 17:33:01 | 998 | 2960 | BACKUP | ES7 ES114 |

CONFIDENTIAL    COR 001306

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 17:33:02 | 998 | 2960 | MDTACK | ES114 |
| RSO | 17:33:11 | 2 | N5089 | DISP | ST98 |
| RSO | 17:34:14 | 998 | 5402 | ARRIVE | 5ES85 |
| RSO | 17:35:34 | 2 | N5089 | CONTCT | PE150; TIMER OFF |
| RSO | 17:39:41 | 998 | 2960 | ARRIVE | ES114 |
| RSO | 17:40:59 | 2 | N5089 | REMARK | ST98 :RPD IN PURSUIT SB BARTON REF 10851/NEG ASSISTANCE NEEDED |
| RSO | 17:42:33 | 2 | N5089 | DISP | 4PC44-R; ASSIGNED TO #PC23104049 |
| RSO | 17:43:14 | 998 | 5222 | ARRIVE | 5ES84 |
| RSO | 17:45:58 | 2 | N5089 | CONTCT | ES114; TIMER OFF |
| RSO | 17:49:44 | 2 | N5089 | REMARK | ES7 :PER INTEL/K944 DOING ANNOUNCEMENTS/WILL BE CLEAR PROP W STONEY HILL |
| RSO | 17:51:36 | 2 | N5089 | REMARK | PE174 :WILL BE SOUTHEND OF PERIM VIS OF 2-3 SUBJS AT TOP OF HILL |
| RSO | 17:52:10 | 2 | N5089 | REMARK | ES7 :STANDING BY FOR BEARCAT |
| RSO | 17:52:32 | 2 | N5089 | REMARK | ST98 :VIS OF SUBJS/WILL BE 3 ON TOP OF THE HILL/POSS UNRELATED REF SUBJS |
| RSO | 17:52:43 | 2 | N5089 | REMARK | ST98 :LSW DIRTBIKE GEAR |
| RSO | 17:54:11 | 2 | N5089 | REMARK | BEARCAT 97 |
| RSO | 17:56:00 | 2 | N5089 | CONTCT | 5ES84 5ES85; TIMER OFF |
| RSO | 17:58:22 | 2 | N5089 | REMARK | ES114 :PATCH W SEB TAC2 W PER 1 |
| RSO | 18:02:10 | 998 | 3804 | BACKUP | K9162 K931 |
| RSO | 18:02:12 | 998 | 3804 | MDTACK | K931 |
| RSO | 18:02:15 | 998 | 3804 | ARRIVE | K931 |
| RSO | 18:02:21 | 2 | N5089 | CONTCT | K931; TIMER OFF |
| RSO | 18:02:37 | 2 | N5089 | REMARK | ES7 :REQ RCF TO STAGE AT JOHN X RIVER |
| RSO | 18:03:19 | 998 | 5620 | BACKUP | PE150 2PE37 |
| RSO | 18:03:22 | 998 | 5620 | MDTACK | 2PE37 |
| RSO | 18:06:04 | 7 | N6637 | REMARK | CO FIRE ADVD |
| RSO | 18:07:12 | 2 | N5089 | ARRIVE | K932; TIMER OFF |
| RSO | 18:07:40 | 2 | N5089 | ARRIVE | K932; TIMER OFF; AT WEST END OF RIVERVIEW |
| RSO | 18:18:28 | 2 | N5089 | INSERV | ST98 |
| RSO | 18:20:32 | 998 | 5620 | ENHAN8 | 2PE37 |
| RSO | 18:20:33 | 998 | 5620 | ARRIVE | 2PE37 |
| RSO | 18:20:39 | 998 | 6078 | BACKUP | PE150 1PC40 |
| RSO | 18:20:41 | 998 | 6078 | MDTACK | 1PC40 |
| RSO | 18:20:58 | 998 | 5620 | CONTCT | 2PE37; TIMER OFF |
| RSO | 18:21:39 | 2 | N5089 | REMARK | ES7 :REQ RCF BE ADVD REF UNITS ON RIVER BTWN STONYHILL W AND STONYHILL E |
| RSO | 18:21:48 | 2 | N5089 | REMARK | RCF ADVD |
| RSO | 18:25:56 | 998 | 5620 | RELOCE | 2PE37; TO STONYHILL X RIVER |
| RSO | 18:26:00 | 998 | 5620 | ARRIVE | 2PE37 |
| RSO | 18:26:03 | 998 | 5620 | CONTCT | 2PE37; TIMER OFF |
| RSO | 18:28:17 | 6 | N5970 | REMARK | ES114 :2 DOORS ON SHED LOCKED/DOGS DID NOT ALERT |
| RSO | 18:28:24 | 6 | N5970 | REMARK | ES114 :K9 CURR WORKING RV |
| RSO | 18:30:06 | 6 | N5970 | REMARK | ES7 :CLEARED RV W K9 AND UTL |
| RSO | 18:31:27 | 998 | 5919 | ENHAN8 | 3PC41 |
| RSO | 18:31:29 | 998 | 5919 | ENHAN8 | 3PC41 3PC41 |
| RSO | 18:34:31 | 6 | N5970 | REMARK | ES114 :USING DRONE TO CLEAR VEGETATION |
| RSO | 18:39:57 | 998 | 6078 | ARRIVE | 1PC40 |
| RSO | 18:41:17 | 6 | N5970 | TEXTF | STRUCTURE ON 3-4 CORNER OF CONTAINMENT UNITS WORKING ON CLEARING NOW |

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 18:46:47 | 6 | N5970 | ARRIVE | 5ES87; TIMER OFF |
|-----|----------|---|-------|--------|------------------|
| RSO | 18:47:09 | 6 | N5970 | ARRIVE | ES280; TIMER OFF |
| RSO | 18:47:20 | 3 | N6836 | CONTCT | 1PC40; TIMER OFF |
| RSO | 18:55:08 | 6 | N5970 | REMARK | PER HOMEOWNER ALL DOORS AND WINDOWS SHOULD BE INTACT |
| RSO | 18:55:37 | 6 | N5970 | REMARK | 5ES85 :3 SIDE WINDOW HAS A CRACK |
| RSO | 19:01:00 | 6 | N5970 | REMARK | 5ES85 :3 SIDE WINDOW COMPLETLY OUT/PLYWOOD SEEN INSIDE/UNABLE TO TELL IF |
| RSO | 19:01:11 | 6 | N5970 | REMARK | 5ES85 :WOOD IS SCREWED IN OR NOT/GLASS IS GONE |
| RSO | 19:01:45 | 6 | N5970 | REMARK | 5ES85 :DOORS ARE ALL IN TACT |
| RSO | 19:03:42 | 6 | N5970 | REMARK | ES7 :MOVING UP TO THE 3 SIDE |
| RSO | 19:05:49 | 6 | N5970 | DISPAR | K920-R |
| RSO | 19:05:54 | 6 | N5970 | DISPAR | K921-R |
| RSO | 19:05:59 | 6 | N5970 | DISPAR | K944-R |
| RSO | 19:06:16 | 6 | N5970 | DISPAR | 5ES57-R |
| RSO | 19:06:57 | 6 | N5970 | CONTCT | K920 K921 K944; TIMER OFF |
| RSO | 19:17:32 | 6 | N5970 | REMARK | ES7 :SHOTS FIRED |
| RSO | 19:17:41 | 6 | N5970 | REMARK | ES7 :NEG DEPS INJURED |
| RSO | 19:18:02 | 6 | N5970 | REMARK | 5ES57 :UNITS TAKE COVER |
| RSO | 19:18:14 | 6 | N5970 | REMARK | 5ES57 :NEED BEARCAT FOR COVERAGE |
| RSO | 19:18:48 | 6 | N5970 | REMARK | SUSP SHOT AT HUNITS/NEG OIS |
| RSO | 19:18:58 | 6 | N5970 | REMARK | RIGHT IFO THE BEARCAT /SUBJ IN THE TREES |
| RSO | 19:19:03 | 6 | N5970 | REMARK | DOG POSS DOWN |
| RSO | 19:19:35 | 6 | N5970 | REMARK | ES7 :UNITS HOLD CONTAINMENT/SUSP CURR EB FROM UNITS |
| RSO | 19:19:44 | 7 | N5565 | DISP | ST98 |
| RSO | 19:20:40 | 6 | N5970 | DISPAR | K912 |
| RSO | 19:20:53 | 6 | N5970 | REMARK | K912 :SUBJ WALKING EB IN THE RIVERBED STILL LSW GRY SWEATSHIRT |
| RSO | 19:21:01 | 6 | N5970 | REMARK | K912 :MALE W THE FEM |
| RSO | 19:21:08 | 6 | N5970 | REMARK | SUBJ SHOT ONE TIME |
| RSO | 19:21:15 | 6 | N5970 | REMARK | ST98 :VIS OF SUBJS HUNKERING DOWN IN A BUSH |
| RSO | 19:21:43 | 6 | N5970 | REMARK | ST98 :BEARCAT FACING SUBJS /SUBJS OFF THE PASSENGER SIDE |
| RSO | 19:22:25 | 7 | N5565 | ARRIVE | ST98; IN 15 MINS |
| RSO | 19:22:25 | 6 | N5970 | REMARK | ST98 :SUBJS ARE TOGETHER/1 SUBJ EXITING THE BUSH |
| RSO | 19:22:39 | 6 | N5970 | REMARK | ST98 :WILL BE ON THE OTHER SIDE OF TREE LINE OPPOSITE BEAR CAT |
| RSO | 19:22:48 | 6 | N5970 | REMARK | ST98 :SUBJS LAYED BACK DOWN |
| RSO | 19:22:55 | 6 | N5970 | REMARK | ST98 :WILL BE NEAR THE SMALL ROCK CROPPING |
| RSO | 19:23:17 | 6 | N5970 | REMARK | ST98 :SUBJS MOVING EB |
| RSO | 19:23:29 | 6 | N5970 | REMARK | ST98 :SUBJS IN TREE LINE NOF ROCK CROPPING |
| RSO | 19:23:34 | 6 | N5970 | REMARK | ST98 :SUBJS CURR CRAWLING AWAY FROM UNITS |
| RSO | 19:24:22 | 6 | N5970 | REMARK | ST98 :SUBJS IN A HVY TREE LINE/50 YARDS FROM THE BEAR CAT |
| RSO | 19:24:38 | 6 | N5970 | REMARK | ST98 :SUBJS CRAWLING TWDS ORIG PROPERTY UNITS WERE GOING TO SEARCH |
| RSO | 19:24:47 | 6 | N5970 | REMARK | ST98 :UNITS NOT IN THE LINE OF FIRE/SUBJS ATTG TO HIDE FROM UNITS |
| RSO | 19:25:57 | 6 | N5970 | REMARK | ST98 :SUBJS RUNNING BACK TWDS RIVER/NB AWAY FROM RIVERBOTTOM |
| RSO | 19:26:03 | 6 | N5970 | REMARK | ST98 :SUBJ HAS ITEM IN HIS LEFT HAND |
| RSO | 19:26:10 | 6 | N5970 | REMARK | ST98 :RUNNING TWDS THE GATE TWDS RIVER |
| RSO | 19:26:30 | 6 | N5970 | REMARK | ST98 :SUBJ APPROACHING ROOFTOP 085 |

COR 001308

Data Warehouse - Call Detail  (Fri May 17 13:46:03 PDT 2024)   Page : 6

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 19:26:52 | 6 | N5970 | REMARK | ST98 :SUBJ CURR IN THE DRIVEWAY |
|-----|----------|---|-------|--------|---------------------------------|
| RSO | 19:27:13 | 6 | N5970 | REMARK | ST98 :FEM STOPPED BEH WHITE SINGLEWIDE |
| RSO | 19:27:21 | 6 | N5970 | REMARK | ST98 :SUBJ HAS A GUN TO HIS HEAD |
| RSO | 19:27:26 | 6 | N5970 | REMARK | ST98 :GUN IN HIS RIGHT HAND |
| RSO | 19:27:52 | 6 | N5970 | REMARK | ST98 :SUBJ LOW CRAWLING ON THE DRIVEWAY/GUN IN HIS MOUTH |
| RSO | 19:28:06 | 6 | N5970 | REMARK | ST98 :RIGHT HAND ON THE GUN LEFT HAND IN THE AIR |
| RSO | 19:28:20 | 6 | N5970 | REMARK | ST98 :GUN TO HIS HEAD |
| RSO | 19:28:25 | 6 | N5970 | REMARK | ST98 :WATCH FOR CROSSFIRE |
| RSO | 19:28:42 | 6 | N5970 | REMARK | ST98 :WALKING TWDS THE RESD |
| RSO | 19:29:00 | 6 | N5970 | REMARK | ST98 :GUN IN HIS HAND /RIGHT TURN NOW RUNNING IN THE WASH ALONG PHONE POLES |
| RSO | 19:29:09 | 6 | N5970 | REMARK | ST98 :RUNNING AWAY FROM UNITS |
| RSO | 19:29:19 | 6 | N5970 | REMARK | ST98 :SHOTS FIRED /SUSP DOWN |
| RSO | 19:29:26 | 6 | N5970 | REMARK | ST98 :SUBJ STILL MOVING CURR CRAWLING |
| RSO | 19:29:30 | 240 | N5515 | TEXTF | RCF UPDATED// |
| RSO | 19:29:39 | 6 | N5970 | TEXTF | 3 SIDE SECURED |
| RSO | 19:29:53 | 6 | N5970 | REMARK | ST98 :MAKING CONT W SUBJ |
| RSO | 19:30:34 | 6 | N5970 | TEXTF | NEED ASSISTANCE W K9 GETTING TO THE HOSP |
| RSO | 19:30:44 | 6 | N5970 | REMARK | ES114 :1 DET'D |
| RSO | 19:31:09 | 6 | N5970 | REMARK | ST98 :NEG VIS OF FEM |
| RSO | 19:31:16 | 7 | N5565 | DISPAR | 5ES52 |
| RSO | 19:31:27 | 6 | N5970 | REMARK | 5ES52 :FEM LS BEH THE WHITE TRAILER ON THE PROPERTY |
| RSO | 19:31:41 | 240 | N5515 | TEXTF | RCF STILL STAGING |
| RSO | 19:31:43 | 6 | N5970 | REMARK | 5ES52 :2 SHOOTERS/ALL DEPS CD4 |
| RSO | 19:32:03 | 6 | N5970 | REMARK | K932 :DID NOT HAVE VIS OF FEM GO NORTH SOUTH OF THE VAN |
| RSO | 19:32:46 | 7 | N5565 | RELOCA | ES114; AT 22250 RIVER; WERE MED IS NEEDED AND WHERE OIS OCCD |
| RSO | 19:32:55 | 6 | N5970 | REMARK | 22250 RIVER WHERE OIS OCCD AND WHERE MEDICAL IS NEEDED |
| RSO | 19:33:09 | 6 | N5970 | REMARK | ST98 :FEM UNDER THE TRAILER/SO FAR COMPLIANT |
| RSO | 19:33:19 | 6 | N5970 | REMARK | ST98 :SUSP AT 22240 |
| RSO | 19:33:40 | 6 | N5970 | REMARK | ES114 :FEM IC |
| RSO | 19:34:16 | 6 | N5970 | REMARK | WILL BE K9 RUDY WHO WAS INJ |
| RSO | 19:34:28 | 6 | N5970 | REMARK | ES114 :MEDICS 97 W SUSP |
| RSO | 19:34:38 | 7 | N5565 | REMARK | CDF ADVD TO ROLL IN TO 22240 RIVER |
| RSO | 19:35:23 | 10 | N6509 | REMARK | MCB PAGED |
| RSO | 19:35:50 | 6 | N5970 | REMARK | ES114 :OCCD AT ENTRANCE OF 22250 |
| RSO | 19:36:03 | 6 | N5970 | DISP | 3PC40 |
| RSO | 19:36:09 | 6 | N5970 | REMARK | 3PC40 :STARTING CRITICAL INCIDENT |
| RSO | 19:36:13 | 998 | 6150 | MDTACK | 3PC40 |
| RSO | 19:36:33 | 6 | N5970 | REMARK | SHOOTERS ES114 AND 5ES85 |
| RSO | 19:36:38 | 16 | N4478 | REMARK | PSB ADVD |
| RSO | 19:36:51 | 6 | N5970 | REMARK | ES114 :CORR OCCD AT 22240 RIVER/AMR TAKING OVER |
| RSO | 19:37:06 | 6 | N5970 | REMARK | ES114 :REQ UNITS FOR A SAFETY SWEEP |
| RSO | 19:37:10 | 10 | N6509 | REMARK | CALL SENT TO W. MENDEZ W PSB |
| RSO | 19:37:14 | 6 | N5970 | REMARK | ES7 :SUBJ 10-7 |
| RSO | 19:37:28 | 16 | N4478 | REMARK | UNDERSHERIFF SHARP ADVD |
| RSO | 19:37:55 | 10 | N6509 | REMARK | SGT MARTINEZ W PSB ADVD |
| RSO | 19:37:59 | 16 | N4478 | REMARK | DISP ADMIN AWARE OF CALL AND COPY OF CALLS SENT TO THEM |
| RSO | 19:38:23 | 6 | N5970 | REMARK | K9 ENRT TO THE HOSP CODE IN MURR |

CONFIDENTIAL

COR 001309

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 19:38:32 | 16 | N4478 | REMARK | RSA BEING ADVD |
|-----|----------|----|-------|--------|----------------|
| RSO | 19:38:53 | 6 | N5970 | REMARK | ES7 :10-34 |
| RSO | 19:39:01 | 10 | N6509 | REMARK | MA101 ADVD / FID ADVD AND WILL BE RESPG |
| RSO | 19:39:07 | 6 | N5970 | REMARK | ES7 :UNITS DOING DOOR KNOCKS FOR POSS IMPACTS |
| RSO | 19:39:08 | 10 | N6509 | REMARK | CALL SEND TO MA101 |
| RSO | 19:39:35 | 6 | N5970 | REMARK | ES7 :UTL ANY IMPACTS |
| RSO | 19:40:09 | 6 | N5970 | REMARK | ES7 :SO FAR |
| RSO | 19:40:40 | 6 | N5970 | REMARK | PE174 :22910 RIVER X STONEY HILL WILL BE SECONDARY COMMAND POST |
| RSO | 19:40:48 | 10 | N6509 | REMARK | CALL SENT TO UNDERSHERIFF SHARP |
| RSO | 19:40:48 | 7 | N5565 | REMARK | MPD ENRT TO ASSIST IN ESCORT FOR K9 TO HOSP |
| RSO | 19:41:00 | 6 | N5970 | REMARK | 5ES52 :22285 RIVER RESIDENTS CD4 |
| RSO | 19:41:58 | 7 | N5565 | RELOCE | K920; TO VCA MURRIETA; ETA 9 MIN |
| RSO | 19:41:59 | 10 | N6509 | REMARK | SHERIFF BIANCO ADVD / CALL SENT TO SHERIFF BIANCO |
| RSO | 19:42:21 | 6 | N5970 | REMARK | 2 CRITICAL INCIDENT LOGS AT ORIG SHOOTING AND 2ND SHOOTING |
| RSO | 19:42:40 | 6 | N5970 | CONTCT | 5ES52 ES114 K912; TIMER OFF |
| RSO | 19:42:48 | 6 | N5970 | CONTCT | 5ES57; TIMER OFF |
| RSO | 19:42:49 | 6 | N5970 | CONTCT | ST98; IN 15 MINS |
| RSO | 19:42:54 | 7 | N5565 | REMARK | MPD WILL BLOCK SB 215 AT LOS ALAMOS |
| RSO | 19:43:16 | 6 | N5970 | REMARK | ES280 :AT INITIAL SHOOTING SCENE |
| RSO | 19:43:16 | 16 | N4478 | REMARK | RSA GIVEN INFO |
| RSO | 19:43:53 | 16 | N4478 | REMARK | MIB PAGED |
| RSO | 19:44:19 | 6 | N5970 | INSERV | ST98 |
| RSO | 19:44:32 | 10 | N6509 | REMARK | CORONER ADVD AND WILL CONT PE150 |
| RSO | 19:44:53 | 7 | N5565 | REMARK | K920 :K9S 1 OUT FROM HOSP / MPD ADVD |
| RSO | 19:45:16 | 6 | N5970 | REMARK | K932 :27403 EAGLECREST NO ANSWER |
| RSO | 19:45:43 | 16 | N4478 | REMARK | MA101 ADVD OF CALL |
| RSO | 19:45:54 | 10 | N6509 | REMARK | WENDY W/ MIB ADVD |
| RSO | 19:45:59 | 7 | N5565 | REMARK | *****SECONDARY COMMAND POST AT 22910 RIVER X STONEY HILL |
| RSO | 19:46:38 | 7 | N5565 | REMARK | ****3PC40 DOING CRITICAL INCIDENT LOG |
| RSO | 19:46:54 | 16 | N4478 | REMARK | SGT DELAGARZA W EMP WELLNESS AND SUPPORT UNIT ADVD OF CALL |
| RSO | 19:46:57 | 10 | N6509 | REMARK | MIB ENRT |
| RSO | 19:46:58 | 6 | N5970 | REMARK | K932 :22420 EAGLE CREST W HOMEOWNER |
| RSO | 19:47:14 | 7 | N5565 | ARRIVE | K9162; TIMER OFF |
| RSO | 19:47:16 | 7 | N5565 | ARRIVE | K920 |
| RSO | 19:47:23 | 7 | N5565 | RELOCA | K9162; AT VCA HOSP MURRIETA |
| RSO | 19:47:24 | 998 | N6799 | BACKUP | K944 1T366 |
| RSO | 19:47:25 | 7 | N5565 | CONTCT | K9162; TIMER OFF |
| RSO | 19:47:26 | 998 | N6799 | MDTACK | 1T366 |
| RSO | 19:47:37 | 6 | N5970 | REMARK | K932 :PROPERTY EMPTY AT TIME OF INCIDENT |
| RSO | 19:48:33 | 998 | N6799 | ENHAN8 | 1T366 1T366 |
| RSO | 19:48:40 | 14 | N2948 | REMARK | ON CALL DA ADVISED |
| RSO | 19:48:41 | 10 | N6509 | REMARK | CALL SENT TO SGT DE LA GARZA W WELLNESS SUPPORT UNIT |
| RSO | 19:50:15 | 7 | N5565 | RELOCA | K944; AT VCA HOSP MURRIETA |
| RSO | 19:50:41 | 7 | N5565 | CONTCT | K944; TIMER OFF |
| RSO | 19:55:56 | 998 | 2951 | BACKUP | ES114 ES106 |
| RSO | 19:55:57 | 998 | 2951 | MDTACK | ES106 |
| RSO | 19:56:50 | 5 | N6350 | REMARK | K920 :NEG ANS ON SW AIR |
| RSO | 19:57:51 | 998 | 4117 | RELOCE | K912; TO VCA MURRIETA |

CONFIDENTIAL

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.
This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| | | | | | |
|---|---|---|---|---|---|
| RSO | 19:58:00 | 7 | N5565 | RELOCE | K932; TO VCA HOSP MURRIETA |
| RSO | 19:58:12 | 998 | 2807 | ENHAN8 | K932 |
| RSO | 19:58:15 | 998 | 2807 | ENHAN8 | K932 K932 |
| RSO | 19:58:24 | 7 | N5565 | RELOCE | K921; TO VCA HOSP MURRIETA |
| RSO | 19:58:44 | 998 | 5579 | ENHAN8 | K921 |
| RSO | 19:58:47 | 998 | 5579 | ENHAN8 | K921 K921 |
| RSO | 19:59:17 | 5 | N6350 | CONTCT | K920; TIMER OFF |
| RSO | 19:59:47 | 10 | N6509 | REMARK | SGT BRITO-GONZALEZ W MIB ENRT |
| RSO | 20:02:21 | 998 | 2951 | ARRIVE | ES106 |
| RSO | 20:10:37 | 3 | N6836 | TRANS | 3PC40; AT 1014 W1X 1019; SM 89 |
| RSO | 20:18:20 | 998 | 4117 | ARRIVE | K912 |
| RSO | 20:19:40 | 6 | N5970 | REMARK | ES7 :CD4 TO DROP THE PATCH |
| RSO | 20:20:35 | 6 | N5970 | REMARK | DROPPING THE PATCH |
| RSO | 20:22:19 | 240 | N5515 | ARRIVE | 3PC40; TIMER OFF; EM 96 |
| RSO | 20:27:51 | 5 | N6350 | CONTCT | K912; TIMER OFF |
| RSO | 20:29:52 | 3 | N6836 | REMARK | PE174 :REQ SERT 21 WC DIRECT |
| RSO | 20:30:09 | 998 | 5402 | RELOCE | 5ES85; TO SEB |
| RSO | 20:31:48 | 3 | N6836 | REMARK | PE174 :MEDIA 97 |
| RSO | 20:31:54 | 7 | N4157 | REMARK | SERT5 ADV TO CONT PE174 |
| RSO | 20:32:59 | 998 | 3804 | ENHAN8 | K931 K931 |
| RSO | 20:34:30 | 5 | N6350 | CONTCT | ES106; TIMER OFF |
| RSO | 20:40:31 | 3 | N6836 | REMARK | PE174 :GTF UNITS ON PERIMETER/DIRECT ADMIN UNITS TO 2NDARY CP |
| RSO | 20:49:52 | 1 | N4157 | DISP | SERT22 |
| RSO | 20:53:59 | 56 | N6020 | DISP | 5ID21 |
| RSO | 20:55:06 | 56 | N6020 | RELOCE | 5ID21; TO STONYHILL X RIVER ROAD |
| RSO | 21:00:06 | 998 | 5402 | ARRIVE | 5ES85 |
| RSO | 21:00:14 | 998 | 5402 | CONTCT | 5ES85; TIMER OFF |
| RSO | 21:03:45 | 58 | N6256 | DISP | 5ID13; AT 24194 DAYTONA COVE |
| RSO | 21:10:37 | 3 | N6836 | ARRIVE | SERT22; TIMER OFF |
| RSO | 21:12:52 | 3 | N6836 | ARRIVE | 5ID21; TIMER OFF |
| RSO | 21:19:45 | 58 | N6256 | ARRIVE | 5ID13; TIMER OFF |
| RSO | 21:46:08 | 998 | 4402 | BUSY | ES280; AT SEB |
| RSO | 22:00:04 | 998 | 6096 | RELOCE | 5ES88; TO SEB |
| RSO | 22:00:21 | 998 | 3804 | BACKUP | K9162 K931 |
| RSO | 22:00:22 | 998 | 3804 | MDTACK | K931 |
| RSO | 22:14:45 | 998 | 6096 | ARRIVE | 5ES88 |
| RSO | 22:14:48 | 998 | 6096 | CONTCT | 5ES88; TIMER OFF |
| RSO | 22:19:28 | 44 | N7234 | DISP | 5ID93 |
| RSO | 22:20:33 | 998 | 3804 | ARRIVE | K931 |
| RSO | 22:26:02 | 1 | N4157 | CONTCT | K931; TIMER OFF |
| RSO | 22:39:53 | 52 | N7140 | TEXTF | ADDL RP DONALD JORDAN 951.437.2209 REQ DEP CONT REF HAS JUVS ALONE AT HIS RESD |
| RSO | 22:39:53 | 52 | N7140 | TEXTF | 27399 THEDA ST AND UNABLE TO GET THROUGH BLOCKAGE |
| RSO | 22:49:15 | 13 | N6411 | CONTCT | ES280; TIMER OFF |
| RSO | 22:55:28 | 1 | N4157 | REMARK | SPOKE W DONALD/ ADV GOING BACK WAY TO GET TO RESD |
| RSO | 23:21:44 | 998 | 3870 | ENHAN8 | PE174 |
| RSO | 23:21:46 | 998 | 3870 | ENHAN8 | PE174 PE174 |
| RSO | 23:27:01 | 240 | N5515 | CNTCLR | 5ID93; IN 60 MINS; 20MINS OUT |
| RSO | 23:29:23 | 1 | N4157 | DISP | 1TE65 |
| RSO | 23:29:28 | 998 | 1828 | MDTACK | 1TE65 |

Data Warehouse - Call Detail (Fri May 17 13:46:03 PDT 2024)   Page : 9

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.
This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 23:52:54 | 52 | N7140 | ARRIVE | 5ID93; TIMER OFF |
| RSO | 04/15/2023 | | | | |
| RSO | 00:07:53 | 998 | 6096 | ENHAN8 | 5ES88 |
| RSO | 00:07:54 | 998 | 5190 | ENHAN8 | 5ES87 5ES87 |
| RSO | 00:07:57 | 998 | 6096 | ENHAN8 | 5ES88 5ES88 |
| RSO | 00:10:31 | 998 | 5222 | ENHAN8 | 5ES84 5ES84 |
| RSO | 00:25:17 | 998 | 4117 | ENHAN8 | K912 |
| RSO | 00:25:20 | 998 | 4117 | ENHAN8 | K912 K912 |
| RSO | 00:29:49 | 1 | N4157 | ARRIVE | 1TE65; TIMER OFF |
| RSO | 00:33:01 | 998 | 3665 | BUSY | K9162; AT SEB |
| RSO | 00:42:57 | 998 | 1828 | ARRIVE | 1TE65 |
| RSO | 00:45:50 | 11 | N6408 | TEXTF | RP MARK REDDICK 951 350 6320 ON 911 ADVG HE IS CURR AT RIVER RD X GREENWALD REQ |
| RSO | 00:45:50 | 11 | N6408 | TEXTF | UESTING ASSISTANCE TO GET TO HIS RESD AT 22265 RACITOT |
| RSO | 00:46:09 | 998 | 3540 | ENHAN8 | K920 |
| RSO | 00:46:13 | 998 | 3540 | ENHAN8 | K920 K920 |
| RSO | 00:46:52 | 3 | N6256 | REMARK | GBD ADDTL |
| RSO | 00:49:08 | 5 | N7377 | CONTCT | 1TE65; TIMER OFF |
| RSO | 01:03:40 | 998 | 2951 | ENHAN8 | ES106 |
| RSO | 01:03:43 | 998 | 2951 | ENHAN8 | ES106 ES106 |
| RSO | 01:05:33 | 52 | N7140 | INSERV | 5ES52 |
| RSO | 01:05:54 | 998 | 5402 | INSERV | 5ES85 |
| RSO | 01:06:19 | 6 | N5970 | RELOCE | 5ID13; TO 22240 RIVER |
| RSO | 01:07:52 | 998 | 4402 | ENHAN8 | ES280 |
| RSO | 01:07:53 | 998 | 4402 | ENHAN8 | ES280 ES280 |
| RSO | 01:08:20 | 998 | 5345 | INSERV | K944 |
| RSO | 01:08:27 | 998 | 2960 | ENHAN8 | ES114 |
| RSO | 01:08:29 | 998 | 2960 | ENHAN8 | ES114 ES114 |
| RSO | 01:16:29 | 998 | 3804 | INSERV | K931 |
| RSO | 01:21:44 | 3 | N6256 | ARRIVE | 5ID13 |
| RSO | 01:21:48 | 3 | N6256 | ARRIVE | 5ID13; TIMER OFF |
| RSO | 01:29:59 | 41 | N8053 | INSERV | 5ID93; 1019 |
| RSO | 01:37:54 | 3 | N6256 | CONTCT | K9162; TIMER OFF |
| RSO | 01:43:20 | 998 | 5620 | ENHAN8 | 2PE37 |
| RSO | 01:43:22 | 998 | 5620 | ENHAN8 | 2PE37 2PE37 |
| RSO | 01:44:54 | 998 | 3665 | ENHAN8 | K9162 |
| RSO | 01:44:56 | 998 | 3665 | ENHAN8 | K9162 K9162 |
| RSO | 02:00:53 | 1 | N4157 | INSERV | PE150 |
| RSO | 02:01:51 | 1 | N4157 | COPY | FROM #PC23104039 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (LOC:) 27080 W ST HWY 74'MEAD,X MEADOWBROOK |
| RSO | 02:01:51 | 1 | N4157 | COPY | (RP:) DANIEL PUSZERT |
| RSO | 02:01:51 | 1 | N4157 | COPY | (ADD:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | (PH:) 9512599471 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1553 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REF #PC23102034 & #PC23103045 10851 ID 1154 / ADV SUBJ AT LOC IS SPRAYPAINTING |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1553 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | VEH AND SWITCHING LIC PLATE / RP BELIEVES IS 1032V HOWEVER CANNOT CONFIRM |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1554 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | TEXTF : |

CONFIDENTIAL                    COR 001312

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 02:01:51 | 1 | N4157 | COPY | RP ADV SUBJ CURR HAS BLK OLDER CHEVY S10 LIC UNK / SINFO REF JOHNNY UNK LAST HM |
|-----|----------|---|-------|------|--------|
| RSO | 02:01:51 | 1 | N4157 | COPY | (1554 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | TEXTF :A 30S 600 185 LSW GRY TANK TOP BLU JEANS |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1554 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | TEXTF :UNK REF WPNS / KNOWN TO BE HBD REF BOTTLE OF WHISKEY POSS CDN REF METH |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1554 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :3PC41 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1555 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:RP ASKING FOR DEPS TO BE DISCREET |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1556 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | TEXTF : |
| RSO | 02:01:51 | 1 | N4157 | COPY | RP ADV SUBJ IS ALSO SELLING TOOLS THAT HE HAD STOLE FRM MAINTENANCE EMP AT NEAR |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1556 060/N7231:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | TEXTF :BY APTS |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1603 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :3PC40-R |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1605 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :3PE34 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1611 007/N6637:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:ST9 ADVD VIA AIR CALL |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1614 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :5ES57; REQ UNITS STANDDOWN |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1614 998/4505 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:5ES57 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1620 998/5919 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:3PC41 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1621 998/5919 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | RELOCE:3PC41; TO 74 X THEDA |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1621 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:3PC40 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1621 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:3PC40 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1621 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:5ES57 :UNITS HEBERT AND MCPHEARSON |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1622 998/2573 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:3PC41 ES7 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1622 998/2573 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:ES7 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1624 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:3PC41 :LLAMAS,JOHNNY 050587 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1630 998/3540 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:5ES57 K920 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1630 998/3540 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:K920 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1630 998/3540 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:K920 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1632 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PE34; AT MEADBROOK X 74; IN UC |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1634 998/5345 :) |

CONFIDENTIAL

COR 001313

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.
This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:K920 K944 |
|-----|----------|---|-------|------|-------------------|
| RSO | 02:01:51 | 1 | N4157 | COPY | (1634 998/5345 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:K944 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1635 998/2807 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:3PC41 K932 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1635 998/2807 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:K932 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1637 998/2807 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:K932 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1639 998/2573 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:ES7 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1639 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:5ES57 :VEH LS EB FROM 74 ON ETHANAC |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1639 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PC40 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1640 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:3PC40 :ACHECK |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1640 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K920 3PE34; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1640 998/2573 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | INSERV:ES7 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1640 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:3PC40 :C 0 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1641 998/5919 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PC41; AT LITTLE VALLEY X GREENWALD |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1642 998/5919 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PC41 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1644 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K932; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1644 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ALERT :K932; AT THEDA NB FROM RIVER; CKG |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1645 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:3PC40; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1649 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:3PC41; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1650 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K932; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1650 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:K932 K921 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1650 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:K921 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1650 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:K921 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1650 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K921; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1653 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :K932-R; ASSIGNED TO #PC23104046 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1653 998/5919 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PC41; AT GREENWALD X HWY 74 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1654 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :3PC41-R; ASSIGNED TO #PC23104046 |

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 02:01:51 | 1 | N4157 | COPY | (1715 998/5345 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:K944 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1716 998/5345 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K944; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1722 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:5ES57; TIMER OFF; AT 27450 EAGLE CREST |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1722 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:5ES57; TIMER OFF; AT 27403 EAGLE CREST; W SEARCH TEAM |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1724 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PC40; TIMER OFF; AT STONYHILL RIVER |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1728 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:3PE34; TIMER OFF; AT STN |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1742 998/5473 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:3PE34 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1742 998/5473 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:3PE34 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1742 998/5473 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:3PE34 3PE34 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1756 002/N5089:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:K944 :K9 ANNOUNCEMENT MADE AROUND CONTAINMENT NEG RESPONSE |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1807 998/1674 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | BACKUP:3PC40 4PC44 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1807 998/1674 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:4PC44 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1812 998/1674 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:4PC44 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1815 998/1674 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:4PC44 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1815 998/1674 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:4PC44 4PC44 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1829 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | RELOCE:K921; EAST STONY HILL |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1829 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ARRIVE:K921 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1829 998/5579 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CONTCT:K921; TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1832 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:5ES57 :NEG OPEN WINDOWS |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1832 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | REMARK:5ES57 :OR DOORS ON THE 3 SIDE |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1849 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:3PC40 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1849 998/6150 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | ENHAN8:3PC40 3PC40 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1905 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISPAR:K920-R; ASSIGNED TO #PC23104046 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1905 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISPAR:K921-R; ASSIGNED TO #PC23104046 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1905 006/N5970:) |

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| RSO | 02:01:51 | 1 | N4157 | COPY | DISPAR:K944-R; ASSIGNED TO #PC23104046 |
|-----|----------|---|-------|------|----------------------------------------|
| RSO | 02:01:51 | 1 | N4157 | COPY | (1906 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISPAR:5ES57-R; ASSIGNED TO #PC23104046 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (1906 006/N5970:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | CNTCLR:; INC TIMER OFF |
| RSO | 02:01:51 | 1 | N4157 | COPY | (0152 001/N4157:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | DISP  :3PC47 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (0152 998/6154 :) |
| RSO | 02:01:51 | 1 | N4157 | COPY | MDTACK:3PC47 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (0153 001/N4157:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | INSERV:3PC47 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (0201 001/N4157:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | COPY  :COPIED #PC23104039 TO #PC23104046 |
| RSO | 02:01:51 | 1 | N4157 | COPY | (0201 001/N4157:) |
| RSO | 02:01:51 | 1 | N4157 | COPY | COPY  :; , PER PE189 |
| RSO | 03:05:16 | 50 | N8046 | DISP | 1TE64 |
| RSO | 03:05:22 | 998 | 5600 | MDTACK | 1TE64 |
| RSO | 03:08:27 | 998 | 4923 | BACKUP | 3PC40 PE150 |
| RSO | 03:08:30 | 998 | 4923 | MDTACK | PE150 |
| RSO | 03:09:34 | 998 | 4923 | RELOCA | PE150; AT RIVER RD EOF THEDA ST |
| RSO | 03:16:42 | 11 | N6408 | INSERV | SERT22 |
| RSO | 03:17:47 | 11 | N6408 | CONTCT | PE150; TIMER OFF |
| RSO | 03:43:33 | 998 | 6150 | ENHAN8 | 3PC40 |
| RSO | 03:43:35 | 998 | 6150 | ENHAN8 | 3PC40 3PC40 |
| RSO | 03:50:57 | 5 | N7377 | ARRIVE | 1TE64; TIMER OFF; ON PERR AIR |
| RSO | 04:01:05 | 998 | 5600 | ENHAN8 | 1TE64 1TE64 |
| RSO | 04:21:35 | 5 | N7377 | DISP | 1TE65-R; ASSIGNED TO #TE23105013 |
| RSO | 04:32:56 | 3 | N7665 | DISPAR | 1PE31 |
| RSO | 04:33:23 | 3 | N7665 | CONTCT | 1PE31; TIMER OFF |
| RSO | 05:49:31 | 998 | 4923 | ENHAN8 | PE150 |
| RSO | 05:50:30 | 52 | N7140 | INSERV | 5ID13 |
| RSO | 05:53:24 | 998 | 4923 | ENHAN8 | PE150 PE150 |
| RSO | 05:54:52 | 242 | N3464 | INSERV | 5ID21 |
| RSO | 06:15:30 | 998 | 6078 | ENHAN8 | 1PC40 |
| RSO | 06:15:32 | 998 | 6078 | ENHAN8 | 1PC40 1PC40 |
| RSO | 10:00:22 | 55 | N7858 | DISP | 5ID6; AT STONYHILL |
| RSO | 10:14:53 | 3 | N7779 | ARRIVE | 5ID6; TIMER OFF |
| RSO | 10:32:32 | 998 | 6102 | ENHAN8 | 1PE31 1PE31 |
| RSO | 11:25:42 | 998 | 4505 | ENHAN8 | 5ES57 5ES57 |
| RSO | 11:43:14 | 3 | N7779 | DISPAR | ST97 |
| RSO | 11:43:21 | 3 | N7779 | CONTCT | ST97; IN 10 MINS |
| RSO | 11:49:12 | 998 | 2573 | INSERV | ES7 |
| RSO | 11:54:27 | 3 | N7779 | CONTCT | ST97; IN 10 MINS |
| RSO | 12:00:11 | 3 | N7779 | INSERV | ST97 |
| RSO | 12:43:26 | 3 | N7779 | INSERV | 5ID6 |
| RSO | 12:51:18 | 2 | N6637 | DISP | MB273 |
| RSO | 12:51:29 | 3 | N7779 | 98 | MB273; CLOSING PRIMARY UNIT - MB273; OFFICER - 4078 ; REPORT TYPE - R |
| RSO | 12:51:29 | 3 | N7779 | 98 | ; CLOSURE CODES - 25Z2N |

CONFIDENTIAL

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sheriff's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| Oper | Name |
|------|------|
| 1674 | THOMAS,DAVID L |
| 1828 | CLEAR,WALLACE(12/23) |
| 2573 | WALSH,MICHAEL |
| 2807 | NACCARATO,RICHARD |
| 2951 | ALANIS,MARK |
| 2960 | HUBACHEK,SHAWN |
| 3540 | CASILLAS,RAFAEL |
| 3665 | SANTISTEVAN,JASON |
| 3804 | MUSHINSKIE,PATRICK |
| 3870 | BIKUL,KASIM |
| 4078 | BISHOP,JARRED |
| 4117 | CISNEROS,BRENT |
| 4402 | SEGURA,WALTER |
| 4505 | DEVINE,DAVID |
| 4923 | MEISSEN,JARROD S |
| 5190 | STALLARD,ANDREW |
| 5222 | HUYLER,STEVEN |
| 5345 | DAY,SHANE |
| 5402 | MCGUIRE,JIMMIE |
| 5579 | DUCOEUR,CRYSTAL |
| 5600 | CORTEZ,DANIEL |
| 5620 | AZIZ,YASMEEN |
| 5919 | DELAROSA,RUDY |
| 6078 | BELL,ROBERT |
| 6096 | BLYTHE,ZACHARY |
| 6102 | REGALADO,ALEX |
| 6150 | SANCHEZ,JOSE |
| 6192 | AVELAR,ALLEN |
| N2948 | ZENIBUKURO,YUKARI |
| N3464 | JOU,JUDY |
| N4157 | SMITH,KELLI |
| N4478 | VARELA,ELENA(12/23) |
| N5089 | SUTTON,MONICA |
| N5515 | MURREY,KIMBERLY |
| N5565 | IBARRA,RINDI |
| N5872 | WHEELER,MARK |
| N5970 | HOLMES,CHRISTINA M |
| N6020 | CARAZA,MICHAEL(07/23) |
| N6256 | SERNA,JOANNA(01/24) |
| N6350 | MERAZ,KIMBERLY |
| N6408 | PASSALACQUA,RACHEL |
| N6411 | GIMPEL,JENNIFER |
| N6509 | DIAZ,AMY |
| N6637 | HERNANDEZ,SIERRA |
| N6783 | BLANSET,ALEXIS |
| N6799 | DE LA MORA, STEPHANIE |
| N6836 | MACIAS,ESMERALDA |
| N7140 | BRINTLE,VICTORIA |

Copyright (C) 2005-2024 Riverside County Sheriff's Department. All rights reserved.

This information is for internal Sherrif's Department use only and shall not
be released outside the department without the express permission of the Sheriff

| N7234 | URIBE,BRITTANY |
|-------|----------------|
| N7377 | WHENNEN,TRAVIS |
| N7665 | KLUNDT,LYNDSAY |
| N7779 | JACKSON,ALYSSA |
| N7858 | BURNARD,CHELSEA |
| N8046 | CLARK,ASIANNA |
| N8053 | VIRAMONTES CAMPOS,DALIA |

CONFIDENTIAL

# EXHIBIT 13

# EXHIBIT 13



# EXHIBIT 14

# EXHIBIT 14

Page 1

US DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA


Case No.: 5:2024cv00249


----------------------------x

Llamas,

                    Plaintiff,

V.


County of Riverside, et al.

                    Defendants.

--------------------------------x


    205. Interview. Campbell, C. 041523[COR 000351 -
                CONFIDENTIAL]



COR 002026

Page 2

```
 1                A P P E A R A N C E S

 2   Mr. Bishop

 3   Mr. Crosson

 4   Carolyn Campbell

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



COR 002027

Page 3

```
 1              MR. BISHOP:  It's April 15th, 2022, 1201
 2   hours.  Investigator Bishop and Crosson are at 402
 3   Davis Street and Elsinore attempting contact with
 4   Carolyn Campbell next of kin to Johnny Llamas.
 5              Gets serenaded.  Yeah.  So the taxi
 6   found the truck?
 7              MR. CROSSON:  Yeah.
 8              MR. BISHOP:  I'm already on.
 9              Hello.
10              MS. CAMPBELL:  Hi.
11              MR. BISHOP:  Hi, Sheriff's Department.
12              MS. CAMPBELL:  Hi.
13              MR. BISHOP:  Hi, are you Carolyn?
14              MS. CAMPBELL:  Yes.
15              MR. BISHOP:  Can we talk to you for a
16   second, ma'am?
17              MS. CAMPBELL:  Yeah.  Come on in.
18              MR. CROSSON:  Okay.  Is the dog going to
19   kill us?
20              MS. CAMPBELL:  Let me grab my dog.  I
21   don't want him to go out, please.
22              MR. BISHOP:  Okay.  Yeah, grab him.
23              MS. CAMPBELL:  Come here.  I'm going to
24   spank your butt.
25              MR. CROSSON:  Yeah.  Get him.
```



Page 4

1              MS. CAMPBELL:  Yeah.  You'll get me.

2    Come on you little brat.  Just make sure --

3              MR. CROSSON:  It's latched.  It's

4    latched here in the middle.

5              MS. CAMPBELL:  Thank you.

6              MR. CROSSON:  Here we go.

7              MR. BISHOP:  It's always the little

8    dogs, huh.

9              MR. CROSSON:  Get back there.  Get back.

10   You won't --

11             MS. CAMPBELL:  (Inaudible.)

12             MR. BISHOP:  Here.  I'll latch it for

13   you.  There we go.

14             You're okay.

15             MR. CROSSON:  Okay.  So, I'm sorry,

16   Carolyn Campbell?

17             MS. CAMPBELL:  Yes.

18             MR. CROSSON:  Did you used to live over

19   on Greenwald?

20             MS. CAMPBELL:  Yes.

21             MR. CROSSON:  Okay.  Do you have a son

22   named Johnny?

23             MS. CAMPBELL:  Yes.

24             MR. CROSSON:  Okay.  Can we talk to you

25   about that?  Is there someplace we can sit down or



Page 5

1  is that all we got?  Okay.  Go ahead.  We'll follow

2  you.  It's latched.

3            MS. CAMPBELL:  Hey, what's going on.

4            MR. BISHOP:  Well, he was in a little

5  bit of trouble.

6            MS. CAMPBELL:  I had figured that.

7            MR. CROSSON:  Yeah.  Why is that?

8            MS. CAMPBELL:  Because, you know, he

9  doesn't listen to me.  We've been fighting because

10  (inaudible), and patrol officer, and, you know

11  (inaudible) life.  But he has so many problems.  I

12  don't know what it is.

13            MR. CROSSON:  What kind of problems?

14            MR. BISHOP:  You are okay.  Come on.

15            MS. CAMPBELL:  Fighting people.

16  Fighting (inaudible) and all kinds of stuff.

17            MR. CROSSON:  Come on.  When was the

18  last time you saw him?

19            MS. CAMPBELL:  A week ago.

20            MR. BISHOP:  Carolyne, would you mind if

21  we just turn the volume on the TV down?  I'm having

22  a hard time hearing you if you don't mind.  Yeah.

23            MR. CROSSON:  Is this right here?

24            MS. CAMPBELL:  I got it right here.

25            MR. BISHOP:  Okay.  Thank you very much.



Page 6

1    I have a -- I have a hearing problem, so it's hard

2    for me to hear if I have --

3                MS. CAMPBELL:  I do.  (Inaudible).  Okay

4    --

5                MR. CROSSON:  Okay.  So I'm sorry, you

6    said you saw him about a week ago?

7                MS. CAMPBELL:  Yeah.

8                MR. CROSSON:  And what was going on with

9    him then?  What did he say?

10               MS. CAMPBELL:  Well, it just -- he

11   looked skinny.  He just looked like he had been

12   having a lot of problems.

13               MR. CROSSON:  Yeah.

14               MS. CAMPBELL:  And, I guess, he has so

15   many problems.

16               MR. CROSSON:  Oh, really?  Do you know

17   if he had like -- has like a drug problem or

18   anything?

19               MS. CAMPBELL:  No, not that I know of.

20               MR. CROSSON:  No, you don't know whether

21   he uses drugs?

22               MS. CAMPBELL:  He don't even drink.

23               MR. CROSSON:  Oh, really?

24               MS. CAMPBELL:  Mm-hmm.

25               MR. CROSSON:  Okay.  So apparently he



Page 7

1   had some warrants for his arrest, you know, do you

2   know anything about that?

3              MS. CAMPBELL:  Yeah.  He was accused of

4   molesting his niece or something like that.

5              MR. CROSSON:  Oh, really?

6              MS. CAMPBELL:  And he was supposed to go

7   to check in or something like that.  And it -- I

8   guess he just was scared that if he went in that

9   they would automatically -- she said something.

10             MR. CROSSON:  Oh, okay.

11             MS. CAMPBELL:  You know, that it would

12  automatically just be bad on him.

13             MR. CROSSON:  Is that a niece on your

14  side of the family?

15             MS. CAMPBELL:  Yes.

16             MR. CROSSON:  How old was she?

17             MS. CAMPBELL:  Granddaughter.  Thirteen.

18             MR. CROSSON:  Thirteen.  All right.  How

19  old is Johnny?

20             MS. CAMPBELL:  Thirty-four.

21             MR. CROSSON:  Okay.

22             MR. BISHOP:  I just want to make sure.

23  This is one of Johnny's old booking photos, but this

24  is -- this is your son, correct?

25             MS. CAMPBELL:  Yeah.



Page 8

```
 1                MR. BISHOP:  Okay.  All right.  I just
 2  want to make sure we're talking about the right
 3  person.
 4                MR. CROSSON:  Does he go by any other
 5  names?
 6                MS. CAMPBELL:  No.
 7                MR. CROSSON:  Does anybody call him Jay?
 8                MS. CAMPBELL:  No.
 9                MR. CROSSON:  Nothing that you're aware
10  of?
11                MS. CAMPBELL:  Not that I know of.  But
12  he is been out there doing his own thing.  I don't
13  want to know nothing that's going on in his life or
14  --
15                MR. CROSSON:  You don't want to know?
16                MS. CAMPBELL:  I don't want to know.
17                MR. CROSSON:  You just don't want to be
18  involved with what is going on?
19                MS. CAMPBELL:  I don't want to be
20  involved.  I don't know what's going on.  I love him
21  to death, you know.
22                MR. CROSSON:  That's your son, right?
23                MS. CAMPBELL:  I just -- I don't know
24  what I can do for him because he's always mad at me
25  because I always --
```



Page 9

```
 1                    MR. CROSSON:  Yeah.
 2                    MS. CAMPBELL:  Tell him, you know --
 3   like he can walk out with a glass and I tell him,
 4   Johnny, you know, don't walk off with my glasses, my
 5   forks, and before you know it, I'm not going to have
 6   nothing, you know.  So -- and that's real -- you
 7   know, really what it basically is.  But you he tries
 8   -- he really does try.
 9                    MR. CROSSON:  Mm-hmm.
10                    MS. CAMPBELL:  (Inaudible) his foot on
11   the right path, but it just doesn't need to get out
12   here.
13                    MR. CROSSON:  Yeah.  Does he have a
14   girlfriend?
15                    MS. CAMPBELL:  Yes.
16                    MR. CROSSON:  Who is it?  Do you know --
17   do you know her?
18                    MS. CAMPBELL:  I don't know her.
19                    MR. CROSSON:  Have you seen her?
20                    MS. CAMPBELL:  Well, he's had a few
21   girlfriends actually.
22                    MR. CROSSON:  No.  Recent girlfriends, I
23   guess.
24                    MS. CAMPBELL:  Well, I heard -- I
25   haven't met her, but I heard there's -- she's black
```



Page 10

 1   or something.

 2              MR. CROSSON:  Okay.

 3              MS. CAMPBELL:  Black.

 4              MR. CROSSON:  You don't know her name

 5   though?

 6              MS. CAMPBELL:  Um-um (negative).

 7              MR. CROSSON:  No.  Any other other

 8   questions?

 9              MR. BISHOP:  No.

10              MR. CROSSON:  Ma'am, I'm going to give

11   you my card and then, let you know what I'm doing.

12   Okay?  I'm an investigator with the District

13   Attorney's office.

14              MS. CAMPBELL:  Uh-huh (affirmative).

15              MR. CROSSON:  Okay?  And we investigate

16   officer-involved shootings.  All right?  So your son

17   was involved with an incident with the Riverside

18   County Sheriff's last night, and I'm sorry to tell

19   you that he was shot and killed.

20              MS. CAMPBELL:  No.

21              MR. CROSSON:  Okay.  I'm sorry.  That's

22   why we --

23              MS. CAMPBELL:  No, don't say that.

24   Please don't say that.

25              MR. CROSSON:  I'm sorry, ma'am.  I'm



Page 11

1  very sorry.  That's why we showed you the picture to

2  make sure you were talking to the right person.

3              MR. BISHOP:  It's true, ma'am.  We're

4  very sorry.

5              MS. CAMPBELL:  So why are you guys

6  coming here and talking like this and all of a

7  sudden tell me my son is dead?  (Inaudible.)

8              MR. CROSSON:  You can contact the

9  coroner.  We can give you all the information you

10 need.

11             MS. CAMPBELL:  Oh my God.

12             MR. CROSSON:  If you want, ma'am, I can

13 write down that information on the back of my card

14 so that you have the numbers you need.  And if you

15 need anything at all, you can call me -- you can

16 call me and I'm -- I'll be willing to help you.

17             MS. CAMPBELL:  What happened?  What

18 happened with him.

19             MR. CROSSON:  I can't give you all the

20 details, okay?  I can just tell you that.

21             MS. CAMPBELL:  Stop, baby.  Stop.

22             MR. CROSSON:  (Inaudible) upset.  So --

23             MS. CAMPBELL:  He's dead.  He's dead.

24             MR. CROSSON:  Yeah.  I'm sorry, ma'am.

25 And --



Page 12

 1              MR. BISHOP:  Because he was --

 2              MS. CAMPBELL:  What happened?  What

 3   happened.

 4              MR. CROSSON:  The basic information --

 5              MS. CAMPBELL: Stop.  Okay.  Stop.

 6              MR. CROSSON:  It's okay.  It's okay.

 7              MR. BISHOP:  You're okay, (inaudible).

 8              MS. CAMPBELL:  Come here.

 9              MR. BISHOP:  You're okay.

10              MR. CROSSON:  Put the dog out and close

11   the door.

12              MS. CAMPBELL:  No, you stop barking.

13   Come on.  Come on, baby.  He is dead, huh?  No, he

14   can't be.

15              MR. CROSSON:  He had -- he knew about

16   the warrants that he had, right?

17              MS. CAMPBELL:  I didn't know about any

18   warrant.  I know --

19              MR. CROSSON:  (Crosstalks) us there was

20   one incident.  Okay?  But he had multiple warrants

21   for his arrest, and he tried to -- he went on a

22   pursuit with the police and --

23              MS. CAMPBELL:  Oh.

24              MR. CROSSON:  -- and at the end of the

25   -- and at the end of that pursuit, unfortunately, he



Page 13

1    ended up being shot and killed.  Okay?  And that was

2    last night.

3                MS. CAMPBELL:  How many times he was

4    shot.

5                MR. CROSSON:  I don't know, ma'am.

6                MS. CAMPBELL:  You don't know.

7                MR. CROSSON:  I don't know that.  I

8    don't have that information.

9                MS. CAMPBELL:  I need to go see him.

10               MR. CROSSON:  Okay.  Well, let me write

11   it down.

12               MR. BISHOP:  I got you.

13               MR. CROSSON:  Oh, you got it already?

14               MR. BISHOP:  Yeah.

15               MR. CROSSON:  Well, here's my -- keep my

16   card, and like I said, I know -- I know you're upset

17   and I get it.  But the reason we're here is because

18   we investigate the actions of the officers involved

19   in the shooting, okay?  We're not investigating your

20   son, we're investigating the officers, okay?  So if

21   you need something, you give me a call and I'll

22   answer any questions I can.  And he's going to give

23   you the information from the coroner's office.  Is

24   there somebody we could call for you to come with --

25   come over here for you?



COR 002038

Page 14

```
 1              MS. CAMPBELL:  No.

 2              MR. CROSSON:  To be with you right now,

 3   is there somebody that can help you with this?

 4              MS. CAMPBELL:  No.  How do I go see him?

 5   What do I do.

 6              MR. BISHOP:  Carolyn, let me explain the

 7   process to you a little bit, okay?

 8              MS. CAMPBELL:  I need to go see him.

 9              MR. BISHOP:  That's --

10              MS. CAMPBELL:  I need to go see him.

11              MR. BISHOP:  That's not a possibility

12   right this second, okay?  That --

13              MS. CAMPBELL:  Oh God, I wish he

14   would've (inaudible) what he's done or whatever.

15   Oh, what -- they chased him, or what happened.

16              MR. BISHOP:  Well, he ran from the

17   deputies.  They were trying to arrest him for his

18   warrant, and he ran from the deputies.  Okay.  A

19   sheriff's department K9, one of the -- one of the

20   dogs was shot and killed during that incident as

21   well.

22              MS. CAMPBELL:  Oh.

23              MR. BISHOP:  Okay?

24              MS. CAMPBELL:  Is this real?  This isn't

25   real, is it.
```



COR 002039

Page 15

 1              MR. BISHOP:  It's very -- it's very
 2    much, unfortunately, it is, or we would not be doing
 3    this to you unless we were -- unless we would not do
 4    this to you unless it was real.
 5              MS. CAMPBELL:  Oh, my God.  Well, he
 6    never made it to straighten out, did he?  I was
 7    hoping he would.
 8              MR. BISHOP:  As every mom would.
 9              MS. CAMPBELL:  Oh my God.  When can I
10    see?  What do I do (inaudible).
11              MR. BISHOP:  I'm going to give you --
12    let me show you this card right here, okay?
13              MS. CAMPBELL:  Okay.
14              MR. BISHOP:  So, right -- this is my
15    card, on the back here is the number for the
16    coroner's office, okay?  This is the coroner's case
17    number, okay?  So what's going to happen is -- I'll
18    let you have this.  What's going to happen is,
19    there's going to be an autopsy conducted on Tuesday,
20    okay?  Because we need to obviously know, just like
21    you want to know how many times he was hit and
22    things like that, okay?
23              MS. CAMPBELL:  But I can't just go -- I
24    can't go get my kiss or nothing right now.  I can't
25    --



Page 16

1           MR. BISHOP:  You can't right now.

2           MR. CROSSON:  They would let you view on

3  afterwards.

4           MS. CAMPBELL:  Would I have to wait

5  until Tuesday.

6           MR. BISHOP:  Well, what will happen is

7  -- so you can't -- the coroner's office will not let

8  you go into the coroner's office to do a viewing,

9  okay?  So what's going to have to happen is that

10  you're going to need to make arrangements with a

11  mortuary or contact our coroner's office and they

12  will help --

13           MS. CAMPBELL:  I don't have any money.

14  What do I do.

15           MR. BISHOP:  They'll help you out with

16  that.  You just need to call them, okay?

17           MS. CAMPBELL:  Okay.

18           MR. BISHOP:  And they will -- they will

19  help you out with that, okay?  Once a mortuary picks

20  him up, you are more than free to go -- go see him

21  and things like that.  They just -- because of COVID

22  and everything else, they won't let anybody into the

23  coroner's office right now, okay?  So what I'll tell

24  you is, on Monday, just try to give them a call,

25  okay?



COR 002041

Page 17

```
 1              MS. CAMPBELL:  Today's only Saturday.  I
 2  have to wait that long.  I mean, I want to -- I want
 3  to see him.
 4              MR. CROSSON:  I'm sorry.
 5              MR. BISHOP:  I know, ma'am.  It's just
 6  --
 7              MR. CROSSON:  You can call them and at
 8  least try and get -- you know, get some information
 9  from them.  They can inform you better on what's
10  going to happen, you know, once they're done with
11  the autopsy.  And like I said, if there's somebody
12  we can call for you to help you with this, we're
13  more than happy to do that.
14              MR. BISHOP:  Is there -- do you have any
15  -- do you have any family in the area or anything
16  like that?
17              MS. CAMPBELL:  No, I'll be all right.
18              MR. BISHOP:  Would you like to call us?
19  We can call a counselor, or, you know, a pastor or
20  something like that if you'd like.
21              MS. CAMPBELL:  I was (inaudible) this
22  would never happen because, you know, there's so
23  many people that don't get -- they don't get along
24  together, and I was worried about -- never from the
25  sheriff.
```



Page 18

 1              MR. BISHOP:  Yeah.  It was very

 2  unfortunate what happened?  Like my partner said,

 3  we're -- our job is to investigate the deputies.

 4              MS. CAMPBELL:  What time did this all

 5  happen?  Do you know.

 6              MR. CROSSON:  This was last night before

 7  dark.

 8              MS. CAMPBELL:  Like what -- what time?

 9  8:00.  What --

10              MR. CROSSON:  Like 7:00, maybe?

11              MR. BISHOP:  Yeah, it was about 7:30

12  last night.

13              MS. CAMPBELL:  And where was this at.

14              MR. BISHOP:  Over in Meadowbrook.

15              MS. CAMPBELL:  Oh, in Meadowbrook.

16              MR. CROSSON:  Mm-hmm.

17              MR. BISHOP:  What does -- does he have

18  people over there or does he associate over in

19  Meadowbrook?  Because it was close to where you used

20  to live?

21              MS. CAMPBELL:  Yeah, he knows a lot of

22  people over there.  We were -- he -- I got him there

23  in '89.

24              MR. BISHOP:  Okay.

25              MR. CROSSON:  Where was he living?



Page 19

1   Where was he living before?  Where was he living?

2              MS. CAMPBELL:  All over.

3              MR. CROSSON:  He didn't have a

4   (inaudible).

5              MS. CAMPBELL:  Well, he had a place and

6   then somebody could rob him or --

7              MR. BISHOP:  Okay.

8              MS. CAMPBELL:  Something, you know, he'd

9   leave that place and he'd go somewhere.  I never

10  knew where he was at.

11             MR. CROSSON:  But lately -- but lately

12  he didn't have a residence.

13             MS. CAMPBELL:  No.

14             MR. CROSSON:  Okay.

15             MR. BISHOP:  It was -- it was over by

16  the backside of the lake off of River.

17             MS. CAMPBELL:  By River.

18             MR. BISHOP:  Yeah.

19             MS. CAMPBELL:  Oh, okay -- okay.

20             MR. BISHOP:  So yeah, the entire -- the

21  entire situation's unfortunate, like I said, as --

22             MS. CAMPBELL:  And what's your name?

23  Jared.

24             MR. BISHOP:  Yes, ma'am.

25             MS. CAMPBELL:  And yours?  Just, this



Page 20

 1   one right here.

 2             MR. CROSSON:  Eric Crosson.  Yeah,.

 3             MS. CAMPBELL:  That is -- that's --

 4   doesn't say that here.

 5             MR. CROSSON:  It is not right there.

 6             MS. CAMPBELL:  This says, Michael.

 7             MR. BISHOP:  No, that's --

 8             MR. CROSSON:  (Crosstalks.)

 9             MR. BISHOP:  In the middle.

10             MS. CAMPBELL:  Okay.

11             MR. CROSSON:  Michael's my boss.

12             MS. CAMPBELL:  Okay.  All right guys.

13             MR. CROSSON:  Okay.

14             MR. BISHOP:  I think Eric's cell phone

15   number is on there.  My cell phone's number is on

16   there.  If we leave and you have any questions, you

17   can give us -- give us a call.  We're going to be

18   working all day today and all day tomorrow, okay?

19   Again, is there anything that we can do for you

20   right now?

21             MS. CAMPBELL:  No.

22             MR. BISHOP:  I had -- we had to drop

23   this news on you and just leave, but we had -- we

24   had to let you know.

25             MS. CAMPBELL:  Okay.  Probably let me



Page 21

1    call my daughter and my sisters, so --

2                MR. BISHOP:  Okay.

3                MR. CROSSON:  All right.  Once again --

4                MS. CAMPBELL:  (Inaudible.)

5                MR. CROSSON:  I won't.  If you need

6    something though, you just give us a call, okay?

7    We're very sorry, ma'am.

8                MS. CAMPBELL:  It's all right.

9                MR. BISHOP:  Okay.

10                MR. CROSSON:  Come and lock up your

11    door.

12                MR. BISHOP:  12:14.

13

14

15

16

17

18

19

20

21

22

23

24

25



COR 002046

Page 22

1                  CERTIFICATE OF TRANSCRIPTION

2     I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT

3     I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;

4      AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT

5                  TRANSCRIPTION OF MY NOTES.

6     I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL

7     OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE

8     OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH

9       THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE

10                         ACTION.

11    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

12      APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

13    UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

14                 CERTIFYING TRANSCRIBER.

15            DATED THIS 12TH DAY OF SEPTEMBER 2024

16            *Stephen Simpson*

17             STEPHEN SIMPSON, TRANSCRIBER

18

19

20

21

22

23

24

25



COR 002047

# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



CONFIDENTIAL

COR 002048

## A

accused
7:3
ACTION
22:9,10
actions
13:18
affirmative
10:14
ago
5:19 6:6
ahead
5:1
al
1:10
AND/OR
22:13
answer
13:22
anybody
8:7 16:22
apparently
6:25
APPLY
22:12
April
3:1
area
17:15
arrangements
16:10
arrest
7:1 12:21 14:17
associate
18:18
attempting
3:3
ATTORNEY
22:6,8
Attorney's
10:13
AUDIO
22:3
AUTHORIZED
22:3

automatically
7:9,12
autopsy
15:19 17:11
aware
8:9

## B

baby
11:21 12:13
back
4:9,9 11:13 15:15
backside
19:16
bad
7:12
barking
12:12
basic
12:4
basically
9:7
better
17:9
Bishop
2:2 3:1,2,8,11,13,15
3:22 4:7,12 5:4,14
5:20,25 7:22 8:1
10:9 11:3 12:1,7,9
13:12,14 14:6,9,11
14:16,23 15:1,8,11
15:14 16:1,6,15,18
17:5,14,18 18:1,11
18:14,17,24 19:7,15
19:18,20,24 20:7,9
20:14,22 21:2,9,12
bit
5:5 14:7
black
9:25 10:3
booking
7:23
boss
20:11
brat
4:2

butt
3:24

## C

C
1:14 2:1
CALIFORNIA
1:1
call
8:7 11:15,16 13:21
13:24 16:16,24 17:7
17:12,18,19 20:17
21:1,6
Campbell
1:14 2:4 3:4,10,12,14
3:17,20,23 4:1,5,11
4:16,17,20,23 5:3,6
5:8,15,19,24 6:3,7
6:10,14,19,22,24
7:3,6,11,15,17,20
7:25 8:6,8,11,16,19
8:23 9:2,10,15,18
9:20,24 10:3,6,14
10:20,23 11:5,11,17
11:21,23 12:2,5,8
12:12,17,23 13:3,6
13:9 14:1,4,8,10,13
14:22,24 15:5,9,13
15:23 16:4,13,17
17:1,17,21 18:4,8
18:13,15,21 19:2,5
19:8,13,17,19,22,25
20:3,6,10,12,21,25
21:4,8
card
10:11 11:13 13:16
15:12,15
Carolyn
2:4 3:4,13 4:16 14:6
Carolyne
5:20
case
1:3 15:16
cell
20:14,15
CENTRAL

1:1
CERTIFICATE
22:1
CERTIFICATION
22:11
CERTIFY
22:2,6
CERTIFYING
22:14
chased
14:15
check
7:7
close
12:10 18:19
come
3:17,23 4:2 5:14,17
12:8,13,13 13:24,25
21:10
coming
11:6
conducted
15:19
CONFIDENTIAL
1:15
CONNECTED
22:8
contact
3:3 11:8 16:11
CONTROL
22:13
coroner
11:9
coroner's
13:23 15:16,16 16:7
16:8,11,23
correct
7:24 22:4
COUNSEL
22:6,8
counselor
17:19
County
1:10 10:18
COURT
1:1



COR 002049

**COVID**
16:21
**Crosson**
2:3 3:2,7,18,25 4:3,6
4:9,15,18,21,24 5:7
5:13,17,23 6:5,8,13
6:16,20,23,25 7:5
7:10,13,16,18,21
8:4,7,9,15,17,22 9:1
9:9,13,16,19,22
10:2,4,7,10,15,21
10:25 11:8,12,19,22
11:24 12:4,6,10,15
12:19,24 13:5,7,10
13:13,15 14:2 16:2
17:4,7 18:6,10,16
18:25 19:3,11,14
20:2,2,5,8,11,13
21:3,5,10
**Crosstalks**
12:19 20:8

**D**

**dark**
18:7
**DATED**
22:15
**daughter**
21:1
**Davis**
3:3
**day**
20:18,18 22:15
**dead**
11:7,23,23 12:13
**death**
8:21
**Defendants**
1:11
**department**
3:11 14:19
**deputies**
14:17,18 18:3
**details**
11:20
**DIRECT**

22:13
**DIRECTION**
22:13
**District**
1:1,1 10:12
**dog**
3:18,20 12:10
**dogs**
4:8 14:20
**doing**
8:12 10:11 15:2
**door**
12:11 21:11
**drink**
6:22
**drop**
20:22
**drug**
6:17
**drugs**
6:21

**E**

**E**
2:1,1
**Elsinore**
3:3
**EMPLOYEE**
22:7
**ended**
13:1
**entire**
19:20,21
**Eric**
20:2
**Eric's**
20:14
**et**
1:10
**explain**
14:6

**F**

**family**
7:14 17:15
**fighting**

5:9,15,16
**figured**
5:6
**FILE**
22:3
**FINANCIALLY**
22:9
**follow**
5:1
**foot**
9:10
**FOREGOING**
22:4,11
**forks**
9:5
**found**
3:6
**free**
16:20
**FURTHER**
22:6

**G**

**girlfriend**
9:14
**girlfriends**
9:21,22
**give**
10:10 11:9,19 13:21
13:22 15:11 16:24
20:17,17 21:6
**glass**
9:3
**glasses**
9:4
**go**
3:21 4:6,13 5:1 7:6
8:4 13:9 14:4,8,10
15:23,24 16:8,20,20
19:9
**God**
11:11 14:13 15:5,9
**going**
3:18,23 5:3 6:8 8:13
8:18,20 9:5 10:10
13:22 15:11,17,18

15:19 16:9,10 17:10
20:17
**grab**
3:20,22
**Granddaughter**
7:17
**Greenwald**
4:19
**guess**
6:14 7:8 9:23
**guys**
11:5 20:12

**H**

**happen**
15:17,18 16:6,9
17:10,22 18:5
**happened**
11:17,18 12:2,3
14:15 18:2
**happy**
17:13
**hard**
5:22 6:1
**hear**
6:2
**heard**
9:24,25
**hearing**
5:22 6:1
**Hello**
3:9
**help**
11:16 14:3 16:12,15
16:19 17:12
**Hey**
5:3
**Hi**
3:10,11,12,13
**hit**
15:21
**hoping**
15:7
**hours**
3:2
**huh**



4:8 12:13

**I**

**inaudible**
4:11 5:10,11,16 6:3
9:10 11:7,22 12:7
14:14 15:10 17:21
19:4 21:4
**incident**
10:17 12:20 14:20
**inform**
17:9
**information**
11:9,13 12:4 13:8,23
17:8
**INTERESTED**
22:9
**Interview**
1:14
**investigate**
10:15 13:18 18:3
**investigating**
13:19,20
**investigator**
3:2 10:12
**involved**
8:18,20 10:17 13:18

**J**

**Jared**
19:23
**Jay**
8:7
**job**
18:3
**Johnny**
3:4 4:22 7:19 9:4
**Johnny's**
7:23

**K**

**K9**
14:19
**keep**
13:15
**kill**

**killed**
10:19 13:1 14:20
**kin**
3:4
**kind**
5:13
**kinds**
5:16
**kiss**
15:24
**knew**
12:15 19:10
**know**
5:8,10,12 6:16,19,20
7:1,2,11 8:11,13,15
8:16,20,21,23 9:2,4
9:5,6,7,16,17,18
10:4,11 12:17,18
13:5,6,7,16,16
15:20,21 17:5,8,10
17:19,22 18:5 19:8
20:24
**knows**
18:21

**L**

**lake**
19:16
**latch**
4:12
**latched**
4:3,4 5:2
**lately**
19:11,11
**leave**
19:9 20:16,23
**life**
5:11 8:13
**listen**
5:9
**little**
4:2,7 5:4 14:7
**live**
4:18 18:20
**living**

18:25 19:1,1
**Llamas**
1:6 3:4
**lock**
21:10
**long**
17:2
**looked**
6:11,11
**lot**
6:12 18:21
**love**
8:20

**M**

**ma'am**
3:16 10:10,25 11:3
11:12,24 13:5 17:5
19:24 21:7
**mad**
8:24
**Meadowbrook**
18:14,15,19
**mean**
17:2
**MEANS**
22:12
**met**
9:25
**Michael**
20:6
**Michael's**
20:11
**middle**
4:4 20:9
**mind**
5:20,22
**Mm-hmm**
6:24 9:9 18:16
**molesting**
7:4
**mom**
15:8
**Monday**
16:24
**money**

16:13
**mortuary**
16:11,19
**multiple**
12:20

**N**

**N**
2:1
**name**
10:4 19:22
**named**
4:22
**names**
8:5
**need**
9:11 11:10,14,15
13:9,21 14:8,10
15:20 16:10,16 21:5
**negative**
10:6
**never**
15:6 17:22,24 19:9
**news**
20:23
**niece**
7:4,13
**night**
10:18 13:2 18:6,12
**NOTES**
22:5
**number**
15:15,17 20:15,15
**numbers**
11:14

**O**

**obviously**
15:20
**office**
10:13 13:23 15:16
16:7,8,11,23
**officer**
5:10
**officer-involved**
10:16



MAGNA
CONFIDENTIAL
LEGAL SERVICES

COR 002051

officers
13:18,20
**Oh**
6:16,23 7:5,10 11:11
  12:23 13:13 14:13
  14:15,22 15:5,9
  18:15 19:19
**okay**
3:18,22 4:14,15,21
  4:24 5:1,14,25 6:3,5
  6:25 7:10,21 8:1
  10:2,12,15,21 11:20
  12:5,6,6,7,9,20 13:1
  13:10,19,20 14:7,12
  14:18,23 15:12,13
  15:16,17,20,22 16:9
  16:16,17,19,23,25
  18:24 19:7,14,19,19
  20:10,12,13,18,25
  21:2,6,9
**old**
7:16,19,23
**once**
16:19 17:10 21:3

**P**

**P**
2:1,1
**PAGES**
22:4
**PARTIES**
22:7
**partner**
18:2
**PARTY**
22:8
**pastor**
17:19
**path**
9:11
**patrol**
5:10
**people**
5:15 17:23 18:18,22
**person**
8:3 11:2

**phone**
20:14
**phone's**
20:15
**photos**
7:23
**picks**
16:19
**picture**
11:1
**place**
19:5,9
**Plaintiff**
1:7
**please**
3:21 10:24
**police**
12:22
**possibility**
14:11
**Probably**
20:25
**problem**
6:1,17
**problems**
5:11,13 6:12,15
**process**
14:7
**pursuit**
12:22,25
**Put**
12:10

**Q**

**questions**
10:8 13:22 20:16

**R**

**R**
2:1
**ran**
14:16,18
**real**
9:6 14:24,25 15:4
**really**
6:16,23 7:5 9:7,8

**reason**
13:17
**RELATIVE**
22:7
**REPRODUCTION**
22:12
**residence**
19:12
**right**
5:23,24 7:18 8:1,2,22
  9:11 10:16 11:2
  12:16 14:2,12 15:12
  15:14,24 16:1,23
  17:17 20:1,5,12,20
  21:3,8
**River**
19:16,17
**Riverside**
1:10 10:17
**rob**
19:6

**S**

**S**
2:1
**Saturday**
17:1
**saw**
5:18 6:6
**says**
20:6
**scared**
7:8
**second**
3:16 14:12
**see**
13:9 14:4,8,10 15:10
  16:20 17:3
**seen**
9:19
**SEPTEMBER**
22:15
**serenaded**
3:5
**sheriff**
17:25

**sheriff's**
3:11 10:18 14:19
**shooting**
13:19
**shootings**
10:16
**shot**
10:19 13:1,4 14:20
**show**
15:12
**showed**
11:1
**side**
7:14
**SIMPSON**
22:2,17
**sisters**
21:1
**sit**
4:25
**situation's**
19:21
**skinny**
6:11
**somebody**
13:24 14:3 17:11
  19:6
**someplace**
4:25
**son**
4:21 7:24 8:22 10:16
  11:7 13:20
**sorry**
4:15 6:5 10:18,21,25
  11:1,4,24 17:4 21:7
**spank**
3:24
**STEPHEN**
22:2,17
**stop**
11:21,21 12:5,5,12
**straighten**
15:6
**Street**
3:3
**stuff**



COR 002052

5:16
**sudden**
11:7
**supposed**
7:6
**sure**
4:2 7:22 8:2 11:2

---

**T**

**talk**
3:15 4:24
**talking**
8:2 11:2,6
**taxi**
3:5
**tell**
9:2,3 10:18 11:7,20
    16:23
**Thank**
4:5 5:25
**thing**
8:12
**things**
15:22 16:21
**think**
20:14
**Thirteen**
7:17,18
**Thirty-four**
7:20
**time**
5:18,22 18:4,8
**times**
13:3 15:21
**today**
20:18
**Today's**
17:1
**tomorrow**
20:18
**TRANSCRIBE**
22:3
**TRANSCRIBER**
22:2,14,17
**TRANSCRIPT**
22:11

**TRANSCRIPTION**
22:1,5
**tried**
12:21
**tries**
9:7
**trouble**
5:5
**truck**
3:6
**true**
11:3 22:4
**try**
9:8 16:24 17:8
**trying**
14:17
**Tuesday**
15:19 16:5
**turn**
5:21
**TV**
5:21

---

**U**

**Uh-huh**
10:14
**Um-um**
10:6
**unfortunate**
18:2 19:21
**unfortunately**
12:25 15:2
**upset**
11:22 13:16
**uses**
6:21

---

**V**

**V**
1:8
**view**
16:2
**viewing**
16:8
**volume**
5:21

---

**W**

**wait**
16:4 17:2
**walk**
9:3,4
**want**
3:21 7:22 8:2,13,15
    8:16,17,19 11:12
    15:21 17:2,2
**warrant**
12:18 14:18
**warrants**
7:1 12:16,20
**We'll**
5:1
**we're**
8:2 11:3 13:17,19,20
    17:12 18:3 20:17
    21:7
**We've**
5:9
**week**
5:19 6:6
**went**
7:8 12:21
**willing**
11:16
**wish**
14:13
**working**
20:18
**worried**
17:24
**would've**
14:14
**write**
11:13 13:10

---

**X**

**x**
1:5,12

---

**Y**

**yeah**
3:5,7,17,22,25 4:1
    5:7,22 6:7,13 7:3,25

9:1,13 11:24 13:14
18:1,11,21 19:18,20
20:2

---

**Z**

---

**0**

**000351**
1:14
**041523[COR**
1:14

---

**1**

**12:14**
21:12
**1201**
3:1
**12TH**
22:15
**15th**
3:1

---

**2**

**2022**
3:1
**2024**
22:15
**205**
1:14

---

**3**

---

**4**

**402**
3:2

---

**5**

**5:2024cv00249**
1:3

---

**6**

---

**7**

**7:00**
18:10
**7:30**
18:11



COR 002053

| 8 | | | |
|---|---|---|---|
| **8:00** | | | |
| 18:9 | | | |
| **89** | | | |
| 18:23 | | | |
| 9 | | | |



# EXHIBIT 15

# EXHIBIT 15

# Use of Force

## 300.1  PURPOSE AND SCOPE

This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial, and reasonable manner (Government Code § 7286).

In addition to those methods, techniques, and tools set forth below, the guidelines for the reasonable application of force contained in this policy shall apply to all policies addressing the potential use of force, including but not limited to the Control Devices and Techniques and Conducted Energy Device policies.

Retaliation prohibitions for reporting suspected violations are addressed in the Anti-Retaliation Policy.

### 300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Any use of force that creates a substantial risk of causing death or serious bodily injury, including but not limited to the discharge of a firearm (Penal Code § 835a).

**Feasible** - Reasonably capable of being done or carried out under the circumstances to successfully achieve the arrest or lawful objective without increasing risk to the deputy or another person (Government Code § 7286(a)).

**Force** - The application of physical techniques or tactics, chemical agents, or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed, or restrained.

**Serious bodily injury** - A serious impairment of physical condition, including but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement (Penal Code § 243(f)(4)).

**Totality of the circumstances** - All facts known to the deputy at the time, including the conduct of the officer and the subject leading up to the use of force (Penal Code § 835a).

## 300.2  POLICY

The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Deputies are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Deputies must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's Department

## Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

---

*Use of Force*

The department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting deputies with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

### 300.2.1   DUTY TO INTERCEDE
Any deputy present and observing another law enforcement officer or an employee using force that is clearly beyond that which is necessary, as determined by an objectively reasonable deputy under the circumstances, shall, when in a position to do so, intercede (as defined by Government Code § 7286) to prevent the use of unreasonable force.

When observing force used by a law enforcement officer, each deputy should take into account the totality of the circumstances and the possibility that other law enforcement officers may have additional information regarding the threat posed by the subject (Government Code § 7286(b)).

### 300.2.2   FAILURE TO INTERCEDE
A deputy who has received the required training on the duty to intercede and then fails to act to intercede when required by law, may be disciplined in the same manner as the deputy who used force beyond that which is necessary (Government Code § 7286(b)).

### 300.3   USE OF FORCE
Deputies shall use only that amount of force that is objectively reasonable given the facts and totality of the circumstances known to or perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose (Penal Code § 835a).

The reasonableness of force will be judged from the perspective of a reasonable deputy on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that deputies are often forced to make split-second decisions about the amount of force that is objectively reasonablein a particular situation, with limited information and in circumstances that are tense, uncertain, and rapidly evolving.

Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. Deputies may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance (Government Code § 7286(b)).

It is also recognized that circumstances may arise in which deputies reasonably believe that it would be impractical or ineffective to use any of the approved or authorized tools, weapons, or methods provided by the Department. Deputies may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be objectively reasonable and utilized only to accomplish a legitimate law enforcement purpose.

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's
Department    Use of Force - 58

COR 001709

# Riverside County Sheriff's Department
Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

## Use of Force

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires a deputy to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1  USE OF FORCE TO EFFECT AN ARREST
Any peace officer may use objectively reasonable force to effect an arrest, to prevent escape, or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape, or to overcome resistance. Retreat does not mean tactical repositioning or other de-escalation techniques (Penal Code § 835a).

### 300.3.2  FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include but are not limited to:

(a) The apparent immediacy and severity of the threat to officers or others (Penal Code§ 835a).

(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d) The conduct of the involved officer (Penal Code § 835a).

(e) The effects of drugs or alcohol.

(f) The individual's apparent mental state or capacity (Penal Code § 835a).

(g) The individual's apparent ability to understand and comply with officer commands (Penal Code § 835a).

(h) Proximity of weapons or dangerous improvised devices.

(i) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(j) The availability of other reasonable and feasible options and their possible effectiveness (Penal Code § 835a).

(k) Seriousness of the suspected offense or reason for contact with the individual.

(l) Training and experience of the officer.

(m) Potential for injury to officers, suspects, and others.

(n) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.

(o) The risk and reasonably foreseeable consequences of escape.

(p) The apparent need for immediate control of the subject or a prompt resolution of the situation.

(q) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's
Department
COR 001710

Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

*Use of Force*

(r) Prior contacts with the subject or awareness of any propensity for violence.

(s) Any other exigent circumstances.

### 300.3.3  PAIN COMPLIANCE TECHNIQUES
Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers should only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a) The degree to which the application of the technique may be controlled given the level of resistance.

(b) Whether the person can comply with the direction or orders of the officer.

(c) Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4  CAROTID CONTROL HOLD
Effective June 10, 2020, the Carotid Restraint Control Hold is no longer an authorized force option for members of the department.

### 300.3.5  USE OF FORCE TO SEIZE EVIDENCE
In general, deputies may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, deputies are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, deputies should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Deputies should consider the severity of the crime and the value of retrieving the evidence against the force needed to retrieve it.

### 300.3.6  USE OF FORCE AGAINST A VICIOUS ANIMAL
The reasonable use of force against a dangerous or vicious animal is authorized. When encountering a vicious animal, department members shall, when possible:

    (a)    Request Animal Control officials;

    (b)    Avoid the animal;

    (c)    Secure or isolate the animal;

    (d)    Attempt to find the owner;

    (e)    Use the lowest level of force given the threat presented.

### 300.3.7  EUTHANIZATION OF INJURED ANIMALS
With the approval of a supervisor, a member may euthanize an animal that is so badly injured that human compassion requires its removal from further suffering and where other dispositions are

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's
Department

COR 001711

# Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

## Use of Force

impractical (Penal Code § 597.1(e)). Injured animals (with the exception of dogs and cats) may only be euthanized after a reasonable search to locate the owner has been made (Penal Code § 597.1(b)). Injured dogs and cats found without their owners shall be taken to an appropriate veterinarian for determination of whether they should be treated or humanely destroyed.

### 300.3.8  RESTRICTIONS ON THE USE OF A CHOKE HOLD
Deputies of this department are not authorized to use a choke hold. A choke hold means any defensive tactic or force option in which direct pressure is applied to a person's trachea or windpipe (Government Code § 7286.5).

### 300.3.9  ADDITIONAL RESTRICTIONS
Terms such as "positional asphyxia," "restraint asphyxia," and "excited delirium" continue to remain the subject of debate among experts and medical professionals, are not universally recognized medical conditions, and frequently involve other collateral or controlling factors such as narcotics or alcohol influence, or pre-existing medical conditions. While it is impractical to restrict a deputy's use of reasonable control methods when attempting to restrain a combative individual, deputies are not authorized to use any restraint or transportation method which might unreasonably impair an individual's breathing or respiratory capacity for a period beyond the point when the individual has been adequately and safely controlled. Once controlled, the individual should be placed into a recovery position (e.g., supine or seated) and monitored for signs of medical distress (Government Code § 7286.5).

### 300.4  DEADLY FORCE APPLICATIONS
Where feasible, the deputy shall, prior to the use of deadly force, make reasonable efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the deputy has objectively reasonable grounds to believe the person is aware of those facts (Penal Code 835a(5)(c)(1)(B)).

If an objectively reasonable deputy would consider it safe and feasible to do so under the totality of the circumstances, deputies shall evaluate and use other reasonably available resources and techniques when determining whether to use deadly force. To the extent that it is reasonably practical, deputies should consider their surroundings and any potential risks to bystanders prior to discharging a firearm (Government Code § 7286(b)).

The use of deadly force is only justified when the deputy reasonably believes it is necessary in the following circumstances (Penal Code § 835a):

(a) A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes is an imminent threat of death or serious bodily injury to the deputy or another person.

(b) A deputy may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the deputy reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.

# Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

*Use of Force*

Deputies shall not use deadly force against a person based on the danger that person poses to him/herself, if an objectively reasonable deputy would believe the person does not pose an imminent threat of death or serious bodily injury to the deputy or to another person (Penal Code § 835a).

An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable deputy in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the deputy or another person. A deputy's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention (Penal Code § 835a).

## 300.4.1  SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective. Deputies should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. A deputy should only discharge a firearm at a moving vehicle or its occupants when the deputy reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the deputy or others.

Deputies shall not shoot at any part of a vehicle in an attempt to disable the vehicle, except as described above.

## 300.4.2  WARNING SHOTS
The firing of warning or attention shots into the air, ground or any other medium is strictly prohibited.

## 300.5  MEDICAL ATTENTION
As soon as it is safe to do so, medical assistance shall be summoned for or applied to, by deputies at the scene, any person who has sustained visible injury, expressed a complaint of pain, or who has been rendered unconscious. Any person exhibiting signs of physical distress after an encounter should be continuously monitored until they can be medically assessed.

Based on the initial member's assessment of the nature and extent of the person's injuries, the appropriate medical assistance required here may consist of examination by fire personnel, paramedics, hospital staff, or medical staff at the jail. If any such person refuses medical attention, it shall be fully documented in related reports and, whenever practicable, should be witnessed by another member and/or medical personnel. If a recording is made of the contact or interview with the person, any refusal should be included in the recording, if possible.

The on-scene supervisor or a deputy shall inform attending medical personnel the person was subjected to force, and shall include a description of the force used and any other circumstances the member reasonably believes would present potential safety or medical risks to the person (e.g., prolonged struggle, extreme agitation, impaired respiration).

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's Department

COR 001713

## Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

---

*Use of Force*

---

Persons who exhibit extreme agitation and/or violent, irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and impervious to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple members to be brought under control, may be at an increased risk of sudden death. Members who reasonably suspect a medical emergency shall request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

### 300.6 DEPARTMENT MEMBER RESPONSIBILITIES

All department members are expected to promptly notify their supervisor of a use-of-force incident as soon as it is safe to do so. Deputies shall do the following consistent with the Risk Management Policy and the Use of Force Reporting:

- (a) Complete use-of-force paperwork and thoroughly document the incident prior to EOW, absent extenuating circumstances. Reports may only be held with permission from the supervisor overseeing the collection of documentation for the incident.

- (b) Attempt to obtain a thorough recorded interview with the suspect. The interview shall establish:
  1. Violations of law
  2. Explanation as to why the suspect resisted.
  3. Details of commands given to the suspect
  4. Knowledge that the department member was identified or identifiable as law enforcement
  5. Use of drugs or alcohol
  6. Attempts to cause injury or resistance likely to cause injury
  7. Attempts to resist, delay, obstruct

- (c) Identify witnesses and conduct recorded interviews. The interviews shall establish:
  1. Observation of the suspect's behavior before the use-of-force
  2. Observation of the use-of-force
  3. Observation of the suspect's actions resulting in a use-of-force
  4. Observation of the department member's verbal commands
  5. Observation of the department member's attire (were they readily identifiable as law enforcement)
  6. Observation of the suspect's behavior toward the department member
  7. Observation of the suspect's use of drugs or alcohol

- (d) Identify and collect evidence to include taking digital photographs of the scene, involved department members, and suspects. Photographs should include:
  1. Overall photographs of involved department members (front, back, left, right)
  2. Photographs of any items of physical evidence

---

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's
Department

Riverside County Sheriff's Department Standards Manual (DSM)

Riverside County Sheriff's Department Standards Manual (DSM)

*Use of Force*

---

      3.    Overall photographs of the scene

      4.    Close up photographs of injuries

      5.    Overall photographs of the suspect (front, back, left, right)

(e)    Canvass area for video surveillance from residences and/or businesses in the vicinity of the incident.

(f)    Evaluate the suspect for drug and alcohol use, consider relevant related charges and the need for a blood or urine sample.

(g)    Advise a supervisor if the incident involved a significant use-of-force or caused significant injury to either the suspect or department member. Dependent upon the situation and severity of injury a supervisor may consider treating the department member as a victim and assign uninvolved personnel to investigate and transport the suspect.

(h)    Book body worn camera footage from all department members who respond to the scene. Footage shall be booked before EOW, unless permission to delay is granted by a supervisor due to extenuating circumstances.

(i)    File all relevant related charges, which led the department member to contact the suspect, and to ultimately use force.

(j)    File all relevant charges related to crimes against peace officers (148 PC, 69 PC, 243(b) PC).

(k)    Conduct additional follow-up, as instructed by a supervisor or by the CAPO Unit.

## 300.7  SUPERVISOR RESPONSIBILITIES

When available, supervisors shall respond to calls when they reasonably believe there is a likelihood force may be used, or when possessing knowledge that force was used. Supervisors shall respond to all deadly force incidents.

Upon a supervisor's arrival, they shall assess the circumstances, take command of the scene if necessary, expand or reduce resources as necessary, direct personnel actions, and later review each incident to insure compliance with department policy and the law. Other actions shall include:

(a)    Ensure medical attention is promptly provided to both department members and suspects.

(b)    Ensure a thorough interview of the suspect is attempted and recorded.

(c)    In the event the suspect invokes Miranda Rights, attempt to conduct a civil/risk management interview with the suspect.

      1.    Civil interviews may only be recorded with the knowledge of the suspect.

      2.    BWC recordings and/or audio recordings of a civil interview shall be uploaded in LEFTA and labeled as a "Civil Interview."

          (a)    In the event a BWC recording is not available, the civil interview shall be documented in an Intra-Department Memorandum and forwarded to PSB.

# Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)

Riverside County Sheriff's Department Standards Manual (DSM)

*Use of Force*

(d)    Ensure all witnesses are identified and recorded interviews are completed.

(e)    Ensure the area is canvassed for video surveillance from residences and businesses, if possible.

(f)    Ensure the scene, department members, and suspects are photographed. See deputy responsibilities for details.

(g)    Evaluate the need for Forensics to respond due to either the nature of the incident or the nature of the injuries sustained.

(h)    Dependent upon the situation and severity of injury to department member consider treating the department member as a victim and assign uninvolved personnel to investigate and transport the suspect.

(i)    Consider the need for an immediate notification and/or response from station investigations. PSB Civil/CAPO, and the Force Investigation Detail when the following factors are present:

　　1.    Significant force/injuries

　　2.    Social media or media attention highly likely

　　3.    High profile case and/or suspect

(j)    Ensure all use-of-force paperwork and initial and supplemental reports are completed by EOW (unless extenuating circumstances exist).

(k)    Ensure all personnel on-scene book their body worn camera footage as evidence by EOW.

(l)    Watch all body worn camera footage prior to approving initial and supplemental reports.

(m)    The use-of-force packet and review of reports should be handled by the supervisor most knowledgeable about the incident. Establish a primary sergeant who will be responsible for reviewing all use-of-force reports, crime reports, and body worn camera footage. There may be times when extenuating circumstances make this impractical, but reasonable attempts should be made to ensure continuity in the review process.

(n)    Ensure Internal Force Number (IFN) has been assigned by Dispatch and references the original file number.

(o)    Notify Facility/Station/Bureau administration of the incident and follow any additional direction provided.

(p)    **Email PSBAdmin@riversidesheriff.org before EOW and provide the file number, Incident Force Number, and include a working copy of the initial report with full block-out information for all suspects, witnesses, and others. No other summary or outline is needed.**

## 300.8  DISPATCH RESPONSIBILITIES

Dispatch personnel shall be responsible for the following actions following a use of force:

# Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)
Riverside County Sheriff's Department Standards Manual (DSM)

---

*Use of Force*

---

(a) Assign Internal Force Number (IFN) when use of force occurs. Qualifying indicators include:

1. Department member reporting a use of force

2. Request for back up when a suspect is becoming "physical."

3. Supervisor or deputy requests IFN

4. Request for "medical" or AMR due to an injury resulting from a use-of-force

5. Perceived use-of-force based on radio traffic

When an IFN is generated, Dispatch shall notify the watch commander. The original file number and IFN shall be referenced in each file. Dispatch personnel may not cancel or purge an IFN believed to be pulled in error. The PSB will review an IFN and determine if the file number should be cancelled.

## 300.9  REPORTING THE USE OF FORCE

Department members who are involved in a use of force incident, shall report it to a supervisor as soon as possible. Any department member who has knowledge of an unreported use of force shall report it to a supervisor as soon as possible.

Any use of force by a member of this department shall also be documented promptly, completely and accurately in an appropriate report. The deputy should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the department may require the completion of additional report forms, as specified in department policy, procedure or law.

## 300.10  USE OF FORCE COMPLAINTS

The receipt, processing, and investigation of civilian complaints involving use of force incidents should be handled in accordance with the Personnel Complaints Policy (Government Code § 7286(b)).

## 300.11  POLICY REVIEW

The Sheriff or the authorized designee should regularly review and update this policy to reflect developing practices and procedures (Government Code § 7286(b)).

## 300.12  POLICY AVAILABILITY

The Sheriff or the authorized designee should ensure this policy is accessible to the public (Government Code § 7286(c)).

## 300.13  PUBLIC RECORDS REQUESTS

Requests for public records involving a deputy's personnel records shall be processed in accordance with Penal Code § 832.7 and the Personnel Records and Records Maintenance and Release policies (Government Code § 7286(b)).

---

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's Department

COR 001717

## Riverside County Sheriff's Department

Riverside County Sheriff's Department Standards Manual (DSM)

Riverside County Sheriff's Department Standards Manual (DSM)

*Use of Force*

### 300.14  TRAINING RESTRICTION

The Sheriff, or designee, is responsible for establishing a process to identify deputies who are restricted from training other deputies for the time period specified by law because of a sustained use of force complaint (Government Code section 7286(b)).

Copyright Lexipol, LLC 2023/02/16, All Rights Reserved.
Published with permission by Riverside County Sheriff's
Department

COR 001718

# EXHIBIT 16

# EXHIBIT 16

1  Dale K. Galipo, Esq., #144074
   dalekgalipo@yahoo.com
2  **LAW OFFICES OF DALE K. GALIPO**
   21800 Burbank Boulevard, Suite 310
3  Woodland Hills, CA  92367-6479
   Telephone: (818) 347-3333
4  Facsimile: (818) 347-4118

5  Attorneys for Plaintiff V.L.

6  Garo Mardirossian, Esq., #101812
   garo@garolaw.com
7  Lawrence D. Marks, Esq., #153460
   Lmarks@garolaw.com
8  **MARDIROSSIAN AKARAGIAN, LLP**
   6311 Wilshire Boulevard
9  Los Angeles, CA  90048-5001
   Telephone (323) 653-6311
10 Facsimile (323) 651-5511

11 Attorneys for Plaintiffs S.L. and
   CAROLYN CAMPBELL

12

13          **UNITED STATES DISTRICT COURT**

14          **CENTRAL DISTRICT OF CALIFORNIA**

15 S.L., a minor by and through the Guardian ) **FIRST AMENDED COMPLAINT**
   Ad Litem Kristine Llamas Leyva,          )
16 individually and as successor-in-interest to ) 1. Fourth Amendment – Excessive
   JOHNNY RAY LLAMAS, deceased;            )    Force (42 U.S.C. § 1983)
17 V.L., by and through the Guardian Ad       ) 2. Fourth Amendment – Denial of
   Litem Amber Snetsinger, individually and   )    Medical Care (42 U.S.C. § 1983)
18 as successor-in-interest to JOHNNY RAY    ) 3. Fourteenth Amendment – Interference
   LLAMAS, deceased; and CAROLYN        )    with Familial Relationship (42 U.S.C.
19 CAMPBELL, individually,                )    § 1983)
                                          ) 4. Municipal Liability – Unconstitutional
20          Plaintiffs,                   )    Custom, Policy, or Practice (42 U.S.C.
                                          )    § 1983)
21      vs.                               ) 5. Municipal Liability – Failure to Train
                                          )    (42 U.S.C. § 1983)
22 COUNTY OF RIVERSIDE; SHAWN         ) 6. Battery (Survival and Wrongful
   HUBACHEK; JIMMIE MCGUIRE; and    )    Death)
23 DOES 3-10, inclusive,                 ) 7. Negligence (Survival and Wrongful
                                          )    Death)
24          Defendants.                   ) 8. Violation of Bane Act (Cal. Civil
                                          )    Code § 52.1)
25                                        )
                                          ) **DEMAND FOR JURY TRIAL**
26                                        )

27

28

-- 1 --
FIRST AMENDED COMPLAINT

## **COMPLAINT FOR DAMAGES**

S.L., a minor, by and through the guardian *ad litem* Kristine Llamas Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., a minor, by and through the guardian *ad litem* Amber Snetsinger, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; and CAROLYN CAMPBELL, individually, for their Complaint against Defendants COUNTY OF RIVERSIDE; SHAWN HUBACHECK; JIMMIE MCGUIRE and DOES 3-10, inclusive, allege as follows:

## **JURISDICTION AND VENUE**

1.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. This Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

2.     Venue is proper in this Court under 28 U.S.C. §1391(b), because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## **INTRODUCTION**

3.     This civil rights and state tort action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and state law in connection with the fatal officer shooting of JOHNNY RAY LLAMAS on April 14, 2023.

## **PARTIES**

4.     At all relevant times, Decedent JOHNNY RAY LLAMAS ("DECEDENT") was an individual residing in the County of Riverside, California.

/ / /

FIRST AMENDED COMPLAINT

5. Plaintiff S.L. is a citizen of the United States residing in the County of Riverside, California, and is the natural minor child of DECEDENT. Plaintiff S.L. sues both in their individual capacity as the minor child of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT pursuant to California Code of Civil Procedure §§ 377.30 and 377.60. Plaintiff S.L. seeks both survival and wrongful death damages under federal and state law.

6. Plaintiff V.L. is a citizen of the United States residing in the County of Riverside, California, and is the natural minor child of DECEDENT. Plaintiff V.L. sues both in their individual capacity as the minor child of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT pursuant to California Code of Civil Procedure §§ 377.30 and 377.60. Plaintiff V.L. seeks both survival and wrongful death damages under federal and state law.

7. Plaintiff CAROLYN CAMPBELL is an individual residing in the County of Riverside, California. CAROLYN CAMPBELL is the natural mother of DECEDENT and sues in her individual capacity. CAROLYN CAMPBELL seeks wrongful death damages, compensatory damages, and punitive damages under federal and state law.

8. Plaintiffs S.L., V.L., and CAROLYN CAMPBELL were dependent upon DECEDENT at the time of DECEDENT's death for the necessaries of life, including but not limited to support that aided plaintiffs in obtaining the things, such as shelter, clothing, food, and medical treatment, which one cannot and should not do without.

9. At all relevant times, Defendant COUNTY OF RIVERSIDE ("COUNTY") was and is a public entity duly organized and existing as such under the laws of the State of California. COUNTY is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including the Riverside County Sheriff's Department ("RCSD") and its agents and employees. At all relevant times, Defendant COUNTY is and was responsible for assuring that the actions, omissions, policies, procedures, practices, and customs of the RCSD and its agents and employees complied with the laws of the United States and of the State of California.

10.     At all relevant times, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 were duly appointed by COUNTY as RCSD deputies and employees or agents of COUNTY, subject to oversight and supervision by COUNTY's elected and non-elected officials. At all relevant times, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 acted under color of law, including under color of the statutes, ordinances, regulations, policies, customs, and usages of Defendant COUNTY and the RCSD, and under color of the statutes and regulations of the State of California. At all relevant times, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 acted within the course and scope of their employment with COUNTY and the RCSD.

11.     In doing the acts and failing and omitting to act as hereinafter described, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 were acting on the implied and actual permission and consent of Defendant COUNTY.

12.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 are sued in their individual capacities.

13.     The true names and capacities of DOES 3-10 are unknown to Plaintiffs, who otherwise sue these Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to show the true names and capacities of these Defendants when they have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

14.     At all times herein mentioned, each and every defendant was the agent of each and every other defendant and had the legal duty to oversee and supervise the hiring, conduct, employment and discipline of each and every other defendant

15.     All of the acts complained of herein by Plaintiffs against Defendants were done and performed by said Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts complained of herein.

16.     Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

17.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

18.     The incidents complained of occurred at or near the 22,000 block of River Road, in the unincorporated area of Perris, known as Meadowbrook, County of Riverside, State of California.

19.     On April 14, 2023, at approximately 4:45 p.m., JOHNNY RAY LLAMAS was encountered by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10.

20.     On information and belief, JOHNNY RAY LLAMAS had not committed any crime and Defendants had no information that JOHNNY RAY LLAMAS had committed a felony.

21.     At all relevant times, JOHNNY RAY LLAMS posed no imminent threat of death or serious physical injury to defendants, or to any other person.

22.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 used excessive force upon JOHNNY RAY LLAMAS by, among other things, shooting JOHNNY RAY LLAMAS in the back, and by shooting JOHNNY RAY LLAMAS again after he had fallen to the ground after being shot in the back.

23.     At the time Defendants fired these shots at JOHNNY RAY LLAMAS, JOHNNY RAY LLAMAS posed no imminent or immediate threat of death or serious bodily harm to Defendants or to anyone else.

24.     Because the Defendants had JOHNNY RAY LLAMAS outnumbered and surrounded, and because JOHNNY RAY LLAMAS was compliant and did not pose an imminent threat of death or serious physical injury to the officers or anyone else,

Defendants could have and should have communicated with JOHNNY RAY LLAMAS in effort to deescalate, rather than escalate, the situation.

25.     Defendants used excessive force upon JOHNNY RAY LLAMAS by, among other things, use of their firearms. Even though the officers outnumbered JOHNNY RAY LLAMAS, even though the officers and had control of JOHNNY RAY LLAMAS, even though JOHNNY RAY LLAMAS was compliant with the officers' commands, and even though the officers had far less harmful means of interacting with JOHNNY RAY LLAMAS at their disposal, Defendants failed and refused to communicate with JOHNNY RAY LLAMAS, and instead, without any justification or good cause, Defendants shot and killed JOHNNY RAY LLAMAS.

26.     Defendants used excessive force upon JOHNNY RAY LLAMAS by escalating this incident to the point where deadly force was used.

27.     The search and seizure and the use of deadly force was excessive and objectively unreasonable under the circumstances. The escalation of the incident and use of deadly force by Defendants demonstrated a deliberate indifference to the health and safety of JOHNNY RAY LLAMAS that shocks the conscience.

28.     On information and belief, despite having knowledge that JOHNNY RAY LLAMAS was seriously injured by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 use of deadly force, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 failed to timely summon medical care or permit medical personnel to treat JOHNNY RAY LLAMAS. The delay of medical care to JOHNNY RAY LLAMAS was a contributing cause of JOHNNY RAY LLAMAS's harm, injury, pain and suffering, and ultimate death.

29.     As a direct result of his interaction with Defendants herein, JOHNNY RAY LLAMAS died. Defendants' actions caused JOHNNY RAY LLAMAS to lose his life, caused Plaintiffs S.L. and V.L. to lose their father, and caused Plaintiff CAROLYN CAMPBELL to lose her son.

30.     JOHNNY RAY LLAMAS did not die immediately.

FIRST AMENDED COMPLAINT

31.     The search and seizure and the use of deadly force was excessive and objectively unreasonable under the circumstances. The use of deadly force by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 demonstrated a deliberate indifference to the health and safety of JOHNNY RAY LLAMAS that shocks the conscience.

32.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 were present at the scene and intentionally and knowingly permitted the unprovoked and unjustified battery and killing of JOHNNY RAY LLAMAS by failing to prevent it when circumstances were such that they could have done so.

33.     These acts of Defendants constituted excessive and deadly force which caused Plaintiffs special and general damages, physical injuries, and extreme emotional distress. Further the acts of Defendants COUNTY OF RIVERSIDE and Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 deprived Plaintiffs and JOHNNY RAY LLAMAS of rights secured to them by the Fourth and Fourteenth Amendments to the United States Constitution in that Defendants deprived JOHNNY RAY LLAMAS of his right to be free in his person against unreasonable search and seizure, and from excessive force, and deprived Plaintiffs of their right to be free from interference with their familial relationship with JOHNNY RAY LLAMAS.

34.     At all times herein mentioned Defendants were acting under the color of one or more statutes, laws, regulations, customs, practices and usages of the State of California, the County of Riverside, and the RCSD.

35.     In doing the acts and omissions alleged in this Complaint, Defendants pursued an unprivileged course of extreme and outrageous conduct directed at JOHNNY RAY LLAMAS with the intent to cause JOHNNY RAY LLAMAS to suffer extreme terror, fear, shock, anxiety, mental anguish, despair and emotional distress. Defendants' actions shock the conscience.

/ / /

36.     The aforesaid acts and omissions of defendants were done knowingly, intentionally and for the purpose of depriving Plaintiffs and JOHNNY RAY LLAMAS of their constitutional rights in reckless and callous disregard of the same, and by reason thereof, Plaintiffs claim exemplary and punitive damages against each individual Defendants (and not against Defendant COUNTY OF RIVERSIDE) in an amount according to proof.

37.     On August 1, 2023, Plaintiffs presented to Defendant COUNTY OF RIVERSIDE a Government Tort Claim based on the acts, omissions, damages and injuries herein complained of. Defendant COUNTY OF RIVERSIDE denied this Claim in a letter dated August 9, 2023.

## FIRST CLAIM FOR RELIEF
### Fourth Amendment – Excessive Force (42 U.S.C. § 1983)
### [By Plaintiffs S.L. and V.L. against Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive]

38.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

39.     Decedent JOHNNY RAY LLAMAS had a cognizable interest under the Fourth Amendment of the United States Constitution to not be subjected to excessive force while being detained or arrested by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10.

40.     On April 14, 2023, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 each intentionally used excessive force upon JOHNNY RAY LLAMAS by, among other things, shooting JOHNNY RAY LLAMAS in the back, and by shooting JOHNNY RAY LLAMAS again after he had fallen to the ground after being shot in the back.

41.     The lethal force applied to decedent by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was in excess of the amount of force a reasonable police officer would have used under similar circumstances.

42.     These acts and omissions of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 violated the rights of decedent JOHNNY RAY LLAMAS under the Fourth Amendment of the United States Constitution to not be subjected to excessive force. Further, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10's shooting and use of force violated their training and standard police officer training.

43.     As a result of their misconduct, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 are liable for JOHNNY RAY LLAMAS's injuries, either because they were integral participants in the use of excessive force, and/or because they failed to intervene to prevent these violations.

44.     As a result of the foregoing, JOHNNY RAY LLAMAS suffered great physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity.

45.     As a direct and legal result of the acts and omissions of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, and each of them, as sheriff's deputies under color of law, Plaintiffs have suffered extreme and severe mental anguish and pain and have been injured in mind and body and have further been deprived of the life-long love, companionship, comfort, care, assistance, protection, affection, society, moral support, training and guidance of JOHNNY RAY LLAMAS. Plaintiffs also claim funeral and burial expenses and loss of financial support.

46.     The conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiffs, and of decedent JOHNNY RAY LLAMAS, and therefore warrants imposition of exemplary and punitive damages as against these Defendants.

47.     Plaintiffs S.L. and V.L. bring this claim as successors-in-interest to JOHNNY RAY LLAMAS and seek survival damages, including pre-death pain and suffering, emotional distress, loss of life, and loss of enjoyment of life, for the violation of JOHNNY RAY LLAMAS's rights. Plaintiffs S.L. and V.L. also seek attorney's fees and costs under this claim.

## SECOND CLAIM FOR RELIEF

### Fourth Amendment – Denial of Medical Care (42 U.S.C. § 1983)

### [By Plaintiffs S.L. and V.L. against Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive]

48.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

49.     The denial of medical care by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 deprived JOHNNY RAY LLAMAS of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

50.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 failed to provide needed medical care to JOHNNY RAY LLAMAS, failed to timely summon needed medical care for DECEDENT, prevented medical care personnel from timely treating JOHNNY RAY LLAMAS, and refused to permit medical care personnel to access and care for JOHNNY RAY LLAMAS at the scene for an appreciable time after the incident.

51.     On information and belief, after Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 had shot a number of times at JOHNNY RAY LLAMAS and it was apparent to these Defendants that JOHNNY RAY LLAMAS had been struck by at least some of the shots, Defendants SHAWN HUBACHEK, JIMMIE

FIRST AMENDED COMPLAINT

MCGUIRE, and DOES 3-10 failed to timely summon medical care for JOHNNY RAY LLAMAS and failed to timely provide medical care to JOHNNY RAY LLAMAS.

52.    As a result of the foregoing, JOHNNY RAY LLAMAS suffered great physical pain and suffering up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity.

53.    Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 knew that failure to provide timely medical treatment to JOHNNY RAY LLAMAS could result in further significant injury, the unnecessary and wanton infliction of pain, or death, but disregarded that serious medical need, causing JOHNNY RAY LLAMAS great bodily harm and death.

54.    As a result of their misconduct, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 are liable for JOHNNY RAY LLAMAS's injuries, either because they were integral participants in the denial of medical care, and/or because they failed to intervene to prevent these violations.

55.    Plaintiffs S.L. and V.L. bring this claim as successors-in-interest to JOHNNY RAY LLAMAS and seek survival damages, including pre-death pain and suffering, emotional distress, loss of life, and loss of enjoyment of life, for the violation of JOHNNY RAY LLAMAS's rights. Plaintiffs S.L. and V.L. also seek attorney's fees and costs under this claim.

## THIRD CLAIM FOR RELIEF

**Interference with Familial Relationship – First Amendment, Fourteenth Amendment (42 U.S.C. § 1983)**

**[By all Plaintiffs against Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive]**

56.    Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

57.     Plaintiff S.L. had a cognizable interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff S.L.'s familial relationship with their father, JOHNNY RAY LLAMAS.

58.     Plaintiff V.L. had a cognizable interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff V.L.'s familial relationship with their father, JOHNNY RAY LLAMAS.

59.     Plaintiff CAROLYN CAMPBELL had a cognizable interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff CAROLYN CAMPBELL's familial relationship with her son, JOHNNY RAY LLAMAS.

60.     The aforementioned acts and omissions of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiffs and with a purpose to harm unrelated to any legitimate law enforcement objective.

61.     As a direct and proximate result of these acts and omissions, JOHNNY RAY LLAMAS experienced pain and suffering and eventually died. Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 thus violated the substantive due process rights of Plaintiffs to be free from unwarranted interference with their familial relationship with JOHNNY RAY LLAMAS.

62.     As a direct and proximate cause of the acts of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, Plaintiffs suffered emotional

distress, mental anguish, and pain. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent JOHNNY RAY LLAMAS, and will continue to be so deprived for the remainder of their natural lives.

63.     The conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of JOHNNY RAY LLAMAS and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10.

64.     Plaintiffs S.L., V.L., and CAROLYN CAMPBELL bring this claim individually, for the interference with S.L. and V.L.'s relationship with their father, JOHNNY RAY LLAMAS, and with CAROLYN CAMPBELL's relationship with her son, JOHNNY RAY LLAMAS, and seek wrongful death damages for the violation of Plaintiffs' rights. Plaintiffs also claim funeral and burial expenses and a loss of financial support. Plaintiffs S.L., V.L., and CAROLYN CAMPBELL also seek attorney's fees and costs under this claim.

## FOURTH CLAIM FOR RELIEF

### Municipal Liability – Unlawful Custom, Policy, or Practice (42 U.S.C. § 1983)
### [By all Plaintiffs against Defendant COUNTY OF RIVERSIDE]

65.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

66.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 acted pursuant to an expressly adopted policy or longstanding practice or custom of Defendant COUNTY OF RIVERSIDE.

67.     On information and belief, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 were not disciplined, reprimanded, retrained, suspended, or

otherwise penalized in connection with their deprivation of JOHNNY RAY LLAMAS's and Plaintiffs' rights.

68.     Defendant COUNTY OF RIVERSIDE, together with the RCSD and various COUNTY and RCSD policymakers and supervisors, maintained, inter alia, the following unconstitutional customs, practices, and policies:

(a)     Using excessive and unreasonable force, including deadly force on persons who do not pose an immediate risk of death or serious bodily injury to others;

(b)     Providing inadequate training regarding the use of force, including deadly force;

(c)     Providing inadequate training regarding de-escalation;

(d)     Employing and retaining as police officers, individuals such as Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive, who Defendant COUNTY at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for using excessive force;

(e)     Inadequately supervising, training, controlling, assigning, and disciplining COUNTY deputies, and other personnel, including Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive, who COUNTY knew or in the exercise of reasonable care should have known, had the aforementioned propensities or character traits;

(f)     Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by deputies of the COUNTY; and

(g)     Failing to adequately discipline COUNTY deputies for the above-mentioned categories of misconduct, including inadequate discipline and "slaps on the wrist," discipline that is so slight as to be out of proportion with the magnitude

of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct.

69.    Defendant COUNTY, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged herein. Despite having knowledge as stated above, COUNTY condoned, tolerated and through actions and inactions thereby ratified such policies. COUNTY also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of JOHNNY RAY LLAMAS, Plaintiffs, and other individuals similarly situated.

70.    By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendant COUNTY acted with intentional, reckless, and callous disregard for the constitutional rights of JOHNNY RAY LLAMAS and Plaintiffs. Furthermore, the policies, practices, and customs implemented, maintained, and tolerated by Defendant COUNTY caused the deprivation of Plaintiffs' and Decedent's rights by the Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10; that is, COUNTY's maintenance of the aforementioned unconstitutional customs, practices, and policies and failure to prevent violations of law by its employees is so closely related to the deprivations of Plaintiffs' and Decedent's rights as to be the moving force that caused the ultimate injury.

71.    Based on information and belief, the following are only a few examples of cases evidencing Defendant COUNTY's unconstitutional policies, where the involved deputies were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with the underlying acts giving rise to the below lawsuits, which indicates that COUNTY routinely ratifies such behavior and maintains a practice of allowing such behavior:

(a)    In *A.F., et al. v. County of Riverside, et al.*, case number 5:15-cv-01603 JGB (DTBx), Defendant COUNTY failed to discipline its deputy who

FIRST AMENDED COMPLAINT

attacked a man with his K-9 and shot used deadly force against him while he was not an immediate threat of death or serious bodily injury to anyone;

(b)    In *Howard v. County of Riverside, et al.*, case number 5:12-cv-00700 VAP (OPx), Defendant COUNTY argued that the use of deadly force against an individual was reasonable; a federal jury found otherwise and returned a verdict in favor of plaintiff, a man who posed no immediate threat of death or serious bodily injury and suffered a severe brain injury and partial paralysis after a use of force by a COUNTY sheriff's deputy;

(c)    In *Travillion v. County of Riverside*, case number EDCV 14-0003 VAP (DTBx), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(d)    In *Bosch v. County of Riverside*, case number EDCV 13-02352 (SVW)(FFM), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(e)    In *Castillo v. County of Riverside*, case number EDCV 13-00789 VAP (SPx), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(f)    In *Munoz v. County of Riverside*, case number RIC120794, plaintiff argued that the involved COUNTY Sheriff's deputy used deadly force against her son at a time when he posed no immediate threat.  The jury in that case returned a verdict in favor of plaintiff;

(g)    In *L.R., et al. v. County of Riverside, et al.,* case number 15-cv-1767, Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

FIRST AMENDED COMPLAINT

(h)    In *Galvan v. County of Riverside, et al.*, case number 5:21-cv-00384 JGB (SHKx), Defendant COUNTY failed to discipline its deputy who entered plaintiff's room while plaintiff was sleeping and immediately escalated the situation by commanding a canine to attack plaintiff, including being bit in the neck, a use of deadly force under the circumstances, while plaintiff was not an immediate risk of harm to anyone;

(i)    In *Arocha v. County of Riverside, et al.*, case number 5:18-cv-01585 DMG (SHKx), Defendant COUNTY failed to discipline its deputy who viciously punched plaintiff in the face resulting in loss of consciousness and a broken orbital bone, a use of deadly force under the circumstances, while plaintiff was not an immediate risk of harm to anyone;

(j)    In *Cortina v. County of Riverside, et al.*, case number 5:18-cv-01579 DDP (SPx), Defendant COUNTY failed to discipline its deputy who used force including deadly force, including deployment of a chemical agent, on an unarmed man who was not an immediate threat of harm to anyone;

(k)    In *Aguirre, et al. v. County of Riverside, et al.*, case number 5:18-cv-00762 DMG (SPx), Defendant COUNTY failed to discipline its deputy who used excessive force against the decedent who was not an immediate threat of death or serious bodily injury, arguing that the force was reasonable even after a unanimous jury returned a verdict in favor of plaintiffs;

(l)    In *Orellana v. County of Riverside, et al.*, case number 5:19-cv-01263 JGB (SHKx), Defendant COUNTY failed to discipline its deputies who used excessive force including deadly force against a man who was not an immediate threat of harm to anyone.

72.    By reasons of the aforementioned acts and omissions, Decedent JOHNNY RAY LLAMAS suffered great physical pain and suffering up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity; Plaintiffs suffered

emotional distress, mental anguish, and pain; and Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent JOHNNY RAY LLAMAS, and will continue to be so deprived for the remainder of their natural lives.

73. Accordingly, Defendant COUNTY is liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983. Plaintiffs also seek attorneys' fees and costs under this claim.

## FIFTH CLAIM FOR RELIEF
### Municipal Liability – Failure to Train (42 U.S.C. § 1983)
### [By all Plaintiffs against Defendant COUNTY OF RIVERSIDE]

74. Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

75. On information and belief, COUNTY and the RCSD failed to properly and adequately train Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive, including but not limited to, with regard to the use of physical force, less than lethal force, lethal force, de-escalation tactics, communication tactics, and pursuit tactics, and COUNTY's training on these subjects was not adequate to prevent violations of law by its employees.

76. The training policies of Defendant COUNTY and the RCSD were not adequate to train their officers to handle the usual and recurring situations with which they must deal, including de-escalation techniques, communication tactics, pursuit tactics, and the use of lethal force.

77. Defendant COUNTY OF RIVERSIDE was deliberately indifferent to the substantial risk that its and RCSD's de-escalation tactics, communication tactics, pursuit tactics and use of deadly force policies were inadequate to prevent violations of law by its employees, and to the known or obvious consequences of its failure to adequately train its

police officers with respect to the de-escalation tactics, communication tactics, pursuit tactics and the use of deadly force.

78.    The failure of Defendant COUNTY to provide adequate training caused the deprivation of JOHNNY RAY LLAMAS's and Plaintiffs' rights by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive; that is, COUNTY's failure to train is so closely related to the deprivation of these rights as to be the moving force that caused the ultimate injury.

79.    Based on information and belief, the following are only a few examples of cases where the involved deputies were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with the underlying acts giving rise to the below lawsuits, which indicates that COUNTY failed to adequately train its deputies with regard to the use of force:

(a)    In *A.F., et al. v. County of Riverside, et al.*, case number 5:15-cv-01603 JGB (DTBx), Defendant COUNTY failed to discipline its deputy who attacked a man with his K-9 and shot used deadly force against him while he was not an immediate threat of death or serious bodily injury to anyone;

(b)    In *Howard v. County of Riverside, et al.*, case number 5:12-cv-00700 VAP (OPx), Defendant COUNTY argued that the use of deadly force against an individual was reasonable; a federal jury found otherwise and returned a verdict in favor of plaintiff, a man who posed no immediate threat of death or serious bodily injury and suffered a severe brain injury and partial paralysis after a use of force by a COUNTY sheriff's deputy;

(c)    In *Travillion v. County of Riverside*, case number EDCV 14-0003 VAP (DTBx), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

FIRST AMENDED COMPLAINT

(d)     In *Bosch v. County of Riverside*, case number EDCV 13-02352 (SVW)(FFM), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(e)     In *Castillo v. County of Riverside*, case number EDCV 13-00789 VAP (SPx), Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(f)     In *Munoz v. County of Riverside*, case number RIC120794, plaintiff argued that the involved COUNTY Sheriff's deputy used deadly force against her son at a time when he posed no immediate threat.  The jury in that case returned a verdict in favor of plaintiff;

(g)     In *L.R., et al. v. County of Riverside, et al.*, case number 15-cv-1767, Defendant COUNTY failed to discipline its deputy who used deadly force on a man who was not an immediate threat of death or serious bodily injury to anyone;

(h)     In *Galvan v. County of Riverside, et al.*, case number 5:21-cv-00384 JGB (SHKx), Defendant COUNTY failed to discipline its deputy who entered plaintiff's room while plaintiff was sleeping and immediately escalated the situation by commanding a canine to attack plaintiff, including being bit in the neck, a use of deadly force under the circumstances, while plaintiff was not an immediate risk of harm to anyone;

(i)     In *Arocha v. County of Riverside, et al.*, case number 5:18-cv-01585 DMG (SHKx), Defendant COUNTY failed to discipline its deputy who viciously punched plaintiff in the face resulting in loss of consciousness and a broken orbital bone, a use of deadly force under the circumstances, while plaintiff was not an immediate risk of harm to anyone;

FIRST AMENDED COMPLAINT

(j)    In *Cortina v. County of Riverside, et al.*, case number 5:18-cv-01579 DDP (SPx), Defendant COUNTY failed to discipline its deputy who used force including deadly force, including deployment of a chemical agent, on an unarmed man who was not an immediate threat of harm to anyone;

(k)    In *Aguirre, et al. v. County of Riverside, et al.*, case number 5:18-cv-00762 DMG (SPx), Defendant COUNTY failed to discipline its deputy who used excessive force against the decedent who was not an immediate threat of death or serious bodily injury, arguing that the force was reasonable even after a unanimous jury returned a verdict in favor of plaintiffs;

(l)    In *Orellana v. County of Riverside, et al.*, case number 5:19-cv-01263 JGB (SHKx), Defendant COUNTY failed to discipline its deputies who used excessive force including deadly force against a man who was not an immediate threat of harm to anyone.

80.    By reasons of the aforementioned acts and omissions, Decedent JOHNNY RAY LLAMAS suffered great physical pain and suffering up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity; Plaintiffs suffered emotional distress, mental anguish, and pain; and Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of Decedent JOHNNY RAY LLAMAS, and will continue to be so deprived for the remainder of their natural lives.

81.    Accordingly, Defendant COUNTY is liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983. Plaintiffs also seek attorneys' fees and costs under this claim.

///

///

///

## SIXTH CLAIM FOR RELIEF

### Battery (Survival and Wrongful Death)

### [By All Plaintiffs against All Defendants]

82.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

83.     Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, while working as sheriff's deputies for RCSD and COUNTY, and acting within the course and scope of their duties, intentionally shot JOHNNY RAY LLAMAS multiple times and used unreasonable and excessive force against him. As a result of the actions of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, JOHNNY RAY LLAMAS ultimately died from his injuries. Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 had no legal justification for using force against JOHNNY RAY LLAMAS, and their use of force while carrying out their duties as police officers was an unreasonable and non-privileged use of force.

84.     As a direct and proximate result of the conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 as alleged above, JOHNNY RAY LLAMAS sustained injuries, experienced pain and suffering, died from his injuries and also lost his earning capacity. Also as a direct and proximate result of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10's conduct as alleged above, Plaintiffs S.L., V.L., and CAROLYN CAMPBELL suffered emotional distress and mental anguish. S.L., V.L., and CAROLYN CAMPBELL also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of JOHNNY RAY LLAMAS, and will continue to be so deprived for the remainder of their natural life.

85.     COUNTY is vicariously liable for the wrongful acts of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries

FIRST AMENDED COMPLAINT

caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

86.     The conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of JOHNNY RAY LLAMAS, entitling Plaintiffs S.L. and V.L., as successors-in-interest to JOHNNY RAY LLAMAS, to an award of exemplary and punitive damages as to Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10.

87.     Pursuant to California Code of Civil Procedure §§ 377.60 and 377.70, Plaintiffs S.L. and V.L. bring this claim individually, as a wrongful death claim, and as successors-in-interest to JOHNNY RAY LLAMAS, as a survival claim. Plaintiffs S.L. and V.L. seek survival damages, including pain and suffering, and wrongful death damages under this claim.

88.     Pursuant to California Code of Civil Procedure §§ 377.60, Plaintiff CAROLYN CAMPBELL brings this claim individually and seeks wrongful death damages on this claim.

89.     As a further proximate result of the aforesaid acts and omissions by defendants and the death of decedent, Plaintiffs have incurred funeral and burial expenses in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### Negligence (Survival and Wrongful Death)
### [By All Plaintiffs against All Defendants]

90.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

91.     Law enforcement officers, including Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, have a duty to use reasonable care to prevent harm

or injury to others. This duty includes using appropriate tactics, giving appropriate commands, giving warnings, and not using any force unless necessary, using less than lethal options, and only using deadly force as a last resort.

92.   Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 breached this duty of care. Upon information and belief, the actions and inactions of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 were negligent and reckless, including but not limited to:

(a)   the failure to properly and adequately assess the need to use force or deadly force against JOHNNY RAY LLAMAS;

(b)   the negligent tactics and handling of the situation with JOHNNY RAY LLAMAS, including pre-shooting negligence;

(c)   the negligent use of force, including deadly force, against JOHNNY RAY LLAMAS;

(d)   the failure to provide prompt medical care to JOHNNY RAY LLAMAS;

(e)   the failure to properly train and supervise employees, both professional and non-professional, including Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10;

(f)   the failure to properly employ, retain, assign, control, and discipline employees, including Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, including despite known dangerous propensities and/or propensities for using excessive force;

(g)   the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of JOHNNY RAY LLAMAS;

(h)   the negligent handling of evidence and witnesses; and

(i)   the negligent communication of information during the incident.

FIRST AMENDED COMPLAINT

93.  As a direct and proximate result of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10's conduct as alleged above, and other undiscovered negligent conduct, JOHNNY RAY LLAMAS experienced pain and suffering ultimately died. Also as a direct and proximate result of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10's conduct as alleged above, Plaintiffs S.L., V.L., and CAROLYN CAMPBELL suffered emotional distress and mental anguish. Plaintiffs S.L., V.L., and CAROLYN CAMPBELL also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of JOHNNY RAY LLAMAS, and will continue to be so deprived for the remainder of their natural lives.

94.  COUNTY is vicariously liable for the wrongful acts of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

95.  Pursuant to California Code of Civil Procedure §§ 377.60 and 377.70, Plaintiffs S.L. and V.L. bring this claim individually, as a wrongful death claim, and as successors-in-interest to JOHNNY RAY LLAMAS, as a survival claim. Plaintiffs S.L. and V.L. seek survival damages, including pain and suffering, and wrongful death damages under this claim.

96.  Pursuant to California Code of Civil Procedure §§ 377.60, Plaintiff CAROLYN CAMPBELL brings this claim individually and seeks wrongful death damages on this claim.

97.  As a further proximate result of the aforesaid acts and omissions by defendants and the death of decedent, Plaintiffs have incurred funeral and burial expenses in an amount to be proven at trial.

///

///

# EIGHTH CLAIM FOR RELIEF

## Violation of California Civil Code § 52.1

### [By All Plaintiffs against All Defendants]

98.     Plaintiffs refer to and replead each and every allegation contained in the foregoing paragraphs of this Complaint, and by this reference incorporates the same herein and makes each a part hereof.

99.     California Civil Code, Section 52.1 (the Bane Act), prohibits any person from using violent acts or threatening to commit violent acts in retaliation against another person for exercising that person's constitutional rights.

100.    On information and belief, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, while working for the COUNTY and acting within the course and scope of their duties, intentionally committed and attempted to commit acts of violence against JOHNNY RAY LLAMAS or acted in reckless disregard of JOHNNY RAY LLAMAS's civil rights, including by shooting him without justification or excuse, and by denying him necessary medical care.

101.    When Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 shot JOHNNY RAY LLAMAS numerous times, either by integrally participating in the shooting or by failing to intervene, they deliberately subjected JOHNNY RAY LLAMAS to excessive force that was beyond what was necessary and coercively interfered with his civil rights to be free from unreasonable searches and seizures, to due process, to equal protection of the laws, to medical care, to be free from state actions that shock the conscience, and to life, liberty, and property.

102.    On information and belief, Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 intentionally and spitefully coercively committed the above acts to coercively interference with JOHNNY RAY LLAMAS's civil rights, to discourage JOHNNY RAY LLAMAS from exercising his civil rights, to retaliate against him for invoking such rights, or to prevent him from exercising such rights, which he was fully entitled to enjoy.

103.   On information and belief, JOHNNY RAY LLAMAS reasonably believed and understood that the violent acts committed by Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive were intended to coercively interfere with JOHNNY RAY LLAMAS's civil rights, to discourage him from exercising the above civil rights, to retaliate against him for invoking such rights, or to prevent him from exercising such rights.

104.   Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 successfully interfered with the above civil rights of JOHNNY RAY LLAMAS.

105.   The conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was a substantial factor in causing JOHNNY RAY LLAMAS's harms, losses, injuries, and damages.

106.   COUNTY is vicariously liable for the wrongful acts of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10, inclusive pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

107.   The conduct of Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10 was malicious, wanton, oppressive, and accomplished with a conscious disregard for JOHNNY RAY LLAMAS's rights, justifying an award of exemplary and punitive damages as to Defendants SHAWN HUBACHEK, JIMMIE MCGUIRE, and DOES 3-10.

108.   Plaintiffs S.L. and V.L. bring this claim as successors-in-interest to JOHNNY RAY LLAMAS and seek survival damages, including emotional distress, loss of life, and loss of enjoyment of life under this claim. Plaintiffs S.L. and V.L. also seek treble damages, attorney's fees, and costs under this claim.

109.   As a further proximate result of the aforesaid acts and omissions by defendants and the death of decedent, plaintiffs have incurred funeral and burial expenses in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment on all causes of action against defendants, and each of them, as follows:

1. For compensatory damages in whatever other amount may be proven at trial, including both survival damages and wrongful death damages under federal and state law;

2. For funeral and burial expenses, and loss of financial support;

3. For punitive damages against the individual defendants in an amount to be proven at trial;

4. For statutory damages;

5. For treble damages pursuant to California Civil Code sections 52, 52.1;

6. For interest;

7. For reasonable attorney's fees, including litigation expenses;

8. For costs of suit; and

9. For such other and further relief as the court may deem just, proper, and appropriate.

Dated:  September 27, 2024        **MARDIROSSIAN AKARAGIAN, LLP**


By:  /s/ Lawrence D. Marks
GARO MARDIROSSIAN
LAWRENCE D. MARKS
Attorneys for Plaintiffs S.L. and CAROLYN CAMPBELL

Dated:  September 27, 2024        **LAW OFFICES OF DALE K. GALIPO**


By:  /s/ Dale K. Galipo
DALE K. GALIPO
Attorneys for Plaintiff V.L.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: September 27, 2024          **MARDIROSSIAN AKARAGIAN, LLP**


                                   By:  /s/ Lawrence D. Marks
                                   GARO MARDIROSSIAN
                                   LAWRENCE D. MARKS
                                   Attorneys for Plaintiffs S.L. and CAROLYN
                                   CAMPBELL


Dated: September 27, 2024          **LAW OFFICES OF DALE K. GALIPO**


                                   By:  /s/ Dale K. Galipo
                                   DALE K. GALIPO
                                   Attorneys for Plaintiff V.L.

FIRST AMENDED COMPLAINT

# EXHIBIT 17

# EXHIBIT 17

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO.: 5:24-cv-00249-CAS(SPx)

---------------------x

Johnny Ray Llamas,

     Plaintiffs,

V.

County of Riverside,

     Defendants.

---------------------x

         October 23rd, 2024

         Deposition via Zoom.



Page 2

```
 1               A P P E A R A N C E S
 2   Appearing on behalf of the plaintiff and the witness:
 3   BY:  LAWRENCE MARKS, ESQ
 4
 5   Appearing on behalf of the defendants:
 6   BY:  KAYLEIGH ANDERSEN, ESQ
 7
 8   Appearing on behalf of Plaintiff V.L.:
 9   BY:  SHANNON LEAP, ESQ
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

1                                    I N D E X

2

3    WITNESS                    EXAMINATION              PAGE

4    CAROLYN CAMPBELL           DIRECT EXAMINATION

5                               BY MS. ANDERSEN          5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1              THE VIDEOGRAPHER:   We are now on the

2    record.   This begins Videotape number 1 in the

3    deposition of Carolyn Campbell in the matter of

4    Johnny Ray Llamas vs. County of Riverside, the

5    United States District Court, Central District of

6    California, case number 524-cv-00249-CAS(SPx).

7    Today is October 23rd, 2024, and the time is 1:13

8    p.m.   This deposition is being taken remotely at the

9    request of Manning & Kass.   The videographer is

10   Victor Salcedo(phonetic) of Magna Legal Services and

11   the court reporter is Kathleen McLaughlin of Magna

12   Legal Services.   Will counsel and all parties

13   present state their appearances and whom they

14   represent.

15              MR. MARKS:   Lawrence Marks, I represent

16   the plaintiff and the witness.

17              MS. LEAP:   Shannon Leap on behalf of

18   Plaintiff V.L.

19              MS. ANDERSEN:   Kayleigh Andersen on

20   behalf of the defendants.

21              THE VIDEOGRAPHER:   Will the court

22   reporter please swear in the witness.

23              THE COURT REPORTER:   Ms. Campbell,

24   please raise your right hand.   Do you solemnly state

25   the testimony you're about to give in this



Page 5

1    proceeding shall be the truth, the whole truth, and

2    nothing but the truth?

3              THE WITNESS:  Yes.

4              (Whereupon, the witness was duly sworn.)

5              THE COURT REPORTER:  Thank you.

6    Whereupon,

7              C A R O L Y N   C A M P B E L L,

8    having been first duly sworn, was examined and testified

9    as follows:

10   DIRECT EXAMINATION.

11   BY MS. ANDERSEN:

12       Q.  Good afternoon, Ms. Campbell.  Could I have

13   you please state and spell your full name for the

14   record?

15       A.  It's Carolyn, C-A-R-O-L-Y-N, and I use my

16   middle name Jean, J-E-A-N, Campbell,

17   C-A-M-P-B-E-L-L.

18       Q.  Thank you.  Have you ever had your deposition

19   taken before?

20       A.  No.

21       Q.  Have you ever testified in court before?

22       A.  What'd you say.

23       Q.  Have you ever testified in a courtroom

24   before?

25       A.  No.



Page 6

1       Q.   Okay.  So let me go over some of the ground

2   rules for the depositions so we have a better

3   understanding of today's proceedings.

4       A.   Mm-hmm.

5       Q.   A -- a deposition is a question and answer

6   session, so I will be asking you the questions and

7   you provide your best answers.  The court reporter

8   is here to take down everything that is said.  She

9   can only take down verbal responses, so I ask that

10  you continue to give verbal responses to my

11  questions as opposed to uh-uhs or uh-uhs, or nodding

12  or shaking your head.  Does that make sense?

13      A.   Yes.

14      Q.   Okay.  You'll have an opportunity to review

15  the transcript once it's complete and make any

16  changes that you deem appropriate.  I will caution

17  you that if you make substantive changes to your

18  testimony, it may affect your credibility at the

19  time of trial and myself, or other attorneys would

20  be able to comment on those changes.  Does that make

21  sense?

22      A.   Yes.

23      Q.   Okay.  From time to time, your attorney or

24  the other attorney here, Ms. Leap, may have

25  objections to my questions.  Please allow them to



Page 7

1    state their objections for the record and then you

2    can proceed with your answer.  Okay?

3        A.  Okay.

4        Q.  I do not want you to guess or speculate today

5    about anything, but I am entitled to your best

6    estimate.  Do you understand the difference between

7    a guess and an estimate?

8        A.  No.

9        Q.  Okay.  So let me give you an example that we

10    frequently use.  So there's a -- I'm assuming based

11    on how you're seated, you're sitting at a table of

12    some sort; is that correct?

13        A.  Yes.

14        Q.  Okay.  So I'm also sitting at a table, but if

15    I asked you to tell me how long the table in front

16    of me is with feet or inches, that would be a

17    complete guess because you've never seen this table,

18    correct?

19        A.  Correct.

20        Q.  Okay.  But if I were to ask you how long the

21    table in front of you is, you may not know exactly

22    how long it is, but you'd be able to give me some

23    type of estimate or approximation.  Does that make

24    sense?

25        A.  Yes.



Page 8

1    Q.   Okay.  So does that make sense as opposed to

2    what a guess is as opposed to an estimate?

3    A.   Right.  Yes.

4    Q.   Okay.  If at any time you don't understand my

5    question, please let me know and I'll do my best to

6    rephrase it.  Okay?

7    A.   Okay.

8    Q.   I'm speaking kind of loud because I think I

9    heard you say something before we started, that

10   you're hard of hearing?

11   A.   Yes.

12   Q.   Is that correct?

13   A.   Yes.

14   Q.   Okay.  So if at any time you don't hear me or

15   need something repeated back, please let me know.

16   Okay?

17   A.   Okay.

18   Q.   If you need a break at any time, we can also

19   go ahead and take a break.  I just ask that if

20   there's a question pending, you answer that question

21   before we go ahead and take the break.  Okay?

22   A.   All right.

23   Q.   Is there any reason that would prevent you

24   from going forward with your deposition today?

25   A.   No.


MAGNA
LEGAL SERVICES

Page 9

```
 1      Q.   Have you had any drugs or alcohol in the last
 2   24 hours that would impair your ability to give your
 3   best testimony today?
 4      A.   No.
 5      Q.   Have you reviewed anything in preparation for
 6   your deposition?
 7      A.   No.
 8      Q.   Have you ever talked with anyone from the
 9   Riverside County Sheriff's Department about the
10   incident involving your son, Johnny Llamas, and law
11   enforcement on April 13th of 2023?
12      A.   Yes.
13      Q.   Okay.  When did you speak with law
14   enforcement about that incident?
15      A.   Well, they -- they came to my house to tell
16   me that -- that my son was killed.
17      Q.   Okay.  So the notification; is that correct?
18      A.   Right.
19      Q.   And when was that?
20      A.   It was the 14th of April.
21      Q.   Okay.  So it was the same date, as far as you
22   understood it, as the incident took place?
23      A.   It was the next day.
24      Q.   Oh, okay.  Do you recall the names of the
25   individual officers or --
```



Page 10

```
 1     A.  No.

 2     Q.  -- deputies that came?

 3          MR. MARKS:  You got to slow down just a

 4  little bit and let her finish her question before

 5  you start to answer.

 6          THE WITNESS:  Okay.

 7  BY MS. ANDERSEN:

 8     Q.  Do you recall the names of the deputies or

 9  law enforcement officers who came to your house to

10  notify you?

11     A.  No.

12     Q.  Okay.  Other -- or let me ask then, what did

13  they notify you about?

14     A.  That my son was killed, shot.

15     Q.  Did they provide any more information about

16  that incident or the -- the death of your son?

17     A.  No.

18     Q.  Okay.  Was anyone home with you at the time

19  that you had that notification?

20     A.  I was by myself.

21     Q.  Okay.  Were you at your -- your residence,

22  your home?

23     A.  Yes.

24     Q.  Okay.  Other than that notification where law

25  enforcement informed you that your son had died, did
```



Page 11

1   you have any other contact with anyone from the

2   Riverside County Sheriff's Department about the

3   death of your son?

4       A.  No.

5       Q.  Okay.  And I know it's kind of obvious from

6   the complaint, but the -- your relationship to

7   Johnny Llamas, he is your biological son; is that

8   correct?

9       A.  Yes.

10      Q.  Okay.  Have you gone by any other names in

11  your life other than Carolyn Campbell?

12      A.  Yes.

13      Q.  And what other names have you gone by?

14      A.  Llamas.

15      Q.  Okay.  And when did you stop going by Llamas?

16      A.  When I got married.

17      Q.  Okay.  Is Llamas your maiden name then?

18      A.  Yes.

19      Q.  Okay.  And then what year then did you stop

20  using Llamas as your maiden name?

21      A.  In '89.

22      Q.  1989?

23      A.  Mm-hmm.

24      Q.  Yes?

25      A.  Yes.



MAGNA
LEGAL SERVICES

Page 12

1    Q.   Okay.  Thank you.  What's your date of birth?

2    A.   May 2nd, 1958.

3    Q.   And do you currently live with anyone?

4    A.   No.

5    Q.   But where do you live?

6    A.   In Lake Elsinore.

7    Q.   Okay.  Let's say since the year 2020, have

8    you ever lived with anyone at the same residence?

9    A.   No.

10    Q.   In April of 2023, did you live at the same

11    residence you currently live at in Lake Elsinore?

12    A.   Yes.

13    Q.   Between 2020 and 2023, did Johnny ever live

14    with you at your --

15    A.   Yes.

16    Q.   -- residence?

17    A.   Yes.

18    Q.   Okay.  And during what time periods?

19    A.   When he first was released from prison.  I'm

20    not sure what the date was.  I was really sick.  I

21    don't remember a lot.

22    Q.   Can you give me your best estimate?  Maybe

23    just the year?

24    A.   I -- I -- I really don't know.

25    Q.   Okay.



Page 13

1    A.   Whenever he was released.

2    Q.   Do you know how long he lived with you?

3    A.   It was off and on.

4    Q.   Okay.   In April of 2023, was Johnny living

5    with you at your residence?

6    A.   No.

7    Q.   Okay.  Are -- are you currently married?

8    A.   No, I'm a widow.

9    Q.   Okay.  Were you ever married to -- to

10   Johnny's father?

11   A.   No.

12   Q.   And from the testimony of your daughter,

13   Kristine, I understand you have -- are there four

14   children?

15   A.   Three.

16   Q.   Three children?  Okay.  And what are the

17   names of your -- your three children?

18   A.   Michelle(phonetic), Kristine, and my son,

19   Johnny.

20   Q.   Okay.  Do you know if Johnny was ever

21   married?

22   A.   No.

23   Q.   Is that -- I guess I asked that question

24   pretty poorly, but does that mean he -- as far as

25   you're aware, he was never married; is that correct?



Page 14

1      A.   Never married.

2      Q.   Okay.   Thank you.   And do you know how many

3   children Johnny has?

4      A.   Two.

5      Q.   Two.   And I'm just going to refer to them by

6   their initials as I understand it.   Would that be

7   S.L.   and V.L.?

8      A.   Yes.

9      Q.   Okay.   And what is your highest level of

10   education?

11      A.   High school graduate.

12      Q.   Within the past 10 years, have you been

13   convicted of a felony?

14      A.   No.

15      Q.   What is Johnny's highest level of education?

16      A.   Ninth grade, I believe.

17      Q.   Again, from the testimony of your daughter

18   earlier, I understand he was maybe taking classes or

19   courses to obtain his GED.   Does that sound

20   accurate?

21      A.   Yes.

22      Q.   Okay.   Do you know if he ever obtained his

23   GED?

24      A.   No.

25      Q.   Do you know whether he ever obtained any type



Page 15

1   of trade certificates?

2       A.   Yes.

3       Q.   Okay.  In what?

4       A.   He worked for the fire camp at the prison and

5   he got certificates, stuff like that.  He took

6   college classes in prison to better himself --

7       Q.   Okay.

8       A.   -- for the fire department.

9       Q.   Okay.  Other than while in custody, do you

10   know if he took any college courses outside?

11       A.   No, not that I know of.

12       Q.   Okay.  Same thing, out of custody, do you

13   know if he ever took any or attended any trade

14   school, courses, or classes?

15       A.   No, not that I know of.

16       Q.   And do you -- again, this is maybe silly, but

17   since -- I'm only going to talk about the time

18   period from the -- the time Johnny turned 18, so as

19   an adult.  From 18 until his -- his death in 2023,

20   do you know if Johnny had been convicted of any

21   felonies?

22       A.   I believe so.

23       Q.   Do you know approximately how many times he

24   had been convicted of a felony during that time

25   period?



Page 16

1      A.   I can't recall.

2      Q.   Do you recall, as an adult, so since he

3 reached the age of 18, he had multiple separate

4 incarcerations in either a county jail or state

5 prison?

6      A.   Yes.

7      Q.   Do you know any of the state prisons in which

8 he was incarcerated?  The names of them?

9      A.   I believe one was Wasco, Chino.

10      Q.   I'm sorry?

11      A.   Chino.

12      Q.   Chino?  Oh, okay.  I'm sorry.  So Chino and

13 Wasco.  Do you know any other state prisons in which

14 he was incarcerated?

15      A.   I don't know.  I can't recall the names.

16      Q.   Okay.  Do you know approximately when he was

17 at Wasco State Prison?

18      A.   No, I -- I don't -- I don't remember.

19      Q.   Okay.  What about at Chino?  Do you know the

20 -- recall the approximate time period?

21      A.   No, I -- I don't -- I don't.

22      Q.   Okay.  Do you know the nature of the charges

23 related to any of his felony convictions as an

24 adult?

25      A.   Yes.



Page 17

1    Q.   And what were -- what were those?

2    A.   Car theft.

3    Q.   Other than car theft, are you aware of any

4    other charges that relate to any of the felony

5    convictions he had as an adult?

6    A.   No.

7    Q.   Do you know whether Johnny was on probation

8    at the time of his death?

9    A.   I believe so.

10   Q.   Do you know whether he had a warrant for his

11   arrest out at the time of his death?

12   A.   No, till after.

13             THE COURT REPORTER:   I didn't hear that.

14   I'm sorry.   No.   What was the rest of the words?

15             THE WITNESS:   After he died.

16   BY MS. ANDERSEN:

17   Q.   Okay.   You're saying after his -- after he

18   died, you became aware of a warrant?

19   A.   Yes.

20   Q.   Okay.   How are you currently employed?

21   A.   I'm retired.

22   Q.   How long have you been retired?

23   A.   Ten years.

24   Q.   Ten years.   What previous job did you have?

25   A.   I was a housewife a lot of my years, but I



Page 18

1  worked at the casinos, Pechanga, Soboba.

2     Q.  When did you work at the casino?  Pechanga?

3     A.  The year, probably 1999 or so.

4     Q.  Okay.  After 1999, did you work?

5     A.  No.

6     Q.  Okay.  So when was the last time you actual

7  -- you had employment?

8     A.  At that job, that was the last time.

9     Q.  Approximately 1999?

10    A.  Yeah.

11    Q.  Okay.  Do you know if Johnny was employed in

12  April of 2023?

13    A.  Not that I know of.

14    Q.  Okay.  What about since -- as an adult, do

15  you know of any jobs that Johnny held?

16    A.  Well, I know he applied for a lot of jobs and

17  he never got no response.  He tried to get into the

18  fire camp and nothing became of it.  But I know he

19  would do odd jobs.

20    Q.  But self-employed, is that how you would

21  categorize it?

22    A.  Yes.

23    Q.  Okay.  But as far as you're aware, he never

24  worked for a specific business, or company, or

25  anything like that; is that accurate?



Page 19

```
 1      A.  Yes.

 2      Q.  Okay.  What types of odd jobs would he work

 3 as far as you were aware?

 4      A.  He did plumbing, he laid cement, construction

 5 type job.

 6      Q.  Do you know -- let's break it down maybe

 7 monthly.  Do you know approximately how much Johnny

 8 would make in a month between the years of 2020 and

 9 2023?

10      A.  I have no clue what he made or -- money-wise

11 or anything like that.

12      Q.  Okay.  Have you ever been a party to a civil

13 lawsuit before?

14      A.  No.

15      Q.  Okay.  Now, this is again a clarifying

16 question, so I think I know the answer, but did you

17 witness -- personally witness any part of the

18 incident between Johnny and the deputies with the

19 sheriff's department on April 14th of 2023?

20      A.  No.

21      Q.  Okay.  Do you know a woman named Priscilla

22 Raju(phonetic)?

23      A.  I met her.

24      Q.  Okay.  When did you meet her?

25      A.  She came over to the house with Johnny, I'd
```



Page 20

1  say probably about a month before he was murdered.

2      Q.  Okay.  Did he or she tell you the -- the

3  nature of their relationship?

4      A.  A boyfriend and girlfriend, I guess, for a

5  minute.

6      Q.  Okay.  Other than that one time,

7  approximately one month before the incident, have

8  you ever spoken with her outside of that time?

9      A.  She came over with Johnny another time and I

10  gave her a dress, and Johnny spoke highly of her,

11  said she took care of him and stuff.  She seemed

12  pretty nice.

13      Q.  Okay.  What about since -- since Johnny's

14  passing, have you spoken with Priscilla Raju?

15      A.  Yes, I was in the hospital.  It was just like

16  the day or two after he passed on, she came to see

17  me at the hospital.  She stayed for a few minutes

18  and left.

19      Q.  Okay.  Did you talk about anything related to

20  the incident with your son?

21      A.  No, I was so upset I didn't ask her anything.

22      Q.  Okay.  Did she tell you anything about what

23  happened during the incident with her son -- oh,

24  with -- I'm sorry, with your son and the deputies?

25      A.  No, she never spoke of anything.



Page 21

```
 1      Q.  Other than that one time -- a couple days or
 2   so after your son's passing, have you spoken with
 3   her again?
 4      A.  No.
 5      Q.  Okay.  Have you attempted to reach out to her
 6   at any time, again, other than that one time you --
 7   you spoke with her a couple days after the incident?
 8      A.  No.
 9      Q.  Any other time where you tried to reach out
10   to her?
11      A.  No.
12      Q.  Okay.  Any other time where she's tried to
13   contact you since Johnny's passing?
14      A.  No.
15      Q.  Okay.  Do you know where she lives?
16      A.  No.
17      Q.  Do you have a phone number for her or
18   anything?
19      A.  No.
20      Q.  When was the last time you saw Johnny prior
21   to his death?
22      A.  The night before he was murdered.
23      Q.  Okay.  And where did you see him?
24      A.  He came to my house.
25      Q.  Okay.  Did you guys talk about anything?
```



Page 22

1    A.   No, he took a shower, fed him.  He told me to
2  be careful.  He was worried about me being sick.
3    Q.   Did he spend the night at your house?
4    A.   No.
5    Q.   Okay.  Was Priscilla with him at that time?
6    A.   No, he was by himself.
7    Q.   Okay.  Did he say anything about law
8  enforcement, or police, or deputies, or anything
9  during your contact with him that night before?
10    A.   He told me that they tried -- they set his
11  place on fire and it was so hot it melted all kinds
12  of metal and stuff there.
13    Q.   When did he say that occurred, if he did?
14    A.   Right before he died.
15    Q.   Okay.  He -- he told you that the police had
16  set something on fire of his?
17    A.   His -- his place.
18    Q.   Where -- where was he living at that time?
19    A.   I think it's Mountain Road or something like
20  that.
21    Q.   Was he living in an apartment, a house?
22    A.   A trailer.
23    Q.   A trailer?  And did he tell you during -- the
24  night before that the police had set his trailer on
25  fire?



Page 23

1    A.   Yeah, and it was really hot, melted some keys

2    and stuff like that.  He was real worried.

3    Q.   Okay.  Did he elaborate any further on the

4    circumstances of that event?

5    A.   No.

6    Q.   Okay.  Did he say if anybody was with him

7    when the police allegedly lit his trailer on fire?

8    A.   No.

9    Q.   Did you believe him when he said that?

10   A.   Yeah, I did because he was pretty upset.

11   Q.   Okay.  Did he -- do you know if Johnny took

12   any drugs or anything as an adult?

13   A.   Not that I'm aware of.

14   Q.   Do you know if Johnny had ever been diagnosed

15   with any mental health issues at any time in his

16   life?

17   A.   No, not that I know of.

18   Q.   Okay.  Did you receive any type of financial

19   support from Johnny at any time in his adult life?

20   A.   No.

21   Q.   Do you maintain contact with the other

22   plaintiffs in this case, your granddaughters, S.L.

23   and V.L.?

24   A.   I didn't understand you.

25   Q.   Do you still see your granddaughters, S.L.



Page 24

1    and V.L., Johnny's daughters?

2        A.  Yes.

3        Q.  Okay.  When was the last time you saw S.L.

4    maybe other than currently at your attorney's

5    office?  But when was the last time before this that

6    you saw S.L.?

7        A.  Couple days ago.

8        Q.  Do you guys live close to each other in Lake

9    Elsinore?

10       A.  Yes.

11       Q.  What about V.L.?  When was the last time you

12   saw her?

13       A.  Oh, it's probably been about eight months.

14       Q.  Okay.  And it's my understanding she lives

15   out of state; is that -- is that correct?

16       A.  Yes.

17       Q.  Do you know what state she lives in?

18       A.  I believe it's Oklahoma.

19       Q.  Have you ever gone to Oklahoma to visit her?

20       A.  No.

21       Q.  Do you know if Johnny ever went to Oklahoma

22   to visit her?

23       A.  No, but he sent her money in Oklahoma.

24       Q.  Okay.  Have you ever talked about what

25   happened during the incident with Johnny and the law



Page 25

1    enforcement officers on April 14th with anyone other

2    than your attorneys and also that one conversation

3    you already mentioned with Priscilla?  Any other

4    time that you spoke with anybody about that

5    incident?

6        A.  Well, everybody knew, the neighborhood,

7    before I did.

8               THE COURT REPORTER:  I'm sorry.  The

9    neighborhood?

10              THE WITNESS:  Yeah.

11              THE COURT REPORTER:  I didn't hear what

12   she --

13              MR. MARKS:  She said, "Before I did."

14              THE COURT REPORTER:  Okay.

15   BY MS. ANDERSEN:

16       Q.  So did anybody -- has anybody told you they

17   personally witnessed the incident involving law

18   enforcement and your son, Johnny, on April 14th?

19       A.  They heard it.

20       Q.  Okay.  Do you know who heard it?

21       A.  Quite a few people.

22       Q.  And when you say heard it, do you mean they

23   heard about it or that they personally heard the

24   actual incident taking place?

25       A.  Well, you know, my -- you could hear them



Page 26

1    screaming and the helicopter and everything.

2        Q.  Okay.  Can you give me the name of the person

3    who told you that they heard it?

4        A.  I'm not sure of their name.

5        Q.  Are they a neighbor of yours?

6        A.  No.

7        Q.  Okay.  Did you ever go to, like the location

8    or around the location where the incident took place

9    and speak with any of the homeowners in that area?

10       A.  Yes, I have.

11       Q.  Okay.

12       A.  I've seen bullet holes.

13       Q.  I'm sorry?

14       A.  I've seen the bullet holes.

15       Q.  Okay.  And do you recall the names of the

16   homeowners that you did speak with?

17       A.  I don't know them.

18       Q.  Okay.  Do you know the address of the home

19   that you -- you know, where the owners were that you

20   spoke with?

21       A.  Right where he was killed.

22       Q.  Okay.  And what did they tell you, if

23   anything?

24       A.  I've never talked to them.  I've just been

25   there, put flowers on the -- the site where he was



Page 27

1    killed.

2       Q.  Okay.  So to clarify, you -- you have not

3    spoken to any of the homeowners in the area --

4       A.  No.

5       Q.  -- or the -- I know you -- I know you

6    understand where my question is going, but just let

7    me finish my question before you answer.  It just

8    helps the court reporter keep --

9       A.  Okay.

10      Q.  -- a clear transcript.  Okay?

11      A.  Sorry.

12      Q.  That's okay.  It's hard over Zoom.  I

13   understand.  Just to clarify, you have not spoken to

14   any of the homeowners in the area where this -- the

15   incident with your son occurred, correct?

16      A.  Correct.

17      Q.  Okay.  But I -- I understand from your

18   daughter's testimony that there was some type of

19   cross placed in the area.  Is that what you referred

20   to?

21      A.  Yes.

22      Q.  Okay.  Have you -- now, to clarify again,

23   have you spoken with anyone who has told you that

24   they're a personal witness to the incident between

25   Johnny and the deputies on April 14th?



Page 28

1    A.  No.

2    Q.  Okay.  Have you ever talked with your

3 daughter, Kristina, about the incident with Johnny

4 and what happened or anything like that?

5    A.  Yes.

6    Q.  Okay.  And out -- I don't want to know any

7 communications you had with your attorney or in the

8 presence of your attorney.  So with that qualifier

9 and clarifier, what conversations have you had with

10 your daughter, Kristina, about Johnny's death?

11    A.  Just that they already had shot him in the

12 back twice.  Why couldn't have they done something

13 different than to shoot him in the head -- in the

14 back of the head?  I just can't understand.

15    Q.  And, again, I don't want any information from

16 your attorney, but have you ever read any reports or

17 watched any videos related to the incident with law

18 enforcement and Johnny?

19    A.  No.

20    Q.  Okay.  When Johnny was incarcerated, did you

21 maintain communication with him?

22    A.  Always.

23    Q.  Okay.  And how would he reach you?

24    A.  Telephone calls, mail.

25    Q.  Okay.  Did you ever call him while he was in



Page 29

 1  custody?

 2      A.  No.

 3      Q.  Okay.  Was it always calls from him to you?

 4      A.  Yes.

 5      Q.  Okay.  And do you know how he was making

 6  those phone calls to you?

 7      A.  I put money on the phone for him.

 8      Q.  Okay.  Were you aware of any cell phone in

 9  his possession that he was using to call you?

10      A.  No, it was a payphone.

11      Q.  You think he was using a payphone at the

12  jail?  Is that what you're talking about?

13      A.  Yes.

14      Q.  Okay.  What about when he was at the fire

15  camp?  Do you know how he was contacting you?

16      A.  He wouldn't contact me.

17      Q.  Okay.  Did you ever --

18      A.  When he on the fire --

19      Q.  I'm sorry, I didn't mean to interrupt you.

20  Can you -- can you repeat your answer?

21      A.  He would never contact me on the fire camp.

22  There was no phones accessible to him except for

23  when he was in the prison camp.

24      Q.  Okay.  Do you know if he was in possession of

25  a cell phone that allowed you to communicate with



Page 30

1    him when he was at the fire camps?

2        A.  Not that I know of.

3        Q.  Okay.  So it's your testimony that you never

4    spoke with him at any time while he was at the fire

5    camps; is that correct?

6        A.  I believe so.

7        Q.  Well, you believe so.  Did you make any phone

8    calls to him when he was at the fire camps?

9        A.  No.

10       Q.  Okay.  Did you receive any phone calls or

11   texts from him while he was at the fire camp?

12       A.  I don't believe they had a phone available

13   for him.

14       Q.  Okay.  Do you know what years he was at the

15   fire camp?

16       A.  All the times he was in prison, he always got

17   to the fire camp.

18       Q.  So when he was incarcerated in an actual jail

19   or prison, not at the fire camp, how often would you

20   speak with him on the phone?

21       A.  Every day sometimes.

22       Q.  And then you said also through mail; is that

23   correct?

24       A.  Mm-hmm.

25       Q.  Yes?



Page 31

 1    A.  Yes.

 2    Q.  Okay.  When he wasn't in custody, how often

 3 would you say you saw him?

 4    A.   Three, four times a week.

 5    Q.  Okay.  And where would you see him?

 6    A.  He'd come to my house, or I would take

 7 groceries to him, or take gas.

 8    Q.  Where was he living when you would bring him

 9 groceries or get him gas?

10    A.  On mount -- off of Mountain Street.

11    Q.  In what city is that?

12    A.  Paris.

13    Q.  Okay.  Is that the trailer that you were

14 talking about earlier?  Is that the same location?

15    A.  Mm-hmm.

16    Q.  Yes?

17    A.  Yes.

18    Q.  Okay.  Other than living in that trailer, do

19 you know any other locations he lived in?

20    A.  He lived all around Paris in different

21 people's homes, you know, but I don't know --

22    Q.  Do you know what -- sorry, I didn't mean to

23 cut you off.  Did -- do you know who owned the

24 trailer that Johnny was living in?

25    A.  Can't think of his name.  He died.  He



1   recently died.

2       Q.  Okay.  Was it like a -- a male friend of some

3   sort or acquaintance of Johnny's?

4       A.  Yes.

5       Q.  Okay.  Not -- not a family member; is that

6   accurate?

7       A.  No, no family.

8       Q.  Okay.  Do you know approximately what time

9   period he lived at that trailer?

10      A.  Off and on -- off and on for years.

11      Q.  And, again, so other than the times he would

12  stay at the trailer or with you sometimes, do you

13  know any other locations he -- he lived at at any

14  time as an adult?

15      A.  The land -- BLM, Bureau of Land Management,

16  or something like that.  He had a bunch of friends

17  down that way.

18      Q.  What are you referring to?  Are you talking

19  about like open land?  BLM land?

20      A.  Yeah, the land.  It's open land.

21      Q.  Okay.  Was he just living on the land or was

22  there some type of property that you're -- that

23  you're referring to?

24      A.  Well, it was people that he knew.

25      Q.  Did you ever visit him at that -- at that



Page 33

1    location?

2       A.  Oh, no.  You had to have four-wheel drive to

3    get back there.

4       Q.  Okay.  Do you know the names of any of the

5    people that he lived with at that time?

6       A.  I didn't know of them.

7       Q.  Okay.  Do you know the time period where he

8    was living at the -- on this BLM land?

9       A.  I didn't know any of them.

10      Q.  No, the time period that he -- he lived

11   there?

12      A.  All the time, off and on whenever he got out

13   of prison or -- he was always out that way.

14      Q.  Did you provide financial support to Johnny

15   at any time during his adult life?

16      A.  Yes.

17      Q.  Okay.  How often would you say you -- you

18   would give him money?

19      A.  Every time I saw him it seemed like.

20      Q.  Okay.  Did he ever give you money?

21      A.  No.

22      Q.  Okay.  Did he ever buy you groceries instead

23   of you buying him groceries?

24      A.  No.

25      Q.  Okay.  And then you said gas, you would get



Page 34

1    him gas.  Did he ever get you gas?

2       A.  No.

3       Q.  Okay.  Back in around 2022, did you ever

4    speak with Kristina, your -- your daughter,

5    Kristina, about an investigation related to your

6    son?

7       A.  No.

8       Q.  Okay.  She -- she never told you anything

9    about an ongoing investigation by the Riverside

10   Sheriff's Department and your son?

11      A.  No.

12      Q.  Related to any type of allegations of

13   inappropriate touching at her residence?

14      A.  No.  I never heard of that, and I -- my son

15   never talked to me about anything neither.

16      Q.  Did you say Melissa, or did you say Kristine?

17   I'm sorry.

18      A.  Never.

19      Q.  Okay.  Were there ever any times that you and

20   your granddaughters would be on the phone with

21   Johnny in your presence?

22      A.  No.

23      Q.  Okay.  Since Johnny's passing, have you

24   sought any type of counseling or therapy?

25      A.  One session.  I did.



Page 35

1      Q.   Okay.  And when was that?

2      A.   About a month after he passed.

3      Q.   Do you recall the name of the counselor or

4  the therapist that you saw?

5      A.   I can't think of her name.  It's what happens

6  when you get old, forget everything.  I can't think

7  of her name.

8      Q.   How about where did you see this counselor or

9  therapist?

10     A.   Lake Elsinore Mental.

11     Q.   You say Lake Elsinore Mental?

12     A.   Mental clinic.

13     Q.   Okay.  Is that the name that you recall?

14     A.   Uh-huh.

15     Q.   Specifically, that name?

16     A.   Yes.

17     Q.   Okay.  And you only did, I think you said one

18  session about a month after your son's passing; is

19  that -- is that accurate?

20     A.   Yes.  She was a therapist and I saw her once,

21  and then they had me go to a side doctor.  He was

22  treating me pills and I -- I didn't like that.

23     Q.   Okay.  So she sent you or referred you

24  somehow to a -- a psychiatric doctor who prescribed

25  you medication?



Page 36

1              THE COURT REPORTER:  I didn't hear that.
2    I'm sorry.  Please, repeat your answer.
3              THE WITNESS:  Yes.  I understood what
4    she said.  No.  They were in the same clinic, and in
5    order for me to see the therapist, I have to see a
6    psychiatric doctor, whatever it is.
7    BY MS. ANDERSEN:
8       Q.  Okay.  Do you recall the name of the
9    psychiatrist that you saw at that clinic?
10      A.  Wait a minute, Boba or something.
11      Q.  Would -- I mean, can you spell that if you
12   can?
13      A.  B-O-B-A.
14      Q.  Okay.  That's what it sounded like.  Okay.
15   Did you only see that psychiatrist one time?
16      A.  I think it was like three times.
17      Q.  Okay.  And when was the first time you saw
18   that psychiatrist?
19      A.  Maybe a month and a half after Johnny's
20   death.
21      Q.  Okay.  Would -- would that have been then,
22   after you initially saw that -- that therapist at
23   the same clinic?
24      A.  Yes.  Yes.
25      Q.  Okay.  And then you said three times, you



Page 37

1  know what -- when was the second time you saw that

2  psychiatrist?

3      A.  I had allergic reaction to the medication he

4  gave me.

5      Q.  What medication did he prescribe to you?

6      A.  I -- I have no clue what it was, but it

7  really -- I had big old welts all over me and

8  everything and he -- he let me stop it and he gave

9  me some other stuff, but I -- I -- I didn't really

10  want medication.  I didn't -- after that, I didn't

11  want anything, any help like that.

12      Q.  Okay.  So the -- how -- how -- how soon after

13  the first appointment did you have that second

14  appointment to talk about the medication with the

15  psychiatrist?

16      A.  I think it's, like, 30 days.

17      Q.  Okay.  And then I think you said there was a

18  third appointment; is that true?

19      A.  Yes.

20      Q.  Okay.  How -- how close in time to the second

21  appointment was that third appointment?

22      A.  I believe it's 30 days.

23      Q.  Okay.  By the time of the third appointment,

24  were you taking any of the -- the medications that

25  this doctor had prescribed?



Page 38

1     A.   Yes.   The second medication.   Yes.

2     Q.   Okay.   Do you recall the names right now of

3  either of those medications you were prescribed?

4     A.   I never heard of them in my whole life, and I

5  just -- I just decided that, you know what -- what

6  -- what are they giving me?   I mean, I wasn't

7  feeling any different or it's weird.

8     Q.   Do you know what they were for?   Maybe not --

9  you don't know the name of them, but did the doctor

10 tell you what they were prescriptions for?

11    A.   He said all kinds of things were wrong with

12 me.   Depression -- oh, I have a list at home.   It

13 was ridiculous.

14    Q.   Okay.   And let's say before your son's

15 passing, had you ever sought any type of mental

16 health treatment?

17    A.   No.

18    Q.   Okay.   So this was the first time you had

19 ever sought mental health treatment, that's about a

20 --

21    A.   Right.

22    Q.   -- month after the incident?

23    A.   Right.

24    Q.   Okay.   Did you talk with these therapists or

25 the therapist or the psychiatrist about your son's



Page 39

1  passing and its effect on you?

2      A.  The therapist I did.

3      Q.  Okay.  What kind of things did you talk about

4  with the therapist related to your son's passing?

5      A.  Well, I was real -- I -- I -- I was scared

6  because I didn't know if he suffered or what was

7  going on.  And I told her, I -- you know, I can't

8  get over it.  And she says my son was standing right

9  next to me and that brought me comfort.  But --

10     Q.  The -- just to clarify, the therapist told

11 you that your son was standing next to you at the

12 time --

13     A.  Uh-huh.

14     Q.  -- at the time of the appointment?

15     A.  Yes.

16     Q.  Okay.  Did you talk with her about what

17 happened during the incident or anything like that?

18     A.  Yes.  I did.

19     Q.  Okay.  What did you tell her?

20     A.  I told her about the police dog.

21          THE COURT REPORTER:  I didn't hear.  I'm

22 sorry.  You told her about?

23          THE WITNESS:  About him shooting the

24 police dog.

25          THE COURT REPORTER:  The police dog?



Page 40

```
 1              THE WITNESS:  Uh-huh.
 2  BY MS. ANDERSEN:
 3     Q.  Who did you -- who did you tell the therapist
 4  shot the police dog?
 5     A.  My son.
 6     Q.  Okay.  And then what else about the incident
 7  did you talk to the therapist about?
 8     A.  I just told her I couldn't believe that he
 9  would do something like that.  You know, because he
10  -- he wasn't like that.  And I told -- told her I
11  felt lost because I didn't know if he made it to
12  heaven or what.  You know, did he suffer?  I was
13  just so scared.  And she goes, no, he -- he is
14  standing right next to you.  He is telling you that
15  he's okay.
16     Q.  Okay.  Did you ever go back to that therapist
17  for any therapy or counseling sessions?
18     A.  No.  I didn't.
19     Q.  Was there a reason?  Oh, I'm sorry.  Go
20  ahead.
21     A.  She was really busy and I felt like she
22  didn't have time.
23     Q.  Okay.  Did you ever try to get an appointment
24  with a different therapist or counselor, either at
25  that facility or a different facility?
```



Page 41

1    A.   No.  I didn't.

2    Q.   Okay.  Are you still taking that -- the

3    medication prescribed by that psychiatrist at the

4    clinic?

5    A.   Oh, no.

6    Q.   Okay.  What -- when did you stop taking that

7    medication -- the second medication?

8    A.   Like two weeks after the last time I saw him.

9    Q.   Okay.  Was there a specific reason you

10   stopped?

11   A.   Excuse me.

12   Q.   Was there a specific reason why you stopped

13   taking that medication?

14   A.   I didn't see any difference -- any difference

15   in my feelings.  I was still feeling the same, you

16   know.  I guess, I was expecting a miracle.

17   Q.   Okay.  Did you ever go back to the

18   psychiatrist or attempt to make another appointment

19   with the psychiatrist to discuss the medications?

20   A.   Yes.

21   Q.   What -- after the third time?  I'm sorry,

22   maybe I should clarify --

23   A.   No.  No.

24   Q.   No?  Okay.  Since stopping taking that second

25   medication, have you taken any other medication for



Page 42

```
1    any, like, mental health, things related to your

2    son's passing?

3        A.  No.

4        Q.  So, I want to ask you just again about S.L.

5    and V.L.  because you have maintained contact with

6    them.  Did you notice any changes in their behavior?

7    We can take one at a time.  So let's do S.L.  first.

8    So did you notice any changes in S.L.'s behavior

9    from before her father passed to after he passed?

10       A.  Yeah.  I do.

11       Q.  Okay.  Can you tell me what those -- what

12   those are -- what those changes were that you

13   noticed?

14       A.  She's sad.  She doesn't say much anymore.

15   She used to color and draw and be all over me, and

16   now she's like this --

17           THE COURT REPORTER:  I'm sorry.  I need

18   you to repeat that, ma'am.  I -- I'm sorry.  She

19   doesn't say much anymore.  She's -- please repeat

20   your answer?

21           THE WITNESS:  She's distant.  She's,

22   like, into her own little world.

23   BY MS. ANDERSEN:

24       Q.  Did you -- do you know the last time she

25   spoke with her father, your son, before the
```



Page 43

1   incident?

2      A.  No.  I'm not sure.

3      Q.  Okay.  When did you notice those changes in

4   her behavior?

5      A.  She's around me all the time.

6      Q.  Yeah.  I meant, like, what -- what -- maybe

7   my question wasn't right.  Approximately what time

8   period?  Was it around your son's passing?

9      A.  Yes.

10     Q.  Okay.  And then what about V.L.?  Let's talk

11  about V.L.  Have you noticed any changes in V.L.'s

12  behavior from before her father's passing to after?

13     A.  No.  I -- I am not around her.  She lives in

14  Oklahoma, so I don't really see her.

15     Q.  Do you know approximately when she moved to

16  Oklahoma?

17     A.  Not offhand.  It's been a couple years.

18     Q.  Okay.  Did the therapist or the psychiatrist

19  or anyone do you -- I -- I think you said there was

20  a whole list of things they -- they diagnosed you

21  with.  Do you recall any of the diagnoses you

22  received from that clinic in Lake Elsinore after

23  your son's death?

24     A.  I didn't understand the question.

25     Q.  Yeah.  You -- you said there was a list of



Page 44

1    things they -- they diagnosed you with, if I'm

2    understanding what you said correctly.  Do you

3    recall any of the diagnoses you received from either

4    the therapist or the psychiatrist you saw after your

5    son's death?

6        A.  Well, I -- I didn't realize that he -- he had

7    all these different things down and I'm going, what

8    the heck is this?  I didn't understand it, to be

9    honest with you.

10       Q.  Okay.

11       A.  I didn't understand how he came up with all

12   of that.

13       Q.  Okay.  And this -- this question, can you

14   tell me a bit about how your son's passing has

15   affected you?

16       A.  I'm lost.  Not like this.  I'm not myself

17   anymore.  I'm withdrawn.  I don't do anything

18   anymore.  I just feel so scared, and sad.  He was a

19   big part of my life.  He used to come over and we'd

20   sit down and we'd talk about music and tell me not

21   to worry that everything's going to be all right.

22   He always told me, don't let nobody get you down,

23   mom.  You're a beautiful person.  He used to tell me

24   how nice and sweet.  I was -- I was always there for

25   him.  I always believed in him.  I told him, don't



Page 45

1  ever give up.  You'll get it right one day.

2      Q.  I think you mentioned -- you said you were

3  scared now.  Can you tell me what -- what are you

4  scared of?

5      A.  I'm scared that I'm by myself now.  I don't

6  have him and he's always come -- make me feel good,

7  make me feel better inside, cheer me up, make me

8  laugh.  I'm really scared without him.  And I was

9  scared that -- that -- when they shot him, I was so

10  scared that he was laying there and I don't know

11  whether he died instantly or if he laid there and

12  heard all the cops saying whatever they were saying.

13  I don't know.  But that terrifies me.

14      Q.  Had you ever seen your son with a gun before

15  this incident?

16      A.  No.  I never saw him with any kind of bombs

17  or anything.  I never saw him with -- like that.

18      Q.  Did you know if he ever owned a gun at any

19  time as an adult?

20      A.  No.  I never -- never knew that.

21          MS. ANDERSEN:  Okay.  I don't have any

22  more questions for Ms. Campbell.

23          MR. MARKS:  Right.  Very good.

24          THE COURT REPORTER:  Okay.  Mr. Marks,

25  do you want to order a copy of the transcript.



Page 46

1              MR. MARKS:  Please?

2              THE COURT REPORTER:  All right.  And I

3    may have some spelling questions.  Okay.  Go ahead.

4              THE VIDEOGRAPHER:  Are you ready to

5    conclude the deposition.

6              MS. ANDERSEN:  Yes.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              CERTIFICATE OF TRANSCRIPTION



Page 47

1    I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT

2    I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;

3    AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT

4    TRANSCRIPTION OF MY NOTES.

5    I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL

6    OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE

7    OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH

8    THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE

9    ACTION.

10   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

11   APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

12   UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

13   CERTIFYING TRANSCRIBER.

14   DATED THIS 3RD DAY OF DECEMBER 2024

15   *Stephen Simpson*

16   STEPHEN SIMPSON, TRANSCRIBER

17

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**ability**
9:2
**able**
6:20 7:22
**accessible**
29:22
**accurate**
14:20 18:25 32:6
35:19
**acquaintance**
32:3
**ACTION**
47:8,9
**actual**
18:6 25:24 30:18
**address**
26:18
**adult**
15:19 16:2,24 17:5
18:14 23:12,19
32:14 33:15 45:19
**affect**
6:18
**afternoon**
5:12
**age**
16:3
**ago**
24:7
**ahead**
8:19,21 40:20 46:3
**alcohol**
9:1
**allegations**
34:12
**allegedly**
23:7
**allergic**
37:3
**allow**
6:25
**allowed**
29:25
**AND/OR**

47:12
**Andersen**
2:6 3:5 4:19,19 5:11
10:7 17:16 25:15
36:7 40:2 42:23
45:21 46:6
**answer**
6:5 7:2 8:20 10:5
19:16 27:7 29:20
36:2 42:20
**answers**
6:7
**anybody**
23:6 25:4,16,16
**anymore**
42:14,19 44:17,18
**apartment**
22:21
**appearances**
4:13
**Appearing**
2:2,5,8
**applied**
18:16
**APPLY**
47:11
**appointment**
37:13,14,18,21,21,23
39:14 40:23 41:18
**appropriate**
6:16
**approximate**
16:20
**approximately**
15:23 16:16 18:9
19:7 20:7 32:8 43:7
43:15
**approximation**
7:23
**April**
9:11,20 12:10 13:4
18:12 19:19 25:1,18
27:25
**area**
26:9 27:3,14,19
**arrest**

17:11
**asked**
7:15 13:23
**asking**
6:6
**assuming**
7:10
**attempt**
41:18
**attempted**
21:5
**attended**
15:13
**attorney**
6:23,24 28:7,8,16
47:5,7
**attorney's**
24:4
**attorneys**
6:19 25:2
**AUDIO**
47:2
**AUTHORIZED**
47:2
**available**
30:12
**aware**
13:25 17:3,18 18:23
19:3 23:13 29:8

**B**

**B**
5:7
**B-O-B-A**
36:13
**back**
8:15 28:12,14 33:3
34:3 40:16 41:17
**based**
7:10
**beautiful**
44:23
**begins**
4:2
**behalf**
2:2,5,8 4:17,20

**behavior**
42:6,8 43:4,12
**believe**
14:16 15:22 16:9
17:9 23:9 24:18
30:6,7,12 37:22
40:8
**believed**
44:25
**best**
6:7 7:5 8:5 9:3 12:22
**better**
6:2 15:6 45:7
**big**
37:7 44:19
**biological**
11:7
**birth**
12:1
**bit**
10:4 44:14
**BLM**
32:15,19 33:8
**Boba**
36:10
**bombs**
45:16
**boyfriend**
20:4
**break**
8:18,19,21 19:6
**bring**
31:8
**brought**
39:9
**bullet**
26:12,14
**bunch**
32:16
**Bureau**
32:15
**business**
18:24
**busy**
40:21
**buy**



33:22
**buying**
33:23

---
**C**
---

**C**
2:1 5:7,7
**C-A-M-P-B-E-L-L**
5:17
**C-A-R-O-L-Y-N**
5:15
**California**
1:2 4:6
**call**
28:25 29:9
**calls**
28:24 29:3,6 30:8,10
**camp**
15:4 18:18 29:15,21
  29:23 30:11,15,17
  30:19
**Campbell**
3:4 4:3,23 5:12,16
  11:11 45:22
**camps**
30:1,5,8
**car**
17:2,3
**care**
20:11
**careful**
22:2
**Carolyn**
3:4 4:3 5:15 11:11
**case**
1:3 4:6 23:22
**casino**
18:2
**casinos**
18:1
**categorize**
18:21
**caution**
6:16
**cell**
29:8,25

**cement**
19:4
**Central**
1:2 4:5
**CERTIFICATE**
46:25
**certificates**
15:1,5
**CERTIFICATION**
47:10
**CERTIFY**
47:1,5
**CERTIFYING**
47:13
**changes**
6:16,17,20 42:6,8,12
  43:3,11
**charges**
16:22 17:4
**cheer**
45:7
**children**
13:14,16,17 14:3
**Chino**
16:9,11,12,12,19
**circumstances**
23:4
**city**
31:11
**civil**
19:12
**clarifier**
28:9
**clarify**
27:2,13,22 39:10
  41:22
**clarifying**
19:15
**classes**
14:18 15:6,14
**clear**
27:10
**clinic**
35:12 36:4,9,23 41:4
  43:22
**close**

24:8 37:20
**clue**
19:10 37:6
**college**
15:6,10
**color**
42:15
**come**
31:6 44:19 45:6
**comfort**
39:9
**comment**
6:20
**communicate**
29:25
**communication**
28:21
**communications**
28:7
**company**
18:24
**complaint**
11:6
**complete**
6:15 7:17
**conclude**
46:5
**CONNECTED**
47:7
**construction**
19:4
**contact**
11:1 21:13 22:9
  23:21 29:16,21 42:5
**contacting**
29:15
**continue**
6:10
**CONTROL**
47:12
**conversation**
25:2
**conversations**
28:9
**convicted**
14:13 15:20,24

**convictions**
16:23 17:5
**cops**
45:12
**copy**
45:25
**correct**
7:12,18,19 8:12 9:17
  11:8 13:25 24:15
  27:15,16 30:5,23
  47:3
**correctly**
44:2
**counsel**
4:12 47:5,7
**counseling**
34:24 40:17
**counselor**
35:3,8 40:24
**county**
1:8 4:4 9:9 11:2 16:4
**couple**
21:1,7 24:7 43:17
**courses**
14:19 15:10,14
**court**
1:1 4:5,11,21,23 5:5
  5:21 6:7 17:13 25:8
  25:11,14 27:8 36:1
  39:21,25 42:17
  45:24 46:2
**courtroom**
5:23
**credibility**
6:18
**cross**
27:19
**currently**
12:3,11 13:7 17:20
  24:4
**custody**
15:9,12 29:1 31:2
**cut**
31:23

---
**D**
---



**D**
3:1
**date**
9:21 12:1,20
**DATED**
47:14
**daughter**
13:12 14:17 28:3,10
34:4
**daughter's**
27:18
**daughters**
24:1
**day**
9:23 20:16 30:21
45:1 47:14
**days**
21:1,7 24:7 37:16,22
**death**
10:16 11:3 15:19
17:8,11 21:21 28:10
36:20 43:23 44:5
**DECEMBER**
47:14
**decided**
38:5
**deem**
6:16
**defendants**
1:9 2:5 4:20
**department**
9:9 11:2 15:8 19:19
34:10
**deposition**
1:13 4:3,8 5:18 6:5
8:24 9:6 46:5
**depositions**
6:2
**Depression**
38:12
**deputies**
10:2,8 19:18 20:24
22:8 27:25
**diagnosed**
23:14 43:20 44:1
**diagnoses**

43:21 44:3
**died**
10:25 17:15,18 22:14
31:25 32:1 45:11
**difference**
7:6 41:14,14
**different**
28:13 31:20 38:7
40:24,25 44:7
**DIRECT**
3:4 5:10 47:12
**DIRECTION**
47:12
**discuss**
41:19
**distant**
42:21
**District**
1:1,2 4:5,5
**doctor**
35:21,24 36:6 37:25
38:9
**dog**
39:20,24,25 40:4
**draw**
42:15
**dress**
20:10
**drive**
33:2
**drugs**
9:1 23:12
**duly**
5:4,8

————————— **E** —————————

**E**
2:1,1 3:1 5:7
**earlier**
14:18 31:14
**education**
14:10,15
**effect**
39:1
**eight**
24:13

**either**
16:4 38:3 40:24 44:3
**elaborate**
23:3
**Elsinore**
12:6,11 24:9 35:10
35:11 43:22
**employed**
17:20 18:11
**EMPLOYEE**
47:6
**employment**
18:7
**enforcement**
9:11,14 10:9,25 22:8
25:1,18 28:18
**entitled**
7:5
**ESQ**
2:3,6,9
**estimate**
7:6,7,23 8:2 12:22
**event**
23:4
**everybody**
25:6
**everything's**
44:21
**exactly**
7:21
**EXAMINATION**
3:3,4 5:10
**examined**
5:8
**example**
7:9
**Excuse**
41:11
**expecting**
41:16

————————— **F** —————————

**facility**
40:25,25
**family**
32:5,7

**far**
9:21 13:24 18:23
19:3
**father**
13:10 42:9,25
**father's**
43:12
**fed**
22:1
**feel**
44:18 45:6,7
**feeling**
38:7 41:15
**feelings**
41:15
**feet**
7:16
**felonies**
15:21
**felony**
14:13 15:24 16:23
17:4
**felt**
40:11,21
**FILE**
47:2
**financial**
23:18 33:14
**FINANCIALLY**
47:8
**finish**
10:4 27:7
**fire**
15:4,8 18:18 22:11
22:16,25 23:7 29:14
29:18,21 30:1,4,8
30:11,15,17,19
**first**
5:8 12:19 36:17
37:13 38:18 42:7
**flowers**
26:25
**follows**
5:9
**FOREGOING**
47:3,10



Page 4

forget
35:6
forward
8:24
four
13:13 31:4
four-wheel
33:2
frequently
7:10
friend
32:2
friends
32:16
front
7:15,21
full
5:13
further
23:3 47:5

## G

gas
31:7,9 33:25 34:1,1
GED
14:19,23
girlfriend
20:4
give
4:25 6:10 7:9,22 9:2
12:22 26:2 33:18,20
45:1
giving
38:6
go
6:1 8:19,21 26:7
35:21 40:16,19
41:17 46:3
goes
40:13
going
8:24 11:15 14:5
15:17 27:6 39:7
44:7,21
good
5:12 45:6,23

grade
14:16
graduate
14:11
granddaughters
23:22,25 34:20
groceries
31:7,9 33:22,23
ground
6:1
guess
7:4,7,17 8:2 13:23
20:4 41:16
gun
45:14,18
guys
21:25 24:8

## H

half
36:19
hand
4:24
happened
20:23 24:25 28:4
39:17
happens
35:5
hard
8:10 27:12
head
6:12 28:13,14
health
23:15 38:16,19 42:1
hear
8:14 17:13 25:11,25
36:1 39:21
heard
8:9 25:19,20,22,23
25:23 26:3 34:14
38:4 45:12
hearing
8:10
heaven
40:12
heck

44:8
held
18:15
helicopter
26:1
help
37:11
helps
27:8
High
14:11
highest
14:9,15
highly
20:10
holes
26:12,14
home
10:18,22 26:18 38:12
homeowners
26:9,16 27:3,14
homes
31:21
honest
44:9
hospital
20:15,17
hot
22:11 23:1
hours
9:2
house
9:15 10:9 19:25
21:24 22:3,21 31:6
housewife
17:25

## I

impair
9:2
inappropriate
34:13
incarcerated
16:8,14 28:20 30:18
incarcerations
16:4

inches
7:16
incident
9:10,14,22 10:16
19:18 20:7,20,23
21:7 24:25 25:5,17
25:24 26:8 27:15,24
28:3,17 38:22 39:17
40:6 43:1 45:15
individual
9:25
information
10:15 28:15
informed
10:25
initially
36:22
initials
14:6
inside
45:7
instantly
45:11
INTERESTED
47:8
interrupt
29:19
investigation
34:5,9
involving
9:10 25:17
issues
23:15

## J

J-E-A-N
5:16
jail
16:4 29:12 30:18
Jean
5:16
job
17:24 18:8 19:5
jobs
18:15,16,19 19:2
Johnny



1:5 4:4 9:10 11:7
12:13 13:4,19,20
14:3 15:18,20 17:7
18:11,15 19:7,18,25
20:9,10 21:20 23:11
23:14,19 24:21,25
25:18 27:25 28:3,18
28:20 31:24 33:14
34:21
**Johnny's**
13:10 14:15 20:13
21:13 24:1 28:10
32:3 34:23 36:19

---

### K

**Kass**
4:9
**Kathleen**
4:11
**Kayleigh**
2:6 4:19
**keep**
27:8
**keys**
23:1
**killed**
9:16 10:14 26:21
27:1
**kind**
8:8 11:5 39:3 45:16
**kinds**
22:11 38:11
**knew**
25:6 32:24 45:20
**know**
7:21 8:5,15 11:5
12:24 13:2,20 14:2
14:22,25 15:10,11
15:13,15,20,23 16:7
16:13,15,16,19,22
17:7,10 18:11,13,15
18:16,18 19:6,7,16
19:21 21:15 23:11
23:14,17 24:17,21
25:20,25 26:17,18
26:19 27:5,5 28:6

29:5,15,24 30:2,14
31:19,21,21,22,23
32:8,13 33:4,6,7,9
37:1 38:5,8,9 39:6,7
40:9,11,12 41:16
42:24 43:15 45:10
45:13,18
**Kristina**
28:3,10 34:4,5
**Kristine**
13:13,18 34:16

---

### L

**L**
5:7,7,7
**laid**
19:4 45:11
**Lake**
12:6,11 24:8 35:10
35:11 43:22
**land**
32:15,15,19,19,20,20
32:21 33:8
**laugh**
45:8
**law**
9:10,13 10:9,24 22:7
24:25 25:17 28:17
**Lawrence**
2:3 4:15
**lawsuit**
19:13
**laying**
45:10
**Leap**
2:9 4:17,17 6:24
**left**
20:18
**Legal**
4:10,12
**let's**
12:7 19:6 38:14 42:7
43:10
**level**
14:9,15
**life**

11:11 23:16,19 33:15
38:4 44:19
**list**
38:12 43:20,25
**lit**
23:7
**little**
10:4 42:22
**live**
12:3,5,10,11,13 24:8
**lived**
12:8 13:2 31:19,20
32:9,13 33:5,10
**lives**
21:15 24:14,17 43:13
**living**
13:4 22:18,21 31:8
31:18,24 32:21 33:8
**Llamas**
1:5 4:4 9:10 11:7,14
11:15,17,20
**location**
26:7,8 31:14 33:1
**locations**
31:19 32:13
**long**
7:15,20,22 13:2
17:22
**lost**
40:11 44:16
**lot**
12:21 17:25 18:16
**loud**
8:8

---

### M

**M**
5:7
**ma'am**
42:18
**Magna**
4:10,11
**maiden**
11:17,20
**mail**
28:24 30:22

**maintain**
23:21 28:21
**maintained**
42:5
**making**
29:5
**male**
32:2
**Management**
32:15
**Manning**
4:9
**Marks**
2:3 4:15,15 10:3
25:13 45:23,24 46:1
**married**
11:16 13:7,9,21,25
14:1
**matter**
4:3
**McLaughlin**
4:11
**mean**
13:24 25:22 29:19
31:22 36:11 38:6
**MEANS**
47:11
**meant**
43:6
**medication**
35:25 37:3,5,10,14
38:1 41:3,7,7,13,25
41:25
**medications**
37:24 38:3 41:19
**meet**
19:24
**Melissa**
34:16
**melted**
22:11 23:1
**member**
32:5
**mental**
23:15 35:10,11,12
38:15,19 42:1



mentioned
25:3 45:2
met
19:23
metal
22:12
Michelle(phonetic)
13:18
middle
5:16
minute
20:5 36:10
minutes
20:17
miracle
41:16
Mm-hmm
6:4 11:23 30:24
    31:15
mom
44:23
money
24:23 29:7 33:18,20
money-wise
19:10
month
19:8 20:1,7 35:2,18
    36:19 38:22
monthly
19:7
months
24:13
mount
31:10
Mountain
22:19 31:10
moved
43:15
multiple
16:3
murdered
20:1 21:22
music
44:20

**N**

N
2:1 3:1 5:7
name
5:13,16 11:17,20
    26:2,4 31:25 35:3,5
    35:7,13,15 36:8
    38:9
named
19:21
names
9:24 10:8 11:10,13
    13:17 16:8,15 26:15
    33:4 38:2
nature
16:22 20:3
need
8:15,18 42:17
neighbor
26:5
neighborhood
25:6,9
neither
34:15
never
7:17 13:25 14:1
    18:17,23 20:25
    26:24 29:21 30:3
    34:8,14,15,18 38:4
    45:16,17,20,20
nice
20:12 44:24
night
21:22 22:3,9,24
Ninth
14:16
nodding
6:11
NOTES
47:4
notice
42:6,8 43:3
noticed
42:13 43:11
notification
9:17 10:19,24
notify

10:10,13
number
4:2,6 21:17

**O**

O
5:7
objections
6:25 7:1
obtain
14:19
obtained
14:22,25
obvious
11:5
occurred
22:13 27:15
October
1:12 4:7
odd
18:19 19:2
offhand
43:17
office
24:5
officers
9:25 10:9 25:1
oh
9:24 16:12 20:23
    24:13 33:2 38:12
    40:19 41:5
okay
6:1,14,23 7:2,3,9,14
    7:20 8:1,4,6,7,14,16
    8:17,21 9:13,17,21
    9:24 10:6,12,18,21
    10:24 11:5,10,15,17
    11:19 12:1,7,18,25
    13:4,7,9,16,20 14:2
    14:9,22 15:3,7,9,12
    16:12,16,19,22
    17:17,20 18:4,6,11
    18:14,23 19:2,12,15
    19:21,24 20:2,6,13
    20:19,22 21:5,12,15
    21:23,25 22:5,7,15

23:3,6,11,18 24:3
24:14,24 25:14,20
26:2,7,11,15,18,22
27:2,9,10,12,17,22
28:2,6,20,23,25
29:3,5,8,14,17,24
30:3,10,14 31:2,5
31:13,18 32:2,5,8
32:21 33:4,7,17,20
33:22,25 34:3,8,19
34:23 35:1,13,17,23
36:8,14,14,17,21,25
37:12,17,20,23 38:2
38:14,18,24 39:3,16
39:19 40:6,15,16,23
41:2,6,9,17,24
42:11 43:3,10,18
44:10,13 45:21,24
46:3
Oklahoma
24:18,19,21,23 43:14
    43:16
old
35:6 37:7
once
6:15 35:20
ongoing
34:9
open
32:19,20
opportunity
6:14
opposed
6:11 8:1,2
order
36:5 45:25
outside
15:10 20:8
owned
31:23 45:18
owners
26:19

**P**

P
2:1,1 5:7



**p.m**
4:8
**PAGE**
3:3
**PAGES**
47:3
**Paris**
31:12,20
**part**
19:17 44:19
**parties**
4:12 47:6
**party**
19:12 47:7
**passed**
20:16 35:2 42:9,9
**passing**
20:14 21:2,13 34:23
  35:18 38:15 39:1,4
  42:2 43:8,12 44:14
**payphone**
29:10,11
**Pechanga**
18:1,2
**pending**
8:20
**people**
25:21 32:24 33:5
**people's**
31:21
**period**
15:18,25 16:20 32:9
  33:7,10 43:8
**periods**
12:18
**person**
26:2 44:23
**personal**
27:24
**personally**
19:17 25:17,23
**phone**
21:17 29:6,7,8,25
  30:7,10,12,20 34:20
**phones**
29:22

**pills**
35:22
**place**
9:22 22:11,17 25:24
  26:8
**placed**
27:19
**plaintiff**
2:2,8 4:16,18
**plaintiffs**
1:6 23:22
**please**
4:22,24 5:13 6:25 8:5
  8:15 36:2 42:19
  46:1
**plumbing**
19:4
**police**
22:8,15,24 23:7
  39:20,24,25 40:4
**poorly**
13:24
**possession**
29:9,24
**preparation**
9:5
**prescribe**
37:5
**prescribed**
35:24 37:25 38:3
  41:3
**prescriptions**
38:10
**presence**
28:8 34:21
**present**
4:13
**pretty**
13:24 20:12 23:10
**prevent**
8:23
**previous**
17:24
**prior**
21:20
**Priscilla**

19:21 20:14 22:5
  25:3
**prison**
12:19 15:4,6 16:5,17
  29:23 30:16,19
  33:13
**prisons**
16:7,13
**probably**
18:3 20:1 24:13
**probation**
17:7
**proceed**
7:2
**proceeding**
5:1
**proceedings**
6:3
**property**
32:22
**provide**
6:7 10:15 33:14
**psychiatric**
35:24 36:6
**psychiatrist**
36:9,15,18 37:2,15
  38:25 41:3,18,19
  43:18 44:4
**put**
26:25 29:7

**Q**

**qualifier**
28:8
**question**
6:5 8:5,20,20 10:4
  13:23 19:16 27:6,7
  43:7,24 44:13
**questions**
6:6,11,25 45:22 46:3
**Quite**
25:21

**R**

**R**
2:1 5:7

**raise**
4:24
**Raju**
20:14
**Raju(phonetic)**
19:22
**Ray**
1:5 4:4
**reach**
21:5,9 28:23
**reached**
16:3
**reaction**
37:3
**read**
28:16
**ready**
46:4
**real**
23:2 39:5
**realize**
44:6
**really**
12:20,24 23:1 37:7,9
  40:21 43:14 45:8
**reason**
8:23 40:19 41:9,12
**recall**
9:24 10:8 16:1,2,15
  16:20 26:15 35:3,13
  36:8 38:2 43:21
  44:3
**receive**
23:18 30:10
**received**
43:22 44:3
**record**
4:2 5:14 7:1
**refer**
14:5
**referred**
27:19 35:23
**referring**
32:18,23
**relate**
17:4



related
16:23 20:19 28:17
    34:5,12 39:4 42:1
relationship
11:6 20:3
RELATIVE
47:6
released
12:19 13:1
remember
12:21 16:18
remotely
4:8
repeat
29:20 36:2 42:18,19
repeated
8:15
rephrase
8:6
reporter
4:11,22,23 5:5 6:7
    17:13 25:8,11,14
    27:8 36:1 39:21,25
    42:17 45:24 46:2
reports
28:16
represent
4:14,15
REPRODUCTION
47:11
request
4:9
residence
10:21 12:8,11,16
    13:5 34:13
response
18:17
responses
6:9,10
rest
17:14
retired
17:21,22
review
6:14
reviewed

9:5
ridiculous
38:13
right
4:24 8:3,22 9:18
    22:14 26:21 38:2,21
    38:23 39:8 40:14
    43:7 44:21 45:1,23
    46:2
Riverside
1:8 4:4 9:9 11:2 34:9
Road
22:19
rules
6:2

_____
**S**

S
2:1
S.L
14:7 23:22,25 24:3,6
    42:4,7
S.L.'s
42:8
sad
42:14 44:18
Salcedo(phonetic)
4:10
saw
21:20 24:3,6,12 31:3
    33:19 35:4,20 36:9
    36:17,22 37:1 41:8
    44:4 45:16,17
saying
17:17 45:12,12
says
39:8
scared
39:5 40:13 44:18
    45:3,4,5,8,9,10
school
14:11 15:14
screaming
26:1
seated
7:11

second
37:1,13,20 38:1 41:7
    41:24
see
20:16 21:23 23:25
    31:5 35:8 36:5,5,15
    41:14 43:14
seen
7:17 26:12,14 45:14
self-employed
18:20
sense
6:12,21 7:24 8:1
sent
24:23 35:23
separate
16:3
Services
4:10,12
session
6:6 34:25 35:18
sessions
40:17
set
22:10,16,24
shaking
6:12
Shannon
2:9 4:17
sheriff's
9:9 11:2 19:19 34:10
shoot
28:13
shooting
39:23
shot
10:14 28:11 40:4
    45:9
shower
22:1
sick
12:20 22:2
side
35:21
silly
15:16

SIMPSON
47:1,16
sit
44:20
site
26:25
sitting
7:11,14
slow
10:3
Soboba
18:1
solemnly
4:24
son
9:10,16 10:14,16,25
    11:3,7 13:18 20:20
    20:23,24 25:18
    27:15 34:6,10,14
    39:8,11 40:5 42:25
    45:14
son's
21:2 35:18 38:14,25
    39:4 42:2 43:8,23
    44:5,14
soon
37:12
sorry
16:10,12 17:14 20:24
    25:8 26:13 27:11
    29:19 31:22 34:17
    36:2 39:22 40:19
    41:21 42:17,18
sort
7:12 32:3
sought
34:24 38:15,19
sound
14:19
sounded
36:14
speak
9:13 26:9,16 30:20
    34:4
speaking
8:8



specific
18:24 41:9,12
Specifically
35:15
speculate
7:4
spell
5:13 36:11
spelling
46:3
spend
22:3
spoke
20:10,25 21:7 25:4
    26:20 30:4 42:25
spoken
20:8,14 21:2 27:3,13
    27:23
standing
39:8,11 40:14
start
10:5
started
8:9
state
4:13,24 5:13 7:1 16:4
    16:7,13,17 24:15,17
States
1:1 4:5
stay
32:12
stayed
20:17
STEPHEN
47:1,16
stop
11:15,19 37:8 41:6
stopped
41:10,12
stopping
41:24
Street
31:10
stuff
15:5 20:11 22:12
    23:2 37:9

substantive
6:17
suffer
40:12
suffered
39:6
support
23:19 33:14
sure
12:20 26:4 43:2
swear
4:22
sweet
44:24
sworn
5:4,8

--- T ---

table
7:11,14,15,17,21
take
6:8,9 8:19,21 31:6,7
    42:7
taken
4:8 5:19 41:25
talk
15:17 20:19 21:25
    37:14 38:24 39:3,16
    40:7 43:10 44:20
talked
9:8 24:24 26:24 28:2
    34:15
talking
29:12 31:14 32:18
Telephone
28:24
tell
7:15 9:15 20:2,22
    22:23 26:22 38:10
    39:19 40:3 42:11
    44:14,20,23 45:3
telling
40:14
Ten
17:23,24
terrifies

45:13
testified
5:8,21,23
testimony
4:25 6:18 9:3 13:12
    14:17 27:18 30:3
texts
30:11
Thank
5:5,18 12:1 14:2
theft
17:2,3
therapist
35:4,9,20 36:5,22
    38:25 39:2,4,10
    40:3,7,16,24 43:18
    44:4
therapists
38:24
therapy
34:24 40:17
thing
15:12
things
38:11 39:3 42:1
    43:20 44:1,7
think
8:8 19:16 22:19
    29:11 31:25 35:5,6
    35:17 36:16 37:16
    37:17 43:19 45:2
third
37:18,21,23 41:21
three
13:15,16,17 31:4
    36:16,25
till
17:12
time
4:7 6:19,23,23 8:4,14
    8:18 10:18 12:18
    15:17,18,24 16:20
    17:8,11 18:6,8 20:6
    20:8,9 21:1,6,6,9,12
    21:20 22:5,18 23:15
    23:19 24:3,5,11

25:4 30:4 32:8,14
33:5,7,10,12,15,19
36:15,17 37:1,20,23
38:18 39:12,14
40:22 41:8,21 42:7
42:24 43:5,7 45:19
times
15:23 30:16 31:4
    32:11 34:19 36:16
    36:25
today
4:7 7:4 8:24 9:3
today's
6:3
told
22:1,10,15 25:16
    26:3 27:23 34:8
    39:7,10,20,22 40:8
    40:10,10 44:22,25
touching
34:13
trade
15:1,13
trailer
22:22,23,24 23:7
    31:13,18,24 32:9,12
TRANSCRIBE
47:2
TRANSCRIBER
47:1,13,16
transcript
6:15 27:10 45:25
    47:10
TRANSCRIPTION
46:25 47:4
treating
35:22
treatment
38:16,19
trial
6:19
tried
18:17 21:9,12 22:10
true
37:18 47:3
truth



5:1,1,2
**try**
40:23
**turned**
15:18
**twice**
28:12
**two**
14:4,5 20:16 41:8
**type**
7:23 14:25 19:5
23:18 27:18 32:22
34:12,24 38:15
**types**
19:2

**U**

**Uh-huh**
35:14 39:13 40:1
**uh-uhs**
6:11,11
**understand**
7:6 8:4 13:13 14:6,18
23:24 27:6,13,17
28:14 43:24 44:8,11
**understanding**
6:3 24:14 44:2
**understood**
9:22 36:3
**United**
1:1 4:5
**upset**
20:21 23:10
**use**
5:15 7:10

**V**

**V**
1:7
**V.L**
2:8 4:18 14:7 23:23
24:1,11 42:5 43:10
43:11
**V.L.'s**
43:11
**verbal**

6:9,10
**Victor**
4:10
**videographer**
4:1,9,21 46:4
**videos**
28:17
**Videotape**
4:2
**visit**
24:19,22 32:25
**vs**
4:4

**W**

**Wait**
36:10
**want**
7:4 28:6,15 37:10,11
42:4 45:25
**warrant**
17:10,18
**Wasco**
16:9,13,17
**wasn't**
31:2 38:6 40:10 43:7
**watched**
28:17
**way**
32:17 33:13
**week**
31:4
**weeks**
41:8
**weird**
38:7
**welts**
37:7
**went**
24:11
**What'd**
5:22
**widow**
13:8
**withdrawn**
44:17

**witness**
2:2 3:3 4:16,22 5:3,4
10:6 17:15 19:17,17
25:10 27:24 36:3
39:23 40:1 42:21
**witnessed**
25:17
**woman**
19:21
**words**
17:14
**work**
18:2,4 19:2
**worked**
15:4 18:1,24
**world**
42:22
**worried**
22:2 23:2
**worry**
44:21
**wouldn't**
29:16
**wrong**
38:11

**X**

**x**
1:4,10 3:1

**Y**

**Y**
5:7
**Yeah**
18:10 23:1,10 25:10
32:20 42:10 43:6,25
**year**
11:19 12:7,23 18:3
**years**
14:12 17:23,24,25
19:8 30:14 32:10
43:17

**Z**

**Zoom**
1:13 27:12

**0**

**1**

**1**
4:2
**1:13**
4:7
**10**
14:12
**13th**
9:11
**14th**
9:20 19:19 25:1,18
27:25
**18**
15:18,19 16:3
**1958**
12:2
**1989**
11:22
**1999**
18:3,4,9

**2**

**2020**
12:7,13 19:8
**2022**
34:3
**2023**
9:11 12:10,13 13:4
15:19 18:12 19:9,19
**2024**
1:12 4:7 47:14
**23rd**
1:12 4:7
**24**
9:2
**2nd**
12:2

**3**

**30**
37:16,22
**3RD**
47:14



|   | 4 |
|---|---|

|   | 5 |
|---|---|

**5**
3:5
**5:24-cv-00249-CA...**
1:3
**524-cv-00249-CAS...**
4:6

|   | 6 |
|---|---|

|   | 7 |
|---|---|

|   | 8 |
|---|---|

**89**
11:21

|   | 9 |
|---|---|



# EXHIBIT 18

# EXHIBIT 18

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO.: 5:24-cv-00249-CAS(SPx)

----------------------x

Johnny Ray Llamas,

        Plaintiffs,

V.

County of Riverside,

        Defendants.

----------------------x


                October 23rd, 2024

                Deposition via Zoom.



Page 2

```
 1                  A P P E A R A N C E S

 2   Appearing on behalf of the plaintiff and the witness:

 3   BY:  LAWRENCE MARKS, ESQ

 4

 5   Appearing on behalf of the defendants:

 6   BY:  KAYLEIGH ANDERSEN, ESQ

 7

 8   Appearing on behalf of Plaintiff V.L.:

 9   BY:  SHANNON LEAP, ESQ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 3

1                          I N D E X

2

3   WITNESS                    EXAMINATION              PAGE

4   KRISTINE ROSE LLAMAS-LEYVA

5                              DIRECT EXAMINATION

6                              BY MS. ANDERSEN          5

7

8

9

10

11

12

13

14

15

16

17

18   THE VIDEOGRAPHER:  We are now on the record.  This

19   begins Videotape number 1 in the deposition of GAL

20   Kristine Llamas Leyva in the matter of Johnny Ray

21   Llamas vs. County of Riverside in the United States

22   District Court, Central District of California.

23   Today is October 23rd, 2024.  The time is 10:34 a.m.

24   The case number is 524-CV-00249-CAS PX.  This

25   deposition is being taken remotely at the request of



Page 4

1  Manning & Kass.  The videographer is Victor Salcedo

2  (phonetic) of Magna Legal Services and the court

3  reporter is Kathleen McLaughlin of Magna Legal

4  Services.

5  Will counsel and all parties present state their

6  appearances and whom they represent?

7            MR. MARKS:  Lawrence Marks, on behalf of

8  plaintiffs.

9            MS. LEAP:  Shannon Leap, on behalf of

10 plaintiff V.L.

11           MS. ANDERSEN:  Kayleigh Andersen, on

12 behalf of the defendants.

13           THE VIDEOGRAPHER:  Will the court

14 reporter please swear in the witness.

15           THE COURT REPORTER:  Ms. Leyva, please

16 raise your right hand.  Do you solemnly state the

17 testimony you're about to give in this proceeding

18 shall be the truth, the whole truth, and nothing but

19 the truth?

20           THE WITNESS:  Yes.

21           (Whereupon, the witness was duly sworn.)

22           THE COURT REPORTER:  Thank you.

23 Whereupon,

24    K R I S T I N E   R O S E   L L A M A S-L E Y V A,

25 having been first duly sworn, was examined and testified



Page 5

1  as follows:

2  DIRECT EXAMINATION.

3  BY MS. ANDERSEN:

4      Q.  All right.  Good morning.  Can you please

5  state and spell your full name for the record?

6      A.  Kristine, K-R-I-S-T-I-N-E.  Rose, R-O-S-E.

7  Llamas, L-L-A-M-A-S.  Leyva, L-E-Y-V as in Victor,

8  A.

9      Q.  Do you prefer to be called Ms. Llamas?  Ms.

10 Leyva?  Ms. Llamas-Leyva?  What do you prefer?

11     A.  Ms. Leyva.

12     Q.  Okay.  Great.  Have you ever had your

13 deposition taken before?

14     A.  No.

15     Q.  Have you ever testified in court before?

16     A.  No.

17     Q.  Okay.  So I'll go over some of the ground

18 rules.  You heard a little bit of it during

19 plaintiff S.L.'s deposition this morning, but I'll

20 go over it and elaborate a bit further?

21         So a deposition is a question and answer

22 session, so I'm going to be asking you questions,

23 you provide your best answer.  There's a court

24 reporter here who is taking down everything that is

25 said.  So I just ask you to continue giving verbal



Page 6

1  responses to my questions as opposed to nodding or

2  shaking your head or Eva's -- even, mm-hmm, or,

3  uh-huh's, because those don't reflect well in a

4  transcript.  Does that make sense?

5      A.  Yes.

6      Q.  After this deposition, once the transcript is

7  completed, you'll be provided an opportunity to

8  review it and make any changes you deem appropriate.

9  I'll just caution you that if you make substantive

10 changes to your testimony, it could affect your

11 credibility and I and other attorneys may be able to

12 comment on that at the time of trial.  Do you

13 understand that?

14     A.  Yes.

15     Q.  Do you understand that the oath that you took

16 at the beginning of this deposition is under penalty

17 of perjury?

18     A.  Yes.

19     Q.  Okay.  So from time to time, your attorney,

20 Mr. Marks or even Ms. Leap, may have objections to

21 my question.  Please allow them to state those

22 objections for the record before you proceed with

23 your answer that keeps the record clear so we're not

24 speaking over each other, which I understand can be

25 difficult over Zoom, but does that make sense?



Page 7

1     A.  Yes.

2     Q.  Okay.  At no point today do I want you to

3  guess or speculate, but I am entitled to your best

4  estimate.  Do you understand the difference between

5  a guess and an estimate?

6     A.  Yes.

7     Q.  Okay.  If you don't understand my question,

8  please let me know and I'll do my best to rephrase

9  it, okay?

10    A.  Yes.

11    Q.  If you need a break at any time today, I

12  don't anticipate going too long, but if you do need

13  a break at any time, please just let me know and we

14  can take a break.  But if there is a question

15  pending, I ask that you answer that question before

16  we go ahead and take a break, okay?

17    A.  Yes.

18    Q.  Is there any reason that would prevent you

19  from going forward with your deposition today?

20    A.  No.

21    Q.  Have you had any drugs or alcohol in the last

22  24 hours that would impair your ability to give your

23  best testimony today?

24    A.  No.

25    Q.  Okay.  Have you reviewed anything in



Page 8

 1  preparation for your deposition?

 2      A.  No.

 3      Q.  Have you ever spoken with anyone from the

 4  Riverside County Sheriff's Department about the

 5  incident between Mr. Llamas and the Riverside County

 6  Sheriff's Department deputies on April 14th, of

 7  2023?

 8      A.  No.

 9      Q.  Okay.  Other than Kristine Rose Llamas Leyva,

10  have you gone by any other names in your lifetime?

11      A.  No.

12      Q.  What's your date of birth?

13      A.  7/23/82.

14      Q.  And do you currently live in Lake Elsinore

15  with S.L.?

16      A.  Yes.

17      Q.  Okay.  Does anyone else currently live with

18  you at that -- that home?

19      A.  Yes.

20      Q.  Who else lives with you in the same residence

21  as S.L.?

22      A.  My ex-husband, Christopher Leyva, my daughter

23  Sariah Leyva, and from time to time my son Ray

24  Leyva.

25      Q.  And other than those individuals, has anybody



Page 9

1    else lived with you and S.L.  in the same residence
2    since 2020?
3        A.  Since 2020?  No.  Can you rephrase that
4    question?  I don't know why it's --
5        Q.  Of course.  So you listed a couple
6    individuals that currently live with you and S.L.
7    at the same residence, so since 2020, has there been
8    any other individuals that also lived with you and
9    S.L.  in the same residence other than who you
10   already listed?
11       A.  Johnny Llamas lived with us for a short
12   period of time in 2020.
13       Q.  Okay.  Between 20 -- between that point in
14   2020 and 2023, did he live with you?
15       A.  No.
16       Q.  Okay.  So I guess between 2021 and 2023; it's
17   correct that Johnny did not live with you?
18       A.  Correct.
19       Q.  Okay.  Do you know where Johnny lived between
20   2021 and 2023?
21       A.  Johnny was incarcerated and when he was
22   released, I don't know the exact month of 2022, from
23   that time on, he would reside basically wherever he
24   could.  He was pretty much homeless at that point.
25       Q.  Okay.  What is your relationship to plaintiff



Page 10

1    S.L.?

2        A.    I am her adoptive mother.    I'm actually her

3    biological aunt, but I've had her since she was 10

4    months old, so I am her mother.    I have adopted her.

5        Q.    Okay.    What -- what was her biological

6    mother's name?

7        A.    Janelle Brown (phonetic).

8        Q.    Okay.    And her biological father is Johnny

9    Ray Llamas, correct?

10       A.    Yes.

11       Q.    Okay.    And are you Johnny Ray Llama's sister?

12       A.    Yes.

13       Q.    Okay.    Between S.L.'s birth in 2013 and 2020,

14   when you stated that Johnny lived with the two of

15   you, did Johnny live with you at any other point

16   between 2013 and 2020?

17       A.    Yes.

18       Q.    Okay.    What -- approximately what time period

19   or periods?

20       A.    He briefly lived with us, and this is

21   approximately, this isn't going to be an exact date.

22   I want to say when Sophia was about three or four,

23   he resided with us just for a few months in and out.

24   Let me be clear about that.    When I say, reside, he

25   would spend a few nights there and -- but his



Page 11

1    clothes were there.  That was basically a place for
2    him to keep his belongings safe because he was
3    pretty much homeless.  And -- but during Sophia's
4    birth and the time of his death I would say he lived
5    with -- lived with us probably three, maybe four
6    times.

7        Q.  Okay.  And so I -- I know that she's your
8    daughter and I keep hearing you say her -- her true
9    name.  I want to -- I know, I know it's very
10   difficult because I understand she's your daughter.
11   But let's call her S.L.  just to again, protect her
12   identity.  I don't know if we can change that in the
13   transcript?
14            MR. MARKS:  Yeah.  I think I -- I -- I
15   think what we could do, and I've done this in other
16   depositions before, is allow Kristine just to use
17   her name and we'd ask the court reporter anytime she
18   uses her name instead of typing the name instead
19   just put the letters S.L?
20            MS. ANDERSEN:  That's completely fine
21   with me.
22            MR. MARKS:  So, Ms. Reporter, you're
23   good with that?
24            THE COURT REPORTER:  Yes.  Absolutely.
25            MS. ANDERSEN:  Okay.  Great.



Page 12

1             MR. MARKS:  Okay.  Great.  Thank you so

2    much.

3             MS. ANDERSEN:  That makes it things a

4    lot easier.

5    BY MS. ANDERSEN:

6       Q.  Okay.  So in -- you said about three to four

7    times that Johnny lived with you and your daughter

8    S.L.  approximately how long would he stay with you?

9    I -- was it a couple nights at a time or, you know,

10   what -- what time periods are we looking at for

11   those three to four times?

12      A.  A couple of months at a time.  It would vary

13   but in 2020 was probably the longest that he -- 2019

14   to 2020 was probably the longest period that he had

15   stayed with us, which was approximately four to five

16   months, give or take.

17      Q.  Okay.

18      A.  Prior to that it might've been a month or so,

19   maybe two months.  It wasn't too long.

20      Q.  Okay.  Do you have S.L.'s birth certificate?

21      A.  I do.  I have it.  I didn't bring it with me.

22   No.

23      Q.  Yeah.  That's okay.  You don't -- you don't

24   need to have it right now.  But you are in

25   possession of it at -- somewhere?



Page 13

1      A.   Oh, yes.

2      Q.   Okay.  And is Johnny listed as the father on

3   her birth certificate?

4      A.   Not on the one where I'm listed as the

5   mother.  No.

6      Q.   Not the adopted one?

7      A.   No.  And I'm not sure about the original with

8   her biological mother.  He's probably is on that

9   one.

10      Q.   Okay.

11      A.   I don't know for sure.

12      Q.   Have you ever seen that -- the original one?

13   Like not the adopted one, but the one with her birth

14   mother?

15      A.   I have not.

16      Q.   Okay.  Your -- your ex-husband, Mr. Leyva, he

17   currently lives with you; is that correct?

18      A.   Yes.

19      Q.   Has he adopted plaintiff S.L.  in any way?

20      A.   No.

21      Q.   Legally?  Okay.  Did any of Johnny's other

22   children ever live with you at any point in time?

23      A.   No.

24      Q.   Do you know how many other children Johnny

25   had?



Page 14

1        A.   One other child.

2        Q.   Okay.   And do you know what -- by initials

3    only, do you know her initials?

4        A.   V.L.

5        Q.   Okay.   So, V.L.   never lived with you and

6    S.L.   in the same house between 2013 and 2023; is

7    that correct?

8        A.   No.   Correct.

9        Q.   Okay.   Do you know who V.L.'s mother is?

10       A.   Yes.

11       Q.   Okay.   And what -- what's her name?

12       A.   Amber Sietsinger.

13       Q.   Okay.   I'm not going to attempt to say that

14   last name, but Amber, have you ever spoken to her

15   about Johnny since his passing?

16       A.   Yes.

17       Q.   Okay.   And -- and I'm going to say outside

18   the presence of your attorney or even his -- her

19   attorney have you spoken to her about Johnny since

20   2023?

21       A.   I have spoken to her.   I'm trying to think if

22   it was in regards to Johnny.   Yes.   I believe there

23   was one conversation when he initially passed away.

24   I had one conversation with Amber in regards to

25   Johnny.



Page 15

```
 1     Q.  Do you recall the substance of that
 2  conversation with her?
 3     A.  Yes.  She was -- we were both very upset and
 4  she had informed me that V.L.  was not taking it too
 5  well.  That's basically what the conversation
 6  centered around was how V.L.  was handling the death
 7  of her father and how Amber was going to proceed
 8  moving forward.  You know, in her life she was
 9  pretty shocked.
10     Q.  Okay.  Do you -- do S.L.  and V.L., let's say
11  since 2023, do they see each other?
12     A.  Not see, they do talk.  V.L.  lives in
13  another state, which makes it difficult, but last
14  summer V.L.  came out.  The visit was supposed to be
15  with her dad with Johnny, but he had passed away in
16  April.  So, V.L.  still was able to come out and
17  that's when she got to see S.L.  and they spent a
18  weekend together --
19     Q.  Okay.
20     A.  -- celebrating S.L.'s birthday.
21     Q.  Okay.  So during, let's say S.L.'s life
22  between 2013 and 2023, before Johnny passed, did
23  S.L.  and V.L.  see each other?
24     A.  See each other?  No.  Talk to each other?
25  Occasionally.
```



1    Q.  Okay.  How long -- as -- as far as you know,

2  how long has V.L.  lived out of state?

3    A.  I'm going to guesstimate about two years.

4    Q.  Okay.

5    A.  Could be a little less.

6    Q.  Okay.  You mean from today, like, two years

7  as of today approximately?

8    A.  Yeah.  I'd say about two years -- no.  Maybe

9  longer than -- she was already living out there when

10  Johnny passed away, which was April of '23.  I want

11  to say she left probably January or February of '23.

12  Okay.  And she has remained out in the other state

13  since.

14    Q.  Okay.

15    A.  I can't do the math.  I can't think about

16  that right now, but (inaudible)--

17    Q.  That's okay.

18    A.  -- that is --

19    Q.  That's okay.  That's okay.  I understand

20  everything is an estimate or an approximation.  You

21  know, I -- I don't need specific dates, but just do

22  your best to give me your best estimate.  Okay.  Did

23  Johnny have any type of legal custody over S.L.  at

24  any time during her life?

25    A.  No.



Page 17

1    Q.  Okay.  Did he ever, as far as you know,

2    because you're her adopted mother petition the Court

3    for any type of custody or visitation with S.L.?

4              MR. MARKS:  Lacks foundation calls for

5    speculation?  You can answer if you know.

6              THE WITNESS:  I don't know.

7    BY MS. ANDERSEN:

8    Q.  Okay.  And do you have any other children

9    other than S.L.?

10   A.  My own biological children, yes.

11   Q.  Okay.  And what are their names?

12   A.  Sariah Leyva, Ray Leyva, Carolyn Leyva.

13   Q.  Okay.  And how old are those three?  Your

14   biological children?

15   A.  Sariah Leyva is 17, Ray Leyva is 19.  Carolyn

16   Leyva is 22.

17   Q.  Are you currently married?

18   A.  No.

19   Q.  Okay.  Do you know if Johnny was ever

20   married?

21   A.  No.  He was never married.

22   Q.  Other than the times that he lived with you

23   and S.L.  between S.L.'s birth in 2013 and

24   approximately 2020 before he was incarcerated, do

25   you know the locations of anywhere else Johnny



Page 18

1    stayed or lived during that time period?

2       A.  I'm sorry, can you repeat that question.

3       Q.  Of course.  It was a very long question.  So

4    you mentioned there were about three to four time

5    periods between 2013 and 2020 where Johnny would

6    live with you for a couple months or so at a time,

7    okay?  Is that accurate?

8       A.  Yes.

9       Q.  Okay.  Other than those times where he was

10   living with you, where you knew where he was living,

11   do you know any other places he lived between 2013

12   and 2020?

13      A.  Okay.  Between 2013 and '20.  Oh, Sophia --

14   yes.  He resided with my mother Carolyn Campbell.

15   And that's the only solid residence that I could say

16   for sure that he resided at, was on the Green

17   (inaudible) address with my mother.

18      Q.  Okay.  Other than Johnny, do you have any

19   other siblings?

20      A.  Yes.

21      Q.  How many?

22      A.  One.

23      Q.  Okay.  And what's that sibling's name?

24      A.  Michelle Armijo (phonetic).

25      Q.  Okay.  Was that -- I think that was the aunt


MAGNA
LEGAL SERVICES

Page 19

1   that your daughter S.L.  referred to Michelle?

2       A.  Yes.

3       Q.  Okay.  That's -- that's her aunt as well,

4   correct?

5       A.  Correct.

6       Q.  Do you know if Johnny had any other siblings

7   outside of you and Michelle?

8       A.  Yes.  I left out my half sibling Juanita

9   Anaya (phonetic).  She is -- Johnny and my sister

10  from my dad's side.  Michelle has a different dad.

11  We all share the same mom.  We have two separate

12  fathers.  So, Johnny and I have a sister by the name

13  of Juanita Anaya and S.L.  doesn't know her.  She's

14  only met her once.

15      Q.  Okay.

16      A.  And Michelle Armijo (phonetic) is our other

17  sister who -- we never split any -- you know, she's

18  our sister.

19      Q.  Right.  Do you and Johnny then share -- share

20  the same mother and father?

21      A.  Yes.

22      Q.  Okay.  What's your father's name?

23      A.  Manuel Gonzalez.

24      Q.  Okay.  Is he still alive?

25      A.  No, he is not.



Page 20

1    Q.   Okay.  Can I ask when he passed?

2    A.   2004.

3    Q.   Okay.  A little bit of background now.

4  What's your highest level of education?

5    A.   I have an associate's degree in

6  administration of justice.

7    Q.   Okay.  And are you currently employed?

8    A.   Yes.

9    Q.   And how are you employed?

10   A.   I'm employed by the Lake Elsinore Unified

11  School District.

12   Q.   In -- in what capacity?

13   A.   I am a paraeducator with children with

14  special needs.

15   Q.   And I just have to ask this, I'm going to

16  assume the answer is no, but within the past 10

17  years, have you been convicted of a felony?

18   A.   No.

19   Q.   What was Johnny's highest level of education?

20   A.   Good question.  I believe he finished middle

21  school.

22   Q.   Okay.  So as far as you're aware, he did not

23  attend any high school?

24   A.   He did not attend any public high school, no.

25  He did attend schooling in prison while he was in --



MAGNA
LEGAL SERVICES

Page 21

1    one of his times in prison he was studying for his

2    GED.

3       Q.   Okay.  Do you know if he ever obtained his

4    GED?

5       A.   Not that I know of.

6       Q.   Okay.  Do you know whether he attended any

7    trade schools or, you know, obtained any trade

8    certificates or anything like that?

9       A.   While he was incarcerated he did attend the

10   fire camp, completed it, several times.  He has

11   certificates.  I do believe I have them at home of

12   his completions of the fire camps, he was able to go

13   out on the -- the fires and participate in that.

14      Q.   Okay.

15      A.   But other than that, there was no other trade

16   schools outside.  No.

17      Q.   Okay.  So do you know whether Johnny had ever

18   been convicted of a felony in his adult life?

19      A.   Yes.  Yes.

20      Q.   Okay.  Since he turned 18, let's focus on

21   that time period between eight -- when he turned 18

22   and went -- you know, his passing in 2023, just that

23   time period is what I'm asking about.  Do you recall

24   the first time he was convicted of a felony in that

25   time period?



Page 22

1    A.   I cannot recall the first time he was

2    convicted.  No.

3    Q.   Do you recall approximately how many separate

4    times he was convicted of a felony in that time

5    period?

6    A.   I know he was convicted.  I don't know how

7    many times he was convicted, but I do know that he

8    had felony -- felonies on him.  But I don't know how

9    many times he had been convicted.  I couldn't give

10   you an answer.

11   Q.   Okay.  Do you know the -- the nature of the

12   charge of any of his actual felony convictions?

13   A.   They would've been auto -- auto theft.

14   Q.   Anything other than auto -- auto theft that

15   resulted in a felony conviction during that specific

16   time period?

17   A.   Not that I'm aware of, no.

18   Q.   This is -- this may be hard to estimate as

19   well, but in that same time period, do you know how

20   many separate time periods he spent incarcerated?

21   A.   And that -- can you give me the time period

22   again.

23   Q.   Again, from the time he reached the age of

24   18, so as an adult to 2023.

25   A.   And repeat the question.



1    Q.   How many separate incarcerations, if you can

2    estimate for me, did he have?

3    A.   An estimate, yes, maybe about -- an estimate,

4    probably about five times.

5    Q.   Okay.

6    A.   And that could be like more on the higher

7    end, I'm thinking.

8    Q.   Yes.  I -- I just asking for your best

9    estimate.  I -- I understand it could be off one,

10   two, you know, however many.  It's as far as you

11   know as well.  Let's see.  Were all of those times,

12   as far as you can recall, again, in that time period

13   when he was incarcerated in a county jail facility

14   or were any prison?

15   A.   Somewhere in the county.  Somewhere in a

16   prison.

17   Q.   Okay.  Do you -- oh, go ahead.

18   A.   If you want to repeat that question again,

19   maybe I can give you a better answer.

20   Q.   Yeah.  So my -- my last question to you,

21   which led to your response being approximately five

22   times, five separate periods of incarceration

23   between the age of 18 and his passing.  I'm asking

24   if any of those were in a county jail, all of those

25   were in a county jail, whether any were in prison,



Page 24

1    you know, what's your best estimate of that

2    breakdown of how many were county jail and how many

3    were state prison incarcerations?

4        A.   Thank you for repeating that.   These were

5    state prison, however, he was held, I want to say

6    one to two times at a county -- at a county jail due

7    to the overcrowding at the prisons.   So where he

8    should have been sent to the prison, he was held to

9    do his time at the county jail.   But they -- four of

10   those five times I would say he was sent to a state

11   prison.

12       Q.   Okay.  Did you ever take S.L.  to go visit

13   him during any of his incarcerations, I -- assuming

14   during her lifetime, obviously between 2013 and

15   2023?

16       A.   No.

17       Q.   Okay.  But she did testify, obviously, as you

18   heard, that she did speak with him on occasion while

19   he was incarcerated; is that correct?

20       A.   Yes.

21       Q.   Okay.  Do you recall approximately what time

22   period that was where she had communication with him

23   during his incarceration?

24       A.   She talked to him all -- all the time up

25   until, this is an approximate, I want to say 2021.



MAGNA
LEGAL SERVICES

Page 25

1    She stopped talking to him over the phone while he

2    was incarcerated, but during those years, prior to

3    2021, she did speak to her father over the phone

4    pretty much every day.

5        Q.  Was -- was there a reason that it stopped in

6    2021, the communication between S.L.  and her

7    father?

8        A.  Yes, I had some personal issues going on in

9    my life and I just didn't want to continue on with

10   the conversations at all.

11       Q.  Between 2013 and 2023, did Johnny ever

12   provide you any type of financial support for S.L.?

13       A.  Yes, he did.

14       Q.  Okay.  How often would he provide you

15   financial support for S.L.?

16       A.  So around 2020 we were receiving stimuluses

17   for the pandemic.  Johnny would give me part of that

18   stimulus check to provide for her.  Also while he

19   was out, he had provided me with -- with $200 to --

20   excuse me, I need just a second.  He had provided me

21   with $200 out of his pocket for whatever I needed

22   pertaining, you know, to the household, which his

23   daughter was in the household.  So -- so, you know,

24   whatever he got from his stimulus checks, he pretty

25   much handed me more than half.  And he also, gave me



1    an extra $200 from a job that he had done --

2        Q.  Okay.

3        A.  -- to get -- to get the groceries that I

4    needed for the house.

5        Q.  Do you need to take a moment?

6        A.  I'm sorry.  No, I'll - I'll be okay.  I

7    apologize.

8        Q.  Okay.  Just let me know if -- you don't need

9    to apologize, just let me know if you need a break

10   at any time.  Okay?

11       A.  Thank you.

12       Q.  That $200 that Johnny would give you for the

13   -- for the household expenses, when -- when did that

14   start?

15       A.  So that was not a monthly occurrence.  Johnny

16   didn't have a monthly amount of money that he got.

17   He didn't have an -- like a employment type of job

18   where he got money every single week.  He would do

19   odd jobs.  And that particular job, he had made

20   $500.

21       Q.  Okay.  What -- what -- oh, I'm sorry.  Go

22   ahead.

23       A.  And he had given me the $200 out of it.

24       Q.  Okay.  And approximately when was that?

25       A.  That had to have been -- it was early COVID.



1 Early, maybe January, February.  It's just when

2 COVID started to -- people started talking about it

3 and it started to get worse during that time so --

4      Q.  Okay.  Between 2013 and 2020 when COVID

5 started and those stimulus checks rolled in for

6 people, did you receive any financial support from

7 Johnny for S.L.?

8      A.  Yes, I received.  Let me stop.  Let me have

9 you please, ask me that question again.

10      Q.  Of course.  So we've talked about the

11 stimulus checks and then the extra money he was

12 giving you from the job he was working on.  But

13 between 2013 and 2020, let's say pre-COVID during

14 S.L.'s lifetime, did Johnny provide you any

15 financial support for S.L.?

16      A.  Financial support if he had it, yes, he did.

17      Q.  Do you know approximately how much he would

18 give you, let's say on a monthly basis, if you can

19 break it down that much for me?

20      A.  It's hard to break it down monthly because

21 some months I wouldn't get anything at all, but if

22 he came, and his daughter needed diapers, you know,

23 he might slip me $100.  I shouldn't say he might, he

24 would slip me $100.  So if I had to break it down,

25 maybe a couple $100 every other month, you know, but



Page 28

1    you're asking monetary, like actual cash.

2         Q.   Right.

3         A.   But he would bring diapers, he would bring

4    formula, whatever I needed and this wasn't just for

5    my own child, but we're talking about S.L., but

6    whatever the household needed, or didn't need, he

7    showed up with a big thing of Costco toilet paper

8    before, you know, he was just -- he would just show

9    up with stuff.  I didn't have to really ask for

10   anything.  But if he had cash on him, you know, he

11   would -- he knew I didn't like to take money from

12   him because he -- he didn't have a -- like a steady

13   place to live.

14          So it was -- me being the older sister, it

15   was a little bit harder for me to take things from

16   him, but he would like leave it on the table when I

17   -- you know, and then I come back in and he's

18   already gone and leave me a note, "Here sis, I know

19   you need this." And he would leave it on the table,

20   whatever the cash was.  Or he'd come and say, "I

21   brought toilet paper," you know, "I brought you

22   laundry soap." Just, you wouldn't really have to ask

23   for it.  It's just what he thought my household

24   needed and that's what he would bring.

25        Q.   Okay.



Page 29

1    A.   So, I don't know, you just wanted know

2    monetary, like actual physical money or things that

3    I needed for my home.

4    Q.   No, I appreciate the extra information.  My

5    focus is S.L., so that's why I was asking

6    specifically about S.L.  But I do understand she's

7    living in your household, so I do appreciate the

8    additional information.  Is there -- if you know, is

9    there a reason that you got custody of S.L.  and not

10   Johnny back in 2013?

11    A.   With Johnny when S.L.  was born, he was

12   incarcerated.  So, mom obviously, was not.  Mom --

13   when I say mom, Janelle Brown, was not incarcerated

14   at the time.  When Sophia was four months old,

15   Janelle lost --- Janelle Brown lost custody of her,

16   and I went through the court proceedings and all

17   this -- these things that you have to go through in

18   order to adopt her.  So by the time she came to me

19   -- S.L.  came to me, she was 10 months old.  So both

20   mom and dad were incarcerated.

21    Q.   Okay.  When -- when was Johnny released from

22   incarceration, I guess, after S.L.'s birth?

23    A.   Well, I'll tell you, I don't absolutely know

24   a date, but he was present for her first birthday.

25   I have pictures that I didn't bring of course, but I



Page 30

1   do have pictures of her -- of those two present

2   together on her first birthday.  So he was out prior

3   to her first birthday.

4       Q.  Okay.  Did he always celebrate S.L.'s

5   birthday with her if he was out of custody, I

6   assume?

7       A.  If he was out of custody, and I can't tell

8   you when and where, I'd have to go back in her

9   pictures and look, but yes.

10              THE COURT REPORTER:  I -- she froze.

11              MS. ANDERSEN:  Okay.  I thought it was

12   me.  I'm sorry.  I think we have to go off the

13   record because I can't hear anything.

14              THE VIDEOGRAPHER:  You said you would

15   like to go off the record counsel.

16              MS. ANDERSEN:  She's back.  She's back.

17              MR. MARKS:  She was frozen.  I guess you

18   couldn't hear her or me.

19              MS. ANDERSEN:  No.

20              MR. MARKS:  But we were both talking.

21   BY MS. ANDERSEN:

22       Q.  I'm sorry.  You're going to have to repeat

23   yourself.

24       A.  Yes, no problem.  Yes, he was always present

25   at her birthday parties, birthday celebrations as



Page 31

```
 1   long as he was out of prison.  So I don't know when

 2   he was locked up, I'd have to look back at the

 3   photos and see what pictures, you know, he was in at

 4   what ages type of thing.

 5       Q.  Okay.  I think you mentioned that Johnny did

 6   have odd jobs, that's in -- during his adult life.

 7   Do you recall any specific employment he held as an

 8   adult?

 9       A.  Besides odd jobs.

10       Q.  Yeah, I mean, you can give me sorts of odd

11   jobs.

12       A.  Oh, well, Johnny would do yard work.  He

13   would take in, what they call that?  Junk metal.  He

14   would randomly fix somebody's broken pipe in their

15   yard.  He didn't necessarily hold a -- like a 9:00

16   to 5:00, W4 form thing he had to fill out.  He

17   didn't hold one of those.  Not that he didn't try,

18   but he wasn't successful in obtaining one of those

19   positions.  But he was a really good handyman and

20   people hired him to fix things for him, you know,

21   and he was really strong so he would move things for

22   people.  He was like a mover and those -- those are

23   odd jobs that he would -- that he would tell me

24   about, you know.

25       Q.  Was it always self -- like self-employment
```



Page 32

1  then?

2      A.  Oh, yeah.  Yeah.

3      Q.  Okay.

4      A.  That I know of.  Yes.

5      Q.  Yes.  I -- I'm only asking as far as you --

6  you know.  Okay.

7      A.  I don't know if this makes a difference, but

8  I have this paper here, I told you guys he was in

9  the -- the firefighting training camps and he had

10  sent me this note and it says, "Kristine, please

11  look up and print out everything you know about

12  these two companies, UNAC and American Car Needs,"

13  and I might not be reading that word right.  He was

14  trying to get into the private sector of the

15  firefighters because he knew he couldn't get into

16  CAL FIRE due to his -- his felony.  So his heart,

17  and he spent a lot of time applying for the private

18  forestries, but they never called him -- they never

19  called him back before his passing.

20      Q.  Okay.  So as far as you know he didn't work

21  for either of those companies that he asked you to

22  look up; is that correct?

23      A.  Correct.

24      Q.  Okay.  And the fire camps he was at, like the

25  firefighting camps that you refer to, that was



Page 33

1    through his incarceration or was part of his

2    incarceration; is that correct?

3        A.   Yes.

4        Q.   Did he -- as far as you know, did he attend

5    any other types of either fire academy, fire camps

6    that weren't related to his incarceration?

7        A.   No, he did not attend any.   There were none

8    available.

9        Q.   Okay.   Now, again, this -- this is going to

10   be a silly question, but I just need to know the

11   full extent of your -- your personal knowledge.   Did

12   you witness any part of the incident between Johnny

13   and the deputies with the Riverside County Sheriff's

14   Department on April 14th, 2023 when Johnny passed?

15       A.   On that date, no.

16       Q.   Okay.   Did you see Johnny at any time on that

17   date?

18       A.   Unfortunately not.

19       Q.   Did you speak with him through any method on

20   that date?

21       A.   Unfortunately not.

22       Q.   Okay.   Other than you learned from -- other

23   than what you learned from your attorneys, do you

24   know what happened during the incident between

25   Johnny and the deputies on April 14th, 2023?


MAGNA
LEGAL SERVICES

Page 34

1    A.  Unfortunately not.

2    Q.  Have you ever watched the video of the

3  incident?

4          MR. MARKS:  I'm going to object that

5  that would've been -- if she did it would've been

6  with her -- her attorneys.  So I'm going to object

7  to that.  And it's not relevant whether she saw it

8  or not.

9  BY MS. ANDERSEN:

10    Q.  Okay.  Other than out -- you know, other than

11  sitting next to your attorney watching the video,

12  have you ever seen the video of the incident, like

13  on YouTube?

14    A.  No.

15    Q.  Okay.  Have you ever -- do you know who

16  Priscilla Raju (phonetic) is?

17    A.  Do I know her personally?  No.

18    Q.  Have you ever spoken to her at any time?

19    A.  I have sent her a message on Facebook.

20    Q.  Okay.  What was the message to her?

21    A.  I asked her if she could please tell me what

22  happened.

23    Q.  Did she ever respond?

24    A.  No, she did not.

25    Q.  Okay.  Have you ever attempted to contact her



Page 35

1   any other way?

2       A.   No.

3       Q.   Okay.  Had Johnny ever told you about

4   Priscilla Raju?

5       A.   No.

6       Q.   Okay.  You said you don't know her

7   personally.  What -- what do you know about her?

8       A.   I was informed by another person that lives

9   in that area where he was killed that if -- that

10  Priscilla was with him that day that he passed away,

11  which is why I had reached out to her to find out

12  what had happened.  And this is early days of me

13  finding out that my brother had passed away.

14      Q.   Okay.  Did you talk to any of the people who

15  lived in that area where the incident occurred?

16      A.   I talked to one lady.

17      Q.   Do you recall her name?

18      A.   If I told you a name, it probably wouldn't be

19  correct.  I can't even tell you what -- what her

20  name was.  It was a very intense conversation.  It

21  was right after passing.  And what in the world was

22  her name?  I don't recall her name.  No, I don't.

23      Q.   Okay.  Do you recall the substance of your

24  communication with her?

25      A.   Yes.



Page 36

1     Q.   Okay.  What -- what did -- what did you ask

2   her?

3     A.   I had asked her what had happened leading up

4   to his passing that day, what her relationship was

5   with him.  And that was -- the only thing that

6   really sticks out into my mind, was a -- well, the

7   conversation led to a briefcase that Johnny had, and

8   he said that he needed this girl to get this

9   suitcase to his daughter, to S.L., and I wanted to

10  find where that suitcase was.  And that's basically

11  what the -- the -- that's basically where the

12  conversation had gone.  It had gone into that --

13  that direction.

14        It started out what happened, and then she

15  told me -- it started out me asking her what had

16  happened that day.  And when she told me about the

17  suitcase that needed to get to my daughter, that's

18  all that I wanted to know, where's this suitcase?

19  Nobody's ever been able to tell me where this

20  suitcase, if it even exists at this point, but

21  where's this suitcase that Sophia is entitled to

22  from her dad?

23    Q.   You said the relationship between this --

24  this woman who lived in the area and Johnny, what --

25  what did she tell you?



Page 37

1      A.   This relationship between this woman was like

2    a fling, you know, a little side fling that he had

3    had with this girl.  God I wish I could remember her

4    name, it would make so much sense.  But, he had just

5    this side fling with this girl and he had divulged a

6    lot of information to her about his life and how he

7    was feeling at that moment, you know, at that time

8    in his life and how important it was to get this --

9    the suitcase to his daughter.

10     Q.   And since you don't remember the name of this

11   woman, do you know where she lives?

12     A.   She's like -- she's a transient pretty much.

13   She's a -- a -- a white lady.  She had blonde hair.

14     Q.   So just to confirm --

15     A.   Good fit but --

16     Q.   -- she's not -- I'm sorry, I -- I -- I think

17   I spoke -- spoke over you, can you --

18     A.   No, I said she had a good fit, but I

19   understand what you're saying but I don't have a

20   name for her.

21     Q.   Just to confirm, this isn't somebody who

22   owned one of the homes in the area where the

23   incident with Johnny and the deputies occurred,

24   correct?

25     A.   Oh, this lady, no.  No, she wouldn't have



Page 38

1    owned a home.

2        Q.  Okay.  Did she live in that area on those --

3    in that property area where this specific incident

4    occurred between Johnny and the deputies?

5        A.  I don't know really know where she lived.  I

6    --

7        Q.  What -- what did she tell you in terms of

8    what she witnessed then of the incident?

9        A.  Well, she said she didn't witness the

10   incident, per se, you know?  What had happened, I

11   ran -- I ran into her one day and I asked her to

12   tell me what had happened.  I wanted to know what

13   had happened and how can I go about finding

14   Priscilla, because Priscilla is supposed to be the

15   one that knows what happened.  And that's when we

16   got into this conversation about this -- her not

17   knowing where Priscilla was anymore, and the

18   conversation about the briefcase.  So, at that point

19   my mind went from, I don't care where Priscilla is,

20   to where's this briefcase?  And that's where the

21   conversation went.

22       Q.  Have you talked to anyone who has told you

23   that they witnessed what happened during the

24   incident between Johnny and the deputies on that

25   date?



1    A.  No, I have not.

2    Q.  Okay.  When was the last time you saw Johnny

3  prior to April 14th, 2023?

4    A.  An estimate, probably a week before that day

5  he passed away.

6    Q.  Okay.  And where did you see him?

7    A.  I seen him at my mother's residence.

8    Q.  Was S.L.  with you?

9    A.  No.

10    Q.  Okay.  So about a week before.  So early

11  April of 2023?

12    A.  Yes.

13    Q.  And do you recall any communication or

14  conversations you had with him on that time -- on

15  that last time you saw him?

16    A.  I had a lot of issues going on in my life at

17  that time.  I came to drop off some groceries to my

18  mother.  I walked in, I said hello to everybody in

19  the house, and I dropped the groceries off and I

20  left.

21    Q.  Okay.  Other than saying hello to him, did

22  you speak -- have any more of a substantive

23  conversation with him?

24    A.  No, I did not.

25    Q.  Okay.



Page 40

1      A.   I was in a rush to go home.

2      Q.   Okay.  Let's say prior to that, you know,

3   early April time where you saw him at your mother's

4   house, do you know the last time before then that

5   you saw him in person?

6      A.   Not that I actually saw him.  I did have a --

7   a conversation with him through text messages.

8      Q.   And when was that?

9      A.   That had to have been maybe in March.  My

10   mother -- he found my mother passed out in her

11   house.  She has a lot of health problems and he had

12   messaged me that my mom was in the hospital, so we

13   were messaging each other back and forth about how

14   she's doing.  And he was making repairs on her door

15   and taking care of a dog that he had given her.  He

16   had given her a little chihuahua and that's

17   basically what the conversation was about.

18      Q.   And that was --

19      A.   You see, I didn't know that he was going to

20   die, so I didn't know that there was a reason to

21   have such in-depth conversations.  You know, it was

22   really -- it was really quick because I just was

23   concerned about my mother's health and he was too.

24   So we had, you know, conversations about how our

25   mother's going to have to stop smoking or things



Page 41

1    like -- along that nature.

2        Q.  So that was 2023 -- March of 2023, when you

3    had that text message exchange about your mother's

4    health.  What -- did you have any other

5    communication with him between that text message

6    conversation and his -- his passing on April 14th?

7        A.  No, man, I'll state it again, I -- I was

8    going through a lot at that time, and I did not -- I

9    didn't see the reason, and I didn't see the reason

10   to have consistent dialogue with him.  Just like I

11   don't with my other sister, you know, I just -- I

12   didn't know he was going to die.

13       Q.  Do you know the last time that your daughter

14   S.L.  saw her father approximately?

15       A.  Yeah, she saw him before he was incarcerated

16   in -- I want to say he went to prison in April of

17   2020.  It was somewhere around that time.  So she

18   saw her dad a little prior -- a few days prior to

19   him being picked up.  And then she -- I never

20   allowed her to see her father in prison.  So she had

21   contact with him over the phone up until sometime in

22   2021 before he was released.

23       Q.  Was -- was Johnny released from prison in

24   2021 then?

25       A.  I could be wrong.  I think it was 2022.



Page 42

1      Q.   Okay.

2      A.   Because he was killed shortly after he was

3   released from prison.

4      Q.   Okay.  Was there any reason why you didn't

5   let your daughter communicate with him between,

6   let's say 2021 and his release in 2022, I believe is

7   when it was, but correct me if I'm wrong?

8      A.   Like I stated, I had a lot of -- I had a lot

9   of things going on at home and I tend to shut down

10  and I didn't want to be bothered by anybody at that

11  point, so I wasn't really having much conversation

12  with anybody.  And that meant my whole family, you

13  know, everybody was -- if I said there was no

14  conversation, there was no conversation with

15  anybody, you know, in the household.

16     Q.   Okay.

17     A.   I was trying to get my family back on track.

18     Q.   Okay.  To your knowledge, did Johnny use any

19  type of drugs?

20     A.   Yes.

21     Q.   Again, to your knowledge, what types of drugs

22  did he use?

23     A.   I know he smoked marijuana.

24     Q.   Anything else?

25     A.   I know that he drank.



Page 43

1    Q.  Okay.  Other than drinking and marijuana, are

2    you aware of any other substances that he used?

3    A.  I'm not aware of any other substances, no.

4    Q.  Okay.  Do -- again, to your knowledge, did --

5    did Johnny have any diagnosed mental health issues?

6    A.  He had not been diagnosed, but given our

7    family history, all of us, he should have been

8    diagnosed.  Yeah.

9    Q.  Okay.  Are you referring to a specific type

10   of mental health issue that you believe he should

11   have been diagnosed with?

12   A.  Oppositional defiance disorder.  He --

13   depression.  Severe depression on my dad's side of

14   the family.  My mom's side of the family has

15   depression as well.

16   Q.  But as far as you're aware, he was never

17   diagnosed with ODD or depression; is that correct?

18   A.  Correct.

19   Q.  Okay.  Did you ever see at any time in his

20   adult life, Johnny with a gun?

21   A.  No, I did not actually see him carrying a

22   gun, no.

23   Q.  Okay.

24   A.  He wouldn't have showed me that.

25   Q.  Okay.  So you -- you never saw him like



Page 44

1    holding a gun at any time in his adult life?

2    A.  No.

3    Q.  Okay.  Do you know if he ever owned any guns

4    at any time in his adult life?

5    A.  When you say owned, like registered to him,

6    an actual registered gun?  No, he never had a

7    registered gun to him.

8    Q.  Do you know if he ever owned any guns that

9    you're not aware of them being -- whoever they were

10   registered to, regardless of registration?

11   A.  I have to say no.  I -- I would have to say

12   no because I'm not aware of any time that he

13   would've been in possession of -- of a weapon.  No.

14   He would never have disclosed that to me.

15   Q.  Okay.  Now I'm going to get into, you know,

16   more of your role as the guardian ad litem for your

17   daughter S.L?

18             MR. MARKS:  Before you get into that,

19   maybe we can take five minutes.

20             MS. ANDERSEN:  Absolutely.  Yeah, that's

21   fine?

22             MR. MARKS:  All right.  Great.

23             (Whereupon, there was a short break.)

24             THE VIDEOGRAPHER:  We are back on the

25   record.  The time is 11:46 a.m?



Page 45

1    BY MS. ANDERSEN:

2       Q.  All right.  Ms. Leyva, do you understand that

3    you're still under oath after that -- that quick

4    break?

5       A.  Yes.

6       Q.  Okay.  So what I started asking you, and what

7    I want to get into a little bit now is obviously you

8    are the guardian ad litem for your daughter,

9    Plaintiff S.L.  Can you describe to me how, if at --

10   if at all S.L.  has been affected by the death of

11   her father?

12      A.  It's hard to describe it without tears

13   flowing down.  She has -- Sophia has internalized a

14   lot of it.  She doesn't share a lot about her dad to

15   very many people.  She's told me that it's really

16   hard for her to -- to bring up his name because it's

17   hard for her to remember and know that he is gone.

18          And she's trying, this I know for a fact

19   because she's told me, she's trying to put things

20   together in her mind as a way to block out the fact

21   that she doesn't have a dad anymore.  And in her

22   mind, she thinks, and this is what she has told me,

23   she thinks a way of honoring her dad would to be,

24   because he'd always tell her, toughen up little

25   girl, you're my little soldier, and so what she's



Page 46

1   trying to do is toughen up and be his little

2   soldier.

3         And what I've explained to her, what he meant

4   by that was that she didn't need to cry over little

5   things like a fall or maybe friends being mean.

6   That's what he meant by that.  But she's taking it

7   like if she shows an emotional side that she's

8   letting him down.  She calls him her protector, now

9   her protector is gone.

10        She has expressed to me that who's going to

11  go out with her when she goes to buy a car.  And I

12  explained to her like, I'll be there to help you buy

13  the car.  And she said, but my dad's the one that

14  said he'd show me how to fix it.  So I think she's

15  coming to terms with the fact that, I shouldn't say

16  I think, I know she's coming to terms with the fact

17  that she's going to be losing out on a lot moving

18  forward.

19        Because when you're 7, 8, 9 years old,

20  there's not a whole lot you can process.  There's

21  not a whole lot you need your -- your dad for, I

22  should say in a sense, because I'm always there for

23  all of her needs.  But just the other day we had a

24  flat tire and I have AAA.  And she goes, wasn't my

25  dad supposed to teach me how to change a tire mom?



Page 47

1    And I told her like, that's what we have AAA for.

2    You know, like, you got to make do.  I explained to

3    her, you got to make do with what you have.

4            We, in a way to memorialize him because he

5    was cremated and he's resting with my mother, you

6    know, my mom has his ashes, we put a cross -- we put

7    a cross up on Highway 74, a small one.  I didn't

8    take her to the actual site.  She has seen it, but I

9    didn't want to put a cross on somebody's property.

10   So we put a cross on Highway 74 as a way for her to

11   have a place to grieve.

12           And I was pretty surprised at how well she

13   took it because it kind of scares me that she

14   doesn't let her emotions out.  But she did -- she

15   did cry and we wanted to make that little cross look

16   really nice.  So we went out and bought just a few

17   little trinkets for Halloween to hang up.  I told

18   her we couldn't put a lot up, you know because it

19   can't be a distraction on the road, but just a place

20   for her to be able to say like, this is where my dad

21   was, you know, like, we grew up directly across the

22   street from River Road from where I --

23           MR. MARKS:  I think you're getting a

24   little beyond the question.  He's -- she's just

25   asking you about the loss of love and companionship



Page 48

1    and, you know, guidance and stuff that she's lost

2    from losing her dad.  That's the focus of the

3    question.

4                THE WITNESS:  Okay.

5    BY MS. ANDERSEN:

6        Q.  Yeah.  So beyond -- beyond what you've

7    already told me about how Johnny's death has

8    affected his daughter S.L., is there any other ways

9    you've noticed based on S.L.'s behavior or what

10   she's told to you that the loss of her father has

11   affected her?

12       A.  Her behavior, like I said was different from

13   the time that he passed to what it is now.  She's

14   very angry which is why the school is seeking out

15   counseling for her now, which is why I put that

16   cross up for her as a way for her to be able to let

17   things out because she's -- she tells me she -- she

18   holds it in.  So she's been real destructive with

19   her -- with her things at home, you know, just

20   wanting to be alone.  She -- when I say destructive

21   with her things, she's not as careful with her stuff

22   as she used to be.

23            She gets very angry and will slam her doors

24   and just tell me she wants to be left alone, just

25   leave me alone.  And she's 11.  And I had to ask



Page 49

1    her, was it a difference between, like, is that just

2    what a normal teenager does?  Like, is there

3    something going on at school?  And she won't even

4    tell me anything anymore.  You know, it's just leave

5    me alone.  I just want to be left alone.  So we are

6    seeking out counseling, the school and I, because

7    her grades are dropping.  She's very sad.  How can I

8    explain to you what I see in my daughter without

9    going into too much now?

10    Q.  Well, let me -- let me follow up and I'm

11    going to continue asking questions in the -- in the

12    s`ame vein.  You -- she testified at -- during her

13    deposition this morning that she did see a school

14    counselor when she was in fifth grade.  Has she seen

15    any other therapist, counselor, since her -- her

16    father's passing?

17    A.  Yes.  The school has provided like a one,

18    two-time, do you need to come and talk to me type of

19    counseling but she won't talk about it.  She -- so,

20    she -- the attempt has been made, she's gone but

21    from what I understand, she's not speaking, she'll

22    just sit there and not say anything at all.  She

23    doesn't want to talk about it at all.

24    Q.  So if I have the, please correct me if I'm

25    wrong, if I have the timeline correctly, S.L.  was



Page 50

1    about nine years old when her father passed, April

2    of 2023.   Does that sound accurate?

3       A.   Probably, yeah.

4       Q.   And the last time, from my understanding of

5    your testimony and her testimony that she saw him or

6    spoke to him was in 2021 when she was either seven

7    or eight years old; is that correct?

8       A.   Yeah.   Doing --

9       Q.   Okay.

10       A.   -- the math, yeah.

11       Q.   Between the ages of seven and eight,

12    whenever, however, you know, whatever month of 2021

13    it was, depends on whether she was seven or eight

14    years old, between then and her father's passing,

15    did she ever ask to speak to him?

16       A.   You're saying before her father's passing,

17    right.

18       Q.   Of course, yes.

19       A.   I'm sorry.   My mind is -- yeah, she asked to

20    speak to her dad.   She didn't understand why she

21    wasn't speaking to him.

22       Q.   Did you tell her -- oh, I'm sorry, go ahead.

23       A.   I had, you know, I had to explain to her that

24    mom's not doing very well, I don't feel good and I'm

25    not talking to anybody right now.



Page 51

1    Q.  Okay.  And did you notice any changes in

2    behavior before his passing, but starting with the

3    time period that she stopped seeing or speaking to

4    him in 2021?

5    A.  Yeah, I noticed behavior.

6    Q.  Okay.  Can -- can you tell me what changes in

7    behavior you did notice when she stopped seeing him

8    or being able to see him and speak to him in 2021?

9    A.  She wasn't as delightful as she normally is.

10   She wasn't like a ray of sunshine is what, you know,

11   we could refer to her as a happy, talkative, joyful

12   little girl to be around.  She got real like quiet.

13   She got real quiet.

14   Q.  Do you know if she was --

15   A.  She just wanted to be left alone and she

16   didn't want to have to talk about her dad anymore,

17   you know.

18   Q.  Okay.  Let's say starting in 2021, between

19   2021 and 2023, did you seek out any counseling for

20   her of any kind?

21   A.  I talked to the school to see if they could

22   help me and the principal had called in Sophia and

23   offered her counseling.  Sophia said she didn't want

24   it and that's kind of where it was left.

25   Q.  So as far as you're aware between her last,


MAGNA ▶
LEGAL SERVICES

Page 52

1  like, let's say last conversation with him in

2  approximately 2021 and his passing, she did not have

3  any type of counseling or therapy, not for lack of

4  trying, but is that accurate that she didn't have

5  any type of therapy during that time period?

6      A.  She had some therapy.  She did have some

7  therapy after his passing.  It wasn't long because

8  she wouldn't talk about it.  She refused to open up

9  to the therapist.

10     Q.  Yes.  I --

11     A.  After a while, the therapist didn't want to

12  pursue it anymore.

13     Q.  I -- my question was actually about a -- the

14  different time period between her last communication

15  with him in 2021 when that was cut off for whatever

16  reason, and then 2023 before his passing, did she

17  have any counseling or therapy during that specific

18  time period?

19     A.  Specific time period, no.

20     Q.  Okay.  And that you -- I -- I do understand

21  that she did have some counseling after his passing

22  and I -- I believe she said fifth grade.  Does that

23  sound accurate to you?

24     A.  Yes.  Yes.

25     Q.  Other than through the school, are there any



Page 53

1    other sources of therapy or counseling that you've

2    sought out for her?

3        A.   No.

4        Q.   Okay.  Do you know the name of the school

5    counselor that she did speak with back in fifth

6    grade?

7        A.   I don't know the name of the school

8    counselor.

9        Q.   Okay.  And then you said you are seeking

10   counseling for her.  Is that also through the school

11   again?

12       A.   No.  This is going to be an outside agency.

13   It was difficult to get her counseling through an

14   outside agency due to the fact that she is adopted

15   and the medical coverage, I didn't have the card and

16   it was a big fiasco trying to get the -- the

17   coverage -- trying to get the coverage from the

18   adoption, it wasn't an agency, it's through

19   Riverside County Adoption.  I can't even tell you

20   how long -- how it went about.  But finally I got

21   the -- the medical card that she needs to get the

22   counseling that she needs.  But prior to that, all I

23   could deal with was the school and there wasn't much

24   that the school had to offer.

25       Q.   Okay.  And I just want to make sure I'm clear



Page 54

1    on the -- the legal terminology to the best you're

2    able to tell me.  Is it correct that you are her

3    adopted mother as opposed to a legal guardian?

4              MR. MARKS:  I'm going to object that

5    that probably calls for a legal opinion and

6    conclusion.  You can answer if you know.

7              THE WITNESS:  I am her adopted mother,

8    yes.

9    BY MS. ANDERSEN:

10    Q.  Okay.  And does she have an adopted father?

11    A.  No.

12    Q.  Okay.  Do you know, again, this is to the

13   extent that you are able to answer this question,

14   whether you know, I don't want you to guess or

15   speculate.  Do you know if Johnny's rights to her

16   were terminated?  His parental rights?

17    A.  Yes, they were terminated.

18    Q.  Thank you.  Okay.  Now I want to take you

19   back to 2021 when you say you had a lot of stuff

20   going on, and that's kind of what happened with the

21   contact with Johnny either fading out or however it

22   ended.  Did you call the police in July of 2021

23   regarding Johnny?

24    A.  I had so much going on, I'm not going to

25   answer that at this time.



Page 55

```
 1     Q.  Are you refusing to answer the question about
 2  whether you called the police on your brother?
 3     A.  Yes.
 4     Q.  Okay.  Is there --
 5     A.  I'm refusing -- I'm refusing to answer that
 6  question.
 7     Q.  So you are going to not answer any questions
 8  right now about your call to the police about him
 9  inappropriately touching somebody in your house?
10     A.  I am not going to answer that question during
11  this time.
12             MR. MARKS:  This has -- and -- and I'm
13  going to object on relevance.  This has nothing to
14  do with her -- his daughter.  And -- and it's not
15  relevant and --
16             MS. ANDERSEN:  Well, I'll -- I'll put on
17  the record that it is because S.L.  was involved in
18  some of these incidents so that -- that's clear,
19  it's the same residence.  And then also it goes to
20  damages because this is the warrant that he was out
21  -- that was out for his arrest at the time of the
22  incident.  This is why the police responded.  Are
23  you still sticking with, she's not answering any
24  questions about this molestation in her house.
25             MR. MARKS:  Well, it -- number one is,
```



Page 56

1    it doesn't have anything to do with the plaintiff in

2    this case.  And -- and I am sticking with my

3    objection on relevance, but she's not -- she said

4    she's not going to answer these questions?

5           MS. ANDERSEN:  Okay.  Do you understand

6    that you are under oath here and that I will be

7    seeking a motion to compel your responses to this.

8           MR. MARKS:  I -- but you -- but you

9    don't have to threaten her.  She's -- she's told you

10   where she is on this and -- and if you file a

11   motion, you file a motion and such as what happens,

12   happens.  But you don't have to -- you don't have to

13   threaten her.

14          MS. ANDERSEN:  Well, I mean if that's

15   the truth.  I mean, she's the guardian ad litem.

16   Her -- her daughter is directly involved in these

17   incidents.  It was in her house.  It goes to damages

18   and the 14th Amendment claim here.

19          MR. MARKS:  I know, but you continue to

20   say that her daughter was directly involved in this

21   and you -- you're the -- we're talking about her

22   daughter, the plaintiff.  And -- and the plaintiff,

23   Sophia, was not involved in any of this.

24          MS. ANDERSEN:  She -- she was, according

25   to the -- the Victim 1.  I mean, we produced the


MAGNA
LEGAL SERVICES

Page 57

1  police reports.  I mean, she was directly there.

2  BY MS. ANDERSEN:

3     Q.  And Kristine, I mean, you can correct me if

4  I'm wrong here, I'll ask the question anyway.  Did

5  you tell the police that you weren't sure that

6  whether Johnny had touched S.L.  or not because she

7  was young and you weren't -- you just didn't know?

8     A.  I'm not answering any of those questions

9  right now.

10    Q.  Okay.  Okay.  You didn't call the police on

11 him?  We'll start with that question.  You're not

12 going to answer that question?

13    A.  I'm not going to answer that question.  It

14 has nothing to do with Sophia.

15            MS. ANDERSEN:  Well, relevance is not --

16 I -- I'll -- I'll talk to your counsel about this.

17            Relevance is not a proper objection, I

18 mean, or -- or instruction not to answer.  What's

19 the privacy right here?

20            MR. MARKS:  Okay.  So -- so, you know,

21 Kayleigh, there -- there's no sense in -- in

22 spending a lot of time on this.  She's made it

23 perfectly clear she's not going to answer these

24 questions.  Maybe you and I can meet and confer

25 about this later and if you convince me somehow


MAGNA
LEGAL SERVICES

Page 58

```
 1   otherwise, then we'll produce her again and you can
 2   ask her these questions.  But again, you're not
 3   going to get anywhere with these questions today.
 4            MS. ANDERSEN:  Well, that's -- that's
 5   the issue.  I do want this all on the record because
 6   I want to make it clear for the Court that you're
 7   not instructing her not to answer.  And is that
 8   clear that she's refusing on her own to answer.
 9            MR. MARKS:  The record, is what the
10   record is.
11            MS. ANDERSEN:  I -- I want to clarify it
12   so it makes it clear because you're -- you're
13   asserting objections, you're allowed to do that of
14   course, but your objections are mostly relevance,
15   which is not a basis for an instruction not to
16   answer.  So that's -- I just want to clarify, are
17   you instructing her not to answer.
18            MR. MARKS:  The -- the -- again, the --
19   the record is real clear, you haven't heard me
20   instruct her not to answer any of the questions.
21            MS. ANDERSEN:  Okay.  So just so I can
22   clarify with Ms. Leyva, are you refusing to answer
23   any questions about the investigation that you
24   initiated into your brother Johnny regarding
25   allegations of molestation, inappropriate touching
```



Page 59

1    starting in 2029 -- 2019.

2              MR. MARKS:  And again, I'm going to

3    object.  That is -- it's in -- in addition to not

4    being relevant, it's also an invasion of privacy of

5    the potential victim who's not the plaintiff in this

6    case.

7              MS. ANDERSEN:  Correct, she will not be

8    named.

9              MR. MARKS:  So -- so I -- I believe that

10   all of this is not relevant and it's also an

11   invasion of privacy of the other individual.

12   BY MS. ANDERSEN:

13      Q.  Yes.  And I'm not asking any disclosure of

14   that individual's identity, but is that correct, Ms.

15   Leyva?

16      A.  I'm not answering any questions at this time.

17      Q.  Okay.  How about, have you ever called the

18   police on your brother at any time?

19      A.  I'm not answering these questions at this

20   time.

21              MS. ANDERSEN:  Okay.  Well that's the

22   end of this deposition then, but I certainly will be

23   seeking a second deposition, so I'll meet and confer

24   with Mr. Marks about that.

25              MR. MARKS:  So you have no other



Page 60

1    questions other than this particular topic?

2              MS. ANDERSEN:  That's correct.

3              MR. MARKS:  All right.  Very good.  Then

4    we're done for today with this one as well.  And I

5    do want to put on the record, and I know that it's

6    not the record of S.L.'s depo, but we had a

7    conversation off the record.  And what I'm going to

8    do is I'm going email to our court reporter and I've

9    already copied Ms. Andersen and Ms. Leap with the

10   exhibits, and I'm going to attach four exhibits as

11   exhibits to the deposition of S.L.

12             THE COURT REPORTER:  All right.  Mr.

13   Marks, do you want to order a copy of this

14   transcript.

15             MR. MARKS:  Please.

16             THE COURT REPORTER:  All right.  And I

17   have some questions for the witness if we can stay

18   on.

19             Go ahead, Victor.

20             THE VIDEOGRAPHER:  Yes.  Okay.  You said

21   you'd like to stay on the record, Madam Court

22   Reporter?

23             THE COURT REPORTER:  No, I don't want

24   the witness to leave?

25             THE VIDEOGRAPHER:  Oh.  Oh, I see.  I



Page 61

1    understand.

2              THE COURT REPORTER:  Sorry.

3              THE VIDEOGRAPHER:  Very good.  Just

4    before we go off the record, are there any video

5    copy orders.

6              MR. MARKS:  Not at this time, but I'm

7    sure I'll have your contact information in the

8    transcript so that if we decide to get the video, I

9    can contact you after.

10             THE VIDEOGRAPHER:  Of course, Counsel.

11             This concludes the deposition for today.

12   We're off the record at 12:08 p.m.

13             (Whereupon, the deposition was concluded

14   at 12:08 p.m.)

15

16

17

18

19

20

21

22

23

24

25



Page 62

1                    CERTIFICATE OF TRANSCRIPTION

2    I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT

3    I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;

4     AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT

5                    TRANSCRIPTION OF MY NOTES.

6    I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL

7    OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE

8    OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH

9      THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE

10                            ACTION.

11   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

12     APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

13   UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

14                   CERTIFYING TRANSCRIBER.

15          DATED THIS 3RD DAY OF DECEMBER 2024

16                    *Stephen Simpson*

17            STEPHEN SIMPSON, TRANSCRIBER

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



Page 1

**A**

**a.m**
3:23 44:25
**AAA**
46:24 47:1
**ability**
7:22
**able**
6:11 15:16 21:12
36:19 47:20 48:16
51:8 54:2,13
**absolutely**
11:24 29:23 44:20
**academy**
33:5
**accurate**
18:7 50:2 52:4,23
**ACTION**
62:9,10
**actual**
22:12 28:1 29:2 44:6
47:8
**ad**
44:16 45:8 56:15
**addition**
59:3
**additional**
29:8
**address**
18:17
**administration**
20:6
**adopt**
29:18
**adopted**
10:4 13:6,13,19 17:2
53:14 54:3,7,10
**adoption**
53:18,19
**adoptive**
10:2
**adult**
21:18 22:24 31:6,8
43:20 44:1,4
**affect**

**6:10**
**age**
22:23 23:23
**agency**
53:12,14,18
**ages**
31:4 50:11
**ahead**
7:16 23:17 26:22
50:22 60:19
**alcohol**
7:21
**alive**
19:24
**allegations**
58:25
**allow**
6:21 11:16
**allowed**
41:20 58:13
**Amber**
14:12,14,24 15:7
**Amendment**
56:18
**American**
32:12
**amount**
26:16
**Anaya**
19:9,13
**AND/OR**
62:13
**Andersen**
2:6 3:6 4:11,11 5:3
11:20,25 12:3,5
17:7 30:11,16,19,21
34:9 44:20 45:1
48:5 54:9 55:16
56:5,14,24 57:2,15
58:4,11,21 59:7,12
59:21 60:2,9
**angry**
48:14,23
**answer**
5:21,23 6:23 7:15
17:5 20:16 22:10

23:19 54:6,13,25
55:1,5,7,10 56:4
57:12,13,18,23 58:7
58:8,16,17,20,22
**answering**
55:23 57:8 59:16,19
**anticipate**
7:12
**anybody**
8:25 42:10,12,15
50:25
**anymore**
38:17 45:21 49:4
51:16 52:12
**anytime**
11:17
**anyway**
57:4
**apologize**
26:7,9
**appearances**
4:6
**Appearing**
2:2,5,8
**APPLY**
62:12
**applying**
32:17
**appreciate**
29:4,7
**appropriate**
6:8
**approximate**
24:25
**approximately**
10:18,21 12:8,15
16:7 17:24 22:3
23:21 24:21 26:24
27:17 41:14 52:2
**approximation**
16:20
**April**
8:6 15:16 16:10
33:14,25 39:3,11
40:3 41:6,16 50:1
**area**

35:9,15 36:24 37:22
38:2,3
**Armijo**
18:24 19:16
**arrest**
55:21
**ashes**
47:6
**asked**
32:21 34:21 36:3
38:11 50:19
**asking**
5:22 21:23 23:8,23
28:1 29:5 32:5
36:15 45:6 47:25
49:11 59:13
**asserting**
58:13
**associate's**
20:5
**assume**
20:16 30:6
**assuming**
24:13
**attach**
60:10
**attempt**
14:13 49:20
**attempted**
34:25
**attend**
20:23,24,25 21:9
33:4,7
**attended**
21:6
**attorney**
6:19 14:18,19 34:11
62:6,8
**attorneys**
6:11 33:23 34:6
**AUDIO**
62:3
**aunt**
10:3 18:25 19:3
**AUTHORIZED**
62:3



22:13,13,14,14
available
33:8
aware
20:22 22:17 43:2,3
    43:16 44:9,12 51:25

**B**

back
28:17 29:10 30:8,16
    30:16 31:2 32:19
    40:13 42:17 44:24
    53:5 54:19
background
20:3
based
48:9
basically
9:23 11:1 15:5 36:10
    36:11 40:17
basis
27:18 58:15
beginning
6:16
begins
3:19
behalf
2:2,5,8 4:7,9,12
behavior
48:9,12 51:2,5,7
believe
14:22 20:20 21:11
    42:6 43:10 52:22
    59:9
belongings
11:2
best
5:23 7:3,8,23 16:22
    16:22 23:8 24:1
    54:1
better
23:19
beyond
47:24 48:6,6
big

28:7 53:16
biological
10:3,5,8 13:8 17:10
    17:14
birth
8:12 10:13 11:4
    12:20 13:3,13 17:23
    29:22
birthday
15:20 29:24 30:2,3,5
    30:25,25
bit
5:18,20 20:3 28:15
    45:7
block
45:20
blonde
37:13
born
29:11
bothered
42:10
bought
47:16
break
7:11,13,14,16 26:9
    27:19,20,24 44:23
    45:4
breakdown
24:2
briefcase
36:7 38:18,20
briefly
10:20
bring
12:21 28:3,3,24
    29:25 45:16
broken
31:14
brother
35:13 55:2 58:24
    59:18
brought
28:21,21
Brown
10:7 29:13,15

buy
46:11,12

**C**

C
2:1
CAL
32:16
California
1:2 3:22
call
11:11 31:13 54:22
    55:8 57:10
called
5:9 32:18,19 51:22
    55:2 59:17
calls
17:4 46:8 54:5
camp
21:10
Campbell
18:14
camps
21:12 32:9,24,25
    33:5
capacity
20:12
car
32:12 46:11,13
card
53:15,21
care
38:19 40:15
careful
48:21
Carolyn
17:12,15 18:14
carrying
43:21
case
1:3 3:24 56:2 59:6
cash
28:1,10,20
caution
6:9
celebrate

30:4
celebrating
15:20
celebrations
30:25
centered
15:6
Central
1:2 3:22
certainly
59:22
certificate
12:20 13:3 62:1
certificates
21:8,11
CERTIFICATION
62:11
CERTIFY
62:2,6
CERTIFYING
62:14
change
11:12 46:25
changes
6:8,10 51:1,6
charge
22:12
check
25:18
checks
25:24 27:5,11
chihuahua
40:16
child
14:1 28:5
children
13:22,24 17:8,10,14
    20:13
Christopher
8:22
claim
56:18
clarify
58:11,16,22
clear
6:23 10:24 53:25



55:18 57:23 58:6,8
58:12,19
**clothes**
11:1
**come**
15:16 28:17,20 49:18
**coming**
46:15,16
**comment**
6:12
**communicate**
42:5
**communication**
24:22 25:6 35:24
39:13 41:5 52:14
**companies**
32:12,21
**companionship**
47:25
**compel**
56:7
**completed**
6:7 21:10
**completely**
11:20
**completions**
21:12
**concerned**
40:23
**concluded**
61:13
**concludes**
61:11
**conclusion**
54:6
**confer**
57:24 59:23
**confirm**
37:14,21
**CONNECTED**
62:8
**consistent**
41:10
**contact**
34:25 41:21 54:21
61:7,9

**continue**
5:25 25:9 49:11
56:19
**CONTROL**
62:13
**conversation**
14:23,24 15:2,5
35:20 36:7,12 38:16
38:18,21 39:23 40:7
40:17 41:6 42:11,14
42:14 52:1 60:7
**conversations**
25:10 39:14 40:21,24
**convicted**
20:17 21:18,24 22:2
22:4,6,7,9
**conviction**
22:15
**convictions**
22:12
**convince**
57:25
**copied**
60:9
**copy**
60:13 61:5
**correct**
9:17,18 10:9 13:17
14:7,8 19:4,5 24:19
32:22,23 33:2 35:19
37:24 42:7 43:17,18
49:24 50:7 54:2
57:3 59:7,14 60:2
62:4
**correctly**
49:25
**Costco**
28:7
**counsel**
4:5 30:15 57:16
61:10 62:6,8
**counseling**
48:15 49:6,19 51:19
51:23 52:3,17,21
53:1,10,13,22
**counselor**

49:14,15 53:5,8
**county**
1:8 3:21 8:4,5 23:13
23:15,24,25 24:2,6
24:6,9 33:13 53:19
**couple**
9:5 12:9,12 18:6
27:25
**course**
9:5 18:3 27:10 29:25
50:18 58:14 61:10
**court**
1:1 3:22 4:2,13,15,22
5:15,23 11:17,24
17:2 29:16 30:10
58:6 60:8,12,16,21
60:23 61:2
**coverage**
53:15,17,17
**COVID**
26:25 27:2,4
**credibility**
6:11
**cremated**
47:5
**cross**
47:6,7,9,10,15 48:16
**cry**
46:4 47:15
**currently**
8:14,17 9:6 13:17
17:17 20:7
**custody**
16:23 17:3 29:9,15
30:5,7
**cut**
52:15

---
**D**
---

**D**
3:1
**dad**
15:15 19:10 29:20
36:22 41:18 45:14
45:21,23 46:21,25
47:20 48:2 50:20

51:16
**dad's**
19:10 43:13 46:13
**damages**
55:20 56:17
**date**
8:12 10:21 29:24
33:15,17,20 38:25
**DATED**
62:15
**dates**
16:21
**daughter**
8:22 11:8,10 12:7
19:1 25:23 27:22
36:9,17 37:9 41:13
42:5 44:17 45:8
48:8 49:8 55:14
56:16,20,22
**day**
25:4 35:10 36:4,16
38:11 39:4 46:23
62:15
**days**
35:12 41:18
**deal**
53:23
**death**
11:4 15:6 45:10 48:7
**DECEMBER**
62:15
**decide**
61:8
**deem**
6:8
**defendants**
1:9 2:5 4:12
**defiance**
43:12
**degree**
20:5
**delightful**
51:9
**Department**
8:4,6 33:14
**depends**



50:13
**depo**
60:6
**deposition**
1:13 3:19,25 5:13,19
5:21 6:6,16 7:19 8:1
49:13 59:22,23
60:11 61:11,13
**depositions**
11:16
**depression**
43:13,15,17
**deputies**
8:6 33:13,25 37:23
38:4,24
**describe**
45:9,12
**destructive**
48:18,20
**diagnosed**
43:5,6,8,11,17
**dialogue**
41:10
**diapers**
27:22 28:3
**die**
40:20 41:12
**difference**
7:4 32:7 49:1
**different**
19:10 48:12 52:14
**difficult**
6:25 11:10 15:13
53:13
**DIRECT**
3:5 5:2 62:13
**direction**
36:13 62:13
**directly**
47:21 56:16,20 57:1
**disclosed**
44:14
**disclosure**
59:13
**disorder**
43:12

**distraction**
47:19
**District**
1:1,2 3:22,22 20:11
**divulged**
37:5
**dog**
40:15
**doing**
40:14 50:8,24
**door**
40:14
**doors**
48:23
**drank**
42:25
**drinking**
43:1
**drop**
39:17
**dropped**
39:19
**dropping**
49:7
**drugs**
7:21 42:19,21
**due**
24:6 32:16 53:14
**duly**
4:21,25

——————— E ———————
**E**
2:1,1 3:1 4:24,24,24
**early**
26:25 27:1 35:12
39:10 40:3
**easier**
12:4
**education**
20:4,19
**eight**
21:21 50:7,11,13
**either**
32:21 33:5 50:6
54:21

**elaborate**
5:20
**Elsinore**
8:14 20:10
**email**
60:8
**emotional**
46:7
**emotions**
47:14
**employed**
20:7,9,10
**EMPLOYEE**
62:7
**employment**
26:17 31:7
**ended**
54:22
**entitled**
7:3 36:21
**ESQ**
2:3,6,9
**estimate**
7:4,5 16:20,22 22:18
23:2,3,9 24:1 39:4
**Eva's**
6:2
**everybody**
39:18 42:13
**ex-husband**
8:22 13:16
**exact**
9:22 10:21
**EXAMINATION**
3:3,5 5:2
**examined**
4:25
**exchange**
41:3
**excuse**
25:20
**exhibits**
60:10,10,11
**exists**
36:20
**expenses**

26:13
**explain**
49:8 50:23
**explained**
46:3,12 47:2
**expressed**
46:10
**extent**
33:11 54:13
**extra**
26:1 27:11 29:4

——————— F ———————
**Facebook**
34:19
**facility**
23:13
**fact**
45:18,20 46:15,16
53:14
**fading**
54:21
**fall**
46:5
**family**
42:12,17 43:7,14,14
**far**
16:1 17:1 20:22
23:10,12 32:5,20
33:4 43:16 51:25
**father**
10:8 13:2 15:7 19:20
25:3,7 41:14,20
45:11 48:10 50:1
54:10
**father's**
19:22 49:16 50:14,16
**fathers**
19:12
**February**
16:11 27:1
**feel**
50:24
**feeling**
37:7
**felonies**



22:8
**felony**
20:17 21:18,24 22:4
  22:8,12,15 32:16
**fiasco**
53:16
**fifth**
49:14 52:22 53:5
**file**
56:10,11 62:3
**fill**
31:16
**finally**
53:20
**financial**
25:12,15 27:6,15,16
**FINANCIALLY**
62:9
**find**
35:11 36:10
**finding**
35:13 38:13
**fine**
11:20 44:21
**finished**
20:20
**fire**
21:10,12 32:16,24
  33:5,5
**firefighters**
32:15
**firefighting**
32:9,25
**fires**
21:13
**first**
4:25 21:24 22:1
  29:24 30:2,3
**fit**
37:15,18
**five**
12:15 23:4,21,22
  24:10 44:19
**fix**
31:14,20 46:14
**flat**

46:24
**fling**
37:2,2,5
**flowing**
45:13
**focus**
21:20 29:5 48:2
**follow**
49:10
**follows**
5:1
**FOREGOING**
62:4,11
**forestries**
32:18
**form**
31:16
**formula**
28:4
**forth**
40:13
**forward**
7:19 15:8 46:18
**found**
40:10
**foundation**
17:4
**four**
10:22 11:5 12:6,11
  12:15 18:4 24:9
  29:14 60:10
**friends**
46:5
**froze**
30:10
**frozen**
30:17
**full**
5:5 33:11
**further**
5:20 62:6

--- G ---

**GAL**
3:19
**GED**

21:2,4
**getting**
47:23
**girl**
36:8 37:3,5 45:25
  51:12
**give**
4:17 7:22 12:16
  16:22 22:9,21 23:19
  25:17 26:12 27:18
  31:10
**given**
26:23 40:15,16 43:6
**giving**
5:25 27:12
**go**
5:17,20 7:16 21:12
  23:17 24:12 26:21
  29:17 30:8,12,15
  38:13 40:1 46:11
  50:22 60:19 61:4
**God**
37:3
**goes**
46:11,24 55:19 56:17
**going**
5:22 7:12,19 10:21
  14:13,17 15:7 16:3
  20:15 25:8 30:22
  33:9 34:4,6 39:16
  40:19,25 41:8,12
  42:9 44:15 46:10,17
  49:3,9,11 53:12
  54:4,20,24,24 55:7
  55:10,13 56:4 57:12
  57:13,23 58:3 59:2
  60:7,8,10
**Gonzalez**
19:23
**good**
5:4 11:23 20:20
  31:19 37:15,18
  50:24 60:3 61:3
**grade**
49:14 52:22 53:6
**grades**

49:7
**Great**
5:12 11:25 12:1
  44:22
**Green**
18:16
**grew**
47:21
**grieve**
47:11
**groceries**
26:3 39:17,19
**ground**
5:17
**guardian**
44:16 45:8 54:3
  56:15
**guess**
7:3,5 9:16 29:22
  30:17 54:14
**guesstimate**
16:3
**guidance**
48:1
**gun**
43:20,22 44:1,6,7
**guns**
44:3,8
**guys**
32:8

--- H ---

**hair**
37:13
**half**
19:8 25:25
**Halloween**
47:17
**hand**
4:16
**handed**
25:25
**handling**
15:6
**handyman**
31:19



hang
47:17
happened
33:24 34:22 35:12
    36:3,14,16 38:10,12
    38:13,15,23 54:20
happens
56:11,12
happy
51:11
hard
22:18 27:20 45:12,16
    45:17
harder
28:15
head
6:2
health
40:11,23 41:4 43:5
    43:10
hear
30:13,18
heard
5:18 24:18 58:19
hearing
11:8
heart
32:16
held
24:5,8 31:7
hello
39:18,21
help
46:12 51:22
high
20:23,24
higher
23:6
highest
20:4,19
Highway
47:7,10
hired
31:20
history
43:7

hold
31:15,17
holding
44:1
holds
48:18
home
8:18 21:11 29:3 38:1
    40:1 42:9 48:19
homeless
9:24 11:3
homes
37:22
honoring
45:23
hospital
40:12
hours
7:22
house
14:6 26:4 39:19 40:4
    40:11 55:9,24 56:17
household
25:22,23 26:13 28:6
    28:23 29:7 42:15

_____
I
_____
identity
11:12 59:14
impair
7:22
important
37:8
in-depth
40:21
inappropriate
58:25
inappropriately
55:9
inaudible
18:17
inaudible)--
16:16
incarcerated
9:21 17:24 21:9
    22:20 23:13 24:19

25:2 29:12,13,20
    41:15
incarceration
23:22 24:23 29:22
    33:1,2,6
incarcerations
23:1 24:3,13
incident
8:5 33:12,24 34:3,12
    35:15 37:23 38:3,8
    38:10,24 55:22
incidents
55:18 56:17
individual
59:11
individual's
59:14
individuals
8:25 9:6,8
information
29:4,8 37:6 61:7
informed
15:4 35:8
initially
14:23
initials
14:2,3
initiated
58:24
instruct
58:20
instructing
58:7,17
instruction
57:18 58:15
intense
35:20
INTERESTED
62:9
internalized
45:13
invasion
59:4,11
investigation
58:23
involved

55:17 56:16,20,23
issue
43:10 58:5
issues
25:8 39:16 43:5

_____
J
_____
jail
23:13,24,25 24:2,6,9
Janelle
10:7 29:13,15,15
January
16:11 27:1
job
26:1,17,19 27:12
jobs
26:19 31:6,9,11,23
Johnny
1:5 3:20 9:11,17,19
    9:21 10:8,11,14,15
    12:7 13:2,24 14:15
    14:19,22,25 15:15
    15:22 16:10,23
    17:19,25 18:5,18
    19:6,9,12,19 21:17
    25:11,17 26:12,15
    27:7,14 29:10,11,21
    31:5,12 33:12,14,16
    33:25 35:3 36:7,24
    37:23 38:4,24 39:2
    41:23 42:18 43:5,20
    54:21,23 57:6 58:24
Johnny's
13:21 20:19 48:7
    54:15
joyful
51:11
Juanita
19:8,13
July
54:22
Junk
31:13
justice
20:6



**K**

**K**
4:24
**K-R-I-S-T-I-N-E**
5:6
**Kass**
4:1
**Kathleen**
4:3
**Kayleigh**
2:6 4:11 57:21
keep
11:2,8
keeps
6:23
killed
35:9 42:2
kind
47:13 51:20,24 54:20
knew
18:10 28:11 32:15
know
7:8,13 9:4,19,22 11:7
11:9,9,12 12:9
13:11,24 14:2,3,9
15:8 16:1,21 17:1,5
17:6,19,25 18:11
19:6,13,17 21:3,5,6
21:7,17,22 22:6,6,7
22:8,11,19 23:10,11
24:1 25:22,23 26:8
26:9 27:17,22,25
28:8,10,17,18,21
29:1,1,8,23 31:1,3
31:20,24 32:4,6,7
32:11,20 33:4,10,24
34:10,15,17 35:6,7
36:18 37:2,7,11
38:5,5,10,12 40:2,4
40:19,20,21,24
41:11,12,13 42:13
42:15,23,25 44:3,8
44:15 45:17,18
46:16 47:2,6,18,21
48:1,19 49:4 50:12

50:23 51:10,14,17
53:4,7 54:6,12,14
54:15 56:19 57:7,20
60:5
knowing
38:17
knowledge
33:11 42:18,21 43:4
knows
38:15
**Kristine**
3:4,20 5:6 8:9 11:16
32:10 57:3

**L**

**L**
4:24,24
**L-E-Y-V**
5:7
**L-L-A-M-A-S**
5:7
lack
52:3
**Lacks**
17:4
lady
35:16 37:13,25
**Lake**
8:14 20:10
laundry
28:22
**Lawrence**
2:3 4:7
leading
36:3
**Leap**
2:9 4:9,9 6:20 60:9
learned
33:22,23
leave
28:16,18,19 48:25
49:4 60:24
led
23:21 36:7
left
16:11 19:8 39:20

48:24 49:5 51:15,24
legal
4:2,3 16:23 54:1,3,5
**Legally**
13:21
let's
11:11 15:10,21 21:20
23:11 27:13,18 40:2
42:6 51:18 52:1
letters
11:19
letting
46:8
level
20:4,19
**Leyva**
3:20 4:15 5:7,10,11
8:9,22,23,24 13:16
17:12,12,12,15,15
17:16 45:2 58:22
59:15
life
15:8,21 16:24 21:18
25:9 31:6 37:6,8
39:16 43:20 44:1,4
lifetime
8:10 24:14 27:14
listed
9:5,10 13:2,4
litem
44:16 45:8 56:15
little
5:18 16:5 20:3 28:15
37:2 40:16 41:18
45:7,24,25 46:1,4
47:15,17,24 51:12
live
8:14,17 9:6,14,17
10:15 13:22 18:6
28:13 38:2
lived
9:1,8,11,19 10:14,20
11:4,5 12:7 14:5
16:2 17:22 18:1,11
35:15 36:24 38:5
lives

8:20 13:17 15:12
35:8 37:11
living
16:9 18:10,10 29:7
**Llama's**
10:11
**Llamas**
1:5 3:20,21 5:7,9 8:5
8:9 9:11 10:9
**Llamas-Leyva**
3:4 5:10
locations
17:25
locked
31:2
long
7:12 12:8,19 16:1,2
18:3 31:1 52:7
53:20
longer
16:9
longest
12:13,14
look
30:9 31:2 32:11,22
47:15
looking
12:10
losing
46:17 48:2
loss
47:25 48:10
lost
29:15,15 48:1
lot
12:4 32:17 37:6
39:16 40:11 41:8
42:8,8 45:14,14
46:17,20,21 47:18
54:19 57:22
love
47:25

**M**

**M**
4:24



**Madam**
60:21
**Magna**
4:2,3
**making**
40:14
**man**
41:7
**Manning**
4:1
**Manuel**
19:23
**March**
40:9 41:2
**marijuana**
42:23 43:1
**Marks**
2:3 4:7,7 6:20 11:14
  11:22 12:1 17:4
  30:17,20 34:4 44:18
  44:22 47:23 54:4
  55:12,25 56:8,19
  57:20 58:9,18 59:2
  59:9,24,25 60:3,13
  60:15 61:6
**married**
17:17,20,21
**math**
16:15 50:10
**matter**
3:20
**McLaughlin**
4:3
**mean**
16:6 31:10 46:5
  56:14,15,25 57:1,3
  57:18
**MEANS**
62:12
**meant**
42:12 46:3,6
**medical**
53:15,21
**meet**
57:24 59:23
**memorialize**

47:4
**mental**
43:5,10
**mentioned**
18:4 31:5
**message**
34:19,20 41:3,5
**messaged**
40:12
**messages**
40:7
**messaging**
40:13
**met**
19:14
**metal**
31:13
**method**
33:19
**Michelle**
18:24 19:1,7,10,16
**middle**
20:20
**might've**
12:18
**mind**
36:6 38:19 45:20,22
  50:19
**minutes**
44:19
**mm-hmm**
6:2
**molestation**
55:24 58:25
**mom**
19:11 29:12,12,13,20
  40:12 46:25 47:6
**mom's**
43:14 50:24
**moment**
26:5 37:7
**monetary**
28:1 29:2
**money**
26:16,18 27:11 28:11
  29:2

**month**
9:22 12:18 27:25
  50:12
**monthly**
26:15,16 27:18,20
**months**
10:4,23 12:12,16,19
  18:6 27:21 29:14,19
**morning**
5:4,19 49:13
**mother**
10:2,4 13:5,8,14 14:9
  17:2 18:14,17 19:20
  39:18 40:10,10 47:5
  54:3,7
**mother's**
10:6 39:7 40:3,23,25
  41:3
**motion**
56:7,11,11
**move**
31:21
**mover**
31:22
**moving**
15:8 46:17

—————————————
### N
—————————————
**N**
2:1 3:1 4:24
**name**
5:5 10:6 11:9,17,18
  11:18 14:11,14
  18:23 19:12,22
  35:17,18,20,22,22
  37:4,10,20 45:16
  53:4,7
**named**
59:8
**names**
8:10 17:11
**nature**
22:11 41:1
**necessarily**
31:15
**need**

7:11,12 12:24 16:21
  25:20 26:5,8,9 28:6
  28:19 33:10 46:4,21
  49:18
**needed**
25:21 26:4 27:22
  28:4,6,24 29:3 36:8
  36:17
**needs**
20:14 32:12 46:23
  53:21,22
**never**
14:5 17:21 19:17
  32:18,18 41:19
  43:16,25 44:6,14
**nice**
47:16
**nights**
10:25 12:9
**nine**
50:1
**Nobody's**
36:19
**nodding**
6:1
**normal**
49:2
**normally**
51:9
**note**
28:18 32:10
**NOTES**
62:5
**notice**
51:1,7
**noticed**
48:9 51:5
**number**
3:19,24 55:25

—————————————
### O
—————————————
**O**
4:24
**oath**
6:15 45:3 56:6
**object**



34:4,6 54:4 55:13
59:3
**objection**
56:3 57:17
**objections**
6:20,22 58:13,14
**obtained**
21:3,7
**obtaining**
31:18
**obviously**
24:14,17 29:12 45:7
**occasion**
24:18
**Occasionally**
15:25
**occurred**
35:15 37:23 38:4
**occurrence**
26:15
**October**
1:12 3:23
**odd**
26:19 31:6,9,10,23
43:17
**offer**
53:24
**offered**
51:23
**oh**
13:1 18:13 23:17
26:21 31:12 32:2
37:25 50:22 60:25
60:25
**okay**
5:12,17 6:19 7:2,7,9
7:16,25 8:9,17 9:13
9:16,19,25 10:5,8
10:11,13,18 11:7,25
12:1,6,17,20,23
13:2,10,16,21 14:2
14:5,9,11,13,17
15:10,19,21 16:1,4
16:6,12,14,17,19,19
16:22 17:1,8,11,13
17:19 18:7,9,13,18

18:23,25 19:3,15,22
19:24 20:1,3,7,22
21:3,6,14,17,20
22:11 23:5,17 24:12
24:17,21 25:14 26:2
26:6,8,10,21,24
27:4 28:25 29:21
30:4,11 31:5 32:3,6
32:20,24 33:9,16,22
34:10,15,20,25 35:3
35:6,14,23 36:1
38:2 39:2,6,10,21
39:25 40:2 42:1,4
42:16,18 43:1,4,9
43:19,23,25 44:3,15
45:6 48:4 50:9 51:1
51:6,18 52:20 53:4
53:9,25 54:10,12,18
55:4 56:5 57:10,10
57:20 58:21 59:17
59:21 60:20
**old**
10:4 17:13 29:14,19
46:19 50:1,7,14
**older**
28:14
**once**
6:6 19:14
**open**
52:8
**opinion**
54:5
**opportunity**
6:7
**opposed**
6:1 54:3
**Oppositional**
43:12
**order**
29:18 60:13
**orders**
61:5
**original**
13:7,12
**outside**
14:17 19:7 21:16

53:12,14
**overcrowding**
24:7
**owned**
37:22 38:1 44:3,5,8

―――――――

**P**

**P**
2:1,1
**p.m**
61:12,14
**PAGE**
3:3
**PAGES**
62:4
**pandemic**
25:17
**paper**
28:7,21 32:8
**paraeducator**
20:13
**parental**
54:16
**part**
25:17 33:1,12
**participate**
21:13
**particular**
26:19 60:1
**parties**
4:5 30:25 62:7
**PARTY**
62:8
**passed**
14:23 15:15,22 16:10
20:1 33:14 35:10,13
39:5 40:10 48:13
50:1
**passing**
14:15 21:22 23:23
32:19 35:21 36:4
41:6 49:16 50:14,16
51:2 52:2,7,16,21
**penalty**
6:16
**pending**

7:15
**people**
27:2,6 31:20,22
35:14 45:15
**perfectly**
57:23
**period**
9:12 10:18 12:14
18:1 21:21,23,25
22:5,16,19,21 23:12
24:22 51:3 52:5,14
52:18,19
**periods**
10:19 12:10 18:5
22:20 23:22
**perjury**
6:17
**person**
35:8 40:5
**personal**
25:8 33:11
**personally**
34:17 35:7
**pertaining**
25:22
**petition**
17:2
**phone**
25:1,3 41:21
**phonetic**
4:2 10:7 18:24 19:9
19:16 34:16
**photos**
31:3
**physical**
29:2
**picked**
41:19
**pictures**
29:25 30:1,9 31:3
**pipe**
31:14
**place**
11:1 28:13 47:11,19
**places**
18:11



**plaintiff**
2:2,8 4:10 5:19 9:25
    13:19 45:9 56:1,22
    56:22 59:5
**plaintiffs**
1:6 4:8
**please**
4:14,15 5:4 6:21 7:8
    7:13 27:9 32:10
    34:21 49:24 60:15
**pocket**
25:21
**point**
7:2 9:13,24 10:15
    13:22 36:20 38:18
    42:11
**police**
54:22 55:2,8,22 57:1
    57:5,10 59:18
**positions**
31:19
**possession**
12:25 44:13
**potential**
59:5
**pre-COVID**
27:13
**prefer**
5:9,10
**preparation**
8:1
**presence**
14:18
**present**
4:5 29:24 30:1,24
**pretty**
9:24 11:3 15:9 25:4
    25:24 37:12 47:12
**prevent**
7:18
**principal**
51:22
**print**
32:11
**prior**
12:18 25:2 30:2 39:3

40:2 41:18,18 53:22
**Priscilla**
34:16 35:4,10 38:14
    38:14,17,19
**prison**
20:25 21:1 23:14,16
    23:25 24:3,5,8,11
    31:1 41:16,20,23
    42:3
**prisons**
24:7
**privacy**
57:19 59:4,11
**private**
32:14,17
**probably**
11:5 12:13,14 13:8
    16:11 23:4 35:18
    39:4 50:3 54:5
**problem**
30:24
**problems**
40:11
**proceed**
6:22 15:7
**proceeding**
4:17
**proceedings**
29:16
**process**
46:20
**produce**
58:1
**produced**
56:25
**proper**
57:17
**property**
38:3 47:9
**protect**
11:11
**protector**
46:8,9
**provide**
5:23 25:12,14,18
    27:14

**provided**
6:7 25:19,20 49:17
**public**
20:24
**pursue**
52:12
**put**
11:19 45:19 47:6,6,9
    47:10,18 48:15
    55:16 60:5
**PX**
3:24

---

**Q**

**question**
5:21 6:21 7:7,14,15
    9:4 18:2,3 20:20
    22:25 23:18,20 27:9
    33:10 47:24 48:3
    52:13 54:13 55:1,6
    55:10 57:4,11,12,13
**questions**
5:22 6:1 49:11 55:7
    55:24 56:4 57:8,24
    58:2,3,20,23 59:16
    59:19 60:1,17
**quick**
40:22 45:3
**quiet**
51:12,13

---

**R**

**R**
2:1 4:24,24
**R-O-S-E**
5:6
**raise**
4:16
**Raju**
34:16 35:4
**ran**
38:11,11
**randomly**
31:14
**ray**
1:5 3:20 8:23 10:9,11

17:12,15 51:10
**reached**
22:23 35:11
**reading**
32:13
**real**
48:18 51:12,13 58:19
**really**
28:9,22 31:19,21
    36:6 38:5 40:22,22
    42:11 45:15 47:16
**reason**
7:18 25:5 29:9 40:20
    41:9,9 42:4 52:16
**recall**
15:1 21:23 22:1,3
    23:12 24:21 31:7
    35:17,22,23 39:13
**receive**
27:6
**received**
27:8
**receiving**
25:16
**record**
3:18 5:5 6:22,23
    30:13,15 44:25
    55:17 58:5,9,10,19
    60:5,6,7,21 61:4,12
**refer**
32:25 51:11
**referred**
19:1
**referring**
43:9
**reflect**
6:3
**refused**
52:8
**refusing**
55:1,5,5 58:8,22
**regarding**
54:23 58:24
**regardless**
44:10
**regards**





14:22,24
**registered**
44:5,6,7,10
**registration**
44:10
**related**
33:6
**relationship**
9:25 36:4,23 37:1
**RELATIVE**
62:7
**release**
42:6
**released**
9:22 29:21 41:22,23
   42:3
**relevance**
55:13 56:3 57:15,17
   58:14
**relevant**
34:7 55:15 59:4,10
**remained**
16:12
**remember**
37:3,10 45:17
**remotely**
3:25
**repairs**
40:14
**repeat**
18:2 22:25 23:18
   30:22
**repeating**
24:4
**rephrase**
7:8 9:3
**reporter**
4:3,14,15,22 5:24
   11:17,22,24 30:10
   60:8,12,16,22,23
   61:2
**reports**
57:1
**represent**
4:6
**REPRODUCTION**

62:12
**request**
3:25
**reside**
9:23 10:24
**resided**
10:23 18:14,16
**residence**
8:20 9:1,7,9 18:15
   39:7 55:19
**respond**
34:23
**responded**
55:22
**response**
23:21
**responses**
6:1 56:7
**resting**
47:5
**resulted**
22:15
**review**
6:8
**reviewed**
7:25
**right**
4:16 5:4 12:24 16:16
   19:19 28:2 32:13
   35:21 44:22 45:2
   50:17,25 55:8 57:9
   57:19 60:3,12,16
**rights**
54:15,16
**River**
47:22
**Riverside**
1:8 3:21 8:4,5 33:13
   53:19
**road**
47:19,22
**role**
44:16
**rolled**
27:5
**Rose**

3:4 5:6 8:9
**rules**
5:18
**rush**
40:1

———————————

**S**

**S**
2:1 4:24,24
**S-L**
4:24
**S.L**
8:15,21 9:1,6,9 10:1
   11:11,19 12:8 13:19
   14:6 15:10,17,23
   16:23 17:3,9,23
   19:1,13 24:12 25:6
   25:12,15 27:7,15
   28:5 29:5,6,9,11,19
   36:9 39:8 41:14
   44:17 45:9,10 48:8
   49:25 55:17 57:6
   60:11
**S.L.'s**
5:19 10:13 12:20
   15:20,21 17:23
   27:14 29:22 30:4
   48:9 60:6
**s`ame**
49:12
**sad**
49:7
**safe**
11:2
**Salcedo**
4:1
**Sariah**
8:23 17:12,15
**saw**
34:7 39:2,15 40:3,5,6
   41:14,15,18 43:25
   50:5
**saying**
37:19 39:21 50:16
**says**
32:10

**scares**
47:13
**school**
20:11,21,23,24 48:14
   49:3,6,13,17 51:21
   52:25 53:4,7,10,23
   53:24
**schooling**
20:25
**schools**
21:7,16
**se**
38:10
**second**
25:20 59:23
**sector**
32:14
**see**
15:11,12,17,23,24
   23:11 31:3 33:16
   39:6 40:19 41:9,9
   41:20 43:19,21 49:8
   49:13 51:8,21 60:25
**seeing**
51:3,7
**seek**
51:19
**seeking**
48:14 49:6 53:9 56:7
   59:23
**seen**
13:12 34:12 39:7
   47:8 49:14
**self**
31:25
**self-employment**
31:25
**sense**
6:4,25 37:4 46:22
   57:21
**sent**
24:8,10 32:10 34:19
**separate**
19:11 22:3,20 23:1
   23:22
**Services**



4:2,4
**session**
5:22
**seven**
50:6,11,13
**Severe**
43:13
**shaking**
6:2
**Shannon**
2:9 4:9
**share**
19:11,19,19 45:14
**she'll**
49:21
**Sheriff's**
8:4,6 33:13
**shocked**
15:9
**short**
9:11 44:23
**shortly**
42:2
**show**
28:8 46:14
**showed**
28:7 43:24
**shows**
46:7
**shut**
42:9
**sibling**
19:8
**sibling's**
18:23
**siblings**
18:19 19:6
**side**
19:10 37:2,5 43:13
43:14 46:7
**Sietsinger**
14:12
**silly**
33:10
**SIMPSON**
62:2,17

**single**
26:18
**sis**
28:18
**sister**
10:11 19:9,12,17,18
28:14 41:11
**sit**
49:22
**site**
47:8
**sitting**
34:11
**slam**
48:23
**slip**
27:23,24
**small**
47:7
**smoked**
42:23
**smoking**
40:25
**soap**
28:22
**soldier**
45:25 46:2
**solemnly**
4:16
**solid**
18:15
**somebody**
37:21 55:9
**somebody's**
31:14 47:9
**son**
8:23
**Sophia**
10:22 18:13 29:14
36:21 45:13 51:22
51:23 56:23 57:14
**Sophia's**
11:3
**sorry**
18:2 26:6,21 30:12
30:22 37:16 50:19

50:22 61:2
**sorts**
31:10
**sought**
53:2
**sound**
50:2 52:23
**sources**
53:1
**speak**
24:18 25:3 33:19
39:22 50:15,20 51:8
53:5
**speaking**
6:24 49:21 50:21
51:3
**special**
20:14
**specific**
16:21 22:15 31:7
38:3 43:9 52:17,19
**specifically**
29:6
**speculate**
7:3 54:15
**speculation**
17:5
**spell**
5:5
**spend**
10:25
**spending**
57:22
**spent**
15:17 22:20 32:17
**split**
19:17
**spoke**
37:17,17 50:6
**spoken**
8:3 14:14,19,21
34:18
**start**
26:14 57:11
**started**
27:2,2,3,5 36:14,15

45:6
**starting**
51:2,18 59:1
**state**
4:5,16 5:5 6:21 15:13
16:2,12 24:3,5,10
41:7
**stated**
10:14 42:8
**States**
1:1 3:21
**stay**
12:8 60:17,21
**stayed**
12:15 18:1
**steady**
28:12
**STEPHEN**
62:2,17
**sticking**
55:23 56:2
**sticks**
36:6
**stimulus**
25:18,24 27:5,11
**stimuluses**
25:16
**stop**
27:8 40:25
**stopped**
25:1,5 51:3,7
**street**
47:22
**strong**
31:21
**studying**
21:1
**stuff**
28:9 48:1,21 54:19
**substance**
15:1 35:23
**substances**
43:2,3
**substantive**
6:9 39:22
**successful**



31:18
**suitcase**
36:9,10,17,18,20,21
37:9
**summer**
15:14
**sunshine**
51:10
**support**
25:12,15 27:6,15,16
**supposed**
15:14 38:14 46:25
**sure**
13:7,11 18:16 53:25
57:5 61:7
**surprised**
47:12
**swear**
4:14
**sworn**
4:21,25

**T**

**T**
4:24
**table**
28:16,19
**take**
7:14,16 12:16 24:12
26:5 28:11,15 31:13
44:19 47:8 54:18
**taken**
3:25 5:13
**talk**
15:12,24 35:14 49:18
49:19,23 51:16 52:8
57:16
**talkative**
51:11
**talked**
24:24 27:10 35:16
38:22 51:21
**talking**
25:1 27:2 28:5 30:20
50:25 56:21
**teach**

46:25
**tears**
45:12
**teenager**
49:2
**tell**
29:23 30:7 31:23
34:21 35:19 36:19
36:25 38:7,12 45:24
48:24 49:4 50:22
51:6 53:19 54:2
57:5
**tells**
48:17
**tend**
42:9
**terminated**
54:16,17
**terminology**
54:1
**terms**
38:7 46:15,16
**testified**
4:25 5:15 49:12
**testify**
24:17
**testimony**
4:17 6:10 7:23 50:5,5
**text**
40:7 41:3,5
**Thank**
4:22 12:1 24:4 26:11
54:18
**theft**
22:13,14
**therapist**
49:15 52:9,11
**therapy**
52:3,5,6,7,17 53:1
**thing**
28:7 31:4,16 36:5
**things**
12:3 28:15 29:2,17
31:20,21 40:25 42:9
45:19 46:5 48:17,19
48:21

**think**
11:14,15 14:21 16:15
18:25 30:12 31:5
37:16 41:25 46:14
46:16 47:23
**thinking**
23:7
**thinks**
45:22,23
**thought**
28:23 30:11
**threaten**
56:9,13
**three**
10:22 11:5 12:6,11
17:13 18:4
**time**
3:23 6:12,19,19 7:11
7:13 8:23,23 9:12
9:23 10:18 11:4
12:9,10,12 13:22
16:24 18:1,4,6
21:21,23,24,25 22:1
22:4,16,19,20,21,23
23:12 24:9,21,24
26:10 27:3 29:14,18
32:17 33:16 34:18
37:7 39:2,14,15,17
40:3,4 41:8,13,17
43:19 44:1,4,12,25
48:13 50:4 51:3
52:5,14,18,19 54:25
55:11,21 57:22
59:16,18,20 61:6
**timeline**
49:25
**times**
11:6 12:7,11 17:22
18:9 21:1,10 22:4,7
22:9 23:4,11,22
24:6,10
**tire**
46:24,25
**today**
3:23 7:2,11,19,23
16:6,7 58:3 60:4

61:11
**toilet**
28:7,21
**told**
32:8 35:3,18 36:15
36:16 38:22 45:15
45:19,22 47:1,17
48:7,10 56:9
**topic**
60:1
**touched**
57:6
**touching**
55:9 58:25
**toughen**
45:24 46:1
**track**
42:17
**trade**
21:7,7,15
**training**
32:9
**TRANSCRIBE**
62:3
**TRANSCRIBER**
62:2,14,17
**transcript**
6:4,6 11:13 60:14
61:8 62:11
**TRANSCRIPTION**
62:1,5
**transient**
37:12
**trial**
6:12
**trinkets**
47:17
**true**
11:8 62:4
**truth**
4:18,18,19 56:15
**try**
31:17
**trying**
14:21 32:14 42:17
45:18,19 46:1 52:4



53:16,17
**turned**
21:20,21
**two**
10:14 12:19 16:3,6,8
  19:11 23:10 24:6
  30:1 32:12
**two-time**
49:18
**type**
16:23 17:3 25:12
  26:17 31:4 42:19
  43:9 49:18 52:3,5
**types**
33:5 42:21
**typing**
11:18

———————
**U**

**uh-huh's**
6:3
**UNAC**
32:12
**understand**
6:13,15,24 7:4,7
  11:10 16:19 23:9
  29:6 37:19 45:2
  49:21 50:20 52:20
  56:5 61:1
**understanding**
50:4
**Unfortunately**
33:18,21 34:1
**Unified**
20:10
**United**
1:1 3:21
**upset**
15:3
**use**
11:16 42:18,22
**uses**
11:18

———————
**V**

**V**

**1:7 4:24**
**V.L**
2:8 4:10 14:4,5 15:4
  15:6,10,12,14,16,23
  16:2
**V.L.'s**
14:9
**vary**
12:12
**vein**
49:12
**verbal**
5:25
**victim**
56:25 59:5
**Victor**
4:1 5:7 60:19
**video**
34:2,11,12 61:4,8
**videographer**
3:18 4:1,13 30:14
  44:24 60:20,25 61:3
  61:10
**Videotape**
3:19
**visit**
15:14 24:12
**visitation**
17:3
**vs**
3:21

———————
**W**

**W4**
31:16
**walked**
39:18
**want**
7:2 10:22 11:9 16:10
  23:18 24:5,25 25:9
  41:16 42:10 45:7
  47:9 49:5,23 51:16
  51:23 52:11 53:25
  54:14,18 58:5,6,11
  58:16 60:5,13,23
**wanted**

29:1 36:9,18 38:12
  47:15 51:15
**wanting**
48:20
**wants**
48:24
**warrant**
55:20
**wasn't**
12:19 28:4 31:18
  42:11 46:24 50:21
  51:9,10 52:7 53:18
  53:23
**watched**
34:2
**watching**
34:11
**way**
13:19 35:1 45:20,23
  47:4,10 48:16
**ways**
48:8
**we'll**
57:11 58:1
**we're**
6:23 28:5 56:21 60:4
  61:12
**we've**
27:10
**weapon**
44:13
**week**
26:18 39:4,10
**weekend**
15:18
**went**
21:22 29:16 38:19,21
  41:16 47:16 53:20
**weren't**
33:6 57:5,7
**white**
37:13
**wish**
37:3
**witness**
2:2 3:3 4:14,20,21

17:6 33:12 38:9
  48:4 54:7 60:17,24
**witnessed**
38:8,23
**woman**
36:24 37:1,11
**word**
32:13
**work**
31:12 32:20
**working**
27:12
**world**
35:21
**worse**
27:3
**would've**
22:13 34:5,5 44:13
**wouldn't**
27:21 28:22 35:18
  37:25 43:24 52:8
**wrong**
41:25 42:7 49:25
  57:4

———————
**X**

**x**
1:4,10 3:1

———————
**Y**

**Y**
4:24
**yard**
31:12,15
**yeah**
11:14 12:23 16:8
  23:20 31:10 32:2,2
  41:15 43:8 44:20
  48:6 50:3,8,10,19
  51:5
**years**
16:3,6,8 20:17 25:2
  46:19 50:1,7,14
**young**
57:7
**YouTube**



34:13

---

**Z**

**Zoom**
1:13 6:25

---

**0**

---

**1**

---

**1**
3:19 56:25
**10**
10:3 20:16 29:19
**10:34**
3:23
**100**
27:23,24,25
**11**
48:25
**11:46**
44:25
**12:08**
61:12,14
**14th**
8:6 33:14,25 39:3
  41:6 56:18
**17**
17:15
**18**
21:20,21 22:24 23:23
**19**
17:15

---

**2**

---

**20**
9:13 18:13
**200**
25:19,21 26:1,12,23
**2004**
20:2
**2013**
10:13,16 14:6 15:22
  17:23 18:5,11,13
  24:14 25:11 27:4,13
  29:10
**2019**

12:13 59:1
**2020**
9:2,3,7,12,14 10:13
  10:16 12:13,14
  17:24 18:5,12 25:16
  27:4,13 41:17
**2021**
9:16,20 24:25 25:3,6
  41:22,24 42:6 50:6
  50:12 51:4,8,18,19
  52:2,15 54:19,22
**2022**
9:22 41:25 42:6
**2023**
8:7 9:14,16,20 14:6
  14:20 15:11,22
  21:22 22:24 24:15
  25:11 33:14,25 39:3
  39:11 41:2,2 50:2
  51:19 52:16
**2024**
1:12 3:23 62:15
**2029**
59:1
**22**
17:16
**23**
16:10,11
**23rd**
1:12 3:23
**24**
7:22

---

**3**

---

**3RD**
62:15

---

**4**

---

**5**

---

**5**
3:6
**5:00**
31:16
**5:24-cv-00249-CA...**
1:3

**500**
26:20
**524-CV-00249-CAS**
3:24

---

**6**

---

**7**

---

**7**
46:19
**7/23/82**
8:13
**74**
47:7,10

---

**8**

---

**8**
46:19

---

**9**

---

**9**
46:19
**9:00**
31:15



# EXHIBIT 19

# EXHIBIT 19

Amber Snetsinger                                        October 24, 2024

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case No. 5:24-cv-00249-CAS(SPx)

S.L., a minor by and through the )
Guardian ad Litem Kristine       )
Llamas-Leyva, individually and   )
as successor-in-interest to      )
JOHNNY RAY LLAMAS, deceased;     )
V.L, by and through the          )
Guardian ad Litem Amber          )
Sietsinger, individually and as  )
successor-in-interest to JOHNNY  )
RAY LLAMAS, deceased; and        )
CAROLYN  CAMPBELL, individually, )
                                 )
              Plaintiffs,        )
                                 )
          vs.                    )
                                 )
COUNTY OF RIVERSIDE and          )
DOES 1-10, inclusive,            )
                                 )
              Defendants.        )
_____)


REMOTE VIDEOTAPED DEPOSITION OF AMBER SNETSINGER
Thursday, October 24, 2024
CONDUCTED VIA ZOOM VIDEO CONFERENCE

REPORTED BY:  KATHLEEN S. McLAUGHLIN
              Certified Shorthand Reporter
              License No. 5845

Magna Legal Services
866-624-6221
www.MagnaLS.com

Amber Snetsinger                                    October 24, 2024

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
 4              Case No. 5:24-cv-00249-CAS(SPx)
 5
 6  S.L., a minor by and through the )
    Guardian ad Litem Kristine       )
 7  Llamas-Leyva, individually and   )
    as successor-in-interest to      )
 8  JOHNNY RAY LLAMAS, deceased;     )
    V.L, by and through the          )
 9  Guardian ad Litem Amber          )
    Sietsinger, individually and as  )
10  successor-in-interest to JOHNNY  )
    RAY LLAMAS, deceased; and        )
11  CAROLYN  CAMPBELL, individually, )
                                     )
12                     Plaintiffs,   )
                                     )
13              vs.                  )
                                     )
14  COUNTY OF RIVERSIDE and          )
    DOES 1-10, inclusive,            )
15                                   )
                       Defendants.   )
16  _____)
17
18
19
20          Remote videotaped deposition of AMBER
21  SNETSINGER taken on behalf of Defendant beginning at
22  10:43 a.m. on Thursday, October 24, 2024, remotely
23  before KATHLEEN S. McLAUGHLIN, Certified Shorthand
24  Reporter No. 5845, located in the City of Vista,
25  County of San Diego, State of California.
```

Amber Snetsinger                                    October 24, 2024

Page 3

1                    A P P E A R A N C E S

2

3        (All parties appeared via Zoom video conference)

4

5    FOR THE PLAINTIFFS V.L. by and through the Guardian

     ad Litem, Amber Snetsinger, individually and as

6    successor-in-interest to JOHNNY RAY LLAMAS,

     deceased:

7

8                SHANNON J. LEAP, ESQ.

9                LAW OFFICES OF DALE K. GALIPO

10               21800 Burbank Blvd.

11               Suite 310

12               Woodland Hills, California  92367-6479

13               818.347.3333

14               sleap@galipolaw.com

15

16   FOR THE PLAINTIFFS S.L. by and through the Guardian

     ad Litem, Kristine Llamas Leyva, individually and as

17   successor-in-interest to JOHNNY RAY LLAMAS,

     deceased, and CAROLYN CAMPBELL, individually:

18

19               LAWRENCE D. MARKS, ESQ.

20               MARDIROSSIAN AKARAGIAN, LLP

21               6311 Wilshire Blvd.

22               Los Angeles, California  90048-5001

23               323.653.6311

24               lmarks@garolaw.com

25                      (continued)

Amber Snetsinger                                    October 24, 2024

```
                                                        Page 4

 1                    A P P E A R A N C E S

 2                        (continued)

 3

 4    FOR THE DEFENDANT:

 5

 6              KAYLEIGH ANDERSEN, ESQ.

 7              MANNING & KASS

 8              ELLROD, RAMIREZ, TRESTER LLP

 9              801 S. Figueroa Street

10              15th Floor

11              Los Angeles, California  90017-3012

12              213.624.6900

13              kayleigh.andersen@manningkass.com

14

15

16    ALSO PRESENT:

17

18              BRAD BISSEGGER, VIDEOGRAPHER

19

20

21

22

23

24

25
```

Amber Snetsinger                                    October 24, 2024

Page 5

1                      I N D E X

2                Index of Examinations

3                                              Page

4    Examination by Ms. Andersen                    7

5

6

7          EXHIBITS MARKED FOR IDENTIFICATION

8                    (None)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Amber Snetsinger                                    October 24, 2024

Page 6

1                    THURSDAY, OCTOBER 24, 2024

2                         10:43 A.M.

3

4           THE VIDEOGRAPHER:  We are now on the

5    record.  This begins the video deposition of Amber

6    Snetsinger in the matter of Johnny Ray Llamas versus

7    County of Riverside, et al. in the United States

8    District Court, Central District of California, case

9    5:24-cv-00249-CAS(SPx).

10          Today is October 24th, 2024, and the time

11   is 10:43 a.m. Pacific Daylight Time.  This

12   deposition is being taken via Zoom at the request of

13   Manning & Kass, Ellrod, Ramirez, Trester LLP for the

14   defendant.

15          The videographer is Brad Bissegger of Magna

16   Legal Services, and the court reporter is Kathleen

17   McLaughlin of Magna Legal Services.

18          Will counsel for the parties please state

19   their appearances and whom they represent.

20          MS. LEAP:  Shannon Leap on behalf of

21   plaintiff V.L.

22          MR. MARKS:  Lawrence Marks for plaintiff

23   S.L. and plaintiff Carolyn Campbell.

24          MS. ANDERSEN:  Kayleigh Andersen for the

25   defendants.

Amber Snetsinger                                    October 24, 2024

Page 7

 1          THE VIDEOGRAPHER:  Thank you.  The court

 2    reporter may now swear in the witness.

 3

 4                  AMBER SNETSINGER,

 5          Called as a witness by and on behalf of the

 6    Defendant, and having been first duly sworn by the

 7    Deposition Officer, was examined and testified as

 8    follows:

 9

10                  EXAMINATION

11    BY MS. ANDERSEN:

12      Q    Good morning, Ms. Snetsinger.  I hope

13    that's how you pronounce it.  But can I have you

14    please state and spell your full name for the

15    record?

16      A    My name is Amber Snetsinger.  A-M-B-E-R and

17    then Snetsinger is S-N-E-T-S-I-N-G-E-R.

18      Q    Great.  Thank you.

19          Have you ever had your deposition taken

20    before?

21      A    No.

22      Q    Have you ever testified in court before?

23      A    No.

24      Q    So I'll go over some of the ground rules

25    for this deposition proceeding.  A deposition is a

Amber Snetsinger                                    October 24, 2024

Page 8

1   question-and-answer session.  I will be asking you

2   questions, and then you provide me with your best

3   answer.

4           The court reporter is here to take down

5   everything that is said, but she can only take down

6   what we say verbally.  So just continue giving your

7   responses verbally as opposed to nodding your head

8   or shaking your head or, you know, uh-uh's or

9   uh-huh's because those don't reflect well on a

10  transcript.

11          Does that make sense?

12  A    Yes.

13  Q    Okay.

14          It's difficult over Zoom, but just let me

15  finish my question before you start with your answer

16  and then I'll do the same thing.  I'll do my best to

17  wait for you to finish your response before I ask my

18  next question; okay?

19  A    Okay.

20  Q    Once the transcript is complete, you'll

21  have an opportunity to review the transcript and

22  make any changes you deem appropriate.

23          I'll just caution you that if there are

24  substantive changes that could affect your

25  credibility, I or other attorneys may be able to

Amber Snetsinger                                    October 24, 2024

Page 9

1    comment on those changes at the time of trial.

2            Does that make sense?

3    A    Yes.

4    Q    Do you understand that the oath that you

5    took at the beginning of this deposition is under

6    penalty of perjury?

7    A    Yes.

8    Q    At no time today do I want you to guess or

9    speculate in response to my questions, but I am

10   entitled to your best estimate.

11           Do you understand the difference between a

12   guess and an estimate?

13   A    Yes.

14   Q    Okay.

15           From time to time your attorney or any of

16   the other attorneys may have objections to my

17   questions.  Please allow the attorneys to state

18   their objections for the record and then you can

19   proceed with your answer; okay?

20   A    Okay.

21   Q    If you need a break at any time today,

22   please just let me know, and we can go ahead and

23   take a break.

24           I'd just ask if there is a question pending

25   that you go ahead and answer that question and then

Amber Snetsinger                          October 24, 2024

Page 10

1    we can go ahead and take a break; okay?

2         A    Okay.

3         Q    Is there any reason that would prevent you

4    from giving your best testimony today?

5         A    No.

6         Q    Have you had any drugs or alcohol in the

7    last 24 hours that would impair your ability to give

8    your best testimony today?

9         A    No.

10        Q    Did you review anything in preparation for

11   your deposition today?

12        A    Yes.

13        Q    What did you review?

14        A    The email I got yesterday with the paper --

15   I'm sorry.  I forgot what --

16        Q    Let me stop you right there.  That's -- I'm

17   glad this happened early.  I should have said it at

18   the beginning.

19             I don't want to know any communications

20   you've had with your attorneys in this case.  So

21   emails, phone calls, texts, however it happened,

22   anybody from Ms. Leap's office, you don't need to

23   disclose those.

24        A    Okay.

25             MS. LEAP:  May I offer just a point of

Amber Snetsinger                                    October 24, 2024

Page 11

1    clarification?

2            MS. ANDERSEN:  Yes.

3            MS. LEAP:  It was just the discovery

4    responses.

5            MS. ANDERSEN:  Okay.

6    BY MS. ANDERSEN:

7       Q    Did you review discovery responses in

8    preparation for your deposition today?

9       A    Yes.

10      Q    Okay.  Would that have been V.L.'s or your

11   discovery responses to requests?

12      A    Yes.

13      Q    Okay.

14           Anything else that you reviewed in

15   preparation for your deposition?

16      A    No.

17      Q    Have you ever spoken with anybody from the

18   Riverside County Sheriff's office about Johnny Ray

19   Llamas or the incident on April 14 of 2023?

20      A    No.

21      Q    Have you gone by any other names in your

22   life other than Amber Snetsinger?

23      A    No.

24      Q    What's your date of birth?

25      A    March 11, 1987.

Amber Snetsinger                                    October 24, 2024

Page 12

1      Q     And where do you currently live?

2      A     In Mangum, Oklahoma.

3      Q     Can you spell that for me?

4      A     M-A-N-G-U-M.  Like man -- yeah.

5      Q     How long have you lived there?

6      A     I think it's been about three years

7  probably.

8      Q     Okay.

9            Would you say that you moved there sometime

10  in 2021?  Does that sound accurate?

11     A     No.  It was 2022 because it was after

12  COVID.  The end.

13     Q     Okay.  So sometime in 2022 you moved to

14  Oklahoma?

15     A     Probably like August, because the kids were

16  only, like, a month off of school when we got here.

17  So, yeah, like, August, September.

18     Q     Okay.

19            Was there any reason that prompted the move

20  to Oklahoma?

21     A     Cheaper living and just a better, fresh

22  start.

23     Q     Okay.

24            And where were you living when you were

25  living in California?

Amber Snetsinger                                          October 24, 2024

Page 13

1      A    Perris.

2      Q    Did you go straight from Perris, California

3    to Mangum, Oklahoma?

4      A    Yes.

5      Q    Who do you currently live with?

6      A    Myself and my kids.

7      Q    I understand there are four kids living

8    with you.  Is that correct?

9      A    Yes.

10     Q    All of them are biologically your children;

11   correct?

12     A    Yes.

13     Q    Okay.

14          Is plaintiff V.L., is she the only one with

15   a different father than the other three?

16     A    No.

17     Q    Okay.  Is V.L. your oldest?

18     A    Yes.

19     Q    Okay.  And who is her biological father?

20     A    Johnny Llamas.

21     Q    And is he on the birth certificate for

22   V.L.?

23     A    No.

24     Q    Okay.

25          Is there a reason he's not on the birth

Amber Snetsinger                                    October 24, 2024

Page 14

1    certificate?

2        A      He was incarcerated when she was born, and

3    they have to be present when they do the whole birth

4    certificate thing.

5        Q      Okay.

6               At any time after he was released or

7    whenever that happened after 2011, did you or he

8    attempt to go through the court system to get his

9    name on the birth certificate?

10       A      No.

11       Q      Have there ever been any legal proceedings

12   with respect to parental rights for V.L.?

13       A      No.

14       Q      Okay.

15              What about any legal proceedings with

16   respect to visitation for Johnny to V.L.?

17       A      No.

18       Q      And then same question.   Any court

19   proceedings related to child support for V.L.?

20       A      No.

21       Q      Were you ever married to Johnny?

22       A      No.

23       Q      Okay.

24              Were you in a relationship at the time that

25   you got pregnant with V.L.?

Amber Snetsinger                                    October 24, 2024

Page 15

1      A     Yes.

2      Q     Okay.

3            Did that relationship continue after V.L.

4      was born?

5      A     He was in jail.  So pretty much, no.  No.

6      Q     Okay.

7            Did you -- did V.L. ever live in the same

8      house with Johnny?

9      A     No.

10     Q     And I understand there's another -- that

11     your daughter V.L. has another sibling through

12     Johnny.

13           Is that correct?

14     A     Yes.

15     Q     Is it just one -- and I'll go by her

16     initials -- S.L.?

17     A     Yes.

18     Q     Are you aware of any other children of

19     Johnny's?

20     A     No.

21     Q     Are you currently married?

22     A     No.

23     Q     Have you ever been married?

24     A     No.

25     Q     Do you know Johnny's parents' names?

Amber Snetsinger                                    October 24, 2024

Page 16

```
 1      A    I know his mom, Carolyn Campbell, but I

 2   can't remember his dad.

 3      Q    I understand his dad has passed.

 4      A    Yes.

 5      Q    Okay.  Is that accurate?

 6      A    Yes.

 7      Q    When was the last time you spoke to Carolyn

 8   Campbell?

 9      A    I don't remember exactly, but it was, like,

10   right after she was born.  Probably -- maybe a year

11   after she was born was the last time we actually

12   spoke but ...

13      Q    And by "she," you mean your daughter V.L.?

14      A    Yes.

15      Q    Okay.

16      A    Sorry.

17      Q    That's okay.  I just want to make sure

18   we're talking about the correct person.

19           Are you currently employed?

20      A    Yes.

21      Q    Okay.  What's your job?

22      A    I'm a cashier at Love's Travel Store.

23      Q    And how long have you worked there?

24      A    Two and a half years.

25      Q    Did you receive any type of financial
```

Amber Snetsinger                                    October 24, 2024

Page 17

1    support from Johnny for your daughter V.L. at any

2    time during her life?

3        A    Yes.

4        Q    Okay.

5             And can you -- let's do -- how often would

6    you receive money from Johnny for your daughter

7    V.L.?

8        A    It wasn't like an often thing.  It was just

9    a few times.  He had sent me money for diapers or

10   got ahold of his sister to help me pay for bills or

11   pay for diapers usually.  So it wasn't like an often

12   thing but ...

13       Q    When you say get ahold of his sister, are

14   you referring to Kristine?

15       A    Yes.

16       Q    Was it your understanding that Kristine was

17   assisting Johnny to send you money for V.L.?

18       A    Yeah, because he was in jail for most of

19   those times.  But, yeah.  A few times after he was

20   out of jail, he actually helped with, like, her band

21   instrument and stuff but ...

22       Q    Did Johnny -- I mean I understand that -- I

23   just took your daughter V.L.'s deposition.  She's

24   only 13.  But -- so her memory is probably different

25   than yours as her mother.

Amber Snetsinger                                    October 24, 2024

Page 18

1          Did V.L. ever see Johnny in person?

2      A   When she was a baby, yeah.

3      Q   Okay.  Approximately what age was the last

4  time she saw Johnny in person?

5      A   When she was 11 months old.

6      Q   Okay.  Was there --

7      A   She went and spent a month with him.

8      Q   Okay.

9          Was there a reason she spent a month with

10  him at that time?

11     A   Because he had just gotten out of jail

12  again, and it was his first time meeting her, and I

13  just let them have their time.

14     Q   During that month do you know where he was

15  living or staying with your daughter?

16     A   Yeah.  He had an apartment down the street

17  from his sister in Lake Elsinore.

18     Q   And then other than that -- about one-month

19  time period when your daughter was about 11 months

20  old, did she see him any other time in person?

21     A   Other than that time, besides video chat,

22  no.

23     Q   Was there a reason why during -- you know,

24  when you guys were living in California still,

25  obviously, that she didn't see him in person?

Amber Snetsinger                                    October 24, 2024

Page 19

1    A    He was in jail the majority of the time.

2    Q    Whenever he was out of custody, did you

3  ever attempt to set up, you know, a visit or

4  anything between V.L. and Johnny?

5    A    Well, I -- I never went, like, looking for

6  him to be out.  When he would get out, he would tell

7  me, and then we'd try to set up a meet-and-greet or

8  whatever at his sister's where he would stay when he

9  got out, but those never really happened at that

10  time.

11    Q    Okay.

12    A    (Unintelligible.)

13    Q    I'm sorry?  Go ahead.

14    A    Sorry.  I don't know.  But yeah.  Not

15  really.  It didn't ever happen.

16    Q    Okay.

17         And then you said video chat.  Would have

18  been times when he was out of custody communicating

19  with V.L.?

20    A    Yes.

21    Q    Do you know where he was living at any

22  time?  Other than that one apartment you mentioned

23  where he stayed with your daughter for about a

24  month, do you know any other places that he lived

25  when he was out of custody?

Amber Snetsinger                              October 24, 2024

Page 20

1      A     He usually stayed with Mischelle, his other

2    sister, as far as I know.  But sometimes with

3    Kristine.

4      Q     When was the last time you spoke with

5    Kristine?

6      A     We messaged each other about a week ago and

7    we verbally talked like two, three weeks ago.

8      Q     What was the substance of your

9    communication with -- is it Kristina or Kristine?  I

10   don't even remember now.  I feel bad.

11     A     It's Kristine.

12     Q     Kristine.

13           When you spoke with her on the phone, what

14   did you speak with Kristine about?

15     A     She -- well, V.L. -- like if V.L. needs

16   anything and how is V.L. doing and how am I doing

17   and if there's jobs out here, because she wants to

18   move out here eventually.  I told her it's really

19   boring.  I don't -- just stuff like that.  Normal

20   stuff.

21     Q     So we did this yesterday.  I know it's hard

22   because she's your daughter, and you want to call

23   her by her first name.  But we're going to refer to

24   her as V.L.  So we'll do what we did --

25     A     Oh.

Amber Snetsinger                                    October 24, 2024

Page 21

1      Q     It's okay.  It's completely understandable.

2            We did this yesterday with S.L. and her

3      mother that we should probably just have -- anytime

4      you say her real name, we'll just change it in the

5      transcript to V.L.

6            Is that okay?

7      A     That's fine.  Thank you.

8      Q     Of course.

9            Do you know any jobs that Johnny had when

10     he was out of custody?

11     A     I don't know.

12     Q     What's your highest level of education?

13     A     Eleventh grade.

14     Q     And do you know what Johnny's highest level

15     of education is or was?

16     A     I don't remember.

17     Q     Within the past 10 years have you been

18     convicted of a felony?

19     A     No.

20     Q     Do you know any of the -- do you know

21     approximately how many times Johnny was incarcerated

22     during V.L.'s lifetime, separate incarcerations?

23     A     No, I don't know how many.

24     Q     Do you know the nature of any of the

25     convictions?  Like the charges, the nature of the

Amber Snetsinger                                October 24, 2024

Page 22

1  charges of any of the felony convictions that he had

2  during V.L.'s lifetime?

3      A    No, I don't really know the specifics or

4  anything like that.

5      Q    Did you ever go visit him in custody,

6  whether it was a county jail or a state prison?

7      A    No.

8      Q    Did you ever speak with him when he was in

9  custody, whether it was at a county jail or a state

10 prison?

11     A    Yes.

12     Q    How often would you speak with him when he

13 was in custody?

14     A    Not that often.  I could probably count

15 like two, three.  But at least five.  Not that many.

16     Q    Okay.  What about V.L.?  Did V.L. ever

17 communicate with Johnny when he was in custody?

18     A    No.  He would kind of -- he would talk to

19 her through me.  Like check on her and stuff.  But

20 not when he was in custody.

21     Q    Okay.

22          Now, as of April of 2023, you were already

23 living in Oklahoma; correct?

24     A    Yes.

25     Q    Okay.

Amber Snetsinger                                  October 24, 2024

Page 23

 1          And it's my understanding that from your

 2   daughter, and I think from the testimony yesterday,

 3   that your daughter and you went out to California to

 4   visit with S.L. and Kristine.

 5      A    She went out first because I didn't have

 6   vacation from my job until the last two weeks of

 7   their vacation.

 8          So they went out there to spend the

 9   majority of the summer with my family, but it was on

10   the -- it was, like, on the plans to go and spend

11   some time with her -- his family too.  So -- yeah.

12   I didn't get to personally see her but V.L. did.

13      Q    And that would have been in the summer

14   of --

15      A    Yeah.  V.L. I mean.

16      Q    That's okay.  We already have the running

17   change in the transcript.  It's an easy -- it's

18   completely understandable.

19          Would that have been summer of 2023 after

20   Johnny's passing?

21      A    Yes.

22      Q    Okay.  Do you know a woman named Priscilla

23   Raju?

24      A    I do not know her but I know -- I've heard

25   of her.

Amber Snetsinger                                October 24, 2024

Page 24

1       Q     Okay.

2             How did you hear of her?  And if it's from

3    your attorney, you don't need to --

4       A     No.

5       Q     How did you hear of her?

6       A     Just people talking from -- like street

7    talk.  I don't know.  Gossip.  People saying, "Oh,

8    that's who he was with."  You know how it is.  Just

9    gossip.

10      Q     Do you know who you were speaking to when

11   that name came up?

12      A     No, I don't really know her name but she

13   was -- no, I don't know her name.

14      Q     Did you ever speak with Kristine about

15   Priscilla?

16      A     No.

17      Q     Have you ever spoken with Carolyn Campbell

18   about Priscilla?

19      A     No.

20      Q     Do you have any understanding of what her

21   connection was to the incident?

22      A     I just heard that -- I watched the video

23   that was on YouTube.  So that's my extent of

24   knowledge on that one.

25      Q     Okay.

Amber Snetsinger                                    October 24, 2024

Page 25

1          So you did watch the video on YouTube that

2    showed, like, different video clips of the incident?

3    Is that correct?

4          A     Yeah.  And it had the police call in the

5    beginning, yeah.

6          Q     Like the critical incident video or

7    whatever they publicly released?

8          A     Yes.

9          Q     Had you watched any other videos of -- you

10   know, whether it's body cam or helicopter or

11   anything like that of the incident?

12         A     Just the YouTube one.

13         Q     Okay.

14               When was the last time you saw Johnny prior

15   to the incident?

16         A     Like physically or on video chat?

17         Q     Let's start with physically in person.

18         A     Probably when they seen -- when they

19   visited each when she was first born.

20         Q     Okay.

21         A     Yeah.  That's the last time.

22         Q     Okay.

23               And then so, basically, from the time she

24   was 11 months old or so all the way up and through

25   his passing you did not see him in person.

Amber Snetsinger                          October 24, 2024

Page 26

    1           Is that correct?

    2      A    No.

    3      Q    When was the last time you spoke with him,

    4   whether it's on a phone, email, text, however --

    5   whatever method, when was the next time you spoke

    6   with him prior to the date of the incident?

    7      A    Real close to that.  Probably a month

    8   before he died.

    9      Q    Do you recall the substance of that

   10   conversation?

   11      A    Just how excited he was to meet her.  He

   12   was planning the summer so ...

   13      Q    Was that the same phone call that your

   14   daughter also participated in with Johnny?

   15      A    No.  It was a different one.

   16      Q    Okay.

   17           Did you exchange any text messages with him

   18   between that phone call and the date of the

   19   incident?

   20      A    Yeah.

   21      Q    Do you recall what -- do you recall the

   22   substance of those, you know, communications?

   23      A    Just how he was planning to do better and

   24   how it was different this time around and how he was

   25   excited and how nervous he was about how to even be

Amber Snetsinger                                    October 24, 2024

Page 27

1   a good dad and just -- basically, nervous.  Really

2   nervous.  I told him there's no set of directions.

3   You know.  Just kind of talk.

4        Q    How often would you say that your daughter

5   spoke with him on the phone from, you know -- I

6   guess 11 months old when she last saw him all the

7   way up until his passing?

8        A    Probably like a handful of times since --

9   because he went to jail one more time -- they

10  started talking before he went to jail the last time

11  and then stopped.  And then the last time he was

12  out, it was like a bunch back to back.

13       Q    Okay.  Would that have been --

14       A    (Unintelligible.)

15            (Reporter interrupts for

16            clarification of the record.)

17            THE WITNESS:  I don't know the exact

18  number specifically, but it was a lot more towards

19  the end.

20  BY MS. ANDERSEN:

21       Q    Can you give me your best estimate as to

22  how many times they spoke with each other on the

23  phone, let's say, between 2020 and his death in

24  2023?

25       A    Like twice before he went to jail the last

Amber Snetsinger                                    October 24, 2024

Page 28

1   time.  And then when he got out, it was probably,

2   like, once a week kind of for a good two months.

3        Q     Okay.  Okay.

4              And do you know -- did your daughter have a

5   cell phone in April of 2023?

6        A     She does not have a cell phone.

7        Q     That's got to be hard to keep a teenager

8   away from a cell phone.

9        A     It's hard.

10       Q     Did you ever provide any type of financial

11  support to Johnny?

12       A     In the beginning -- like, when she was

13  first born I put money on his books once or twice,

14  but it wasn't big.  Just ...

15       Q     Okay.

16       A     It was support.

17       Q     As far as you're aware, did Johnny use any

18  type of drugs at any time during V.L.'s lifetime?

19       A     Not that I know.

20       Q     Do you know if Johnny had ever been

21  diagnosed with any mental health issues in his life?

22       A     I don't know.

23       Q     So during V.L.'s deposition she mentioned

24  seeing a therapist outside of school.  I think she

25  said when she was in seventh grade.  Does that sound

Amber Snetsinger                                    October 24, 2024

Page 29

1    accurate?

2        A    Yeah.  It was right after.

3        Q    I'm sorry.  I didn't mean to cut you off.

4    You said it was after?

5        A    Yeah.  Right after he had died.

6        Q    Do you know how many times she saw that

7    therapist?

8        A    They would meet, like, twice a week, and

9    she didn't see her very long.  So maybe a month.  So

10   like eight times, I guess.

11       Q    What's the name of that therapist?

12       A    I don't remember her last name, but her

13   first name is Dana.

14       Q    Where was she seeing her?

15       A    At the clinic here by the WIC office in

16   town.  It's a really small town.  So like the main

17   place.

18       Q    Do you know the name of the clinic?

19       A    Not offhand.  I can go look it up, if you

20   want.

21       Q    Maybe before we close the record if we take

22   a quick break, but I can also speak with your

23   attorney about supplementing discovery too.  It's

24   not a huge deal.

25            Other than that therapist after -- so

Amber Snetsinger                                    October 24, 2024

Page 30

1   approximately eight times or so after the incident,

2   has V.L. seen anybody else about her father?

3       A    No.

4       Q    Okay.

5            Did she ever see any type of school

6   counselors since her father's death?

7       A    Yes.  The school counselor was the one that

8   referred her to the outside school counselor.

9       Q    And other than that, I guess it would have

10  been one visit with the school counselor to get the

11  referral --

12      A    Probably a few times before.  I'm not very,

13  like -- I don't know for sure exactly.  But I'm

14  pretty sure.

15      Q    Do you know the name of the school

16  counselor that she saw?

17      A    Tara.  I don't know her last name offhand

18  but ...

19      Q    Does she work at that middle school, like

20  physically in person at the middle school?

21      A    Yes.  She's a school guidance counselor.

22      Q    Okay.

23           Have you noticed any changes in V.L.

24  schoolwise since her father's passing?

25      A    Yes.

Amber Snetsinger                                    October 24, 2024

Page 31

1       Q     What changes have you noticed?

2       A     She's -- she's just -- she's not -- her

3   grades have gone down.  Her social life has pretty

4   much ended.  She's been withdrawn.  She's going

5   through a lot you could tell.  She only lets me in

6   on so much.

7             But from what I've observed, her grades,

8   her behavior, her just whole demeanor just -- she's

9   not the same happy-go-lucky V.L.  I mean V.L.

10      Q     That's okay.  So you're saying more

11  withdrawn?

12      A     Yes.

13      Q     Anything else you noticed outside of school

14  behavior-wise since her father's passing?

15      A     The same.  She's just shut down and more --

16  she's separated herself from our family unit, if

17  that makes sense.  She's -- she's, like, detached

18  kind of, if that makes sense.

19      Q     Have you ever -- other than the times,

20  obviously, she went and saw the therapist and the

21  school counselor, have you ever tried to take her or

22  make an appointment somewhere else for her to get

23  additional therapy or counseling?

24      A     Yeah.  We have looked -- I've looked into

25  it, but it takes a lot longer out here, and you have

Amber Snetsinger                                    October 24, 2024

Page 32

1    to get referral after referral, and the whole

2    medical coverage part is a process.  So ...

3        Q    Okay.  Has she received -- I'm sorry.  Go

4    ahead.

5        A    No.  Go ahead.

6        Q    I'm trying not to cut you off.  I know

7    there's a weird kind of lag on my end, I think.

8             But has she received any type of diagnosis

9    as a result of any of these therapy sessions or

10   counseling sessions?

11       A    No.

12       Q    Okay.

13            That's all the questions I have for you,

14   Ms. Snetsinger.

15       A    Okay.

16            MS. LEAP:  I don't have any questions.

17            MS. ANDERSEN:  Okay.

18            Kathleen, do you need anything else?

19            THE COURT REPORTER:  Does anyone want to

20   order a copy?

21            MS. LEAP:  Not at this time.

22            THE VIDEOGRAPHER:  This concludes today's

23   deposition.  The time is 11:11 a.m.  The date is

24   October 24th, 2024, and we're off the record.

25            (The deposition concluded at 11:11 a.m.)

Amber Snetsinger                                         October 24, 2024

Page 33

1              (END OF PROCEEDINGS.  DECLARATION UNDER

2     PENALTY OF PERJURY ON THE FOLLOWING PAGE HEREOF.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Amber Snetsinger                                    October 24, 2024

Page 34

```
 1            I, AMBER SNETSINGER, do hereby declare

 2    under penalty of perjury that I have read the

 3    foregoing transcript; that I have made any

 4    corrections as appear noted in ink initialed by me

 5    or, in the alternative, changes have been noted to

 6    an electronic version and conveyed; that my

 7    testimony as contained herein, as corrected, is true

 8    and correct.

 9            EXECUTED THIS _____ day of _____.

10    20___, at _____, _____.
                     (City)              (State)

11

12                           _____

                             AMBER SNETSINGER

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Amber Snetsinger                                    October 24, 2024

Page 35

1                        ERRATA SHEET

2                     (Correction List)

3      PAGE      LINE                  CHANGE

4      _____     _____     _____

5      _____     _____     _____

6      _____     _____     _____

7      _____     _____     _____

8      _____     _____     _____

9      _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____

25     _____     _____     _____

Amber Snetsinger                                    October 24, 2024

Page 36

1                        CERTIFICATE OF

2            CALIFORNIA CERTIFIED SHORTHAND REPORTER

3

4            I, Kathleen S. McLaughlin, a Certified

5    Shorthand Reporter in the State of California,

6    Certificate No. 5845, do hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, Certificate

9    No. 5845 issued by the Court Reporters Board of

10   California and which is in full force and effect.

11   (Business & Professions Section 8016).

12           I am not financially interested in this

13   action and am not a relative or employee of any

14   attorney of the parties or of any of the parties.

15   (California Code of Civil Procedure Section

16   2025.320[a]).

17           I am authorized to administer oaths or

18   affirmations pursuant to California Code of Civil

19   Procedure Section 2093(b) and, prior to being

20   examined, the deponent was first placed under oath

21   or affirmation by me.  (California Code of Civil

22   Procedure Sections 2025.320, 2025.540[a]).

23           I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition, sworn statement or

Amber Snetsinger                                    October 24, 2024

Page 37

1   declaration, and the foregoing transcript is a true

2   record of the testimony given.  (California Code of

3   Civil Procedure Section 2025.540[a]).

4           The foregoing proceedings were taken

5   before me at the time herein set forth.  Every

6   attempt was made to ensure a verbatim record of the

7   remote proceedings, which inherently have technical

8   interference, audio interruptions and transmission

9   issues.

10          Such transcript was created by me using

11  machine shorthand which was thereafter transcribed

12  under my direction.

13          Reading and signing was requested.

14          IN WITNESS WHEREOF, I have this date

15  subscribed my name.  My certificate to the original

16  may be attached to certified copies electronically.

17

18  Dated: January 10, 2025      _____

                                 KATHLEEN S. McLAUGHLIN

19                               CSR No. 5845

20

21

22

23

24

25

Amber Snetsinger                                    October 24, 2024

Page 38

1                      CERTIFICATE OF

2        CALIFORNIA CERTIFIED SHORTHAND REPORTER

3           (California Code of Civil Procedure

4                  Section 2025.520[e])

5

6           I, Kathleen S. McLaughlin, a Certified

7    Shorthand Reporter in the State of California,

8    Certificate No. 5845, do hereby certify:

9           I am the deposition officer that

10   stenographically recorded the testimony in the

11   foregoing proceeding.

12          Written notice pursuant to California Code

13   of Civil Procedure Section 2025.520[a] having been

14   sent, the deponent took the following action within

15   the allotted period with respect to the transcript

16   of the proceeding:

17          (  )   In person, at the office of the

18   deposition officer, made the changes set forth on

19   the original of the transcript and signed the

20   transcript.  The parties attending the proceeding

21   have been notified of said changes.

22          (  )   Approved the transcript by signing

23   it.

24          (  )   Declined to approve the transcript by

25   not signing it.

Amber Snetsinger                                    October 24, 2024

Page 39

1              (  )  By means of a signed letter, made the

2      changes and approved or declined to approve the

3      transcript as set forth therein.  Said letter has

4      been attached to the original transcript and copies

5      thereof mailed to all parties attending the

6      proceeding.

7              (  )  Failed to approve the transcript

8      within the allotted time period.

9

10     Dated: January 10, 2025      *Kathleen S. McLaughlin*

                                    KATHLEEN S. McLAUGHLIN

11                                  CSR No. 5845

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

ability
10:7
able
8:25
accurate
12:10 16:5 29:1
action
36:13 38:14
ad
1:6,9 2:6,9 3:5,16
additional
31:23
administer
36:17
affect
8:24
affirmation
36:21
affirmations
36:18
age
18:3
ago
20:6,7
ahead
9:22,25 10:1 19:13
    32:4,5
ahold
17:10,13
AKARAGIAN
3:20
al
6:7
alcohol
10:6
allotted
38:15 39:8
allow
9:17
alternative
34:5
Amber
1:9,18 2:9,20 3:5 6:5
    7:4,16 11:22 34:1
    34:12
Andersen
4:6 5:4 6:24,24 7:11

11:2,5,6 27:20
    32:17
Angeles
3:22 4:11
answer
8:3,15 9:19,25
anybody
10:22 11:17 30:2
anytime
21:3
apartment
18:16 19:22
appear
34:4
appearances
6:19
appeared
3:3
appointment
31:22
appropriate
8:22
approve
38:24 39:2,7
approved
38:22 39:2
approximately
18:3 21:21 30:1
April
11:19 22:22 28:5
asking
8:1
assisting
17:17
attached
37:16 39:4
attempt
14:8 19:3 37:6
attending
38:20 39:5
attorney
9:15 24:3 29:23
    36:14
attorneys
8:25 9:16,17 10:20
audio
37:8
August

12:15,17
authorized
36:17
aware
15:18 28:17
A-M-B-E-R
7:16
a.m
2:22 6:2,11 32:23,25

**B**

baby
18:2
back
27:12,12
bad
20:10
band
17:20
basically
25:23 27:1
beginning
2:21 9:5 10:18 25:5
    28:12
begins
6:5
behalf
2:21 6:20 7:5
behavior
31:8
behavior-wise
31:14
best
8:2,16 9:10 10:4,8
    27:21
better
12:21 26:23
big
28:14
bills
17:10
biological
13:19
biologically
13:10
birth
11:24 13:21,25 14:3
    14:9
Bissegger

4:18 6:15
Blvd
3:10,21
Board
36:9
body
25:10
books
28:13
boring
20:19
born
14:2 15:4 16:10,11
    25:19 28:13
Brad
4:18 6:15
break
9:21,23 10:1 29:22
bunch
27:12
Burbank
3:10
Business
36:11

**C**

C
3:1 4:1
California
1:2 2:2,25 3:12,22
    4:11 6:8 12:25 13:2
    18:24 23:3 36:2,5,8
    36:10,15,18,21 37:2
    38:2,3,7,12
call
20:22 25:4 26:13,18
Called
7:5
calls
10:21
cam
25:10
Campbell
1:11 2:11 3:17 6:23
    16:1,8 24:17
Carolyn
1:11 2:11 3:17 6:23
    16:1,7 24:17
case

Amber Snetsinger

October 24, 2024

1:4 2:4 6:8 10:20
**cashier**
16:22
**caution**
8:23
**cell**
28:5,6,8
**Central**
1:2 2:2 6:8
**certificate**
13:21 14:1,4,9 36:1,6
36:8 37:15 38:1,8
**certified**
1:22 2:23 36:2,4,7
37:16 38:2,6
**certify**
36:6 38:8
**change**
21:4 23:17 35:3
**changes**
8:22,24 9:1 30:23
31:1 34:5 38:18,21
39:2
**charges**
21:25 22:1
**chat**
18:21 19:17 25:16
**Cheaper**
12:21
**check**
22:19
**child**
14:19
**children**
13:10 15:18
**City**
2:24 34:10
**Civil**
36:15,18,21 37:3
38:3,13
**clarification**
11:1 27:16
**clinic**
29:15,18
**clips**
25:2
**close**
26:7 29:21

**Code**
36:15,18,21 37:2
38:3,12
**comment**
9:1
**communicate**
22:17
**communicating**
19:18
**communication**
20:9
**communications**
10:19 26:22
**complete**
8:20
**completely**
21:1 23:18
**concluded**
32:25
**concludes**
32:22
**CONDUCTED**
1:20
**conference**
1:20 3:3
**connection**
24:21
**contained**
34:7
**continue**
8:6 15:3
**continued**
3:25 4:2
**conversation**
26:10
**conveyed**
34:6
**convicted**
21:18
**convictions**
21:25 22:1
**copies**
37:16 39:4
**copy**
32:20
**correct**
13:8,11 15:13 16:18
22:23 25:3 26:1

34:8
**corrected**
34:7
**Correction**
35:2
**corrections**
34:4
**counsel**
6:18
**counseling**
31:23 32:10
**counselor**
30:7,8,10,16,21
31:21
**counselors**
30:6
**count**
22:14
**county**
1:14 2:14,25 6:7
11:18 22:6,9
**course**
21:8
**court**
1:1 2:1 6:8,16 7:1,22
8:4 14:8,18 32:19
36:9
**coverage**
32:2
**COVID**
12:12
**created**
37:10
**credibility**
8:25
**critical**
25:6
**CSR**
37:19 39:11
**currently**
12:1 13:5 15:21
16:19
**custody**
19:2,18,25 21:10
22:5,9,13,17,20
**cut**
29:3 32:6

------

**D**

**D**
3:19 5:1
**dad**
16:2,3 27:1
**DALE**
3:9
**Dana**
29:13
**date**
11:24 26:6,18 32:23
37:14
**Dated**
37:18 39:10
**daughter**
15:11 16:13 17:1,6
17:23 18:15,19
19:23 20:22 23:2,3
26:14 27:4 28:4
**day**
34:9
**Daylight**
6:11
**deal**
29:24
**death**
27:23 30:6
**deceased**
1:8,10 2:8,10 3:6,17
**declaration**
33:1 37:1
**declare**
34:1
**declined**
38:24 39:2
**deem**
8:22
**defendant**
2:21 4:4 6:14 7:6
**defendants**
1:15 2:15 6:25
**demeanor**
31:8
**deponent**
36:20 38:14
**deposition**
1:18 2:20 6:5,12 7:7
7:19,25,25 9:5
10:11 11:8,15 17:23

28:23 32:23,25
36:23,25 38:9,18
**detached**
31:17
**diagnosed**
28:21
**diagnosis**
32:8
**diapers**
17:9,11
**died**
26:8 29:5
**Diego**
2:25
**difference**
9:11
**different**
13:15 17:24 25:2
26:15,24
**difficult**
8:14
**direction**
37:12
**directions**
27:2
**disclose**
10:23
**discovery**
11:3,7,11 29:23
**District**
1:1,2 2:1,2 6:8,8
**doing**
20:16,16
**drugs**
10:6 28:18
**duly**
7:6 36:7

_____
E
**E**
3:1,1 4:1,1 5:1
**early**
10:17
**easy**
23:17
**education**
21:12,15
**effect**
36:10

**eight**
29:10 30:1
**electronic**
34:6
**electronically**
37:16
**Eleventh**
21:13
**Ellrod**
4:8 6:13
**Elsinore**
18:17
**email**
10:14 26:4
**emails**
10:21
**employed**
16:19
**employee**
36:13
**ended**
31:4
**ensure**
37:6
**entitled**
9:10
**ERRATA**
35:1
**ESQ**
3:8,19 4:6
**estimate**
9:10,12 27:21
**et**
6:7
**eventually**
20:18
**exact**
27:17
**exactly**
16:9 30:13
**Examination**
5:4 7:10
**Examinations**
5:2
**examined**
7:7 36:20
**exchange**
26:17

**excited**
26:11,25
**EXECUTED**
34:9
**EXHIBITS**
5:7
**extent**
24:23

_____
F
**Failed**
39:7
**family**
23:9,11 31:16
**far**
20:2 28:17
**father**
13:15,19 30:2
**father's**
30:6,24 31:14
**feel**
20:10
**felony**
21:18 22:1
**Figueroa**
4:9
**financial**
16:25 28:10
**financially**
36:12
**fine**
21:7
**finish**
8:15,17
**first**
7:6 18:12 20:23 23:5
25:19 28:13 29:13
36:20
**five**
22:15
**Floor**
4:10
**following**
33:2 38:14
**follows**
7:8
**force**
36:10
**foregoing**

34:3 36:25 37:1,4
38:11
**forgot**
10:15
**forth**
37:5 38:18 39:3
**four**
13:7
**fresh**
12:21
**full**
7:14 36:10

_____
G
**GALIPO**
3:9
**give**
10:7 27:21
**given**
37:2
**giving**
8:6 10:4
**glad**
10:17
**go**
7:24 9:22,25 10:1
13:2 14:8 15:15
19:13 22:5 23:10
29:19 32:3,5
**going**
20:23 31:4
**good**
7:12 27:1 28:2
**gossip**
24:7,9
**gotten**
18:11
**grade**
21:13 28:25
**grades**
31:3,7
**Great**
7:18
**ground**
7:24
**Guardian**
1:6,9 2:6,9 3:5,16
**guess**
9:8,12 27:6 29:10

30:9
**guidance**
30:21
**guys**
18:24

———————————
**H**
———————————
**half**
16:24
**handful**
27:8
**happen**
19:15
**happened**
10:17,21 14:7 19:9
**happy-go-lucky**
31:9
**hard**
20:21 28:7,9
**head**
8:7,8
**health**
28:21
**hear**
24:2,5
**heard**
23:24 24:22
**helicopter**
25:10
**help**
17:10
**helped**
17:20
**HEREOF**
33:2
**highest**
21:12,14
**Hills**
3:12
**hope**
7:12
**hours**
10:7
**house**
15:8
**huge**
29:24

———————————
**I**
———————————

**IDENTIFICATION**
5:7
**impair**
10:7
**incarcerated**
14:2 21:21
**incarcerations**
21:22
**incident**
11:19 24:21 25:2,6
    25:11,15 26:6,19
    30:1
**inclusive**
1:14 2:14
**Index**
5:2
**individually**
1:7,9,11 2:7,9,11 3:5
    3:16,17
**inherently**
37:7
**initialed**
34:4
**initials**
15:16
**ink**
34:4
**instrument**
17:21
**interested**
36:12
**interference**
37:8
**interruptions**
37:8
**interrupts**
27:15
**issued**
36:9
**issues**
28:21 37:9

———————————
**J**
———————————
**J**
3:8
**jail**
15:5 17:18,20 18:11
    19:1 22:6,9 27:9,10
    27:25

**January**
37:18 39:10
**job**
16:21 23:6
**jobs**
20:17 21:9
**Johnny**
1:8,10 2:8,10 3:6,17
    6:6 11:18 13:20
    14:16,21 15:8,12
    17:1,6,17,22 18:1,4
    19:4 21:9,21 22:17
    25:14 26:14 28:11
    28:17,20
**Johnny's**
15:19,25 21:14 23:20

———————————
**K**
———————————
**K**
3:9
**Kass**
4:7 6:13
**Kathleen**
1:21 2:23 6:16 32:18
    36:4 37:18 38:6
    39:10
**Kayleigh**
4:6 6:24
**kayleigh.andersen...**
4:13
**keep**
28:7
**kids**
12:15 13:6,7
**kind**
22:18 27:3 28:2
    31:18 32:7
**know**
8:8 9:22 10:19 15:25
    16:1 18:14,23 19:3
    19:14,21,24 20:2,21
    21:9,11,14,20,20,23
    21:24 22:3 23:22,24
    23:24 24:7,8,10,12
    24:13 25:10 26:22
    27:3,5,17 28:4,19
    28:20,22 29:6,18
    30:13,15,17 32:6
**knowledge**

24:24
**Kristina**
20:9
**Kristine**
1:6 2:6 3:16 17:14,16
    20:3,5,9,11,12,14
    23:4 24:14

———————————
**L**
———————————
**lag**
32:7
**Lake**
18:17
**LAW**
3:9
**Lawrence**
3:19 6:22
**Leap**
3:8 6:20,20 10:25
    11:3 32:16,21
**Leap's**
10:22
**legal**
1:24 6:16,17 14:11
    14:15
**letter**
39:1,3
**let's**
17:5 25:17 27:23
**level**
21:12,14
**Leyva**
3:16
**License**
1:22
**life**
11:22 17:2 28:21
    31:3
**lifetime**
21:22 22:2 28:18
**LINE**
35:3
**List**
35:2
**Litem**
1:6,9 2:6,9 3:5,16
**live**
12:1 13:5 15:7
**lived**

12:5 19:24
**living**
12:21,24,25 13:7
18:15,24 19:21
22:23
**Llamas**
1:8,10 2:8,10 3:6,16
3:17 6:6 11:19
13:20
**Llamas-Leyva**
1:7 2:7
**LLP**
3:20 4:8 6:13
**lmarks@garolaw.c...**
3:24
**located**
2:24
**long**
12:5 16:23 29:9
**longer**
31:25
**look**
29:19
**looked**
31:24,24
**looking**
19:5
**Los**
3:22 4:11
**lot**
27:18 31:5,25
**Love's**
16:22

**M**
**machine**
37:11
**Magna**
1:24 6:15,17
**mailed**
39:5
**main**
29:16
**majority**
19:1 23:9
**man**
12:4
**Mangum**
12:2 13:3

**Manning**
4:7 6:13
**March**
11:25
**MARDIROSSIAN**
3:20
**MARKED**
5:7
**Marks**
3:19 6:22,22
**married**
14:21 15:21,23
**matter**
6:6
**McLAUGHLIN**
1:21 2:23 6:17 36:4
37:18 38:6 39:10
**mean**
16:13 17:22 23:15
29:3 31:9
**means**
39:1
**medical**
32:2
**meet**
26:11 29:8
**meeting**
18:12
**meet-and-greet**
19:7
**memory**
17:24
**mental**
28:21
**mentioned**
19:22 28:23
**messaged**
20:6
**messages**
26:17
**method**
26:5
**middle**
30:19,20
**minor**
1:6 2:6
**Mischelle**
20:1

**mom**
16:1
**money**
17:6,9,17 28:13
**month**
12:16 18:7,9,14
19:24 26:7 29:9
**months**
18:5,19 25:24 27:6
28:2
**morning**
7:12
**mother**
17:25 21:3
**move**
12:19 20:18
**moved**
12:9,13
**M-A-N-G-U-M**
12:4

**N**
**N**
3:1 4:1 5:1
**name**
7:14,16 14:9 20:23
21:4 24:11,12,13
29:11,12,13,18
30:15,17 37:15
**named**
23:22
**names**
11:21 15:25
**nature**
21:24,25
**need**
9:21 10:22 24:3
32:18
**needs**
20:15
**nervous**
26:25 27:1,2
**never**
19:5,9
**nodding**
8:7
**Normal**
20:19
**noted**

34:4,5
**notice**
38:12
**noticed**
30:23 31:1,13
**notified**
38:21
**number**
27:18

**O**
**oath**
9:4 36:20
**oaths**
36:17
**objections**
9:16,18
**observed**
31:7
**obviously**
18:25 31:20
**October**
1:19 2:22 6:1,10
32:24
**offer**
10:25
**offhand**
29:19 30:17
**office**
10:22 11:18 29:15
38:17
**officer**
7:7 36:23 38:9,18
**OFFICES**
3:9
**Oh**
20:25 24:7
**okay**
8:13,18,19 9:14,19
9:20 10:1,2,24 11:5
11:10,13 12:8,13,18
12:23 13:13,17,19
13:24 14:5,14,23
15:2,6 16:5,15,17
16:21 17:4 18:3,6,8
19:11,16 21:1,6
22:16,21,25 23:16
23:22 24:1,25 25:13
25:20,22 26:16

Amber Snetsinger                                    October 24, 2024

27:13 28:3,3,15
30:4,22 31:10 32:3
32:12,15,17
**Oklahoma**
12:2,14,20 13:3
22:23
**old**
18:5,20 25:24 27:6
**oldest**
13:17
**once**
8:20 28:2,13
**one-month**
18:18
**opportunity**
8:21
**opposed**
8:7
**order**
32:20
**original**
37:15 38:19 39:4
**outside**
28:24 30:8 31:13

**P**

**P**
3:1,1 4:1,1
**Pacific**
6:11
**Page**
5:3 33:2 35:3
**paper**
10:14
**parental**
14:12
**parents**
15:25
**part**
32:2
**participated**
26:14
**parties**
3:3 6:18 36:14,14
38:20 39:5
**passed**
16:3
**passing**
23:20 25:25 27:7

30:24 31:14
**pay**
17:10,11
**penalty**
9:6 33:2 34:2
**pending**
9:24
**people**
24:6,7
**period**
18:19 38:15 39:8
**perjury**
9:6 33:2 34:2
**Perris**
13:1,2
**person**
16:18 18:1,4,20,25
25:17,25 30:20
38:17
**personally**
23:12
**phone**
10:21 20:13 26:4,13
26:18 27:5,23 28:5
28:6,8
**physically**
25:16,17 30:20
**place**
29:17
**placed**
36:20
**places**
19:24
**plaintiff**
6:21,22,23 13:14
**Plaintiffs**
1:12 2:12 3:5,16
**planning**
26:12,23
**plans**
23:10
**please**
6:18 7:14 9:17,22
**point**
10:25
**police**
25:4
**pregnant**

14:25
**preparation**
10:10 11:8,15
**present**
4:16 14:3
**pretty**
15:5 30:14 31:3
**prevent**
10:3
**prior**
25:14 26:6 36:19
**Priscilla**
23:22 24:15,18
**prison**
22:6,10
**probably**
12:7,15 16:10 17:24
21:3 22:14 25:18
26:7 27:8 28:1
30:12
**Procedure**
36:15,19,22 37:3
38:3,13
**proceed**
9:19
**proceeding**
7:25 38:11,16,20
39:6
**proceedings**
14:11,15,19 33:1
37:4,7
**process**
32:2
**Professions**
36:11
**prompted**
12:19
**pronounce**
7:13
**provide**
8:2 28:10
**publicly**
25:7
**pursuant**
36:18 38:12
**put**
28:13

**Q**

**qualified**
36:7
**question**
8:15,18 9:24,25
14:18
**questions**
8:2 9:9,17 32:13,16
**question-and-answ...**
8:1
**quick**
29:22

**R**

**R**
3:1 4:1
**Raju**
23:23
**Ramirez**
4:8 6:13
**Ray**
1:8,10 2:8,10 3:6,17
6:6 11:18
**read**
34:2
**Reading**
37:13
**real**
21:4 26:7
**really**
19:9,15 20:18 22:3
24:12 27:1 29:16
**reason**
10:3 12:19 13:25
18:9,23
**recall**
26:9,21,21
**receive**
16:25 17:6
**received**
32:3,8
**record**
6:5 7:15 9:18 27:16
29:21 32:24 37:2,6
**recorded**
36:24 38:10
**refer**
20:23
**referral**
30:11 32:1,1

referred
30:8
referring
17:14
reflect
8:9
related
14:19
relationship
14:24 15:3
relative
36:13
released
14:6 25:7
remember
16:2,9 20:10 21:16
29:12
remote
1:18 2:20 37:7
remotely
2:22
REPORTED
1:21
reporter
1:22 2:24 6:16 7:2
8:4 27:15 32:19
36:2,5,8 38:2,7
Reporters
36:9
represent
6:19
request
6:12
requested
37:13
requests
11:11
respect
14:12,16 38:15
response
8:17 9:9
responses
8:7 11:4,7,11
result
32:9
review
8:21 10:10,13 11:7
reviewed

11:14
right
10:16 16:10 29:2,5
rights
14:12
Riverside
1:14 2:14 6:7 11:18
rules
7:24
running
23:16

**S**

s
1:21 2:23 3:1 4:1,9
11:10 17:23 21:22
22:2 28:18,23 36:4
37:18 38:6 39:10
San
2:25
saw
18:4 25:14 27:6 29:6
30:16 31:20
saying
24:7 31:10
school
12:16 28:24 30:5,7,8
30:10,15,19,20,21
31:13,21
schoolwise
30:24
Section
36:11,15,19 37:3
38:4,13
Sections
36:22
see
18:1,20,25 23:12
25:25 29:9 30:5
seeing
28:24 29:14
seen
25:18 30:2
send
17:17
sense
8:11 9:2 31:17,18
sent
17:9 38:14

separate
21:22
separated
31:16
September
12:17
Services
1:24 6:16,17
session
8:1
sessions
32:9,10
set
19:3,7 27:2 37:5
38:18 39:3
seventh
28:25
shaking
8:8
Shannon
3:8 6:20
SHEET
35:1
Sheriff's
11:18
shorthand
1:22 2:23 36:2,5,7
37:11 38:2,7
showed
25:2
shut
31:15
sibling
15:11
Sietsinger
1:9 2:9
signed
38:19 39:1
signing
37:13 38:22,25
sister
17:10,13 18:17 20:2
sister's
19:8
sleap@galipolaw.c...
3:14
small
29:16

Snetsinger
1:18 2:21 3:5 6:6 7:4
7:12,16,17 11:22
32:14 34:1,12
social
31:3
sorry
10:15 16:16 19:13,14
29:3 32:3
sound
12:10 28:25
speak
20:14 22:8,12 24:14
29:22
speaking
24:10
specifically
27:18
specifics
22:3
speculate
9:9
spell
7:14 12:3
spend
23:8,10
spent
18:7,9
spoke
16:7,12 20:4,13 26:3
26:5 27:5,22
spoken
11:17 24:17
start
8:15 12:22 25:17
started
27:10
state
2:25 6:18 7:14 9:17
22:6,9 34:10 36:5,8
38:7
statement
36:25
States
1:1 2:1 6:7
stay
19:8
stayed

Amber Snetsinger                                              October 24, 2024

19:23 20:1
**staying**
18:15
**stenographically**
36:24 38:10
**stop**
10:16
**stopped**
27:11
**Store**
16:22
**straight**
13:2
**street**
4:9 18:16 24:6
**stuff**
17:21 20:19,20 22:19
**subscribed**
37:15
**substance**
20:8 26:9,22
**substantive**
8:24
**successor-in-interest**
1:7,10 2:7,10 3:6,17
**Suite**
3:11
**summer**
23:9,13,19 26:12
**supplementing**
29:23
**support**
14:19 17:1 28:11,16
**sure**
16:17 30:13,14
**swear**
7:2
**sworn**
7:6 36:25
**system**
14:8
**S-N-E-T-S-I-N-G-...**
7:17
**S.L**
1:6 2:6 3:16 6:23
15:16 21:2 23:4

——————— **T** ———————

**take**

8:4,5 9:23 10:1 29:21
31:21
**taken**
2:21 6:12 7:19 37:4
**takes**
31:25
**talk**
22:18 24:7 27:3
**talked**
20:7
**talking**
16:18 24:6 27:10
**Tara**
30:17
**technical**
37:7
**teenager**
28:7
**tell**
19:6 31:5
**testified**
7:7,22
**testimony**
10:4,8 23:2 34:7
36:24 37:2 38:10
**text**
26:4,17
**texts**
10:21
**Thank**
7:1,18 21:7
**therapist**
28:24 29:7,11,25
31:20
**therapy**
31:23 32:9
**thereof**
39:5
**thing**
8:16 14:4 17:8,12
**think**
12:6 23:2 28:24 32:7
**three**
12:6 13:15 20:7
22:15
**Thursday**
1:19 2:22 6:1
**time**

6:10,11 9:1,8,15,15
9:21 14:6,24 16:7
16:11 17:2 18:4,10
18:12,13,19,20,21
19:1,10,22 20:4
23:11 25:14,21,23
26:3,5,24 27:9,10
27:11 28:1,18 32:21
32:23 37:5 39:8
**times**
17:9,19,19 19:18
21:21 27:8,22 29:6
29:10 30:1,12 31:19
**today**
6:10 9:8,21 10:4,8,11
11:8
**today's**
32:22
**told**
20:18 27:2
**town**
29:16,16
**transcribed**
37:11
**transcript**
8:10,20,21 21:5
23:17 34:3 37:1,10
38:15,19,20,22,24
39:3,4,7
**transmission**
37:8
**Travel**
16:22
**Trester**
4:8 6:13
**trial**
9:1
**tried**
31:21
**true**
34:7 37:1
**try**
19:7
**trying**
32:6
**twice**
27:25 28:13 29:8
**two**

16:24 20:7 22:15
23:6 28:2
**type**
16:25 28:10,18 30:5
32:8

——————— **U** ———————

**uh-huh's**
8:9
**uh-uh's**
8:8
**understand**
9:4,11 13:7 15:10
16:3 17:22
**understandable**
21:1 23:18
**understanding**
17:16 23:1 24:20
**Unintelligible**
19:12 27:14
**unit**
31:16
**United**
1:1 2:1 6:7
**use**
28:17
**usually**
17:11 20:1

——————— **V** ———————

**vacation**
23:6,7
**verbally**
8:6,7 20:7
**verbatim**
37:6
**version**
34:6
**versus**
6:6
**video**
1:20 3:3 6:5 18:21
19:17 24:22 25:1,2
25:6,16
**videographer**
4:18 6:4,15 7:1 32:22
**videos**
25:9
**videotaped**

1:18 2:20
**visit**
19:3 22:5 23:4 30:10
**visitation**
14:16
**visited**
25:19
**Vista**
2:24
**vs**
1:13 2:13
**V.L**
1:8 2:8 3:5 6:21
  11:10 13:14,17,22
  14:12,16,19,25 15:3
  15:7,11 16:13 17:1
  17:7,17,23 18:1
  19:4,19 20:15,15,16
  20:24 21:5,22 22:2
  22:16,16 23:12,15
  28:18,23 30:2,23
  31:9,9

**W**
**wait**
8:17
**want**
9:8 10:19 16:17
  20:22 29:20 32:19
**wants**
20:17
**wasn't**
17:8,11 28:14
**watch**
25:1
**watched**
24:22 25:9
**way**
25:24 27:7
**week**
20:6 28:2 29:8
**weeks**
20:7 23:6
**weird**
32:7
**went**
18:7 19:5 23:3,5,8
  27:9,10,25 31:20
**we'll**

20:24 21:4
**we're**
16:18 20:23 32:24
**WHEREOF**
37:14
**WIC**
29:15
**Wilshire**
3:21
**withdrawn**
31:4,11
**witness**
7:2,5 27:17 37:14
**woman**
23:22
**Woodland**
3:12
**work**
30:19
**worked**
16:23
**Written**
38:12
**www.MagnaLS.com**
1:25

**X**
**X**
5:1

**Y**
**yeah**
12:4,17 17:18,19
  18:2,16 19:14 23:11
  23:15 25:4,5,21
  26:20 29:2,5 31:24
**year**
16:10
**years**
12:6 16:24 21:17
**yesterday**
10:14 20:21 21:2
  23:2
**YouTube**
24:23 25:1,12

**Z**
**Zoom**
1:20 3:3 6:12 8:14

**1**
**1-10**
1:14 2:14
**10**
21:17 37:18 39:10
**10:43**
2:22 6:2,11
**11**
11:25 18:5,19 25:24
  27:6
**11:11**
32:23,25
**13**
17:24
**14**
11:19
**15th**
4:10
**1987**
11:25

**2**
**20**
34:10
**2011**
14:7
**2020**
27:23
**2021**
12:10
**2022**
12:11,13
**2023**
11:19 22:22 23:19
  27:24 28:5
**2024**
1:19 2:22 6:1,10
  32:24
**2025**
37:18 39:10
**2025.320**
36:22
**2025.320[a**
36:16
**2025.520[a**
38:13
**2025.520[e**
38:4

**2025.540[a**
36:22 37:3
**2093(b)**
36:19
**213.624.6900**
4:12
**21800**
3:10
**24**
1:19 2:22 6:1 10:7
**24th**
6:10 32:24

**3**
**310**
3:11
**323.653.6311**
3:23

**5**
**5:24-cv-00249-CA...**
1:4 2:4 6:9
**5845**
1:22 2:24 36:6,9
  37:19 38:8 39:11

**6**
**6311**
3:21

**7**
**7**
5:4

**8**
**801**
4:9
**8016**
36:11
**818.347.3333**
3:13
**866-624-6221**
1:24

**9**
**90017-3012**
4:11
**90048-5001**
3:22

3:22
**92367-6479**
3:12

# EXHIBIT 20

# EXHIBIT 20

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   S.L., a minor by and through the      )
     Guardian Ad Litem Kristine Llamas     )
 5   Leyva, individually and as successor- )
     in-interest to JOHNNY RAY LLAMAS,     )
 6   deceased; V.L., by and through the    )
     Guardian Ad Litem Amber Snetsinger,   )
 7   individually and as successor-in      )
     interest to JOHNNY RAY LLAMAS,        )
 8   deceased; and CAROLYN CAMPBELL,       )
     individually,                         )
 9                                         )
                     Plaintiffs,           )
10                                         )
                     vs.                   ) Case No.
11                                         ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10,   )
12   inclusive,                            )
                                           )
13                   Defendants.           )
     _____)

14

15

16        REMOTE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                       SHAWN HUBACHECK

18                   TUESDAY, DECEMBER 18, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116557
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 2

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   S.L., a minor by and through the    )
     Guardian Ad Litem Kristine Llamas   )
 5   Leyva, individually and as successor-)
     in-interest to JOHNNY RAY LLAMAS,   )
 6   deceased; V.L., by and through the  )
     Guardian Ad Litem Amber Snetsinger, )
 7   individually and as successor-in    )
     interest to JOHNNY RAY LLAMAS,      )
 8   deceased; and CAROLYN CAMPBELL,     )
     individually,                       )
 9                                       )
                  Plaintiffs,            )
10                                       )
                  vs.                    ) Case No.
11                                       ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10, )
12   inclusive,                          )
                                         )
13                Defendants.            )
     _____)

14

15

16        The remote videotaped videoconference deposition of

17   SHAWN HUBACHECK, taken on behalf of the Plaintiffs, beginning

18   at 1:14 p.m., and ending at 3:24 p.m., on Tuesday, December

19   18, 2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  SHANNON J. LEAP, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  sleap@galipolaw.com
 8

 9            MARDIROSSIAN AKARAGIAN, LLP
              BY:  ANTHONY BABAKHANIAN, ESQ.
10            BY:  GARO MARDIROSSIAN, ESQ.
              BY:  LAWRENCE D. MARKS, ESQ.
11            6311 Wilshire Boulevard
              Los Angeles, California 90048
12            Tel:  323-653-6311
              Fax:  323-651-5511
13            E-mail:  garo@garolaw.com
              E-mail:  lmarks@garolaw.com
14

15    For the Defendants:

16            MANNING & KASS ELLROD, RAMIREZ, TRESTER, LLP
              BY:  EUGENE P. RAMIREZ, ESQ.
17            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
18            Tel:  213-624-6900
              Fax:  213-624-6999
19            E-mail:  eugene.ramirez@manningkass.com

20

21

22

23

24

25
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

|  |  | **Page 4** |
|---|---|---|
| 1 | INDEX | |
| 2 | WITNESS: | PAGE |
| 3 | SHAWN HUBACHECK | |
| 4 | BY: MR. GALIPO | 7 |
| 5 | BY: MR. RAMIREZ | 76 |
| 6 | BY: MR. GALIPO | 77 |
| 7 | BY: MR. RAMIREZ | 79 |
| 8 | BY: MR. GALIPO | 80 |
| 9 | | |
| 10 | EXHIBITS | |
| 11 | MARKED FOR IDENTIFICATION | PAGE |
| 12 | Exhibit 1        Critical Incident Video | 61 |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 5

```
 1                        CALIFORNIA

 2                 WEDNESDAY, DECEMBER 18, 2024

 3                        1:14 P.M.

 4          VIDEOGRAPHER:  Good afternoon, everyone.

 5          We're going on video record at 1:14 p.m., Pacific

 6   time, and the date is December 18, 2024.

 7          This is Media 1, in the video-recorded deposition of

 8   Deputy Jimmie McGuire and Sergeant Shawn Hubacheck --

 9          MR. GALIPO:  Hold on a second.

10          The deposition is of who?

11          VIDEOGRAPHER:  I'm reading the caption right here.

12          It says the depositions of Deputy Jimmie McGuire and

13   Sergeant Shawn --

14          MR. RAMIREZ:  Hubacheck.

15          MR. GALIPO:  Right.  This is the sergeant's depo

16   today even though there is going to be another depo on

17   Friday.

18          Just for the record, we're just doing the sergeant

19   today.

20          VIDEOGRAPHER:  Gotcha.  Okay.

21          This is Media 1, in the -- for the video-recorded

22   deposition of Sergeant Shawn Hubacheck in the matter of S.L.,

23   a minor by and through the guardian Ad Litem Kristine Llamas,

24   et al. vs. The County of Riverside, and DOES 1-10, inclusive.

25          It's being filed under the United States District
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 6

1   Court, Central District of California, and the case number is

2   5:24-CV-00249-CAS-SP.

3         And this deposition is being taken via remote

4   virtual Zoom.  My name is Noah Suszcklewicz; I'm the legal

5   videographer.  And our court reporter today is Jinna G. Kim.

6   We're both here representing Huseby Global Litigation

7   Services.

8         Counsel, would you please identify yourself for the

9   record.

10        MR. GALIPO:  Yes.  Dale Galipo, on behalf of the

11  Plaintiffs.  And Shannon Leap, from my office, also on behalf

12  of the Plaintiffs.

13        MR. BABAKHANIAN:  Anthony Babakhanian, of

14  Mardirossian and Akaragian, for Plaintiffs, S.L. and Carolyn

15  Campbell.

16        MR. RAMIREZ:  Gene Ramirez, Manning Kass, here with

17  Sergeant Shawn Hubacheck and also representing Jimmie McGuire

18  and the County of Riverside.

19                   SHAWN HUBACHECK,

20  called as a witness on behalf of the Plaintiffs, having been

21  first duly sworn remotely via videoconference, was examined

22  and testified as follows:

23                   EXAMINATION

24  BY MR. GALIPO:

25        Q.   Okay.  Thank you.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 7

1              Can you please state your name and spell your last
2    name for the court reporter.
3        A.   Yes, sir.  Shawn Hubacheck, H-u-b-a-c-h-e-k.
4        Q.   Are you able to hear me okay so far?
5        A.   Yes, sir.
6        Q.   If you have any trouble hearing me at any time, will
7    you please let me know?
8        A.   Yes, sir.
9        Q.   I'm going to try to ask you clear questions that you
10   understand, but if I ask you a question and for some reason
11   you do not understand it, please let me know, and I'll try to
12   word it in a better way.
13             Okay?
14       A.   Yes, sir.
15       Q.   Also, I usually go about an hour and then take a
16   break each hour, but if you need to take a break for any
17   reason at any time before that, just tell me I need to take a
18   break, and we'll take a break at that time.
19             Understood?
20       A.   Yes, sir.
21       Q.   And I also promised your lawyer who I have a lot of
22   respect for that I would finish before 5:00 today.  So I'm
23   pretty good at keeping my word.
24             And I anticipate we'll be done before then.
25             Okay?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 8

```
 1            MR. RAMIREZ:  Thank you.  I can drive back to
 2    Pasadena for dinner.
 3            MR. GALIPO:  Yes.  I don't want you to get you in
 4    trouble with your wife, Gene.
 5            MR. RAMIREZ:  Thank you.
 6            MR. GALIPO:  You're welcome.
 7    BY MR. GALIPO:
 8        Q.   So have you reviewed any documents in preparation
 9    for the deposition?
10        A.   Yes, sir.
11        Q.   Can you please tell me what you've reviewed.
12        A.   I read a transcript of my interview, policies,
13    procedures, and that's pretty much it as far as documents.
14        Q.   Have you looked at any video footage of the
15    incident?
16        A.   Yes, sir.  I looked at my body-cam video, Lieutenant
17    Walsh's body-cam, and the video from the Aviation Unit.
18        Q.   When was the last time you looked at any of the
19    videos?
20        A.   Last night.
21        Q.   Do you have an estimate as to how many times
22    altogether since this incident occurred that you looked at
23    the videos?
24        A.   I would say five or less.
25        Q.   You gave an interview at some point after the
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 9

1    shooting?

2        A.    Yes, sir.

3        Q.    And when did you give your interview in relation to

4    the shooting?

5        A.    It was two days later on the 16th of April.

6        Q.    Were you given the opportunity to look at the videos

7    before you gave your interview?

8        A.    Yes, I was.

9        Q.    And did you have a representative present on your

10   behalf for the interview?

11       A.    Yes, I did.

12       Q.    Was that an attorney, if you recall?

13       A.    It was an attorney, yes.

14       Q.    And did you just give the one formal interview or

15   more than one?

16       A.    Just one.

17       Q.    Before we get into the incident, I just want to

18   learn a little bit about your background starting with

19   education.

20            I'm assuming you graduated from high school?

21       A.    Yes, sir.

22       Q.    What year did you do that in?

23       A.    1995.

24       Q.    And did you go to any college after high school?

25       A.    Yes, sir.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 10

1    Q.    Did you study anything in particular?

2    A.    Criminal Justice.

3    Q.    And did you end up getting a degree in that?

4    A.    No, sir.

5    Q.    Any military experience?

6    A.    None.

7    Q.    When did you first go to the police academy?

8    A.    In October of 1999.

9    Q.    What type of work did you do before going to the

10   academy?

11   A.    I worked for In-and-Out Burger.

12   Q.    It's one of my favorite drive-thrus.

13   A.    It's a good place to work for.

14   Q.    Yes.  How tall are you?

15   A.    Five-eleven.

16   Q.    What is your current weight, approximately?

17   A.    About 205.

18   Q.    Was that about your weight at the time of this

19   incident?

20   A.    It was probably pretty close, yes.

21   Q.    What was your assignment at the time of this

22   incident?

23   A.    I was assigned as a sergeant on Riverside County

24   Sheriff's Department Emergency Services Team which is our

25   SWAT Team.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 11

1      Q.    When did you first become a part of the SWAT Team?

2      A.    My first time was in 2008.

3      Q.    And during what period of time, were you assigned

4    there during that time frame?

5      A.    2008 until 2022.

6      Q.    And when were you promoted to sergeant?

7      A.    In 2022, February, 2022.

8      Q.    And the incident we're here to talk about happened

9    when?

10     A.    In April of 2023.

11     Q.    So a little over a year after you had been

12   promoted?

13     A.    Yes, sir.

14     Q.    Was your assignment -- I'll call it SWAT, but you

15   referred to it as a different name; is that correct?

16     A.    We call it the Emergency Services Team our EST, but

17   it's SWAT.

18     Q.    So if I either say SWAT or EST, you'll know what I'm

19   referring to?

20     A.    Yes, sir.

21     Q.    Was that your full-time assignment during this time

22   frame from 2008 to 2022, or did you have other assignments at

23   the same time?

24     A.    From 2008 to 2022 that was my full-time

25   assignment.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 12

1      Q.   Okay.  So before the date of the incident, had you

2   ever seen a suspect with a gun in their hand before?

3      A.   Yes, sir, I have.

4      Q.   Do you have an estimate or a range as to how many

5   times?

6      A.   I would say a couple dozen.

7      Q.   Were you trained that you could shoot someone merely

8   for seeing a gun in their hand, that fact alone?

9      A.   No, sir, I was not trained that.

10     Q.   And I'm sure you've seen other weapons in suspect's

11  hands before; knives and other objects?

12     A.   Yes, sir.

13     Q.   Prior to the date of the shooting we're here to talk

14  about, had you ever been present for an officer-involved

15  shooting before?

16          MR. RAMIREZ:  I'll object as to relevance.  It may

17  invade his police personnel privileges.

18          But he can answer yes or no at this point.

19          THE WITNESS:  Yes.

20  BY MR. GALIPO:

21     Q.   Have you -- had you been involved -- and this is

22  just a yes or no at this point -- in officer-involved

23  shootings before?

24          MR. RAMIREZ:  I'll object same objections.

25          But you may answer yes or no.

Page 13

```
 1              THE WITNESS:  Yes.
 2    BY MR. GALIPO:
 3       Q.   And without getting into details, how many prior
 4    officer-involved shootings had you been involved in?
 5       A.   Two --
 6              MR. RAMIREZ:  Same objections.
 7              But you can answer.
 8    BY MR. GALIPO:
 9       Q.   Okay.  And again, without getting into details at
10    this point, in what year or years did those occur?
11       A.   In 2020, 2022.  And then this one, 2023.
12       Q.   And did all of those occur during your work with the
13    EST?
14       A.   Yes, sir.
15       Q.   In the prior officer-involved shootings, did you
16    also have to give a statement or interview?
17       A.   Yes, sir, I did.
18       Q.   Were you also represented or have an attorney
19    representative present for those?
20       A.   Yes.
21       Q.   How many shots in total did you fire in this
22    incident?
23       A.   One.
24       Q.   Do you recall how many shots you fired in either of
25    your prior shootings?
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 14

1          MR. RAMIREZ:  Objection as to relevance; may invoke

2    his police personnel privileges in the State and Federal law.

3          But you can answer if you know.

4          THE WITNESS:  Yes, sir, I know.

5    BY MR. GALIPO:

6      Q.    In the 2020 incident how many shots did you fire?

7      A.    Four shots.

8      Q.    And in the 2022 incident how many shots?

9      A.    One shot.

10     Q.    And 2023 also one shot?

11     A.    Yes, sir.

12     Q.    From the same type of weapon or different weapons?

13     A.    Same type, all three.

14     Q.    What type of weapon was that?

15     A.    It is a BCM, 556, a rifle, semiautomatic rifle.

16     Q.    Is that the caliber, the 556?

17     A.    Yes, sir.

18     Q.    And the semiautomatic, obviously, you have to press

19   the trigger for each shot?

20     A.    Yes, sir.  And to be clear on that, it's actually a

21   full -- it's designed -- it has an option of full auto, but

22   none of my shootings were in the full auto selection.

23     Q.    That's good --

24     A.    If that makes sense.  I said semiautomatic, but it's

25   actually a full automatic rifle.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 15

```
1        Q.    It has the way you can make it fully automatic, but
2    it was set on semiautomatic?
3        A.    Yes, sir.
4        Q.    When you fired your shots in the case we're here to
5    talk about, were you shooting at a particular person?
6        A.    Yes, sir.
7        Q.    And who was that person, if you know?
8        A.    Mr. Llamas.
9        Q.    And when you fired your shot, do you have an
10   estimate as to the distance between you and Mr. Llamas?
11       A.    I believe 40 to 50 yards.
12       Q.    And I know we're in football season, but doing some
13   simple math, are we talking a 120 to 150 feet?
14       A.    Yes, sir.  Roughly.
15       Q.    I only asked you because in my last case, the
16   officer kept getting confused between yards and feet, and he
17   happened to be an ex-football player.
18             So I was joking with him about that.
19             MR. RAMIREZ:  Right.  I think he has a CTE,
20   possibly.
21             MR. GALIPO:  Right.
22   BY MR. GALIPO:
23       Q.    And what part of -- I'll let you take your sip.
24       A.    Sorry.
25       Q.    That's okay.  What part of Mr. Llamas' body were you
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 16

```
1    aiming at when you fired your one shot?

2        A.    His upper thoracic area, upper body.

3        Q.    And from your perspective was that his front, his

4    back, or some other part?

5        A.    I believe it was the front of his body.

6        Q.    So would you have been aiming at his chest-stomach

7    area?

8        A.    Correct.

9        Q.    Were you stationary or moving when you fired?

10       A.    I was stationary.

11       Q.    And was Mr. Llamas stationary or moving when you

12   fired?

13       A.    He was moving.

14       Q.    And in what manner was he his body moving?

15       A.    I'm not sure I understand what you're asking.

16       Q.    It's not a clear question.

17             So that was a good point.

18             Was he walking or running as far as his legs?

19       A.    He was walking.

20       Q.    And which direction was he walking?

21       A.    In a westerly direction.

22       Q.    And would that be walking away from you, towards

23   you, or in some other way?

24       A.    I would say kind of like perpendicular to us.

25             He's 50 yards in the front, walking towards my left
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 17

```
 1   which would be westerly.

 2        Q.   Okay.  So was he walking from your right-to-left?

 3        A.   Yes.

 4        Q.   And so he would have been north of you?

 5        A.   Yes, sir.

 6        Q.   Before you fired your shot, did you see him with a

 7   gun in his hand?

 8        A.   Yes, I did.

 9        Q.   And which hand was that?

10        A.   His right hand.

11        Q.   And did you at some point see him holding the gun to

12   his head?

13        A.   Yes, sir.

14        Q.   And do you recall what side of his head that was?

15        A.   Right side of his head.

16        Q.   Did it appear that he had the barrel of the gun

17   pressed or close to the right side of his head at some

18   point?

19        A.   It was either pressed or close to, yes.

20        Q.   And for how long of a period of time did you see him

21   with the gun close to the right side of his head?

22        A.   I would say about a minute.

23        Q.   And can you generally describe to me what he was

24   doing during that approximate minute that he had the gun

25   pressed either, you know, close to or up against the side of
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 18

1  his head?

2      A.    During the time that he had the weapon to his head,

3  he was in the street in front of me, and there was commands

4  given to him.  He was looking in our direction, and then at

5  one point Mr. Llamas kind of pointed to the ground, like, you

6  know, you want me to give you up here, but as he did that, he

7  still had the weapon to his head.

8      Q.    During any of the time he had the weapon to his

9  head, did you think based on your training and experience it

10  was appropriate to shoot him?

11      A.    No, sir.

12      Q.    And is that essentially because with the gun to his

13  head, it was not an immediate threat of death or serious

14  bodily injury to others?

15      A.    To myself or others.  Yes, sir, that's correct.

16      Q.    So am I understanding you correctly that at one

17  point when he had the gun to his head, it looked like he was

18  gesturing towards the ground near him as if to say, do you

19  want me to get down here?

20      A.    That's just an assumption based on what I saw from

21  the distance that I was at, but yes, he did kind of point to

22  the ground, and it appeared to me like, you know, you want me

23  to lay down here, but he did not lay down.

24      Q.    And when he pointed to the ground, would he have

25  pointed with his left hand?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 19

```
 1    A.    Yes, sir.

 2    Q.    Still holding the right hand up against or near his

 3    right side of his head?

 4    A.    That's correct.

 5    Q.    And were there any other officers near you during

 6    this approximate 60-second time frame that you saw him

 7    holding the gun to his head?

 8    A.    Yes, sir.

 9    Q.    And can you tell me the names of the officer or

10    officers that were near you?

11    A.    Deputy Jimmie McGuire and Lieutenant Mike Walsh.

12    Q.    Where were you generally positioned?

13          Were you near cover, or out in the open?

14          How would you describe your location when you were

15    making these observations?

16    A.    When I made those observations, I was near Deputy

17    McGuire's unit.

18    Q.    What type of unit was it?

19    A.    Chevy Tahoe.

20    Q.    What part of the vehicle were you near?

21    A.    At the beginning of it I was near the driver side

22    door, and then I moved to the passenger side door.

23    Q.    Were the doors of the vehicle open?

24    A.    Yes.  The passenger door was not open, but I ended

25    up opening it for me.
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 20

1    Q.   So on the driver side were you kind of in the "V" of

2    the door using it as partial cover?

3    A.   No, sir.  Deputy McGuire was in the "V" of the door.

4         I was off to the left of his door.

5    Q.   And then on the passenger side, you repositioned and

6    opened that door?

7    A.   Yes, sir.

8    Q.   And then were using that as cover or partial

9    cover?

10   A.   Yes, sir.

11   Q.   And was the front of the vehicle facing north?

12   A.   The front of that vehicle would have been facing

13   east.

14   Q.   Oh, east.  And then where was the lieutenant?

15   A.   He was on the driver side near Deputy McGuire at

16   this point in time.

17   Q.   So are we still talking about this window of time

18   where you saw the gun to his head?

19   A.   Yes, sir.

20   Q.   So am I understanding correctly, that you were

21   initially on the driver side of the vehicle when you made

22   that observation just off to the side of the open door, and

23   then tactically repositioned to the passenger side, opened

24   that door, and were using that as cover during this 60-second

25   approximate window?

Page 21

```
 1      A.    That's correct.
 2      Q.    Did any one of the three of you, if you know, have
 3   less-lethal with them or out?
 4      A.    With it -- there's two different things.
 5            With them or out?
 6      Q.    Another good point.  Let's start with them.
 7            Do you know if there was any less-lethal in the
 8   units?
 9      A.    I know there was less-lethal in the units, yes.
10      Q.    And what less-lethal were you aware of?
11      A.    Pepper spray, 40-millimeter impact munitions.
12            I carry some steam ball grenades, flash bangs.
13            That's all I could think of off the top of my
14   head.
15      Q.    Was anyone assigned less-lethal at that point?
16      A.    During that -- you're talking about the same point
17   that observations of the gun, you said?
18      Q.    Yes.
19      A.    No, sir.  Nobody was assigned less-lethal.
20      Q.    And when did you shoot in relation to this
21   approximate 60-second window that you observed him with the
22   gun to his head?
23      A.    So after Mr. Llamas pointed to the ground, he fled
24   north from his location.  And then we -- Deputy McGuire and I
25   ended up going on foot to -- Mr. Llamas ran down a dirt
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 22

1    driveway of an address located at 22240 River Road.

2              So Deputy McGuire and I ran on foot to that -- the

3    threshold of the street and the driveway, and then that's

4    where the deputy-involved shooting occurred.

5         Q.    So would it be correct that there were no shots

6    fired before he started running north on the driveway?

7         A.    To be clear, there were no shots fired from law

8    enforcement.  That's correct.

9         Q.    Okay.  You heard a shot earlier?

10        A.    I did not physically hear the gunshot, but I was

11   aware of a shot being fired, yes.

12        Q.    How did you become aware of it?

13        A.    Over my -- my unit radio.

14        Q.    Did someone communicate that they heard a shot

15   fired?

16        A.    Yes, sir.

17        Q.    And there had been a K-9 deployed?

18              MR. RAMIREZ:  I would say it's vague and ambiguous.

19              But you may respond if you understand.

20              THE WITNESS:  I'm -- it depends on what you're

21   asking me.  I'm aware of a K-9 being deployed now, but when I

22   heard the shot report as being fired, I was not aware of the

23   K-9 having been deployed yet.  If that's makes sense.

24   BY MR. GALIPO:

25        Q.    Okay.  Yeah, that does.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 23

1    Were you aware that a K-9 was on-scene?

2       A.    Yes, I was.

3       Q.    Did you have an understanding as to who the K-9

4    handler was?

5       A.    There were multiple K-9 units on-scene.

6       Q.    And how did you know that?

7       A.    I physically saw them.

8       Q.    And when you say multiple, can you give me an

9    estimate as to how many?

10      A.    I know of at least two.  There might have been a

11   third, but --

12      Q.    Did you have -- oh, I'm sorry.

13            Go ahead.

14      A.    That's okay.  I know two for sure.

15      Q.    Okay.  Did you have an understanding that Mr. Llamas

16   might have been with a female?

17      A.    Yes, sir.

18      Q.    And you had some information as to her name?

19      A.    No, sir.  I did not know her name.

20      Q.    Only that he was with a female?

21      A.    That's correct.

22      Q.    Was there any discussions that you were aware of

23   about potentially deploying the K-9s tactically?

24      A.    Again, I don't know if I understand the question,

25   but the dog had been deployed tactically before the shot was

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 24

1    fired.  I witnessed that.

2        Q.   I guess -- okay.  Even if we back up before that.

3             Sometimes it's my understanding that units like you

4    have and especially you're a sergeant, develop tactical

5    plans?

6        A.   Yes, sir.

7        Q.   And I'm just wondering as part of the tactical plan,

8    was there any discussion that you were involved with about

9    potential of deploying a K-9 under the circumstances?

10       A.   So again, prior to I witnessed the dog being

11   deployed tactically prior to the shot being fired, if that

12   makes sense.

13            Was there a discussion after that, I don't know.

14       Q.   Was there a discussion before that, I was wondering.

15       A.   Yes, there was.

16       Q.   And what was that discussion?

17       A.   That we would utilize the K-9 as needed in order to

18   clear the area that we were searching at the time.

19       Q.   And was it your understanding that the K-9 involved

20   was also able to bite and hold on command?

21            MR. RAMIREZ:  May call for speculation.

22            But you may respond if you know.

23            THE WITNESS:  Can you repeat the question just so

24   I'm clear.

25   BY MR. GALIPO:

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 25

1    Q.    Sure.  It's my general understanding that some K-9s

2    are like search dogs, some K-9s can bite and hold on command.

3          I didn't know if you had an understanding as to the

4    K-9's capabilities that was involved?

5    A.    So this particular dog is a -- we call it police

6    service dog or Sheriff's service dogs.

7          So if it locates a suspect, yes, it may bite them.

8    Q.    And at some point you saw the dog deployed?

9    A.    Yes, sir.

10   Q.    And if I'm understanding your testimony, you did not

11   hear a gunshot, but you heard a communication over the radio

12   after that, that a gunshot had been fired?

13   A.    So I think I need to clarify again.  The deployment

14   of the dog that I personally witnessed was at the extreme

15   southwest corner of this large containment that we had.

16   After I witnessed that dog deployment, we kind of reallocated

17   our resources.  There was a separate deployment of the K-9

18   and the shot fired that I was not a witness to.

19   Q.    Okay.

20   A.    If that makes sense.

21   Q.    That does.  Thank you for that clarification.

22         I guess what I'm wondering, did you have knowledge

23   or information that after the shot had been fired, that the

24   K-9 handler tried to call his dog back, and the dog did not

25   come back?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 26

```
 1     A.   Yes, sir, I am.

 2     Q.   So one of the possibilities I'm sure you considered

 3    is that the dog may have been shot?

 4     A.   It was a consideration, yes.

 5     Q.   Was there any communication about that possibility

 6    that you recall over the police radio?

 7          MR. RAMIREZ:  Vague and ambiguous.

 8          But you may respond if you understand.

 9    BY MR. GALIPO:

10     Q.   In other words, maybe he had shot the dog, or words

11    to that effect?

12     A.   Over the radio I don't recall any communication over

13    the radio, no.

14     Q.   Was there any communication about that that was not

15    over the radio that you remember?

16     A.   I don't remember if the words used were shot, but I

17    spoke to Deputy Day after the shots were fired, and he was

18    extremely upset that his dog was not recalling like he

19    typically would.

20          So -- but I don't remember if he said something

21    along the lines of, you know, my dog's been shot or something

22    like that.

23     Q.   Can you spell --

24     A.   I'm sorry?

25     Q.   No.  I'm sorry.  I cut you off.
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 27

1        I was just hoping you can spell the last name of the

2    K-9 handler for the court reporter.

3        A.    D-a-y, David Adam Young.

4        Q.    Okay.  Thank you.

5              So you do recall a conversation with Deputy Day?

6        A.    Yes, sir.

7        Q.    And he would have been at least the one of the K-9

8    handlers, and his dog was the one that ended up being shot?

9        A.    That's correct.

10       Q.    And just to give me a time reference, do you know

11   when you had this conversation with Deputy Day in relation to

12   the 60-second window where you saw Mr. Llamas with the gun to

13   his head?

14       A.    That conversation was prior to me seeing

15   Mr. Llamas.

16       Q.    And do you have any time reference, whether it was

17   an hour, a half hour, five minutes, any estimate you can

18   give?

19       A.    So your question is the conversation with Deputy Day

20   in relation to me seeing Mr. Llamas with the gun to his head;

21   is that correct?

22       Q.    Correct.  That's correct.

23       A.    I would say a couple of minutes, two to five

24   minutes.

25       Q.    And where did that conversation take place

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 28

1   physically?

2       A.   That so that was inside of our containment which is

3   a pretty large containment, 20-plus acres, and it was near a

4   old dilapidated boat, and it was near where K-9 Rudy was

5   deployed by the tree line, if that makes any sense.

6       **Q.   So did you yourself ever see the female at any time**

7   **before you fired your shot?**

8       A.   No, sir, I did not.

9       **Q.   And was the first time that you saw Mr. Llamas that**

10  **day when you saw him with the gun to his head, or had you**

11  **seen him previously?**

12      A.   The first time I saw him was when he came out of the

13  tree line on the pavement side with the gun to his head.

14           That was the first time I physically saw him.

15      **Q.   And how long approximately had you been out in that**

16  **location before you actually saw him?**

17      A.   I personally was there for approximately two

18  hours.

19      **Q.   Do you have an estimate as to how many officers**

20  **altogether were on-scene as of the time of the shooting?**

21      A.   I mean it was a lot.  I would say at least 20.

22      **Q.   And were they mostly all from your department, the**

23  **SWAT?**

24      A.   That's two questions.  My department or SWAT.

25           My team is part of the Sheriff's Department.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 29

1              So most of them were Riverside County Sheriff, but

2    there were a number of them that were not part of SWAT.

3         Q.    So I would like to go back to the time frame

4    immediately after this 60 seconds approximately when

5    Mr. Llamas, I think, you told me was running northbound.

6         A.    That's correct.

7         Q.    And do you have an estimate as to how far he ran

8    northbound, approximately?

9         A.    Again, I would say 40 to 50 yards.

10        Q.    And to your knowledge, were any shots fired as he

11   was running northbound?

12        A.    To my knowledge, no, sir.

13        Q.    Did you think based on your training and experience,

14   it was appropriate to shoot him as he was running

15   northbound?

16             MR. RAMIREZ:  Vague and ambiguous; incomplete

17   hypothetical; lacks foundation.

18             But you can answer if you can.

19             THE WITNESS:  As Mr. Llamas ran north from us, I

20   couldn't physically see him at that time.

21   BY MR. GALIPO:

22        Q.    Okay.  Is that the entire time he was running north,

23   or just part of it?

24        A.    I would say the entire time because my first visual

25   of him after he ran, he went out of sight because of the

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 30

```
 1    bushes and trees and things like that.

 2             So when I crested the threshold of the driveway was

 3    when I saw him again, and he was no longer running.

 4        Q.   Do you have an estimate as to how much time he was

 5    out of your view before coming back into view?

 6        A.   Less than 30 seconds.

 7        Q.   And during that time frame, you were running I

 8    assume also northbound?

 9        A.   No, sir.  I ran eastbound.

10             I ran east to the threshold of the driveway.

11        Q.   And what distance do you think you ran approximately

12    to get to the threshold of the driveway?

13        A.   Again, 40 to 50 yards.

14        Q.   And is this where the driveway meets the street?

15        A.   Correct.

16        Q.   And do you recall the name of the street?

17        A.   River Road.

18        Q.   And you gave me an address earlier.

19             Was that the address to that residence?

20        A.   I'm pretty sure it is, yes, sir.  22240.

21        Q.   Was there an airship overhead during this time

22    frame?

23             MR. RAMIREZ:  Vague and ambiguous as to what time

24    frame.

25             MR. GALIPO:  Well, the time frame we have been
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 31

```
 1  talking about.  So the 60 seconds that you saw Mr. Llamas --

 2          MR. RAMIREZ:  In other words --

 3          MR. GALIPO:  I'm sorry?

 4          MR. RAMIREZ:  -- in the driveway area, we're talking

 5  about that.

 6          MR. GALIPO:  Yeah.  Basically, I'm just wondering

 7  because sometimes, you know, the sergeant may be aware an

 8  airship was overheard because he saw it, heard it, or there

 9  were some communications with the airship.

10  BY MR. GALIPO:

11      Q.   And I'm just wondering, during the time that you saw

12  Mr. Llamas with the gun to his head that we were talking

13  about earlier, did you have an understanding or knowledge

14  whether there was an airship overhead?

15      A.   I knew there was an airship overhead.

16      Q.   And was there any communications that you could hear

17  from time to time from the airship?

18      A.   Yes, sir.

19      Q.   And were they making any communications regarding

20  Mr. Llamas or the gun to his head?

21      A.   Were they making communications with us on the

22  ground, or with the suspect, Mr. Llamas?

23      Q.   Either one that you could hear.

24      A.   Both.

25      Q.   All right.  Let's break it down.
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 32

1          How about the communications to you, what do you

2    recall?

3       A.   I recall that Deputy Tom Davis -- I just know who he

4    is because he was on our team for a little bit.  He's the

5    tactical flight officer.  He was putting out communication

6    that Mr. Llamas before he emerged onto the pavement of River

7    Road before we saw him, that Mr. Llamas had the gun to his

8    head and in his mouth.

9       Q.   And what tactical channel were those communications

10   being made over?

11      A.   Probably SEB.  So we have four tac channels that are

12   assigned to our team SEB.  Tac 1, 2, 3, and 4.  At the time I

13   don't recall if 4 was actually in play, but that channel is

14   typically patched with the patrol channel, but which SEB tac

15   channel, I don't recall.

16      Q.   Do you know if those communications were recorded?

17      A.   I don't know.  I know they typically are, yes.

18           I'm sorry.  On the radio, yes, they typically are

19   recorded via dispatch in Downtown.

20      Q.   Anything else you recall hearing from the

21   helicopter?

22      A.   Again, are we talking -- yes.

23           There was communications, you know, when he fled

24   north that they were giving his direction of travel, the

25   direction of the female's travel, and then just the

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 33

1    information about the gun to his head and his mouth.

2            And then once he was street side, and we saw him, I

3    don't recall any communications from the helicopter at that

4    point.

5       Q.    What do you recall hearing about the female?

6       A.    Just that she was fleeing in a direction different

7    from him.  He fled more in a northerly direction from where

8    the shots were fired.

9            She fled kind of like easterly direction.

10      Q.    So you're running to the mouth of the driveway, and

11   there is another officer running near you?

12      A.    Yes, sir.

13      Q.    Can you remind me of the other officer's name

14   again?

15      A.    Deputy Jimmie McGuire.

16      Q.    Okay.  I couldn't read my own writing.

17           So thank you.

18      A.    That's all right.

19      Q.    Do you have happen to remember as you were

20   approaching this driveway, whether Deputy mcGuire was ahead

21   of you, behind you, or to one of your sides as you were

22   running?

23      A.    I believe he was off to my left side basically equal

24   with me, not in front of or not really behind.

25      Q.    And so you had some information of the direction of

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 34

1   travel of Mr. Llamas from the airship?

2       A.   At which point?

3       Q.   **Well, I think you said they said he was running**

4   **north?**

5       A.   So again, he ran, that I know of, two different

6   times.  After the shot was fired in the tree line, he fled

7   north to the paved road of River Road.  That's where we saw

8   him.

9            And then he fled again.  Both times -- I'm sorry --

10  both times he fled was mostly in a northerly direction.

11      Q.   **Did the -- when he fled the second time in a**

12  **northerly direction when you and Deputy McGuire were running**

13  **towards the driveway, was the airship continuing to broadcast**

14  **where he was?**

15      A.   I'm sure they were, but I don't recall specifically

16  what was said from them.

17      Q.   **Now, at some point he comes in view again; is that**

18  **correct?**

19      A.   That's correct.

20      Q.   **And where were you in relation to the street or the**

21  **mouth of the driveway when he came back into view?**

22      A.   I was in the mouth of the driveway probably ten feet

23  north of the actual pavement, the paved roadway.

24      Q.   **So you're actually in the driveway?**

25      A.   Yes, sir.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 35

```
 1      Q.   About ten feet from the street?

 2      A.   Ten feet north of the pavement if that makes sense

 3   because it's -- the driveway's dirt.

 4      Q.   And was Deputy McGuire still to your left?

 5      A.   I believe he was at this time, yes.

 6      Q.   And then when you see Mr. Llamas again, where is

 7   he?

 8      A.   Directly in front of me to the north about 40 to 50

 9   yards north of me.

10      Q.   I have a lot of 40 to 50 yards estimates.

11      A.   I know.

12      Q.   But if that's what it is, that's what it is.

13      A.   That's my best estimate to be honest.

14      Q.   If I watch a football game and the announcer says

15   this part I usually punts between 40 and 50 yards, I'm going

16   to remember this deposition.

17      A.   All right.  All right.

18      Q.   Okay.  So how much time passed from you seeing

19   Mr. Llamas again in the driveway and you firing your shot?

20      A.   I would say 15 seconds or less.

21           It was fairly quick.

22      Q.   Did you hear other than -- I'm not talking about the

23   shot that might have possibly be fired at the K-9, but when

24   you were in the driveway, did you hear any shots being fired

25   before your shot?
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 36

```
 1      A.    Not before.

 2      Q.    Did you stop at some point in the driveway before

 3   you fired?

 4      A.    Yes, sir.  It was right around that ten-foot mark is

 5   where I stopped.

 6      Q.    And you're saying you were stopped there for

 7   approximately 15 seconds or so?

 8      A.    It was less than that.  As soon as I crested the

 9   mouth of the driveway and I turned to face north, is when I

10   saw Mr. Llamas in front of me.

11            And I took maybe a couple steps, and then stopped.

12      Q.    So I just want to make sure I'm understanding you.

13            When you see him again, so he comes in your vision

14   again to the -- in the driveway to the time you fire your

15   shot, how much time passed between those two points?

16      A.    Again, I would say less -- it was pretty quick.

17            So I think I initially said 15 seconds.

18            It was probably less than that.

19      Q.    Okay.

20      A.    It was pretty quick.

21      Q.    Did you hear Mr. Llamas say anything in that time

22   frame between seeing him and firing your shot?

23      A.    No, I did not.

24      Q.    What was he initially doing when you first saw him

25   in the driveway?
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 37

1    A.   When I first saw him, again, he was walking kind of

2  in a westerly direction initially with the gun to his head.

3    Q.   **And was it still in his right hand?**

4    A.   Yes, sir.

5    Q.   **And still to the right side of his head?**

6    A.   That's correct.

7    Q.   **Did you have a body-worn camera on at the time?**

8    A.   I was wearing a body-worn camera, yes.

9    Q.   **Was it working, if you know, or turned on?**

10   A.   I eventually turned it on, yes.

11   Q.   **Did you turn it on before or after the shooting?**

12   A.   After.

13   Q.   **And why did you turn it on after?**

14   A.   So when on the team a lot of these missions that

15  we have are drawn out, long drawn out thing.  So we typically

16  turn in on and off in order to conserve battery.

17        So when I changed my position from where the initial

18  shot was fired, at some point I deactivated my body-worn

19  camera in order to conserve battery.  And when this all

20  occurred, I just did not click it on prior to me shooting,

21  but my --

22   Q.   **Did you -- I'm sorry.  Go ahead.**

23   A.   My footage was captured via the recall, the recall

24  mode of the body-worn camera.

25   Q.   **How far does it go back?**

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 38

1    A.    I think it's 30 seconds, I believe.

2    Q.    **Did it capture the shooting itself?**

3    A.    I believe it did, yes.  There is no audio.

4          There is video, but no audio.

5    Q.    **Does it capture the time frame that Mr. Llamas had**

6    **the gun to his head before he ran?**

7    A.    My body-worn camera?

8    Q.    **Yes.**

9    A.    When he through the street, no my body-cam did not

10   capture that.

11   Q.    **So it sounds like with everything going on, you**

12   **didn't turn it on before the shooting, but after the shooting**

13   **you realized you should turn it on?**

14   A.    Yes, sir.

15   Q.    **So that time frame what we are talking earlier when**

16   **you were on the driver side and then went to the passenger**

17   **side, you didn't turn it on during that time frame?**

18   A.    That's correct.

19   Q.    **Do you know if Deputy McGuire had his body-worn**

20   **camera turned on?**

21   A.    Deputy McGuire did not.

22         He was not wearing a body-worn camera.

23   Q.    **And do you know why some of the -- like you had one**

24   **on, and he didn't?**

25         **Do you know why that is?**

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 39

1     A.   Yes, sir.  At the time the direction from my command

2  was from Sheriff's Administration that our team was exempted

3  from policy regarding body-worn cameras on SWAT operations.

4  And at the time we had implemented that sergeants would wear

5  them, and deputies at the time were not wearing them.

6     Q.   Is that still the same now, or is that policy

7  changed?

8          MR. RAMIREZ:  I'll object to relevance.

9          But you may respond.

10          THE WITNESS:  Our policy has now changed.

11  BY MR. GALIPO:

12     Q.   And is it changed so that everyone has body-worn

13  cameras, or is it changed so that the sergeants don't

14  either?

15     A.   It's changed to where everybody wears one.

16     Q.   Okay.  So going back to the driveway when he comes

17  back into view, it sounds like you stopped in that position

18  you talked about, ten feet from the roadway?

19     A.   Yes, sir.

20     Q.   And that Deputy McGuire, I think, would be somewhere

21  to your left?

22     A.   That's correct.

23     Q.   And at this point when Mr. Llamas comes back into

24  your view, he is like 40 or 50 yards from you?

25     A.   That's correct.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 40

1    Q.   And initially, when you see him he is walking, and

2    he still has the gun to the right side of his head?

3    A.   Yes, sir.

4    Q.   Do you give him any commands in between seeing him

5    and you firing your shot?

6    A.   No, I do not.

7    Q.   Do you know if Deputy McGuire gave him any commands

8    in that time frame?

9    A.   I don't believe so.

10   Q.   Did either one of you give him any verbal warning

11   that you were going to shoot him?

12   A.   No, I did not.

13   Q.   Di you know if the airship was giving him any

14   commands after you saw him in the driveway?

15   A.   I'm unaware of him given commands at that point.

16   Q.   Which compass direction would you have been facing

17   when you were in the driveway as you described?

18   A.   Basically northerly direction.

19   Q.   And when you first saw him you said he was walking;

20   correct?

21   A.   Correct.

22   Q.   Which direction compass-wise was Mr. Llamas

23   walking?

24   A.   In a westerly direction.

25   Q.   So he would be walking from your right-to-left.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 41

```
1              Do I have that correct?

2      A.    That's correct.

3      Q.    And for how long of a period of time did you see the

4  gun to his head after he reappeared, but before you fired

5  your shot?

6      A.    Just a couple of seconds.

7              Again, it was very, very quick.

8      Q.    So when you told me 15 seconds earlier, that

9  probably was a little bit on the long side?

10     A.    Absolutely.  The time that I reacquired Mr. Llamas

11 in the mouth of the driveway to the time that I fired was

12 very, very fast.  I don't know the exact time frame.

13     Q.    Okay.  Obviously, I'm not expecting exact, but can

14 you give me like a range?

15             Are we talking like two to three seconds?

16             I mean when you say very fast, what do you think?

17     A.    I would say five seconds or less.

18     Q.    Okay.  And during some of that time frame, you saw

19 the gun to his head?

20     A.    That's correct.

21     Q.    And did you see the gun move from that position at

22 some point?

23     A.    Yes, sir, I did.

24     Q.    And how did you see the gun move?

25     A.    As Mr. Llamas was walking in a westerly direction,
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 42

1   he kind of bladed his upper body towards Mr. Deputy McGuire

2   and I, towards our location, and the gun dropped from

3   basically this to more this where he's pointed it directly at

4   our position.

5       Q.   Okay.  So when you say bladed, would he -- are you

6   saying he kind of turned slightly to his left?

7       A.   That's correct.

8       Q.   And you're saying the gun came from a position on

9   the right side of his head, and it lowered down so it was

10  coming in your direction?

11      A.   That's correct.

12      Q.   Based -- again, based on your training and

13  experience, do you think it would have been appropriate to

14  shoot Mr. Llamas in the driveway if the gun had stayed up to

15  the right side of his head?

16      A.   If Mr. Llamas had kept the gun just pointed at his

17  head, no, it would not have been appropriate to fire.

18      Q.   And is that for the same reasons we discussed

19  earlier, because you wouldn't have an immediate threat of

20  death or serious bodily injury if that was the case?

21      A.   Yes, sir.

22      Q.   You don't recall any commands given to Mr. Llamas to

23  drop it, meaning, drop the gun after you saw him in the

24  driveway?

25      A.   There were commands given to him to drop the weapon

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 43

1   before he fled north again, but when we reacquired him when I

2   was in the driveway, there were not additional commands,

3   no.

4       Q.   Okay.  Now your weapon that you had, are you

5   familiar with that weapon?

6       A.   Are you talking about the weapon I used for the

7   actual shooting?  Because I was in possession of two weapons

8   at the time.

9       Q.   Yeah.  The one used for the shooting.

10      A.   Yes, sir.  I'm familiar with it.

11      Q.   Did you also have a handgun?

12      A.   That's correct.

13      Q.   What caliber was that?

14      A.   9-millimeter.

15      Q.   Okay.  I'm sure you are familiar with both weapons;

16   is that fair?

17      A.   Yes, sir.

18      Q.   And have you taken the 556 to the shooting range

19   before?

20      A.   Absolutely.  Yes, sir.

21      Q.   And given your knowledge of that weapon, do you have

22   an understanding as to how many shots in a second you can

23   fire from that weapon?

24      A.   I'm trained on that, yes, sir.

25      Q.   And what is your understanding of the capability of

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 44

1    the weapon?

2        A.    Of how many rounds I can round per second?

3        Q.    Yes.

4        A.    I would say between six and eight rounds per

5    second.

6        Q.    And is that something you know from actual training

7    and experience?

8        A.    Yes, sir.  And that's accurate rounds, not just

9    pulling the trigger.

10       Q.    Accurate rounds?

11       A.    That's correct.

12       Q.    And in this case you're saying you only fired one

13   round?

14       A.    That's correct.

15       Q.    And why did you only fire one round?

16       A.    When I fired my one round Mr. Llamas immediately

17   went down.  As he went down I could see that he was still

18   moving around, but I could no longer see the weapon.

19             I couldn't see his hands or anything like that.

20             So I no longer could see that he was an immediate

21   threat to myself or anybody else at that moment.

22       Q.    And were you still standing in this position in the

23   driveway you described?

24       A.    That's correct.

25       Q.    And Deputy McGuire was still generally to your

Page 45

1  left?

2      A.   Yes, sir.

3      Q.   Did he have a similar type weapon as you?

4      A.   Yes, sir, he did.

5      Q.   And did you hear any shots fired after Mr. Llamas

6  went to the ground?

7      A.   Yes, I did.

8      Q.   How many shots did you hear fired after he went to

9  the ground?

10     A.   Three to four rounds.

11     Q.   And if you know, who was firing those rounds?

12     A.   Deputy McGuire.

13     Q.   And I think you've already told me this, but did you

14  fire any rounds at all after Mr. Llamas went to the ground?

15     A.   No, sir, I did not.

16     Q.   Okay.

17         MR. GALIPO:  Is this a good time for everyone?

18         We'll take our first break for about ten minutes?

19         THE WITNESS:  Sure.

20         MR. RAMIREZ:  That works.

21         MR. GALIPO:  Okay.  Thank you, all.

22         Off the record.

23         (Recess taken.)

24         THE VIDEOGRAPHER:  We're going back on the record at

25  2:24 p.m.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 46

```
 1            MR. GALIPO:  Okay.  Are we ready to continue?
 2   BY MR. GALIPO:
 3       Q.   You indicated to me earlier that you fired one shot;
 4   is that correct?
 5       A.   Yes, sir.
 6       Q.   And the weapon --
 7            (Audio interruption.)
 8       A.   That wasn't me, sir.
 9       Q.   I know that.  And the weapon that you were firing
10   from has the capabilities with you firing to fire six to
11   eight shots in a second?
12       A.   That's correct.
13       Q.   Are you actually saying the gun was pointed at
14   you?
15       A.   Mr. Llamas -- no.  I don't believe that the -- the
16   muzzle of his weapon was moving towards my direction.
17       Q.   You're not saying the gun was pointed at you?
18       A.   That's correct.
19       Q.   And with the muzzle of his weapon moving in your
20   direction, you only fired one shot even though you had the
21   capability of firing six to eight in a second?
22       A.   Yes, sir.
23       Q.   And I think you've told me earlier that you didn't
24   hear any shots being fired before you fired your shot?
25       A.   That's correct.
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 47

1      Q.   So would it be correct to say you never had the

2   impression that Mr. Llamas was firing at you?

3      A.   That's correct.

4      Q.   At some point you became aware that Deputy McGuire

5   was firing?

6      A.   I knew that Deputy McGuire and I -- when I fired,

7   Deputy McGuire fired pretty much simultaneous to me.

8      Q.   And so with respect to Deputy McGuire, there would

9   have been two volleys of shots?

10      A.   That's correct.

11      Q.   And how much time would you estimate separated the

12   first volley of shots from Deputy McGuire to the second

13   volley?

14      A.   Two to three seconds.

15      Q.   And during that two to three seconds was Mr. Llamas

16   on the ground?

17      A.   Yes, sir.

18      Q.   And he was still 40 to 50 yards away?

19      A.   That's correct.

20      Q.   Is your vision pretty good as far as you know?

21      A.   Yes, sir.  It's pretty good.

22          MR. RAMIREZ:  As far as he can see.

23   BY MR. GALIPO:

24      Q.   Do you wear or are you required to wear corrective

25   lenses?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 48

1      A.   No, sir.

2      Q.   It was light outside at the time?

3      A.   It was like basic kind of -- the sun was going down

4   at the time, but it was not dark.

5      Q.   When you were firing your shot, do you know if

6   Mr. Llamas' buttocks was exposed to you?

7      A.   I don't know that for sure.

8      Q.   You don't know one way or the other?

9      A.   Not one way or the other.  Again, when I fired my

10  shot, Mr. Llamas was turning towards his left, his upper body

11  towards my left.

12           So I would think yes, his buttocks was exposed to

13  me, yes.

14     Q.   If I recall your testimony, you're facing generally

15  north?

16     A.   Correct.

17     Q.   And when you see Mr. Llamas emerge in the driveway,

18  he's walking generally westbound from your right to left?

19     A.   That's correct.

20     Q.   I'm trying to see if you can give me a description

21  or an estimate as to how much his body turned to the left.

22           I was thinking of the hands of a clock.  I don't

23  know if that would help us at all, but I was imagining

24  someone at the bottom 6 facing towards 12, and him walking

25  towards 9.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 49

1           And if that's not comfortable for you, maybe anyway

2   you want to describe it.

3           I don't know if he turned ten degrees, a quarter

4   turn, however you want to describe it.

5     A.   Right.  I mean if you're calling his direction of

6   travel like 12 o'clock, he would have moved his body towards

7   like the 9 clock, but I would say it probably got to like the

8   upper body to roughly -- I don't know -- between 9 and 10

9   o'clock-ish if that makes sense.

10     Q.   Yeah.  So slightly less than a quarter turn?

11     A.   I would say yes.

12     Q.   Do you have an estimate as to how many shots were

13   fired in the first volley by Deputy McGuire?

14           I think you told me three to four already; is that

15   right?

16     A.   No, sir.  That was the second volley.

17     Q.   Okay.  The second volley.

18           Your memory is better than mine right now.

19           I think my morning deposition tired me out.

20           How many shots were fired in the first volley by

21   Deputy McGuire if you can give an estimate?

22           MR. RAMIREZ:  Calls for speculation.

23           But if you can respond, you may.

24           THE WITNESS:  I estimate three to four from Deputy

25   McGuire.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 50

1    BY MR. GALIPO:

2        Q.    So three to four in the first volley by Deputy

3    McGuire, and also approximately three to four in the second

4    volley?

5        A.    That's correct.

6        Q.    Was anything said by either you or Deputy McGuire to

7    Mr. Llamas between Deputy McGuire's first volley and second

8    volley?

9        A.    No, sir.

10       Q.    And you would have observed Mr. Llamas go to the

11   ground?

12       A.    I would have observed?  I saw --

13       Q.    No.  You did observe that?

14       A.    I did.

15       Q.    Was it your impression that he was struck by at

16   least one of the shots when he went to the ground?

17       A.    Yes, sir.

18       Q.    And then how did his body position end up on the

19   ground?

20             In other words, was he on his back, his chest-down,

21   or in some other position?

22       A.    I didn't have a clear visual of Mr. Llamas at this

23   point when he was down.  Just I could see that he was kind of

24   moving around.  I could see like his body movement.

25             I couldn't see his actual positioning whether it was

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 51

1    prone or on his back or anything.  I couldn't see that.

2       Q.   What part of his body could you see?

3       A.   Like I could see his knees for sure kind of moving

4    around.

5       Q.   Do you know if you could see his head or face?

6       A.   I could not.

7       Q.   Were you looking at him when he was on the ground

8    immediately after he went down?

9       A.   Yes, sir.

10      Q.   And was your gun still pointed in his direction?

11      A.   General direction, yes.

12      Q.   Did you see him pointing a gun at you or Deputy

13   McGuire after he went to the ground?

14      A.   I did not see that, no.

15      Q.   Did you see a gun in his hand after he went to the

16   ground and before Deputy McGuire fired his second volley?

17      A.   No, sir.

18      Q.   Did you see any gun in his hand or around Mr. Llamas

19   during the time frame Deputy McGuire fired his second

20   volley?

21      A.   Can you restate the question?

22      Q.   Sure.  During the shots, so during the second volley

23   of shots, did you see Mr. Llamas with a gun in his hand?

24      A.   No, sir.

25      Q.   At any time on-scene after the shooting, did you

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 52

1    tell Deputy McGuire that you saw the gun coming in your

2    direction before you fired?

3        A.   I don't call having conversation with Deputy McGuire

4    as to him orienting the weapon towards us or anything like

5    that.  I don't recall that.

6        Q.   Do you recall Deputy McGuire indicating that you to

7    at all?

8        A.   Deputy McGuire did make a statement after his second

9    volley that he saw Mr. Llamas with the gun pointed in our

10   direction.

11       Q.   Okay.  And is that statement, if you know, captured

12   on an audio recording?

13       A.   I believe it was caught on Lieutenant Walsh's

14   body-worn camera.

15       Q.   Okay.  This is just something you didn't see; is

16   that fair?

17       A.   I did not see it, correct.

18       Q.   Did you approach Mr. Llamas at some point after all

19   the shots had been fired?

20       A.   Yes, sir.

21       Q.   And did Deputy McGuire also approach him?

22       A.   Yes, sir.

23       Q.   What position was his body in when you

24   approached?

25       A.   I recall I believe he was laying on his left side.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 53

1          I'm sorry -- his right side, kind of facing the

2    driveway.  His head was facing south towards the driveway,

3    but he was laying, I believe, he was laying on his right side

4    with his right arm on his -- on the ground.

5          Q.   The driveway we're speaking of, is it a dirt

6    driveway?

7          A.   Yes, sir.

8          Q.   And does it run essentially north-south?

9          A.   Yes, sir.

10          Q.   And when you approached Mr. Llamas, would his head

11    be more towards the north or some other direction?

12          A.   His face would be facing to the south, the top of

13    his head would be facing west.

14          Q.   Okay.  So his head would have been more to the west

15    and his feet more to the east?

16          A.   Correct.

17          Q.   But when you say facing, actually you mean like

18    looking south on his right side?

19          A.   Mr. Llamas was looking directly at us laying on his

20    right side.

21          Q.   As you approached?

22          A.   That's correct.

23          Q.   And was it just you and Deputy McGuire that

24    approached him, or did some other officer approach with

25    you?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 54

```
 1     A.    Lieutenant Walsh approached with us.
 2     Q.    And do you have an estimate as to how much time
 3  passed from the shots being fired to the approach?
 4     A.    Are you talking about the second volley of shots?
 5     Q.    Yeah.  The second volley.
 6           I'm talking about the second volley.
 7     A.    I got you.  It was pretty much immediate.
 8           As soon as that second volley was done, we knew that
 9  he had to advance on Mr. Llamas and put him -- and apprehend
10  him.
11           So I would say as soon as Deputy McGuire stopped
12  firing, it was a matter of two to three seconds that were on
13  the move.
14     Q.    Did you notice any wounds to him when you approached
15  him?
16     A.    I don't recall seeing any wounds to Mr. Llamas.
17     Q.    Did he say anything when you approached him?
18     A.    Mr. Llamas?
19     Q.    Yes.
20     A.    No, sir.
21     Q.    Was he handcuffed?
22     A.    He was eventually handcuffed, yes.
23     Q.    When you say eventually, how much time passed after
24  approaching until he was -- but before he was handcuffed?
25     A.    I didn't -- I would say 20 seconds.
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 55

1      Q.   Was he still alive at the time you handcuffed him?

2      A.   I don't know.

3           MR. RAMIREZ:  May call for medical opinion.

4           But you may answer.

5           THE WITNESS:  I don't know, sir.

6   BY MR. GALIPO:

7      Q.   Did anyone check his breathing, if you know?

8      A.   I don't know if his breathing was specifically

9   checked.

10     Q.   Do you know if anyone checked for a pulse?

11     A.   I don't know.

12     Q.   Did you say anything to him as you were approaching

13  him?

14     A.   No, I did not.

15     Q.   Did you hear anyone else saying anything else to

16  him?

17     A.   I don't recall anything being said directly to

18  Mr. Llamas.

19     Q.   Was any medical attention given to him by any of the

20  deputies that you observed?

21     A.   Yes.

22     Q.   What medical attention did you observe?

23     A.   Lieutenant Walsh asked me to grab his unit which was

24  at the threshold of the driveway which I was unaware of, and

25  that he had a medical kit on his seat.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 56

1          So I retrieved Lieutenant Walsh's unit; drove it

2    down the driveway; and then gave Lieutenant Walsh the medical

3    kit.

4          At the same time I requested medical to respond up

5    to our location, and I went back to the threshold to escort

6    them in.

7      Q.   Did you observe medical attention being given to

8    Mr. Llamas?

9      A.   I don't recall observing any medical attention

10   specifically given to him.

11         I have witnessed it watching Lieutenant Walsh

12   body-cam, but I don't recall that the day of.

13     Q.   Okay.  You don't recall seeing it at the time, but

14   in reviewing the body-worn camera footage, you observed

15   that?

16     A.   That's correct.

17     Q.   And from observing the body-worn camera footage, if

18   you know, who was giving medical attention to Mr. Llamas?

19     A.   I believe it was Lieutenant Walsh.

20     Q.   And could you tell what type of medical attention he

21   was giving, whether they were seals or something else?

22     A.   By seals, do you mean like chest seals?

23     Q.   Yes.

24     A.   No.  It was more, gauze like attending to like a

25   bleeding.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 57

1    Q.    How long did you stay on-scene after the shooting?

2    A.    This is a rough estimate, 20 to 30 minutes-ish.

3          I don't recall.  I had to assist patrol with a

4    couple of things, and I honestly I would say 20 to 30

5    minutes.

6    Q.    And you indicated, I think, that you have seen some

7    of the video footage, and you were permitted to watch some of

8    it before you gave your interview?

9    A.    The interview after, yes, sir.

10   Q.    In terms of your training on tactics, are you

11   generally trained if you believe someone's armed with a

12   firearm, to try to have access to positions of cover if you

13   can?

14   A.    If the situation allows for it, yes.

15         It's obviously ideal to have some position of cover

16   and concealment.

17   Q.    Is that one of the reasons you were using the car

18   for some partial cover earlier in the incident?

19   A.    Yes, sir.

20   Q.    In terms of commands, are you generally trained to

21   give commands in a loud, clear voice if you can?

22   A.    Yes, sir.

23   Q.    And are you trained to give the person an

24   opportunity to comply with the commands if you can safely do

25   so?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 58

1      A.   Yes, sir.

2      Q.   With respect to deadly force, are you generally

3   trained that deadly force should only be used if there is an

4   immediate or imminent threat of death or serious bodily

5   injury?

6      A.   That's correct.

7      Q.   And as part of that training, are you trained that

8   that essentially means that the person has the ability,

9   opportunity, and apparent intent to immediately cause death

10  or serious bodily injury?

11     A.   Yes, sir.  That's correct.

12     Q.   And are you generally trained if those requirements

13  are not there, in other words, there is not an immediate

14  threat of death or serious bodily injury, then deadly force

15  should not be used?

16     A.   That's correct.

17     Q.   And are you trained that officers have to be able to

18  justify each shot when using deadly force?

19     A.   We're trained to, yes, sir.

20     Q.   Are you trained that a verbal warning that you're

21  going to use deadly force should be given when feasible?

22     A.   When feasible, yes, sir.

23     Q.   And I think you've already told me this, but you

24  would agree under the facts of this case based on your

25  training, it would not have been appropriate to shoot

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 59

1   Mr. Llamas for running away with and holding the gun to his

2   head if it had stayed in that position?

3           MR. RAMIREZ:  Asked and answered.

4           But you may respond.

5           THE WITNESS:  That's correct.  Based on what your

6   question is, if he had just kept the gun in his head, that in

7   and of itself would not have allowed for deadly force.

8   BY MR. GALIPO:

9       Q.   And running away in and of itself under these facts

10  would not have been sufficient based on your training to

11  shoot him; is that fair?

12      A.   I would say that's fair.

13      Q.   Okay.

14          MR. GALIPO:  We're going to try, Gene, just to show

15  a few of these videos.

16          MR. RAMIREZ:  Okay.

17          MR. GALIPO:  And I'm going to have Ms. Shannon Leap

18  help me with that.

19          Hopefully, this will show, so everybody could see

20  it.

21          Which one you want to start with, Shannon?

22          MS. LEAP:  I have the overhead one ready to go if

23  you want to start with that.

24          MR. GALIPO:  Okay.  We'll mark that as Exhibit 1.

25          I think, Sergeant, this is the overhead view from

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 60

1    the helicopter.

2            THE WITNESS:  Okay.

3            MS. LEAP:  And it's the critical incident video.

4            THE WITNESS:  Oh, it's the critical incident video

5    from the Sheriff?

6            MS. LEAP:  It's from that, yeah.

7            THE WITNESS:  I got you.

8            (Exhibit 1 was marked for identification.)

9            MS. LEAP:  Can everyone see that?

10           MR. RAMIREZ:  Yes.

11           MR. GALIPO:  Okay.  Why don't we play it once

12   through this portion, and it looks like it's starting at --

13   is it 5 minutes in?

14           MS. LEAP:  Yes.

15           MR. GALIPO:  Okay.  And then I might have you play

16   it again and stop it, but why don't we -- we see a figure

17   that looks somewhat white in this.

18   BY MR. GALIPO:

19       Q.   Is that, if you know, represent Mr. Llamas?

20       A.   Yes, it does.

21       Q.   And is it your understanding this comes on the

22   bottom-left from the helicopter?

23       A.   Yes, sir.

24       Q.   And on the upper-right, is it your understanding

25   that's footage from body-worn camera?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 61

1     A.   Yes, that's correct.

2     Q.   I think they tried to sync them, but we'll see.

3          Let's play it, please.

4          (Video playing.)

5          MR. GALIPO:  Okay.  Let's go back to five, and I'm

6     going to ask you to stop it at various times, Shannon.

7     BY MR. GALIPO:

8     Q.   And there is different people saying different

9     things, Sergeant.  So if you can listen to that, I might ask

10    you if you know who was saying that, whether it was the

11    ground unit or the airship and whether you heard that at the

12    time.

13         MR. GALIPO:  So let's start again, and I'll tell you

14    when to stop, Shannon.

15         (Video playing.)

16         MR. GALIPO:  Okay.  Let's stop.

17         (Video paused.)

18    BY MR. GALIPO:

19    Q.   So did you hear "Drop the gun" being yelled out?

20    A.   Yes, sir, I did.

21    Q.   Do you know who was saying that?

22    A.   Lieutenant Walsh.

23    Q.   Okay.  And then it sounded like, "If he budges, you

24    tack him."

25         I don't know if I got that right or not.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 62

```
 1      A.   Tag, T-a-g.
 2      Q.   Oh, tag him.  Did you hear that when we just played
 3   the audio?
 4      A.   I heard it on the audio, yes, sir.
 5      Q.   What do you understand that to mean, if he budges,
 6   you tag him?
 7           MR. RAMIREZ:  May call for speculation.
 8           But you may respond if you understand.
 9           THE WITNESS:  I understand.  I understood that as if
10   he lowers the weapon from his head and presents it towards
11   us, then it becomes a lethal force encounter.
12   BY MR. GALIPO:
13      Q.   Okay.  So budges, you understood as movement of the
14   weapon?
15      A.   That's correct.
16      Q.   And tag him, you understood to mean shoot him?
17      A.   Yes, sir.
18      Q.   And that was the lieutenant saying that?
19      A.   Correct.
20      Q.   Okay.
21           MR. GALIPO:  Let's play a little more, please.
22           (Video playing.)
23           MR. GALIPO:  Let's stop it again.
24           (Video paused.)
25   BY MR. GALIPO:
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 63

1    Q.   Is that the lieutenant continuing to give those

2    commands?

3    A.   That's correct.

4    Q.   And then he starts saying something like, "Don't let

5    him."

6         Did you hear that portion?

7    A.   Yes, sir.

8    Q.   Did you understand what he was referring to?

9         MR. RAMIREZ:  May call for speculation.

10        But you may respond if you can.

11        THE WITNESS:  Yes.  I knew what he was going to

12   say.

13   BY MR. GALIPO:

14   Q.   What was that?

15   A.   To not let him get towards that -- there is a house

16   at the end of that driveway, and to not allow the suspect to

17   get towards that house.

18   Q.   Did you interpret that to mean that if he got

19   towards the house, it was okay to shoot him?

20        MR. RAMIREZ:  Vague and ambiguous to the term "okay

21   to shoot him."

22        But you may respond if you understand.

23        THE WITNESS:  No.  I don't believe that that was a

24   command that if he gets to the house, we can just blatantly

25   shoot him, but there still has to be more to it when we pull

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 64

1    the trigger.  In and of itself, no.

2  BY MR. GALIPO:

3        Q.   Okay.  All right.  Thank you.

4             And we stopped it at 5:23.

5             Let's play it, please.

6             (Video playing.)

7             MR. GALIPO:  Stop a moment.

8             (Video paused.)

9  BY MR. GALIPO:

10       Q.   So who is saying, "We got to move up on a unit" or

11  something like that?

12       A.   All these commands are still Lieutenant Walsh.

13       Q.   Okay.  And what did you understand that to mean?

14       A.   I knew that we had to close the distance between us

15  and the suspect because of the house that was at the end of

16  that driveway.

17       Q.   Okay.  And then let's -- we stopped it at 5:34.

18            Let's continue, please.

19            (Video playing.)

20            MR. GALIPO:  Let's stop again.

21            (Video paused.)

22  BY MR. GALIPO:

23       Q.   Was that the lieutenant again saying, "He's got

24  cover, he's got cover."

25       A.   Yes, sir.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 65

1    Q.   And also the lieutenant saying, "We got to move up

2    on him."

3    A.   That's correct.

4    Q.   Okay.  And we can see him in the lower-left here,

5    but I take it during this time frame, you yourself could not

6    see him; is that correct?

7    A.   Correct.

8    Q.   Okay.  We stopped it at 5:39.

9         MR. GALIPO:  Let's continue.

10        (Video playing.)

11        MR. GALIPO:  Let's stop it.

12        (Video paused.)

13   BY MR. GALIPO:

14   Q.   We stopped it at 5:48.

15        If you know, has the shooting taken place yet?

16   A.   No, sir.

17   Q.   Okay.

18        MR. GALIPO:  Continue.

19        (Video playing.)

20        MR. GALIPO:  Stop.

21        (Video paused.)

22   BY MR. GALIPO:

23   Q.   Can you tell if he is in the driveway or not, or

24   somewhere else?

25   A.   I'm sorry.  Can I tell if the suspect's in the

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 66

```
 1   driveway?
 2        Q.   Yeah.  He seem -- I'm looking at the lower left.
 3             There seems to be some type of a pathway, but I
 4   don't know what that is.
 5             Do you know?
 6        A.   I believe that's still the driveway.
 7        Q.   Okay.
 8        A.   The driveway continues past the house.
 9        Q.   All right.  And to your knowledge, has the shooting
10   taken place yet?
11        A.   No, sir.
12             MR. GALIPO:  All right.
13             We stopped it at 5:50.
14             Let's continue.
15             (Video playing.)
16             MR. GALIPO:  Let's stop it.
17             (Video paused.)
18   BY MR. GALIPO:
19        Q.   Did we just hear the first group of shots?
20        A.   Yes, sir.
21        Q.   And is the footage on the upper-right from your
22   body-worn camera?
23        A.   I don't believe it is, no.  This should be
24   Lieutenant Walsh's.
25             I'm not quite sure.  It says Deputy 3.
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 67

```
1          I'm not -- I don't think it's mine.

2          Can we rewind it just a couple of seconds so I

3    could --

4       Q.  Sure, sure.  That might help you.

5          MR. GALIPO:  Let's go like five seconds back so

6    we can hear the shots.

7          THE WITNESS:  So that's me on the left right there.

8          So no.  This would be Lieutenant Walsh.

9    BY MR. GALIPO:

10      Q.  I got it.  So he would have been somewhere behind

11   you?

12      A.  That's correct.

13      Q.  Does that refresh your recollection that McGuire

14   might have been to your right, not your left?

15      A.  Yes, sir.  I stand corrected on that.

16      Q.  Okay.

17      A.  And then also the distance of the initial shot, I

18   mean you can see where Walsh's after the initial shot,

19   Lieutenant Walsh's truck it basically parked on the hard wall

20   of the road and the dirt.

21          So I think the ten foot would probably be pretty

22   accurate from my initial shot.

23      Q.  Okay.  Did you ever try to use his vehicle as cover

24   at that point?

25      A.  I was unaware at that -- when the shooting occurred,
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 68

1   I was a unaware that Lieutenant Walsh drove his vehicle.

2        I did not hear him say anything about the cover.

3        So my assumption at this moment was that Lieutenant

4   Walsh was on foot with us.

5        Q.   Okay.  If you had heard that and seen the vehicle,

6   you might have considered that as an option?

7        MR. RAMIREZ:  Calls for speculation.

8        But you may respond.

9        THE WITNESS:  It would have been considered, yes.

10       MR. GALIPO:  Okay.  We stopped it again at 5:50.

11       So let's move forward just a little bit and I'll

12   tell you when to stop.

13       (Video playing.)

14       MR. GALIPO:  Stop.

15       (Video paused.)

16   BY MR. GALIPO:

17       Q.   So that was -- that was the first group of shots

18   that we heard; correct?

19       A.   That's correct.

20       Q.   And someone is saying, "Hold, hold, hold."

21       Do you know who that is?

22       A.   I have to listen to it again.  It might be

23   Lieutenant Walsh, but I have to listen to it again.

24       Q.   Okay.

25       MR. GALIPO:  Let's go back and play that again for

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 69

1    the sergeant.

2           (Video playing.)

3           MR. GALIPO:  Stop.

4           (Video paused.)

5           THE WITNESS:  I believe that was Deputy McGuire.

6    BY MR. GALIPO:

7       Q.   I think you indicated at this point it was difficult

8    for you to see exactly what body position Mr. Llamas was

9    in?

10      A.   That's correct.

11      Q.   And we stopped it at 5:58.

12          MR. GALIPO:  Let's continue and see if we hear any

13   additional shots.

14          (Video playing.)

15          MR. GALIPO:  Stop.

16          (Video paused.)

17   BY MR. GALIPO:

18      Q.   So the additional shots, we can hear in that

19   segment?

20      A.   Yes, sir.

21      Q.   And after those shots, is someone saying, "We got to

22   move on him because the house could be occupied," is that the

23   lieutenant again?

24      A.   That's correct.

25      Q.   And then let's continue.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 70

1          I think this says footage from Sheriff's helicopter

2     slowed down and zoomed-in.

3          (Video playing.)

4          MR. GALIPO:  We can stop that.  Thank you for that,

5     Shannon.

6          (Video paused.)

7     BY MR. GALIPO:

8     Q.   So it sounds like although you see the car in the

9     video, the lieutenant's car, and you heard the cover

10    references, at the time you were not aware the car was

11    there?

12    A.   At the time of the shooting, that's correct.

13    Q.   When did you first become aware the car was there

14    after the shooting?

15    A.   When Lieutenant Walsh asked me to go get his unit

16    for his medical kit.

17    Q.   Did you ever before you left the scene have contact

18    with the female?

19    A.   I did not, no.

20    Q.   Did you know, I think you mentioned earlier, she was

21    taken into custody at some point?

22    A.   Yes, sir.

23    Q.   And I think you've answered this, but you never

24    heard Mr. Llamas say anything; is that correct?

25    A.   I never heard Mr. Llamas say one word the entire

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 71

1   time I was there.

2        Q.    Okay.

3             MR. GALIPO:  I think we'll take our last break if

4   that's okay with everyone; come back about 3:10.

5             And Anthony, if you want to call our office, we can

6   put you on speaker phone or call me on the cell, whatever you

7   would like to do.

8             Okay.  We'll take a break.

9             Thank you, all.

10            (Recess taken.)

11            THE VIDEOGRAPHER:  And going back on the record at

12  3:14 p.m.

13  BY MR. GALIPO:

14       Q.    Okay.  Back on the record.

15            So I want to go back to just the few seconds before

16  the -- you fired your shot.

17            That's the time frame I'm going back to.

18            When you saw Mr. Llamas, is that when you came to a

19  stop at that location of the driveway, or were you stopped

20  before you saw him?

21       A.    I believe I stopped as soon as I saw him.

22       Q.    And we can at least see from the recent video

23  footage we looked at that Deputy McGuire would have been to

24  your right and slightly behind you; is that fair?

25       A.    For the first volley, yes, sir.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 72

1    Q.   And the lieutenant, although, you didn't know it at
2    the time, would have been behind both of you?
3    A.   That's correct.
4    Q.   And then for the second volley of shots, did you
5    know where Deputy McGuire was in relation to you?
6    A.   I believe his second volley was off to my left.
7    Q.   Okay.  First volley to your right slightly behind
8    you, second volley to your left?
9    A.   That's correct.
10   Q.   And so when you first saw Mr. Llamas in the
11   driveway, he would have been a 120 to 150 feet from you?
12   A.   Roughly.  Yes, sir.
13   Q.   And when you saw him at that point with the gun to
14   the right side of his head, it would have been that same
15   distance?
16   A.   About that, yes, sir.
17   Q.   And when you saw the movement of the gun that you
18   described, he would have still been about that same
19   distance?
20   A.   Yes, sir.
21   Q.   And then he went down to the ground almost
22   immediately after you fired your shot; is that fair?
23   A.   It was pretty much simultaneous from me shooting to
24   him going down.
25   Q.   And you had the impression you may have struck

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 73

1  him?

2     A.   I was under the impression he was struck by gunfire,

3  yes.  Whether it was mine, that, I don't know that.

4     Q.   And when he was on the ground, you continued to

5  maintain a visual on him?

6     A.   That's correct.

7     Q.   And he still would have been this 120 to 150 feet

8  away?

9     A.   Correct.

10     Q.   And at that point when he was on the ground, you're

11  saying you did not see a gun or a gun pointed in your

12  direction or coming in your direction; is that fair?

13         MR. RAMIREZ:  Misstates his testimony.

14         But you may respond.

15         THE WITNESS:  When he is on the ground, I did not

16  see the weapon going towards me.  Prior to the shooting, I

17  did see the weapon moving towards me.

18  BY MR. GALIPO:

19     Q.   Right.  But when he was on the ground after the

20  first group of shots, did you see a weapon at all in his hand

21  whether it was pointed towards you, moving towards you, or

22  just in his hand?

23     A.   At which point?

24         Maybe I misunderstood your question.

25     Q.   That's okay.  So after the first -- after your shot

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 74

1  and Deputy McGuire's shot, he goes to the ground, and for the

2  next five seconds, ten seconds you're maintaining a visual on

3  him; correct?

4     A.   Yes.

5     Q.   During that next five or ten seconds, did you see a

6  gun in his hand at all?

7     A.   So I believe I stated that the time lapse between my

8  first volley and the second volley was two to three

9  seconds.

10    Q.   Right.  Now I'm moving forward to when he was on the

11 ground.

12    A.   Okay.

13    Q.   So let me break it down.  After he went to the

14 ground, but before you heard the second volley two or three

15 seconds later, did you see any gun in his hand?

16    A.   No.

17    Q.   During the second volley did you see any gun in his

18 hand?

19    A.   No, sir.

20    Q.   Immediately after the second volley, did you see any

21 gun in his hand?

22    A.   Not immediately after, no, sir.

23    Q.   And are you saying from the distance you were at

24 after he went to the ground, you could not tell what position

25 he was on the ground?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 75

1    A.   Based on my position after he went down, I don't

2   know what exactly was obscuring my view of him, but whether

3   it would be the terrain, the angles of the driveway, things

4   like that, but I could see him moving around.

5          But I did not have a clear visual of him.

6    Q.   I think you could say you could see his knees and

7   things like that?

8    A.   That's what I recall, yes.

9    Q.   Was there any tree or anything obstructing your view

10  of him, to your knowledge?

11   A.   I don't recall one.

12          MR. GALIPO:  Gene, do you have any questions of the

13  sergeant today?

14          MR. RAMIREZ:  Yes, I do, if you don't mind.

15          MR. GALIPO:  I don't mind.

16                        EXAMINATION

17  BY MR. RAMIREZ:

18   Q.   All right.  Sergeant Hubacheck, when you approached

19  Mr. Llamas, did you see a gun?

20   A.   Yes, I did.

21   Q.   Where was the gun?

22   A.   In his right hand.

23   Q.   Where was the barrel pointing?

24   A.   Directly at our approach as we walked up to him.

25   Q.   Does Mr. Llamas have to be disarmed, in other words,

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 76

1    the gun taken out of his hand before first aid could be

2    started?

3        A.   Yes, sir.

4        Q.   Mr. Galipo asked you if you knew the lieutenant's

5    truck was right next to you in the driveway, would you have

6    taken cover.

7             You said it would be considered.

8             What did you mean?

9        A.   So the cover would have been considered, but based

10   on this particular situation, the cover probably would not

11   have been utilized because the time it would have taken to

12   utilize that, that would allow Mr. Llamas to continue his

13   motion towards that residence.

14       Q.   Does that mean you were willing to put your own life

15   at risk by getting away from cover in order to prevent

16   Mr. Llamas from getting close to a house that might be

17   occupied?

18       A.   Yes, sir.

19            MR. GALIPO:  Objection.  Leading.

20            MR. RAMIREZ:  I have nothing further.

21                            EXAMINATION

22   BY MR. GALIPO:

23       Q.   So if I'm understanding your testimony, because I

24   thought you told me earlier the gun was not pointed at you

25   when you fired your first shot.  I thought you said it was

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 77

1    coming in your direction.

2            Did I misunderstand you?

3        A.   I think you're misunderstanding my second with what

4    Mr. Ramirez just asked me, is when I fired my round, the

5    weapon was not directly pointed at me.

6            It was the muzzle of the weapon was moving towards

7    our direction.  After all shots were fired and we approached

8    him, that's when I saw the weapon in his hand and the muzzle

9    pointed straight at us.

10       Q.   Okay.  Did you ever see the gun pointed at you

11   before you fired?

12       A.   Not directly at me, no, sir.

13       Q.   Did you ever see the gun pointed at you during the

14   first volley of shots including your shot and Deputy

15   McGuire's shots?

16       A.   Not directly at me, no, sir.

17       Q.   And I think you already told me this, but you didn't

18   see the gun pointed at you during the second volley; is that

19   correct?

20       A.   That's correct.

21       Q.   And if I also understand your testimony, you're

22   saying that him having the gun to his head or running away

23   based on your training would not justify shooting him; there

24   had to be more than that?

25       A.   In a hypothetical, yes.  But in this particular

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 78

1  situation we did have more than that, but the gun to his head

2  alone is not justification for lethal force.

3      Q.   And you're saying if the gun was not moving in your

4  direction, then based on your training and experience you

5  would not have shot?

6      A.   I would not have shot, no.

7      Q.   Okay.

8           MR. GALIPO:  Gene, did you have any further

9  follow-up?

10          MR. RAMIREZ:  Yes.

11                              EXAMINATION

12  BY MR. RAMIREZ:

13     Q.   When the lieutenant -- when Mr. Galipo asked you

14  about the lieutenant saying tag him or something of that

15  nature, did you take that as an order that you have to shoot

16  right then and there?

17     A.   No, sir.

18     Q.   Do you still have to make the individual decision as

19  to why you can press the trigger and shoot someone?

20     A.   Yes, sir.  It's up to each individual officer to

21  justify when they pull the trigger.

22          They cannot be given the order to do so.

23     Q.   And are you trained that you have to allow the

24  suspect to shoot at you before you're allowed to defend

25  yourself with deadly force?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 79

1      A.   No, sir, I'm not.

2           MR. RAMIREZ:  I have nothing further.

3                          EXAMINATION

4   BY MR. GALIPO:

5      Q.   **Do you recall -- I'm trying to remember the verbiage**

6   **that the lieutenant used regarding the tagging --**

7           **Go ahead.**

8      A.   "If he budges, tag him."

9           I believe that's what the words were.

10     Q.   **Okay.  Thank you.**

11          MR. GALIPO:  Gene, anything else?

12          MR. RAMIREZ:  No, sir.  Thank you very much.

13          MR. GALIPO:  You're welcome.

14          Anthony, are we good?

15          MR. BABAKHANIAN:  Great.

16          MR. GALIPO:  All right.  I'd like to say hi to my

17   good friend, Larry Marks, that I see --

18          (Multiple, simultaneous colloquy)

19          MR. GALIPO:  Hold on a second.

20          We have the video going.

21          Can we turn the video -- we're done, Noah.

22          VIDEOGRAPHER:  Okay.  Going off the record at 3:24

23   p.m.

24          (Deposition proceeding concluded at 3:24 p.m.)

25                          *   *   *

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

**Page 80**

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3    Case Name:  S.L., et al. vs. County of Riverside, et al.

 4    Date of Deposition:  December 18, 2024

 5    Job No.:  116557

 6

 7              I, _____, hereby certify

 8    under penalty of perjury under the laws of the State of

 9    California that the foregoing is true and correct.

10              Executed this _____ day of _____,

11    20____, at _____, California.

12

13

14

15

16

17              _____

18                        SHAWN HUBACHECK

19

20

21

22

23

24

25
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 81

```
1                        CERTIFICATE

2                             OF

3           CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5           I, JINNA GRACE KIM, CSR No. 14151, a Certified

6   Stenographic Shorthand Reporter of the State of California,

7   do hereby certify:

8           That the foregoing proceedings were taken before me

9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15          Further, that the foregoing is an accurate

16  transcription thereof.

17          I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  December 18, 2024.

23          _____

24          Jinna Grace Kim, CSR No. 14151

25
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 82

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name:  S.L., et al. vs. County of Riverside, et al.

 3   Witness:  Shawn Hubacheck

 4   Date of Deposition:  December 18, 2024

 5   Job No.:  116557

 6

 7   Reason Codes:   1. To clarify the record.

 8                   2. To conform to the facts.

 9                   3. To correct transcription errors.

10

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17   Page _____ Line _____ Reason _____

18   From _____ To _____

19   Page _____ Line _____ Reason _____

20   From _____ To _____

21   Page _____ Line _____ Reason _____

22   From _____ To _____

23   Page _____ Line _____ Reason _____

24   From _____ To _____

25   Page _____ Line _____ Reason _____
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

                                                                    **Page 83**

```
 1   DEPOSITION ERRATA SHEET

 2   From _____ To _____

 3   Page _____ Line _____ Reason _____

 4   From _____ To _____

 5   Page _____ Line _____ Reason _____

 6   From _____ To _____

 7   Page _____ Line _____ Reason _____

 8   From _____ To _____

 9   Page _____ Line _____ Reason _____

10   From _____ To _____

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17

18   _____ Subject to the above changes, I certify that the

19   transcript is true and correct.

20   _____ No changes have been made.  I certify that the

21   transcript is true and correct.

22

23        _____

24                  SHAWN HUBACHECK

25
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024                    Index: 1..additional

**Exhibits**

**HubacheckS 1**
4:12 59:24
60:8

---

**1**

**1**  5:7,21
32:12
59:24 60:8

**1-10**  5:24

**10**  49:8

**12**  48:24
49:6

**120**  15:13
72:11 73:7

**15**  35:20
36:7,17
41:8

**150**  15:13
72:11 73:7

**16th**  9:5

**18**  5:2,6

**1995**  9:23

**1999**  10:8

**1:14**  5:3,5

---

**2**

**2**  32:12

**20**  28:21
54:25

57:2,4

**20-plus**  28:3

**2008**  11:2,
5,22,24

**2020**  13:11
14:6

**2022**  11:5,
7,22,24
13:11 14:8

**2023**  11:10
13:11
14:10

**2024**  5:2,6

**205**  10:17

**22240**  22:1
30:20

**2:24**  45:25

---

**3**

**3**  32:12
66:25

**30**  30:6
38:1 57:2,
4

**3:10**  71:4

**3:14**  71:12

**3:24**  79:22,
24

---

**4**

**4**  32:12,13

**40**  15:11
29:9 30:13
35:8,10,15
39:24
47:18

**40-millimeter**
21:11

---

**5**

**5**  60:13

**50**  15:11
16:25 29:9
30:13
35:8,10,15
39:24
47:18

**556**  14:15,
16 43:18

**5:00**  7:22

**5:23**  64:4

**5:24-CV-00249-
CAS-SP**  6:2

**5:34**  64:17

**5:39**  65:8

**5:48**  65:14

**5:50**  66:13
68:10

**5:58**  69:11

---

**6**

**6**  48:24

**60**  29:4

31:1

**60-second**
19:6 20:24
21:21
27:12

---

**9**

**9**  48:25
49:7,8

**9-millimeter**
43:14

---

**A**

**ability**  58:8

**Absolutely**
41:10
43:20

**academy**
10:7,10

**access**  57:12

**accurate**
44:8,10
67:22

**acres**  28:3

**actual**  34:23
43:7 44:6
50:25

**Ad**  5:23

**Adam**  27:3

**additional**
43:2
69:13,18

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024       Index: address..background

address  22:1
  30:18,19

Administration
  39:2

advance  54:9

afternoon
  5:4

agree  58:24

ahead  23:13
  33:20
  37:22 79:7

aid  76:1

aiming  16:1,
  6

airship
  30:21
  31:8,9,14,
  15,17
  34:1,13
  40:13
  61:11

Akaragian
  6:14

alive  55:1

allowed  59:7
  78:24

altogether
  8:22 28:20

ambiguous
  22:18 26:7
  29:16
  30:23
  63:20

angles  75:3

announcer
  35:14

Anthony  6:13
  71:5 79:14

anticipate
  7:24

apparent
  58:9

appeared
  18:22

apprehend
  54:9

approach
  52:18,21
  53:24 54:3
  75:24

approached
  52:24
  53:10,21,
  24 54:1,
  14,17
  75:18 77:7

approaching
  33:20
  54:24
  55:12

approximate
  17:24 19:6
  20:25
  21:21

approximately
  10:16
  28:15,17

29:4,8
  30:11 36:7
  50:3

April  9:5
  11:10

area  16:2,7
  24:18 31:4

arm  53:4

armed  57:11

assigned
  10:23 11:3
  21:15,19
  32:12

assignment
  10:21
  11:14,21,
  25

assignments
  11:22

assist  57:3

assume  30:8

assuming
  9:20

assumption
  18:20 68:3

attending
  56:24

attention
  55:19,22
  56:7,9,18,
  20

attorney
  9:12,13

13:18

audio  38:3,4
  46:7 52:12
  62:3,4

auto  14:21,
  22

automatic
  14:25 15:1

Aviation
  8:17

aware  21:10
  22:11,12,
  21,22
  23:1,22
  31:7 47:4
  70:10,13

                B

Babakhanian
  6:13 79:15

back  8:1
  16:4 24:2
  25:24,25
  29:3 30:5
  34:21
  37:25
  39:16,17,
  23 45:24
  50:20 51:1
  56:5 61:5
  67:5 68:25
  71:4,11,
  14,15,17

background
  9:18

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024                    Index: ball..changed

ball  21:12

bangs  21:12

barrel  17:16
  75:23

based  18:9,
  20 29:13
  42:12
  58:24
  59:5,10
  75:1 76:9
  77:23 78:4

basic  48:3

basically
  31:6 33:23
  40:18 42:3
  67:19

battery
  37:16,19

BCM  14:15

beginning
  19:21

behalf  6:10,
  11,20 9:10

bit  9:18
  32:4 41:9
  68:11

bite  24:20
  25:2,7

bladed  42:1,
  5

blatantly
  63:24

bleeding

56:25

boat  28:4

bodily  18:14
  42:20
  58:4,10,14

body  15:25
  16:2,5,14
  42:1
  48:10,21
  49:6,8
  50:18,24
  51:2 52:23
  69:8

body-cam
  8:16,17
  38:9 56:12

body-worn
  37:7,8,18,
  24 38:7,
  19,22
  39:3,12
  52:14
  56:14,17
  60:25
  66:22

bottom  48:24

bottom-left
  60:22

break  7:16,
  18 31:25
  45:18
  71:3,8
  74:13

breathing
  55:7,8

broadcast
  34:13

budges  61:23
  62:5,13
  79:8

Burger  10:11

bushes  30:1

buttocks
  48:6,12

─────────────
       C
─────────────

caliber
  14:16
  43:13

California
  5:1 6:1

call  11:14,
  16 24:21
  25:5,24
  52:3 55:3
  62:7 63:9
  71:5,6

called  6:20

calling  49:5

Calls  49:22
  68:7

camera  37:7,
  8,19,24
  38:7,20,22
  52:14
  56:14,17
  60:25
  66:22

cameras
  39:3,13

Campbell
  6:15

capabilities
  25:4 46:10

capability
  43:25
  46:21

caption  5:11

capture
  38:2,5,10

captured
  37:23
  52:11

car  57:17
  70:8,9,10,
  13

Carolyn  6:14

carry  21:12

case  6:1
  15:4,15
  42:20
  44:12
  58:24

caught  52:13

cell  71:6

Central  6:1

changed
  37:17
  39:7,10,
  12,13,15

channel
32:9,13,
14,15

channels
32:11

check   55:7

checked
55:9,10

chest   56:22

chest-down
50:20

chest-stomach
16:6

Chevy   19:19

circumstances
24:9

clarification
25:21

clarify
25:13

clear   7:9
14:20
16:16 22:7
24:18,24
50:22
57:21 75:5

click   37:20

clock   48:22
49:7

close   10:20
17:17,19,
21,25
64:14

76:16

college   9:24

colloquy
79:18

comfortable
49:1

command
24:20 25:2
39:1 63:24

commands
18:3 40:4,
7,14,15
42:22,25
43:2
57:20,21,
24 63:2
64:12

communicate
22:14

communication
25:11
26:5,12,14
32:5

communications
31:9,16,
19,21
32:1,9,16,
23 33:3

compass
40:16

compass-wise
40:22

comply   57:24

concealment
57:16

concluded
79:24

confused
15:16

conserve
37:16,19

consideration
26:4

considered
26:2 68:6,
9 76:7,9

contact
70:17

containment
25:15
28:2,3

continue
46:1 64:18
65:9,18
66:14
69:12,25
76:12

continued
73:4

continues
66:8

continuing
34:13 63:1

conversation
27:5,11,
14,19,25
52:3

corner   25:15

correct
11:15 16:8
18:15 19:4
21:1 22:5,
8 23:21
27:9,21,22
29:6 30:15
34:18,19
37:6 38:18
39:22,25
40:20,21
41:1,2,20
42:7,11
43:12
44:11,14,
24 46:4,
12,18,25
47:1,3,10,
19 48:16,
19 50:5
52:17
53:16,22
56:16
58:6,11,16
59:5 61:1
62:15,19
63:3 65:3,
6,7 67:12
68:18,19
69:10,24
70:12,24
72:3,9
73:6,9
74:3
77:19,20

corrected

67:15

corrective
47:24

correctly
18:16
20:20

Counsel   6:8

County   5:24
6:18 10:23
29:1

couple   12:6
27:23
36:11 41:6
57:4 67:2

court   6:1,5
7:2 27:2

cover   19:13
20:2,8,9,
24 57:12,
15,18
64:24
67:23 68:2
70:9 76:6,
9,10,15

crested   30:2
36:8

Criminal
10:2

critical
60:3,4

CTE   15:19

current
10:16

custody
70:21

cut   26:25

_____

**D**

_____

D-A-Y   27:3

Dale   6:10

dark   48:4

date   5:6
12:1,13

David   27:3

Davis   32:3

day   26:17
27:5,11,19
28:10
56:12

days   9:5

deactivated
37:18

deadly   58:2,
3,14,18,21
59:7 78:25

death   18:13
42:20
58:4,9,14

December
5:2,6

decision
78:18

defend   78:24

degree   10:3

degrees   49:3

department
10:24
28:22,24,
25

depends
22:20

deployed
22:17,21,
23 23:25
24:11 25:8
28:5

deploying
23:23 24:9

deployment
25:13,16,
17

depo   5:15,
16

deposition
5:7,10,22
6:3 8:9
35:16
49:19
79:24

depositions
5:12

deputies
39:5 55:20

Deputy   5:8,
12 19:11,
16 20:3,15
21:24 22:2
26:17

27:5,11,19
32:3
33:15,20
34:12 35:4
38:19,21
39:20 40:7
42:1 44:25
45:12
47:4,6,7,
8,12
49:13,21,
24 50:2,6,
7 51:12,
16,19
52:1,3,6,
8,21 53:23
54:11
66:25 69:5
71:23 72:5
74:1 77:14

deputy-
involved
22:4

describe
17:23
19:14
49:2,4

description
48:20

designed
14:21

details
13:3,9

develop   24:4

Di   40:13

**difficult**
  69:7

**dilapidated**
  28:4

**dinner**  8:2

**direction**
  16:20,21
  18:4
  32:24,25
  33:6,7,9,
  25 34:10,
  12 37:2
  39:1
  40:16,18,
  22,24
  41:25
  42:10
  46:16,20
  49:5
  51:10,11
  52:2,10
  53:11
  73:12
  77:1,7
  78:4

**directly**
  35:8 42:3
  53:19
  55:17
  75:24
  77:5,12,16

**dirt**  21:25
  35:3 53:5
  67:20

**disarmed**
  75:25

**discussed**
  42:18

**discussion**
  24:8,13,
  14,16

**discussions**
  23:22

**dispatch**
  32:19

**distance**
  15:10
  18:21
  30:11
  64:14
  67:17
  72:15,19
  74:23

**District**
  5:25 6:1

**documents**
  8:8,13

**dog**  23:25
  24:10
  25:5,6,8,
  14,16,24
  26:3,10,18
  27:8

**dog's**  26:21

**dogs**  25:2,6

**door**  19:22,
  24 20:2,3,
  4,6,22,24

**doors**  19:23

**Downtown**
  32:19

**dozen**  12:6

**drawn**  37:15

**drive**  8:1

**drive-thrus**
  10:12

**driver**  19:21
  20:1,15,21
  38:16

**driveway**
  22:1,3,6
  30:2,10,
  12,14 31:4
  33:10,20
  34:13,21,
  22,24
  35:19,24
  36:2,9,14,
  25 39:16
  40:14,17
  41:11
  42:14,24
  43:2 44:23
  48:17
  53:2,5,6
  55:24 56:2
  63:16
  64:16
  65:23
  66:1,6,8
  71:19
  72:11 75:3
  76:5

**driveway's**
  35:3

**drop**  42:23,
  25 61:19

**dropped**  42:2

**drove**  56:1
  68:1

**duly**  6:21

_____

                E

**earlier**  22:9
  30:18
  31:13
  38:15 41:8
  42:19
  46:3,23
  57:18
  70:20
  76:24

**east**  20:13,
  14 30:10
  53:15

**eastbound**
  30:9

**easterly**
  33:9

**education**
  9:19

**effect**  26:11

**emerge**  48:17

**emerged**  32:6

**Emergency**
  10:24
  11:16

**encounter**

62:11

end  10:3
  50:18
  63:16
  64:15

ended  19:24
  21:25 27:8

enforcement
  22:8

entire
  29:22,24
  70:25

equal  33:23

escort  56:5

essentially
  18:12 53:8
  58:8

EST  11:16,
  18 13:13

estimate
  8:21 12:4
  15:10 23:9
  27:17
  28:19 29:7
  30:4 35:13
  47:11
  48:21
  49:12,21,
  24 54:2
  57:2

estimates
  35:10

et al  5:24

eventually
  37:10
  54:22,23

ex-football
  15:17

exact  41:12,
  13

EXAMINATION
  6:23 75:16
  76:21
  78:11 79:3

examined
  6:21

exempted
  39:2

exhibit
  59:24 60:8

expecting
  41:13

experience
  10:5 18:9
  29:13
  42:13 44:7
  78:4

exposed
  48:6,12

extreme
  25:14

extremely
  26:18

_____

F

_____

face  36:9

51:5 53:12

facing
  20:11,12
  40:16
  48:14,24
  53:1,2,12,
  13,17

fact  12:8

facts  58:24
  59:9

fair  43:16
  52:16
  59:11,12
  71:24
  72:22
  73:12

fairly  35:21

familiar
  43:5,10,15

fast  41:12,
  16

favorite
  10:12

feasible
  58:21,22

February
  11:7

Federal  14:2

feet  15:13,
  16 34:22
  35:1,2
  39:18
  53:15
  72:11 73:7

female
  23:16,20
  28:6 33:5
  70:18

female's
  32:25

figure  60:16

filed  5:25

finish  7:22

fire  13:21
  14:6 36:14
  42:17
  43:23
  44:15
  45:14
  46:10

firearm
  57:12

fired  13:24
  15:4,9
  16:1,9,12
  17:6 22:6,
  7,11,15,22
  24:1,11
  25:12,18,
  23 26:17
  28:7 29:10
  33:8 34:6
  35:23,24
  36:3 37:18
  41:4,11
  44:12,16
  45:5,8
  46:3,20,24
  47:6,7

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**                    Index: firing..give

48:9
49:13,20
51:16,19
52:2,19
54:3 71:16
72:22
76:25
77:4,7,11

**firing** 35:19
36:22 40:5
45:11
46:9,10,21
47:2,5
48:5 54:12

**Five-eleven**
10:15

**flash** 21:12

**fled** 21:23
32:23
33:7,9
34:6,9,10,
11 43:1

**fleeing** 33:6

**flight** 32:5

**follow-up**
78:9

**foot** 21:25
22:2 67:21
68:4

**footage** 8:14
37:23
56:14,17
57:7 60:25
66:21 70:1
71:23

**football**
15:12
35:14

**force** 58:2,
3,14,18,21
59:7 62:11
78:2,25

**formal** 9:14

**forward**
68:11
74:10

**foundation**
29:17

**frame** 11:4,
22 19:6
29:3 30:7,
22,24,25
36:22
38:5,15,17
40:8
41:12,18
51:19 65:5
71:17

**Friday** 5:17

**friend** 79:17

**front** 16:3,
5,25 18:3
20:11,12
33:24 35:8
36:10

**full** 14:21,
22,25

**full-time**
11:21,24

**fully** 15:1

_____

G
_____

**Galipo** 5:9,
15 6:10,24
8:3,6,7
12:20
13:2,8
14:5
15:21,22
22:24
24:25 26:9
29:21
30:25
31:3,6,10
39:11
45:17,21
46:1,2
47:23 50:1
55:6 59:8,
14,17,24
60:11,15,
18 61:5,7,
13,16,18
62:12,21,
23,25
63:13
64:2,7,9,
20,22
65:9,11,
13,18,20,
22 66:12,
16,18
67:5,9
68:10,14,
16,25
69:3,6,12,

15,17
70:4,7
71:3,13
73:18
75:12,15
76:4,19,22
78:8,13
79:4,11,
13,16,19

**game** 35:14

**gauze** 56:24

**gave** 8:25
9:7 30:18
40:7 56:2
57:8

**Gene** 6:16
8:4 59:14
75:12 78:8
79:11

**general** 25:1
51:11

**generally**
17:23
19:12
44:25
48:14,18
57:11,20
58:2,12

**gesturing**
18:18

**give** 9:3,14
13:16 18:6
23:8
27:10,18
40:4,10

41:14
48:20
49:21
57:21,23
63:1

giving  32:24
40:13
56:18,21

Global  6:6

good  5:4
7:23 10:13
14:23
16:17 21:6
45:17
47:20,21
79:14,17

Gotcha  5:20

grab  55:23

graduated
9:20

Great  79:15

grenades
21:12

ground  18:5,
18,22,24
21:23
31:22
45:6,9,14
47:16
50:11,16,
19 51:7,
13,16 53:4
61:11
72:21
73:4,10,

15,19
74:1,11,
14,24,25

group  66:19
68:17
73:20

guardian
5:23

guess  24:2
25:22

gun  12:2,8
17:7,11,
16,21,24
18:12,17
19:7 20:18
21:17,22
27:12,20
28:10,13
31:12,20
32:7 33:1
37:2 38:6
40:2 41:4,
19,21,24
42:2,8,14,
16,23
46:13,17
51:10,12,
15,18,23
52:1,9
59:1,6
61:19
72:13,17
73:11
74:6,15,
17,21
75:19,21
76:1,24

77:10,13,
18,22
78:1,3

gunfire  73:2

gunshot
22:10
25:11,12

_____

_____

H

H-U-B-A-C-H-E-
K  7:3

half  27:17

hand  12:2,8
17:7,9,10
18:25 19:2
37:3
51:15,18,
23 73:20,
22 74:6,
15,18,21
75:22 76:1
77:8

handcuffed
54:21,22,
24 55:1

handgun
43:11

handler  23:4
25:24 27:2

handlers
27:8

hands  12:11
44:19
48:22

happen  33:19

happened
11:8 15:17

hard  67:19

head  17:12,
14,15,17,
21 18:1,2,
7,9,13,17
19:3,7
20:18
21:14,22
27:13,20
28:10,13
31:12,20
32:8 33:1
37:2,5
38:6 40:2
41:4,19
42:9,15,17
51:5 53:2,
10,13,14
59:2,6
62:10
72:14
77:22 78:1

hear  7:4
22:10
25:11
31:16,23
35:22,24
36:21
45:5,8
46:24
55:15
61:19 62:2
63:6 66:19
67:6 68:2

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Shawn Hubacheck on 12/18/2024                    Index: heard..justify

69:12,18

heard  22:9,
  14,22
  25:11 31:8
  61:11 62:4
  68:5,18
  70:9,24,25
  74:14

hearing  7:6
  32:20 33:5

helicopter
  32:21 33:3
  60:1,22
  70:1

high  9:20,
  24

hold  5:9
  24:20 25:2
  68:20
  79:19

holding
  17:11
  19:2,7
  59:1

honest  35:13

honestly
  57:4

hoping  27:1

hour  7:15,
  16 27:17

hours  28:18

house  63:15,
  17,19,24
  64:15 66:8

69:22
  76:16

Hubacheck
  5:8,14,22
  6:17,19
  7:3 75:18

Huseby  6:6

hypothetical
  29:17
  77:25

_____

I

ideal  57:15

identification
  60:8

identify  6:8

imagining
  48:23

immediately
  29:4 44:16
  51:8 58:9
  72:22
  74:20,22

imminent
  58:4

impact  21:11

implemented
  39:4

impression
  47:2 50:15
  72:25 73:2

In-and-out
  10:11

incident
  8:15,22
  9:17
  10:19,22
  11:8 12:1
  13:22
  14:6,8
  57:18
  60:3,4

including
  77:14

inclusive
  5:24

incomplete
  29:16

indicating
  52:6

individual
  78:18,20

information
  23:18
  25:23
  33:1,25

initial
  37:17
  67:17,18,
  22

initially
  20:21
  36:17,24
  37:2 40:1

injury  18:14
  42:20
  58:5,10,14

inside  28:2

intent  58:9

interpret
  63:18

interruption
  46:7

interview
  8:12,25
  9:3,7,10,
  14 13:16
  57:8,9

invade  12:17

invoke  14:1

involved
  12:21 13:4
  24:8,19
  25:4

_____

J

Jimmie  5:8,
  12 6:17
  19:11
  33:15

Jinna  6:5

joking  15:18

Justice  10:2

justification
  78:2

justify
  58:18
  77:23
  78:21

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024                    Index: K-9..Llamas

**K**

K-9  22:17,
  21,23
  23:1,3,5
  24:9,17,19
  25:17,24
  27:2,7
  28:4 35:23

K-9's  25:4

K-9s  23:23
  25:1,2

Kass  6:16

keeping  7:23

Kim  6:5

kind  16:24
  18:5,21
  20:1 25:16
  33:9 37:1
  42:1,6
  48:3 50:23
  51:3 53:1

kit  55:25
  56:3 70:16

knees  51:3
  75:6

knew  31:15
  47:6 54:8
  63:11
  64:14 76:4

knives  12:11

knowledge
  25:22
  29:10,12

31:13
43:21 66:9
75:10

Kristine
  5:23

_____

**L**

lacks  29:17

lapse  74:7

large  25:15
  28:3

Larry  79:17

law  14:2
  22:7

lawyer  7:21

lay  18:23

laying  52:25
  53:3,19

Leading
  76:19

Leap  6:11
  59:17,22
  60:3,6,9,
  14

learn  9:18

left  16:25
  18:25 20:4
  33:23 35:4
  39:21 42:6
  45:1
  48:10,11,
  18,21
  52:25 66:2

67:7,14
70:17
72:6,8

legal  6:4

legs  16:18

lenses  47:25

less-lethal
  21:3,7,9,
  10,15,19

lethal  62:11
  78:2

lieutenant
  8:16 19:11
  20:14
  52:13 54:1
  55:23
  56:1,2,11,
  19 61:22
  62:18 63:1
  64:12,23
  65:1 66:24
  67:8,19
  68:1,3,23
  69:23
  70:15 72:1
  78:13,14
  79:6

lieutenant's
  70:9 76:4

life  76:14

light  48:2

lines  26:21

listen  61:9
  68:22,23

Litem  5:23

Litigation
  6:6

Llamas  5:23
  15:8,10
  16:11 18:5
  21:23,25
  23:15
  27:12,15,
  20 28:9
  29:5,19
  31:1,12,
  20,22
  32:6,7
  34:1 35:6,
  19 36:10,
  21 38:5
  39:23
  40:22
  41:10,25
  42:14,16,
  22 44:16
  45:5,14
  46:15
  47:2,15
  48:10,17
  50:7,10,22
  51:18,23
  52:9,18
  53:10,19
  54:9,16,18
  55:18
  56:8,18
  59:1 60:19
  69:8
  70:24,25
  71:18

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024            Index: Llamas'..morning

72:10
75:19,25
76:12,16

Llamas'
15:25 48:6

located 22:1

locates 25:7

location
19:14
21:24
28:16 42:2
56:5 71:19

long 17:20
28:15
37:15
41:3,9
57:1

longer 30:3
44:18,20

looked 8:14,
16,18,22
18:17
71:23

lot 7:21
28:21
35:10
37:14

loud 57:21

lower 66:2

lower-left
65:4

lowered 42:9

lowers 62:10

**M**

made 19:16
20:21
32:10

maintain
73:5

maintaining
74:2

make 15:1
36:12 52:8
78:18

makes 14:24
22:23
24:12
25:20 28:5
35:2 49:9

making 19:15
31:19,21

manner 16:14

Manning 6:16

Mardirossian
6:14

mark 36:4
59:24

marked 60:8

Marks 79:17

math 15:13

matter 5:22
54:12

mcguire 5:8,
12 6:17

19:11
20:3,15
21:24 22:2
33:15,20
34:12 35:4
38:19,21
39:20 40:7
42:1 44:25
45:12
47:4,6,7,
8,12
49:13,21,
25 50:3,6
51:13,16,
19 52:1,3,
6,8,21
53:23
54:11
67:13 69:5
71:23 72:5

Mcguire's
19:17 50:7
74:1 77:15

meaning
42:23

means 58:8

Media 5:7,21

medical
55:3,19,
22,25
56:2,4,7,
9,18,20
70:16

meets 30:14

memory 49:18

mentioned
70:20

Mike 19:11

military
10:5

mind 75:14,
15

mine 49:18
67:1 73:3

minor 5:23

minute
17:22,24

minutes
27:17,23,
24 45:18
57:5 60:13

minutes-ish
57:2

missions
37:14

Misstates
73:13

misunderstand
77:2

misunderstandi
ng 77:3

misunderstood
73:24

mode 37:24

moment 44:21
64:7 68:3

morning

Case 5:24-cv-00249-CAS-SP   Document 43-3   Filed 05/16/25   Page 510 of 885   Page ID #:854

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024          Index: motion..opening**

49:19

motion   76:13

mouth   32:8
33:1,10
34:21,22
36:9 41:11

move   41:21,
24 54:13
64:10 65:1
68:11
69:22

moved   19:22
49:6

movement
50:24
62:13
72:17

moving   16:9,
11,13,14
44:18
46:16,19
50:24 51:3
73:17,21
74:10 75:4
77:6 78:3

multiple
23:5,8
79:18

munitions
21:11

muzzle
46:16,19
77:6,8

**N**

names   19:9

nature   78:15

needed   24:17

night   8:20

Noah   6:4
79:21

north   17:4
20:11
21:24 22:6
29:19,22
32:24
34:4,7,23
35:2,8,9
36:9 43:1
48:15
53:11

north-south
53:8

northbound
29:5,8,11,
15 30:8

northerly
33:7
34:10,12
40:18

notice   54:14

number   6:1
29:2

**O**

o'clock-ish

49:9

object
12:16,24
39:8

Objection
14:1 76:19

objections
12:24 13:6

objects
12:11

obscuring
75:2

observation
20:22

observations
19:15,16
21:17

observe
50:13
55:22 56:7

observed
21:21
50:10,12
55:20
56:14

observing
56:9,17

obstructing
75:9

occupied
69:22
76:17

occur   13:10,

12

occurred
8:22 22:4
37:20
67:25

October   10:8

office   6:11
71:5

officer
15:16 19:9
32:5 33:11
53:24
78:20

officer's
33:13

officer-
involved
12:14,22
13:4,15

officers
19:5,10
28:19
58:17

on-scene
23:1,5
28:20
51:25 57:1

open   19:13,
23,24
20:22

opened   20:6,
23

opening
19:25

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Shawn Hubacheck on 12/18/2024        Index: operations..pointed

operations
    39:3

opinion    55:3

opportunity
    9:6  57:24
    58:9

option    14:21
    68:6

order    24:17
    37:16,19
    76:15
    78:15,22

orienting
    52:4

overhead
    30:21
    31:14,15
    59:22,25

overheard
    31:8

———————
P

p.m.    5:3,5
    45:25
    71:12
    79:23,24

Pacific    5:5

parked    67:19

part    11:1
    15:23,25
    16:4  19:20
    24:7  28:25
    29:2,23
    35:15  51:2

58:7

partial
    20:2,8
    57:18

Pasadena    8:2

passed    35:18
    36:15
    54:3,23

passenger
    19:22,24
    20:5,23
    38:16

past    66:8

patched
    32:14

pathway    66:3

patrol    32:14
    57:3

paused    61:17
    62:24
    64:8,21
    65:12,21
    66:17
    68:15
    69:4,16
    70:6

paved    34:7,
    23

pavement
    28:13  32:6
    34:23  35:2

people    61:8

Pepper    21:11

period    11:3
    17:20  41:3

permitted
    57:7

perpendicular
    16:24

person    15:5,
    7  57:23
    58:8

personally
    25:14
    28:17

personnel
    12:17  14:2

perspective
    16:3

phone    71:6

physically
    22:10  23:7
    28:1,14
    29:20

place    10:13
    27:25
    65:15
    66:10

Plaintiffs
    6:11,12,
    14,20

plan    24:7

plans    24:5

play    32:13
    60:11,15
    61:3  62:21

64:5  68:25

played    62:2

player    15:17

playing
    61:4,15
    62:22
    64:6,19
    65:10,19
    66:15
    68:13
    69:2,14
    70:3

point    8:25
    12:18,22
    13:10
    16:17
    17:11,18
    18:5,17,21
    20:16
    21:6,15,16
    25:8  33:4
    34:2,17
    36:2  37:18
    39:23
    40:15
    41:22  47:4
    50:23
    52:18
    67:24  69:7
    70:21
    72:13
    73:10,23

pointed
    18:5,24,25
    21:23
    42:3,16

46:13,17
51:10 52:9
73:11,21
76:24
77:5,9,10,
13,18

pointing
51:12
75:23

points  36:15

police  10:7
12:17 14:2
25:5 26:6

policies
8:12

policy  39:3,
6,10

portion
60:12 63:6

position
37:17
39:17
41:21
42:4,8
44:22
50:18,21
52:23
57:15 59:2
69:8 74:24
75:1

positioned
19:12

positioning
50:25

positions
57:12

possession
43:7

possibilities
26:2

possibility
26:5

possibly
15:20
35:23

potential
24:9

potentially
23:23

preparation
8:8

present  9:9
12:14
13:19

presents
62:10

press  14:18
78:19

pressed
17:17,19,
25

pretty  7:23
8:13 10:20
28:3 30:20
36:16,20
47:7,20,21
54:7 67:21
72:23

prevent
76:15

previously
28:11

prior  12:13
13:3,15,25
24:10,11
27:14
37:20
73:16

privileges
12:17 14:2

procedures
8:13

proceeding
79:24

promised
7:21

promoted
11:6,12

prone  51:1

pull  63:25
78:21

pulling  44:9

pulse  55:10

punts  35:15

put  54:9
71:6 76:14

putting  32:5

---

Q

---

quarter

49:3,10

question
7:10 16:16
23:24
24:23
27:19
51:21 59:6
73:24

questions
7:9 28:24
75:12

quick  35:21
36:16,20
41:7

---

R

---

radio  22:13
25:11
26:6,12,
13,15
32:18

Ramirez  5:14
6:16 8:1,5
12:16,24
13:6 14:1
15:19
22:18
24:21 26:7
29:16
30:23
31:2,4
39:8 45:20
47:22
49:22 55:3
59:3,16
60:10 62:7

63:9,20
68:7 73:13
75:14,17
76:20 77:4
78:10,12
79:2,12

**ran** 21:25
22:2 29:7,
19,25
30:9,10,11
34:5 38:6

**range** 12:4
41:14
43:18

**reacquired**
41:10 43:1

**read** 8:12
33:16

**reading** 5:11

**ready** 46:1
59:22

**realized**
38:13

**reallocated**
25:16

**reappeared**
41:4

**reason** 7:10,
17

**reasons**
42:18
57:17

**recall** 9:12
13:24

17:14
26:6,12
27:5 30:16
32:2,3,13,
15,20
33:3,5
34:15
37:23
42:22
48:14
52:5,6,25
54:16
55:17
56:9,12,13
57:3 75:8,
11 79:5

**recalling**
26:18

**recent** 71:22

**recess** 45:23
71:10

**recollection**
67:13

**record** 5:5,
18 6:9
45:22,24
71:11,14
79:22

**recorded**
32:16,19

**recording**
52:12

**reference**
27:10,16

**references**

70:10

**referred**
11:15

**referring**
11:19 63:8

**refresh**
67:13

**relation** 9:3
21:20
27:11,20
34:20 72:5

**relevance**
12:16 14:1
39:8

**remember**
26:15,16,
20 33:19
35:16 79:5

**remind** 33:13

**remote** 6:3

**remotely**
6:21

**repeat** 24:23

**report** 22:22

**reporter** 6:5
7:2 27:2

**repositioned**
20:5,23

**represent**
60:19

**representative**
9:9 13:19

**represented**
13:18

**representing**
6:6,17

**requested**
56:4

**required**
47:24

**requirements**
58:12

**residence**
30:19
76:13

**resources**
25:17

**respect** 7:22
47:8 58:2

**respond**
22:19
24:22 26:8
39:9 49:23
56:4 59:4
62:8
63:10,22
68:8 73:14

**restate**
51:21

**retrieved**
56:1

**reviewed**
8:8,11

**reviewing**
56:14

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Shawn Hubacheck on 12/18/2024                Index: rewind..shooting

rewind   67:2

rifle   14:15,
25

right-to-left
17:2  40:25

risk   76:15

River   22:1
30:17  32:6
34:7

Riverside
5:24  6:18
10:23  29:1

road   22:1
30:17  32:7
34:7  67:20

roadway
34:23
39:18

rough   57:2

roughly
15:14  49:8
72:12

round   44:2,
13,15,16
77:4

rounds   44:2,
4,8,10
45:10,11,
14

Rudy   28:4

run   53:8

running
16:18  22:6

29:5,11,
14,22
30:3,7
33:10,11,
22  34:3,12
59:1,9
77:22

—————————

S

—————————

S.L.   5:22
6:14

safely   57:24

scene   70:17

school   9:20,
24

seals   56:21,
22

search   25:2

searching
24:18

season   15:12

seat   55:25

SEB   32:11,
12,14

seconds   29:4
30:6  31:1
35:20
36:7,17
38:1  41:6,
8,15,17
47:14,15
54:12,25
67:2,5
71:15

74:2,5,9,
15

segment
69:19

selection
14:22

semiautomatic
14:15,18,
24  15:2

sense   14:24
22:23
24:12
25:20  28:5
35:2  49:9

separate
25:17

separated
47:11

sergeant
5:8,13,18,
22  6:17
10:23  11:6
24:4  31:7
59:25  61:9
69:1
75:13,18

sergeant's
5:15

sergeants
39:4,13

service   25:6

Services   6:7
10:24
11:16

set   15:2

Shannon   6:11
59:17,21
61:6,14
70:5

Shawn   5:8,
13,22
6:17,19
7:3

Sheriff   29:1
60:5

Sheriff's
10:24  25:6
28:25  39:2
70:1

shoot   12:7
18:10
21:20
29:14
40:11
42:14
58:25
59:11
62:16
63:19,21,
25  78:15,
19,24

shooting
9:1,4
12:13,15
15:5  22:4
28:20
37:11,20
38:2,12
43:7,9,18
51:25  57:1

65:15 66:9
67:25
70:12,14
72:23
73:16
77:23

**shootings**
12:23
13:4,15,25
14:22

**shot** 14:9,
10,19 15:9
16:1 17:6
22:9,11,
14,22
23:25
24:11
25:18,23
26:3,10,
16,21 27:8
28:7 34:6
35:19,23,
25 36:15,
22 37:18
40:5 41:5
46:3,20,24
48:5,10
58:18
67:17,18,
22 71:16
72:22
73:25 74:1
76:25
77:14
78:5,6

**shots** 13:21,
24 14:6,7,

8 15:4
22:5,7
26:17
29:10 33:8
35:24
43:22
45:5,8
46:11,24
47:9,12
49:12,20
50:16
51:22,23
52:19
54:3,4
66:19 67:6
68:17
69:13,18,
21 72:4
73:20
77:7,14,15

**show** 59:14,
19

**side** 17:14,
15,17,21,
25 19:3,
21,22
20:1,5,15,
21,22,23
28:13
33:2,23
37:5
38:16,17
40:2 41:9
42:9,15
52:25
53:1,3,18,
20 72:14

**sides** 33:21

**sight** 29:25

**similar** 45:3

**simple** 15:13

**simultaneous**
47:7 72:23
79:18

**sip** 15:23

**sir** 7:3,5,
8,14,20
8:10,16
9:2,21,25
10:4
11:13,20
12:3,9,12
13:14,17
14:4,11,
17,20
15:3,6,14
17:5,13
18:11,15
19:1,8
20:3,7,10,
19 21:19
22:16
23:17,19
24:6 25:9
26:1 27:6
28:8 29:12
30:9,20
31:18
33:12
34:25 36:4
37:4 38:14
39:1,19
40:3 41:23

42:21
43:10,17,
20,24 44:8
45:2,4,15
46:5,8,22
47:17,21
48:1 49:16
50:9,17
51:9,17,24
52:20,22
53:7,9
54:20 55:5
57:9,19,22
58:1,11,
19,22
60:23
61:20
62:4,17
63:7 64:25
65:16
66:11,20
67:15
69:20
70:22
71:25
72:12,16,
20 74:19,
22 76:3,18
77:12,16
78:17,20
79:1,12

**situation**
57:14
76:10 78:1

**slightly**
42:6 49:10
71:24 72:7

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**                    Index: slowed..talking

slowed   70:2

someone's
  57:11

sounded
  61:23

sounds   38:11
  39:17 70:8

south   53:2,
  12,18

southwest
  25:15

speaker   71:6

speaking
  53:5

specifically
  34:15 55:8
  56:10

speculation
  24:21
  49:22 62:7
  63:9 68:7

spell   7:1
  26:23 27:1

spoke   26:17

spray   21:11

stand   67:15

standing
  44:22

start   21:6
  59:21,23
  61:13

started   22:6

76:2

starting
  9:18 60:12

starts   63:4

state   7:1
  14:2

stated   74:7

statement
  13:16
  52:8,11

States   5:25

stationary
  16:9,10,11

stay   57:1

stayed   42:14
  59:2

steam   21:12

steps   36:11

stop   36:2
  60:16
  61:6,14,16
  62:23
  64:7,20
  65:11,20
  66:16
  68:12,14
  69:3,15
  70:4 71:19

stopped
  36:5,6,11
  39:17
  54:11
  64:4,17

65:8,14
66:13
68:10
69:11
71:19,21

straight
  77:9

street   18:3
  22:3
  30:14,16
  33:2 34:20
  35:1 38:9

struck   50:15
  72:25 73:2

study   10:1

sufficient
  59:10

sun   48:3

suspect   12:2
  25:7 31:22
  63:16
  64:15
  78:24

suspect's
  12:10
  65:25

Suszcklewicz
  6:4

SWAT   10:25
  11:1,14,
  17,18
  28:23,24
  29:2 39:3

sworn   6:21

sync   61:2

_____

T

T-A-G   62:1

tac   32:11,
  12,14

tack   61:24

tactical
  24:4,7
  32:5,9

tactically
  20:23
  23:23,25
  24:11

tactics
  57:10

tag   62:1,2,
  6,16 78:14
  79:8

tagging   79:6

Tahoe   19:19

talk   11:8
  12:13 15:5

talked   39:18

talking
  15:13
  20:17
  21:16
  31:1,4,12
  32:22
  35:22
  38:15
  41:15 43:6

54:4,6

**tall** 10:14

**team** 10:24,
25 11:1,16
28:25
32:4,12
37:14 39:2

**ten** 34:22
35:1,2
39:18
45:18 49:3
67:21
74:2,5

**ten-foot**
36:4

**term** 63:20

**terms** 57:10,
20

**terrain** 75:3

**testified**
6:22

**testimony**
25:10
48:14
73:13
76:23
77:21

**thing** 37:15

**things** 21:4
30:1 57:4
61:9 75:3,
7

**thinking**
48:22

**thoracic**
16:2

**thought**
76:24,25

**threat** 18:13
42:19
44:21
58:4,14

**threshold**
22:3 30:2,
10,12
55:24 56:5

**time** 5:6
7:6,17,18
8:18
10:18,21
11:2,3,4,
21,23
17:20
18:2,8
19:6
20:16,17
24:18
27:10,16
28:6,9,12,
14,20
29:3,20,
22,24
30:4,7,21,
23,25
31:11,17
32:12
34:11
35:5,18
36:14,15,
21 37:7
38:5,15,17

39:1,4,5
40:8 41:3,
10,11,12,
18 43:8
45:17
47:11
48:2,4
51:19,25
54:2,23
55:1 56:4,
13 61:12
65:5
70:10,12
71:1,17
72:2 74:7
76:11

**times** 8:21
12:5 34:6,
9,10 61:6

**tired** 49:19

**today** 5:16,
19 6:5
7:22 75:13

**told** 29:5
41:8 45:13
46:23
49:14
58:23
76:24
77:17

**Tom** 32:3

**top** 21:13
53:12

**total** 13:21

**trained**

12:7,9
43:24
57:11,20,
23 58:3,7,
12,17,19,
20 78:23

**training**
18:9 29:13
42:12 44:6
57:10
58:7,25
59:10
77:23 78:4

**transcript**
8:12

**travel**
32:24,25
34:1 49:6

**tree** 28:5,
13 34:6
75:9

**trees** 30:1

**trigger**
14:19 44:9
64:1
78:19,21

**trouble** 7:6
8:4

**truck** 67:19
76:5

**turn** 37:11,
13,16
38:12,13,
17 49:4,10
79:21

**turned** 36:9
37:9,10
38:20 42:6
48:21 49:3

**turning**
48:10

**type** 10:9
14:12,13,
14 19:18
45:3 56:20
66:3

**typically**
26:19
32:14,17,
18 37:15

———————

**U**

———————

**unaware**
40:15
55:24
67:25 68:1

**understand**
7:10,11
16:15
22:19
23:24 26:8
62:5,8,9
63:8,22
64:13
77:21

**understanding**
18:16
20:20
23:3,15
24:3,19

25:1,3,10
31:13
36:12
43:22,25
60:21,24
76:23

**understood**
7:19 62:9,
13,16

**unit** 8:17
19:17,18
22:13
55:23 56:1
61:11
64:10
70:15

**United** 5:25

**units** 21:8,9
23:5 24:3

**upper** 16:2
42:1 48:10
49:8

**upper-right**
60:24
66:21

**upset** 26:18

**utilize**
24:17
76:12

**utilized**
76:11

———————

**V**

———————

**vague** 22:18

26:7 29:16
30:23
63:20

**vehicle**
19:20,23
20:11,12,
21 67:23
68:1,5

**verbal** 40:10
58:20

**verbiage**
79:5

**video** 5:5
8:14,16,17
38:4 57:7
60:3,4
61:4,15,17
62:22,24
64:6,8,19,
21 65:10,
12,19,21
66:15,17
68:13,15
69:2,4,14,
16 70:3,6,
9 71:22
79:20,21

**video-recorded**
5:7,21

**videoconference**
6:21

**videos** 8:19,
23 9:6
59:15

**view** 30:5

34:17,21
39:17,24
59:25
75:2,9

**virtual** 6:4

**vision** 36:13
47:20

**visual** 29:24
50:22 73:5
74:2 75:5

**voice** 57:21

**volley**
47:12,13
49:13,16,
17,20
50:2,4,7,8
51:16,20,
22 52:9
54:4,5,6,8
71:25
72:4,6,7,8
74:8,14,
17,20
77:14,18

**volleys** 47:9

———————

**W**

———————

**walked** 75:24

**walking**
16:18,19,
20,22,25
17:2 37:1
40:1,19,
23,25
41:25

48:18,24

**wall**  67:19

**Walsh**  19:11
54:1 55:23
56:2,11,19
61:22
64:12 67:8
68:1,4,23
70:15

**Walsh's**  8:17
52:13 56:1
66:24
67:18,19

**warning**
40:10
58:20

**watch**  35:14
57:7

**watching**
56:11

**weapon**
14:12,14
18:2,7,8
42:25
43:4,5,6,
21,23
44:1,18
45:3 46:6,
9,16,19
52:4
62:10,14
73:16,17,
20 77:5,6,
8

**weapons**

12:10
14:12
43:7,15

**wear**  39:4
47:24

**wearing**  37:8
38:22 39:5

**wears**  39:15

**WEDNESDAY**
5:2

**weight**
10:16,18

**west**  53:13,
14

**westbound**
48:18

**westerly**
16:21 17:1
37:2 40:24
41:25

**white**  60:17

**wife**  8:4

**window**
20:17,25
21:21
27:12

**witnessed**
24:1,10
25:14,16
56:11

**wondering**
24:7,14
25:22

31:6,11

**word**  7:12,
23 70:25

**words**  26:10,
16 31:2
50:20
58:13
75:25 79:9

**work**  10:9,
13 13:12

**worked**  10:11

**working**  37:9

**works**  45:20

**wounds**
54:14,16

**writing**
33:16

_____

|  Y  |
|-----|

**yards**  15:11,
16 16:25
29:9 30:13
35:9,10,15
39:24
47:18

**year**  9:22
11:11
13:10

**years**  13:10

**yelled**  61:19

**Young**  27:3

31:6,11

_____

|  Z  |
|-----|

**Zoom**  6:4

**zoomed-in**
70:2

# EXHIBIT 21

# EXHIBIT 21

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4   S.L., a minor by and through the      )
     Guardian Ad Litem Kristine Llamas     )
 5   Leyva, individually and as successor- )
     in-interest to JOHNNY RAY LLAMAS,     )
 6   deceased; V.L., by and through the    )
     Guardian Ad Litem Amber Snetsinger,   )
 7   individually and as successor-in      )
     interest to JOHNNY RAY LLAMAS,        )
 8   deceased; and CAROLYN CAMPBELL,       )
     individually,                         )
 9                                         )
                   Plaintiffs,             )
10                                         )
                   vs.                     ) Case No.
11                                         ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10,   )
12   inclusive,                            )
                                           )
13                 Defendants.             )
     _____)

14

15

16      REMOTE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                    JIMMIE MCGUIRE

18              FRIDAY, DECEMBER 20, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  125233
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 2

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   S.L., a minor by and through the      )
     Guardian Ad Litem Kristine Llamas     )
 5   Leyva, individually and as successor- )
     in-interest to JOHNNY RAY LLAMAS,     )
 6   deceased; V.L., by and through the    )
     Guardian Ad Litem Amber Snetsinger,   )
 7   individually and as successor-in      )
     interest to JOHNNY RAY LLAMAS,        )
 8   deceased; and CAROLYN CAMPBELL,       )
     individually,                         )
 9                                         )
                    Plaintiffs,            )
10                                         )
                    vs.                    ) Case No.
11                                         ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10,   )
12   inclusive,                            )
                                           )
13                  Defendants.            )
     _____)

14

15

16          The remote videotaped videoconference deposition of

17   JIMMIE MCGUIRE, taken on behalf of the Plaintiffs, beginning

18   at 1:37 p.m., and ending at 4:02 p.m., on Friday, December

19   20, 2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  SHANNON J. LEAP, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  sleap@galipolaw.com
 8

 9            MARDIROSSIAN AKARAGIAN, LLP
              BY:  ANTHONY BABAKHANIAN, ESQ.
10            BY:  GARO MARDIROSSIAN, ESQ.
              BY:  LAWRENCE D. MARKS, ESQ.
11            6311 Wilshire Boulevard
              Los Angeles, California 90048
12            Tel:  323-653-6311
              Fax:  323-651-5511
13            E-mail:  garo@garolaw.com
              E-mail:  lmarks@garolaw.com
14

15    For the Defendants:

16            MANNING & KASS ELLROD, RAMIREZ, TRESTER, LLP
              BY:  EUGENE P. RAMIREZ, ESQ.
17            801 South Figueroa Street, 15th Floor
              Los Angeles, California 90017
18            Tel:  213-624-6900
              Fax:  213-624-6999
19            E-mail:  eugene.ramirez@manningkass.com

20

21

22

23

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

**Page 4**

1                              INDEX

2    WITNESS:                                           PAGE

3    JIMMIE MCGUIRE

4       BY: MR. GALIPO                                  6

5

6                            EXHIBITS

7    MARKED FOR IDENTIFICATION                          PAGE

8    Exhibit 3              Video Footage Helicopter    72

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 5

```
 1                          CALIFORNIA

 2                    FRIDAY, DECEMBER 20, 2024

 3                          1:37 P.M.

 4          THE VIDEOGRAPHER:  Good afternoon, everyone.

 5          We're going on video record at 1:40 p.m. Pacific

 6   time, and the date is December 20, 2024.

 7          This is Media Unit 1 of the video-recorded

 8   deposition of Deputy Jimmie McGuire in the matter of S.L., a

 9   minor by and through the guardian ad litem Kristine Llamas,

10   et al. vs. County of Riverside and DOES 1-10, inclusive.

11          It's being filed in the United States District

12   Court, Central District of California, and the case number is

13   5:24-CV-00249-CAS-SP.  And this deposition is being taken via

14   remote virtual Zoom.

15          My name is Noah Schevitz.  I'm the legal

16   videographer;  our court reporter today is Jinna Kim.  We're

17   both here representing Huseby Global Litigation Services.

18          Counsel, would you please identify yourselves for

19   the record.

20          MR. GALIPO:  Yes.  Dale Galipo with Shannon Leap

21   from my office on behalf of the Plaintiffs.

22          MR. BABAKHANIAN:  Anthony Babakhanian of

23   Mardirossian Akaragian, for Plaintiffs S.L. and Carolyn

24   Campbell.

25          MR. RAMIREZ:  Gene Ramirez, Manning Kass, on behalf
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 6

```
1   of the County of Riverside, Deputy McGuire, Sergeant

2   Hubacheck.

3                        JIMMIE MCGUIRE,

4   called as a witness on behalf of the Plaintiffs, having been

5   first duly sworn remotely via videoconference, was examined

6   and testified as follows:

7                        EXAMINATION

8   BY MR. GALIPO:

9       Q.   Can you please state your name and spell your last

10  name.

11      A.   Yes, sir.  Jimmie McGuire, M-c-g-u-i-r-e.

12      Q.   Are you able to hear me okay so far?

13      A.   Yes, sir.

14      Q.   If you have any trouble hearing me at any time, will

15  you please let me know?

16      A.   I will, sir.

17      Q.   I usually good about an hour and take a break, but

18  if you need to take break any time before that for any

19  reason, just let me know and we'll take a break at that time.

20          Okay?

21      A.   Yes, sir.

22      Q.   Have you had an opportunity to review any documents

23  or videos to prepare for the deposition?

24      A.   Yes, I have.

25      Q.   Can you please tell us what you've reviewed.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 7

1    A.   I looked at documents; I listened to audio; I looked

2    at the videos you speak of, all of evidence involved, and

3    then obviously pictures and our policy, sir.

4    **Q.   Let me just explore a few of those categories.**

5         **In terms of documents, which documents have you**

6    **reviewed?**

7    A.   I reviewed the transcript of my interview.  I think

8    it was taken on the date of this 416, possibly.

9         I could be wrong.  Whenever my interview was.

10        I looked at the autopsy report and read that

11   thoroughly -- well, decently.  And I think for documents I've

12   looked at the -- our CAD call.  It's like the time stamps

13   through dispatch.

14        I think that's -- there may be a few other things, a

15   couple other things I can't think of, but that's the gist of

16   what I've seen.

17   **Q.   How about the audio?**

18   A.   Audio I've listened to the recording of my interview

19   just because there were a few typographical errors.  So I

20   wanted to just kind of cross reference that stuff, and then I

21   think for audio that's it.

22   **Q.   And then the video, what are the different video**

23   **documents you've reviewed?**

24   A.   I reviewed Sergeant Hubacheck's body-worn camera; I

25   reviewed Lieutenant Walsh's body-worn camera; I reviewed Star

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 8

1   9 footage; I have reviewed dash cam footage when Llamas began

2   to cross River Road.  I don't if that was from C.S. Stevens

3   or Ayala, but it's -- it's from their dash cam, and then I've

4   reviewed -- that may be it.

5        Q.   And I think you referenced policies.

6             Which policies did you review?

7        A.   I reviewed our Lexipol policies, mainly our

8   use-of-force policy which is I think 300, Policy 300.

9        Q.   Okay.  And then you kind of made a general statement

10  at the end; all the evidence.

11            Was there other pieces of evidence you reviewed

12  other than what we've spoken about so far?

13       A.   Nothing that I can think of that I haven't

14  mentioned.  I think that's honestly about all I've seen.

15       Q.   Okay.  And then your interview, you thought it was

16  on April 16.

17            I think that's actually the correct date --

18       A.   Yeah.

19       Q.   -- of your interview.  When was the actual shooting

20  incident, do you recall date?

21       A.   I think it was April 14th, sir.

22       Q.   Does that seem about right, about two days later you

23  gave your statement or interview?

24       A.   That's seems correct.

25       Q.   And where were you when you gave that interview?

Page 9

1    A.   I was at a building off of Cactus in Moreno Valley.

2         It's our Riverside Sheriff's Association building,

3    and they have a room for interviews such as that.

4    Q.   And who was present for the interview?

5         And if you don't remember all the names, that's

6    okay, but maybe your understanding of their position?

7    A.    It was myself, attorney, and there were two district

8    attorneys.  They may have been deputy district, but deputy

9    district attorneys or investigators.  I don't know what their

10   exact title would be, but from the DA's Office.

11   Q.   Were those the individuals asking you questions?

12   A.   Correct.  Yes, sir.

13   Q.   And have you looked at a transcript of your

14   interview recently?

15   A.   I have, sir, yes.

16   Q.   And on the second page -- and I'm just quoting, and

17   if you need to see it, I can put it up for you.

18        I think they were asking you what you had looked at,

19   and you said, "I viewed the FLIR camera from Star 9 during

20   the incident."

21   A.   Yes, sir.  It's the footage --

22   Q.   Do you know --

23   A.   I'm sorry.

24   Q.   No.  I'm sorry.  Go ahead.

25   A.   It's the FLIR.  It's a brand of the camera on the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 10

1    helicopter.  It's just a thermal imaging camera that I viewed

2    that I spoke of a few minutes ago, the Star 9 footage.

3        Q.    And when you say of the incident, what portions did

4    you review?

5              Would it be during the time frame before, during,

6    and after the shooting?

7        A.    Excuse me.  That's correct.

8              Not entirely, but yes, portions of it.

9        Q.    What portions did you review, if you recall?

10       A.    I have viewed -- so I've seen parts of the beginning

11   when they were in color, and then their color camera without

12   the FLIR, and then they have a button that can switch to

13   FLIR.  I've seen parts of that during the search just to see

14   if they ever missed Llamas and the female.

15             They were hiding in the bushes that we didn't know

16   where they were.  And then after the Star 9 leaves because

17   they left the scene, and then when they come back I viewed

18   from right before when they were in the color camera, their

19   normal camera they have, and then they switch it to FLIR, and

20   they pick up Llamas in the tree line after Rudy was shot.

21   That's the time that I extensively viewed the video from Star

22   9 until we started medical on Llamas which was immediately

23   after our interaction with him and he was shot.

24             Then when Star 9 left to look for the female, I

25   haven't viewed any of that portion.  So about that window,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 11

1    and I don't have time stamps or a guess-estimate of how long

2    that took.

3        Q.    But in the time frame, let's say the 20 or 30

4    seconds before the -- you fired your first volley of shots,

5    you did review that portion?

6        A.    Yes, sir, that's correct.

7        Q.    And you would have reviewed the portion that

8    included your first volley of shots?

9        A.    Correct.

10       Q.    And also your second volley of shots?

11       A.    Correct, sir.

12       Q.    And then for some time after your second volley?

13       A.    Correct, sir.

14       Q.    And would you have reviewed that before your initial

15   interview?

16       A.    If I recall, it's been a little bit of time.

17             I'm pretty sure that that Star 9 footage was

18   available prior to my interview.

19       Q.    Yes.  That's why I was just quoting from your

20   interview when you said I viewed the FLIR camera from Star 9

21   during the incident.

22             Is that what you were referring to?

23       A.    I see what you're saying.  You mean -- I meant I

24   reviewed the footage of the incident prior to my interview,

25   not while I was on-scene during the incident.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 12

1          I understand I think what you're asking.  So what I

2    meant is when I came into RSA that day, I viewed Star 9

3    footage, and then I saw a few other BWC, things like that,

4    and then I went into my interview.

5          I did not see Star 9 footage that day if that's what

6    you're asking.

7     **Q.   Okay.  I understand that.**

8          **And then have you had a chance to recently look at**

9    **that footage again?**

10    A.   I have, sir.

11    **Q.   And did that include the same time frames we've been**

12   **talking about before the initial shots, the initial shots,**

13   **and then the second volley of shots?**

14    A.   Correct, sir.

15         MR. GALIPO:  Gene, do you know, according to

16   Shannon, we have not received the uninterrupted FLIR video.

17         Do you know if you have that, if the officer has

18   looked at that?

19         MR. RAMIREZ:  Yes.  I thought we sent it to you, but

20   give me a second here.  Let me check with my office to see if

21   they sent that over.

22         MR. GALIPO:  Okay.  And if not, if you can make

23   arraignments to send it during the depo, that would be

24   great.

25         MR. RAMIREZ:  I will work on that right now.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 13

```
 1              MR. GALIPO:  Okay.  Thank you so much, Gene.

 2   BY MR. GALIPO:

 3       Q.   Okay.  So I want to ask you a little bit about your

 4   background.

 5              I'm assuming you graduated high school?

 6       A.   Yes, sir.

 7       Q.   And what year did you do that in?

 8       A.   1998, sir.

 9       Q.   And did you go to any college after high school?

10       A.   I did.  I went to Cameron University for a short

11   time.

12       Q.   Did you study anything in particular?

13       A.   Yes, sir.  Business.

14              That's what everyone does if they don't know what

15   they're going to do.

16       Q.   That's what I did.  So I think that's probably true.

17              MR. RAMIREZ:  Dale, I'm sorry, Dale.  We sent it to

18   you on 12-6.  It was part of the disclosures.  December 6, we

19   would have sent the video.

20              Can you please check, perhaps, Shannon, and if you

21   don't have it there, I will have it sent over right away via

22   link.

23              MS. LEAP:  Thank you.  Yeah, the disclosures we

24   received looks like they're just documents, but I can double

25   check.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 14

```
 1            MR. RAMIREZ:  Please let me know, and then we'll

 2   send it over right away.

 3            MS. LEAP:  Okay.  Thank you.

 4            MR. GALIPO:  Thank you, Gene.

 5            MR. RAMIREZ:  Thank you.  Sorry for interrupting.

 6            MR. GALIPO:  That's okay.

 7   BY MR. GALIPO:

 8       Q.   And when did you go to the academy?

 9       A.   I started the academy in 2014, the year of.

10       Q.   What type of work did you generally do before you

11   went to the academy?

12       A.   I was a -- for 14 years from the year 2000 when I

13   withdrew from college until 2014 when I started the basic

14   academy, I was a professional athlete in the sport of a

15   freestyle motor cross which is dirt bikes kind of like the

16   tricks and stuff that you see on TV.

17       Q.   Yes, I've seen that on TV.  I even tried my hand in

18   it in, not successfully, I may add.

19            So we can have a whole conversation about that, but

20   I don't think it would be fair to everybody else in this

21   room.

22            So we'll talk about the case a little bit.

23       A.   Yes, sir.

24       Q.   So after the academy were you assigned initially to

25   the jails?
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 15

```
 1    A.    I was.  I was 34, and I had a little life

 2  experience.

 3          I was told we would go straight to patrol, and I

 4  ended up in the jails where our past Sheriff not current

 5  Sheriff started a hire freeze.  So I was in the jails for

 6  about four and a half years.

 7    Q.    Probably not the most exciting four and a half years

 8  of your life; is that generally a fair statement?

 9    A.    That's fair.  I made the best of it with a good

10  attitude, though.

11    Q.    Okay.  And then after you finished your time there

12  in the jail facility, were you then assigned to patrol?

13    A.    Yes, sir.  I was in Lake Elsinore Station for

14  approximately a year.

15    Q.    And you had some field training related to patrol?

16    A.    Correct.

17    Q.    And after Lake Elsinore, where did you go?

18    A.    I went to the Special Enforcement Bureau, Emergency

19  Services Team, part of the Special Enforcement Bureau.

20    Q.    Did you start with them in like, what year?

21    A.    I would say 2019, or was it -- no.  I think it

22  was --

23          MR. RAMIREZ:  Your best estimate.

24  BY MR. GALIPO:

25    Q.    You can even give me a range of a few years if
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 16

1    you're not sure.

2        A.    It was whenever COVID started.  I think it was 2020,

3    sir.

4        Q.    And I understand from reviewing your statement that

5    you were involved at least in one other officer-involved

6    shooting before this case?

7        A.    Correct, sir.

8        Q.    When did that occur?

9            MR. RAMIREZ:  Objection as to relevance, and may

10    violate his police personnel privileges and his right to

11    privacy.  However, he can briefly answer the year, and we'll

12    take it from there just like the last time.

13    BY MR. GALIPO:

14        Q.    You may answer.

15        A.    There were two, sir, I was involved in.

16            It was 2021, June, I want to say and December of

17    2021.

18        Q.    So two in 2021.

19            Was this one we're here to talk about the third

20    one?

21        A.    Correct, sir.

22        Q.    And from reading your statement, it appears that one

23    of them occurred actually like on the 215 Freeway?

24        A.    Correct, sir.

25        Q.    And I think you referenced in your statement that

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 17

1    you fired three shots at that time?

2        A.   Correct, sir.

3        Q.   Was it -- what weapon did you fire those shots

4    from?

5        A.   From my duty rifle and four rifle, sir.

6        Q.   Was that a 556?

7        A.   223, sir.

8        Q.   How about the rifle that you fired from in this

9    case?

10       A.   Same rifle, sir.

11       Q.   And the shooting on the 215 Freeway, was that the

12   June shooting or the December shooting?

13       A.   June, sir.

14       Q.   And the December shooting, did you fire from the

15   same weapon, also?

16       A.   Correct, sir.

17       Q.   How many shots in that case?

18       A.   20, sir.

19       Q.   And in the case we're here to talk about, how many

20   shots total, if you know?

21       A.   Seven, sir.

22       Q.   Do you believe that you fired three rounds in the

23   first volley and four rounds in the second volley in this

24   case?

25       A.   To my knowledge, that's correct, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 18

1    Q.   Do you have an estimate as to how much time passed

2    in between the two volleys in this case?

3    A.   Approximately six seconds.

4    Q.   Is that something you estimated or timed just from

5    reviewing it?

6    A.   My estimate was six to ten, and when I viewed it I

7    confirmed it was about six to seven seconds, approximately.

8    Q.   And when you reviewed it, could you also make out

9    the number of shots?  Did it seem consistent with the three

10   in the first volley and the four in the second volley?

11   A.   That's correct.

12   Q.   Do you have an estimate of the distance you were

13   from the -- and I'm talking, again, back in this case, the

14   distance you were from the individual when you fired your

15   first volley of shots?

16   A.   Yes, sir.  Approximately 40 to 50 yards.

17   Q.   So just doing some simple math, a 120 to 150 feet?

18   A.   That's correct.

19   Q.   And were you at about the same distance from the

20   individual when you fired the second volley of shots?

21   A.   I was approximately five yards closer.

22        So I would estimate approximately 35 to 45 yards,

23   sir.

24   Q.   For the second volley?

25   A.   Correct.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 19

1      Q.   Was there any litigation, if you know, with either

2  of your prior shootings?

3           MR. RAMIREZ:   I'll object as to relevance.   It may

4  invade his personnel privileges, but you may without waiving

5  those, you may answer.

6           THE WITNESS:   No, sir.   There were no -- you know

7  what, can you rephrase the question?

8           I want to make sure I'm saying the right yes or no.

9  BY MR. GALIPO:

10     Q.   Okay.   Of course.

11          Do you know if any law -- civil lawsuits were filed

12  related to your first two shootings?

13     A.   No, sir.   There were zero.

14     Q.   To your knowledge, is this the first time that a

15  civil lawsuit has been filed related to one of your

16  shootings?

17     A.   To my knowledge, yes, sir.

18     Q.   The weapon that you were firing, was it in a

19  semiautomatic mode?

20     A.   That's correct, sir.

21     Q.   And would that weapon -- would you need to press the

22  trigger for each shot?

23     A.   Correct, sir.

24     Q.   Did you yourself give any commands to Mr. Llamas in

25  the ten seconds before the first volley?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 20

```
 1      A.    That first volley I did not.

 2            I believe Lieutenant Walsh did.

 3      Q.    Did you give any verbal warning that you were going

 4  to use deadly force?

 5      A.    I think for about three hours there were verbal

 6  warnings from Star 9, our BearCat, our units, as well as K-9

 7  announcements and surrender announcements.

 8            So I was well aware that announcements had been

 9  given for a long period of time, sir.

10      Q.    I'm just wondering whether you, yourself, gave any

11  verbal warning that you were going to use deadly force.

12      A.    No, sir.  At that time I don't feel like it was

13  feasible due to circumstances and time of the situation.

14      Q.    Where was Mr. Llamas when you first saw him?

15      A.    He was approximately 40 yards to the west of my

16  location.  I was parked facing eastbound on River Road, and I

17  would be facing the driveway that he walked out onto for --

18  when he walked out onto River Road, the driveway that he came

19  from.

20      Q.    And what, if anything, did he appear to be doing

21  when you saw him at that point?

22      A.    He appeared to be doing two things.

23            Number one, he had a firearm pointed to his head,

24  and number two, he was looking left and right, left and

25  right, which from my training and experience shows me that he
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 21

1   was looking for an avenue of escape or other options outside

2   of surrendering.

3        Q.   And could you see the firearm to his head from your

4   location?

5        A.   Yes, sir, I could.

6        Q.   And when you watched the FLIR video from the

7   airship, were you able to see this portion of the event that

8   you're referring to?

9        A.   Yes, sir.

10        Q.   And in that video were you able to see what appears

11   to be the outline of a gun to his head?

12        A.   From my training and experience and knowledge, yes,

13   that's correct.

14        Q.   And how long was Mr. Llamas in your view for at that

15   point?

16        A.   Guessing, I would say --

17             MR. RAMIREZ:  Don't guess.

18             THE WITNESS:  Sorry.  Estimating.

19             Estimating approximately less than two minutes,

20   probably more around one minute.

21   BY MR. GALIPO:

22        Q.   Approximately a minute or two, but closer to a

23   minute?

24        A.   Correct.

25        Q.   Now, in your career as a law enforcement officer up

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 22

1  to that time, had you seen suspects with guns in their hand

2  before?

3      A.   I have a good amount of times.  Yes, sir.

4      Q.   Can you give me an estimate, even a range of how

5  many times you've seen a suspect with a gun in their hand

6  before?

7      A.   Less than ten.

8      Q.   Would you be comfortable somewhere between five and

9  ten?

10     A.   Yes, sir.

11     Q.   Were you trained that you can shoot someone merely

12  for seeing a gun in their hand, that fact alone?

13     A.   No, sir.  In fact, I've been in a situation on EST

14  where I had a subject who is wanted felon for a violent

15  felony crime against his significant other, and he was

16  driving his vehicle five miles an hour with a gun pointed to

17  his head, and I was on top of our armored vehicle.

18         I was the -- I was assigned to my lethal -- the

19  lethal option for that scenario, and he drove for about 30

20  seconds in front of us, 15 feet from me because we were right

21  next to him on the vehicle, and the gun was to his head the

22  whole time.

23         He never oriented the gun to me or anyone else, and

24  I did not fire or shoot in that situation.  So yes.  I'm

25  trained that and been in that situation in the real world.

Page 23

1    Q.   How many times have you seen a gun in a suspect's

2  hand that was not oriented towards you?

3    A.   Approximately three times.

4    Q.   So during this approximate minute or so where you

5  initially saw Mr. Llamas, did he have the gun to his head the

6  entire time?

7    A.   No, sir.

8    Q.   Can you explain where the gun was during that time

9  frame based on your observations?

10   A.   Dale, I apologize.

11       Are you talking about the totality of time or the

12  whole time from start to finish before we started medical or

13  Mr. Llamas?

14       Or are you talking about that one minute in on River

15  Road before he went up north up the driveway?

16   Q.   Yes.  I'm going to try to do this in order.

17       I'm going to give you a chance to explain

18  everything, but I was just talking about the first minute or

19  so that you saw him before he ran northbound.

20   A.   The gun was at his head the whole time for that

21  minute.  That's correct, yes, sir.

22   Q.   Okay.  And were you in the same position generally

23  for that whole minute or did you tactically reposition?

24   A.   I was in the same position for that whole minute,

25  that's correct.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 24

1      Q.    And if you know, were there any other officers

2  nearby?

3            When I say nearby, that you could actually see?

4      A.    Lieutenant Walsh to my left and Sergeant Hubacheck,

5  Shawn Hubacheck was to my left as well.

6      Q.    At some point did Mr. Llamas go out of your view?

7      A.    Yes, sir.

8      Q.    And was he essentially running northbound at that

9  point?

10     A.    Correct.

11     Q.    And when he started running northbound, did he go

12 out of your view?

13     A.    For a brief moment in time, yes, he did.

14     Q.    Can you tell me approximately for how long he went

15 out of your view?

16     A.    From the time that it took Sergeant Hubacheck and I

17 to run to the mouth of that driveway.  So less than ten

18 seconds.

19     Q.    When he went out of your view, meaning, Mr. Llamas,

20 running north, you and the sergeant decided so run to the

21 mouth of the driveway; is that a fair statement?

22     A.    That's correct.

23     Q.    And you're approximating it took you about ten

24 seconds to get there?

25     A.    I would guess less -- or sorry.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 25

1          I would estimate less than.

2     Q.    Okay.  I always get nervous when you say guess, so

3   estimate is good.

4          And how far of a distance did you have to run to get

5   to the mouth of the driveway?

6     A.    It was approximately 35 to 40 yards.

7     Q.    And is that when Mr. Llamas came into your view

8   again?

9     A.    Yes, sir.

10    Q.    Shortly after getting to the driveway?

11    A.    Correct.

12    Q.    Were you ware at some point that the lieutenant had

13  pulled his car up?

14         MR. RAMIREZ:  Objection.  Vague and ambiguous as to

15  time.

16         If you understand, you may respond.

17  BY MR. GALIPO:

18    Q.    Yeah.  Any point in time.

19         It could have been before the shooting or after the

20  shooting, but at some point did you become aware of that?

21    A.    I was aware of that, yes.

22    Q.    When did you first become aware of that?

23    A.    I was behind my driver door for cover as well as

24  Lieutenant Walsh, and when Llamas went out of sight, he was

25  running towards an occupied dwelling, and I knew for a fact

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 26

```
 1   it was occupied, a third-party residents, two older men

 2   around the porch when I got to the scene earlier in the day

 3   at 4:45, 5:00.

 4           So when Llamas took off running that way, I knew

 5   that I needed to sacrifice my safety because Walsh,

 6   Lieutenant Walsh said, "Hey, let's pull our --" in less

 7   words, he said, "I'm going to pull my truck up for cover,"

 8   and Sergeant Hubacheck and I didn't feel like we had the

 9   ability to use cover at that time.  We needed to sacrifice

10   our safety and run to the driveway to get eyes back on Llamas

11   or reassess what his actions were at the time.

12           So yes.  I was aware that vehicle was moving up for

13   cover, but I chose to sacrifice that safety and move up to

14   the mouth of the driveway.

15       Q.   Let me just follow up on a few things that you said.

16            The -- I think you referenced two men on a porch?

17       A.   That's correct, sir.

18       Q.   It sounds like you saw them earlier in the day?

19       A.   I did see them earlier in the day, and I did point

20   that out to the Lieutenant Walsh that the blue house at that

21   driveway was occupied.  That's where I first arrived on-scene

22   to start getting the tactical plan.  And then I arrived where

23   Llamas came out of the bushes prior to Sergeant Hubacheck or

24   Lieutenant Walsh, and according to the radio traffic Star 9

25   put out, Llamas wasn't close to the road yet, but he was
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 27

```
 1   coming towards River Road.  So had a brief moment of time to

 2   do a 360, get some intel and make a tactical plan of my

 3   surroundings.

 4           During that time I saw two shadows under a carport

 5   from my location which is where that house was where I've

 6   seen two older gentlemen earlier in the day knowing that that

 7   was an occupied dwelling.  So I knew that they were still at

 8   the house if that makes sense.

 9   Q.   I'm just trying to figure out how much earlier in

10   the day did you see them there.

11   A.   I saw them around 1700.  So whenever I had gone on

12   scene, I'm guessing -- sorry -- estimating 1700 hours.

13           I saw them in broad daylight two elderly white male

14   adults on a porch of that property, and then in the minute

15   that you're saying I saw Llamas that we're estimating I saw

16   Llamas coming out on the River Road, about ten seconds or 20

17   seconds before Llamas broke the tree line to get on the River

18   Road, I saw the shadows of two adult looking individuals at

19   that same property, the blue house that I speak of, that

20   driveway where Llamas was shot, there were two individuals

21   under the carport kind of doing the lookie-loo thing that I

22   could see their shadows under the carport near the vehicles

23   of that house.

24           So 30 seconds before the shooting with Llamas, I was

25   aware that there where were still humans, not sure if they
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 28

1    were the same gentlemen or not, but adult humans at that

2    property.

3         Q.   What time was it about when you saw Mr. Llamas for

4    that first approximate minute?

5         A.   I honestly have no idea what the time stamp on that

6    would be, sir.

7         Q.   So if you first saw the two men at 5 o'clock, I'm

8    just trying to figure out, was it an hour later, two hours

9    later that you see Llamas?

10             I'm just trying to get some estimate.

11        A.   Approximately two hours.  And my original 5 o'clock,

12   the time stamp could be off on that.  When I first landed

13   on-scene it's available on evidence under the CAD call,

14   whatever time that is, that's when I saw the two gentlemen.

15             Outside of that, I would say two to three hours

16   transpired between when I saw them originally and when I

17   located Llamas with the gun to his head.

18        Q.   Did you take any steps to try to evacuate those

19   gentlemen from their home?

20        A.   The terrain did not allow or dictate me to do that.

21        Q.   Did -- sorry.

22        A.   No.  That's it.  Yes, sir.

23        Q.   Did you talk about that with everyone, anybody, the

24   possibility of whether we should evacuate these people?

25        A.   We did not.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 29

1       Q.    And then the two shadows that you saw, did you share

2   that with anyone when you saw them?

3       A.    The second time I saw them, no.

4             The first time I saw them, yes.  I shared that with

5   Lieutenant Walsh who helped make the tactical plan for the

6   day.

7       Q.    Okay.  He was the supervisor on-scene?

8       A.    Correct, sir.

9       Q.    So then the other part of what you said, you heard

10  Lieutenant Walsh say that he was going to pull his vehicle

11  forward for cover?

12      A.    Yes.

13      Q.    And did you actually see or hear the vehicle

14  moving?

15      A.    Yes.  I was standing next to the door when he

16  started to drive forward.

17      Q.    So was it your impression that as you and sergeant

18  was running to the mouth of the driveway, the Lieutenant's

19  vehicle was close behind you?

20      A.    I'm not sure of the exact location.  I knew he was

21  heading to where I ran to, but I wasn't sure of the exact

22  location of his unit or his vehicle.

23      Q.    Did you ever look to see and where it was just to

24  see if he had the option to take cover before moving

25  forward?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 30

1    A.    Time did not allow me to do that.  So no.

2    **Q.    At some point did you see the vehicle parked in the**

3    **mouth of the driveway?**

4    A.    I did not.

5    **Q.    Did you ever see where the vehicle came to stop at**

6    **any time before or after the shooting?**

7    A.    In the -- on BWC footage, yes, but not in real life,

8    no.

9    **Q.    Based on the footage that you saw after the fact,**

10   **where did that vehicle end up?**

11   A.    Approximately 10 yards behind where Sergeant

12   Hubacheck, Lieutenant Walsh, and myself ended up on foot

13   during the initial engagement with Llamas.

14   **Q.    So at some point Mr. Llamas comes back into your**

15   **view?**

16   A.    Correct.

17   **Q.    And are you in the driveway at that point?**

18   A.    Correct.

19   **Q.    Is there a street at the end of the driveway?**

20   A.    There is not.  Maybe --

21        MR. RAMIREZ:  I'm going to object.

22        Vague and ambiguous to what end, but if you

23   understand, you may respond.

24        THE WITNESS:  I don't understand.  If you can

25   explain what end of the driveway you speak of, north or the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 31

1  south, sir.

2  BY MR. GALIPO:

3     Q.   I will try.  It wasn't the best question in the

4  world.

5         But what -- when you and the sergeant were running

6  towards the mouth of the driveway, what surface were you

7  running on?

8     A.   River Road, eastbound.

9     Q.   Okay.  And then does the driveway merge into River

10  Road?

11    A.   If you were headed south on the driveway, that's

12  correct.

13    Q.   Okay.  So did you enter the driveway from River

14  Road?

15    A.   That's correct.

16    Q.   And then does the driveway go south to north?

17    A.   That's correct.

18    Q.   And at some point did you stop at some location

19  initially in the driveway?

20    A.   Approximately five yards into the -- five to ten

21  yards into the mouth of the driveway when I visually

22  reassessed Llamas, yes, that's correct.

23    Q.   Would that be five to ten yards north of the bottom

24  of the driveway where River Road is?

25    A.   That's correct.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 32

1     Q.   And so would you have generally been looking north

2  when you, again, acquired a visual on Mr. Llamas?

3     A.   Yes, sir.

4     Q.   And do you recall when you initially saw Mr. Llamas

5  where the sergeant was in relation to you?

6     A.   He was off to my left approximately five feet.

7     Q.   Did you have an understanding or appreciation where

8  the lieutenant was?

9     A.   I knew he was driving his vehicle up, and then at

10  some point he was off to my right shoulder.

11     Q.   Would it be fair to say that all three of you at

12  some point were near each other on the driveway?

13     A.   Yes, sir.

14     Q.   And then when you reacquired a visual on Mr. Llamas,

15  would he have been moving to your right to left?

16     A.   That would be east to west.  He was running south to

17  north, and then he started to veer to the west.

18        So northwest if that makes sense.

19     Q.   Let me break it down a little bit.

20        I'm trying to -- I'm remembering what the sergeant

21  said on Wednesday, and I don't want to get confused.  I want

22  to get your recollection independently of the sergeant's.

23        When you regained a visual on Mr. Llamas, was he

24  stationary, walking, running, or any words you want to use.

25     A.   He was sprinting.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 33

1    Q.    And were you looking generally north at that time?

2    A.    That's correct.

3    Q.    And which direction was Mr. Llamas sprinting when

4    you regained a visual on him?

5    A.    South to north, but he was drifting to the west.

6    Q.    Were you initially looking at his back?

7    A.    Initially, I saw his back, and then I saw him turn

8    towards me.  So I could see left profile of his face, and

9    then he turned again with firearm not at his head anymore,

10    and I could see full left profile of his body and the side of

11    the firearm orienting towards myself, Sergeant Hubacheck,

12    Lieutenant Walsh, and all the deputies that were two to three

13    hundred yards behind us working on K-9 Rudy who had lethal

14    wound.  So they were all behind us where Llamas was first

15    initially spotted.

16    Q.    Okay.  Let me try to break that down a little bit.

17    A.    Yes, sir.

18    Q.    When you initially saw Mr. Llamas running from south

19    to north when you reacquired him in the driveway, how far was

20    he from you, approximately?

21    A.    25 yards, sir, approximately.

22    Q.    How many?  I'm sorry.  You broke up.

23    A.    25, approximately.

24    Q.    25, thank you.  And when he was running from south

25    to north, was he increasing the distance for some time?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 34

1    A.   He was sprinting.  So distance from my stationary

2   spot or I took a few walking steps to stationary, from that

3   short moment in time, yes, he was increasing the distance

4   because he was sprinting.  I had taken myself and Sergeant

5   Hubacheck took a few walking steps and stopped, and he was

6   continuing to sprint.

7    Q.   And then how far do you think he got from you to

8   when he did that first looking towards you that you

9   discussed?

10    A.   The first look was approximately 25 yards, about 25

11   to 30 yards.

12    Q.   Okay.  And then how about the -- and the first look

13   when you reviewed the footage from the --

14    A.   So that's not from reviewing the footage.

15         That's from me seeing what I can see, so --

16    Q.   I understand --

17         On my firearm I had a three time magnifier that

18   Sergeant Hubacheck and Lieutenant Walsh did not have.  So I

19   could see three times what the normal human eye can see.

20         So my magnification was three times zoomed compared

21   to Sergeant Hubacheck and Lieutenant Walsh.  So I could see

22   plain as day in realtime what Llamas was doing.  I can see

23   the expressions on his face because I had that magnification

24   that they did not have if that's make sense.

25         So that's not from reviewing the camera.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 35

1          That's from my memory.

2     Q.   I understand that.  I was trying to ask you a

3   different question.

4     A.   I'm sorry.  Forgive me.

5     Q.   That's okay.  I know you're anxious to get your

6   version out.  I understand --

7     A.   Oh, no.  It's -- I thought -- I just misunderstood

8   your question.  My apologies.

9     Q.   That's okay.  But thank you for that clarification.

10          And I did review your statement, so I'm aware of

11   some of what you just said.

12     A.   Okay.

13     Q.   I was wondering after the fact when you reviewed the

14   video footage from the helicopter, were you able in the video

15   footage, separate from what you saw on-scene, able to see the

16   time frame when he looked towards you the first time?

17     A.   Yes, yes.

18     Q.   Okay.  And then you're saying he looked in your

19   direction a second time?

20     A.   That's correct, sir.

21     Q.   And what would you estimate his distance to be from

22   you at that point?

23     A.   The second time when the gun was oriented towards us

24   was probably five seconds, five to six seconds.

25     Q.   The five to six seconds time wise between the first

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 36

1    look and the second?

2        A.   You know what, counting off in my head, I would

3    estimate probably between two and five seconds, but closer to

4    two to three seconds, and that's a complete estimate.

5        Q.   And how about the distance separate from the time?

6             It started out at 25 yards at the first look.

7             What would you estimate the distance at the second

8    look?

9        A.   40 to 50 yards, sir.

10       Q.   So there is a portion of your statement that I'm

11   sure you've reviewed recently, and if you want I can show it

12   to you.

13            MR. GALIPO:  Maybe, Shannon, can we put the bottom

14   of Page 16 up for the deputy so he can see this portion of

15   his statement.

16   BY MR. GALIPO:

17       Q.   Before we do that, where was the -- this house that

18   you referred to earlier where you saw the gentlemen earlier

19   and the shadows, where was that in relation to Mr. Llamas

20   just before the first volley of shots occur?

21       A.   Before -- before the first volley of shots, it was

22   like at the first volley, or before the first volley?

23       Q.   Let's say at the first volley.

24       A.   Okay.  The house was approximately 15 yards directly

25   east.  So the driveway comes up, has a circle drive, and then

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 37

```
1    on the east side of that circle kind of roundabout, it's all

2    DG pack like the DG gravel.  On the -- on the east side or

3    looking north the left side of that driveway is the blue

4    house set off at a 45-degree angle.

5         Q.   Are you still looking north from your position?

6         A.   Correct.

7         Q.   And at just before the second volley, is Mr. Llamas

8    running still, or is he walking, or doing something else?

9         A.   He is -- before the second volley --

10        Q.   No.  Before the -- I misspoke.  I'm sorry.

11             Immediately before the first volley when he gained

12   this distance to 40 or 50 yards, is he still sprinting, or

13   does he slow down at some point?

14        A.   He slows down enough that I could see him turning

15   his body about 90 degrees.  He is starting to turn to 180,

16   and the gun now broke off of his head meaning that he removed

17   the firearm from his head, and it's near his left arm or

18   shoulder, and it's orienting in our direction.

19             So it's orients towards house, passed the house, and

20   it starts to come in myself, Sergeant Hubacheck, and

21   Lieutenant Walsh's direction, but it's not at his head

22   anymore.  It's now starting to point towards us so much so

23   that with my three time magnifier, I could start to see the

24   opening of the barrel of the firearm because there's a silver

25   firearm.  So the barrel looks black if that makes sense.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 38

1       Q.    So --

2       A.    You can see the barrel stood out on the -- on the

3    pistol.

4       Q.    So right before he made that movement, were you

5    looking for at his back?

6       A.    Before he started to spin towards myself, Sergeant

7    Hubacheck, and Lieutenant Walsh, that's correct.  He was

8    running away.  He had given us a 90-degree turn once, give or

9    take, 90 degrees estimation, and then he continued another

10    20-ish yards estimating, and then he started do that same

11    orientation, but the gun was at his -- at his head this time.

12    It had come off his head and was more chest level orienting

13    towards us.

14       Q.    But right before he made that second movement that

15    you're describing, he would have been generally facing

16    northbound?

17       A.    He was running northbound favoring to the west.

18       Q.    Okay.

19       A.    Drifting to the west.

20       Q.    Okay.  And then where -- where would the house be in

21    relation to --

22       A.    Directly east.  If he were to cut -- so directly

23    east -- sorry, forgive me -- directly west of his location.

24       Q.    Okay.  That's where I got confused --

25       A.    I think -- I think misspoke earlier and said east.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 39

1          So 20 minutes later -- I apologize.

2          The house was west of where Llamas.

3      Q.   Okay.  That helps me because when you said east,

4   that confused me a little bit.

5          But it would be west; is that correct?

6      A.   Yes, sir, Dale.  My apologies.

7      Q.   That's okay.  It doesn't take much for me to get

8   confused, so I appreciate that --

9          MR. RAMIREZ:  -- started.  Go ahead.

10  BY MR. GALIPO:

11     Q.   So as he is moving north, the house would be to his

12  west which would be to his left.

13         Do I have that generally correct?

14     A.   That's correct, sir.

15     Q.   And you and the other officers would have been to

16  the south?

17     A.   Correct, sir.

18     Q.   So I just want to show you one portion of your

19  statement, and then we'll take our first break.

20         MR. GALIPO:  Can we put the bottom of Page 16 up,

21  please.

22  BY MR. GALIPO:

23     Q.   Just take a moment.  First of all, can you see that

24  on your screen, and do you need it to be enlarged a little

25  bit --

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 40

1     A.   It's great, sir.  I can see it.

2     Q.   Okay.  I want you just -- I was going to ask you

3    about the last paragraph, but to give you a moment to read

4    the paragraph before and just kind of get a feel of where

5    you're at at your statement.

6          And just take a moment, and then let me know when

7    you've had a chance to look at that.

8     A.   Okay, sir.

9     Q.   Okay.  Have you had a chance to look at that?

10    A.   Yes.

11    Q.   And you had previously reviewed this portion in

12   preparation for the deposition?

13    A.   Yes, sir.

14    Q.   Okay.  I just want to ask you about a couple parts

15   of it, and then we'll take our first break.

16          Do you see how there's line numbers on the left-hand

17   side?

18    A.   Yes.

19    Q.   Looking at Line 37, so this is in the last paragraph

20   at the bottom, Line 37 is where you start explaining when he

21   started to orient his body.

22          Do you see that?

23    A.   Uh-huh.

24         MR. RAMIREZ:  Yes?

25         THE WITNESS:  Yes.  Sorry.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 41

1   BY MR. GALIPO:

2       Q.   **That a yes?**

3       A.   That was a yes.  Sorry.

4       Q.   **That's okay.**

5       A.   -- talking.

6       Q.   **And then you say as he spun, the gun went towards**

7   **the house.**

8            **Do you see that?**

9       A.   I do see that.

10      Q.   **And did you see the gun go towards the house at some**

11  **point?**

12      A.   Well, it would have had to because Line 40 when he

13  continued to spin, it like I don't know, in our world

14  flagging means the gun like flagged by something, like it put

15  something in danger of that gun if it had gone off, not

16  meaning that he was going to shoot at the house, just in

17  general.

18           So as he did that, the house was flagged, and then

19  he continued pass the house towards us, and I think that's

20  where Line 39 and 40 kind of pick up.  So yes, I see where

21  you're saying.

22      Q.   **Okay.  I'm still on Line -- so the gun went towards**

23  **the house.  You then say he is looking at the house again**

24  **where the gentlemen are, and now he is starting to turn**

25  **towards myself and my two partners Lieutenant Walsh and**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 42

1    Sergeant Hubacheck, and that's when I engaged approximately

2    three rounds.

3              Do you see that?

4        A.   I do, yes, sir.

5        Q.   And the three rounds you're talking about is the

6    first volley of shots?

7        A.   Correct, sir.

8        Q.   In this portion of your statement, do you ever say

9    that the gun was coming in your direction specifically?

10       A.   I guess in theory, I don't, but that's what I

11   meant.

12       Q.   Okay.  Did you ever say at this portion of you're

13   statement that you could see the barrel of the gun?

14       A.   Somewhere later in the report, to my knowledge.

15       Q.   I'm just --

16       A.   Right here, no, it's not.  I'm sorry.

17            No, it's not, sir.

18       Q.   And when you reviewed the FLIR video from the

19   airship, do you -- can you see in looking at that the gun

20   pointed towards the house just before the first volley of

21   shots?

22       A.   I don't know if you reviewed the FLIR footage, but

23   at that point Star 9 zooms out pretty far.  So to me it does

24   look like the gun is orienting from the house towards my

25   position, but like I said, the FLIR zoomed out about ten or

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 43

1    20 power.  So it's very hard to make that out at that moment.

2            You can see his body orienting in our way, but it's

3    so far zoomed out that it's hard to see where the gun is

4    exactly oriented from Star 9's angle and the FLIR footage.

5        Q.    And then my follow-up question is whether you could

6    see the gun coming in your direction in the FLIR footage

7    before the first volley, before the first volley of shots.

8        A.    From the television I viewed the Star 9 footage on,

9    it's hard to tell exactly where the gun is, but you can see

10    it starting to orient towards my location.

11        Q.    Based on your training and experience as of that

12    time, did you think it was appropriate to shoot Mr. Llamas

13    when you first saw him when he had the gun to his head?

14        A.    I saw him for a minute and a half and never shot,

15    sir.  So the answer to that is no.

16        Q.    And did you think it was appropriate to shoot him

17    when he started running away initially?

18        A.    Just for running away at that time, no.

19        Q.    And then when you saw him initially in the driveway

20    moving north initially before the second time he looked in

21    your direction and turned, did you think it was appropriate

22    to shoot him?

23        A.    He was a fleeing felon for a multiple violent crimes

24    with multiple victims including sexual assault on a minor

25    which was his family member with violence and force as well

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 44

1    as armed robbery where he pistol-whipped the suspect who

2    needed to go to the hospital for great bodily injury.

3            So I knew he was a fleeing felon.  He had the

4    ability, the intent, and the opportunity to do harm to

5    others.  So at that moment in time, it was something that

6    crossed my head telling myself, man, I hope I don't have to

7    shoot at this guy if he doesn't orient his gun in my

8    direction which in my report it states that.

9            And then it says approximately two seconds later

10   from that thought crossing my brain, his gun started to

11   orient in my direction.

12           MR. GALIPO:  Okay.  We can take that down, Shannon.

13   BY MR. GALIPO:

14   **Q.    So are you saying that you were considering shooting**

15   **him even before the gun started orienting in your**

16   **direction?**

17   A.    I wouldn't use the word considering.

18           In what we do, we always have a tactical checklist

19   of how we need to solve a problem with the least amount of

20   force necessary in order to keep myself, my partners, and

21   other civilians safe from harm or death or serious bodily

22   injury.

23           So at that moment it was something -- a checklist

24   that had gone through my brain, what if this happens, what if

25   this happens.  As a tactical operator, we're constantly

Page 45

1    thinking what if this happens, what if that happens.

2          At the moment it's something that went through my

3    mind.  It's in my report, that's correct.  We train that all

4    the time.  Our bread and butter is hostage rescue, so we do

5    train that.  But at the moment in time with Llamas, that

6    wasn't the case Even though that thought had crossed through

7    my head, he started to turn his body orienting towards me

8    with a firearm and towards my partners as well as the

9    partners 300 yards behind us that were still working on Rudy

10   after Rudy was shot.

11   **Q.   So you're saying that you -- when you had this**

12   **checklist in your head, did you check it yes or no in regards**

13   **to --**

14   A.   No, that's not how -- I'm sorry to interrupt you,

15   Dale.  That's not how it works.  It's not a yes or no thing.

16   It -- it operates in theory that that could happen, and if it

17   did happen, that that would be a really hard incident for us

18   to solve.  So as I said, it's just like -- it's like the

19   stock market spins across the -- it's like a bar where all

20   the Dow Jones spins across the market for the day.

21         It's just something that our brains are trained to

22   do and try to see how this situations is going to unfold if

23   that makes sense.

24   **Q.   Let me just ask -- it does.**

25         **Let me just ask you this last question, and then**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 46

```
1    we'll take our break.

2           MR. GALIPO:  I'm sorry it went so long, Jinna.

3    BY MR. GALIPO:

4       Q.   If he had not turned towards you or oriented the gun

5    towards your partners, would you have fired?

6           MR. RAMIREZ:  Calls for speculation; lacks

7    foundation; assumes facts not in evidence.

8           But you can answer if you know.

9           THE WITNESS:  From my training and experience in my

10   incidents, Dale, I do not think I would have fired.  I think

11   would have sprinted towards him putting my safety even

12   further trying to close the gap from him getting to that

13   house 15 yards away if that was the path he chose which was

14   the last path there was, I would have sprinted and put myself

15   in even more jeopardy and closed the gap trying to see if we

16   can get him to surrender peacefully without using force.

17      Q.   Okay.  All right.  Thank you for that.

18          MR. GALIPO:  Is this a good time for a ten-minute

19   break?

20          I can take longer, Jinna, if you want.

21          COURT REPORTER:  No, that's okay.

22          MR. GALIPO:  Okay.  So how about ten minutes.

23          Does that sound good, Gene?

24          MR. RAMIREZ:  That sounds good.

25          And then you should have the Star 9 video.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 47

1          MR. GALIPO:  Okay.  Thank you so much, Gene.

2          MR. RAMIREZ:  Thank you.

3          THE VIDEOGRAPHER:  And off the record at 2:44 p.m.

4          (Recess taken.)

5          THE VIDEOGRAPHER:  And going back on the record at

6     2:59 p.m.

7     BY MR. GALIPO:

8          Q.   Okay.  So let's go back on the record.

9               When you fired your first volley of shots, was

10    Mr. Llamas still moving north?

11         A.   His travel pattern was the same as I mentioned

12    earlier.  North -- south to north, drifting to the west.

13         Q.   And would you say he was till running during the

14    first volley?

15         A.   I don't recall if he was -- he had gone between like

16    a -- I guess you would call it a trot, a sprint and a trot.

17              I don't remember at that time I think he had slowed

18    down a pinch to turn -- well, when he started to orient

19    towards myself, but I don't recall a 100 percent.

20         Q.   So he would have either been running or trotting,

21    but still moving in the direction you indicated?

22         A.   Correct.  He hadn't stopped and surrendered at the

23    point.

24         Q.   Did anyone as far as the tactical plan discuss that

25    if Mr. Llamas is seen running towards one of those houses,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 48

1  that he should be shot?

2      A.    No.

3      Q.    Did anyone tell you that at any time that if he runs

4  towards that house, we should shoot him?

5      A.    No.

6      Q.    Was that your mind frame at any time?

7      A.    Never.

8      Q.    And in terms of your -- the magnifier or the

9  magnification that you talked about earlier, was that

10  something that is customary with your weapon or something you

11  added?

12      A.    We all have that capability.  It's removable.

13          Some guys don't like it, some guys do.  It works

14  great out in the open.  It's not so good if you're clearing a

15  house.  Some guys keep theirs off and put it on if they think

16  they need, and then some guys will keep it on and then take

17  it off if they don't want it.  I choose the latter.

18      Q.    And did you mention to anyone on-scene that you were

19  using your magnification?

20      A.    That's not something we would ever mention with each

21  other.  It's just --

22      Q.    How about at -- I'm sorry.  Go ahead.

23      A.    Sorry.  I was far back.

24          That's not something we would ever talk about

25  on-scene.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 49

1    Q.    And was that discussed at all before or after the

2    shooting?

3    A.    No.  That's not how that works.  It's not -- it's

4    not required for us to have on a rifle.  It's nothing we

5    would ever speak of.  It's just an option if we want to have

6    it.

7    Q.    And were you stationary when you fired your shots?

8    A.    I had just stopped a trot or a walk and placed my

9    feet in a stationary position, that's correct.

10   Q.    And how long do you believe you were in a stationary

11   position before you fired your first volley?

12   A.    Long enough to build a shooting platform and shoot.

13         That's why I stopped because he was orienting his

14   body towards us.

15   Q.    So maybe about a second?

16   A.    I would guess probably a second -- sorry.

17         I would estimate probably a second.

18   Q.    Okay.  And did you have the weapon in two hands?

19   A.    I did.

20   Q.    Were you in some type of a shooting position?

21   A.    That's what I created when I stopped.

22   Q.    And can you describe the shooting position you were

23   in, please.

24   A.    Sure.  Feet are shoulder width apart, left foot

25   slightly forward than my right being that I'm right-handed,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 50

1    and standing facing northbound or north to the north.

2        Q.    Were you using your sights?

3        A.    I was.

4        Q.    And where were you aiming on Mr. Llamas' body from

5    your perspective during the first volley?

6        A.    His torso.

7        Q.    When you say his torso, you mean between his neck

8    and waist essentially?

9        A.    Correct.

10        Q.    And what part of his torso was exposed to you during

11    the first volley?

12        A.    It would have been his left shoulder, left ribs, his

13    glutes were at an angle, his back was at an angle, he was

14    starting to orient his body this way.  So it would have been

15    really between the time we engaged and the time we stopped on

16    the initial volley it would have been left torso, back

17    glutes, left shoulder.

18        Q.    Was his buttocks exposed to you during the first

19    volley of shots?

20        A.    At an angle, yes, it was.

21        Q.    Did you observe any movement as you described his

22    rotation during the shots, or was that more observed before

23    the first shot?

24        A.    I was focused on his -- he was rotating because I

25    could see the firearm through my magnification coming towards

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 51

```
 1    me.  So he was spinning.  He continued to spin after we

 2    engaged that first volley, but he was in the process of

 3    spinning towards us at that time.

 4         So I could still see his glutes from an angle, and I

 5    say that just because your back is a straight line, right?

 6         But your glutes -- like I could see like that part

 7    of his body, and I could also see on this side where his

 8    firearm was, his hand, his firearm, and this side of his

 9    face.

10    Q.   And then did you get the impression that he was

11    struck by one or more of the shots from the first volley?

12    A.   Correct.

13    Q.   And what gave you that impression based on what you

14    observed?

15    A.   The way that he fell to the ground.

16    Q.   And how did he fall to the ground?

17    A.   He fell to the ground like he was still ambulatory,

18    still had muscle movement, or brain -- brain was still

19    working, heart was still working, he still was able to kind

20    of like fall, but still bring himself down to the ground and

21    then start to crawl and orient his firearm at us again.

22         So yes, he still had muscle movement is I guess what

23    I'm trying to explain.

24    Q.    I get that part.  But I'm assuming one of the

25    reasons you thought one or more of the shots struck him is
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 52

1    because he immediately went down to the ground?

2        A.    He fell to the ground, yes.

3        Q.    And you said about six or seven seconds expired

4    between the first volley and the second volley?

5        A.    Correct.

6        Q.    And you moved up, I think, you said about five

7    yards?

8        A.    Approximately.

9        Q.    So you estimated you were 35 to 45 yards from him

10   for the second volley, approximately?

11       A.    Approximately.

12       Q.    And what part of his body were you aiming at for the

13   second volley of shots?

14       A.    His head.

15       Q.    And what part of his head was oriented towards you

16   at that time?

17              Would it be the front, the side, the back, what

18   part?

19       A.    His face, his eyes, mouth, nose, his whole front

20   side of his face.

21       Q.    So you were attempting to strike him in the face

22   area essentially for the second volley?

23       A.    Correct.

24       Q.    And you said you were able to see a magnification to

25   some extent of his face before you fired the second volley?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 53

1          MR. RAMIREZ:  That's vague and ambiguous.

2          But if you understand, you may respond.

3          THE WITNESS:  Can you rephrase the question,

4    please.

5    BY MR. GALIPO:

6      Q.   Sure.  I'm assuming -- are you still using your

7    magnification when he's on the ground after the first

8    volley --

9      A.   That's correct, that's correct.

10     Q.   And with the magnification when he was on the ground

11   before you fired your second volley, so I'm taking you a few

12   seconds before that, were you able to see his face?

13     A.   Correct.

14     Q.   And was his face magnified?

15     A.   I was looking through my magnifier, that's

16   correct.

17     Q.   Did you see any blood on his face before you fired

18   your second volley?

19     A.   I did not.

20     Q.   Did you see any blood on his face after you fired

21   the second volley?

22     A.   No.

23     Q.   Did you ever approach him?

24     A.   Sorry.  Between what time period?

25          Are you talking about through my three time

Page 54

1  magnification, or towards the end of the incident with

2  Llamas?

3      Q.   Well, let's break it down.

4          I'm assuming you're going to say that through your

5  magnification, you didn't see blood on his face after, but

6  when you approached him, you did?

7      A.   When we started performing medical on Llamas, we

8  located some blood by his -- near his nostril, that's

9  correct.

10     Q.   And did you have the impression that one of your

11 shots from the second volley may have struck him there?

12         MR. RAMIREZ:  May call for speculation.

13         But you may respond.

14         THE WITNESS:  That would be my speculation.

15         I would assume that.

16 BY MR. GALIPO:

17     Q.   Right.  Because that's where you were aiming

18 essentially?

19     A.   I would assume that because when I aimed at him with

20 my three-time magnifier, he was pointing the gun at me and my

21 partners trying to from my experience trying to actively

22 track us down with the sights as well as crawling now towards

23 the house to the east.

24         So yes, after on my second volley he still kept the

25 gun pointed towards us, I can still see his eyes open, but he

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 55

```
 1   was no longer moving at that point, whereas right prior to my
 2   second volley, he was actively aiming at myself and my
 3   partners and crawling towards the house.
 4          Whether -- whatever his intention was, I don't
 5   know.
 6      Q.   But when you fired your second volley of shots when
 7   you were aiming at his face, did you observe something that
 8   led you to believe he may have been struck in the second
 9   volley?
10      A.   Yes.  Because he stopped moving.  He stayed
11   oriented -- the gun was still oriented right at me.  His eyes
12   were oriented at me, but there was no more movement from him.
13   He stopped crawling, but I was still under the assumption he
14   was still alive if that's what you're asking, but he stopped
15   moving which is why I stopped shooting.
16      Q.   And then what position did he end up in, if you
17   know, on the ground after the second volley?
18      A.   And let me rephrase that last.  He -- I didn't stop
19   shooting because he stopped moving.  I stopped shooting
20   because he stopped actively trying to track us with his
21   pistol.  That's what stopped moving was his pistol aiming and
22   tracking our position if that makes sense.
23          And then if you can rephrase that last question,
24   Dale.  I apologize.
25      Q.   Sure.  No problem.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 56

1                What position did he end up in on the ground after

2  the second volley of shots?

3     A.  He was laying on his right side, chest was facing

4  us, quadriceps facing us.  I could see his feet to his head

5  and his face was still facing us.

6     Q.  His feet would have generally been in what

7  direction?

8     A.  His toes would have been pointed to the south as

9  well as his face.

10     Q.  And how about his head, generally in what

11  direction?

12     A.  Head is facing south on the west side of his body.

13             His head's on the west side, feet are on the east

14  side.

15     Q.  And you said that you -- did you observe him

16  crawling in between the first volley and the second volley?

17     A.  I did.

18     Q.  And for how long did you observe him crawling before

19  the second volley?

20     A.  It would be between that six seconds that I

21  re-engaged, somewhere between there, whenever I had my sights

22  on him.  My sights, and by sights, I mean my magnification

23  that I could see better.

24     Q.  And how far do you think he crawled based on your

25  observations before you fired the second volley?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 57

```
 1      A.   A few feet.

 2      Q.   And in what direction?

 3      A.   To the west.

 4      Q.   And just so we're clear, a little while ago, you

 5   said the house to the east, but I think you meant the west.

 6      A.   That's correct.  We clarified that.

 7           You're right.

 8      Q.   Okay.  And to your knowledge, are you the only one

 9   who fired during the second volley?

10      A.   Yes, sir.

11      Q.   Do you have an understanding as to how many shots

12   the sergeant fired altogether?

13      A.   I think just from charting and looking at documents,

14   it was one.

15      Q.   And is it your understanding that was some time

16   during the first group of shots?

17      A.   That's correct.

18      Q.   You mentioned earlier that you had reviewed autopsy

19   report fairly carefully?

20      A.   I reviewed it.  I don't know how careful or detailed

21   you want to go, but yes, I have reviewed the autopsy

22   report.

23      Q.   I don't want to go too detailed, but did you look to

24   see where he was shot?

25      A.   I did, yes, sir.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 58

1     Q.    And what is your understanding from reviewing the

2     report?

3     A.    He was shot in the right upper glute.

4           Bullet traveled from the left to the right which

5     would correlate that initial volley From Sergeant Hubacheck

6     and myself as he's spinning towards us, you can still see the

7     top of his glutes, the left side of his shoulder and the rib

8     cage on the left and his left side of his head and eyes as

9     the gun is orienting towards us and aiming for the torso that

10    would make complete sense that the 223 round entered his

11    buttocks from the left traveling to the right side of his

12    right buttocks, and then the second shot looked like it

13    entered the left nostril and went back and into his brain at

14    some point.

15    Q.    So your understanding he was struck by two shots?

16    A.    That's correct.

17    Q.    And your belief based on being there at the time and

18    reviewing the autopsy report is the shots to the buttocks

19    would have happened in the first volley?

20    A.    That's my assumption.

21    Q.    Based on what you already explained?

22    A.    His buttocks was not facing my direction at the time

23    of the second volley.  So my assumption is bullets can do

24    weird things, but my assumption is he was struck in the right

25    buttocks from left to right on the initial volley.

Page 59

1      Q.   And then the second volley would be the shot to the

2  face, and I think you've already told us that's where you

3  were aiming?

4      A.   Yes, sir.

5      Q.   And do you recall whether it was the left buttocks

6  or the right buttocks that was struck?

7      A.   It was the right side, left side of the right

8  buttocks, and the bullet traveled from the left to the right

9  of the buttocks.  So it entered from the left side of the

10  right buttocks upper buttocks if that's makes sense.

11        And I'm no doctor or coroner, but that's what the

12  report states.

13      Q.   Okay.  And do you recall whether that bullet exited

14  the body or stayed in the body?

15      A.   I did extensive medical blood sweeps on Llamas, and

16  I never saw any exit wounds from that entry wound.

17      Q.   Do you recall -- you might not know this, but do you

18  know whether the buttock shot was fatal or not?

19      A.   No idea, sir.  I would assume the --

20        MR. RAMIREZ:  You've already answered.

21  BY MR. GALIPO:

22      Q.   Yeah.  If you don't know, it's okay.

23        Sometimes the report indicate that, and that's all

24  right.  I realize that's not your specific area of expertise.

25        You mentioned that there was a left-to-right

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 60

1    trajectory of the shot to the buttocks?

2        A.   Yes, sir.

3        Q.   And how much -- what is your understanding as to how

4    much of a left-to-right component that had, if you know?

5        A.   No idea, sir.

6             I don't think they put measurements in there.

7        Q.   Okay.  But your understanding was it struck the left

8    side of the right buttocks and had a left-to-right

9    trajectory.

10            Do I have that correct?

11       A.   That's correct.

12       Q.   And when you eventually approached Mr. Llamas, you

13   noticed the shots that you described.

14            That's when you noticed the wounds?

15       A.   Correct.

16       Q.   How much time passed in between the shooting and

17   when you actually approached him?

18       A.   Approximately ten seconds or less.

19       Q.   And --

20       A.   Let me rephrase that.  We approached him almost

21   right away within two seconds, but by the time we made it to

22   his body, it had been less than ten seconds, approximately.

23       Q.   And what distance about did you have to cover to get

24   to his body?

25       A.   About that 35 to 40 yards.

Page 61

1    Q.  Did anyone check, if you know, to see whether he had

2    a pulse?

3    A.  We did, yes, sir.

4    Q.  And who checked, if you know?

5    A.  Lieutenant Walsh.  I also checked his wrist at some

6    point.

7    Q.  And do you know when Lieutenant Walsh checked for a

8    pulse in relation to the approach?

9    A.  Once the gun was taken out of his hands, pretty

10   quickly after that medical started on Llamas from my --

11   Lieutenant Walsh and myself.

12   Q.  What, if anything, did Lieutenant Walsh do medically

13   that you observed?

14   A.  Lieutenant Walsh performed to my knowledge he

15   checked for pulse, checked for breathing, and then we started

16   checking for major hemorrhaging which is the first step.

17        We did not see any major hemorrhaging, so we started

18   doing blood sweeps of Llamas which is how you can find a

19   wound in a cavity that maybe you don't see and maybe he's

20   bleeding out.  We were unable to find that wound or any

21   wounds that was giving him massive hemorrhaging.

22        And then once after -- during that blood sweep or

23   right after, Lieutenant Walsh started compressions on Llamas'

24   chest to start performing CPR.  That's the extent of I think

25   what Lieutenant Walsh did.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 62

1      Q.    How about yourself?

2      A.    I checked his radio pulse on his wrist at some

3   point.  I started doing blood sweeps extensively, put gloves

4   on, started doing blood sweeps right away, trying to see if

5   we can stop a bleed or get a -- get him -- he still looked

6   alive.  So get him stable.  We had medical on-scene.

7          So we knew they were in route.  So from there I saw

8   the wound in the buttocks.  There is not really any medical

9   tactical medical intervention for that.  And then it wasn't

10  until AMR got there which was only a minute or so after that

11  I noticed the wound to the nose because we couldn't figure

12  out why he wasn't responsive from our medical evaluation

13  until AMR was able to come and take over the medicine.

14     Q.    So you said that you noted he was still alive.

15           What did you see that led you --

16     A.    I didn't -- no.  I said that -- I'm sorry, Dale.

17          I said he looked like he was till alive like he --

18  his eyes were still open.  He hadn't completely turned gray

19  like I've seen with people that die in car wrecks and things

20  like that from my experience.

21          So he still looked like he had some color to his

22  life, but he wasn't breathing, and his heart wasn't pumping.

23          That's why we started performing CPR.

24     Q.    Okay.  And was the medical staged nearby, if you

25  know?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 63

```
 1     A.   Very close, yes.

 2     Q.   So they were able to get there relatively quickly?

 3     A.   Very quickly.

 4     Q.   Did you remain nearby while the paramedics were

 5   providing assistance to Mr. Llamas?

 6     A.   For a little bit.  And then I was pulled away from

 7   the scene at that point.

 8     Q.   You mentioned at some point in your statement, and

 9   excuse my language, but did Lieutenant Walsh at some point

10   say, "Oh, shit" or words to that effect?

11     A.   He did.

12     Q.   When did he say that?

13     A.   When Lieutenant Walsh looking at BWC, I did not hear

14   this on-scene.  This is all from BWC, but putting everything

15   I know together, it was when he saw Llamas running up the

16   driveway.

17     Q.   Okay.  That would have been shortly before the shots

18   took place?

19     A.   Correct.

20     Q.   And at the time did you have a body-worn camera?

21     A.   I did not.

22     Q.   What was the policy at the time?

23          That the sergeants would have those, but not

24   deputies?

25     A.   That's correct.
```

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 64

1      Q.    And has that changed now?

2      A.    It has, sir.  We all have BWC now.

3      Q.    Okay.  Everyone has them now in your unit --

4      A.    That's correct.  Yes, sir.

5      Q.    And in your statement you were talking about the

6  bodY language of individuals you shot on the 215, and I think

7  comparing it to some extent with this case.

8            Do you remember that?

9      A.    I do, sir.

10     Q.    What was the body language that you were referring

11 to on the 215 shooting?

12           MR. RAMIREZ:  Objection to relevancy.

13           But you may respond.

14 BY MR. GALIPO:

15     Q.    If you recall.

16     A.    I recall.  Suspect was fleeing felon, very similar

17 crimes to Llamas'.  He ran on -- his car ran out of gas, he

18 ran on the freeway with a firearm in his hand actively

19 pointing it at cars trying to what appeared to me from my

20 training and experience as carjack a vehicle because his car

21 was out of gas.  And then once all the vehicles realized from

22 the southbound 215 what he was doing, they stopped.

23           My assumption is he -- his options were done, or he

24 had no other options but to shoot at the cops.  And so he

25 actually turned towards his left, his back was facing me, he

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 65

1   was looking at all the vehicles trying to get -- point them

2   at every car passing, trying to inside of those cars.

3            And then once the car stopped and they were too far

4   away from him to get to, he started orienting his body

5   towards the left swinging his gun in the same motion towards

6   honestly that Llamas did towards my direction, and I engaged

7   one that day on the 215, which three shots.

8        Q.   Do you know if that person survived or not?

9        A.   Initially, he did, but he died later at the

10  hospital.

11       Q.   And your other shooting you were involved in, do you

12  know if that person survived?

13       A.   He did not.  And I was not the only shooter in

14  that.

15       Q.   So the 215 you were the only shooter, but the other

16  call there were multiple shooters?

17       A.   That's incorrect.  There was a second shooter on the

18  215, but I was one of the shooters.

19       Q.   Okay.  Thank you.

20       A.   Yes, sir.

21       Q.   Shortly after the second volley of shots, did

22  Lieutenant Walsh say something to the effect, you know, "Stop

23  shooting" or "Why are you shooting?"

24       A.   I don't really recall.  And looking at the video

25  evidence, I can't really make out what he said at the time.

Page 66

1          I just heard him say my name.  He was my sergeant

2    prior to him being our lieutenant.  So him and I had a very

3    extensive working background, and I knew exactly what -- when

4    his tone, certain words he can put tones on.  I know that he

5    means something, and I just heard my name Jimmie with the

6    tone he said, and that was him probably -- I don't know --

7          MR. RAMIREZ:  You've answered --

8          THE WITNESS:  I'm assuming.  So yeah,  I just heard

9    him say my name Jimmie.  I think he said some more, but I

10   don't know what it was.  Sorry.

11   BY MR. GALIPO:

12   **Q.    That's okay.  Because in your statement at some**

13   **point you say, "I engaged I think four more rounds, I aimed**

14   **at his head.  I remember Walsh saying my name almost like why**

15   **are shooting."**

16         **Is that what you said --**

17   A.    At the time that was my assumption.

18   **Q.    Okay.  That was your impression at the time?**

19   A.    At that moment in time I assumed, and that's when my

20   response was, "He's pointing a gun at us, the gun is -- he

21   had a gun in his hand, it's pointing at us."

22   **Q.    Okay --**

23   A.    At that point I realized they could not see what I

24   could see.

25   **Q.    Now, prior to shooting Mr. Llamas, did you have any**

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 67

1  information that he had ever shot at anyone else with a

2  firearm?

3      A.   Well, I did -- prior to me shooting him?

4      Q.   Right.

5      A.   I did.  So when -- when he shot the initial shot

6  towards our Search Team, and I went back over there, I was

7  under the assumption from the statement that Deputy Hyler

8  [phonetic] gave me that he shot at us.  He didn't shoot Rudy.

9  He shot at the deputies on-scene.  Rudy was just a byproduct

10 of that because it's in my report Deputy Hyler says, "Dude,

11 that was --"  something to the effect of, "Dude, that was

12 gnarly, he just shot at us."

13          And Lieutenant Max said a few things or Sergeant Max

14 at the time about the bullet whizzing over their heads.  So

15 my assumption was he had already shot at law enforcement that

16 day.  That was my perspective.

17     Q.   So based on that assumption, did you think you could

18 shoot him simply for running up the driveway?

19     A.   No, not at all.  If that was the case, I would have

20 shot him way sooner.  That's not in my brain; that thought

21 was not in my brain at all.

22     Q.   And before that day did you ever have any

23 information that Mr. Llamas had shot at another human

24 being?

25     A.   No, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 68

1    Q.    Any information that he had ever pointed a gun at

2    another human being?

3    A.    Yes, sir.

4    Q.    And what was that?

5    A.    The robbery approximately a week prior was with the

6    firearm.  He had a active warrant for armed robbery, and he

7    had beaten the guy really bad with his pistol.

8    Q.    So there was force used in terms of the pistol

9    against the person?

10   A.    Absolutely.

11   Q.    But you don't know whether there was a pointing of

12   the pistol, but you know it was used as a weapon to beat the

13   person?

14   A.    I guess we can assume either side.

15   Q.    How long did you stay at the scene after the

16   shooting occurred?

17   A.    Approximately complete estimate 20 to 30 minutes.

18   Q.    Where did you go from the scene?

19   A.    And by the scene, I mean I was on River Road at the

20   mouth of the driveway, not with Llamas at that time.

21   Q.    I understand --

22   A.    After the scene I came back to the office, the

23   Special Enforcement Bureau Office.

24   Q.    And how long did you stay there?

25   A.    I was probably there for -- estimating five hours,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 69

1   four, five hours.

2        Q.   Did you speak to anyone while you were there?

3        A.   I did.

4        Q.   Who did you speak to that worked at the

5   department?

6        A.   That worked at the department?

7        Q.   Yeah.  I don't need to know about personal calls you

8   might have made to family or friends.  I'm more concerned

9   about -- interested in people you spoke to that either

10  supervisors or representatives or --

11       A.   There were representatives -- sorry, Dale.

12            There was attorneys, psychologists, and then I

13  really didn't talk with any of my partners about the shooting

14  at all.  They were still on the scene.

15       Q.   Okay.  And you had kind of been through this process

16  a couple times before with the other shootings as far as

17  meeting with the representative, a psychologist, things of

18  that nature?

19       A.   That's correct, sir.

20       Q.   And do you know how it was decided that your

21  statement wasn't going to be taken that day, but a couple

22  days later?

23       A.   I don't, sir.

24       Q.   Okay.

25            MR. GALIPO:  Why don't we take our last break.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 70

1          I think I'm getting pretty close, Gene.

2          You want to take a another ten minutes, and then

3     we'll come back and finish it up?

4          MR. RAMIREZ:  That's fine.

5          MR. GALIPO:  Okay.  Noah, I think we're ready to go

6     off the record.

7          THE VIDEOGRAPHER:  Going off the record at 3:34 p.m.

8          (Recess taken.)

9          THE VIDEOGRAPHER:  Back on the record at 3:45 p.m.

10    BY MR. GALIPO:

11        Q.   Was there any ever a debriefing on this incident

12    just to discuss tactics and things of that nature with your

13    group?

14        A.   Internally, sir.

15        Q.   And when did that take place?

16        A.   I don't recall.  I know the shooting portion was

17    left out of it, but all the tactics that led up to that

18    incident we spoke of was probably within two weeks is my best

19    assumption, estimation.

20        Q.   Is the goal of an operation like this to safely take

21    the person into custody if you can?

22        A.   Every time.

23        Q.   With the minimal amount of force used?

24        A.   Every time.  I think our -- I think our bureau

25    operates 200 to 250 ops' a year, and we get a lot of suspects

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 71

```
1    in custody with no force, no damage, no injures to deputies,

2    suspects, civilians.  That's always our goal.

3        Q.   And in terms of your deadly force training, are you

4    essentially trained that deadly force should only be used if

5    there is an immediate or imminent threat of serious bodily

6    injury?

7        A.   That's correct.

8        Q.   And obviously, the training would be generally

9    speaking if there is not an immediate or imminent threat of

10   death or serious bodily injury, then deadly force should not

11   be used?

12       A.   That's correct.

13       Q.   I think you told me earlier that based on the

14   training, the person has to have the opportunity, ability,

15   and apparent intent to immediately cause death or serious

16   bodily injury?

17       A.   That's correct, sir.

18       Q.   And I think we also discussed that a weapon in

19   someone's hand like a firearm, that fact alone is not enough;

20   there needs to be more than that; is that fair?

21       A.   That's incorrect.  If you recall, I talked about

22   that suicidal subject that I have been on a few calls like

23   that.  So yes, a 100 percent.

24       Q.   Did you think --

25       A.   You can't shoot someone in that situation.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 72

1      Q.   Did you think Mr. Llamas was potentially suicidal

2   when he was running with the gun to his head?

3      A.   I did not, sir.

4      Q.   And you're trained that you're responsible to

5   justify each shot; is that fair?

6      A.   Every shot, sir.

7      Q.   Okay.  We're going to just look quickly at I think

8   the video footage from the helicopter, and we're going to

9   mark it I think as Exhibit 3 going in order.

10          MR. GALIPO:  Is that right, Shannon?

11          We had Exhibit 1 and 2 with the sergeant's

12   deposition, so that's why we're going to mark it as 3.

13          (Exhibit 3 was marked for identification.)

14   BY MR. GALIPO:

15      Q.   I'm going to try to show a portion of it, and we'll

16   watch it through, and then I'll have Shannon stop it then we

17   might look at it again, and I might ask you a few questions

18   about it.

19      A.   Sure.

20      Q.   Okay.  So before we start, we see a white figure in

21   the frame.

22          Is that supposed to be Mr. Llamas, if you know?

23      A.   I can't answer that.  I know there is a female from

24   what I viewed.  I would have to see more of the video to give

25   you that answer, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 73

1      Q.    Okay.

2            MR. GALIPO:  What time are we at?

3            Are we at 46 minutes?

4            MS. LEAP:  Yeah.  For the record, the video is

5      paused at 46 minutes.

6            MR. GALIPO:  Okay.  Why don't you play it about ten

7      seconds and stop just to give the deputy some sense of where

8      we're at.

9            (Video playing.)

10           THE WITNESS:  You can pause it.

11           MR. GALIPO:  Okay.  Let's stop.

12           (Video paused.)

13           THE WITNESS:  From what I've seen that in what I

14     heard Star 9 the traffic put out that day and the evidence

15     videos I've looked at, that's Llamas.

16     BY MR. GALIPO:

17     Q.    Do you know why your general understanding when

18     we're looking at this, he looks to be whitish in color?

19     A.    That's what the FLIR camera does, sir.

20     Q.    Okay.

21           MR. GALIPO:  And all right.  And we stopped it at

22     46:07.  Why don't we continue, please, Shannon.

23           MS. LEAP:  Okay.  And if you want me to move forward

24     at all, just let me know.

25           (Video playing.)

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 74

1              (Video paused.)

2    BY MR. GALIPO:

3        Q.    Is this the initial time that you saw him that we

4    talked about earlier?

5        A.    That's correct, sir.

6        Q.    And during this time frame he essentially had the

7    gun to the right side of his head?

8        A.    Correct.

9        Q.    Was there a time frame here where he like pointed or

10   gestured to the ground?

11       A.    There is.

12       Q.    And what did you interpret him to be doing at that

13   time?

14       A.    From my extensive training and experience, I assumed

15   that he was baiting us to break cover or concealment come

16   closer to him to apprehend him so that he could shoot at

17   us.

18       Q.    And I'm assuming you did not take the bait and leave

19   cover at that point?

20       A.    That's correct.

21       Q.    All right.  And we stopped it at 46:38.

22            MR. GALIPO:  Let's continue, please.

23            (Video playing.)

24            MR. GALIPO:  And let's stop it again.

25            (Video paused.)

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 75

```
 1   BY MR. GALIPO:

 2       Q.   At 46:52.

 3            During any of this time frame did you have an

 4   impression as to whether he knew the law enforcement was

 5   nearby?

 6       A.   He was 100 percent aware that law enforcement was

 7   nearby.  I did the scout on the property when I first landed

 8   on the 20 acres which is a tactic that we do when we first

 9   get on-scene to get an orientation of the property or

10   residence, whatever kind of objective we're working to search

11   or apprehend a bad guy or suspect.

12            So I did the scout of the whole property.  It took

13   about 20 minutes.  It was somewhere around 17:00 hours when I

14   first got there would be my assumption.

15            I could be off on that time, but you can check the

16   CAD report.  During that scout I observed Star 9 put out

17   multiple announcements that by name Johnny Llamas, we know

18   you're armed, we need you to come out to the nearest deputy

19   with your hands in the air, nothing in your hands.  Those

20   announcements were given in Spanish as well as we have police

21   K-9 announcements which that's a separate announcement.

22            And then I heard the same announcements from the

23   police units as well as our BearCats which have an amplified

24   speaker, and during my scout and Star 9's announcements, you

25   could probably hear their announcements a half mile to a mile
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 76

1  away.  So That was three hours, two to three hours worth of

2  announcements in English and Spanish.  In hindsight Llamas

3  spoke English.  So that wasn't an issue anyways, and there

4  were multiple announcements with his name, Johnny Llamas, we

5  know you're armed, we know you have a handgun, we need you to

6  come out with your hands up in the air and nothing in your

7  hands.  So yes, he knew a 100 percent that police and

8  deputies, law enforcement was on-scene.

9     **Q.    Okay.  Thank you for that.  I was -- my question was**

10  **poor.  I was trying to ask you during this time frame that he**

11  **came out during this approximate 60 seconds with the gun to**

12  **his head, whether he ever looked in your direction during**

13  **that time.**

14     A.    He did, yes, sir.

15     **Q.    So you had the impression he knew you were there**

16  **during that time?**

17     A.    He looked in my direction, and he looked to the east

18  where there were other deputies stationed further down, and

19  you could see him look at them, and turn the other way.

20         So he knew a 100 percent that law enforcement was

21  on-scene on River Road.

22     **Q.    And during this approximate 60 seconds, I guess up**

23  **to two minutes that you observed him at this point with the**

24  **gun to his head, did he ever at any time during that time**

25  **frame point the gun at you or any of the officers?**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 77

```
1      A.   Not until -- no, not on River Road.

2      Q.   Okay.  And this is stopped at 46:52.

3           MR. GALIPO:  Please continue, Shannon.

4           (Video playing.)

5           MR. GALIPO:  Stop.

6           (Video paused.)

7    BY MR. GALIPO:

8      Q.   Stopping at 47:17.

9           Is this the time frame when he went out of your

10   view?

11     A.   That's correct.

12     Q.   And this is when he was running northbound as we

13   discussed earlier?

14     A.   It appears he was running northbound, but we were

15   running to the mouth of the driveway.  So in hindsight, it

16   looks like he's northbound, yes.

17     Q.   Okay.

18          MR. GALIPO:  Continue, please.

19          (Video playing.)

20          MR. GALIPO:  Okay.  Stop right there.

21          (Video paused.)

22          MR. GALIPO:  So we're now out 47:27.

23   BY MR. GALIPO:

24     Q.   Are you able too see the white figure still in this

25   still image?
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 78

```
1      A.   Yes.
2      Q.   And you believe that is Mr. Llamas?
3      A.   I do.
4      Q.   And is he running in the driveway that we've been
5    speaking of at this point?
6      A.   He is.
7      Q.   And is he running generally northbound?
8      A.   Like I said earlier, northbound drifting from my
9    perspective on-scene towards the west.
10     Q.   And would you have been at this point at the mouth
11   of the driveway?
12     A.   I'm not sure my exact location, but it was somewhere
13   with him running between somewhere approximately around 35 to
14   45 yards.
15     Q.   And if I have my directions straight, you would have
16   been to the bottom-left portion?
17     A.   You know what, Dale, let me rephrase that.
18          I was at the mouth of the driveway because if you
19   rewind about ten seconds, you can see him orient his body to
20   the left the first time.  I saw that through my magnifier.
21          So I would say yes, I was at the mouth of the
22   driveway at some point.
23          MR. GALIPO:  Okay.  Let's go back just a little bit
24   then.  Okay, yeah.  So let's -- 47:23.
25          Let's play from there.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 79

1          (Video playing.)

2          MR. GALIPO:  And let's stop.

3          (Video paused.)

4    BY MR. GALIPO:

5      Q.    Are you say he already oriented to the left the

6    first time?

7      A.    Yes, sir.

8      Q.    Okay.  When he oriented to the left the first time,

9    you would have already been at the mouth of the driveway?

10     A.    Yes, sir.

11     Q.    And did he -- when he oriented to the left the first

12    time, did the gun come in your direction at all that time?

13     A.    No.  The gun stayed at his head.

14     Q.    All right.  So I take it in the next five seconds or

15    so is when the shooting occurs?

16     A.    I would assume that just from his location on the

17    camera.

18     Q.    And this is when you're saying he turned towards you

19    prior to the shooting?

20     A.    From my perspective from the different angle on the

21    ground through my three by magnifier, that's correct.

22     Q.    All right.

23         MR. GALIPO:  Let's -- we stopped it at 47:29.

24         Please play.

25         (Video playing.)

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 80

1           MR. GALIPO:  Okay.  Stop.

2           (Video paused.)

3           MR. GALIPO:  So let's just go back.

4           We stopped at 47:33

5           Can you go back about ten seconds, Shannon.

6           So 47:23, play forward.

7           Okay.  So stop there.

8           (Video paused.)

9   BY MR. GALIPO:

10      Q.   So the first volley's already happened, right,

11   before he went to the ground?

12      A.   Within a second I would assume that's correct.

13      Q.   And have you seen any enhancement done on this yet

14   by any video experts enhancing his body positioning right

15   before he went to the ground?

16      A.   No, sir.

17      Q.   And then while he was on the ground, the second

18   volley of shots occur?

19      A.   At some point, correct.

20           MR. GALIPO:  Can we just go back a little bit more,

21   and I'm going to have you stop it one last time.

22           Okay.  It's at 47:22, and I'll let you know when to

23   stop it around 47:30.

24           (Video playing.)

25           MR. GALIPO:  Stop right there.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 81

```
 1              (Video paused.)
 2    BY MR. GALIPO:
 3        Q.   Do you think he's made this second turning motion
 4    yet?
 5        A.   Dale, I honestly can't tell looking at -- it's --
 6    it's very zoomed out.  So from the FLIR thermal imaging in
 7    this angle, it's really -- it's hard for me to see right
 8    now.
 9        Q.   Okay.
10             MR. GALIPO:  Let's go just a little bit forward and
11    stop.  Okay, there he's on the ground.
12    BY MR. GALIPO:
13        Q.   Okay.  Is this the video that at least that you have
14    seen several times?
15        A.   Correct.  And like I said earlier, it was, you know,
16    it's small and zoomed out.  It's hard to see on the laptop
17    that I viewed it on.
18        Q.   Okay.
19             MR. GALIPO:  Thank you.  That's fine, Shannon.
20             I think that's all the questions I have.
21             Gene, did you have any questions for your client
22    today?
23             MR. RAMIREZ:  I don't think so.  I think I'm good.
24             I would like to order a copy and also have the video
25    and synced up for both Sergeant Hubacheck and Deputy McGuire,
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 82

1  please.

2          MR. GALIPO:  Okay.  You can arrange that separately

3  with the video company, Gene.

4          MR. RAMIREZ:  Perfect.

5          MR. GALIPO:  Noah, you can reach out to Mr.

6  Ramirez's office for that?

7          THE VIDEOGRAPHER:  Yeah.  No problem.  I'll note it.

8          I'll also take us off the record if that's all

9  right.

10          MR. GALIPO:  Yeah.  Let's go off the record, please.

11          THE VIDEOGRAPHER:  Going off the record at 4:02 p.m.

12          (Deposition proceeding concluded at 4:02 p.m.)

13                          *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 83

```
 1                DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  S.L., et al. vs. County of Riverside, et al.

 4   Date of Deposition:  December 20, 2024

 5   Job No.:  125233

 6

 7            I, _____, hereby certify

 8   under penalty of perjury under the laws of the State of

 9   California that the foregoing is true and correct.

10            Executed this _____ day of _____,

11   20_____, at _____, California.

12

13

14

15

16

17            _____

18                       JIMMIE MCGUIRE

19

20

21

22

23

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 84

```
 1                      CERTIFICATE

 2                          OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8         That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15         Further, that the foregoing is an accurate

16   transcription thereof.

17         I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 20, 2024.

23         _____

24         Jinna Grace Kim, CSR No. 14151

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 85

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name:  S.L., et al. vs. County of Riverside, et al.

 3   Witness:  Jimmie McGuire

 4   Date of Deposition:  December 20, 2024

 5   Job No.:  125233

 6

 7   Reason Codes:   1. To clarify the record.

 8                   2. To conform to the facts.

 9                   3. To correct transcription errors.

10

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17   Page _____ Line _____ Reason _____

18   From _____ To _____

19   Page _____ Line _____ Reason _____

20   From _____ To _____

21   Page _____ Line _____ Reason _____

22   From _____ To _____

23   Page _____ Line _____ Reason _____

24   From _____ To _____

25   Page _____ Line _____ Reason _____
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 86

```
 1   DEPOSITION ERRATA SHEET

 2   From _____ To _____

 3   Page _____ Line _____ Reason _____

 4   From _____ To _____

 5   Page _____ Line _____ Reason _____

 6   From _____ To _____

 7   Page _____ Line _____ Reason _____

 8   From _____ To _____

 9   Page _____ Line _____ Reason _____

10   From _____ To _____

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17

18   _____ Subject to the above changes, I certify that the

19   transcript is true and correct.

20   _____ No changes have been made.  I certify that the

21   transcript is true and correct.

22

23        _____

24                  JIMMIE MCGUIRE

25
```

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Index: 1..60

**Exhibits**

**McGuireJ 3**
  4:8 72:9,
  13

---

**1**

**1**  5:7 72:11

**1-10**  5:10

**10**  30:11

**100**  47:19
  71:23 75:6
  76:7,20

**12-6**  13:18

**120**  18:17

**14**  14:12

**14th**  8:21

**15**  22:20
  36:24
  46:13

**150**  18:17

**16**  8:16
  36:14
  39:20

**1700**  27:11,
  12

**17:00**  75:13

**180**  37:15

**1998**  13:8

**1:37**  5:3

**1:40**  5:5

---

**2**

**2**  72:11

**20**  5:2,6
  11:3 17:18
  27:16 39:1
  43:1 68:17
  75:8,13

**20-ish**  38:10

**200**  70:25

**2000**  14:12

**2014**  14:9,
  13

**2019**  15:21

**2020**  16:2

**2021**  16:16,
  17,18

**2024**  5:2,6

**215**  16:23
  17:11
  64:6,11,22
  65:7,15,18

**223**  17:7
  58:10

**25**  33:21,
  23,24
  34:10 36:6

**250**  70:25

**2:44**  47:3

**2:59**  47:6

---

**3**

**3**  72:9,12,
  13

**30**  11:3
  22:19
  27:24
  34:11
  68:17

**300**  8:8
  45:9

**34**  15:1

**35**  18:22
  25:6 52:9
  60:25
  78:13

**360**  27:2

**37**  40:19,20

**39**  41:20

**3:34**  70:7

**3:45**  70:9

---

**4**

**40**  18:16
  20:15 25:6
  36:9 37:12
  41:12,20
  60:25

**416**  7:8

**45**  18:22
  52:9 78:14

**45-degree**

**37:4**

**46**  73:3,5

**46:07**  73:22

**46:38**  74:21

**46:52**  75:2
  77:2

**47:17**  77:8

**47:22**  80:22

**47:23**  78:24
  80:6

**47:27**  77:22

**47:29**  79:23

**47:30**  80:23

**47:33**  80:4

**4:02**  82:11,
  12

**4:45**  26:3

---

**5**

**5**  28:7,11

**50**  18:16
  36:9 37:12

**556**  17:6

**5:00**  26:3

**5:24-CV-00249-
CAS-SP**  5:13

---

**6**

**6**  13:18

**60**  76:11,22

## 9

**9**  8:1 9:19
10:2,16,
22,24
11:17,20
12:2,5
20:6 26:24
42:23 43:8
46:25
73:14
75:16

**9's** 43:4
75:24

**90**  37:15
38:9

**90-degree**
38:8

## A

**ability**  26:9
44:4 71:14

**Absolutely**
68:10

**academy**
14:8,9,11,
14,24

**acquired**
32:2

**acres**  75:8

**actions**
26:11

**active**  68:6

**actively**
54:21
55:2,20
64:18

**actual**  8:19

**ad**  5:9

**add**  14:18

**added**  48:11

**adult**  27:18
28:1

**adults**  27:14

**afternoon**
5:4

**ahead**  9:24
39:9 48:22

**aimed**  54:19
66:13

**aiming**  50:4
52:12
54:17
55:2,7,21
58:9 59:3

**air**  75:19
76:6

**airship**  21:7
42:19

**Akaragian**
5:23

**alive**  55:14
62:6,14,17

**altogether**
57:12

**ambiguous**
25:14
30:22 53:1

**ambulatory**
51:17

**amount**  22:3
44:19
70:23

**amplified**
75:23

**AMR**  62:10,
13

**angle**  37:4
43:4
50:13,20
51:4 79:20
81:7

**announcement**
75:21

**announcements**
20:7,8
75:17,20,
21,22,24,
25 76:2,4

**Anthony**  5:22

**anxious**  35:5

**anymore**  33:9
37:22

**apologies**
35:8 39:6

**apologize**
23:10 39:1
55:24

**apparent**
71:15

**appeared**
20:22
64:19

**appears**
16:22
21:10
77:14

**appreciation**
32:7

**apprehend**
74:16
75:11

**approach**
53:23 61:8

**approached**
54:6
60:12,17,
20

**approximate**
23:4 28:4
76:11,22

**approximately**
15:14
18:3,7,16,
21,22
20:15
21:19,22
23:3 24:14
25:6 28:11
30:11
31:20 32:6
33:20,21,
23 34:10

36:24 42:1
44:9 52:8,
10,11
60:18,22
68:5,17
78:13

approximating
24:23

April  8:16,
21

area  52:22
59:24

arm  37:17

armed  44:1
68:6 75:18
76:5

armored
22:17

arraignments
12:23

arrange  82:2

arrived
26:21,22

assault
43:24

assigned
14:24
15:12
22:18

assistance
63:5

Association
9:2

assume
54:15,19
59:19
68:14
79:16
80:12

assumed
66:19
74:14

assumes  46:7

assuming
13:5 51:24
53:6 54:4
66:8 74:18

assumption
55:13
58:20,23,
24 64:23
66:17
67:7,15,17
70:19
75:14

athlete
14:14

attempting
52:21

attitude
15:10

attorney  9:7

attorneys
9:8,9
69:12

audio  7:1,
17,18,21

autopsy  7:10
57:18,21
58:18

avenue  21:1

aware  20:8
25:20,21,
22 26:12
27:25
35:10 75:6

Ayala  8:3

———————

**B**

———————

Babakhanian
5:22

back  10:17
18:13
26:10
30:14
33:6,7
38:5 47:5,
8 48:23
50:13,16
51:5 52:17
58:13
64:25 67:6
68:22
70:3,9
78:23
80:3,5,20

background
13:4 66:3

bad  68:7
75:11

bait  74:18

baiting
74:15

bar  45:19

barrel
37:24,25
38:2 42:13

based  23:9
30:9 43:11
51:13
56:24
58:17,21
67:17
71:13

basic  14:13

Bearcat  20:6

Bearcats
75:23

beat  68:12

beaten  68:7

began  8:1

beginning
10:10

behalf  5:21,
25 6:4

belief  58:17

bikes  14:15

bit  11:16
13:3 14:22
32:19
33:16
39:4,25
63:6 78:23
80:20

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024                    Index: black..car

81:10

**black** 37:25

**bleed** 62:5

**bleeding**
61:20

**blood** 53:17,
20 54:5,8
59:15
61:18,22
62:3,4

**blue** 26:20
27:19 37:3

**bodily** 44:2,
21 71:5,
10,16

**body** 33:10
37:15
40:21 43:2
45:7 49:14
50:4,14
51:7 52:12
56:12
59:14
60:22,24
64:6,10
65:4 78:19
80:14

**body-worn**
7:24,25
63:20

**bottom** 31:23
36:13
39:20
40:20

**bottom-left**
78:16

**brain** 44:10,
24 51:18
58:13
67:20,21

**brains** 45:21

**brand** 9:25

**bread** 45:4

**break** 6:17,
18,19
32:19
33:16
39:19
40:15
46:1,19
54:3 69:25
74:15

**breathing**
61:15
62:22

**briefly**
16:11

**bring** 51:20

**broad** 27:13

**broke** 27:17
33:22
37:16

**build** 49:12

**building**
9:1,2

**bullet** 58:4
59:8,13

67:14

**bullets**
58:23

**bureau**
15:18,19
68:23
70:24

**bushes** 10:15
26:23

**Business**
13:13

**butter** 45:4

**buttock**
59:18

**buttocks**
50:18
58:11,12,
18,22,25
59:5,6,8,
9,10 60:1,
8 62:8

**button** 10:12

**BWC** 12:3
30:7
63:13,14
64:2

**byproduct**
67:9

————————————

————————————
C

**C.S.** 8:2

**Cactus** 9:1

**CAD** 7:12

28:13
75:16

**cage** 58:8

**California**
5:1,12

**call** 7:12
28:13
47:16
54:12
65:16

**called** 6:4

**calls** 46:6
69:7 71:22

**cam** 8:1,3

**camera** 7:24,
25 9:19,25
10:1,11,
18,19
11:20
34:25
63:20
73:19
79:17

**Cameron**
13:10

**Campbell**
5:24

**capability**
48:12

**car** 25:13
62:19
64:17,20
65:2,3

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024                    Index: career..correct

career  21:25

careful
  57:20

carefully
  57:19

carjack
  64:20

Carolyn  5:23

carport
  27:4,21,22

cars  64:19
  65:2

case  5:12
  14:22 16:6
  17:9,17,
  19,24
  18:2,13
  45:6 64:7
  67:19

categories
  7:4

cavity  61:19

Central  5:12

chance  12:8
  23:17
  40:7,9

changed  64:1

charting
  57:13

check  12:20
  13:20,25
  45:12 61:1
  75:15

checked
  61:4,5,7,
  15 62:2

checking
  61:16

checklist
  44:18,23
  45:12

chest  38:12
  56:3 61:24

choose  48:17

chose  26:13
  46:13

circle  36:25
  37:1

circumstances
  20:13

civil  19:11,
  15

civilians
  44:21 71:2

clarification
  35:9

clarified
  57:6

clear  57:4

clearing
  48:14

client  81:21

close  26:25
  29:19
  46:12 63:1
  70:1

closed  46:15

closer  18:21
  21:22 36:3
  74:16

college  13:9
  14:13

color  10:11,
  18 62:21
  73:18

comfortable
  22:8

commands
  19:24

company  82:3

compared
  34:20

comparing
  64:7

complete
  36:4 58:10
  68:17

completely
  62:18

component
  60:4

compressions
  61:23

concealment
  74:15

concerned
  69:8

concluded
  82:12

confirmed
  18:7

confused
  32:21
  38:24
  39:4,8

consistent
  18:9

constantly
  44:25

continue
  73:22
  74:22
  77:3,18

continued
  38:9
  41:13,19
  51:1

continuing
  34:6

conversation
  14:19

cops  64:24

copy  81:24

coroner
  59:11

correct
  8:17,24
  9:12 10:7
  11:6,9,11,
  13 12:14
  15:16
  16:7,21,24
  17:2,16,25

18:11,18,
25 19:20,
23 21:13,
24 23:21,
25 24:10,
22 25:11
26:17 29:8
30:16,18
31:12,15,
17,22,25
33:2 35:20
37:6 38:7
39:5,13,
14,17 42:7
45:3 47:22
49:9 50:9
51:12
52:5,23
53:9,13,16
54:9 57:6,
17 58:16
60:10,11,
15 63:19,
25 64:4
69:19
71:7,12,17
74:5,8,20
77:11
79:21
80:12,19
81:15

**correlate**
58:5

**Counsel**   5:18

**counting**
36:2

**County**   5:10
6:1

**couple**   7:15
40:14
69:16,21

**court**   5:12,
16 46:21

**cover**   25:23
26:7,9,13
29:11,24
60:23
74:15,19

**COVID**   16:2

**CPR**   61:24
62:23

**crawl**   51:21

**crawled**
56:24

**crawling**
54:22
55:3,13
56:16,18

**created**
49:21

**crime**   22:15

**crimes**   43:23
64:17

**cross**   7:20
8:2 14:15

**crossed**   44:6
45:6

**crossing**
44:10

**current**   15:4

**custody**
70:21 71:1

**customary**
48:10

**cut**   38:22

---

**D**

---

**DA's**   9:10

**Dale**   5:20
13:17
23:10 39:6
45:15
46:10
55:24
62:16
69:11
78:17 81:5

**damage**   71:1

**danger**   41:15

**dash**   8:1,3

**date**   5:6
7:8 8:17,
20

**day**   12:2,5
26:2,18,19
27:6,10
29:6 34:22
45:20 65:7
67:16,22
69:21
73:14

**daylight**
27:13

**days**   8:22
69:22

**deadly**   20:4,
11 71:3,4,
10

**death**   44:21
71:10,15

**debriefing**
70:11

**December**
5:2,6
13:18
16:16
17:12,14

**decently**
7:11

**decided**
24:20
69:20

**degrees**
37:15 38:9

**department**
69:5,6

**depo**   12:23

**deposition**
5:8,13
6:23 40:12
72:12
82:12

**deputies**
33:12
63:24 67:9
71:1 76:8,
18

deputy 5:8
  6:1 9:8
  36:14
  67:7,10
  73:7 75:18
  81:25
describe
  49:22
describing
  38:15
detailed
  57:20,23
DG 37:2
dictate
  28:20
die 62:19
died 65:9
direction
  33:3 35:19
  37:18,21
  42:9 43:6,
  21 44:8,
  11
  47:21
  56:7,11
  57:2 58:22
  65:6
  76:12,17
  79:12
directions
  78:15
directly
  36:24
  38:22,23

dirt 14:15
disclosures
  13:18,23
discuss
  47:24
  70:12
discussed
  34:9 49:1
  71:18
  77:13
dispatch
  7:13
distance
  18:12,14,
  19 25:4
  33:25
  34:1,3
  35:21
  36:5,7
  37:12
  60:23
district
  5:11,12
  9:7,8,9
doctor 59:11
documents
  6:22 7:1,
  5,11,23
  13:24
  57:13
door 25:23
  29:15
double 13:24
Dow 45:20

drifting
  33:5 38:19
  47:12 78:8
drive 29:16
  36:25
driver 25:23
driveway
  20:17,18
  23:15
  24:17,21
  25:5,10
  26:10,14,
  21 27:20
  29:18
  30:3,17,
  19,25
  31:6,9,11,
  13,16,19,
  21,24
  32:12
  33:19
  36:25 37:3
  43:19
  63:16
  67:18
  68:20
  77:15
  78:4,11,
  18,22 79:9
driving
  22:16 32:9
drove 22:19
Dude 67:10,
  11
due 20:13

duly 6:5
duty 17:5
dwelling
  25:25 27:7

_____

E

earlier
  26:2,18,19
  27:6,9
  36:18
  38:25
  47:12 48:9
  57:18
  71:13 74:4
  77:13 78:8
  81:15
east 32:16
  36:25
  37:1,2
  38:22,23,
  25 39:3
  54:23
  56:13 57:5
  76:17
eastbound
  20:16 31:8
effect 63:10
  65:22
  67:11
elderly
  27:13
Elsinore
  15:13,17
Emergency

15:18

end  8:10
  30:10,19,
  22,25 54:1
  55:16 56:1

ended  15:4
  30:12

enforcement
  15:18,19
  21:25
  67:15
  68:23
  75:4,6
  76:8,20

engaged  42:1
  50:15 51:2
  65:6 66:13

engagement
  30:13

English
  76:2,3

enhancement
  80:13

enhancing
  80:14

enlarged
  39:24

enter  31:13

entered
  58:10,13
  59:9

entire  23:6

entry  59:16

errors  7:19

escape  21:1

essentially
  24:8 50:8
  52:22
  54:18 71:4
  74:6

EST  22:13

estimate
  15:23
  18:1,6,12,
  22 22:4
  25:1,3
  28:10
  35:21
  36:3,4,7
  49:17
  68:17

estimated
  18:4 52:9

estimating
  21:18,19
  27:12,15
  38:10
  68:25

estimation
  38:9 70:19

et al  5:10

evacuate
  28:18,24

evaluation
  62:12

event  21:7

eventually
  60:12

evidence  7:2
  8:10,11
  28:13 46:7
  65:25
  73:14

exact  9:10
  29:20,21
  78:12

EXAMINATION
  6:7

examined  6:5

exciting
  15:7

excuse  10:7
  63:9

exhibit
  72:9,11,13

exit  59:16

exited  59:13

experience
  15:2 20:25
  21:12
  43:11 46:9
  54:21
  62:20
  64:20
  74:14

expertise
  59:24

experts
  80:14

expired  52:3

explain
  23:8,17
  30:25
  51:23

explained
  58:21

explaining
  40:20

explore  7:4

exposed
  50:10,18

expressions
  34:23

extensive
  59:15 66:3
  74:14

extensively
  10:21 62:3

extent  52:25
  61:24 64:7

eye  34:19

eyes  26:10
  52:19
  54:25
  55:11 58:8
  62:18

---

**F**

face  33:8
  34:23 51:9
  52:19,20,
  21,25

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024                    Index: facility..frame

53:12,14,
17,20 54:5
55:7 56:5,
9 59:2

**facility**
15:12

**facing**
20:16,17
38:15 50:1
56:3,4,5,
12 58:22
64:25

**fact** 22:12,
13 25:25
30:9 35:13
71:19

**facts** 46:7

**fair** 14:20
15:8,9
24:21
32:11
71:20 72:5

**fairly** 57:19

**fall** 51:16,
20

**family** 43:25
69:8

**fatal** 59:18

**favoring**
38:17

**feasible**
20:13

**feel** 20:12
26:8 40:4

**feet** 18:17
22:20 32:6
49:9,24
56:4,6,13
57:1

**fell** 51:15,
17 52:2

**felon** 22:14
43:23 44:3
64:16

**felony** 22:15

**female**
10:14,24
72:23

**field** 15:15

**figure** 27:9
28:8 62:11
72:20
77:24

**filed** 5:11
19:11,15

**find** 61:18,
20

**fine** 70:4
81:19

**finish** 23:12
70:3

**finished**
15:11

**fire** 17:3,
14 22:24

**firearm**
20:23 21:3

33:9,11
34:17
37:17,24,
25 45:8
50:25
51:8,21
64:18 67:2
68:6 71:19

**fired** 11:4
17:1,8,22
18:14,20
46:5,10
47:9 49:7,
11 52:25
53:11,17,
20 55:6
56:25
57:9,12

**firing** 19:18

**flagged**
41:14,18

**flagging**
41:14

**fleeing**
43:23 44:3
64:16

**FLIR** 9:19,
25 10:12,
13,19
11:20
12:16 21:6
42:18,22,
25 43:4,6
73:19 81:6

**focused**

50:24

**follow** 26:15

**follow-up**
43:5

**foot** 30:12
49:24

**footage** 8:1
9:21 10:2
11:17,24
12:3,5,9
30:7,9
34:13,14
35:14,15
42:22
43:4,6,8
72:8

**force** 20:4,
11 43:25
44:20
46:16 68:8
70:23
71:1,3,4,
10

**forgive** 35:4
38:23

**forward**
29:11,16,
25 49:25
73:23 80:6
81:10

**foundation**
46:7

**frame** 10:5
11:3 23:9
35:16 48:6

72:21
74:6,9
75:3
76:10,25
77:9

**frames**  12:11

**freestyle**
  14:15

**freeway**
  16:23
  17:11
  64:18

**freeze**  15:5

**FRIDAY**  5:2

**friends**  69:8

**front**  22:20
  52:17,19

**full**  33:10

───────────
G
───────────

**gained**  37:11

**Galipo**  5:20
  6:8 12:15,
  22 13:1,2
  14:4,6,7
  15:24
  16:13 19:9
  21:21
  25:17 31:2
  36:13,16
  39:10,20,
  22 41:1
  44:12,13
  46:2,3,18,

22 47:1,7
53:5 54:16
59:21
64:14
66:11
69:25
70:5,10
72:10,14
73:2,6,11,
16,21
74:2,22,24
75:1 77:3,
5,7,18,20,
22,23
78:23
79:2,4,23
80:1,3,9,
20,25
81:2,10,
12,19
82:2,5,10

**gap**  46:12,
  15

**gas**  64:17,
  21

**gave**  8:23,
  25 20:10
  51:13 67:8

**Gene**  5:25
  12:15 13:1
  14:4 46:23
  47:1 70:1
  81:21 82:3

**general**  8:9
  41:17
  73:17

**generally**
  14:10 15:8
  23:22 32:1
  33:1 38:15
  39:13
  56:6,10
  71:8 78:7

**gentlemen**
  27:6 28:1,
  14,19
  36:18
  41:24

**gestured**
  74:10

**gist**  7:15

**give**  12:20
  15:25
  19:24 20:3
  22:4 23:17
  38:8 40:3
  72:24 73:7

**giving**  61:21

**Global**  5:17

**gloves**  62:3

**glute**  58:3

**glutes**
  50:13,17
  51:4,6
  58:7

**gnarly**  67:12

**goal**  70:20
  71:2

**good**  5:4
  6:17 15:9

**generally** (col 3)

22:3 25:3
46:18,23,
24 48:14
81:23

**graduated**
  13:5

**gravel**  37:2

**gray**  62:18

**great**  12:24
  40:1 44:2
  48:14

**ground**
  51:15,16,
  17,20
  52:1,2
  53:7,10
  55:17 56:1
  74:10
  79:21
  80:11,15,
  17 81:11

**group**  57:16
  70:13

**guardian**  5:9

**guess**  21:17
  24:25 25:2
  42:10
  47:16
  49:16
  51:22
  68:14
  76:22

**guess-estimate**
  11:1

**guessing**
21:16
27:12

**gun**  21:11
22:5,12,
16,21,23
23:1,5,8,
20 28:17
35:23
37:16
38:11
41:6,10,
14,15,22
42:9,13,
19,24
43:3,6,9,
13 44:7,
10,15 46:4
54:20,25
55:11 58:9
61:9 65:5
66:20,21
68:1 72:2
74:7
76:11,24,
25 79:12,
13

**guns**  22:1

**guy**  44:7
68:7 75:11

**guys**  48:13,
15,16

———————————
**H**
———————————

**half**  15:6,7
43:14

75:25

**hand**  14:17
22:1,5,12
23:2 51:8
64:18
66:21
71:19

**handgun**  76:5

**hands**  49:18
61:9 75:19
76:6,7

**happen**
45:16,17

**happened**
58:19
80:10

**hard**  43:1,
3,9 45:17
81:7,16

**harm**  44:4,
21

**head**  20:23
21:3,11
22:17,21
23:5,20
28:17 33:9
36:2
37:16,17,
21 38:11,
12 43:13
44:6 45:7,
12 52:14,
15 56:4,
10,12 58:8
66:14 72:2

**74:7**
76:12,24
79:13

**head's**  56:13

**headed**  31:11

**heading**
29:21

**heads**  67:14

**hear**  6:12
29:13
63:13
75:25

**heard**  29:9
66:1,5,8
73:14
75:22

**hearing**  6:14

**heart**  51:19
62:22

**helicopter**
10:1 35:14
72:8

**helped**  29:5

**helps**  39:3

**hemorrhaging**
61:16,17,
21

**Hey**  26:6

**hiding**  10:15

**high**  13:5,9

**hindsight**
76:2 77:15

**hire**  15:5

**home**  28:19

**honestly**
8:14 28:5
65:6 81:5

**hope**  44:6

**hospital**
44:2 65:10

**hostage**  45:4

**hour**  6:17
22:16 28:8

**hours**  20:5
27:12
28:8,11,15
68:25 69:1
75:13 76:1

**house**  26:20
27:5,8,19,
23 36:17,
24 37:4,19
38:20
39:2,11
41:7,10,
16,18,19,
23 42:20,
24 46:13
48:4,15
54:23 55:3
57:5

**houses**  47:25

**Hubacheck**
6:2 24:4,
5,16 26:8,
23 30:12

33:11
34:5,18,21
37:20 38:7
42:1 58:5
81:25

**Hubacheck's**
7:24

**human** 34:19
67:23 68:2

**humans** 27:25
28:1

**hundred**
33:13

**Huseby** 5:17

**Hyler** 67:7,
10

---

**I**

**idea** 28:5
59:19 60:5

**identification**
72:13

**identify**
5:18

**image** 77:25

**imaging** 10:1
81:6

**immediately**
10:22
37:11 52:1
71:15

**imminent**
71:5,9

**impression**
29:17
51:10,13
54:10
66:18 75:4
76:15

**incident**
8:20 9:20
10:3
11:21,24,
25 45:17
54:1
70:11,18

**incidents**
46:10

**include**
12:11

**included**
11:8

**including**
43:24

**inclusive**
5:10

**incorrect**
65:17
71:21

**increasing**
33:25 34:3

**independently**
32:22

**individual**
18:14,20

**individuals**
9:11

27:18,20
64:6

**information**
67:1,23
68:1

**initial**
11:14
12:12
30:13
50:16
58:5,25
67:5 74:3

**initially**
14:24 23:5
31:19 32:4
33:6,7,15,
18 43:17,
19,20 65:9

**injures** 71:1

**injury** 44:2,
22 71:6,
10,16

**inside** 65:2

**intel** 27:2

**intent** 44:4
71:15

**intention**
55:4

**interaction**
10:23

**interested**
69:9

**Internally**
70:14

**interpret**
74:12

**interrupt**
45:14

**interrupting**
14:5

**intervention**
62:9

**interview**
7:7,9,18
8:15,19,
23,25 9:4,
14 11:15,
18,20,24
12:4

**interviews**
9:3

**invade** 19:4

**investigators**
9:9

**involved** 7:2
16:5,15
65:11

**issue** 76:3

---

**J**

**jail** 15:12

**jails** 14:25
15:4,5

**jeopardy**
46:15

**Jimmie** 5:8
6:3,11

66:5,9

Jinna  5:16
  46:2,20

Johnny  75:17
  76:4

Jones  45:20

June  16:16
  17:12,13

justify  72:5

---

**K**

K-9  20:6
  33:13
  75:21

Kass  5:25

Kim  5:16

kind  7:20
  8:9 14:15
  27:21 37:1
  40:4 41:20
  51:19
  69:15
  75:10

knew  25:25
  26:4 27:7
  29:20 32:9
  44:3 62:7
  66:3 75:4
  76:7,15,20

knowing  27:6

knowledge
  17:25
  19:14,17

21:12
42:14 57:8
61:14

Kristine  5:9

---

**L**

lacks  46:6

Lake  15:13,
  17

landed  28:12
  75:7

language
  63:9 64:6,
  10

laptop  81:16

law  19:11
  21:25
  67:15
  75:4,6
  76:8,20

lawsuit
  19:15

lawsuits
  19:11

laying  56:3

Leap  5:20
  13:23 14:3
  73:4,23

leave  74:18

leaves  10:16

led  55:8
  62:15

70:17

left  10:17,
  24 20:24
  24:4,5
  32:6,15
  33:8,10
  37:3,17
  39:12
  49:24
  50:12,16,
  17 58:4,7,
  8,11,13,25
  59:5,7,8,9
  60:7 64:25
  65:5 70:17
  78:20
  79:5,8,11

left-hand
  40:16

left-to-right
  59:25
  60:4,8

legal  5:15

lethal
  22:18,19
  33:13

level  38:12

Lexipol  8:7

lieutenant
  7:25 20:2
  24:4
  25:12,24
  26:6,20,24
  29:5,10
  30:12 32:8

33:12
34:18,21
37:21 38:7
41:25
61:5,7,11,
12,14,23,
25 63:9,13
65:22 66:2
67:13

Lieutenant's
  29:18

life  15:1,8
  30:7 62:22

link  13:22

listened
  7:1,18

litem  5:9

litigation
  5:17 19:1

Llamas  5:9
  8:1 10:14,
  20,22
  19:24
  20:14
  21:14
  23:5,13
  24:6,19
  25:7,24
  26:4,10,
  23,25
  27:15,16,
  17,20,24
  28:3,9,17
  30:13,14
  31:22

32:2,4,14,
23 33:3,
14,18
34:22
36:19 37:7
39:2 43:12
45:5
47:10,25
54:2,7
59:15
60:12
61:10,18
63:5,15
65:6 66:25
67:23
68:20
72:1,22
73:15
75:17
76:2,4
78:2

**Llamas'**   50:4
61:23
64:17

**located**
28:17 54:8

**location**
20:16 21:4
27:5
29:20,22
31:18
38:23
43:10
78:12
79:16

**long**   11:1
20:9 21:14

24:14 46:2
49:10,12
56:18
68:15,24

**longer**   46:20
55:1

**looked**   7:1,
10,12
9:13,18
12:18
35:16,18
43:20
58:12
62:5,17,21
73:15
76:12,17

**lookie-loo**
27:21

**lot**   70:25

---

**M**

---

**M-C-G-U-I-R-E**
6:11

**made**   8:9
15:9 38:4,
14 60:21
69:8 81:3

**magnification**
34:20,23
48:9,19
50:25
52:24
53:7,10
54:1,5
56:22

**magnified**
53:14

**magnifier**
34:17
37:23 48:8
53:15
54:20
78:20
79:21

**major**   61:16,
17

**make**   12:22
18:8 19:8
27:2 29:5
34:24 43:1
58:10
65:25

**makes**   27:8
32:18
37:25
45:23
55:22
59:10

**male**   27:13

**man**   44:6

**Manning**   5:25

**Mardirossian**
5:23

**mark**   72:9,
12

**marked**   72:13

**market**
45:19,20

**massive**
61:21

**math**   18:17

**matter**   5:8

**Max**   67:13

**Mcguire**   5:8
6:1,3,11
81:25

**meaning**
24:19
37:16
41:16

**means**   41:14
66:5

**meant**   11:23
12:2 42:11
57:5

**measurements**
60:6

**Media**   5:7

**medical**
10:22
23:12 54:7
59:15
61:10
62:6,8,9,
12,24

**medically**
61:12

**medicine**
62:13

**meeting**
69:17

member   43:25

memory   35:1

men   26:1,16
28:7

mention
48:18,20

mentioned
8:14  47:11
57:18
59:25  63:8

merge   31:9

mile   75:25

miles   22:16

mind   45:3
48:6

minimal
70:23

minor   5:9
43:24

minute
21:20,22,
23  23:4,
14,18,21,
23,24
27:14  28:4
43:14
62:10

minutes   10:2
21:19  39:1
46:22
68:17  70:2
73:3,5
75:13
76:23

missed   10:14

misspoke
37:10
38:25

misunderstood
35:7

mode   19:19

moment   24:13
27:1  34:3
39:23
40:3,6
43:1  44:5,
23  45:2,5
66:19

Moreno   9:1

motion   65:5
81:3

motor   14:15

mouth   24:17,
21  25:5
26:14
29:18  30:3
31:6,21
52:19
68:20
77:15
78:10,18,
21  79:9

move   26:13
73:23

moved   52:6

movement
38:4,14
50:21

51:18,22
55:12

moving   26:12
29:14,24
32:15
39:11
43:20
47:10,21
55:1,10,
15,19,21

multiple
43:23,24
65:16
75:17  76:4

muscle
51:18,22

_____

**N**

_____

names   9:5

nature   69:18
70:12

nearby   24:2,
3  62:24
63:4  75:5,
7

nearest
75:18

neck   50:7

needed   26:5,
9  44:2

nervous   25:2

Noah   5:15
70:5  82:5

normal   10:19
34:19

north   23:15
24:20
30:25
31:16,23
32:1,17
33:1,5,19,
25  37:3,5
39:11
43:20
47:10,12
50:1

northbound
23:19
24:8,11
38:16,17
50:1
77:12,14,
16  78:7,8

northwest
32:18

nose   52:19
62:11

nostril   54:8
58:13

note   82:7

noted   62:14

noticed
60:13,14
62:11

number   5:12
18:9
20:23,24

numbers
40:16

_____

O
_____

object 19:3
30:21

Objection
16:9 25:14
64:12

objective
75:10

observations
23:9 56:25

observe
50:21 55:7
56:15,18

observed
50:22
51:14
61:13
75:16
76:23

occupied
25:25
26:1,21
27:7

occur 16:8
36:20
80:18

occurred
16:23
68:16

occurs 79:15

office 5:21
9:10 12:20
68:22,23
82:6

officer
12:17
21:25

officer-
involved
16:5

officers
24:1 39:15
76:25

older 26:1
27:6

on-scene
11:25
26:21
28:13 29:7
35:15
48:18,25
62:6 63:14
67:9 75:9
76:8,21
78:9

open 48:14
54:25
62:18

opening
37:24

operates
45:16
70:25

operation
70:20

operator
44:25

opportunity
6:22 44:4
71:14

ops' 70:25

option 22:19
29:24 49:5

options 21:1
64:23,24

order 23:16
44:20 72:9
81:24

orient 40:21
43:10
44:7,11
47:18
50:14
51:21
78:19

orientation
38:11 75:9

oriented
22:23 23:2
35:23 43:4
46:4 52:15
55:11,12
79:5,8,11

orienting
33:11
37:18
38:12
42:24 43:2
44:15 45:7
49:13 58:9

65:4

orients
37:19

original
28:11

originally
28:16

outline
21:11

_____

P
_____

p.m. 5:3,5
47:3,6
70:7,9
82:11,12

Pacific 5:5

pack 37:2

paragraph
40:3,4,19

paramedics
63:4

parked 20:16
30:2

part 13:18
15:19 29:9
50:10
51:6,24
52:12,15,
18

partners
41:25
44:20
45:8,9

Index: parts..position

46:5 54:21 55:3 69:13

**parts** 10:10, 13 40:14

**pass** 41:19

**passed** 18:1 37:19 60:16

**passing** 65:2

**past** 15:4

**path** 46:13, 14

**patrol** 15:3, 12,15

**pattern** 47:11

**pause** 73:10

**paused** 73:5, 12 74:1,25 77:6,21 79:3 80:2, 8 81:1

**peacefully** 46:16

**people** 28:24 62:19 69:9

**percent** 47:19 71:23 75:6 76:7,20

**Perfect** 82:4

**performed** 61:14

**performing** 54:7 61:24 62:23

**period** 20:9 53:24

**person** 65:8, 12 68:9,13 70:21 71:14

**personal** 69:7

**personnel** 16:10 19:4

**perspective** 50:5 67:16 78:9 79:20

**phonetic** 67:8

**pick** 10:20 41:20

**pictures** 7:3

**pieces** 8:11

**pinch** 47:18

**pistol** 38:3 55:21 68:7,8,12

**pistol-whipped** 44:1

**place** 63:18 70:15

**plain** 34:22

**Plaintiffs** 5:21,23

6:4

**plan** 26:22 27:2 29:5 47:24

**platform** 49:12

**play** 73:6 78:25 79:24 80:6

**playing** 73:9,25 74:23 77:4,19 79:1,25 80:24

**point** 20:21 21:15 24:6,9 25:12,18, 20 26:19 30:2,14,17 31:18 32:10,12 35:22 37:13,22 41:11 42:23 47:23 55:1 58:14 61:6 62:3 63:7, 8,9 65:1 66:13,23 74:19 76:23,25 78:5,10,22 80:19

**pointed** 20:23 22:16 42:20 54:25 56:8 68:1 74:9

**pointing** 54:20 64:19 66:20,21 68:11

**police** 16:10 75:20,23 76:7

**policies** 8:5,6,7

**policy** 7:3 8:8 63:22

**poor** 76:10

**porch** 26:2, 16 27:14

**portion** 10:25 11:5,7 21:7 36:10,14 39:18 40:11 42:8,12 70:16 72:15 78:16

**portions** 10:3,8,9

**position** 9:6

23:22,24
37:5 42:25
49:9,11,
20,22
55:16,22
56:1

**positioning**
80:14

**possibility**
28:24

**possibly** 7:8

**potentially**
72:1

**power** 43:1

**preparation**
40:12

**prepare** 6:23

**present** 9:4

**press** 19:21

**pretty** 11:17
42:23 61:9
70:1

**previously**
40:11

**prior** 11:18,
24 19:2
26:23 55:1
66:2,25
67:3 68:5
79:19

**privacy**
16:11

**privileges**

16:10 19:4

**problem**
44:19
55:25 82:7

**proceeding**
82:12

**process** 51:2
69:15

**professional**
14:14

**profile**
33:8,10

**property**
27:14,19
28:2 75:7,
9,12

**providing**
63:5

**psychologist**
69:17

**psychologists**
69:12

**pull** 26:6,7
29:10

**pulled** 25:13
63:6

**pulse** 61:2,
8,15 62:2

**pumping**
62:22

**put** 9:17
26:25
36:13

39:20
41:14
46:14
48:15 60:6
62:3 66:4
73:14
75:16

**putting**
46:11
63:14

---

**Q**

**quadriceps**
56:4

**question**
19:7 31:3
35:3,8
43:5 45:25
53:3 55:23
76:9

**questions**
9:11 72:17
81:20,21

**quickly**
61:10
63:2,3
72:7

**quoting** 9:16
11:19

---

**R**

**radio** 26:24
62:2

**Ramirez** 5:25

12:19,25
13:17
14:1,5
15:23 16:9
19:3 21:17
25:14
30:21 39:9
40:24
46:6,24
47:2 53:1
54:12
59:20
64:12 66:7
70:4 81:23
82:4

**Ramirez's**
82:6

**ran** 23:19
29:21
64:17,18

**range** 15:25
22:4

**re-engaged**
56:21

**reach** 82:5

**reacquired**
32:14
33:19

**read** 7:10
40:3

**reading**
16:22

**ready** 70:5

**real** 22:25

30:7

realize
59:24

realized
64:21
66:23

realtime
34:22

reason   6:19

reasons
51:25

reassess
26:11

reassessed
31:22

recall   8:20
10:9 11:16
32:4
47:15,19
59:5,13,17
64:15,16
65:24
70:16
71:21

received
12:16
13:24

recently
9:14 12:8
36:11

recess   47:4
70:8

recollection
32:22

record   5:5,
19 47:3,5,
8 70:6,7,9
73:4 82:8,
10,11

recording
7:18

reference
7:20

referenced
8:5 16:25
26:16

referred
36:18

referring
11:22 21:8
64:10

regained
32:23 33:4

related
15:15
19:12,15

relation
32:5 36:19
38:21 61:8

relevance
16:9 19:3

relevancy
64:12

remain   63:4

remember   9:5
47:17 64:8
66:14

remembering
32:20

remote   5:14

remotely   6:5

removable
48:12

removed
37:16

rephrase
19:7 53:3
55:18,23
60:20
78:17

report   7:10
42:14 44:8
45:3
57:19,22
58:2,18
59:12,23
67:10
75:16

reporter
5:16 46:21

reposition
23:23

representative
69:17

representative
s   69:10,11

representing
5:17

required
49:4

rescue   45:4

residence
75:10

residents
26:1

respond
25:16
30:23 53:2
54:13
64:13

response
66:20

responsible
72:4

responsive
62:12

review   6:22
8:6 10:4,9
11:5 35:10

reviewed
6:25 7:6,
7,23,24,25
8:1,4,7,11
11:7,14,24
18:8 34:13
35:13
36:11
40:11
42:18,22
57:18,20,
21

reviewing
16:4 18:5
34:14,25
58:1,18

rewind  78:19

rib  58:7

ribs  50:12

rifle  17:5,
8,10  49:4

right-handed
49:25

River  8:2
20:16,18
23:14
27:1,16,17
31:8,9,13,
24  68:19
76:21  77:1

Riverside
5:10  6:1
9:2

road  8:2
20:16,18
23:15
26:25
27:1,16,18
31:8,10,
14,24
68:19
76:21  77:1

robbery  44:1
68:5,6

room  9:3
14:21

rotating
50:24

rotation
50:22

round  58:10

roundabout
37:1

rounds
17:22,23
42:2,5
66:13

route  62:7

RSA  12:2

Rudy  10:20
33:13
45:9,10
67:8,9

run  24:17,
20  25:4
26:10

running
24:8,11,20
25:25  26:4
29:18
31:5,7
32:16,24
33:18,24
37:8  38:8,
17  43:17,
18  47:13,
20,25
63:15
67:18  72:2
77:12,14,
15  78:4,7,
13

runs  48:3

—————————
S
—————————

S.L.  5:8,23

sacrifice
26:5,9,13

safe  44:21

safely  70:20

safety  26:5,
10,13
46:11

scenario
22:19

scene  10:17
26:2  27:12
63:7
68:15,18,
19,22
69:14

Schevitz
5:15

school  13:5,
9

scout  75:7,
12,16,24

screen  39:24

search  10:13
67:6  75:10

seconds  11:4
18:3,7
19:25
22:20
24:18,24
27:16,17,

24  35:24,
25  36:3,4
44:9  52:3
53:12
56:20
60:18,21,
22  73:7
76:11,22
78:19
79:14  80:5

semiautomatic
19:19

send  12:23
14:2

sense  27:8
32:18
34:24
37:25
45:23
55:22
58:10
59:10  73:7

separate
35:15  36:5
75:21

separately
82:2

sergeant  6:1
7:24  24:4,
16,20
26:8,23
29:17
30:11  31:5
32:5,20
33:11
34:4,18,21

37:20 38:6
42:1 57:12
58:5 66:1
67:13
81:25

**sergeant's**
32:22
72:11

**sergeants**
63:23

**Services**
5:17 15:19

**set** 37:4

**sexual** 43:24

**shadows**
27:4,18,22
29:1 36:19

**Shannon** 5:20
12:16
13:20
36:13
44:12
72:10,16
73:22 77:3
80:5 81:19

**share** 29:1

**shared** 29:4

**Shawn** 24:5

**Sheriff**
15:4,5

**Sheriff's**
9:2

**shit** 63:10

**shoot** 22:11,
24 41:16
43:12,16,
22 44:7
48:4 49:12
64:24
67:8,18
71:25
74:16

**shooter**
65:13,15,
17

**shooters**
65:16,18

**shooting**
8:19 10:6
16:6
17:11,12,
14 25:19,
20 27:24
30:6 44:14
49:2,12,
20,22
55:15,19
60:16
64:11
65:11,23
66:15,25
67:3 68:16
69:13
70:16
79:15,19

**shootings**
19:2,12,16
69:16

**short** 13:10

34:3

**shortly**
25:10
63:17
65:21

**shot** 10:20,
23 19:22
27:20
43:14
45:10 48:1
50:23
57:24
58:3,12
59:1,18
60:1 64:6
67:1,5,8,
9,12,15,
20,23
72:5,6

**shots** 11:4,
8,10
12:12,13
17:1,3,17,
20 18:9,
15,20
36:20,21
42:6,21
43:7 47:9
49:7
50:19,22
51:11,25
52:13
54:11 55:6
56:2
57:11,16
58:15,18
60:13

63:17
65:7,21
80:18

**shoulder**
32:10
37:18
49:24
50:12,17
58:7

**show** 36:11
39:18
72:15

**shows** 20:25

**side** 33:10
37:1,2,3
40:17
51:7,8
52:17,20
56:3,12,
13,14
58:7,8,11
59:7,9
60:8 68:14
74:7

**sight** 25:24

**sights** 50:2
54:22
56:21,22

**significant**
22:15

**silver** 37:24

**similar**
64:16

**simple** 18:17

simply   67:18

sir   6:11,
   13,16,21
   7:3 8:21
   9:12,15,21
   11:6,11,13
   12:10,14
   13:6,8,13
   14:23
   15:13
   16:3,7,15,
   21,24
   17:2,5,7,
   10,13,16,
   18,21,25
   18:16,23
   19:6,13,
   17,20,23
   20:9,12
   21:5,9
   22:3,10,13
   23:7,21
   24:7 25:9
   26:17
   28:6,22
   29:8 31:1
   32:3,13
   33:17,21
   35:20 36:9
   39:6,14,17
   40:1,8,13
   42:4,7,17
   43:15
   57:10,25
   59:4,19
   60:2,5
   61:3 64:2,
   4,9 65:20

67:25 68:3
69:19,23
70:14
71:17
72:3,6,25
73:19 74:5
76:14
79:7,10
80:16

situation
   20:13
   22:13,24,
   25 71:25

situations
   45:22

slightly
   49:25

slow   37:13

slowed   47:17

slows   37:14

small   81:16

solve   44:19
   45:18

someone's
   71:19

sooner   67:20

sound   46:23

sounds   26:18
   46:24

south   31:1,
   11,16
   32:16
   33:5,18,24

39:16
47:12
56:8,12

southbound
   64:22

Spanish
   75:20 76:2

speak   7:2
   27:19
   30:25 49:5
   69:2,4

speaker
   75:24

speaking
   71:9 78:5

Special
   15:18,19
   68:23

specific
   59:24

specifically
   42:9

speculation
   46:6
   54:12,14

spell   6:9

spin   38:6
   41:13 51:1

spinning
   51:1,3
   58:6

spins   45:19,
   20

spoke   10:2
   69:9 70:18
   76:3

spoken   8:12

sport   14:14

spot   34:2

spotted
   33:15

sprint   34:6
   47:16

sprinted
   46:11,14

sprinting
   32:25 33:3
   34:1,4
   37:12

spun   41:6

stable   62:6

staged   62:24

stamp   28:5,
   12

stamps   7:12
   11:1

standing
   29:15 50:1

Star   7:25
   9:19 10:2,
   16,21,24
   11:17,20
   12:2,5
   20:6 26:24
   42:23
   43:4,8

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024                    Index: start..suspects

46:25
73:14
75:16,24

**start** 15:20
23:12
26:22
37:23
40:20
51:21
61:24
72:20

**started**
10:22
14:9,13
15:5 16:2
23:12
24:11
29:16
32:17 36:6
38:6,10
39:9 40:21
43:17
44:10,15
45:7 47:18
54:7
61:10,15,
17,23
62:3,4,23
65:4

**starting**
37:15,22
41:24
43:10
50:14

**starts** 37:20

**state** 6:9

**statement**
8:9,23
15:8 16:4,
22,25
24:21
35:10
36:10,15
39:19 40:5
42:8,13
63:8 64:5
66:12 67:7
69:21

**states** 5:11
44:8 59:12

**Station**
15:13

**stationary**
32:24
34:1,2
49:7,9,10

**stationed**
76:18

**stay** 68:15,
24

**stayed** 55:10
59:14
79:13

**step** 61:16

**steps** 28:18
34:2,5

**Stevens** 8:2

**stock** 45:19

**stood** 38:2

**stop** 30:5
31:18
55:18 62:5
65:22
72:16
73:7,11
74:24
77:5,20
79:2 80:1,
7,21,23,25
81:11

**stopped** 34:5
47:22
49:8,13,21
50:15
55:10,13,
14,15,19,
20,21
64:22 65:3
73:21
74:21 77:2
79:23 80:4

**Stopping**
77:8

**straight**
15:3 51:5
78:15

**street** 30:19

**strike** 52:21

**struck**
51:11,25
54:11 55:8
58:15,24
59:6 60:7

**study** 13:12

**stuff** 7:20
14:16

**subject**
22:14
71:22

**successfully**
14:18

**suicidal**
71:22 72:1

**supervisor**
29:7

**supervisors**
69:10

**supposed**
72:22

**surface** 31:6

**surrender**
20:7 46:16

**surrendered**
47:22

**surrendering**
21:2

**surroundings**
27:3

**survived**
65:8,12

**suspect** 22:5
44:1 64:16
75:11

**suspect's**
23:1

**suspects**
22:1 70:25

71:2

sweep  61:22

sweeps  59:15
  61:18
  62:3,4

swinging
  65:5

switch
  10:12,19

sworn  6:5

synced  81:25

―――――――――――
        T
―――――――――――

tactic  75:8

tactical
  26:22 27:2
  29:5
  44:18,25
  47:24 62:9

tactically
  23:23

tactics
  70:12,17

taking  53:11

talk  14:22
  16:19
  17:19
  28:23
  48:24
  69:13

talked  48:9
  71:21 74:4

talking
  12:12
  18:13
  23:11,14,
  18 41:5
  42:5 53:25
  64:5

Team  15:19
  67:6

television
  43:8

telling  44:6

ten  18:6
  19:25
  22:7,9
  24:17,23
  27:16
  31:20,23
  42:25
  46:22
  60:18,22
  70:2 73:6
  78:19 80:5

ten-minute
  46:18

terms  7:5
  48:8 68:8
  71:3

terrain
  28:20

testified
  6:6

theory  42:10
  45:16

thermal  10:1
  81:6

thing  27:21
  45:15

things  7:14,
  15 12:3
  20:22
  26:15
  58:24
  62:19
  67:13
  69:17
  70:12

thinking
  45:1

third-party
  26:1

thought  8:15
  12:19 35:7
  44:10 45:6
  51:25
  67:20

threat  71:5,
  9

three-time
  54:20

till  47:13
  62:17

time  5:6
  6:14,18,19
  7:12 10:5,
  21 11:1,3,
  12,16
  12:11
  13:11

15:11
16:12 17:1
18:1 19:14
20:9,12,13
22:1,22
23:6,8,11,
12,20
24:13,16
25:15,18
26:9,11
27:1,4
28:3,5,12,
14 29:3,4
30:1,6
33:1,25
34:3,17
35:16,19,
23,25 36:5
37:23
38:11
43:12,18,
20 44:5
45:4,5
46:18
47:17
48:3,6
50:15 51:3
52:16
53:24,25
57:15
58:17,22
60:16,21
63:20,22
65:25
66:17,18,
19 67:14
68:20
70:22,24

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

73:2 74:3, 6,9,13 75:3,15 76:10,13, 16,24 77:9 78:20 79:6,8,12 80:21

timed 18:4

times 22:3,5 23:1,3 34:19,20 69:16 81:14

title 9:10

today 5:16 81:22

toes 56:8

told 15:3 59:2 71:13

tone 66:4,6

tones 66:4

top 22:17 58:7

torso 50:6, 7,10,16 58:9

total 17:20

totality 23:11

track 54:22 55:20

tracking

55:22

traffic 26:24 73:14

train 45:3,5

trained 22:11,25 45:21 71:4 72:4

training 15:15 20:25 21:12 43:11 46:9 64:20 71:3,8,14 74:14

trajectory 60:1,9

transcript 7:7 9:13

transpired 28:16

travel 47:11

traveled 58:4 59:8

traveling 58:11

tree 10:20 27:17

tricks 14:16

trigger 19:22

trot 47:16 49:8

trotting 47:20

trouble 6:14

truck 26:7

true 13:16

turn 33:7 37:15 38:8 41:24 45:7 47:18 76:19

turned 33:9 43:21 46:4 62:18 64:25 79:18

turning 37:14 81:3

TV 14:16,17

type 14:10 49:20

typographical 7:19

U

Uh-huh 40:23

unable 61:20

understand 12:1,7 16:4 25:16 30:23,24 34:16

35:2,6 53:2 68:21

understanding 9:6 32:7 57:11,15 58:1,15 60:3,7 73:17

unfold 45:22

uninterrupted 12:16

unit 5:7 29:22 64:3

United 5:11

units 20:6 75:23

University 13:10

upper 58:3 59:10

use-of-force 8:8

V

vague 25:14 30:22 53:1

Valley 9:1

veer 32:17

vehicle 22:16,17, 21 26:12 29:10,13, 19,22

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024                    Index: vehicles..west

30:2,5,10
32:9 64:20

**vehicles**
27:22
64:21 65:1

**verbal**  20:3,
5,11

**version**  35:6

**victims**
43:24

**video**  5:5
7:22 10:21
12:16
13:19
21:6,10
35:14
42:18
46:25
65:24
72:8,24
73:4,9,12,
25 74:1,
23,25
77:4,6,19,
21 79:1,3,
25 80:2,8,
14,24
81:1,13,24
82:3

**video-recorded**
5:7

**videoconferenc**
**e**  6:5

**videos**  6:23
7:2 73:15

**view**  21:14
24:6,12,
15,19 25:7
30:15
77:10

**viewed**  9:19
10:1,10,
17,21,25
11:20 12:2
18:6 43:8
72:24
81:17

**violate**
16:10

**violence**
43:25

**violent**
22:14
43:23

**virtual**  5:14

**visual**  32:2,
14,23 33:4

**visually**
31:21

**volley**  11:4,
8,10,12
12:13
17:23
18:10,15,
20,24
19:25 20:1
36:20,21,
22,23
37:7,9,11
42:6,20

43:7 47:9,
14 49:11
50:5,11,
16,19
51:2,11
52:4,10,
13,22,25
53:8,11,
18,21
54:11,24
55:2,6,9,
17 56:2,
16,19,25
57:9 58:5,
19,23,25
59:1 65:21
80:18

**volley's**
80:10

**volleys**  18:2

_____

W

**waist**  50:8

**waiving**  19:4

**walk**  49:8

**walked**
20:17,18

**walking**
32:24
34:2,5
37:8

**Walsh**  20:2
24:4 25:24
26:5,6,20,
24 29:5,10

30:12
33:12
34:18,21
38:7 41:25
61:5,7,11,
12,14,23,
25 63:9,13
65:22
66:14

**Walsh's**  7:25
37:21

**wanted**  7:20
22:14

**ware**  25:12

**warning**
20:3,11

**warnings**
20:6

**warrant**  68:6

**watch**  72:16

**watched**  21:6

**weapon**  17:3,
15 19:18,
21 48:10
49:18
68:12
71:18

**Wednesday**
32:21

**week**  68:5

**weeks**  70:18

**weird**  58:24

**west**  20:15

32:16,17
33:5
38:17,19,
23 39:2,5,
12 47:12
56:12,13
57:3,5
78:9

**white** 27:13
72:20
77:24

**whitish**
73:18

**whizzing**
67:14

**width** 49:24

**window** 10:25

**wise** 35:25

**withdrew**
14:13

**wondering**
20:10
35:13

**word** 44:17

**words** 26:7
32:24
63:10 66:4

**work** 12:25
14:10

**worked** 69:4,
6

**working**
33:13 45:9

51:19 66:3
75:10

**works** 45:15
48:13 49:3

**world** 22:25
31:4 41:13

**worth** 76:1

**wound** 33:14
59:16
61:19,20
62:8,11

**wounds** 59:16
60:14
61:21

**wrecks** 62:19

**wrist** 61:5
62:2

**wrong** 7:9

---

**Y**

---

**yards** 18:16,
21,22
20:15 25:6
30:11
31:20,21,
23 33:13,
21 34:10,
11 36:6,9,
24 37:12
38:10 45:9
46:13
52:7,9
60:25
78:14

**year** 13:7
14:9,12
15:14,20
16:11
70:25

**years** 14:12
15:6,7,25

---

**Z**

---

**Zoom** 5:14

**zoomed** 34:20
42:25 43:3
81:6,16

**zooms** 42:23

# EXHIBIT 22

# EXHIBIT 22

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4

5  S.L., a minor by and through the
   Guardian Ad Litem Kristine Llamas
6  Leyva, individually and as successor-
   in-interest to JOHNNY RAY LLAMAS,
7  deceased; V.L., by and through the
   Guardian Ad Litem Amber Snetsinger,
8  individually and as successor-in-interest
   to JOHNNY RAY LLAMAS, deceased;
9  and CAROLYN CAMPBELL, individually

10             Plaintiff,

11  v.                    Case No.  5:24-cv-00249-CAS-SP

12   COUNTY OF RIVERSIDE; and
    DOES 1-10, inclusive,
13
             Defendants.
14  _____/

15

16       STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17          DEPOSITION OF MICHAEL WALSH

18             FRIDAY, MARCH 21, 2025

19

20

21  Reported Stenographically by:

22  KIMBERLY D'URSO, CSR 11372, RPR

23  Job No.  00113800

24

25

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 2

```
 1                    APPEARANCES (Remote)

 2

 3   FOR THE PLAINTIFFS:

 4           LAW OFFICES OF DALE K. GALIPO
             BY:  BENJAMIN LEVINE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           818.347.3333
             blevine@galipolaw.com
 7
             MARDIROSSIAN AKARAGIAN, LLP
 8           BY:  LAWRENCE MARKS, ESQ.
             6311 Wilshire Boulevard
 9           Los Angeles, CA  90048-5001
             323.653.6311
10           lmarks@garolaw.com

11   FOR THE DEFENDANTS:

12           MANNING KASS ELLROD RAMIREZ TRESTER, LLP
             BY:  EUGENE P. RAMIREZ, ESQ.
13           801 South Figueroa Street 15th Floor
             Los Angeles, CA 90017
14           213.624.6900
             eugene.ramirez@manningkass.com
15

16                    --oOo--

17

18

19

20

21

22

23

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

**Page 3**

```
 1                    INDEX OF EXAMINATION

 2   WITNESS:  MICHAEL WALSH

 3   EXAMINATION BY                              PAGE

 4          MR. LEVINE............................4

 5          MR. MARKS...........................113

 6                  EXHIBITS FOR REFERENCE

 7
     EXHIBIT              DESCRIPTION            PAGE
 8
                     (NONE MARKED.)
 9                      --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 4

```
 1                        --oOo--

 2            BE IT REMEMBERED, that set on Friday, the

 3   21st day of March, 2025, commencing at the hour of

 4   10:02 a.m., thereof, MICHAEL WALSH, appeared remotely in

 5   Riverside, California, before me, Kimberly E. D'Urso, an

 6   RPR and Certified Shorthand Reporter of the State of

 7   California, the following deposition was stenographically

 8   reported by me:

 9            (Whereby the Certified Shorthand Reporter

10            introduced herself on the record and

11            administered the oath to the deponent.)

12

13                      EXAMINATION

14   BY MR. LEVINE:

15       Q.   Good morning, Lieutenant Walsh.

16       A.   Good morning, sir.

17       Q.   Could you start by please just stating and

18   spelling your last name for the record?

19       A.   Michael Walsh; M-I-C-H-A-E-L, and Walsh is

20   W-A-L-S-H.

21       Q.   And have you had your deposition taken before

22   ever?

23       A.   I have.

24       Q.   How many times, approximately?

25       A.   Including mock or rehearsal, I would say --
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 5

1              (Simultaneous speakers.)

2              MR. RAMIREZ:  No, just actual --

3              THE WITNESS:  -- just actual depositions,

4   probably three.

5   BY MR. LEVINE:

6       Q.    So three actual depositions?

7       A.    Three actual.

8       Q.    Okay.  And when was the most recent deposition

9   of those?

10      A.    Probably the most recent was there was a

11  mountain biker that died up in Ortegas.

12             MR. RAMIREZ:  Just give the date and not the

13  facts.

14             THE WITNESS:  It was probably over seven, eight

15  years ago, if I could guess.

16  BY MR. LEVINE:

17      Q.    And were those all civil cases, to your

18  knowledge, where you gave the three depositions?

19      A.    To my knowledge, yes.

20      Q.    Were you named as a defendant in any of those

21  cases, if you know?

22      A.    I was not -- I don't think I was.

23      Q.    Okay.  Have you ever been named as a defendant

24  in a lawsuit, based on something that happened while you

25  were acting in your capacity as a sheriff's deputy or

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 6

1    law enforcement officer?

2            MR. RAMIREZ:  It's a "yes" or "no."

3            THE WITNESS:  Yes.

4    BY MR. LEVINE:

5        Q.    Okay.  And how recently was that?

6        A.    Probably over ten years ago.

7        Q.    Do you recall the year or approximate year?

8        A.    The one that comes to mind with that was in

9    2000.

10        Q.    Okay.  Do you know if that was based on a use

11    of force by you while you were acting as a deputy?

12        A.    Yes.

13            (Simultaneous speakers.)

14            MR. RAMIREZ:  Objection.  Relevance.

15            (Reporter clarification.)

16            MR. RAMIREZ:  Relevance; but that he may

17    answer.

18    BY MR. LEVINE:

19        Q.    And yeah, just to -- I know you've had your

20    deposition taken before, but just for the benefit of the

21    court reporter, as she's mentioned, you know -- and this

22    goes for between me and you, as well -- it's just

23    important to both speak a little slower than our normal

24    speaking pace, and also try not to step over each other.

25            So, just for example, I'll try to let you

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 7

1  finish your response before I ask my next question, and

2  I'll try to let your attorney object before I say

3  anything else.  Things like that, just to help get a

4  clean record.

5          Does that sound good to you?

6     A.   Sounds good, sir.

7     Q.   Thank you.  I know the court reporter

8  appreciates it.

9          So anyway, was there one single case where

10  you've been named as a defendant in a civil case, to

11  your knowledge?  The one you mentioned?

12     A.   Yes.

13     Q.   Okay.  There haven't been any others, is what

14  I'm asking?

15     A.   Not that I recall.

16     Q.   Okay.  Do you know if that case in which you

17  were named as a defendant ever went to trial?

18     A.   It did not, from what I understand.

19     Q.   Okay.  What -- did you fire a duty weapon or

20  other type of firearm during the incident that was the

21  subject of that lawsuit?

22     A.   A duty weapon.

23     Q.   Do you -- what type of weapon was that, if you

24  recall?

25          MR. RAMIREZ:  Objection as to relevance.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 8

```
 1            But you may answer.

 2            THE WITNESS:  A pistol.

 3  BY MR. LEVINE:

 4       Q.   And how many shots from that pistol did you

 5   fire during that incident?

 6       A.   I think it was six, six to seven, maybe eight.

 7       Q.   Do you know if those six, seven, or eight shots

 8   were fired in one volley or over multiple volleys?

 9            MR. RAMIREZ:  Compound.  Vague and ambiguous.

10  Relevance.

11            But you may answer, if you understand.

12            THE WITNESS:  One volley, sir.

13  BY MR. LEVINE:

14       Q.   And without going too much into detail, are you

15   able to tell me just what the very general circumstances

16   of that incident were that led you to shoot those six to

17   eight shots?

18            MR. RAMIREZ:  Objection as to relevance.

19            But you may answer.

20            THE WITNESS:  It was a call to a residence in

21  Moreno Valley of some subjects that were believed from

22  reporting party -- believed had entered a home, and they

23  were described as three individuals wearing masks,

24  possibly wielding weapons.  And what their intent was in

25  the home was not necessarily understood at the time.
```

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 9

1          But as they exited, one of the suspects fired

2   in our direction when we arrived, and we returned fire.

3   BY MR. LEVINE:

4      **Q.   So just the shooting occurred when the**

5   **individuals you were shooting at had already exited the**

6   **home again and were outside?**

7      A.   One had actually appeared at the front door.

8   But there were several of us there, and, because of

9   angles, only one or two of us could see that subject and

10  then another subject -- there were three -- and then

11  another subject actually exited and fired his weapon in

12  our direction.

13     **Q.   Okay.  So prior to you firing any of your shots**

14  **during that incident, you had actually seen this subject**

15  **aim his firearm in your direction and begin to fire it?**

16     A.   Yes.

17     **Q.   And do you know if that individual died as a**

18  **result of the shots you fired?**

19          MR. RAMIREZ:  Objection as to relevance.

20          But you may answer.

21          THE WITNESS:  He did die.

22  BY MR. LEVINE:

23     **Q.   And I think you mentioned there was another**

24  **deputy or officer who fired around the same time you**

25  **did; is that correct?**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 10

1      A.    There were three others.

2      Q.    So four shooting officers total; is that what

3    you mean?

4      A.    Four total, yes.

5      Q.    Okay.  And do you have any understanding as to

6    whether it was your shots that killed this person or one

7    or more of the other officers?

8          MR. RAMIREZ:  May call for an expert opinion.

9    May call for a medical opinion.  Relevance.

10          But you may answer, if you know.

11          THE WITNESS:  I was told by, at the time,

12   Internal Affairs, within the organization, that they

13   recovered projectiles from the decedent that belonged to

14   several of us.

15   BY MR. LEVINE:

16      Q.    So you weren't sure as to who, you know, fired

17    any potential fatal shots; is that correct?

18      A.    I couldn't tell you if they were the ones that

19    were the lethal shots or whether they just struck him

20    somewhere else.

21      Q.    And was your deposition taken in that matter?

22      A.    I don't recall a deposition.  I do recall being

23    the subject of a lawsuit that was, I believe, later

24    dismissed.

25      Q.    Okay.  You just don't know whether your

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 11

1    deposition was taken at any time prior to that

2    dismissal?

3        A.   I don't recall taking a deposition prior to

4    that dismissal.

5        Q.   Thank you.  So I know we're about ten minutes

6    in here already.  I just wanted to mention I usually

7    would take about an hour during the deposition before

8    taking a ten-minute break, and I know you've had your

9    deposition taken before, so if you need a break at any

10   time, feel free to let me know and that will be fine.

11           Does that work for you?

12       A.   Yes, sir.

13       Q.   Okay.  And I should have asked this earlier,

14   but is there any reason why you cannot give your best

15   testimony today?

16       A.   There is not.

17       Q.   Okay.  Is it your understanding that we're here

18   to discuss an incident involving somebody named Johnny

19   Llamas?

20       A.   Yes.  I thought it was Llamas, but Llamas.

21       Q.   Spelled L-L-A-M-A-S?

22       A.   Correct, sir.

23       Q.   Okay.  We don't need to worry so much about the

24   pronunciation.  If I refer to somebody named Llamas,

25   will you understand who I'm talking about?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 12

```
 1      A.   Yes.
 2      Q.   Have you reviewed any documents in preparation
 3  for this deposition?
 4      A.   I have.
 5      Q.   What have you reviewed?
 6      A.   I reviewed my body-worn footage, body-worn
 7  camera footage, helicopter footage.  I read -- when I
 8  was interviewed, I read the transcripts of the
 9  interview.
10      Q.   Did you ever listen to an audio recording of
11  that interview?
12      A.   I did not listen to an audio recording.
13      Q.   Okay.  And when was the most recent time that
14  you read the transcript of that interview?
15      A.   Last night.
16      Q.   Do you recall how many -- scratch that.
17           Do you recall what date it was that you gave
18  that interview on?
19      A.   I don't recall the date.
20      Q.   Do you have an estimate for how long after the
21  incident it was that you gave the interview?
22      A.   Probably a week later.
23      Q.   Okay.  Do you know how many times between the
24  date that you gave that interview and today, how many
25  times you've reviewed that transcript?
```

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 13

 1      A.    Probably a total of three times.

 2      **Q.    Were those all within the past month or so,**

 3  **approximately?**

 4      A.    Two were within the last month, and the other

 5  one was probably within the last year.

 6      **Q.    And I think you mentioned you reviewed your**

 7  **videos from the body-worn camera that you were wearing**

 8  **on the date of the incident; is that correct?**

 9      A.    That's correct.

10      **Q.    Do you know how many separate videos it was**

11  **that you reviewed from your body camera?**

12          MR. RAMIREZ:  I would say it's vague and

13  ambiguous as to pertaining to his own camera.

14          But if you understand, you may respond.

15          THE WITNESS:  I did review my own camera; I saw

16  portions of Sergeant Hubachek's camera; and I reviewed

17  the aviation footage.

18  BY MR. LEVINE:

19      **Q.    I guess what I'm asking is, when you reviewed**

20  **your own body camera footage -- I'm just talking about**

21  **your own body camera right now -- was it a single video**

22  **file or was it multiple video files, if you recall?**

23      A.    I believe it was a single video file, just a

24  continuation of the event.

25      **Q.    Okay.  And was that video file one that**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 14

1   depicted the deputy shooting during this incident?

2        A.   Portions of it.

3        Q.   Okay.  It included periods of time both before

4   and after the deputies fired their shots?

5        A.   Yes.

6        Q.   And then I think you said you reviewed -- was

7   it Sergeant Hubachek's body-worn camera footage, as

8   well?

9        A.   Portions of it.

10       Q.   Okay.  Did those portions include the deputy

11  shooting?

12       A.   I don't recall the deputy shooting -- the

13  actual shooting his camera, other than post incident or

14  post shooting.

15       Q.   Do you recall viewing any portions of the

16  incident on his camera that were prior to the shooting?

17       A.   I don't recall reviewing anything prior to, on

18  his camera.

19       Q.   Okay.  So in your understanding, everything

20  that you reviewed from his camera was after the

21  shooting; correct?

22            (Reporter clarification.)

23            THE WITNESS:  Yes.

24  BY MR. LEVINE:

25       Q.   And then I think you mentioned reviewing a

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 15

1   camera from a helicopter, as well; is that right?

2       A.   That is correct.

3       Q.   And did that depict the shooting, as well?

4       A.   It did -- or portions of it.  I'm sorry.

5       Q.   That's okay.

6            And also portions of the period prior to and

7   after the shooting?

8       A.   Correct, sir.

9       Q.   That video footage from the helicopter, do you

10  know if that was recorded on some type of infrared

11  camera?

12      A.   It was recorded -- it was recorded on a FLIR,

13  or an infrared camera, portions of it.

14      Q.   The portions that depicted the shooting and

15  immediately before and after the shooting, do you know

16  if that was a recorded on an infrared camera?

17      A.   I believe so, it was.

18      Q.   At least in terms of what you reviewed, I mean?

19      A.   Yes.  Yes.

20      Q.   Okay.  And prior to reviewing that video, have

21  you ever seen those kind of videos taken before on

22  infrared cameras?

23      A.   I have, sir.

24      Q.   And is that something that's, to your

25  knowledge, commonly used when there is a police

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 16

1   helicopter responding to a scene and filming from

2   overhead?

3           MR. RAMIREZ:  May call for speculation.  Lacks

4   foundation.

5           But you may respond as to what you know.

6           THE WITNESS:  I have reviewed it before and,

7   under most circumstances, they are switching from a

8   traditional camera view and an infrared camera view,

9   depending on the circumstances.  It doesn't necessarily

10  have to do with daylight or nighttime.

11          It's -- really it's the heat, differences

12  between the ground temperatures and what humans put out.

13  BY MR. LEVINE:

14      Q.   Okay.

15      A.   Or live objects.

16      Q.   I'm sorry.  I didn't catch the last thing you

17  said.

18      A.   Or live objects, which is something that's

19  alive, whether it's an animal or a person, versus...

20      Q.   Thank you.

21          You had seen this type of video recorded from a

22  helicopter before?  You had seen those types of infrared

23  recordings, prior to this recording?

24      A.   I have.

25      Q.   And you started to mention in one of your

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 17

1    previous responses, heat and temperature.  Is it your

2    understanding that the infrared camera essentially

3    depicts high temperatures in a different way than a

4    normal camera does?

5              MR. RAMIREZ:  May call for speculation.  May

6    call for an expert opinion.

7              But you may respond, if you can.

8              THE WITNESS:  I don't know if it's high

9    temperature, is the difference.  It's really the

10   difference between the object or the living object that

11   you seek, versus surrounding surfaces, such as ground

12   temperature, cars nearby, foliage, et cetera.  And the

13   bigger disparity in temperature is usually easier to see,

14   the living object.

15   BY MR. LEVINE:

16        Q.   To your knowledge and based on the videos you

17   have reviewed, including from this incident taken by

18   these types of cameras, is a living object typically

19   shown in white or a very bright color, similar to white?

20             MR. RAMIREZ:  May call for speculation.  Lacks

21   foundation.

22             But you may respond, if you know.

23             THE WITNESS:  Typically.  It just depends on

24   the model of the camera, but typically.

25   BY MR. LEVINE:

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 18

1    Q.   Okay.  Besides reviewing your interview

2    transcript and the portion of your body-worn camera

3    video that you reviewed and Sergeant Hubachek's

4    body-worn camera video and the video taken from the

5    helicopter that we've discussed, are there any other

6    documents or records that you reviewed in preparation

7    for this deposition?

8    A.   I reviewed some portions of the transcripts

9    that belong to Sergeant Hubachek and Deputy McGuire.

10    Q.   Do you know if those were their interview

11    transcripts or deposition transcripts?

12    A.   Interviews following the incident.

13    Q.   Okay.  Do you know approximately when those

14    interviews took place, based on your review of those

15    transcripts?

16    A.   Probably about a week after the incident.

17    Q.   Approximately around the same time of your

18    interview, more or less?

19    A.   Yes, sir.

20    Q.   Have you ever reviewed a transcript of either

21    of those officers' deposition taken in this case?

22    A.   I have not.

23    Q.   And have you ever reviewed a video recording of

24    those officers' deposition taken in this case?

25    A.   I have not.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 19

1    Q.   Since the time of your interview, between that

2    time and today, have you reviewed any materials related

3    to this case, other than what you've told me about

4    already?

5    A.   In addition to, just some crime scene photos,

6    post incident, obviously.

7    Q.   Did you review those specifically in

8    preparation for this deposition, those photos?

9    A.   I did.  I didn't view all of them, just some of

10   them.

11   Q.   What, generally, did those photos depict, if

12   you recall?

13   A.   The crime scene and where the subject had --

14   had, more or less, died, that area surrounding that.

15   Q.   Basically where he ended up after the shots

16   were fired and was pronounced deceased?

17   A.   Yes.

18   Q.   Anything besides those and what we've already

19   covered that you've reviewed in preparation for this

20   deposition?

21   A.   No, sir.

22   Q.   And then when -- I think you said earlier that

23   you think you gave your interview statement

24   approximately one week after the incident; is that

25   correct?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 20

1      A.    That is correct, sir.

2      Q.    Do you know if, prior to giving that statement,

3   you had had the opportunity to review any video

4   recordings depicting any portion of the incident?

5      A.    I believe I reviewed my -- my body camera and

6   portions of the aviation footage.

7      Q.    To your knowledge, had you reviewed any part of

8   Sergeant Hubachek's body camera footage prior to your

9   statement?

10      A.    I don't recall viewing any of his, prior to my

11   statement.

12      Q.    And when you gave that statement -- well, do

13   you know if it was a voluntary versus a compelled

14   statement?

15      A.    It was voluntary.

16      Q.    And was part of your reason for giving a

17   voluntary statement to assist in the investigation of

18   this incident?

19      A.    Yes, sir.

20      Q.    Were you told during that interview that one of

21   the purposes of the investigation was to determine

22   whether there were any crimes committed by Deputies

23   McGuire or Hubachek?

24          MR. RAMIREZ:  May call for speculation.

25          But you can respond, if you recall.

Page 21

```
 1              THE WITNESS:  Can you ask that again, sir?
 2   BY MR. LEVINE:
 3       Q.   Sure.  I'm just asking, you know, were you told
 4   anything by the interviewer about the purpose or role of
 5   the interview and the investigation it was a part of?
 6       A.   Just to determine what the facts were.
 7       Q.   Okay.  You don't recall the word "criminal"
 8   being used at any point?
 9       A.   I don't recall -- referring to the law
10   enforcement?
11       Q.   Yes.
12       A.   I don't recall anything related to that or that
13   word -- those words being used.
14       Q.   Was -- was it your understanding that it was
15   essentially an Internal Affairs interview or
16   investigation?
17       A.   Yes.
18       Q.   Besides that interview that you gave, have you
19   given any other type of interview or statement regarding
20   this incident, outside of discussions with your
21   attorney, which I don't want to know about?
22       A.   Well, you do an interview with the -- well,
23   it's called the "FID," "Force Investigation Detail."
24   That was the only interview that, I believe, I conducted
25   up until this point.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 22

1      Q.   Have you discussed this incident with Deputies

2  McGuire or Hubachek between the time of the shooting and

3  today?

4           MR. RAMIREZ:   Outside the presence of your

5  attorneys.

6  BY MR. LEVINE:

7      Q.   Outside the presence of your attorneys?

8      A.   We discussed the vague circumstances

9  surrounding, but nothing of detail.

10     Q.   What were the vague circumstances that you

11  discussed with them?

12     A.   Just what we can improve on, tactically.  It's

13  more of a debrief-type incident:  What could we do

14  better the next time, if there was anything we could

15  have done better?

16     Q.   Was that a conversation that was just between

17  the three of you, or were there other law enforcement

18  officials present?

19     A.   I believe just the three of us discussing what

20  we could do internally better, if -- if anything, in

21  that matter.

22     Q.   What did you and other officers discuss that

23  you could have done better during that conversation?

24     A.   Really, the only thing that came up was could

25  we have more -- could more manpower been present?  But

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 23

1  that wasn't necessarily -- it would have been ideal, but

2  honestly, it was not possible, based on how fast the

3  incident -- how dynamic it was and how fast it evolved.

4      Q.   Were there any other points you discussed, in

5  terms of what could have been done better during that

6  conversation, besides the number of -- besides the

7  manpower?

8      A.   Not that I recall, sir.

9      Q.   So I'm going to ask you a few questions about

10  the incident itself in a moment.  But before I do, I

11  just want to ask you a bit about yourself and your

12  background.

13          Are you currently employed?

14      A.   I retired from the Sheriff's Office in

15  December.

16      Q.   So you're retired and not working currently; is

17  that correct?

18      A.   I retired and stayed on as a Level 1 Reserve

19  Deputy, but I'm also fully employed at Yaamava' San

20  Manuel Resort and Casino.

21      Q.   In what capacity are you employed at Yaamava'?

22      A.   I'm part of the executive protection detail.

23  It's a protective service provided to the elected tribal

24  council members.

25      Q.   Is that essentially private security for the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 24

```
 1   facility?

 2        A.   It's essentially security -- personal security

 3   for only the seven elected members.

 4        Q.   Okay.

 5        A.   The council.  More or less their heads of

 6   government.

 7        Q.   Okay.  And do you have a particular job

 8   location where you do this work, or do you kind of

 9   travel with these seven individuals to provide them

10   protection?

11        A.   We travel sometimes in the state of California,

12   outside the state, and internationally, as well.

13        Q.   Okay.  And when did you start working in that

14   role?

15        A.   In January of this year.

16        Q.   So it's been about two months, give or take?

17        A.   Yes, sir.  Two months, give or take.

18        Q.   Do you carry any type of weapon during that --

19   in that line of work?

20        A.   Under some circumstances, I do, yes.

21        Q.   But not routinely?

22        A.   Not on every operation.

23        Q.   Okay.  It's sort of -- I don't want to get too

24   much into the, you know, secret details of this work,

25   but it's kind of on a case-by-case basis, more or less?
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 25

1    A.   Case-by-case.  And sometimes private venues

2  don't allow weapons inside their venues, so we adhere to

3  their rules.

4    Q.   Okay.  Have you discharged a weapon in your

5  current position at any time?

6         MR. RAMIREZ:  Objection as to relevance.

7         But you may respond "yes" or "no."

8         THE WITNESS:  Other than in range training?

9  BY MR. LEVINE:

10   Q.   Other than range training.

11   A.   I have not.

12   Q.   And then I think you said you were retired from

13  the Riverside Sheriff's Department; is that correct?

14   A.   That's correct, sir.

15   Q.   Okay.  What was your rank on the date of this

16  incident?

17   A.   I was a Sheriff's lieutenant.

18   Q.   And did you have an assignment or position that

19  was separate from your rank at the time?

20   A.   I was assigned to our special enforcement

21  bureau, and I was one of two lieutenants that oversaw

22  our emergency services team, which is our SWAT

23  personnel, our canine team, which includes not only

24  apprehension dogs, but it includes bloodhound or

25  tracking dogs, and then our bomb squad.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 26

1      Q.   And were you the -- were Deputies Jimmie

2   McGuire and Sean Hubachek working with you on the date

3   of the incident?

4      A.   They were, sir.

5      Q.   Were they essentially a part of your team?

6      A.   Yes.

7      Q.   Were you their supervisor?

8      A.   I'm their supervisor, but the sergeant is

9   generally under some circum- -- under most, not always,

10   but under most circumstances the team leader in charge

11   of tactics employed.

12      Q.   As a lieutenant, were you senior to or a higher

13   rank than a sergeant?

14      A.   Yes.

15      Q.   So you essentially had some type of authority

16   over a sergeant as a higher-ranking deputy?

17      A.   That is correct, sir.

18      Q.   But despite you being the higher-ranking

19   deputy, the sergeant would have still been the team

20   leader; is that what you're saying?

21      A.   Under most circumstances.

22      Q.   How about under these circumstances?

23      A.   Sergeant McFadden, which I'll sure we'll get to

24   later, he was actually leading the apprehension efforts

25   prior to the shooting.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 27

1    Q.    Do you have any understanding as to whether

2    Sergeant Hubachek was a team leader during the incident?

3        A.    He was assisting Sergeant McFadden as needed.

4        Q.    And what did you understand your role to be as

5    lieutenant on scene during this incident?

6        A.    Overall command, but also just additional

7    personnel on the ground.

8        Q.    And I take it you probably graduated from high

9    school at some point?

10        A.    I did, sir.

11        Q.    Okay.  And did you do any college after that?

12        A.    I did some college in the Marine Corps and,

13    yes.

14        Q.    Did you receive a college degree of any kind?

15        A.    I did not.

16        Q.    Do you know approximately how many years worth

17    of college you completed?

18        A.    Probably close to four, with really no end

19    state.

20        Q.    Understood.  Did you go to the police academy

21    at some point?

22        A.    I did, sir.

23        Q.    Which police academy was that?

24        A.    I went to the Sheriff -- Riverside Sheriff's

25    Academy.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 28

1    Q.   Okay.  And I won't ask you when that was, but

2    how long did you attend the police academy for?

3    A.   It was about six months.

4    Q.   Six months?  Okay.

5         And after working in the academy, did you start

6    working at the jails for the Sheriff's Department?

7    A.   That is correct.

8    Q.   Do you know how long you worked in the jails

9    for, approximately?

10   A.   About two years.

11   Q.   And did you begin working patrol after

12   completing your approximately two years at the jails?

13   A.   Yes, sir.

14   Q.   All right.

15        So I'm going to move on to some questions about

16   this particular incident itself.  I understand that the

17   incident in this case took place over the course of

18   possibly multiple hours, and I'm going focus the

19   questions that I'm going to go into now on kind of the

20   immediate lead-up to the deputy shooting, and also the

21   shooting itself.

22        Do you understand that?

23   A.   Yes, sir.

24   Q.   Okay.  Is it your understanding that there were

25   two other sheriff's deputies on your team that fired

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 29

1    their weapons during this incident?

2        A.    Yes, sir.

3        Q.    Would that be Jimmie McGuire and Sean Hubachek?

4        A.    Yes, sir.

5        Q.    Do you know how many shots each of those

6    deputies fired during this incident?

7        A.    I can give you an approximate, but I don't know

8    the actual round count.

9        Q.    Sure.  An approximate is fine.  Let's start

10   with Deputy McGuire.

11       A.    Six to eight.

12       Q.    And how about Deputy Hubachek?

13       A.    One to two, maybe three.

14       Q.    I'm sorry.  I didn't --

15       A.    Maybe three.  One, two, or three, maybe, for

16   Hubachek.

17       Q.    But you never, as part of any sort of

18   debriefing following this incident, gained specific

19   understanding as to exactly how many shots each of these

20   deputies fired?

21       A.    I did not.

22       Q.    During the incident, did you hear these shots

23   while they were being fired?

24       A.    I did.

25       Q.    Did you have any understanding as to whether

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 30

1   each of these deputies' shots were fired as part of a

2   single volley or multiple volleys, separated by a period

3   of time in between?

4          MR. RAMIREZ:  It's vague and ambiguous.

5   Compound.

6          But you may respond, if you understand.

7          THE WITNESS:  To me, it sounded like two

8   independent volleys, with a very short amount of time

9   between the two.

10  BY MR. LEVINE:

11     Q.   And maybe it will be helpful if I break it up

12  between the two deputies, because we're talking about

13  two people here.

14          I'll start with Deputy Hubachek.  I know you --

15  I think you estimated that you thought he fired

16  somewhere in the range of one to three shots during the

17  incident.

18          Do I have that correct?

19     A.   Yes, sir.

20     Q.   And during the incident, you heard those

21  approximately one to three shots while they were being

22  fired; correct?

23     A.   I did, but I couldn't discern if it was coming

24  from Deputy McGuire or Sergeant Hubachek, because of

25  their proximity to me.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 31

1      Q.   Did the shots that you knew Deputy Hubachek was

2   firing, sort of overlap with at least some of the shots

3   that Deputy McGuire was firing, in terms of the time?

4      A.   Yes, sir.

5      Q.   Okay.  And then after those shots were -- that

6   you heard Deputy Hubachek fire, was there another round

7   of shots some period of time after that, that one of the

8   deputies fired?

9           THE CERTIFIED STENOGRAPHER:  Mr. Ramirez,

10   you're on mute.

11          MR. LEVINE:  You're on mute.  And it looks like

12   the lieutenant's Zoom is frozen, so we can't see or hear

13   him.

14          MR. RAMIREZ:  There you are.  Everybody's back

15   now.

16          THE WITNESS:  We're back, sir.

17   BY MR. LEVINE:

18      Q.   Did you hear my last question?  I'm sorry.

19      A.   I did not.

20      Q.   Okay.  I think we were talking about how there

21   were -- you heard some shots that you understand

22   Sergeant Hubachek to have fired, and those overlapped

23   with at least some of the shots that you understand

24   Deputy McGuire to have fired; is that correct?

25      A.   That is correct.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 32

1      Q.   And then after those shots that

2   Sergeant Hubachek fired, I'm wondering if there was

3   essentially a second round of shots that you heard or

4   saw Deputy McGuire fire shortly thereafter?

5      A.   There was a second volley, and I knew -- I was

6   aware Deputy McGuire had fired, but I don't know if

7   Sergeant Hubachek also fired during the incident, during

8   that second volley.

9      Q.   Okay.  Thank you.  That was partly what I was

10   getting at.

11          So it's your understanding that Deputy --

12   Sergeant Hubachek fired at least one volley and that

13   Deputy McGuire fired two volleys; is that correct?

14      A.   That would be accurate, yes.  Correct.

15      Q.   Okay.  You know that Deputy McGuire fired a

16   second volley, you just don't know whether

17   Sergeant Hubachek fired at that same time as well or

18   not; is that correct?

19      A.   That is correct.

20      Q.   Okay.  Understood.

21          In the approximately -- I'm going to focus on

22   kind of the period, in my next few questions, leading up

23   to the first volley of shots that we talked about there.

24          In the approximately five to ten minutes prior

25   to the first shot that one of those two deputies fired,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 33

1  were you and your team essentially tracking Johnny Llamas

2  to try to take him into custody?

3      A.   We were.

4      Q.   Was there a helicopter overhead during that

5  approximate five- to ten-minute period, prior to the

6  first shot?

7      A.   Yes.

8      Q.   Were you -- during that approximate five- to

9  ten-minute period, prior to the first shot, were you

10  receiving broadcasts from the helicopter, regarding

11  Mr. Llamas's whereabouts and movements?

12      A.   We were.

13      Q.   Were you receiving those broadcasts over a

14  police radio that you had?

15      A.   Yes, sir.

16      Q.   Was that radio attached to your uniform or on

17  your person somewhere?

18      A.   It was -- there's hearing -- there is a hearing

19  device attached to my helmet, like ear cups that it

20  comes through there.

21      Q.   So you had essentially some kind of earpiece

22  that the broadcast is being piped into your ear through?

23      A.   Yes.

24      Q.   And so you're hearing any broadcasts that are

25  being made from the police helicopter as they're being

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 34

1    made during that five- to ten-minute period?

2        A.    Yes.    I'm also hearing verbal announcements

3    from the helicopter, as well, because they have a PA --

4    an audible PA system on the helicopter where they can

5    make announcements to people on the ground.

6        Q.    Okay.    Are those verbal announcements separate

7    from the broadcasts that you're hearing?

8        A.    They are.

9        Q.    In other words, the broadcasts are directed

10   towards other law enforcement officers, whereas the

11   verbal announcements over the PA are directed to people

12   on the ground who may or may not be law enforcement

13   officers?

14       A.    That is correct, sir.

15       Q.    Okay.    Was it your understanding that the --

16   well, let me back up.

17              During the five to ten minutes, approximately,

18   prior to the first shots being fired, did you distinctly

19   hear any of the PA broadcasts being made to the ground

20   from the helicopter?

21       A.    I did.

22       Q.    Could you tell if they were being directed

23   towards Mr. Llamas?

24       A.    They were, sir.

25       Q.    Okay.    Were they essentially giving him

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 35

1    directions or commands from the helicopter,

2    instructions?

3         A.   Commands, directly to him, yes.  Correct.

4         Q.   Could you hear what some of those were?

5         A.   Based on my distance, some of it I couldn't

6    discern, but then some of it was -- and I'm

7    paraphrasing, of course, just, "You need to put the

8    firearm down and surrender."

9         Q.   Okay.  And then I think we discussed that in

10   addition to hearing those PA broadcasts, you're also

11   hearing radio broadcasts through your earpiece, from

12   officers or deputies who are in the helicopter?

13        A.   That is correct, sir.

14        Q.   Okay.  And are they essentially sort of

15   reporting Mr. Llamas's location to you and the other

16   deputies who are on ground via the radio?

17        A.   They are.  In addition, it's corroborated by

18   their positioning overhead, that you can see how they're

19   oriented then.  Using all five senses to include hearing

20   and seeing, we could see the positioning of the

21   helicopter overhead, and then their directed

22   announcements, and then what's being broadcast via the

23   police radio.

24        Q.   Okay.  So you're saying that there were

25   multiple sources of information you had for where

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 36

1   Mr. Llamas was at a given time during that five- to

2   ten-minute period, both from what you're hearing over

3   the radio as well as seeing the location of the

4   helicopter overhead?

5       A.   Correct.

6       Q.   Just focusing on the information right now that

7   you were getting over the police radio as opposed to the

8   location of the helicopter, were you essentially being

9   told over the radio that Mr. Llamas was proceeding

10  northward in the direction of a street called

11  River Road?

12      A.   He was.  That was part of his direction of

13  travel, yes.

14      Q.   Okay.  Was there some other separate part of

15  his direction of travel, prior to him reaching

16  River Road to the south, during that five- to ten-minute

17  period?

18      A.   He was initially fleeing through -- this was a

19  large open space, an open field, essentially open field,

20  but there were structures on it.  He was fleeing

21  eastbound; and then it was more northeast; and then it

22  was more oriented north, towards River Road.

23      Q.   Okay.  Understood.

24          During the period where he started proceeding

25  northeast and then northward towards River Road, was

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 37

1   there a period of time during that period where you're

2   hearing broadcasts about his movement and locations, but

3   you're not able to personally see him, yourself?

4       A.   That is correct, sir.

5       Q.   Okay.  And then during that time when he's

6   proceeding northeast and then northward toward

7   River Road, but you can't personally see him, were you

8   told by any radio broadcasts that deputies in the

9   helicopter saw Mr. Llamas holding a gun to his own head?

10      A.   Correct.  And I believe -- I'm not sure if some

11  of that radio traffic was coming from the deputies that

12  were further east on River Road.  I'm not sure what they

13  could see at the moment, but I'm not -- I'm not sure --

14  I'm not sure if that broadcast came -- it was a

15  combination of broadcasts that came from the helicopter

16  and others, as well.

17      Q.   I understand.  But either way, there's a period

18  of time while he's heading northward towards River Road,

19  where you can't, yourself, see him, but you're receiving

20  information that he's moving northward and holding a gun

21  to his head?

22      A.   Yes.

23      Q.   During that time --

24           (Reporter clarification.)

25  BY MR. LEVINE:

Page 38

1    Q.    During that time before you saw him, while

2   you're receiving this information that he is moving

3   northward toward River Road, did you receive any

4   information as to which hand he was holding the gun

5   with, as he pointed it to his head?

6    A.    I don't recall that descriptive of what hand it

7   was in, but it was -- it wasn't -- the radio reports

8   also indicated that the gun wasn't always oriented

9   towards his head, but he was in -- just in possession of

10  the weapon.

11   Q.    So before you saw him, you were receiving

12  information that at least part of the time he was

13  holding the gun to his head, but may have been orienting

14  it in other directions, too?

15   A.    Correct.

16   Q.    And at some point around when you were hearing

17  this information, did you and some of the other deputies

18  take a position on a portion of River Road, itself, that

19  ran from east to west?

20   A.    We did.  We positioned ourselves west of where

21  he was.

22   Q.    Was there essentially -- at some point while

23  he's moving north, did you have information that he was

24  moving along a driveway that ran from south to north,

25  toward River Road?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 39

```
 1      A.   Yes.

 2      Q.   Was your understanding that driveway was

 3   essentially perpendicular to River Road?

 4      A.   Yes, sir.

 5      Q.   And so you're saying that the position that you

 6   and some of the other deputies took on River Road was

 7   somewhere to the west of where that driveway would have

 8   intersected with River Road; is that right?

 9      A.   Yes.

10      Q.   Do you have a time estimate for approximately

11   how long before the first shot was fired it was, that

12   you took that position to the west of the driveway on

13   River Road?

14           MR. RAMIREZ:  Vague and ambiguous as to time.

15           But if you understand, you may respond.

16           THE WITNESS:  Probably by the time we actually

17   got on River Road and stopped and exited our vehicles, it

18   was probably five minutes or less until the

19   deputy-involved shooting occurred.

20   BY MR. LEVINE:

21      Q.   And at the time that -- were you in a vehicle

22   when you arrived at that position?

23      A.   I was, sir.

24      Q.   Did you get out of that vehicle or exit that

25   vehicle pretty soon after stopping in that position in
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 40

1    your vehicle?

2        A.    I did.

3        Q.    And when you stepped out of the vehicle, could

4    you see Mr. Llamas at that time?

5        A.    Not at that very moment.  And we positioned

6    ourselves along the north curb line to maximize our

7    visual acquisition of the mouth of that driveway.

8        Q.    When you're standing there just after you've

9    exited your vehicle, are you more or less facing to the

10    east?

11        A.    Yes, sir.

12        Q.    And then at some point while you're positioned

13    there facing to the east, sort of in the direction of

14    that driveway that runs south to north towards

15    River Road, at some point did Mr. Llamas come into view

16    for you?

17        A.    He did.

18        Q.    Do you have a time estimate for how long it was

19    between the time you stopped and exited your vehicle and

20    when Mr. Llamas came into view from the south?

21        A.    My best estimate is probably within a minute.

22    Within a minute or two, tops.

23        Q.    Do you, for example, have any estimate as to

24    whether it was more or less than 30 seconds?

25        A.    It may have been that short of a timeframe

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 41

1   before he came into view.

2       Q.   And when Mr. Llamas came into view, did you see

3   him proceeding north from that driveway that was to the

4   south of River Road?

5       A.   I did.

6       Q.   And was he essentially moving north at that

7   time when you saw him come into view?

8       A.   North, across River View [sic], from the south

9   curb line to the north curb line.

10      Q.   Okay.  But just to clarify, I thought I heard

11  you say "River View" right there.  Is the street called

12  "River Road" or "River View"?

13      A.   River Road.  I'm sorry.

14      Q.   That's okay.  I just want to make sure for the

15  record that we have it straight.

16           And then just jumping ahead a little bit, when

17  the deputy-involved shooting occurred, do you know what

18  the actual address was of the property where that took

19  place?

20      A.   I do not.

21      Q.   Okay.  Do you know if it was at 22240

22  River Road?  Does that ring a bell for you, one way or

23  the other?

24      A.   That does sound -- that does sound accurate.

25      Q.   Okay.  Just one moment here.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 42

1          Just to kind of help get on the same page, I'm

2    going to show an image on my computer here.

3          Can you see this image?

4    A.    I can, sir.

5    Q.    Does this appear to be a Google maps overhead

6    view of the incident location?

7    A.    It does, sir.

8    Q.    Okay.  And do you see what's marked as -- a

9    street that's labeled as "River Road," running from east

10   to west, along sort of the bottom third of this image?

11   A.    I do, sir.

12   Q.    Okay.  And then do you see running from south

13   to north, to the south of River Road, a driveway in the

14   bottom third of this image?

15   A.    I do, sir.

16   Q.    Does that appear to be the driveway that

17   Mr. Llamas was coming from when he first came into view

18   for you while you were positioned on River Road?

19   A.    I believe so.

20   Q.    And then, essentially, directly across

21   River Road, from the mouth of that southern driveway,

22   does there appear to be another driveway to the north of

23   River Road?

24   A.    There does.

25   Q.    And does that driveway -- is it your

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 43

1  understanding that driveway is part of the property on

2  which the deputy shooting occurred during this incident?

3      A.   It looks like the property, yes.

4      Q.   Okay.  Do you see where, towards the top of

5  this image, at least Google has labeled this property as

6  being at the address 22240 River Road?

7      A.   I see that, yes.

8      Q.   Okay.  Do you have any reason to doubt the

9  accuracy that that is the address?

10     A.   I do not, sir.

11     Q.   Okay.  You just don't have any independent

12  knowledge to confirm or deny that that's the correct

13  address?

14     A.   It sounds correct, but I can't be absolutely

15  certain.

16     Q.   Okay.  All right.

17          And just -- I'll go ahead and mark this

18  overhead image as Exhibit 1.

19          (Exhibit Number 1 was marked.)

20  BY MR. LEVINE:

21     Q.   I don't know that this is particularly

22  important.  I just wanted to make sure we're kind of on

23  the same page talking about the geography here, and I

24  thought this may be the easiest way to do it.

25          Okay.  So -- one moment here.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 44

1          At the time that you were positioned on

2    River Road facing east, to the west of where those

3    driveways were, did you have any understanding as to

4    whether there were any residents on the property that was

5    on the north side of the street there, at what we've just

6    discussed was 22240 River Road?

7          A.    I believe there was a discussion earlier that

8    one of the deputies -- I don't remember if it was

9    Deputy McGuire, prior to the incident, the actual

10   shooting, had discussed that he saw a residence at that

11   location.

12          It was discussed.  I just don't recall if it

13   was Deputy McGuire or another source.  And then at some

14   point, we actually had a visual acquisition of residents

15   at that location.

16          Q.   I'm just going to break that up a little bit.

17          You mentioned that you heard -- or prior to

18   yourself getting a visual, that you heard at some point

19   one of the other deputies -- you don't know who -- say

20   that he or she had seen individuals at that property.

21   Do you know how long prior to the shooting it was that

22   that visual contact had been made?

23          A.   If I had to guess, it was probably,

24   approximately an hour before, maybe an hour and a half,

25   when the incident was early on.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 45

1    Q.   Did the deputy who relayed this information to

2  you say anything about whether he or she had had any

3  communications with the individuals who were observed on

4  the property at that time?

5    A.   I don't recall if they ever had a conversation

6  with those individuals.

7    Q.   Okay.  So your knowledge, as far as you know,

8  essentially, the deputy, whoever it was, saw some

9  individuals, but didn't necessarily say anything to them

10  or hear them say anything to the deputy?

11    A.   They may have.  I just don't recall that part

12  of the conversation.

13    Q.   Okay.  When Mr. Llamas was approaching

14  River Road from the south and when he first came into

15  your view, was it your understanding that he was moving

16  northward along that driveway that we discussed that

17  runs south to north, to the south of River Road?

18    A.   That is correct, sir.

19    Q.   And then when you first saw him, could you tell

20  if he was still on that driveway or if he had already

21  stepped out onto River Road itself?

22    A.   I believe when we first saw him, his -- a

23  portion of that driveway isn't visible.  More or less

24  than the last 1 percent of that driveway as it

25  intersects with the asphalt is visual -- is -- is -- you

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 46

1    can see it or view it from our position.  So it's just a

2    very small portion that you can't view.

3        Q.    Right.  I guess what I'm wondering is, when you

4    first saw Mr. Llamas, could you tell if he was still on

5    the driveway versus on River Road, itself?

6        A.    I believe that he was in the driveway, but the

7    last -- it had to be the last 5 or 10 feet of that

8    driveway.

9        Q.    Okay.  So 5 or 10 feet away from the road, you

10   mean?

11       A.    Give or take, yes.

12       Q.    And then when you first saw him at that time,

13   approximately how far away was he from you?

14       A.    Probably 30 to 40 yards, 50 tops, yards away.

15       Q.    And at the time he first came into your view on

16   River Road there, where were Deputies McGuire and

17   Hubachek relative to your position?

18       A.    They were -- I don't recall who was to my left

19   or to my right, but they were nearby with their patrol

20   cars, very close to me.

21       Q.    Would you estimate that they were essentially

22   the same distance away from Mr. Llamas at that time,

23   more or less?

24       A.    As I was?

25       Q.    As you were, yes.

Page 47

1    A.    Yes.

2    Q.    At any time prior to you seeing Mr. Llamas come

3    from the south, onto that driveway and then onto

4    River Road, did you have any information that he had

5    pointed a firearm at any person that day?

6    A.    Prior to seeing him?

7    Q.    Prior to seeing him, while you were on

8    River Road there.

9    A.    To my knowledge, he shot a police dog, but I

10   couldn't tell you if the -- his intentions were to shoot

11   us and the police dog got in the way.  I don't know the

12   answer to that question, because we couldn't see him at

13   that point when that incident occurred, prior to the

14   actual deputy-involved shooting.

15   Q.    Okay.  I guess I'm just wondering whether you

16   had information that he had pointed a firearm at any

17   human at any time that day before you saw him step out

18   onto River Road?

19   A.    That includes law enforcement, as well, I'm

20   assuming?

21   Q.    I think of law enforcement as humans, so, yes.

22        MR. RAMIREZ:  I kind of like to think so.

23        THE WITNESS:  Yeah.

24   BY MR. LEVINE:

25   Q.    Certainly.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 48

1    A.    I can only assume that he did, based on dog

2    positioning, and when he fired his weapon, and based on

3    the sound of that -- that -- when we heard the gunfire.

4    **Q.    When you heard that shot, could you see him?**

5    A.    I could not see him.

6    **Q.    Could you see his gun when you heard that shot?**

7    A.    I could not see his gun.

8    **Q.    Did you hear the shot, like, whistle past your**

9    **ear or anything like that?**

10    A.    It did whistle past us.

11    **Q.    Do you have any sense of how far away the shot**

12    **traveled past you?  In other words, whether it was, you**

13    **know, 1 inch away from you versus 20 or more feet away**

14    **from you?**

15    A.    I don't know.

16    **Q.    Okay.  So would it be fair to say that you**

17    **don't -- you didn't know at that time whether, in firing**

18    **that shot, he had pointed his gun at an officer, a human**

19    **officer?**

20    A.    Based -- I was basing that on not only sound,

21    but the direction the dog entered the tree line.  So the

22    dog was entering from the direction we were looking.

23          So looking at this with, like, some -- I was

24    deduct- -- I was using deductive reasoning, thinking of

25    the dog, from our direction, and based on the sound

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 49

1   rapport from the gunfire, it appeared to be coming in

2   our direction.

3        Q.   Okay.  But so you -- based on just what you saw

4   and heard, you didn't know for sure whether he was

5   aiming the gun at any human at that time?

6        A.   That's fair.  Yes, sir.

7        Q.   Was it -- did you gain some understanding at

8   that time or shortly after that the -- a police dog had

9   been shot?

10       A.   Back to when we heard the gunfire?

11       Q.   Yes.

12       A.   We suspected it.

13       Q.   Okay.  When you were suspecting that the police

14   dog had been shot at that time -- and I realize this is

15   prior to the officer shooting that we've been

16   discussing -- was it -- did you form the impression that

17   he had been aiming his shot at the dog?

18       A.   I hadn't formed that impression.  It was either

19   he was attempting to shoot us and the dog got in the

20   line of fire, or he was intentionally shooting just the

21   dog.  I don't know the answer to that question.

22       Q.   Okay.  You didn't have any kind of hunch, or

23   anything like that, as to whether he was aiming at the

24   dog at that time?

25       A.   I suspected that the dog got in the way his of

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 50

1    line of fire; because when the dog entered the brush

2    line, it was within fractions of a second we heard the

3    gunfire.  So he could have been oriented towards the gun

4    and oriented towards us with the dog getting in the way.

5         Q.   Okay.  So as of the time that -- back, you

6    know -- fast forwarding again to while we're on

7    River Road, as of the time that you saw Mr. Llamas step

8    out from the south onto River Road, besides this

9    circumstance with the dog, where you thought it was

10   possible that he had pointed his weapon at an officer,

11   or something along those lines, do you have any other

12   information besides that that he had pointed his weapon

13   at any human being that day -- other than himself?  I'm

14   sorry.

15        A.   I did not, sir.

16             MR. LEVINE:  Okay.  All right.  We've been

17   going for about an hour, so I think it might be a good

18   time for our first break.  Would ten minutes be all

19   right for everybody?

20             THE CERTIFIED STENOGRAPHER:  Yes.

21             MR. LEVINE:  Okay.  Thank you.  All right we'll

22   come back in ten minutes and we can go off the record.

23             (Break taken.)

24   BY MR. LEVINE:

25        Q.   All right.  So I think the last question I

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 51

1    asked you before the break was about the period of time

2    leading up to when Mr. Llamas first came into your view

3    from the south while you were on River Road.

4            Do you recall that?

5    A.   I do, sir.

6    Q.   So relatedly, at any time before you saw

7    Mr. Llamas come onto River Road from the south, while

8    you were positioned to the west on River Road, did you

9    have information that Mr. Llamas had verbally threatened

10   to harm anybody that day?

11   A.   I did not have any information.

12   Q.   And at that time, did you have any information

13   that Mr. Llamas had physically harmed any human that

14   day?

15   A.   That day?  No.

16   Q.   After Mr. Llamas stepped out from the south

17   onto River Road, did he essentially continue northward,

18   going across River Road, towards the property to the

19   north of the road, that we discussed earlier?

20   A.   Yes.

21   Q.   And at some point did he then move from the

22   road onto the driveway of that property to the north?

23   A.   He did.

24   Q.   And was there a point, soon after he crossed

25   from River Road onto the property to the north, where

Page 52

1    you lost sight of him again?

2        A.   I did.

3        Q.   So I'm just sort of focused on -- in my next

4    few questions, on the period of time from when you first

5    saw him come out from the south onto the driveway, right

6    to the south of River Road, until the time he crossed

7    and you lost sight of him to the north again.

8             Do you have that sort of interval in your mind?

9        A.   I do.

10       Q.   All right.  So during that period, could you

11   see if Mr. Llamas was holding a gun?

12       A.   I could.

13       Q.   Could you see with which hand he was holding it

14   during that time?

15       A.   It appeared to be the right hand.

16       Q.   Was his -- given that you were to the west of

17   him and he was moving from the south to the north, was

18   his left side essentially facing you or exposed to you?

19       A.   It was, but he was posturing slightly different

20   as he crossed and traversed across the roadway, so I

21   could see the firearm in the other hand.

22       Q.   Okay.  I see.  Does that refresh your

23   recollection as to he was holding it in his right hand?

24   In other words, the hand that was on the other side of

25   his torso from where you were?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 53

1    A.   Yes.

2    Q.   **Could you see, during that time, whether he was**

3    **holding a gun to his head?**

4    A.   At times, it did appear that he was holding the

5    gun to his head.

6    Q.   **During that time, did you see him take the gun**

7    **away from his head at any point?**

8    A.   I saw, more or less, the gun -- not necessarily

9    take the muzzle away from his head, but drop his elbow,

10   supporting the firearm, so the firearm was more pointed

11   in an upward trajectory -- in an upward direction, if

12   that makes sense?

13   Q.   **I think so.  But was it your impression that**

14   **when he dropped his elbow like that, that the muzzle of**

15   **the firearm was still pointed generally towards his own**

16   **head?**

17   A.   Based on my distance, yes, and what I could

18   see.

19   Q.   **So, in other words, he continued to point -- as**

20   **it appeared to you, he continued to point the muzzle of**

21   **the gun towards his own head, from the time you first**

22   **saw him at the south side of the road near the driveway,**

23   **until the time you lost sight of him again to the north?**

24   A.   Yes.

25   Q.   **And so during that period, you didn't see him**

Page 54

1    point the gun at any other person besides himself;

2    correct?

3        A.   Correct.

4        Q.   During that period, did you hear him say

5    anything?

6        A.   I did not hear him say anything.

7        Q.   And, I'm sorry, you might have said this

8    already, but did you have an estimate for how far away

9    he was from you during that period, approximately?

10       A.   I believe somewhere between 30 and 50 yards, if

11   I had to guess, approximately.

12       Q.   And given the distance -- I know you said just

13   now that you didn't hear him say anything during that

14   time.  Did you see whether he appeared to be speaking at

15   all during that time?

16       A.   I couldn't tell if he was speaking.  There was

17   a lot of ambient noise at that point.

18       Q.   Right.  That's part of why I'm asking if you

19   could see -- could you see his mouth moving as though he

20   was speaking during that time?

21       A.   I couldn't see his mouth moving.

22       Q.   Okay.  Could you see whether his mouth remained

23   closed during that time?

24       A.   Honestly, I don't recall if it was open or

25   closed.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 55

1      Q.   When you saw him during that period holding the

2   gun to his head, did you know whether or not he was

3   suicidal?

4           MR. RAMIREZ:  May call for speculation, and

5   lacks foundation.  May call for a medical opinion.

6           But you may respond.

7           THE WITNESS:  I don't recall if he was

8   suicidal, if that was your question.

9   BY MR. LEVINE:

10      Q.   I guess I'm asking whether you had any

11   knowledge as to whether he was suicidal or not at the

12   time?

13           MR. RAMIREZ:  Same objections as before.

14           But you may respond, if you can.

15           THE WITNESS:  Other than pointing the firearm

16   towards his own body, that would be our only indication

17   that he is potentially suicidal, or doing that to provide

18   a delay.

19   BY MR. LEVINE:

20      Q.   Right.  So it was at least a possibility in

21   your mind?

22      A.   It was possible, yes.

23      Q.   But you didn't know for certain, one way or the

24   other?

25      A.   That's correct.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 56

1      Q.    During the period of time when he's crossing

2   from the south end of River Road to the north and onto

3   the driveway where you lost sight of him, was the

4   distance between you and him essentially the same

5   throughout that period?

6      A.    Yes, sir.

7      Q.    In other words, he didn't move dramatically any

8   distance further away from you or closer to you during

9   that period?

10     A.    That is correct.

11     Q.    Do you have a time estimate for how long it --

12  how much time passed from when you first saw him

13  stepping out from that southern driveway onto River Road

14  until the time that you lost the visual of him again as

15  he went north onto the property, north of River Road?

16     A.    A minute, maybe less.

17     Q.    Okay.  So as long as -- up to 60 seconds?

18     A.    It may be slightly longer than 60, but I

19  believe it was less.

20     Q.    During that period, that interval from when you

21  first saw him to the south and when you lost sight of

22  him again to the north, did you hear Deputies McGuire or

23  Hubachek issue any verbal commands to Mr. Llamas?

24     A.    I don't recall them issuing verbal commands.

25     Q.    Did you hear them say anything else besides

Page 57

1    verbal commands directed to Mr. Llamas?

2        A.    Not directed to Mr. Llamas, but internal

3    discussion amongst the three of us.

4        Q.    At that time, did you have any understanding as

5    to what language or languages Mr. Llamas spoke or

6    understood?

7        A.    Yes.

8        Q.    What was your understanding?

9        A.    He spoke English.

10        Q.    Did you have some prior information from some

11    source, other than Mr. Llamas, that led you to

12    understand that he spoke English?

13        A.    Yes.

14        Q.    What generally was that source of information,

15    if you recall?

16        A.    He was being sought by our Sergeant McFadden

17    and his fugitive team.  And prior to actually searching

18    the property and when they first contacted him, the

19    suspect, it was discussed what language -- Does he speak

20    English?  Is he speaking fluently?  Et cetera.  And it

21    was briefed that he did.

22        Q.    When you say, "It was discussed," discussed by

23    whom?

24        A.    Sergeant McFadden and his team that was seeking

25    the apprehension, that was leading the apprehension

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 58

1  efforts.  They briefed us on the plan -- the tactile

2  plan.  And in addition to that, if we do make commands

3  or make contact, does he speak English?

4      Q.   So the source of information you had for

5  Mr. Llamas speaking English was Sergeant McFadden?

6      A.   And his case agent, I believe Deputy Devine.

7      Q.   Okay.  Had you ever heard Mr. Llamas speak

8  prior to seeing him there on River Road?

9      A.   I had not.

10      Q.   And then, so we discussed at some point, I

11  think you said that Mr. Llamas crossed River Road and

12  went -- proceeded northwards, and you lost sight of him;

13  is that correct?

14      A.   That's correct.

15      Q.   Was it your understanding at that time that he

16  had moved onto that property that was to the north of

17  River Road at -- I think it was 22240?

18      A.   That is correct.

19      Q.   And at that point, did you and the other

20  deputies you were with move up closer to the driveway

21  leading onto that property?

22      A.   We did.

23      Q.   Did the three of you move up together, more or

24  less?

25      A.   Yes, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 59

1    Q.   Were you -- when you covered that distance from

2    where you had positioned to get closer to the driveway

3    to the north, were you in your vehicle or on foot?

4    A.   I was in my vehicle.

5    Q.   How about Deputies McGuire and Hubachek; were

6    they on foot or in a vehicle?

7    A.   Sergeant Hubachek and Deputy McGuire were

8    on-foot.

9    Q.   Okay.  Were they more or less keeping pace with

10   you in covering that distance while you were in your

11   vehicle and they were on foot?

12   A.   Yes.  I was more or less keeping pace with

13   them.

14   Q.   Okay.  You didn't want to speed off and leave

15   them eating your dust?

16   A.   No, sir.

17   Q.   And then when you -- when -- at some point you

18   stopped your vehicle again, I take it?

19   A.   Yes, sir.

20   Q.   Were you pretty much at the level of the

21   driveway when you stopped?

22        (Reporter clarification.)

23        THE WITNESS:  The driveway to the north.  I did

24   pull my vehicle into a portion of the mouth of the

25   driveway.

Page 60

1  BY MR. LEVINE:

2      Q.   Okay.  So did you make something of a partial

3  left turn, then, so that you're partially in the mouth

4  of the driveway?  Is that accurate?

5      A.   Yes, sir.

6      Q.   So would your vehicle, then, have been facing

7  essentially to the northeast, more or less, at that

8  time?

9      A.   That would be accurate, yes.

10     Q.   Okay.  When you stopped your vehicle there, did

11  you exit the vehicle again?

12     A.   I did.

13     Q.   At the time you exited your vehicle, did you

14  regain sight of Mr. Llamas to the north?

15     A.   I did.

16     Q.   Was that while you were still in your vehicle

17  or after he stepped out that you saw him again for the

18  first time?

19     A.   It was after I stepped out and regained visual

20  acquisition, after losing him entering the property.

21     Q.   Do you have a time estimate for how much time

22  passed between when you lost sight of him, when he

23  proceeded northward onto that property, until you

24  regained sight of him after stepping out of your

25  vehicle, after you drove forward?

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 61

1     A.    I would say approximately 30 seconds, give or

2     take.

3         Q.    And then after you stepped out of your vehicle

4     again, near the mouth of that driveway, to the north,

5     and regained a visual of Mr. Llamas, how far away was he

6     from you?

7         A.    About 40 or 50 yards.

8         Q.    Would you say that it was a comparable distance

9     to how far away he had been from you when you had been

10    further to the west on River Road and first saw him come

11    out from the driveway to the south?

12        A.    Similar, yes.

13        Q.    Do you have any -- scratch that.

14              When you saw him to the north again after you

15    exited your vehicle at that driveway, could you see the

16    gun?

17        A.    I could see the firearm, yes.

18        Q.    Was he still holding it in his hand?

19        A.    Yes.

20        Q.    Was he still holding it in his right hand?

21        A.    It appeared so, yes.

22        Q.    Was he still holding it to his head?

23        A.    No, sir.

24        Q.    How was he holding it?

25        A.    Well, as he was running -- because he was

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 62

```
 1   moving, the pistol was -- this is just prior to the
 2   deputy-involved shooting.  The pistol was moving in more
 3   or less three dimensions, including pointing -- at some
 4   point, it looked like it was pointing up towards the
 5   helicopter, towards the people that were occupying the
 6   residence at 22240, potentially oriented towards us, the
 7   three of us.  And then there were deputies to the east
 8   of the mouth of that driveway on River Road.  And at
 9   some point, it even appeared it may have be oriented in
10   the their general direction.
11       Q.   So my question is just really about when you
12   first -- that moment when you first saw him again, after
13   you stepped out the your vehicle and regained visual
14   contact.
15            Do you have that moment in mind?
16       A.   I do.
17       Q.   And at that time, could you tell how the
18   firearm was positioned in his hand?
19       A.   It looked like it was in his right hand.  And
20   again, he was moving -- moving with -- moving fast, like
21   he had a purpose, and that firearm was -- in fractions
22   of a second, the muzzle was passing people near the
23   residence, coming in our general direction, moving
24   towards the sky above.
25            Just as he was moving and driving his arms,
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 63

1    what his intention was, I don't know, but...

2            All that happened very, very fast, as you can

3    imagine, in moving fast.

4        Q.   How much time passed from when you first

5    regained the visual of Mr. Llamas again, to the north of

6    River Road, and when the first shot was fired by a

7    deputy?

8        A.   Probably under ten seconds by the time I saw

9    him, more or less --

10           (Simultaneous speakers.)

11   BY MR. LEVINE:

12       Q.   I'm sorry.

13       A.   More or less.  I'm sorry.

14       Q.   During that period between when you regained a

15   visual of Mr. Llamas and the first deputy's shot was

16   fired, do you at any time see him holding the gun to his

17   head?

18       A.   I did not.

19       Q.   So during that approximately ten seconds, the

20   gun was in -- you saw the gun positioned in lots of

21   different ways, besides being held to his head, but you

22   did not see it held to his head?

23       A.   That is correct.

24       Q.   Did you feel at the time that you had a

25   relatively clear view of Mr. Llamas and of the gun?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 64

1      A.   I did.

2      Q.   When you first saw Mr. Llamas after regaining a

3   visual of him while he's on that driveway, was his back

4   towards you?

5      A.   A portion of it, more or less; his oblique.

6      Q.   Could you explain what you mean?  Was it the

7   left or right oblique, for example?

8      A.   It appeared to be, like, the left oblique, as

9   like, he was as he was rotating his torso towards --

10   starting from the north, rotating it towards the west,

11   and then rotating it towards the south.

12      Q.   So he appeared to be turning left?

13      A.   Turning his torso.  Not necessarily his hips,

14   but his torso.

15      Q.   His torso?

16      A.   Or a portion of his flank.

17      Q.   How about his hips?  Were his hips facing more

18   or less to the north still?

19      A.   His hips -- based on the way that driveway

20   slightly curves, it was -- his hips appeared to be

21   oriented towards the north, northeast and northwest.

22      Q.   So his hips were continuing to be oriented up

23   the driveway; is that accurate?

24      A.   I'm sorry.  I'm sorry.  Yes.

25      Q.   And were -- how about his legs?  Did he -- were

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 65

1  his legs -- was he still moving forward up the driveway,

2  walking, or trotting, or however you put it?

3      A.   Running.  And, yes, up the driveway.

4      Q.   Okay.  So it was his torso and upward that

5  appeared to be turning to the left at that time?

6      A.   Yes, sir.

7      Q.   And then after seeing him -- as you saw him

8  turn to the left, turn his torso to the left, did you

9  see him, like, look over his shoulder with his head?

10     A.   He appeared to be -- yes.  It appeared to be he

11  was looking -- not necessarily completely over his

12  shoulder, but over a portion of his shoulder --

13     Q.   In addition to turning his torso to the left,

14  he turned his head to the left, too?

15     A.   Looking to move his head to the left.  And I'm

16  not sure if he was looking for us in the helicopter or

17  both.

18     Q.   Did you see him look up at that time?

19     A.   Not necessarily his head moving up, but I

20  couldn't tell you if his eyes were moving up, based on

21  the distance we were at.

22     Q.   Did you see his face at that time?

23     A.   Saw glimpses of it, because the lighting and

24  distance.  But I did see portions of his face -- like,

25  the left side -- sorry -- the left side of his face.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 66

1     Q.    When you saw the left side of his face, was it

2     kind of in profile, like you're seeing the left side of

3     his only?

4     A.    Generally, yes, the profile of it, the left

5     side.

6     Q.    At any the between when you first regained the

7     visual of Mr. Llamas again, to the north of River Road

8     and when the first shot was fired, could you ever see

9     enough of his face that you could see both of his eyes?

10    A.    I don't recall seeing both of his eyes or a

11    portion of it.

12    Q.    And then you've been describing how when you

13    first saw him after regaining the visual of him, his

14    hips and legs were oriented up the driveway still, to

15    the north or northeast, and he's kind of turning his

16    torso and shoulders and head to the left.

17         After you saw him turning his torso and

18    shoulders that way, did you ever see him then turn back

19    to face forward again, prior to the shots being -- the

20    first round of shots being fired?

21    A.    I don't recall his torso reorienting towards

22    the north.  His hips and his legs were, because he was

23    moving in that direction.  But you can only turn so far

24    to the left with the torso when the hips are driving in

25    another direction.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 67

1          But I don't recall him trying to reset and

2   almost position his entire body going north again.

3          Q.   So was he essentially still in that position

4   where his hips are facing forwards, but his torso, head,

5   and shoulders are turned to left when the first deputy's

6   shot was fired?

7          A.   Turned or turning to the left.

8          Q.   Okay.  But I guess part of what I'm asking,

9   too, is there was a single position.  So essentially

10  you're saying that when you regained a visual of

11  Mr. Llamas to the north, he is already in the process of

12  starting to turn to the left, and he's still in that

13  left turning motion when the first shots are fired;

14  correct?

15         A.   That's the best of my recollection, yes.

16         Q.   Okay.  And during that period between when you

17  first regained a visual of him and heard the first

18  deputy's shots fired, you never saw a gun held to his

19  own head during that time; correct?

20         A.   Correct.

21         Q.   And, in fact, you could tell that the gun was

22  not to his head at any point during that time; correct?

23         A.   Yes, that is correct.

24         Q.   When the first shot from a deputy was fired at

25  that time, could you tell which deputy it was who fired

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 68

1    that first shot, McGuire or Hubachek?

2        A.   My best estimate would have been

3    Sergeant Hubachek, because he was -- Deputy McGuire was

4    to my left and Sergeant Hubachek was to his left.

5        Q.   Okay.  And let me ask you about that.

6             So when you stepped out of your vehicle again,

7    just -- and then regained a visual of Mr. Llamas as he's

8    proceeding north on that property to the north of

9    River Road, what's the -- what are the positions of the

10   other deputies relative to you?  Are you basically kind

11   of a in a line, left to -- right to left, or describe

12   that for me, if you would?

13       A.   As I get out of my vehicle, they're more or

14   less oriented to the left of my left headlight, with --

15   in line with one another, almost not quite shoulder to

16   shoulder, but their shoulders are in line with one

17   another.

18             And Sergeant Hubachek is to the left as I'm

19   looking at them.  I'm looking at their backs now, and

20   Deputy McGuire is to his right.  And I positioned myself

21   to the right of Deputy McGuire, putting McGuire to my

22   left and Hubachek to his left.

23       Q.   Okay.  So after you positioned yourself to the

24   right of Deputy McGuire, the three of you are basically

25   in a line of the three of you, where you're on the

Page 69

1  right, and then to your left is McGuire, and to his left

2  is Hubachek; is that correct?

3      A.   Correct, sir.

4      Q.   And when the first shot was fired by one of

5  those deputies, were you already in that position in a

6  line there, where you're to the right of Deputy McGuire?

7      A.   I believe I was just getting to my -- for lack

8  of a better term -- position, to Deputy McGuire's right

9  when that shot -- when the shots began.

10     Q.   Okay.  But you could -- you still had a visual

11  of Mr. Llamas throughout that time, when you're moving

12  from behind the two officers to that position to the

13  right of Deputy McGuire?

14     A.   My truck was slightly to their right.  So as I

15  exited my vehicle, as we were discussing, I exited --

16  when I exited, they weren't necessarily obstructing my

17  view, because of my vehicle positioning versus their

18  positioning.  But to get to their right, I had to move

19  slightly right of them, because now we were standing in

20  front of -- essentially standing in front of my truck,

21  or at least the left portion of it.

22     Q.   Right.  I understand that.  I guess I'm just

23  asking whether during that time when you're getting into

24  that position to the right of Deputy McGuire, and that

25  sort of line we discussed, while you're moving into that

Page 70

1   position, are you maintaining visual contact of

2   Mr. Llamas throughout that time?

3       A.   Yes, sir.

4       Q.   And that's the same time as we discussed where

5   you're describing seeing the -- him pointing the gun in

6   various directions and turning his torso and shoulders

7   and head towards the left?

8       A.   Yes, sir.

9       Q.   And when the first shot was fired, how far away

10  was Mr. Llamas from where you and the other deputies

11  were?

12      A.   40 to 50 yards.

13      Q.   And when that first shot was fired, was

14  Mr. Llamas still kind of twisted in that left position

15  where his torso and shoulders and head are facing to the

16  left?

17      A.   That's what I saw; yes, sir.

18      Q.   If -- thinking about, like, the hands on a

19  clock, where if Mr. Llamas was facing the exact same

20  direction you were, such that his head -- the back of

21  his head was exposed to you, and that would be 12:00

22  o'clock, what position on the clock was his head angled

23  at when the first shot was fired?

24      A.   To the best of my recollection, it was probably

25  oriented towards 9:00, 10:00 o'clock.

Page 71

1      Q.   Okay.  So either directly to his left or
2   slightly forward, relative to that?
3      A.   Yes.
4      Q.   Okay.  At the time that first shot was fired,
5   did you know whether there were any people to
6   Mr. Llamas's left?
7      A.   When that first -- well, we had knowledge, that
8   we previously discussed, that there were residents at
9   that home.  And then once the subject was -- these
10   folks -- once the subject was down and we could expand
11   our visual acuity of the entire field in front of us,
12   you could see the folks outside their home.
13      Q.   So you saw them there after all the shots were
14   fired?
15      A.   That would be fair to say.
16      Q.   And I think you said earlier that there was a
17   period of approximately one hour from when you had first
18   heard that there were people seen there until the
19   shooting; is that accurate?
20      A.   I believe you're talking hour, hour and a half,
21   somewhere in there.
22      Q.   Hour, hour and a half?  Okay.
23           Did you -- during that interval of an hour or
24   an hour and a half when you got that information and
25   when the shooting occurred, did you gain any information

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 72

1    as to whether they were still on the property or had

2    left the property, those people?

3        A.   I did not have information either way, whether

4    they had left the property or whether they were still

5    present.

6        Q.   Or whether they had remained on the property,

7    but moved to a different location on the property?

8        A.   That's correct.

9        Q.   And I think you said that you thought that the

10   first shot was fired by Deputy Hubachek; is that

11   correct?

12       A.   Sergeant Hubachek, yes.  I believe he was the

13   first.

14       Q.   Excuse me.  Sergeant Hubachek.

15            And I think you said that that was because he

16   was opposite Deputy McGuire from you, and so was a

17   little further away.  Is that accurate?

18       A.   Based on the audio or the report of the rifle.

19       Q.   In other words, you formed that impression

20   because it sounded like -- the sounds of the rapport of

21   his rifle was a little further away than the rapport

22   would have been if it was coming from Deputy McGuire's

23   rifle?

24       A.   Yes, sir.

25       Q.   Okay.  Did you hear -- within a few seconds of

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 73

1    that first shot, did you hear Deputy McGuire begin to

2    fire, as well?

3        A.   Yes, sir.

4        Q.   Do you know whether he fired after

5    Sergeant Hubachek or whether there was an overlap

6    between Sergeant Hubachek's shots and Deputy McGuire's

7    first volley of shots?

8        A.   There possibly could have been a slight

9    overlap.  That's how fast Deputy McGuire began to engage

10   following what I thought was Sergeant Hubachek initially

11   engaging.

12       Q.   Okay.  And at some point, did you hear

13   Deputy McGuire fire a second volley of shots?

14       A.   I did.

15       Q.   So just focusing on the first volley, as

16   opposed to the second volley that Deputy McGuire fired,

17   could you tell how many shots total were fired in the

18   first volley, including both Sergeant Hubachek and

19   Deputy McGuire's shots?

20       A.   I would say, approximately three to five.

21       Q.   Okay.  So three to five total, combined,

22   between Sergeant Hubachek and Deputy McGuire in the

23   first volley of shots?

24       A.   Yes, sir.

25       Q.   And do you have an understanding, based on what

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 74

1  you heard and saw at that time, that both of those two

2  deputies were firing during the first volley?

3     A.   Yes.

4     Q.   In the ten seconds, let's say, prior to the

5  first volley of shots fired by Deputy McGuire and

6  Sergeant Hubachek, did you hear either of those deputies

7  issue any verbal commands to Mr. Llamas?

8     A.   I did not.

9     Q.   During that time, that ten seconds before the

10 first volley of shots was fired, did you hear either of

11 the deputies issue any verbal warning to Mr. Llamas that

12 they would shoot him?

13    A.   I did not.

14    Q.   Prior to that first volley of shots being

15 fired, had you ever seen Mr. Llamas point that gun at

16 any human, other than himself?

17    A.   Prior -- just prior to the shooting?

18    Q.   Prior to the first volley of shots.

19    A.   Just prior -- if we're talking just seconds

20 prior -- I'm not sure of the time frame we're speaking

21 of.

22    Q.   At any time in your life, prior to the first

23 volley of shots.

24    A.   Other than just prior to the shots, that was

25 the only time I had seen the firearm pointed in a

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 75

1  different direction, other than his head, that is.

2      Q.   Right.  I guess I'm asking -- my question is

3  just a little different, and maybe I asked it poorly.

4  I'm sorry, if I did.

5           I'm wondering whether prior to the moment you

6  heard the first deputy's shot being fired toward

7  Mr. Llamas, had you ever seen Mr. Llamas point that gun

8  at any human being?

9      A.   I had not.  Including law enforcement, I

10  assume, because we're humans, I had not.

11      Q.   Yes, definitely including law enforcement being

12  humans, unless have you some secret you're holding out

13  on me with.  I'll remind you you're under oath.

14      A.   No, sir.  I'm a human.

15      Q.   And prior to the -- excuse me -- prior to that

16  first volley of shots being fired, had you ever seen --

17  excuse me -- had you ever heard Mr. Llamas make any

18  verbal threats to anybody?

19      A.   I had not.

20      Q.   Prior to that first volley of shots being

21  fired, had you ever witnessed Mr. Llamas physically harm

22  any human, including officers?

23      A.   Only what we discussed earlier, where he was

24  maybe attempting to harm us by shooting towards us, but

25  the dog was in the line of fire, or it was his intent to

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 76

```
 1   just shoot the dog.  I don't know the answer to that
 2   question.
 3       Q.   When that earlier shot that you're describing
 4   was fired, was any human struck by it?
 5       A.   No humans were struck by it.
 6       Q.   So, yeah, my question is really limited to
 7   whether you had seen Mr. Llamas physically harm any
 8   human prior to the first volley of the deputies' shots
 9   being fired?
10       A.   No, sir.
11       Q.   Have you ever personally been on that property,
12   prior to entering the driveway area a few seconds before
13   the first volley of shots were fired?
14       A.   I had -- no, I had not.  I had not personally
15   been there.
16       Q.   When you first saw Mr. Llamas from that
17   position at the mouth of the driveway, while he's still
18   moving north, running north, as I think you said, and
19   starting to turn to the left -- I know you said it was a
20   fluid motion -- but at the point he's starting that
21   turn, do you think that it would have been appropriate
22   to shoot him at that time, just for running away?
23       A.   Just for running away?  Not necessarily.  Not
24   absolute, but not necessarily.  But the position of the
25   firearm, yes.
```

Page 77

1    Q.   I heard you give a couple caveats to the

2    "running away" part, and I just want to explore that a

3    little bit.

4         When you say "not necessarily," what do you

5    mean?  Is there -- I guess my question is based on the

6    information that you had at the time.  Did you feel, for

7    example, that you would have been justified in shooting

8    him the moment you first regained the visual at him and

9    he's running away, but starting to twist his torso to

10   the left?

11   A.   Yes.  I believe I -- if you're asking me, I

12   would have been justified, yes.

13   Q.   Based on the fact that he was running away?

14   A.   Not running -- not just running away.  There's

15   a little more -- there's a few more parts to that.  It's

16   the orientation of the firearm, and the residents that

17   were at 22240 River Road.

18   Q.   At the time you first saw him in that position,

19   what was the orientation of the firearm?

20   A.   It was in his right hand, not pointed toward

21   his head, and his legs and his hips are driving him to

22   the north.  Again, going back to your clock analogy,

23   he's rotating his torso to the left to 9:00 or 10:00

24   o'clock and the firearm is going with him.

25        And now the firearm is oriented or beginning to

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 78

1   orient towards the west, which that occupied structure

2   was to the west of him.

3       Q.   So you believe that you would have been

4   justified in shooting him at that moment, based on him

5   starting to orient the firearm towards his left?

6       A.   Yes, sir, potentially risking the lives of the

7   people that are occupying that dwelling are on their

8   porch.

9       Q.   If -- I'm going to give you a hypothetical

10  here.  Supposing that when you exited your vehicle at

11  the mouth of that driveway to the north of River Road

12  and you regained a visual of Mr. Llamas, he's still

13  moving north, like he was when you saw him, except his

14  torso is facing forward as well, such that his back is

15  to you and he's still holding the gun up to his head,

16  like you had seen him holding it when he was crossings

17  River Road.

18          Do you understand my hypothetical?

19      A.   I do, sir.

20      Q.   Okay.  Provided that that was the position he

21  had been in when you first saw him, would you believe

22  that you would have been justified in shooting him at

23  that time, based on him running away?

24          MR. RAMIREZ:  Objection.  Incomplete

25  hypothetical.  Lacks foundation.  Assumes facts not in

Page 79

1  evidence.

2         But you may respond, if you can.

3         THE WITNESS:  If he's running towards what I

4  have knowledge of is an occupied dwelling where there's

5  other people that he's potentially putting in grave

6  danger, based on distance, terrain, obstacles between him

7  and them, it could be a justified shooting; versus him

8  running into open space and we're at distance, and we

9  have cover, it may not be applicable under those

10 circumstances.

11        I bring in the third party as some of the --

12 not all, but some of the deciding factor.

13 BY MR. LEVINE:

14     Q.  Did you -- and I know you mentioned that you

15 had some information from an hour or an hour and a half

16 earlier that there was some other individuals on the

17 property, essentially to the left or the west of

18 Mr. Llamas's position when the first shots were fired;

19 is that correct?

20     A.  That's correct.

21     Q.  Did you also have any information that there

22 were any individuals on the property to his north?

23     A.  I didn't have information whether there were or

24 were not people to the north.

25     Q.  Okay.  So for all you knew, the only people on

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 80

1    the property, other than him, were possibly those two

2    who were to his west, assuming they were still on the

3    property and in that same location; correct?

4        A.   Correct.

5        Q.   Okay.  So I guess, you know, going back to my

6    hypothetical, he's got his -- he's located in the same

7    place, in terms of where his feet are, as he was when

8    you saw him, except again his back is to you, the gun is

9    to his head, he's still running northward or forward

10   along that driveway, which I guess you said was maybe a

11   bit more northeast than north.  You would believe that

12   you would have been justified if you had shot him at

13   that time, under those circumstances, based on him

14   running forward along the driveway?

15           MR. RAMIREZ:  Incomplete hypothetical.  Assumes

16   facts not in evidence.  Misstates the prior testimony of

17   the witness.

18           However, you may respond, if you can.

19           THE WITNESS:  Is the -- the hypothetical you're

20   proposing, is there a third-party residence involved?

21   BY MR. LEVINE:

22       Q.   The information that you have about

23   third-parties is the same as the information you had at

24   the time of this actual incident.  The only difference

25   in my hypothetical versus what you've testified to

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 81

1   already is the positioning of Mr. Llamas's body.

2       A.   It may be applicable and it may not be.  For

3   me, personally, I may not have sought lethal force as

4   the option at that very moment, based on my distance,

5   his posture, his orientation, and the available cover to

6   us, based on that change, where the firearm positioning

7   was.

8       Q.   And why do you think you would not have fired

9   under those circumstances, under my hypothetical?

10      A.   Believing that his attempt was just not to --

11  not necessarily to do harm to others, but it gives the

12  appearance that his attempt is just to flee.  But in the

13  actual circumstances, there was two intentions, in my

14  mind:  The intention to flee and the intention to maybe

15  do harm at the -- at the same time, in order to

16  facilitate his escape.

17      Q.   Okay.  So as I understand it, again, under my

18  hypothetical -- I realize that you're testifying that

19  you saw something different happen that day.  But under

20  my hypothetical, you're saying that if his only apparent

21  intention was to flee, as demonstrated by his back

22  remaining toward you and the gun remaining to his head

23  as he's running northward or northeastward, you would

24  not have felt it was appropriate to shoot under those

25  circumstances, based only on him fleeing?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 82

1          MR. RAMIREZ:  Objection.  Incomplete

2     hypothetical.  Lacks foundation.  Assumes facts not in

3     evidence.

4          (Reporter clarification.)

5          MR. RAMIREZ:  He may respond, if he can.

6          THE WITNESS:  I'm not saying I wouldn't

7     absolutely not deploy lethal force, but it -- again, it's

8     hard on the hypothetical if you're not smelling it,

9     tasting it, touching it, and feeling it all at the same

10    time at that time of day and seeing that may change my

11    course of action.  Not necessarily everybody else's, but

12    again, my course of action.

13         But I can't give you an absolute that I would

14    do this and I would not do that kind of thing, if that

15    makes sense?

16    BY MR. LEVINE:

17    **Q.   Do you think that, under my hypothetical, it**

18    **would be appropriate to shoot him for running away,**

19    **based on the knowledge you had at the time, including**

20    **having no information that there was anybody to his**

21    **north on that property?**

22         MR. RAMIREZ:  Same objections.

23         But you may respond.

24         THE WITNESS:  It could.  You could deploy

25    lethal force under some circum- -- depending on -- again,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 83

1  the pistol orientation is to his head.  But the slight

2  movement of the pistol, whether forward or backward of

3  his head, put people -- if they're to his west and he's

4  running to his north, and the pistol muzzle is pointed on

5  the right side of his head, which is in a westerly

6  direction, just a slight movement of the pistol could put

7  people in grave danger that are at that address of 22240.

8          And if I can see that or discern that occurring

9  or even understand that's likely to occur, based on

10  movement, then the application of lethal force could be

11  justified under those circumstances.

12  BY MR. LEVINE:

13      **Q.   Okay.  Let's assume that under my hypothetical**

14  **you cannot discern such movement, and it appears that**

15  **the muzzle of the pistol is remaining more or less fixed**

16  **at his -- the side of his head.  Does that change**

17  **anything in your response?**

18          MR. RAMIREZ:  Same objection.

19          But you may respond.

20          THE WITNESS:  I might pursue him -- physically

21  pursue him a little bit longer before -- but lethal force

22  is still an option that could be deployed, but I may

23  pursue him a little bit further.

24  BY MR. LEVINE:

25      **Q.   Under my hypothetical, do you think that you**

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 84

1   would have been justified in shooting Mr. Llamas at that

2   time, based on your belief that he had shot a police dog

3   earlier that day?

4           MR. RAMIREZ:  Same objections.

5           But you may respond, if you can.

6           THE WITNESS:  The police dog being shot doesn't

7   necessarily have any bearing on the application of my use

8   of force, but it does -- does lend to the fact that

9   there's also violent behavior, whether it's towards

10  animal or human, for that matter.  And the dog is

11  obviously a police dog with labeling on his dollar.

12          But it just shows -- for me, it illustrates

13  intention -- some intention by the subject.  So I

14  wouldn't necessarily say I would just dismiss the

15  information, but it wouldn't -- it would be part of my

16  decision.

17          But I'm going to still continue to pursue the

18  subject a little bit longer, based on what you describe

19  as the "orientation of the pistol."

20  BY MR. LEVINE:

21      Q.  You've received some training during your

22  career from the Riverside Police Department; correct?

23          MR. RAMIREZ:  Objection.  He doesn't work for

24  Riverside Police Department.

25  BY MR. LEVINE:

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 85

1       Q.   Excuse me.  From the Riverside Sheriff's
2   Department?

3       A.   Yes, sir.

4            MR. RAMIREZ:  They're two rivalries.  I want to
5   make sure we get it right.

6            MR. LEVINE:  I'm sorry.  I misspoke.

7   BY MR. LEVINE:

8       Q.   Based on your training and experience, is a
9   police dog or a canine considered a type of less lethal
10  weapon?

11      A.   It is.

12      Q.   Is a police dog or a canine considered
13  essentially a tool that deputies have at their disposal?

14      A.   It is considered a tool, yes.

15      Q.   Is a police dog or canine considered essential,
16  even though it's a dog, a type of physical property?

17      A.   It's property of the Sheriff's Department.  You
18  are correct.

19      Q.   Okay.  Did you fire your weapon at all during
20  this incident?

21      A.   I did not.

22      Q.   And when you saw, as you say, Mr. Llamas again,
23  after regaining a visual of him, and you saw him turning
24  to the left and manipulating his weapon in the same
25  direction, why did you not fire at that time?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 86

1          (Reporter clarification.)

2          MR. RAMIREZ:  Argumentative.

3          But you may respond.

4          THE WITNESS:  I chose not to fire my weapon

5   because I knew the two people, McGuire and

6   Sergeant Hubachek, were firing theirs.  And based on the

7   suspect's actions before and after he was struck with

8   gunfire, I could tell, for lack of a better term, that it

9   was being "handled."

10          It is a level of professionalism that we strive

11  upon in our team that if we don't need to deploy

12  additional lethal force by additional people, then we

13  restrain from doing such a thing.  And so the lethal

14  force that was -- and those guys were designated as

15  lethal cover from earlier on, but their application of it

16  was -- I felt, was all that was necessary, so it didn't

17  require my intervention.

18          I'm not saying it wouldn't have in the future,

19  if the conclusion had been slightly different, but at

20  that point, I didn't feel it was necessary.

21  BY MR. LEVINE:

22      **Q.   After the first volley of shots that the other**

23  **deputies fired, did Mr. Llamas go to the ground?**

24      A.   After which volley, sir?

25      **Q.   The first.**

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 87

1      A.   After the first, I do recall him laying on the
2   ground or falling down on the ground.
3      Q.   Was it your impression that one or more of the
4   shots fired in that first volley had struck him?
5      A.   Yes, sir.
6      Q.   Was that because he fell to the ground after
7   the first volley?
8      A.   Assuming, yes.
9      Q.   Could you tell at that time where on his body
10   he had been struck by those shots?
11      A.   I could not.
12      Q.   When he fell, which direction did he fall in?
13      A.   If I recall, he fell more or less on his right
14   side.
15      Q.   And what direction, you know, north, south,
16   east, west, did he fall in, in terms of where his body
17   landed?
18      A.   His head was more or less pointed in a
19   northwesterly direction when he fell.
20      Q.   Okay.  And how about his -- I'm sorry.  Were
21   you --
22      A.   A northwesterly direction.  And his torso, if
23   you can envision his chest, was more or less facing in a
24   south direct -- southern direction, towards us, or a
25   southwest direction.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 88

1    Q.   How about his legs or his feet?

2    A.   His feet, if I recall, were -- the bottom of

3  his feet were more or less pointed in a southeasterly

4  direction or more to the east.

5    Q.   Could you tell if his -- when he fell, was his

6  body sort of extended, or was he curled up to some

7  degree or twisted around or -- what position was his

8  body in, generally, as far as you could tell?

9    A.   Extended, but not -- maybe his knees slightly

10  bent.

11    Q.   When he went to the ground after that first

12  volley of shots, was he further away from you than he

13  had been when the first shot was fired?

14    A.   Probably a couple of feet, or, if not, a couple

15  of yards further.

16    Q.   And that would be further to the north or the

17  northeast?

18    A.   Yes, sir.

19    Q.   After the first volley of shots was fired, did

20  you hear another deputy say, "Hold, hold, hold"?

21    A.   I did hear someone yell, "Hold, hold, hold."

22    Q.   Did you know who that was at the time who said

23  that?

24    A.   I did not.

25    Q.   As you sit here today, do you know who that was

Page 89

1    that said that?

2        A.    I believe it was Sergeant Hubachek, I believe.

3        Q.    Did you hear that -- whoever it was, did you

4    hear that voice coming from somewhere to your left at

5    the time?

6        A.    Yes.

7        Q.    What did you understand that to mean at the

8    time, "Hold, hold, hold"?

9        A.    That potentially there was additional gunfire

10   going to erupt and we didn't want anybody running

11   forward of people that were potentially going to

12   reengage the suspect.

13       Q.    So "Hold, hold, hold," in your understanding,

14   was a reference to the deputies holding their respective

15   positions?

16       A.    Correct, sir.

17       Q.    Is that a communication or a type of statement

18   that you're trained on and that is covered in your

19   training that was how you understood it to mean that?

20       A.    Yes.

21       Q.    After the first volley was fired, within a few

22   seconds, did you say, "Shots fired" and "He's down"?

23       A.    I don't recall if that was after the first

24   volley or after the second volley.

25       Q.    So based on your recollection, it could have

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 90

1    been before or after the second volley?

2        A.   Yes.  I believe it was after the second volley,

3    but I can't be absolutely certain.

4        Q.   If I were to play you a short portion of your

5    body camera video, would that refresh your recollection

6    on whether it was before or after the second volley?

7        A.   Yes.

8        Q.   I'll do that.  Give me one moment here.  I'm

9    just going to share my screen.

10            Can you see my screen here?

11       A.   I can.

12       Q.   Do you see in the very bottom left corner that

13   it's labeled as:  "346 BWC shooting Llamas J, by

14   Lieutenant Walsh," and then some numbers?

15       A.   Yes.

16       Q.   And do you recognize this frame that it's

17   paused at, which the video indicates is at 11 minutes

18   and 16 seconds in the video file?

19       A.   Yes.

20       Q.   And do you see, also, that there's a time stamp

21   on the top right corner of the video dated April 14th,

22   2023, at 19:29:05 hours?

23       A.   I do.

24       Q.   Do you recognize this as a being a paused

25   version of your body-worn camera video?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 91

1      A.   It looks like it, yes.

2      Q.   Does this appear to be the same video that you

3   reviewed in preparation for this deposition?

4      A.   Yes, sir.

5      Q.   Okay.  And I'm just going to play a few seconds

6   of it to try to refresh your recollection on whether you

7   made that statement before or after the second volley of

8   shots.

9           (Video being played.)

10  BY MR. LEVINE:

11     Q.   All right.  I paused it there at 11:24 on the

12  video.

13          Does that refresh your recollection as to

14  whether you said, "Shots fired" and "He's down," before

15  the second volley of shots?

16     A.   Yes.

17     Q.   And what's your recollection, now that it's

18  been refreshed, as to whether you made that statement

19  before the second volley or after?

20     A.   It looked like that it was a radio transmission

21  to ensure that everybody that heard gunfire understands

22  it's law enforcement gunfire, primarily.  And it started

23  after the first volley, and the transmission continued

24  into the second volley.

25     Q.   Okay.  When said, "Shots fired" and "He's

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 92

1    down," what did you mean by that?

2        A.    The shots are fired by us, law enforcement; and

3    that "He's down" just simply means that he's down on the

4    ground, but not defeated.  And we often use that

5    terminology that "He's down."  It doesn't necessarily

6    mean that he's defeated or now no longer a threat.

7        Q.    Is there a separate terminology that you have

8    that you would have used to say that he's defeated or no

9    longer a threat instead of "down"?

10       A.    Sometimes it's just plain language, or an

11   example would be, "Suspect's in custody."

12       Q.    Okay.

13       A.    Or "The suspect is 10-7.)

14             (Reporter clarification.)

15   BY MR. LEVINE:

16       Q.    What does "10-7" refer to?

17       A.    "Out of service."

18       Q.    You would say in cust- -- someone's in custody

19   if they're shot and defeated on the ground, even if

20   you're still approximately 40 to 50 yards away from them

21   and haven't advanced to their position yet?

22       A.    I would -- repeat that again, sir?  I'm sorry.

23       Q.    Well, I think you said that, you know, if the

24   suspect was defeated as opposed to down, one of the

25   terms you might use in that circumstance is to say that

Page 93

1    "The suspect is in custody"?

2        A.    Yes.

3        Q.    And so I guess I'm wondering, are you saying

4    that that's a term that you would use if you knew that

5    the suspect had been defeated, even while you're still

6    at a comparable distance to what you were here, 40 to 50

7    yards?

8        A.    It would be a term we'd use, but it wouldn't be

9    likely, under these circumstances because, as you

10   described, the distance we're at, so -- plus the subject

11   appeared to be still moving around.

12       Q.    When -- well, let me ask you about that.  When

13   you say he was moving to the ground, was he covering

14   some distance at that time between the first and second

15   volleys of shots?

16       A.    Not covering distance, no.

17       Q.    But was he, like, rolling over or something

18   like that?

19       A.    Moving around, still in possession of the

20   firearm.  Looked like manipulating the firearm.

21       Q.    Was he crawling in some direction at that time?

22       A.    I didn't necessarily see him crawling.

23       Q.    Okay.  When -- and I think you said that at the

24   time the first volley of shots was fired, you could see

25   the gun coming with him to the left as he's twisting to

Page 94

1   the left.  Was that correct?

2       A.   As the first volley is -- prior to the first

3   volley?

4       Q.   Yeah.  Immediately prior to the first volley

5   and when the first volley started.

6       A.   Yes.  Torso turning to the left, gun turning

7   towards the left, or to the west.

8       Q.   And then while he's falling to the ground,

9   could you still see the gun?

10      A.   I can still see the gun in his hand, yes.

11      Q.   And is the gun still sort of pointed in a

12  westerly direction while he's falling to the ground?

13      A.   While falling to the ground?  I can't

14  necessarily give you those details for that short period

15  of time of the fall, but I could tell you where it was

16  oriented once he was on the ground.

17      Q.   So you could see the gun while he's falling,

18  but you just couldn't see what direction it was pointed

19  in while he's falling?

20      A.   Correct.

21      Q.   Okay.  And then immediately after he landed on

22  the ground, could you still see the gun?

23      A.   I could still see the gun.

24      Q.   Did you lose a visual of the gun at any time

25  from when he started falling to the ground till when you

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 95

1    saw him again on the ground?

2        A.    I did not lose visual of the gun, maybe just

3    the orientation where the gun was when he fell.

4        Q.    In other words, there wasn't any part of his

5    body that passed between you and the gun, to kind of

6    block your view of it at any time during that sequence?

7        A.    Not that I recall.

8        Q.    When he landed on the ground immediately after

9    falling, how was the gun positioned?

10        A.    The gun was positioned in his right hand, and

11    it looks like now it was oriented the towards the south,

12    towards us.

13        Q.    Okay.  And that was something that you could

14    see yourself from where you were positioned?

15        A.    Yes.

16        Q.    Were you looking through any type of scope or

17    magnification device at that time?

18        A.    I did at one point, but I don't recall if it

19    was actually at that moment that I looked through the

20    optic.

21        Q.    Do you recall looking through your optics at

22    any time while shots are being fired that day by

23    deputies?

24        A.    I don't.  I brought my rifle to bear, but I

25    don't ever think I looked through the optic because the

Page 96

1    first volley had concluded.

2        Q.    So you're saying that you were able to see with

3    your naked eye, from where you were at the time you fell

4    to the ground, that his handgun was pointed to the south

5    towards you?

6        A.    Yes.  There were no obstructions generally

7    between us and him.

8        Q.    But you didn't fire at that time either?

9        A.    I did not fire.

10        Q.    When the second volley of shots was fired,

11    could you tell which officer -- which deputy or deputies

12    was firing those shots?

13        A.    I believe it was coming from Deputy McGuire

14    and, again, the rapport of the rifle, because he was to

15    my left, and then I could see his rifle recoiling.

16        Q.    And do you know how many shots were fired in

17    that second volley?

18        A.    Three to four.  Two to -- I'm sorry -- two to

19    four, maybe.

20        Q.    Do you know how much time passed between the

21    last shot of the first volley and the first shot of the

22    second volley?

23        A.    Less than ten -- oh, if I had to guess, about

24    five seconds, give or take, up to ten.

25        Q.    Were you standing in the same position that you

Page 97

1    were in when the second volley of shots was fired as

2    when the first volley was fired?

3        A.    Generally.  I believe we moved up a couple of

4    feet, to the north, that is.

5        Q.    When the second volley of shots was being

6    fired, could you see Mr. Llamas's face?

7        A.    During the second volley?

8        Q.    Yes.

9        A.    I don't recall necessarily seeing -- I could

10   see his face, but I couldn't tell you what his face -- I

11   couldn't make out facial details or anything like that.

12       Q.    Could you tell what direction his face was

13   facing at the time the second volley of shots started?

14       A.    It looks like towards the south, south --

15   southerly direction or southwest direction.

16       Q.    Same direction as his gun?

17       A.    General direction, yes.

18       Q.    While the second volley of shots was being

19   fired, after you had said, "Shots fired and "He's down,"

20   did you say "Jimmie"?

21       A.    I think I said "Jimmie," I believe.

22       Q.    What was your intention in saying that at the

23   time?

24       A.    It was just getting their attention to let them

25   know our next tactical move was going to be to advance

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 98

1  on him if it was necessary to ensure that we didn't --

2  we didn't -- some hostage rescue didn't precipitate at

3  that address we addressed, the 22240.

4      Q.   And just clarify, "Jimmie" refers to "Deputy

5  Jimmie McGuire"?

6      A.   Correct, sir.

7      Q.   When you said "Jimmie" there, was it because

8  you weren't sure why Deputy McGuire was firing his

9  weapon?

10     A.   No, sir.

11     Q.   Was it because you were kind of cautioning him

12  to stop shooting?

13     A.   No, sir.

14     Q.   Did you ever discuss this time where you said

15  "Jimmie" with Deputy McGuire after the incident?

16     A.   I'm sorry, what's the question -- what was your

17  question, sir?

18     Q.   So there was this moment during the second

19  volley of shots where you said "Jimmie"; right?  That

20  we've been discussing?

21     A.   Yes.

22     Q.   Did you ever discuss that with Deputy McGuire

23  after the incident, you having said that?

24     A.   No, sir.

25     Q.   Did you ever read any statement or testimony

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 99

1    that Deputy McGuire gave or heard him say anything to

2    indicate that he thought you were kind of essentially

3    saying, "Why are you still shooting?" when you said,

4    that?  That that's what he understood you to mean?

5        A.   No, sir.

6        Q.   Had you and Deputy McGuire been working

7    together for a long time prior to this incident?

8            MR. RAMIREZ:  Vague and ambiguous as to the

9    term "long time."

10           But you may respond.

11           THE WITNESS:  Yes, since he, more or less, came

12   on the SWAT team.

13           MR. LEVINE:  And I think your attorney was

14   right that that was a vague question.

15   BY MR. LEVINE:

16       Q.   How long, approximately, had you been working

17   together by that point?

18       A.   Year and a half, maybe.

19       Q.   Okay.  Had you had a lot of operations together

20   out in the field where you're communicating with one

21   another verbally?

22       A.   Yes.

23       Q.   And based on that experience that you had

24   together, did you feel like you could understand what he

25   meant when he said certain things to you, based on the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 100

1    intonation or tone in his voice?

2        A.    Yes.

3        Q.    And did you have the impression that he felt

4    the same way about you?

5        A.    Yes.

6              MR. RAMIREZ:  May call for speculation.

7              But you may respond.

8              THE WITNESS:  Yes.

9    BY MR. LEVINE:

10       Q.    Before the first and second volleys of shots

11   being fired, did you hear Deputies McGuire or Hubachek

12   issue any verbal commands?

13       A.    I did not.

14       Q.    During that time, did you hear them issue any

15   verbal warnings that they were going to shoot?

16       A.    No, sir.

17             MR. LEVINE:  I think it might be a good time

18   for our next break, and I think this might be the last

19   one, at least for me.  I don't have a ton left, but I've

20   got a little bit, and I just want to go over my notes.

21             So would another ten minutes be good for

22   everybody?

23             MR. RAMIREZ:  That's fine.

24             MR. MARKS:  Sure.

25             MR. LEVINE:  Sounds good.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 101

1              (Break taken.)

2    BY MR. LEVINE:

3        Q.   I may have asked you this before the break, but

4    I'm not sure, so I'm sure your attorney will let me know

5    if I did.

6              But when the second round of shots was fired,

7    why did you not fire at that time?

8        A.   The second -- again, going back to what we

9    trained often as a team, and trying to keep the

10   designated shooters -- just that, as the designated

11   shooters, should they have to use lethal force, that is,

12   I felt like if there needed to be a second volley, or

13   even a third or forth subsequent volley, that they would

14   do that.

15       Q.   So you didn't feel that it was necessary for

16   you to shoot at the time?

17       A.   I didn't feel my intervention was necessary,

18   unless this gunfight turned into some protracted

19   incident where it got longer and I needed to engage at

20   that point.

21       Q.   And when you say "gunfight," did you have any

22   understanding as to whether Llamas fired his gun at any

23   time during this part of the incident while the deputies

24   are firing their shots, or immediately before or after?

25       A.   Not to my knowledge.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 102

1      Q.   Did you ever form any impression that

2  Mr. Llamas had fired his weapon at any time while on

3  that driveway to the north of River Road?

4      A.   Not that I'm aware of.

5      Q.   Did you ever learn afterwards that he had fired

6  his weapon at any point during that time?

7      A.   I never actively pursued the information, but I

8  believe that he never fired it.

9      Q.   Okay.  Was there -- when -- from the time that

10  you and Deputies Hubachek and McGuire are taking the

11  position on River Road, to the west of those two

12  driveways we discussed earlier, from around that period

13  until the time of the shooting itself, did the three of

14  you ever discuss any kind of tactical plan for how to

15  approach Mr. Llamas, and what to do if he ever took the

16  gun away from his head, or pointed it in a particular

17  direction?  Anything like that?

18      A.   The only tactical -- a lot of these things come

19  down to training with high-risk suspects, so a lot of

20  this is already predesignated, in some respect.  But

21  what's not predesignated is establishing who is going to

22  provide lethal force if it becomes necessary; and we

23  want to make sure we make those designations very clear.

24      Q.   During that time that I just asked about, did

25  any of the three of you have any discussion regarding

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 103

1    the fact that there were possibly occupants on the

2    property at that time, potentially in some position to

3    the west of where Mr. Llamas ultimately fell down and

4    was shot?

5        A.   You mean during the time we were on the road,

6    itself, on River Road?

7        Q.   **Yes, or immediately before or after.**

8        A.   After -- before or after the shots were fired?

9        Q.   **Before or after, while you were positioned on**

10   **the road there to the west, watching Mr. Llamas cross**

11   **the road to the north?**

12       A.   I don't recall any of the discussion talking

13   about the -- in detail, the actual residents being

14   inside a home over there.

15       Q.   **And I guess I remember you saying earlier that**

16   **maybe an hour or an hour and a half before the shooting,**

17   **you had received some information from a deputy, you**

18   **couldn't remember who, that he believed there were a**

19   **couple of occupants in a structure that was essentially**

20   **to the west of where Mr. Llamas ended up; correct?**

21       A.   Correct.

22       Q.   **And I guess I'm wondering, was there ever any**

23   **discussion by or among the three of you, yourself and**

24   **deputies Hubachek and McGuire, regarding those residents**

25   **and any time thereafter, before the shots were fired?**

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 104

1    A.   I don't recall a conversation related to that

2   in that moment on the street.  But I did allude to,

3   earlier that day, Deputy McGuire might have been the one

4   who gave me the information of the occupants being home

5   about an hour, hour and a half earlier.

6    Q.   Okay.  But there wasn't, for example, any

7   conversation or discussion as Mr. Llamas is proceeding

8   north, either crossing River Road or going on to the

9   property at 22240, where any of you said anything like,

10   "Oh, well, we've got to watch out because there might be

11   two occupants on that property," or anything like that?

12    A.   Not at that moment, other than after the shots

13   were fired.

14    Q.   And there wasn't -- before any of the shots

15   were fired -- any discussion of, "Given that there are

16   these occupants who were seen on the property an hour or

17   an hour and a half ago, if Mr. Llamas turns left or

18   points the gun to the west, we've got to shoot him or do

19   anything in particular in response to that, because it

20   might be threatening some occupants of the property"?

21    A.   I don't recall us having that conversation just

22   prior to.

23    Q.   Okay.  Would you say that you had, in the 30 to

24   45 minutes before the shots were fired, any kind of --

25   anything that you would consider to be a tactical

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 105

1   discussion with the other deputies pertaining to these

2   potential occupants on the property?

3       A.   We had a tactical discussion 30 to 45 minutes,

4   even an hour, about setting containment, and then we

5   always know from our experience that breaking any -- any

6   time suspect breaks containment lines, that now they're

7   dealing with dwellings that are potentially occupied or

8   inhabited, hadn't been evacuated.

9           So that is -- again, that's a thing we train

10  and train often, is that we try to keep them within our

11  containment lines because of the risk once they're

12  outside containment.

13      Q.   But this particular property or the suspected

14  occupants of that property were not part of that

15  discussion; correct?

16      A.   No.   Not except for that 60 minutes to 90

17  minutes earlier where it was discussed that people would

18  be on the property -- or were.

19      Q.   Okay.   I just have a few questions sort of

20  about your training that I'll shift you away from this

21  particular incident itself.

22          We talked a little bit earlier about how you

23  went to the police academy.   I take it you received

24  training in the academy?

25      A.   Yes, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 106

```
 1        Q.   And then did you receive additional training

 2   after graduating from the academy, while you were at the

 3   Riverside Sheriff's Department as a sworn deputy?

 4        A.   I did.

 5        Q.   Did that include field training?

 6        A.   It did.

 7        Q.   Did you have a field training officer assigned

 8   to you for a period of time?

 9        A.   Several, I did.

10        Q.   For how long of a period of time was it that

11   you had field training officers assigned to you?

12        A.   About 12 to 13 weeks.

13        Q.   And then did you continue to receive additional

14   training from the Riverside Sheriff's Department after

15   completing your field training with the assigned field

16   training officers?

17        A.   Yes.

18        Q.   And was that continued training essentially

19   ongoing throughout your career at the Riverside

20   Sheriff's Department?

21        A.   Yes, sir.

22        Q.   Between all that training that we've just

23   discussed, did you receive training from the Riverside

24   Sheriff's Department on the use of deadly force?

25        A.   Yes.
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 107

```
 1        Q.   Were you trained that deadly force is the

 2   highest level of force that officers can use or

 3   deputies?

 4        A.   Yes, sir.

 5        Q.   Were you trained that deadly force can only be

 6   used to defend against an imminent or immediate threat

 7   of death or serious bodily harm?

 8        A.   Yes -- generally, yes, for law enforcement and

 9   innocent people.

10        Q.   Is that what you meant by "generally"?

11        A.   Yes, human life.  Human life.

12        Q.   Were you trained that deputies are responsible

13   to justify each shot they fire when using deadly force?

14        A.   Yes.

15        Q.   Were you trained that deputies need to assess,

16   as best they can in between shots or volleys, the need

17   for continued force?

18        A.   Yes.

19             MR. RAMIREZ:  Object as vague and ambiguous,

20   the term "assess."

21             But you may respond.

22             THE WITNESS:  Yes.

23   BY MR. LEVINE:

24        Q.   Were you trained that deputies are required to

25   issue a verbal warning prior to using deadly force, if
```

Page 108

1    feasible?

2        A.   If feasible and prudent, yes.

3        Q.   Is "prudent" separate from "feasible," in your

4    mind?

5        A.   No, sir, a little more detail.

6        Q.   Are those kind of two synonyms, as far as you

7    think of them?

8        A.   Yes.

9        Q.   Okay.  Were you -- was part of your training

10   that -- or -- the reason or at least the main reason for

11   why deputies should issue a verbal warning before

12   shooting, is to give the suspect or subject a final

13   opportunity to comply before deadly force is used

14   against them?

15           MR. RAMIREZ:  Object to the term "final

16   opportunity."

17           But if you understand, you may respond.

18           THE WITNESS:  If feasible -- if feasible, yes,

19   they -- in the hopes of surrender, a peaceful surrender.

20   BY MR. LEVINE:

21       Q.   Were you trained that where a warning is given,

22   prior to using deadly force, the subject or suspect

23   should be given an opportunity to comply with that

24   warning before deadly force is used, if feasible?

25       A.   If feasible, yes.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 109

1      Q.   Were you trained that it is justifiable to use

2   deadly force against somebody just for having a gun in

3   their hand, based on that fact alone?

4           MR. RAMIREZ:  Objection.  Incomplete

5   hypothetical.  Lacks foundation.  Assumes facts not in

6   evidence.

7           But you may respond, if you can.

8           THE WITNESS:  Based on a lot of circumstances.

9   You can be in a 10 by 15 room with a subject with a

10  firearm and you're in grave danger.  You could be in open

11  space or 100 yards away with a subject with a firearm in

12  his hand and it might be a different set of

13  circumstances.

14  BY MR. LEVINE:

15      Q.   So you were trained that there are some

16  circumstances where, based only the fact of a subject

17  holding a gun in their hand alone, you can shoot them?

18          MR. RAMIREZ:  Incomplete hypothetical.

19  Misstates his testimony.  Lacks foundation.

20          But you may respond, if you can.

21          THE WITNESS:  The environment that's occurring

22  in is crucial to that decision.

23  BY MR. LEVINE:

24      Q.   Right.  I understand that there -- you know,

25  there might often be other factors in play and various

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 110

1    situations.  I'm just asking about your training and

2    whether you were ever trained that if you see someone

3    with a gun in their hand, go ahead and shoot them,

4    that's enough?

5        A.   Not necessarily.

6        Q.   And you say "Not necessarily," you mean there

7    would need to be more than that?

8        A.   The totality of circumstances, more than just

9    possessing a firearm.  Possessing a firearm, again, at

10   100 yards in an open space, it might not warrant lethal

11   force yet.

12       Q.   Okay.

13       A.   Might not.  It's hard to get away from the

14   details surrounding someone in mere possession.  There's

15   always more to it than that.

16       Q.   And so given that there are more details, you

17   were not trained that just this one thing, without any

18   other details being present or given to you is enough to

19   shoot standing alone; correct?  You were not trained

20   that?

21       A.   We're not trained that.  Totality of the

22   circumstances is what we're trained.  All details.

23       Q.   And then similarly, I -- were you trained that

24   if you have somebody who's holding a gun to their own

25   head, that fact alone is enough to shoot them?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 111

1          MR. RAMIREZ:  Incomplete hypothetical.  Lacks

2    foundation.  Assumes facts not in evidence.

3          But you may respond, if you can.

4          THE WITNESS:  That's situational dependent.  If

5    the subject's holding a firearm to his head in a 10 by 15

6    room and you just walked into it, because you had to do a

7    rescue of some sort, or someone 100 yards away from you

8    in an open space with a firearm and you have cover

9    between you and the subject.  Again, different set of

10   circumstances.

11   BY MR. LEVINE:

12       Q.   So where you trained there are some

13   circumstances where, depending how close you are to

14   them, if they've got a gun to their own head, you can go

15   ahead and fire?  Is that what you're --

16          (Simultaneous speakers.)

17          (Reporter clarification.)

18       A.   There are circumstances based on distance,

19   proximity, third-party presence, that it may warrant

20   lethal force.

21       Q.   Right.  And you know, I'm not -- we're not --

22   I'm not talking about any third parties being present

23   here.  I'm just asking whether you were trained that,

24   based on that fact standing alone, without anything else

25   going on, that you can shoot somebody for holding a gun

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 112

1   to their own head?

2       A.    Not necessarily.

3       Q.    Okay.  So that wasn't training that you were

4   provided?  No trainer ever said to you, "Deputy Walsh,

5   if you see someone holding a gun to their head and

6   that's all you got, go ahead and shoot them"?

7       A.    You're correct, sir.  No trainer did that.

8       Q.    Okay.  And then have you -- you received

9   training regarding tactics, as well?

10      A.    Yes, sir.

11      Q.    Did that include training on communication with

12  other deputies during operations?

13      A.    Yes.

14      Q.    And did it include training on the use of cover

15  and concealment, as well?

16      A.    Yes.

17      Q.    Is part of that training to take cover, if you

18  can, if someone poses a potential deadly threat toward

19  you?

20          MR. RAMIREZ:  Objection.  Incomplete

21  hypothetical lacks foundation.  Assumes facts not in

22  evidence.

23          But you may respond, if you can.

24          THE WITNESS:  Depending on the circumstances

25  and the availability of cover and it's proximity to you.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 113

1  BY MR. LEVINE:

2     Q.   I guess I'm just more generally wondering were

3  you trained on using cover, when possible, if you're

4  faced with a deadly threat?  Was that a subject of your

5  training?

6          MR. RAMIREZ:  Same objection.

7          But you may respond.

8          THE WITNESS:  If you can sir, yes.

9  BY MR. LEVINE:

10    Q.   Okay.  So you were trained that if you can use

11  cover when faced with a deadly threat, you should use

12  cover?  Is that what you're saying?

13    A.   If you can, and if it's feasible.

14    Q.   Did -- at the time of the -- well, I'll scratch

15  that.

16          MR. LEVINE:  I think that's all I have for

17  right now, in terms of my question.

18          And I will turn it over to Larry, in case Larry

19  has any questions for you.

20          MR. MARKS:  I have a few.

21                    EXAMINATION

22  BY MR. MARKS:

23    Q.   First of all, good afternoon.  I just have a

24  couple questions to follow-up with you.

25          I think you said earlier that there was a

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 114

1  tactical discussion with the other deputies; is that

2  right?

3      A.   There was a tactical briefing before the whole

4  incident actually evolved.

5      Q.   How long prior to the shooting did that

6  tactical briefing take place?

7      A.   There was a briefing before we even ever

8  stepped foot on the property; and that was probably two

9  hours, maybe two and a half hours prior to actually

10  entering the property and beginning to clear some of the

11  structures and brush.

12      Q.   Who do you recall participating in that

13  briefing?

14      A.   Sergeant Hubachek, Sergeant McFadden, Deputy

15  Devine, Deputy McGuire, and there were a few other

16  deputies that were also there.

17      Q.   What do you recall being discussed at that

18  meeting?

19      A.   Discussing that the probability the suspect was

20  contained within our large parcel, and then the tactics

21  going to be employed to clear the large parcel.

22      Q.   What specifically was discussed about clearing

23  the large parcel?

24      A.   How we were going to move from more or less

25  from the west to the east, based on wind direction.  How

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 115

1    we were going to deal with the structures.  What

2    technology was going to be employed.  The positioning of

3    BearCats, based on terrain -- BearCats being armored

4    vehicles -- based on terrain, how far the BearCat can go

5    and where it can't go, and what personnel were going to

6    be used for what specific tasking.

7        Q.   With respect to that last topics, which

8    personnel were be going to be used for which specific

9    tasking, what was discussed in that regard?

10       A.   Who was driving the BearCat.  Who would be

11   operating the technology.  Who was going to protect --

12   primarily protect the dog handler as he deployed his

13   dog, and if we encountered a structure and the entry

14   into the structure, who was attempting to pre-designate

15   who were going to be the entry personnel, and then who

16   was going to be redeployed to assist with containment.

17       Q.   Were you taking a lead role in those tactical

18   discussions?  In other words, were you the one handing

19   out assignments?

20       A.   I wasn't necessarily handing out the

21   assignments, but I was a lead role, in the fact that the

22   leadership discussed it together.  But briefing was

23   provided by Sergeant McFadden.

24       Q.   Where were you when this tactical discussion

25   took place or this tactical briefing?

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 116

1    A.   We were actually off the property, the large

2    parcel, to -- just to the west.  And the first thing we

3    encountered was just a structure that was boarded up

4    that was potentially containing people, but it turned

5    out it was empty.  And it was actually sealed shut so we

6    couldn't get into it anyway.

7         But that's where it started, the west side of

8    that parcel.

9    Q.   Was there another discussion or briefing

10   relative to tactics prior to the shooting, other than

11   what you just discussed?

12   A.   After the dog was shot, but prior to the

13   deputy-involved shooting, it was a redeployment of

14   resources to ensure that the northern containment what

15   robust enough to keep the subject contained, because

16   that's where he was fleeing, running, and seen with a

17   firearm.

18   Q.   And was there any discussion with respect to

19   the deputies about who, if anybody, would be responsible

20   for the use of deadly force, or would it be any deputy

21   or any officer who believed there was a justification or

22   a need for deadly force would -- would use deadly force?

23   A.   The only discussion that was specific to those

24   designated roles -- and, again, when I say "designated,"

25   it doesn't mean that's not subject to change -- but

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 117

 1    those designated roles was when we actually got onto

 2    River Road.  There was a designation there.

 3            Now, that was just from my position the

 4    designation took place.  But you also had deputies and

 5    personnel to the east of the driveway where the subject

 6    appeared from, and what their designations were there, I

 7    don't know.

 8        Q.    Okay.  So let's talk about you and your group.

 9    That was -- who was part of your group when you -- when

10    you decided about the designations at that time?

11        A.    Deputy McGuire and Sergeant Hubachek.

12        Q.    And who made the decision as to the

13    designations for the three of you?

14        A.    I did.

15        Q.    What were the specific designations between the

16    three of you?

17        A.    That they were responsible for lethal coverage,

18    Sergeant Hubachek and Deputy McGuire, and I would take

19    more -- take an active role in leading the group, and

20    then if -- deploying less lethal, if necessary, and

21    providing verbal commands to the subject.

22        Q.    When you say "less lethal," at the time that

23    the shots were fired, you were holding lethal weapon;

24    correct?

25        A.    Sure was.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 118

1    Q.    Was there ever a time you were holding a less

2    lethal weapon?

3    A.    It was in my vehicle, and I had less lethal on

4    my person.

5    Q.    And when you say that the designation was for

6    lethal cover, what does that mean?

7    A.    So if lethal force needed to be used or it

8    became necessary, the ones that are designated or -- and

9    they're in a position to do so, they're the ones that

10    would apply it as the designated folks for that

11    assignment, for that task.

12    Q.    If there was only three of you there, why would

13    you designate lethal cover to two of them and not keep

14    lethal cover for yourself, as well?

15    A.    I can use them to protect myself based on my

16    positioning.

17    Q.    Okay.  At the time of the initial volley of

18    shots, the three of you were essentially lined up

19    together; correct?

20    A.    Yes.

21    Q.    Fair to say that not one of you had a better

22    view of Mr. Llamas at the time of the first volley of

23    shots?

24    A.    I would say that Sergeant Hubachek and Deputy

25    McGuire probably had the better view because they were

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 119

1   out on foot before I actually got out of my car.  So

2   they were seeing the subject before I could see the

3   subject.

4       Q.   Fair to say that despite the designation of the

5   other two deputies having lethal cover, if you felt that

6   lethal force was necessary, you certainly would have

7   used lethal force?

8       A.   If I was -- if I felt, one, it was necessary

9   and, two, that they weren't accomplishing what was

10  necessary, then I would have intervened at that point.

11      Q.   Would you have waited to find out if they were

12  going to use lethal force before you decided to use it?

13  You just wait for that to happen?

14          MR. RAMIREZ:  Assumes facts not in evidence.

15          But you may answer.

16          THE WITNESS:  No.  And working with them and

17  training with them very often, often, I knew what they

18  were capable of and I knew what their thresholds were.

19  BY MR. MARKS:

20      Q.   In other words -- and this is a hypothetical --

21  I want you to assume the three of you are lined up

22  essentially together and you saw a suspect turn and aim

23  a gun at the three of you, and the other two deputies

24  didn't fire.  You certainly would have; correct?

25      A.   If they had not returned fire, yes.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 120

1        Q.   And how long would you have waited to find out

2    if they were going to actually use lethal force before

3    you, yourself, did?

4             MR. RAMIREZ:  Calls for speculation.  Lacks

5    foundation.  Assumes facts not in evidence.

6             But you may respond.

7             THE WITNESS:  Not very long, sir.

8    BY MR. MARKS:

9        Q.   I wouldn't think so.

10            The first volley of shots, can you tell me how

11   many shots in total there were?

12       A.   In that first volley, total, again I believe it

13   was anywhere from three to five.

14       Q.   Do you know how many of those three to five

15   actually his Mr. Llamas?

16       A.   I do not.

17       Q.   Do you know where on Mr. Llamas's body any of

18   those shots hit?

19       A.   After making contact with him?

20       Q.   At any time, whenever you might have learned?

21       A.   After making contact, I could see what I

22   believed were two impacts, but there could be exit --

23   they could be exits at the same time.

24       Q.   Where were the -- where do you believe -- after

25   leaving the scene, where do you believe that the first

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 121

1    volley of shots struck Mr. Llamas?

2        A.   One was towards his hip or his buttocks, and

3    one was, I believe, in his -- just below his nose.

4    Somewhere in his face.

5        Q.   **You believe that the first volley of shots hit**

6    **him in the face?**

7        A.   Based on the way he was moving after the first

8    volley, I would -- deductive reasoning says no, he was

9    not hit in the face after the first volley.

10       Q.   **Okay.  So you think that the first volley would**

11   **have only hit him in the hip or butt?**

12       A.   That's my belief, yes.

13       Q.   **Okay.  And I guess I want to understand what**

14   **you mean by "the hip or the butt."  Are you saying it**

15   **would be somewhere forward on the front side of his**

16   **body, the side of his body, or the back part of his**

17   **body?**

18       A.   Kind of like a portion of the side and back,

19   not necessarily the front.  But again, it could have

20   been an exit and I just didn't locate the entrance.

21       Q.   **And I think you said that you saw Mr. Llamas go**

22   **down to the ground after the first round of shots?**

23       A.   Yes, sir.

24       Q.   **And you were able to continue to see Mr. Llamas**

25   **holding his gun after the first volley of shots?**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 122

```
 1      A.   Yes.

 2      Q.   You never lost sight of him holding his gun;

 3   correct?

 4      A.   I did not.

 5      Q.   Did you ever ask either Deputy Hubachek or

 6   Deputy McGuire why they shot?

 7      A.   I did not ask them at all why they shot.

 8      Q.   At any time before the deputies shot at

 9   Mr. Llamas for the first time, did you think about

10   shooting?

11      A.   Prior to them shooting?

12      Q.   Correct.

13      A.   It did -- it did cross my mind.  Yes, sir.

14      Q.   How long before the other deputies fired did

15   you think about shooting?

16      A.   Well, if you recall from the body cam, as I

17   stepped out of the vehicle and I moved towards the front

18   of my car is right around the time that they engaged

19   with the first volley of gunfire.  So it happened fairly

20   quick that -- their engagement -- as I gained a visual

21   acquisition of the subject for the second time after he

22   crossed the road.

23      Q.   Now, I think earlier when Mr. Levine asked you

24   questions, you said that at the time of the first volley

25   of shots, Mr. Llamas's head, if we're assuming --
```

Page 123

1    looking at a clock and 12:00 o'clock would be looking

2    straight ahead, I think you said that his head was aimed

3    more towards about 9:00 or 10:00 o'clock, for the first

4    volley?

5        A.   Is this while he's -- so 12:00 o'clock being

6    north?

7        Q.   Correct.

8        A.   And so -- and are you speaking when he fell to

9    the ground?

10       Q.   No.  I'm talking about a millisecond before the

11   first shots were fired.  I think you said -- and you can

12   correct me if I'm wrong -- that immediately before the

13   first volley of shots, Mr. Llamas's head was looking in

14   the direction of, say, 9:00 or 10:00 o'clock?

15       A.   Yes, sir.

16       Q.   And at that moment where his head was looking

17   at between 9:00 and 10:00 o'clock, could you see any

18   portion of Mr. Llamas's chest, or could you only see his

19   back?

20       A.   I could see more or less his -- maybe a profile

21   of his chest or his torso, where you're capturing, like,

22   his left shoulder, a portion of his back, and maybe just

23   a portion of his chest.

24       Q.   So in other words, you would see, essentially,

25   his left shoulder?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 124

```
1       A.   Left shoulder.
2       Q.   Assuming that he was not wearing a shirt, fair
3   to say you would not be able to see either of his
4   nipples?
5       A.   Fair to say.
6       Q.   And at that time immediately prior to the first
7   volley of shots, Mr. Llamas was moving in a northbound
8   direction; is that right?
9       A.   Yes, sir.
10      Q.   He was not moving towards the residence, was
11  he?
12      A.   His hips and his leg were driving him north,
13  but his torso was turning to the left and back to our
14  clock analogy, turning towards the 10:00 and 9:00
15  o'clock position, when the residence was towards the
16  9:00 and 10:00 o'clock position.
17      Q.   But even though his head was looking towards
18  the 9:00 or 10:00 o'clock position, he was still running
19  in a 12:00 o'clock direction; correct?
20      A.   Still running in a 12:00 clock direction, but
21  his torso and head were 9:00 and 10:00.
22      Q.   Gotcha.
23           Can you tell me approximately the distance
24  between Mr. Llamas and that residence at the time of the
25  first shot?
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 125

1      A.    This would be just an estimate.

2      Q.    Sure.

3      A.    30 yards, maybe.

4      Q.    So the distance between Mr. Llamas and the

5    residence was less than the distance between you and

6    Mr. Llamas at the time of the first shots?

7      A.    Yes, sir, approximately.  Approximately.

8      Q.    Okay.  I want to ask you a couple questions

9    about the shooting of the canine.  Fair to say that you

10   did not see Mr. Llamas at the time the shot was fired

11   that hit the canine?

12     A.    That's correct, sir.

13     Q.    Fair to say you don't know what Mr. Llamas was

14   aiming at when the canine was shot?

15     A.    That's correct, sir.

16     Q.    Fair to say you do not know how close the

17   canine ever got to Mr. Llamas?

18     A.    That's correct, sir.

19     Q.    Fair to say you do not know the distance

20   between Mr. Llamas and the canine at the time of the

21   shooting of the canine?

22     A.    That's correct.

23     Q.    When did you learn that the canine had actually

24   been shot?

25     A.    I knew the canine had entered a brush line, and

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 126

1  then shortly thereafter was the gunshot.  And when I

2  asked the handler had he attempted to recall his dog, he

3  said he already did.  And the belief was the dog was

4  shot.

5      Q.    When did you learn, in fact, the dog had been

6  hit?

7      A.    With gunfire?

8      Q.    Yes, sir.

9      A.    It wasn't until -- well, I don't know if you

10 could say it's factual, because the dog wouldn't return.

11     Q.    Well, there could be other reasons the dog

12 didn't return, right?

13     A.    There could be.

14     Q.    Let me ask you a little differently.  Did you

15 know that the dog had been shot before the first round

16 of shots towards Mr. Llamas?

17     A.    Suspected of being shot?  I don't recall having

18 direct knowledge like the handler.  But at some point,

19 the handler went in the brush and grabbed him.  I don't

20 know when that occurred and when the rapport was related

21 to the first shooting we had -- first volley.  I'm

22 sorry.

23     Q.    Is it your best recollection that you learned

24 that the canine had been actually shot prior to the

25 first round of shots at Mr. Llamas?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 127

```
 1      A.   I don't recall if I had factual knowledge that

 2   the dog had been shot prior to the first volley of

 3   gunfire by the deputies.

 4      Q.   But that was your belief?

 5      A.   It was my belief because of the circumstances.

 6      Q.   All right.  The second round of shots, how long

 7   was that after the first round of shots?

 8      A.   About --

 9           MR. RAMIREZ:  Asked and answered.

10           But go ahead.

11           THE WITNESS:  About five seconds, give or take.

12   BY MR. MARDIROSSIAN:

13      Q.   Approximately, how many shots were shot for the

14   second volley?

15      A.   Three or -- two to four, maybe.

16      Q.   Do you know how many shots each of the two

17   deputies fired?

18           MR. RAMIREZ:  Asked and answered.

19           But go ahead, again.

20           MR. MARKS:  Not by me, Gene.

21           MR. RAMIREZ:  Yeah, but it's been answered

22   about this case.

23           THE WITNESS:  I believe Sergeant Hubachek was

24   anywhere from one to three, and Deputy McGuire, I

25   believe, was six to eight.  Somewhere in there.
```

Page 128

1  BY MR. MARKS:

2      Q.   That's just the second round I'm talking about.

3      A.   Oh, you mean in total?

4      Q.   No.  I'm only talking about the second volley

5  of shots.  I wanted to know how many each of the

6  deputies shot?

7      A.   Oh.  I'm not sure Sergeant Hubachek engaged in

8  a second volley.  It might have been just Deputy

9  McGuire, and it was anywhere from two to four.

10     Q.   At the time of the second round of shots, did

11  you consider firing, yourself?

12     A.   At the -- yes.

13     Q.   And the reason you did not fire is because one

14  of the other deputies already did; is that right?

15     A.   That is right, sir.

16     Q.   Did you ever ask Deputy McGuire why he fired

17  the second round -- or the second volley?

18     A.   I did not.

19     Q.   Did you ever ask Deputy Hubachek why he did not

20  fire the second volley?

21     A.   I did not.

22     Q.   Do you have an understanding as to where

23  Mr. Llamas was hit with the second volley?

24     A.   My assumption would be that he was struck in

25  the face on the second volley.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 129

```
 1      Q.   Do you know how many of the second volley of
 2  shots actually struck Mr. Llamas?
 3      A.   I don't know.
 4      Q.   Okay.  Did you know anything at all about
 5  Mr. Llamas before the date of this incident?
 6      A.   I only learned of him the day of.
 7      Q.   Okay.  So I'm only asking about -- prior to the
 8  day of, had you ever heard his name or did you know
 9  anything at all about him?
10      A.   I did not, sir.
11      Q.   And what did you learn -- prior to the
12  shooting, on the day of the incident, what did you learn
13  about Mr. Llamas's history?
14      A.   He had an extensive criminal history including
15  previous contacts with a firearm.  I believe he was also
16  wanted for either rape or child molestation or both.
17  And he was actually being pursued because he was a
18  wanted fugitive for those crimes.
19      Q.   When did you learn that, prior to the shooting?
20      A.   That was during the briefing that was provided.
21      Q.   And that would have been the hour and a half to
22  two hours before the shooting?
23      A.   Yes, sir, before the search of the property
24  even commenced.
25      Q.   Who shared that information with you?
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 130

1    A.   Again, Sergeant McFadden, who leads the

2    fugitive apprehension squad, and Deputy Devine, who was

3    the case agent.

4    Q.   Other than what you just told me that you

5    learned at the briefings about Mr. Llamas's history, did

6    you ever learn anything else about Mr. Llamas's history

7    prior to the shooting?

8    A.   I did learn from the -- a reporting party who

9    we spoke to directly that lived on River Road -- on the

10   south side of River Road, that they were the one

11   reporting that they had seen a male matching his

12   description and a female fleeing across their property,

13   more or less from the east to the west, and it was

14   believed that he was possibly armed.

15   Q.   How long before the shooting did you learn

16   that?

17   A.   That was about another -- that was probably

18   about two and a half hours, three hours before the

19   shooting.

20   Q.   And you heard that directly from the reporting

21   individual?

22   A.   I was listening to the conversation between the

23   reporting party and, I believe, the deputy that was

24   interviewing or speaking to her -- an older lady and her

25   granddaughter.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 131

1    Q.   You were standing in proximity to the reporting

2    party?

3    A.   Yes, listening to the conversation.

4    Q.   Can you describe that person for me?

5    A.   The older lady?

6    Q.   Whoever was reporting what they had seen.

7    A.   It was younger girl about 17 years old, who was

8    at times, I believe, translating for her mother or her

9    grandmother.  And an older lady who spoke pretty good

10   English, if I recall correctly, and at times, she didn't

11   so her granddaughter would translate.  She was an older

12   lady, probably in her 60s, maybe 70s.

13   Q.   How's your Spanish?

14   A.   Mine's not good.

15   Q.   The information that you learned from this

16   reporting party, how, if at all, did it factor into your

17   tactical behavior at this scene?

18   A.   It prompted the search to begin there because

19   that was the last known location of where he was because

20   prior to that, he was involved in a vehicle pursuit and

21   then fled from the vehicle.  But he was never seen -- I

22   don't recall him ever being seen from law enforcement

23   after fleeing from the vehicle following the pursuit.

24        It was just a report from this elderly lady and

25   her granddaughter that coincidentally said, "Hey, there

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 132

1   was two people traversing across my property from the

2   west" -- I'm sorry -- "from the east to the west, and

3   these were their descriptions."

4           And then they were shown a photograph of the

5   suspect, and they said, "That was the guy that was

6   crossing our property."

7       Q.   Do you know who had the photograph of

8   Mr. Llamas?

9       A.   I believe Sergeant -- most of us had it on our

10   phone.  That was -- it was sent to us.  I believe

11   Sergeant--

12           (Reporter clarification.)

13           THE WITNESS:  It's S-A-N-T-I-S-T-E-V-A-N.  I

14   believe I spelled that correctly.

15   BY MR. MARKS:

16       Q.   Having heard that information from the

17   reporting party, did you form the understanding that

18   Mr. Llamas was chasing this fleeing woman, or they were

19   together and they were both fleeing from something?

20       A.   Together and both fleeing from something.

21       Q.   Did you ever make contact with the woman that

22   was allegedly fleeing?

23       A.   I did not.

24       Q.   Have you now told me everything that you knew

25   about Mr. Llamas, prior to the first volley of shots

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 133

1    **being fired?**

2         **A.    Yes.**

3         **Q.    Okay.**

4              MR. MARKS:  Thank you.  I don't have any other

5    questions for you.  Thanks for your time this morning.

6              THE WITNESS:  Thank you, sir.

7              MR. LEVINE:  Nothing more from me.

8              Eugene, any questions?

9              MR. RAMIREZ:  No, I'm good.

10             Thank you all.

11             THE CERTIFIED STENOGRAPHER:  Mr. Ramirez, are

12   you ordering a copy?

13             MR. RAMIREZ:  Yes.  If I can get rough also,

14   please.

15             THE CERTIFIED STENOGRAPHER:  Mr. Marks, are you

16   ordering a copy?

17             MR. MARKS:  No, thank you.

18             (1:13 p.m., deposition concluded.)

19                       --oOo--

20

21

22

23

24

25

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 134

1  STATE OF CALIFORNIA)
                      ) ss:
2  COUNTY OF BUTTE    )

3

           I, KIMBERLY E. D'URSO, do hereby certify:
4

5          That the witness named in the foregoing

6  deposition was present remotely and duly sworn to testify

7  to the truth in the within-entitled action on the day and

8  date and at the time and place therein specified;

9          That the testimony of said witness was reported

10 by me in shorthand and was thereafter transcribed through

11 computer-aided transcription;

12         That the foregoing constitutes a full, true and

13 correct transcript of said deposition and of the

14 proceedings which took place;

15         Further, that if the foregoing pertains to the

16 original transcript of a deposition in a federal case,

17 before completion of the proceedings, review of the

18 transcript [ ] was [ ] was not requested.

19         That I am a certified stenographic reporter and

20 a disinterested person to the said action;

21         IN WITNESS WHEREOF, I have hereunder subscribed

22 my hand this 28th day of March, 2025.

23 _____

24 KIMBERLY D'URSO, CSR NO. 11372, RPR

25

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

**Page 135**

```
 1                    ERRATA SHEET

 2   PAGE/LINE              CHANGE              REASON

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 136

1                    DECLARATION OF DEPONENT

2

3            I,  _____, say I have read the

4   foregoing deposition and declare under penalty of perjury

5   under the laws of the State of California and all federal

6   laws that my answers as indicated are true and correct.

7

8            Dated this _____ day of _____, 2025, at

9   _____, California.

10

11                            _____

12                            MICHAEL WALSH

13

14

15

16

17

18

19

20

21

22

23

24

25

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                    Index: --ooo--..actual

---
**-**
---

--ooo--   4:1
 133:19

---
**1**
---

1   23:18
 43:18,19
 45:24
 48:13

10   46:7,9
 109:9
 111:5

10-7   92:13,
 16

100   109:11
 110:10
 111:7

10:00   70:25
 77:23
 123:3,14,
 17 124:14,
 16,18,21

10:02   4:4

11   90:17

11:24   91:11

12   106:12

12:00   70:21
 123:1,5
 124:19,20

13   106:12

14th   90:21

15   109:9
 111:5

16   90:18

17   131:7

19:29:05
 90:22

1:13   133:18

---
**2**
---

20   48:13

2000   6:9

2023   90:22

2025   4:3

21st   4:3

22240   41:21
 43:6 44:6
 58:17 62:6
 77:17 83:7
 98:3 104:9

---
**3**
---

30   40:24
 46:14
 54:10 61:1
 104:23
 105:3
 125:3

346   90:13

---
**4**
---

40   46:14
 61:7 70:12

92:20 93:6

45   104:24
 105:3

---
**5**
---

5   46:7,9

50   46:14
 54:10 61:7
 70:12
 92:20 93:6

---
**6**
---

60   56:17,18
 105:16

60s   131:12

---
**7**
---

70s   131:12

---
**9**
---

90   105:16

9:00   70:25
 77:23
 123:3,14,
 17 124:14,
 16,18,21

---
**A**
---

a.m.   4:4

absolute
 76:24
 82:13

absolutely
 43:14 82:7
 90:3

academy
 27:20,23,
 25 28:2,5
 105:23,24
 106:2

accomplishing
 119:9

accuracy
 43:9

accurate
 32:14
 41:24
 60:4,9
 64:23
 71:19
 72:17

acquisition
 40:7 44:14
 60:20
 122:21

acting   5:25
 6:11

action
 82:11,12

actions   86:7

active
 117:19

actively
 102:7

actual   5:2,
 3,6,7

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                    Index: acuity..armored

14:13 29:8
41:18 44:9
47:14
80:24
81:13
103:13

acuity  71:11

addition
  19:5
  35:10,17
  58:2 65:13

additional
  27:6 86:12
  89:9
  106:1,13

address
  41:18
  43:6,9,13
  83:7 98:3

addressed
  98:3

adhere  25:2

administered
  4:11

advance
  97:25

advanced
  92:21

Affairs
  10:12
  21:15

afternoon
  113:23

agent  58:6
  130:3

ahead  41:16
  43:17
  110:3
  111:15
  112:6
  123:2
  127:10,19

aim  9:15
  119:22

aimed  123:2

aiming  49:5,
  17,23
  125:14

alive  16:19

allegedly
  132:22

allude  104:2

ambient
  54:17

ambiguous
  8:9 13:13
  30:4 39:14
  99:8
  107:19

amount  30:8

analogy
  77:22
  124:14

angled  70:22

angles  9:9

animal  16:19

84:10

announcements
  34:2,5,6,
  11 35:22

apparent
  81:20

appearance
  81:12

appeared  4:4
  9:7 49:1
  52:15
  53:20
  54:14
  61:21 62:9
  64:8,12,20
  65:5,10
  93:11
  117:6

appears
  83:14

applicable
  79:9 81:2

application
  83:10 84:7
  86:15

apply  118:10

appreciates
  7:8

apprehension
  25:24
  26:24
  57:25
  130:2

approach

102:15

approaching
  45:13

approximate
  6:7 29:7,9
  33:5,8

approximately
  4:24 13:3
  18:13,17
  19:24
  27:16
  28:9,12
  30:21
  32:21,24
  34:17
  39:10
  44:24
  46:13
  54:9,11
  61:1 63:19
  71:17
  73:20
  92:20
  99:16
  124:23
  125:7
  127:13

April  90:21

area  19:14
  76:12

Argumentative
  86:2

armed  130:14

armored
  115:3

arms  62:25

arrived  9:2
  39:22

asphalt
  45:25

assess
  107:15,20

assigned
  25:20
  106:7,11,
  15

assignment
  25:18
  118:11

assignments
  115:19,21

assist  20:17
  115:16

assisting
  27:3

assume  48:1
  75:10
  83:13
  119:21

Assumes
  78:25
  80:15 82:2
  109:5
  111:2
  112:21
  119:14
  120:5

assuming
  47:20 80:2

87:8
122:25
124:2

assumption
  128:24

attached
  33:16,19

attempt
  81:10,12

attempted
  126:2

attempting
  49:19
  75:24
  115:14

attend  28:2

attention
  97:24

attorney  7:2
  21:21
  99:13
  101:4

attorneys
  22:5,7

audible  34:4

audio  12:10,
  12 72:18

authority
  26:15

availability
  112:25

aviation
  13:17 20:6

aware  32:6
  102:4

_____

**B**

_____

back  31:14,
  16 34:16
  49:10
  50:5,22
  64:3 66:18
  70:20
  77:22
  78:14
  80:5,8
  81:21
  101:8
  121:16,18
  123:19,22
  124:13

background
  23:12

backs  68:19

backward
  83:2

based  5:24
  6:10 17:16
  18:14 23:2
  35:5 48:1,
  2,20,25
  49:3 53:17
  64:19
  65:20
  72:18
  73:25
  77:5,13
  78:4,23
  79:6 80:13

81:4,6,25
82:19 83:9
84:2,18
85:8 86:6
89:25
99:23,25
109:3,8,16
111:18,24
114:25
115:3,4
118:15
121:7

basically
  19:15
  68:10,24

basing  48:20

basis  24:25

bear  95:24

Bearcat
  115:4,10

Bearcats
  115:3

bearing  84:7

began  69:9
  73:9

begin  9:15
  28:11 73:1
  131:18

beginning
  77:25
  114:10

behavior
  84:9
  131:17

**belief** 84:2
121:12
126:3
127:4,5

**believed**
8:21,22
103:18
116:21
120:22
130:14

**Believing**
81:10

**bell** 41:22

**belong** 18:9

**belonged**
10:13

**benefit** 6:20

**bent** 88:10

**bigger** 17:13

**biker** 5:11

**bit** 23:11
41:16
44:16 77:3
80:11
83:21,23
84:18
100:20
105:22

**block** 95:6

**bloodhound**
25:24

**boarded**
116:3

**bodily** 107:7

**body** 13:11,
20,21
20:5,8
55:16 67:2
81:1 87:9,
16 88:6,8
90:5 95:5
120:17
121:16,17
122:16

**body-worn**
12:6 13:7
14:7 18:2,
4 90:25

**bomb** 25:25

**bottom**
42:10,14
88:2 90:12

**break** 11:8,9
30:11
44:16
50:18,23
51:1
100:18
101:1,3

**breaking**
105:5

**breaks** 105:6

**briefed**
57:21 58:1

**briefing**
114:3,6,7,
13 115:22,
25 116:9

129:20

**briefings**
130:5

**bright** 17:19

**bring** 79:11

**broadcast**
33:22
35:22
37:14

**broadcasts**
33:10,13,
24 34:7,9,
19 35:10,
11 37:2,8,
15

**brought**
95:24

**brush** 50:1
114:11
125:25
126:19

**bureau** 25:21

**butt**
121:11,14

**buttocks**
121:2

**BWC** 90:13

---

**C**

---

**California**
4:5,7
24:11

**call** 8:20

10:8,9
16:3 17:5,
6,20 20:24
55:4,5
100:6

**called** 21:23
36:10
41:11

**Calls** 120:4

**cam** 122:16

**camera** 12:7
13:7,11,
13,15,16,
20,21
14:7,13,
16,18,20
15:1,11,
13,16 16:8
17:2,4,24
18:2,4
20:5,8
90:5,25

**cameras**
15:22
17:18

**canine** 25:23
85:9,12,15
125:9,11,
14,17,20,
21,23,25
126:24

**capable**
119:18

**capacity**
5:25 23:21

capturing
 123:21

car  119:1
 122:18

career  84:22
 106:19

carry  24:18

cars  17:12
 46:20

case  7:9,
 10,16
 18:21,24
 19:3 28:17
 58:6
 113:18
 127:22
 130:3

case-by-case
 24:25 25:1

cases  5:17,
 21

Casino  23:20

catch  16:16

cautioning
 98:11

caveats  77:1

Certified
 4:6,9 31:9
 50:20
 133:11,15

cetera  17:12
 57:20

change  81:6

82:10
83:16
116:25

charge  26:10

chasing
 132:18

chest  87:23
 123:18,21,
 23

child  129:16

chose  86:4

circum-  26:9
 82:25

circumstance
 50:9 92:25

circumstances
 8:15 16:7,
 9 22:8,10
 24:20
 26:10,21,
 22 79:10
 80:13
 81:9,13,25
 83:11 93:9
 109:8,13,
 16 110:8,
 22 111:10,
 13,18
 112:24
 127:5

civil  5:17
 7:10

clarification
 6:15 14:22

37:24
59:22 82:4
86:1 92:14
111:17
132:12

clarify
 41:10 98:4

clean  7:4

clear  63:25
 102:23
 114:10,21

clearing
 114:22

clock  70:19,
 22 77:22
 123:1
 124:14,20

close  27:18
 46:20
 111:13
 125:16

closed
 54:23,25

closer  56:8
 58:20 59:2

coincidentally
 131:25

college
 27:11,12,
 14,17

color  17:19

combination
 37:15

combined
 73:21

command  27:6

commands
 35:1,3
 56:23,24
 57:1 58:2
 74:7
 100:12
 117:21

commenced
 129:24

commencing
 4:3

committed
 20:22

commonly
 15:25

communicating
 99:20

communication
 89:17
 112:11

communications
 45:3

comparable
 61:8 93:6

compelled
 20:13

completed
 27:17

completely
 65:11

completing
  28:12
  106:15

comply
  108:13,23

Compound  8:9
  30:5

computer
  42:2

concealment
  112:15

concluded
  96:1
  133:18

conclusion
  86:19

conducted
  21:24

confirm
  43:12

considered
  85:9,12,
  14,15

contact
  44:22 58:3
  62:14 70:1
  120:19,21
  132:21

contacted
  57:18

contacts
  129:15

contained

114:20
116:15

containment
  105:4,6,
  11,12
  115:16
  116:14

continuation
  13:24

continue
  51:17
  84:17
  106:13
  121:24

continued
  53:19,20
  91:23
  106:18
  107:17

continuing
  64:22

conversation
  22:16,23
  23:6 45:5,
  12 104:1,
  7,21
  130:22
  131:3

copy
  133:12,16

corner
  90:12,21

Corps  27:12

correct   9:25

10:17
11:22
13:8,9
14:21
15:2,8
19:25 20:1
23:17
25:13,14
26:17 28:7
30:18,22
31:24,25
32:13,14,
18,19
34:14
35:3,13
36:5 37:4,
10 38:15
43:12,14
45:18
54:2,3
55:25
56:10
58:13,14,
18 63:23
67:14,19,
20,22,23
69:2,3
72:8,11
79:19,20
80:3,4
84:22
85:18
89:16
94:1,20
98:6
103:20,21
105:15
110:19

112:7
117:24
118:19
119:24
122:3,12
123:7,12
124:19
125:12,15,
18,22

correctly
  131:10
  132:14

corroborated
  35:17

council
  23:24 24:5

count   29:8

couple   77:1
  88:14 97:3
  103:19
  113:24
  125:8

court   6:21
  7:7

cover   79:9
  81:5 86:15
  111:8
  112:14,17,
  25 113:3,
  11,12
  118:6,13,
  14 119:5

coverage
  117:17

covered

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                    Index: covering..depicts

19:19 59:1
89:18

**covering**
59:10
93:13,16

**crawling**
93:21,22

**crime** 19:5,
13

**crimes** 20:22
129:18

**criminal**
21:7
129:14

**cross** 103:10
122:13

**crossed**
51:24
52:6,20
58:11
122:22

**crossing**
56:1 104:8
132:6

**crossings**
78:16

**crucial**
109:22

**cups** 33:19

**curb** 40:6
41:9

**curled** 88:6

**current** 25:5

**curves** 64:20

**cust-** 92:18

**custody** 33:2
92:11,18
93:1

———————————

**D**

———————————

**D'URSO** 4:5

**danger** 79:6
83:7
109:10

**date** 5:12
12:17,19,
24 13:8
25:15 26:2
129:5

**dated** 90:21

**day** 4:3
47:5,17
50:13
51:10,14,
15 81:19
82:10 84:3
95:22
104:3
129:6,8,12

**daylight**
16:10

**deadly**
106:24
107:1,5,
13,25
108:13,22,
24 109:2

112:18
113:4,11
116:20,22

**deal** 115:1

**dealing**
105:7

**death** 107:7

**debrief-type**
22:13

**debriefing**
29:18

**deceased**
19:16

**decedent**
10:13

**December**
23:15

**decided**
117:10
119:12

**deciding**
79:12

**decision**
84:16
109:22
117:12

**deduct-**
48:24

**deductive**
48:24
121:8

**defeated**
92:4,6,8,

19,24 93:5

**defend** 107:6

**defendant**
5:20,23
7:10,17

**degree** 27:14
88:7

**delay** 55:18

**demonstrated**
81:21

**deny** 43:12

**Department**
25:13 28:6
84:22,24
85:2,17
106:3,14,
20,24

**dependent**
111:4

**depending**
16:9 82:25
111:13
112:24

**depends**
17:23

**depict** 15:3
19:11

**depicted**
14:1 15:14

**depicting**
20:4

**depicts** 17:3

deploy  82:7,
  24 86:11

deployed
  83:22
  115:12

deploying
  117:20

deponent
  4:11

deposition
  4:7,21 5:8
  6:20
  10:21,22
  11:1,3,7,9
  12:3 18:7,
  11,21,24
  19:8,20
  91:3
  133:18

depositions
  5:3,6,18

deputies
  14:4 20:22
  22:1 26:1
  28:25
  29:6,20
  30:12 31:8
  32:25
  35:12,16
  37:8,11
  38:17 39:6
  44:8,19
  46:16
  56:22
  58:20 59:5
  62:7 68:10

69:5 70:10
74:2,6,11
85:13
86:23
89:14
95:23
96:11
100:11
101:23
102:10
103:24
105:1
107:3,12,
15,24
108:11
112:12
114:1,16
116:19
117:4
119:5,23
122:8,14
127:3,17
128:6,14

deputies'
  30:1 76:8

deputy  5:25
6:11 9:24
14:1,10,12
18:9 23:19
26:16,19
28:20
29:10,12
30:14,24
31:1,3,6,
24 32:4,6,
11,13,15
43:2 44:9,

13 45:1,8,
10 58:6
59:7 63:7
67:24,25
68:3,20,
21,24
69:6,8,13,
24 72:10,
16,22
73:1,6,9,
13,16,19,
22 74:5
88:20
96:11,13
98:4,8,15,
22 99:1,6
103:17
104:3
106:3
112:4
114:14,15
116:20
117:11,18
118:24
122:5,6
127:24
128:8,16,
19 130:2,
23

deputy's
  63:15
  67:5,18
  75:6

deputy-
involved
  39:19
  41:17

47:14 62:2
116:13

describe
  68:11
  84:18
  131:4

describing
  66:12 70:5
  76:3

description
  130:12

descriptions
  132:3

descriptive
  38:6

designate
  118:13

designated
  86:14
  101:10
  116:24
  117:1
  118:8,10

designation
  117:2,4
  118:5
  119:4

designations
  102:23
  117:6,10,
  13,15

detail  8:14
  21:23 22:9
  23:22

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025          Index: details..dog

103:13
108:5

details
24:24
94:14
97:11
110:14,16,
18,22

determine
20:21 21:6

device  33:19
95:17

Devine  58:6
114:15
130:2

die  9:21

died  5:11
9:17 19:14

difference
17:9,10
80:24

differences
16:11

differently
126:14

dimensions
62:3

direct  87:24
126:18

directed
34:9,11,22
35:21
57:1,2

direction
9:2,12,15
36:10,12,
15 40:13
48:21,22,
25 49:2
53:11
62:10,23
66:23,25
70:20 75:1
83:6 85:25
87:12,15,
19,22,24,
25 88:4
93:21
94:12,18
97:12,15,
16,17
102:17
114:25
123:14
124:8,19,
20

directions
35:1 38:14
70:6

directly
35:3 42:20
71:1
130:9,20

discern
30:23 35:6
83:8,14

discharged
25:4

discuss

11:18
22:22
98:14,22
102:14

discussed
18:5 22:1,
8,11 23:4
35:9 44:6,
10,12
45:16
51:19
57:19,22
58:10
69:25 70:4
71:8 75:23
102:12
105:17
106:23
114:17,22
115:9,22
116:11

discussing
22:19
49:16
69:15
98:20
114:19

discussion
44:7 57:3
102:25
103:12,23
104:7,15
105:1,3,15
114:1
115:24
116:9,18,
23

discussions
21:20
115:18

dismiss
84:14

dismissal
11:2,4

dismissed
10:24

disparity
17:13

disposal
85:13

distance
35:5 46:22
53:17
54:12
56:4,8
59:1,10
61:8
65:21,24
79:6,8
81:4 93:6,
10,14,16
111:18
124:23
125:4,5,19

distinctly
34:18

documents
12:2 18:6

dog  47:9,11
48:1,21,
22,25
49:8,14,

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025          Index: dogs..enforcement

17,19,21,
24,25
50:1,4,9
75:25 76:1
84:2,6,10,
11 85:9,
12,15,16
115:12,13
116:12
126:2,3,5,
10,11,15
127:2

**dogs** 25:24,
25

**dollar** 84:11

**door** 9:7

**doubt** 43:8

**dramatically**
56:7

**driveway**
38:24
39:2,7,12
40:7,14
41:3
42:13,16,
21,22,25
43:1
45:16,20,
23,24
46:5,6,8
47:3 51:22
52:5 53:22
56:3,13
58:20
59:2,21,
23,25 60:4

61:4,11,15
62:8 64:3,
19,23
65:1,3
66:14
76:12,17
78:11
80:10,14
102:3
117:5

**driveways**
44:3
102:12

**driving**
62:25
66:24
77:21
115:10
124:12

**drop** 53:9

**dropped**
53:14

**drove** 60:25

**dust** 59:15

**duty** 7:19,
22

**dwelling**
78:7 79:4

**dwellings**
105:7

**dynamic** 23:3

———————————
E
———————————

**ear** 33:19,

22 48:9

**earlier**
11:13
19:22 44:7
51:19
71:16
75:23 76:3
79:16 84:3
86:15
102:12
103:15
104:3,5
105:17,22
113:25
122:23

**early** 44:25

**earpiece**
33:21
35:11

**easier** 17:13

**easiest**
43:24

**east** 37:12
38:19
40:10,13
42:9 44:2
62:7 87:16
88:4
114:25
117:5
130:13
132:2

**eastbound**
36:21

**eating** 59:15

**efforts**
26:24 58:1

**elbow** 53:9,
14

**elderly**
131:24

**elected**
23:23 24:3

**else's** 82:11

**emergency**
25:22

**employed**
23:13,19,
21 26:11
114:21
115:2

**empty** 116:5

**encountered**
115:13
116:3

**end** 27:18
56:2

**ended** 19:15
103:20

**enforcement**
6:1 21:10
22:17
25:20
34:10,12
47:19,21
75:9,11
91:22 92:2
107:8
131:22

engage   73:9
  101:19

engaged
  122:18
  128:7

engagement
  122:20

engaging
  73:11

English
  57:9,12,20
  58:3,5
  131:10

ensure   91:21
  98:1
  116:14

entered   8:22
  48:21 50:1
  125:25

entering
  48:22
  60:20
  76:12
  114:10

entire   67:2
  71:11

entrance
  121:20

entry
  115:13,15

environment
  109:21

envision
  87:23

erupt   89:10

escape   81:16

essential
  85:15

essentially
  17:2 21:15
  23:25 24:2
  26:5,15
  32:3 33:1,
  21 34:25
  35:14
  36:8,19
  38:22 39:3
  41:6 42:20
  45:8 46:21
  51:17
  52:18 56:4
  60:7 67:3,
  9 69:20
  79:17
  85:13 99:2
  103:19
  106:18
  118:18
  119:22
  123:24

establishing
  102:21

estimate
  12:20
  39:10
  40:18,21,
  23 46:21
  54:8 56:11
  60:21 68:2
  125:1

estimated
  30:15

Eugene   133:8

evacuated
  105:8

event   13:24

Everybody's
  31:14

evidence
  79:1 80:16
  82:3 109:6
  111:2
  112:22
  119:14
  120:5

evolved   23:3
  114:4

exact   70:19

EXAMINATION
  4:13
  113:21

excuse   72:14
  75:15,17
  85:1

executive
  23:22

exhibit
  43:18,19

exit   39:24
  60:11
  120:22
  121:20

exited   9:1,

5,11 39:17
  40:9,19
  60:13
  61:15
  69:15,16
  78:10

exits   120:23

expand   71:10

experience
  85:8 99:23
  105:5

expert   10:8
  17:6

explain   64:6

explore   77:2

exposed
  52:18
  70:21

extended
  88:6,9

extensive
  129:14

eye   96:3

eyes   65:20
  66:9,10

———————————

F

face   65:22,
  24,25
  66:1,9,19
  97:6,10,12
  121:4,6,9
  128:25

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                    Index: faced..fired

faced 113:4,
11

facial 97:11

facilitate
81:16

facility
24:1

facing 40:9,
13 44:2
52:18 60:6
64:17 67:4
70:15,19
78:14
87:23
97:13

fact 67:21
77:13 84:8
103:1
109:3,16
110:25
111:24
115:21
126:5

factor 79:12
131:16

factors
109:25

facts 5:13
21:6 78:25
80:16 82:2
109:5
111:2
112:21
119:14
120:5

factual
126:10
127:1

fair 48:16
49:6 71:15
118:21
119:4
124:2,5
125:9,13,
16,19

fairly
122:19

fall 87:12,
16 94:15

falling 87:2
94:8,12,
13,17,19,
25 95:9

fast 23:2,3
50:6 62:20
63:2,3
73:9

fatal 10:17

feasible
108:1,2,3,
18,24,25
113:13

feel 11:10
63:24 77:6
86:20
99:24
101:15,17

feeling 82:9

feet 46:7,9

48:13 80:7
88:1,2,3,
14 97:4

fell 87:6,
12,13,19
88:5 95:3
96:3 103:3
123:8

felt 81:24
86:16
100:3
101:12
119:5,8

female
130:12

FID 21:23

field 36:19
71:11
99:20
106:5,7,
11,15

file 13:22,
23,25
90:18

files 13:22

filming 16:1

final
108:12,15

find 119:11
120:1

fine 11:10
29:9
100:23

finish 7:1

fire 7:19
8:5 9:2,15
31:6 32:4
49:20 50:1
73:2,13
75:25
85:19,25
86:4 96:8,
9 101:7
107:13
111:15
119:24,25
128:13,20

firearm 7:20
9:15 35:8
47:5,16
52:21
53:10,15
55:15
61:17
62:18,21
74:25
76:25
77:16,19,
24,25 78:5
81:6 93:20
109:10,11
110:9
111:5,8
116:17
129:15

fired 8:8
9:1,11,18,
24 10:16
14:4 19:16
28:25

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                Index: firing..front

29:6,20,23
30:1,15,22
31:8,22,24
32:2,6,7,
12,13,15,
17,25
34:18
39:11 48:2
63:6,16
66:8,20
67:6,13,
18,24,25
69:4 70:9,
13,23
71:4,14
72:10
73:4,16,17
74:5,10,15
75:6,16,21
76:4,9,13
79:18 81:8
86:23 87:4
88:13,19
89:21,22
91:14,25
92:2 93:24
95:22
96:10,16
97:1,2,6,
19 100:11
101:6,22
102:2,5,8
103:8,25
104:13,15,
24 117:23
122:14
123:11
125:10

127:17
128:16
133:1

firing  9:13
31:2,3
48:17 74:2
86:6 96:12
98:8
101:24
128:11

five-  33:5,8
34:1 36:1,
16

fixed  83:15

flank  64:16

fled  131:21

flee  81:12,
14,21

fleeing
36:18,20
81:25
116:16
130:12
131:23
132:18,19,
20,22

FLIR  15:12

fluently
57:20

fluid  76:20

focus  28:18
32:21

focused  52:3

focusing
36:6 73:15

foliage
17:12

folks  71:10,
12 118:10

follow-up
113:24

foot  59:3,
6,11 114:8
119:1

footage
12:6,7
13:17,20
14:7 15:9
20:6,8

force  6:11
21:23 81:3
82:7,25
83:10,21
84:8
86:12,14
101:11
102:22
106:24
107:1,2,5,
13,17,25
108:13,22,
24 109:2
110:11
111:20
116:20,22
118:7
119:6,7,12
120:2

form  49:16
102:1
132:17

formed  49:18
72:19

forward
60:25 65:1
66:19 71:2
78:14
80:9,14
83:2 89:11
121:15

forwarding
50:6

forwards
67:4

foundation
16:4 17:21
55:5 78:25
82:2
109:5,19
111:2
112:21
120:5

fractions
50:2 62:21

frame  74:20
90:16

free  11:10

Friday  4:2

front  9:7
69:20
71:11
121:15,19

122:17

**frozen** 31:12

**fugitive**
57:17
129:18
130:2

**fully** 23:19

**future** 86:18

---

G

---

**gain** 49:7
71:25

**gained** 29:18
122:20

**gave** 5:18
12:17,21,
24 19:23
20:12
21:18 99:1
104:4

**Gene** 127:20

**general** 8:15
62:10,23
97:17

**generally**
19:11 26:9
53:15
57:14 66:4
88:8 96:6
97:3
107:8,10
113:2

**geography**
43:23

**girl** 131:7

**give** 5:12
11:14
24:16,17
29:7 46:11
61:1 77:1
78:9 82:13
90:8 94:14
96:24
108:12
127:11

**giving** 20:2,
16 34:25

**glimpses**
65:23

**good** 4:15,
16 7:5,6
50:17
100:17,21,
25 113:23
131:9,14
133:9

**Google** 42:5
43:5

**Gotcha**
124:22

**government**
24:6

**grabbed**
126:19

**graduated**
27:8

**graduating**
106:2

**granddaughter**
130:25
131:11,25

**grandmother**
131:9

**grave** 79:5
83:7
109:10

**ground** 16:12
17:11 27:7
34:5,12,19
35:16
86:23
87:2,6
88:11
92:4,19
93:13
94:8,12,
13,16,22,
25 95:1,8
96:4
121:22
123:9

**group** 117:8,
9,19

**guess** 5:15
13:19
44:23 46:3
47:15
54:11
55:10 67:8
69:22 75:2
77:5 80:5,
10 93:3
96:23
103:15,22

113:2
121:13

**gun** 37:9,20
38:4,8,13
48:6,7,18
49:5 50:3
52:11
53:3,5,6,
8,21 54:1
55:2 61:16
63:16,20,
25 67:18,
21 70:5
74:15 75:7
78:15 80:8
81:22
93:25
94:6,9,10,
11,17,22,
23,24
95:2,3,5,
9,10 97:16
101:22
102:16
104:18
109:2,17
110:3,24
111:14,25
112:5
119:23
121:25
122:2

**gunfight**
101:18,21

**gunfire** 48:3
49:1,10
50:3 86:8

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025    Index: gunshot..higher-ranking

89:9
91:21,22
122:19
126:7
127:3

gunshot
126:1

guy  132:5

guys  86:14

───────────

─── H ───

half 44:24
71:20,22,
24 79:15
99:18
103:16
104:5,17
114:9
129:21
130:18

hand  38:4,6
52:13,15,
21,23,24
61:18,20
62:18,19
77:20
94:10
95:10
109:3,12,
17 110:3

handgun  96:4

handing
115:18,20

handled  86:9

handler
115:12
126:2,18,
19

hands  70:18

happen  81:19
119:13

happened
5:24 63:2
122:19

hard  82:8
110:13

harm  51:10
75:21,24
76:7
81:11,15
107:7

harmed  51:13

head  37:9,
21 38:5,9,
13 53:3,5,
7,9,16,21
55:2 61:22
63:17,21,
22 65:9,
14,15,19
66:16
67:4,19,22
70:7,15,
20,21,22
75:1 77:21
78:15 80:9
81:22
83:1,3,5,
16 87:18

102:16
110:25
111:5,14
112:1,5
122:25
123:2,13,
16 124:17,
21

heading
37:18

headlight
68:14

heads  24:5

hear  29:22
31:12,18
34:19 35:4
45:10 48:8
54:4,6,13
56:22,25
72:25
73:1,12
74:6,10
88:20,21
89:3,4
100:11,14

heard  30:20
31:6,21
32:3 41:10
44:17,18
48:3,4,6
49:4,10
50:2 58:7
67:17
71:18 74:1
75:6,17
77:1 91:21

99:1 129:8
130:20
132:16

hearing
33:18,24
34:2,7
35:10,11,
19 36:2
37:2 38:16

heat  16:11
17:1

held  63:21,
22 67:18

helicopter
12:7 15:1,
9 16:1,22
18:5 33:4,
10,25
34:3,4,20
35:1,12,21
36:4,8
37:9,15
62:5 65:16

helmet  33:19

helpful
30:11

Hey  131:25

high  17:3,8
27:8

high-risk
102:19

higher  26:12

higher-ranking
26:16,18

**highest**
107:2

**hip** 121:2,
11,14

**hips** 64:13,
17,19,20,
22 66:14,
22,24 67:4
77:21
124:12

**history**
129:13,14
130:5,6

**hit** 120:18
121:5,9,11
125:11
126:6
128:23

**hold** 88:20,
21 89:8,13

**holding**
37:9,20
38:4,13
52:11,13,
23 53:3,4
55:1
61:18,20,
22,24
63:16
75:12
78:15,16
89:14
109:17
110:24
111:5,25
112:5

117:23
118:1
121:25
122:2

**home** 8:22,
25 9:6
71:9,12
103:14
104:4

**honestly**
23:2 54:24

**hopes** 108:19

**hostage** 98:2

**hour** 4:3
11:7 44:24
50:17
71:17,20,
22,23,24
79:15
103:16
104:5,16,
17 105:4
129:21

**hours** 28:18
90:22
114:9
129:22
130:18

**How's** 131:13

**Hubachek**
18:9 20:23
22:2 26:2
27:2 29:3,
12,16
30:14,24

31:1,6,22
32:2,7,12,
17 46:17
56:23
59:5,7
68:1,3,4,
18,22 69:2
72:10,12,
14 73:5,
10,18,22
74:6 86:6
89:2
100:11
102:10
103:24
114:14
117:11,18
118:24
122:5
127:23
128:7,19

**Hubachek's**
13:16 14:7
18:3 20:8
73:6

**human** 47:17
48:18 49:5
50:13
51:13
74:16
75:8,14,22
76:4,8
84:10
107:11

**humans** 16:12
47:21
75:10,12

76:5

**hunch** 49:22

**hypothetical**
78:9,18,25
80:6,15,
19,25
81:9,18,20
82:2,8,17
83:13,25
109:5,18
111:1
112:21
119:20

---

**I**

**ideal** 23:1

**illustrates**
84:12

**image** 42:2,
3,10,14
43:5,18

**imagine** 63:3

**immediately**
15:15
94:4,21
95:8
101:24
103:7
123:12
124:6

**imminent**
107:6

**impacts**
120:22

important
  6:23 43:22

impression
  49:16,18
  53:13
  72:19 87:3
  100:3
  102:1

improve
  22:12

inch   48:13

incident
  7:20 8:5,
  16 9:14
  11:18
  12:21 13:8
  14:1,13,16
  17:17
  18:12,16
  19:6,24
  20:4,18
  21:20
  22:1,13
  23:3,10
  25:16 26:3
  27:2,5
  28:16,17
  29:1,6,18,
  22 30:17,
  20 32:7
  42:6 43:2
  44:9,25
  47:13
  80:24
  85:20
  98:15,23
  99:7

101:19,23
105:21
114:4
129:5,12

include
  14:10
  35:19
  106:5
  112:11,14

included
  14:3

includes
  25:23,24
  47:19

including
  4:25 17:17
  62:3 73:18
  75:9,11,22
  82:19
  129:14

Incomplete
  78:24
  80:15 82:1
  109:4,18
  111:1
  112:20

independent
  30:8 43:11

indication
  55:16

individual
  9:17
  130:21

individuals
  8:23 9:5

24:9 44:20
45:3,6,9
79:16,22

information
  35:25 36:6
  37:20
  38:2,4,12,
  17,23 45:1
  47:4,16
  50:12
  51:9,11,12
  57:10,14
  58:4
  71:24,25
  72:3 77:6
  79:15,21,
  23 80:22,
  23 82:20
  84:15
  102:7
  103:17
  104:4
  129:25
  131:15
  132:16

infrared
  15:10,13,
  16,22
  16:8,22
  17:2

inhabited
  105:8

initial
  118:17

initially
  36:18

73:10

innocent
  107:9

inside   25:2
  103:14

instructions
  35:2

intent   8:24
  75:25

intention
  63:1
  81:14,21
  84:13
  97:22

intentionally
  49:20

intentions
  47:10
  81:13

internal
  10:12
  21:15 57:2

internally
  22:20

internationall
y   24:12

intersected
  39:8

intersects
  45:25

interval
  52:8 56:20
  71:23

intervened
  119:10

intervention
  86:17
  101:17

interview
  12:9,11,
  14,18,21,
  24 18:1,
  10,18
  19:1,23
  20:20
  21:5,15,
  18,19,22,
  24

interviewed
  12:8

interviewer
  21:4

interviewing
  130:24

interviews
  18:12,14

intonation
  100:1

introduced
  4:10

investigation
  20:17,21
  21:5,16,23

involved
  80:20
  131:20

involving

  11:18

issue  56:23
  74:7,11
  100:12,14
  107:25
  108:11

issuing
  56:24

          J

jails  28:6,
  8,12

January
  24:15

Jimmie  26:1
  29:3
  97:20,21
  98:4,5,7,
  15,19

job  24:7

Johnny  11:18
  33:1

jumping
  41:16

justifiable
  109:1

justification
  116:21

justified
  77:7,12
  78:4,22
  79:7 80:12
  83:11 84:1

justify
  107:13

          K

keeping
  59:9,12

killed  10:6

Kimberly  4:5

kind  15:21
  24:8,25
  27:14
  28:19
  32:22
  33:21 42:1
  43:22
  47:22
  49:22
  66:2,15
  68:10
  70:14
  82:14 95:5
  98:11 99:2
  102:14
  104:24
  108:6
  121:18

knees  88:9

knew  31:1
  32:5 79:25
  86:5 93:4
  119:17,18
  125:25
  132:24

knowledge
  5:18,19

  7:11 15:25
  17:16 20:7
  43:12 45:7
  47:9 55:11
  71:7 79:4
  82:19
  101:25
  126:18
  127:1

          L

L-L-A-M-A-S
  11:21

labeled  42:9
  43:5 90:13

labeling
  84:11

lack  69:7
  86:8

lacks  16:3
  17:20 55:5
  78:25 82:2
  109:5,19
  111:1
  112:21
  120:4

lady  130:24
  131:5,9,
  12,24

landed  87:17
  94:21 95:8

language
  57:5,19
  92:10

languages
  57:5

large  36:19
  114:20,21,
  23 116:1

Larry  113:18

law  6:1
  21:9 22:17
  34:10,12
  47:19,21
  75:9,11
  91:22 92:2
  107:8
  131:22

lawsuit  5:24
  7:21 10:23

laying  87:1

lead
  115:17,21

lead-up
  28:20

leader
  26:10,20
  27:2

leadership
  115:22

leading
  26:24
  32:22 51:2
  57:25
  58:21
  117:19

leads  130:1

learn  102:5
  125:23
  126:5
  129:11,12,
  19 130:6,
  8,15

learned
  120:20
  126:23
  129:6
  130:5
  131:15

leave  59:14

leaving
  120:25

led  8:16
  57:11

left  46:18
  52:18 60:3
  64:7,8,12
  65:5,8,13,
  14,15,25
  66:1,2,4,
  16,24
  67:5,7,12,
  13 68:4,
  11,14,18,
  22 69:1,21
  70:7,14,16
  71:1,6
  72:2,4
  76:19
  77:10,23
  78:5 79:17
  85:24 89:4
  90:12

93:25
  94:1,6,7
  96:15
  100:19
  104:17
  123:22,25
  124:1,13

leg  124:12

legs  64:25
  65:1
  66:14,22
  77:21 88:1

lend  84:8

lethal  10:19
  81:3 82:7,
  25 83:10,
  21 85:9
  86:12,13,
  15 101:11
  102:22
  110:10
  111:20
  117:17,20,
  22,23
  118:2,3,6,
  7,13,14
  119:5,6,7,
  12 120:2

level  23:18
  59:20
  86:10
  107:2

Levine  4:14
  5:5,16
  6:4,18
  8:3,13

9:3,22
  10:15
  13:18
  14:24
  16:13
  17:15,25
  21:2 22:6
  25:9 30:10
  31:11,17
  37:25
  39:20
  43:20
  47:24
  50:16,21,
  24 55:9,19
  60:1 63:11
  79:13
  80:21
  82:16
  83:12,24
  84:20,25
  85:6,7
  86:21
  91:10
  92:15
  99:13,15
  100:9,17,
  25 101:2
  107:23
  108:20
  109:14,23
  111:11
  113:1,9,16
  122:23
  133:7

lieutenant
  4:15 25:17
  26:12 27:5

90:14

**lieutenant's**
31:12

**lieutenants**
25:21

**life** 74:22
107:11

**lighting**
65:23

**limited** 76:6

**lined** 118:18
119:21

**lines** 50:11
105:6,11

**listen**
12:10,12

**listening**
130:22
131:3

**live** 16:15,
18

**lived** 130:9

**lives** 78:6

**living**
17:10,14,
18

**Llamas**
11:19,20,
24 33:1
34:23
36:1,9
37:9 40:4,
15,20 41:2

42:17
45:13
46:4,22
47:2 50:7
51:2,7,9,
13,16
52:11
56:23
57:1,2,5,
11 58:5,7,
11 60:14
61:5 63:5,
15,25 64:2
66:7 67:11
68:7 69:11
70:2,10,
14,19
74:7,11,15
75:7,17,21
76:7,16
78:12 84:1
85:22
86:23
90:13
101:22
102:2,15
103:3,10,
20 104:7,
17 118:22
120:15
121:1,21,
24 122:9
124:7,24
125:4,6,
10,13,17,
20 126:16,
25 128:23
129:2,5

132:8,18,
25

**Llamas's**
33:11
35:15 71:6
79:18 81:1
97:6
120:17
122:25
123:13,18
129:13
130:5,6

**locate**
121:20

**located** 80:6

**location**
24:8 35:15
36:3,8
42:6
44:11,15
72:7 80:3
131:19

**locations**
37:2

**long** 12:20
28:2,8
39:11
40:18
44:21
56:11,17
99:7,9,16
106:10
114:5
120:1,7
122:14
127:6

130:15

**longer** 56:18
83:21
84:18
92:6,9
101:19

**looked** 62:4,
19 91:20
93:20
95:19,25

**lose** 94:24
95:2

**losing** 60:20

**lost** 52:1,7
53:23
56:3,14,21
58:12
60:22
122:2

**lot** 54:17
99:19
102:18,19
109:8

**lots** 63:20

_____

**M**

**M-I-C-H-A-E-L**
4:19

**made** 33:25
34:1,19
44:22
91:7,18
117:12

**magnification**

main  108:10

maintaining
 70:1

make  34:5
 41:14
 43:22
 58:2,3
 60:2 75:17
 85:5 97:11
 102:23
 132:21

makes  53:12
 82:15

making
 120:19,21

male  130:11

manipulating
 85:24
 93:20

manpower
 22:25 23:7

Manuel  23:20

maps  42:5

March  4:3

MARDIROSSIAN
 127:12

Marine  27:12

mark  43:17

marked  42:8
 43:19

Marks  100:24

95:17

113:20,22
119:19
120:8
127:20
128:1
132:15
133:4,15,
17

masks  8:23

matching
 130:11

materials
 19:2

matter  10:21
 22:21
 84:10

maximize
 40:6

Mcfadden
 26:23 27:3
 57:16,24
 58:5
 114:14
 115:23
 130:1

Mcguire  18:9
 20:23 22:2
 26:2 29:3,
 10 30:24
 31:3,24
 32:4,6,13,
 15 44:9,13
 46:16
 56:22
 59:5,7

68:1,3,20,
21,24
69:1,6,13,
24 72:16
73:1,9,13,
16,22 74:5
86:5 96:13
98:5,8,15,
22 99:1,6
100:11
102:10
103:24
104:3
114:15
117:11,18
118:25
122:6
127:24
128:9,16

Mcguire's
 69:8 72:22
 73:6,19

means  92:3

meant  99:25
 107:10

medical  10:9
 55:5

meeting
 114:18

members
 23:24 24:3

mention  11:6
 16:25

mentioned
 6:21 7:11

9:23 13:6
14:25
44:17
79:14

mere  110:14

Michael  4:4,
19

millisecond
 123:10

mind  6:8
 52:8 55:21
 62:15
 81:14
 108:4
 122:13

Mine's
 131:14

minute
 40:21,22
 56:16

minutes  11:5
 32:24
 34:17
 39:18
 50:18,22
 90:17
 100:21
 104:24
 105:3,16,
 17

misspoke
 85:6

Misstates
 80:16
 109:19

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Index: mock..north

mock  4:25

model  17:24

molestation
 129:16

moment  23:10
 37:13 40:5
 41:25
 43:25
 62:12,15
 75:5 77:8
 78:4 81:4
 90:8 95:19
 98:18
 104:2,12
 123:16

month  13:2,4

months
 24:16,17
 28:3,4

Moreno  8:21

morning
 4:15,16
 133:5

mother  131:8

motion  67:13
 76:20

mountain
 5:11

mouth  40:7
 42:21
 54:19,21,
 22 59:24
 60:3 61:4
 62:8 76:17

78:11

move  28:15
 51:21 56:7
 58:20,23
 65:15
 69:18
 97:25
 114:24

moved  58:16
 72:7 97:3
 122:17

movement
 37:2 83:2,
 6,10,14

movements
 33:11

moving  37:20
 38:2,23,24
 41:6 45:15
 52:17
 54:19,21
 62:1,2,20,
 23,25 63:3
 65:1,19,20
 66:23
 69:11,25
 76:18
 78:13
 93:11,13,
 19 121:7
 124:7,10

multiple  8:8
 13:22
 28:18 30:2
 35:25

mute  31:10,
 11

muzzle  53:9,
 14,20
 62:22
 83:4,15

———————————

N

———————————

naked  96:3

named  5:20,
 23 7:10,17
 11:18,24

nearby  17:12
 46:19

necessarily
 8:25 16:9
 23:1 45:9
 53:8 64:13
 65:11,19
 69:16
 76:23,24
 77:4 81:11
 82:11
 84:7,14
 92:5 93:22
 94:14 97:9
 110:5,6
 112:2
 115:20
 121:19

needed  27:3
 101:12,19
 118:7

night  12:15

nighttime
 16:10

nipples
 124:4

noise  54:17

normal  6:23
 17:4

north  36:22
 38:23,24
 40:6,14
 41:3,6,8,9
 42:13,22
 44:5 45:17
 51:19,22,
 25 52:7,17
 53:23
 56:2,15,22
 58:16
 59:3,23
 60:14
 61:4,14
 63:5
 64:10,18,
 21 66:7,
 15,22
 67:2,11
 68:8 76:18
 77:22
 78:11,13
 79:22,24
 80:11
 82:21 83:4
 87:15
 88:16 97:4
 102:3
 103:11
 104:8

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025          Index: northbound..opposite

123:6
124:12

northbound
124:7

northeast
36:21,25
37:6 60:7
64:21
66:15
80:11
88:17

northeastward
81:23

northern
116:14

northward
36:10,25
37:6,18,20
38:3 45:16
51:17
60:23 80:9
81:23

northwards
58:12

northwest
64:21

northwesterly
87:19,22

nose   121:3

notes   100:20

number   23:6
43:19

numbers
90:14

O

oath   4:11
75:13

object   7:2
17:10,14,
18 107:19
108:15

objection
6:14 7:25
8:18 9:19
25:6 78:24
82:1 83:18
84:23
109:4
112:20
113:6

objections
55:13
82:22 84:4

objects
16:15,18

oblique
64:5,7,8

observed
45:3

obstacles
79:6

obstructing
69:16

obstructions
96:6

occupants
103:1,19

104:4,11,
16,20
105:2,14

occupied
78:1 79:4
105:7

occupying
62:5 78:7

occur   83:9

occurred   9:4
39:19
41:17 43:2
47:13
71:25
126:20

occurring
83:8
109:21

Office   23:14

officer   6:1
9:24
48:18,19
49:15
50:10
96:11
106:7
116:21

officers
10:2,7
22:22
34:10,13
35:12
69:12
75:22
106:11,16

107:2

officers'
18:21,24

officials
22:18

older   130:24
131:5,9,11

on-foot   59:8

ongoing
106:19

open   36:19
54:24 79:8
109:10
110:10
111:8

operating
115:11

operation
24:22

operations
99:19
112:12

opinion
10:8,9
17:6 55:5

opportunity
20:3
108:13,16,
23

opposed   36:7
73:16
92:24

opposite

72:16

optic  95:20, 25

optics  95:21

option  81:4 83:22

order  81:15

ordering 133:12,16

organization 10:12

orient  78:1, 5

orientation 77:16,19 81:5 83:1 84:19 95:3

oriented 35:19 36:22 38:8 50:3,4 62:6,9 64:21,22 66:14 68:14 70:25 77:25 94:16 95:11

orienting 38:13

Ortegas  5:11

overhead 16:2 33:4

35:18,21 36:4 42:5 43:18

overlap  31:2 73:5,9

overlapped 31:22

oversaw 25:21

_____

**P**

_____

p.m.  133:18

PA  34:3,4, 11,19 35:10

pace  6:24 59:9,12

paraphrasing 35:7

parcel 114:20,21, 23 116:2,8

part  20:7, 16 21:5 23:22 26:5 29:17 30:1 36:12,14 38:12 43:1 45:11 54:18 67:8 77:2 84:15 95:4 101:23 105:14

108:9 112:17 117:9 121:16

partial  60:2

partially 60:3

participating 114:12

parties 111:22

partly  32:9

parts  77:15

party  8:22 79:11 130:8,23 131:2,16 132:17

passed  56:12 60:22 63:4 95:5 96:20

passing 62:22

past  13:2 48:8,10,12

patrol  28:11 46:19

paused 90:17,24 91:11

peaceful 108:19

people  30:13

34:5,11 62:5,22 71:5,18 72:2 78:7 79:5,24,25 83:3,7 86:5,12 89:11 105:17 107:9 116:4 132:1

percent 45:24

period  15:6 30:2 31:7 32:22 33:5,9 34:1 36:2, 17,24 37:1,17 51:1 52:4, 10 53:25 54:4,9 55:1 56:1, 5,9,20 63:14 67:16 71:17 94:14 102:12 106:8,10

periods  14:3

perpendicular 39:3

person  10:6

16:19
33:17 47:5
54:1 118:4
131:4

**personal**
24:2

**personally**
37:3,7
76:11,14
81:3

**personnel**
25:23 27:7
115:5,8,15
117:5

**pertaining**
13:13
105:1

**phone**  132:10

**photograph**
132:4,7

**photos**  19:5,
8,11

**physical**
85:16

**physically**
51:13
75:21 76:7
83:20

**piped**  33:22

**pistol**  8:2,4
62:1,2
83:1,2,4,
6,15 84:19

**place**  18:14
28:17
41:19 80:7
114:6
115:25
117:4

**plain**  92:10

**plan**  58:1,2
102:14

**play**  90:4
91:5
109:25

**played**  91:9

**point**  21:8,
25 27:9,21
38:16,22
40:12,15
44:14,18
47:13
51:21,24
53:7,19,20
54:1,17
58:10,19
59:17
62:4,9
67:22
73:12
74:15 75:7
76:20
86:20
95:18
99:17
101:20
102:6
119:10
126:18

**pointed**  38:5
47:5,16
48:18
50:10,12
53:10,15
74:25
77:20 83:4
87:18 88:3
94:11,18
96:4
102:16

**pointing**
55:15
62:3,4
70:5

**points**  23:4
104:18

**police**  15:25
27:20,23
28:2
33:14,25
35:23 36:7
47:9,11
49:8,13
84:2,6,11,
22,24
85:9,12,15
105:23

**poorly**  75:3

**porch**  78:8

**portion**  18:2
20:4 38:18
45:23 46:2
59:24
64:5,16
65:12

66:11
69:21 90:4
121:18
123:18,22,
23

**portions**
13:16
14:2,9,10,
15 15:4,6,
13,14 18:8
20:6 65:24

**poses**  112:18

**position**
25:5,18
38:18
39:5,12,
22,25
46:1,17
67:2,3,9
69:5,8,12,
24 70:1,
14,22
76:17,24
77:18
78:20
79:18 88:7
92:21
96:25
102:11
103:2
117:3
118:9
124:15,16,
18

**positioned**
38:20
40:5,12

42:18 44:1
51:8 59:2
62:18
63:20
68:20,23
95:9,10,14
103:9

**positioning**
35:18,20
48:2
69:17,18
81:1,6
115:2
118:16

**positions**
68:9 89:15

**possessing**
110:9

**possession**
38:9 93:19
110:14

**possibility**
55:20

**possibly**
8:24 28:18
73:8 80:1
103:1
130:14

**post** 14:13,
14 19:6

**posture** 81:5

**posturing**
52:19

**potential**

10:17
105:2
112:18

**potentially**
55:17 62:6
78:6 79:5
89:9,11
103:2
105:7
116:4

**pre-designate**
115:14

**precipitate**
98:2

**predesignated**
102:20,21

**preparation**
12:2 18:6
19:8,19
91:3

**presence**
22:4,7
111:19

**present**
22:18,25
72:5
110:18
111:22

**pretty** 39:25
59:20
131:9

**previous**
17:1
129:15

**previously**
71:8

**primarily**
91:22
115:12

**prior** 9:13
11:1,3
14:16,17
15:6,20
16:23
20:2,8,10
26:25
32:24
33:5,9
34:18
36:15
44:9,17,21
47:2,6,7,
13 49:15
57:10,17
58:8 62:1
66:19
74:4,14,
17,18,19,
20,22,24
75:5,15,20
76:8,12
80:16
94:2,4
99:7
104:22
107:25
108:22
114:5,9
116:10,12
122:11
124:6

126:24
127:2
129:7,11,
19 130:7
131:20
132:25

**private**
23:25 25:1

**probability**
114:19

**proceeded**
58:12
60:23

**proceeding**
36:9,24
37:6 41:3
68:8 104:7

**process**
67:11

**professionalis
m** 86:10

**profile**
66:2,4
123:20

**projectiles**
10:13

**prompted**
131:18

**pronounced**
19:16

**pronunciation**
11:24

**property**
41:18

43:1,3,5
44:4,20
45:4
51:18,22,
25 56:15
57:18
58:16,21
60:20,23
68:8 72:1,
2,4,6,7
76:11
79:17,22
80:1,3
82:21
85:16,17
103:2
104:9,11,
16,20
105:2,13,
14,18
114:8,10
116:1
129:23
130:12
132:1,6

**proposing**
80:20

**protect**
115:11,12
118:15

**protection**
23:22
24:10

**protective**
23:23

**protracted**

101:18

**provide** 24:9
55:17
102:22

**provided**
23:23
78:20
112:4
115:23
129:20

**providing**
117:21

**proximity**
30:25
111:19
112:25
131:1

**prudent**
108:2,3

**pull** 59:24

**purpose** 21:4
62:21

**purposes**
20:21

**pursue**
83:20,21,
23 84:17

**pursued**
102:7
129:17

**pursuit**
131:20,23

**put** 16:12
35:7 65:2

83:3,6

**putting**
68:21 79:5

_____

_____
**Q**

**question** 7:1
31:18
47:12
49:21
50:25 55:8
62:11 75:2
76:2,6
77:5
98:16,17
99:14
113:17

**questions**
23:9
28:15,19
32:22 52:4
105:19
113:19,24
122:24
125:8
133:5,8

**quick** 122:20

_____

_____
**R**

**radio** 33:14,
16 35:11,
16,23
36:3,7,9
37:8,11
38:7 91:20

**Ramirez** 5:2,

12 6:2,14,
16 7:25
8:9,18
9:19 10:8
13:12 16:3
17:5,20
20:24 22:4
25:6 30:4
31:9,14
39:14
47:22
55:4,13
78:24
80:15
82:1,5,22
83:18
84:4,23
85:4 86:2
99:8
100:6,23
107:19
108:15
109:4,18
111:1
112:20
113:6
119:14
120:4
127:9,18,
21 133:9,
11,13

**ran** 38:19,
24

**range** 25:8,
10 30:16

**rank** 25:15,
19 26:13

rape  129:16

rapport  49:1
72:20,21
96:14
126:20

reaching
36:15

read  12:7,
8,14 98:25

realize
49:14
81:18

reason  11:14
20:16 43:8
108:10
128:13

reasoning
48:24
121:8

reasons
126:11

recall  6:7
7:15,24
10:22 11:3
12:16,17,
19 13:22
14:12,15,
17 19:12
20:10,25
21:7,9,12
23:8 38:6
44:12
45:5,11
46:18 51:4
54:24 55:7

56:24
57:15
66:10,21
67:1 87:1,
13 88:2
89:23
95:7,18,21
97:9
103:12
104:1,21
114:12,17
122:16
126:2,17
127:1
131:10,22

receive
27:14 38:3
106:1,13,
23

received
84:21
103:17
105:23
112:8

receiving
33:10,13
37:19
38:2,11

recent  5:8,
10 12:13

recently  6:5

recognize
90:16,24

recoiling
96:15

recollection
52:23
67:15
70:24
89:25 90:5
91:6,13,17
126:23

record  4:10,
18 7:4
41:15
50:22

recorded
15:10,12,
16 16:21

recording
12:10,12
16:23
18:23

recordings
16:23 20:4

records  18:6

recovered
10:13

redeployed
115:16

redeployment
116:13

reengage
89:12

refer  11:24
92:16

reference
89:14

referring
21:9

refers  98:4

refresh
52:22 90:5
91:6,13

refreshed
91:18

regain  60:14

regained
60:19,24
61:5 62:13
63:5,14
66:6
67:10,17
68:7 77:8
78:12

regaining
64:2 66:13
85:23

regard  115:9

rehearsal
4:25

related  19:2
21:12
104:1
126:20

relatedly
51:6

relative
46:17
68:10 71:2
116:10

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Index: relayed..River

relayed  45:1

relevance
 6:14,16
 7:25 8:10,
 18 9:19
 10:9 25:6

remained
 54:22 72:6

remaining
 81:22
 83:15

remember
 44:8
 103:15,18

REMEMBERED
 4:2

remind  75:13

remotely  4:4

reorienting
 66:21

repeat  92:22

report  72:18
 131:24

reported  4:8

reporter
 4:6,9
 6:15,21
 7:7 14:22
 37:24
 59:22 82:4
 86:1 92:14
 111:17
 132:12

reporting
 8:22 35:15
 130:8,11,
 20,23
 131:1,6,16
 132:17

reports  38:7

require
 86:17

required
 107:24

rescue  98:2
 111:7

Reserve
 23:18

reset  67:1

residence
 8:20 44:10
 62:6,23
 80:20
 124:10,15,
 24 125:5

residents
 44:4,14
 71:8 77:16
 103:13,24

Resort  23:20

resources
 116:14

respect
 102:20
 115:7
 116:18

respective
 89:14

respond
 13:14 16:5
 17:7,22
 20:25 25:7
 30:6 39:15
 55:6,14
 79:2 80:18
 82:5,23
 83:19 84:5
 86:3 99:10
 100:7
 107:21
 108:17
 109:7,20
 111:3
 112:23
 113:7
 120:6

responding
 16:1

response  7:1
 83:17
 104:19

responses
 17:1

responsible
 107:12
 116:19
 117:17

restrain
 86:13

result  9:18

retired

23:14,16,
 18 25:12

return
 126:10,12

returned  9:2
 119:25

review  13:15
 18:14 19:7
 20:3

reviewed
 12:2,5,6,
 25 13:6,
 11,16,19
 14:6,20
 15:18 16:6
 17:17
 18:3,6,8,
 20,23
 19:2,19
 20:5,7
 91:3

reviewing
 14:17,25
 15:20 18:1

rifle  72:18,
 21,23
 95:24
 96:14,15

ring  41:22

risk  105:11

risking  78:6

rivalries
 85:4

River  36:11,

16,22,25
37:7,12,18
38:3,18,25
39:3,6,8,
13,17
40:15
41:4,8,11,
12,13,22
42:9,13,
18,21,23
43:6 44:2,
6 45:14,
17,21
46:5,16
47:4,8,18
50:7,8
51:3,7,8,
17,18,25
52:6 56:2,
13,15
58:8,11,17
61:10 62:8
63:6 66:7
68:9 77:17
78:11,17
102:3,11
103:6
104:8
117:2
130:9,10

**Riverside**
4:5 25:13
27:24
84:22,24
85:1
106:3,14,
19,23

**road**  36:11,
16,22,25
37:7,12,18
38:3,18,25
39:3,6,8,
13,17
40:15
41:4,12,
13,22
42:9,13,
18,21,23
43:6 44:2,
6 45:14,
17,21
46:5,9,16
47:4,8,18
50:7,8
51:3,7,8,
17,18,19,
22,25 52:6
53:22
56:2,13,15
58:8,11,17
61:10 62:8
63:6 66:7
68:9 77:17
78:11,17
102:3,11
103:5,6,
10,11
104:8
117:2
122:22
130:9,10

**roadway**
52:20

**robust**

116:15

**role**  21:4
24:14 27:4
115:17,21
117:19

**roles**  116:24
117:1

**rolling**
93:17

**room**  109:9
111:6

**rotating**
64:9,10,11
77:23

**rough**  133:13

**round**  29:8
31:6 32:3
66:20
101:6
121:22
126:15,25
127:6,7
128:2,10,
17

**routinely**
24:21

**RPR**  4:6

**rules**  25:3

**running**
42:9,12
61:25 65:3
76:18,22,
23 77:2,9,
13,14

78:23
79:3,8
80:9,14
81:23
82:18 83:4
89:10
116:16
124:18,20

**runs**  40:14
45:17

_____

**S**

**S-A-N-T-I-S-T-
E-V-A-N**
132:13

**San**  23:19

**scene**  16:1
19:5,13
27:5
120:25
131:17

**school**  27:9

**scope**  95:16

**scratch**
12:16
61:13
113:14

**screen**  90:9,
10

**sealed**  116:5

**Sean**  26:2
29:3

**search**
129:23

131:18

searching
  57:17

seconds
  40:24
  56:17 61:1
  63:8,19
  72:25
  74:4,9,19
  76:12
  89:22
  90:18 91:5
  96:24
  127:11

secret  24:24
  75:12

security
  23:25 24:2

seek  17:11

seeking
  57:24

senior  26:12

sense  48:11
  53:12
  82:15

senses  35:19

separate
  13:10
  25:19 34:6
  36:14 92:7
  108:3

separated
  30:2

sequence
  95:6

sergeant
  13:16 14:7
  18:3,9
  20:8 26:8,
  13,16,19,
  23 27:2,3
  30:24
  31:22
  32:2,7,12,
  17 57:16,
  24 58:5
  59:7 68:3,
  4,18
  72:12,14
  73:5,6,10,
  18,22 74:6
  86:6 89:2
  114:14
  115:23
  117:11,18
  118:24
  127:23
  128:7
  130:1
  132:9

Sergeant--
  132:11

service
  23:23
  92:17

services
  25:22

set  4:2
  109:12

111:9

setting
  105:4

share  90:9

shared
  129:25

Sheriff
  27:24

sheriff's
  5:25 23:14
  25:13,17
  27:24
  28:6,25
  85:1,17
  106:3,14,
  20,24

shift  105:20

shirt  124:2

shoot  8:16
  47:10
  49:19
  74:12
  76:1,22
  81:24
  82:18
  100:15
  101:16
  104:18
  109:17
  110:3,19,
  25 111:25
  112:6

shooters
  101:10,11

shooting
  9:4,5 10:2
  14:1,11,
  12,13,14,
  16,21
  15:3,7,14,
  15 22:2
  26:25
  28:20,21
  39:19
  41:17 43:2
  44:10,21
  47:14
  49:15,20
  62:2
  71:19,25
  74:17
  75:24 77:7
  78:4,22
  79:7 84:1
  90:13
  98:12 99:3
  102:13
  103:16
  108:12
  114:5
  116:10,13
  122:10,11,
  15 125:9,
  21 126:21
  129:12,19,
  22 130:7,
  15,19

short  30:8
  40:25 90:4
  94:14

Shorthand

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025                    Index: shortly..sir

4:6,9

**shortly** 32:4
  49:8 126:1

**shot** 32:25
  33:6,9
  39:11 47:9
  48:4,6,8,
  11,18
  49:9,14,17
  63:6,15
  66:8 67:6,
  24 68:1
  69:4,9
  70:9,13,23
  71:4 72:10
  73:1 75:6
  76:3 80:12
  84:2,6
  88:13
  92:19
  96:21
  103:4
  107:13
  116:12
  122:6,7,8
  124:25
  125:10,14,
  24 126:4,
  15,17,24
  127:2,13
  128:6

**shots** 8:4,7,
  17 9:13,18
  10:6,17,19
  14:4 19:15
  29:5,19,22
  30:1,16,21

31:1,2,5,
7,21,23
32:1,3,23
34:18
66:19,20
67:13,18
69:9 71:13
73:6,7,13,
17,19,23
74:5,10,
14,18,23,
24 75:16,
20 76:8,13
79:18
86:22
87:4,10
88:12,19
89:22
91:8,14,
15,25 92:2
93:15,24
95:22
96:10,12,
16 97:1,5,
13,18,19
98:19
100:10
101:6,24
103:8,25
104:12,14,
24 107:16
117:23
118:18,23
120:10,11,
18 121:1,
5,22,25
122:25
123:11,13

124:7
125:6
126:16,25
127:6,7,
13,16
128:5,10
129:2
132:25

**shoulder**
  65:9,12
  68:15,16
  123:22,25
  124:1

**shoulders**
  66:16,18
  67:5 68:16
  70:6,15

**show** 42:2

**shown** 17:19
  132:4

**shows** 84:12

**shut** 116:5

**sic** 41:8

**side** 44:5
  52:18,24
  53:22
  65:25
  66:1,2,5
  83:5,16
  87:14
  116:7
  121:15,16,
  18 130:10

**sight** 52:1,7
  53:23

56:3,21
58:12
60:14,22,
24 122:2

**similar**
  17:19
  61:12

**similarly**
  110:23

**simply** 92:3

**simultaneous**
  5:1 6:13
  63:10
  111:16

**single** 7:9
  13:21,23
  30:2 67:9

**sir** 4:16
  7:6 8:12
  11:12,22
  15:8,23
  18:19
  19:21
  20:1,19
  21:1 23:8
  24:17
  25:14
  26:4,17
  27:10,22
  28:13,23
  29:2,4
  30:19
  31:4,16
  33:15
  34:14,24
  35:13 37:4

39:4,23
40:11
42:4,7,11,
15 43:10
45:18 49:6
50:15 51:5
56:6 58:25
59:16,19
60:5 61:23
65:6 69:3
70:3,8,17
72:24
73:3,24
75:14
76:10
78:6,19
85:3 86:24
87:5 88:18
89:16 91:4
92:22
98:6,10,
13,17,24
99:5
100:16
105:25
106:21
107:4
108:5
112:7,10
113:8
120:7
121:23
122:13
123:15
124:9
125:7,12,
15,18
126:8

128:15
129:10,23
133:6

sit   88:25

situational
111:4

situations
110:1

sky   62:24

slight   73:8
83:1,6

slightly
52:19
56:18
64:20
69:14,19
71:2 86:19
88:9

slower   6:23

small   46:2

smelling
82:8

someone's
92:18

sort   24:23
29:17 31:2
35:14
40:13
42:10
52:3,8
69:25 88:6
94:11
105:19
111:7

sought   57:16
81:3

sound   7:5
41:24
48:3,20,25

sounded   30:7
72:20

sounds   7:6
43:14
72:20
100:25

source   44:13
57:11,14
58:4

sources
35:25

south   36:16
38:24
40:14,20
41:4,8
42:12,13
45:14,17
47:3 50:8
51:3,7,16
52:5,6,17
53:22
56:2,21
61:11
64:11
87:15,24
95:11 96:4
97:14
130:10

southeasterly
88:3

southerly
97:15

southern
42:21
56:13
87:24

southwest
87:25
97:15

space   36:19
79:8
109:11
110:10
111:8

Spanish
131:13

speak   6:23
57:19
58:3,7

speakers   5:1
6:13 63:10
111:16

speaking
6:24
54:14,16,
20 57:20
58:5 74:20
123:8
130:24

special
25:20

specific
29:18
115:6,8
116:23

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025      Index: specifically..surrender

117:15

specifically
  19:7
  114:22

speculation
  16:3 17:5,
  20 20:24
  55:4 100:6
  120:4

speed 59:14

spelled
  11:21
  132:14

spelling
  4:18

spoke 57:5,
  9,12 130:9
  131:9

squad 25:25
  130:2

stamp 90:20

standing
  40:8
  69:19,20
  96:25
  110:19
  111:24
  131:1

start 4:17
  24:13 28:5
  29:9 30:14

started
  16:25
  36:24

91:22
94:5,25
97:13
116:7

starting
  64:10
  67:12
  76:19,20
  77:9 78:5

state 4:6
  24:11,12
  27:19

statement
  19:23
  20:2,9,11,
  12,14,17
  21:19
  89:17
  91:7,18
  98:25

stating 4:17

stayed 23:18

STENOGRAPHER
  31:9 50:20
  133:11,15

stenographical
ly 4:7

step 6:24
  47:17 50:7

stepped 40:3
  45:21
  51:16
  60:17,19
  61:3 62:13
  68:6 114:8

122:17

stepping
  56:13
  60:24

stop 98:12

stopped
  39:17
  40:19
  59:18,21
  60:10

stopping
  39:25

straight
  41:15
  123:2

street 36:10
  41:11 42:9
  44:5 104:2

strive 86:10

struck 10:19
  76:4,5
  86:7 87:4,
  10 121:1
  128:24
  129:2

structure
  78:1
  103:19
  115:13,14
  116:3

structures
  36:20
  114:11
  115:1

subject 7:21
  9:9,10,11,
  14 10:23
  19:13
  71:9,10
  84:13,18
  93:10
  108:12,22
  109:9,11,
  16 111:9
  113:4
  116:15,25
  117:5,21
  119:2,3
  122:21

subject's
  111:5

subjects
  8:21

subsequent
  101:13

suicidal
  55:3,8,11,
  17

supervisor
  26:7,8

supporting
  53:10

Supposing
  78:10

surfaces
  17:11

surrender
  35:8
  108:19

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025        Index: surrounding..thinking

surrounding
 17:11
 19:14 22:9
 110:14

suspect
 57:19
 89:12
 92:13,24
 93:1,5
 105:6
 108:12,22
 114:19
 119:22
 132:5

suspect's
 86:7 92:11

suspected
 49:12,25
 105:13
 126:17

suspecting
 49:13

suspects  9:1
 102:19

SWAT  25:22
 99:12

switching
 16:7

sworn  106:3

synonyms
 108:6

system  34:4

---

T

---

tactical
 97:25
 102:14,18
 104:25
 105:3
 114:1,3,6
 115:17,24,
 25 131:17

tactically
 22:12

tactics
 26:11
 112:9
 114:20
 116:10

tactile  58:1

taking  11:3,
 8 102:10
 115:17

talk  117:8

talked  32:23
 105:22

talking
 11:25
 13:20
 30:12
 31:20
 43:23
 71:20
 74:19
 103:12
 111:22
 123:10

128:2,4

task  118:11

tasking
 115:6,9

tasting  82:9

team  25:22,
 23 26:5,
 10,19 27:2
 28:25 33:1
 57:17,24
 86:11
 99:12
 101:9

technology
 115:2,11

temperature
 17:1,9,12,
 13

temperatures
 16:12 17:3

ten  6:6
 11:5 32:24
 34:17
 50:18,22
 63:8,19
 74:4,9
 96:23,24
 100:21

ten-minute
 11:8 33:5,
 9 34:1
 36:2,16

term  69:8
 86:8 93:4,

8 99:9
 107:20
 108:15

terminology
 92:5,7

terms  15:18
 23:5 31:3
 80:7 87:16
 92:25
 113:17

terrain  79:6
 115:3,4

testified
 80:25

testifying
 81:18

testimony
 11:15
 80:16
 98:25
 109:19

thereof  4:4

thing  16:16
 22:24
 82:14
 86:13
 105:9
 110:17
 116:2

things  7:3
 99:25
 102:18

thinking
 48:24

**third-parties**
80:23

**third-party**
80:20
111:19

**thought**
11:20
30:15
41:10
43:24 50:9
72:9 73:10
99:2

**threat** 92:6,
9 107:6
112:18
113:4,11

**threatened**
51:9

**threatening**
104:20

**threats**
75:18

**thresholds**
119:18

**till** 94:25

**time** 8:25
9:24 10:11
11:1,10
12:13 14:3
18:17
19:1,2
22:2,14
25:5,19

70:3,8
31:3,7
32:17 36:1
37:1,5,18,
23 38:1,12
39:10,14,
16,21
40:4,18,19
41:7 44:1
45:4
46:12,15,
22 47:2,17
48:17
49:5,8,14,
24 50:5,7,
18 51:1,6,
12 52:4,6,
14 53:2,6,
21,23
54:14,15,
20,23
55:12
56:1,11,
12,14 57:4
58:15
60:8,13,
18,21
62:17
63:4,8,16,
24 65:5,
18,22
67:19,22,
25 69:11,
23 70:2,4
71:4 74:1,
9,20,22,25
76:22
77:6,18

78:23
80:13,24
81:15
82:10,19
84:2 85:25
87:9 88:22
89:5,8
90:20
93:14,21,
24 94:15,
24 95:6,
17,22
96:3,8,20
97:13,23
98:14
99:7,9
100:14,17
101:7,16,
23 102:2,
6,9,13,24
103:2,5,25
105:6
106:8,10
113:14
117:10,22
118:1,17,
22 120:20,
23 122:8,
9,18,21,24
124:6,24
125:6,10,
20 128:10
133:5

**timeframe**
40:25

**times** 4:24
12:23,25

13:1 53:4
131:8,10

**today** 11:15
12:24 19:2
22:3 88:25

**told** 10:11
19:3 20:20
21:3 36:9
37:8 130:4
132:24

**ton** 100:19

**tone** 100:1

**tool** 85:13,
14

**top** 43:4
90:21

**topics** 115:7

**tops** 40:22
46:14

**torso** 52:25
64:9,13,
14,15
65:4,8,13
66:16,17,
21,24 67:4
70:6,15
77:9,23
78:14
87:22 94:6
123:21
124:13,21

**total** 10:2,4
13:1
73:17,21

120:11,12
128:3

**totality**
110:8,21

**touching**
82:9

**tracking**
25:25 33:1

**traditional**
16:8

**traffic**
37:11

**train** 105:9,
10

**trained**
89:18
101:9
107:1,5,
12,15,24
108:21
109:1,15
110:2,17,
19,21,22,
23 111:12,
23 113:3,
10

**trainer**
112:4,7

**training**
25:8,10
84:21 85:8
89:19
102:19
105:20,24
106:1,5,7,

11,14,15,
16,18,22,
23 108:9
110:1
112:3,9,
11,14,17
113:5
119:17

**trajectory**
53:11

**transcript**
12:14,25
18:2,20

**transcripts**
12:8 18:8,
11,15

**translate**
131:11

**translating**
131:8

**transmission**
91:20,23

**travel** 24:9,
11 36:13,
15

**traveled**
48:12

**traversed**
52:20

**traversing**
132:1

**tree** 48:21

**trial** 7:17

**tribal** 23:23

**trotting**
65:2

**truck** 69:14,
20

**turn** 60:3
65:8
66:18,23
67:12
76:19,21
113:18
119:22

**turned** 65:14
67:5,7
101:18
116:4

**turning**
64:12,13
65:5,13
66:15,17
67:7,13
70:6 85:23
94:6
124:13,14

**turns** 104:17

**twist** 77:9

**twisted**
70:14 88:7

**twisting**
93:25

**type** 7:20,
23 15:10
16:21
21:19

24:18
26:15
85:9,16
89:17
95:16

**types** 16:22
17:18

**typically**
17:18,23,
24

———————

U

———————

**ultimately**
103:3

**understand**
7:18 8:11
11:25
13:14 27:4
28:16,22
30:6
31:21,23
37:17
39:15
57:12
69:22
78:18
81:17 83:9
89:7 99:24
108:17
109:24
121:13

**understanding**
10:5 11:17
14:19 17:2
21:14 27:1
28:24

29:19,25
32:11
34:15 39:2
43:1 44:3
45:15 49:7
57:4,8
58:15
73:25
89:13
101:22
128:22
132:17

**understands**
91:21

**understood**
8:25 27:20
32:20
36:23 57:6
89:19 99:4

**uniform**
33:16

**upward** 53:11
65:4

---
**V**
---

**vague** 8:9
13:12
22:8,10
30:4 39:14
99:8,14
107:19

**Valley** 8:21

**vehicle**
39:21,24,
25 40:1,3,

9,19 59:3,
4,6,11,18,
24 60:6,
10,11,13,
16,25
61:3,15
62:13
68:6,13
69:15,17
78:10
118:3
122:17
131:20,21,
23

**vehicles**
39:17
115:4

**venues** 25:1,
2

**verbal** 34:2,
6,11
56:23,24
57:1 74:7,
11 75:18
100:12,15
107:25
108:11
117:21

**verbally**
51:9 99:21

**version**
90:25

**versus** 16:19
17:11
20:13 46:5
48:13

69:17 79:7
80:25

**video** 13:21,
22,23,25
15:9,20
16:21
18:3,4,23
20:3 90:5,
17,18,21,
25 91:2,9,
12

**videos** 13:7,
10 15:21
17:16

**view** 16:8
19:9
40:15,20
41:1,2,7,
8,11,12
42:6,17
45:15
46:1,2,15
51:2 63:25
69:17 95:6
118:22,25

**viewing**
14:15
20:10

**violent** 84:9

**visible**
45:23

**visual** 40:7
44:14,18,
22 45:25
56:14
60:19 61:5

62:13
63:5,15
64:3 66:7,
13 67:10,
17 68:7
69:10 70:1
71:11 77:8
78:12
85:23
94:24 95:2
122:20

**voice** 89:4
100:1

**volley** 8:8,
12 30:2
32:5,8,12,
16,23
73:7,13,
15,16,18,
23 74:2,5,
10,14,18,
23 75:16,
20 76:8,13
86:22,24
87:4,7
88:12,19
89:21,24
90:1,2,6
91:7,15,
19,23,24
93:24
94:2,3,4,5
96:1,10,
17,21,22
97:1,2,5,
7,13,18
98:19

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025          Index: volleys..Yaamava'

101:12,13
118:17,22
120:10,12
121:1,5,8,
9,10,25
122:19,24
123:4,13
124:7
126:21
127:2,14
128:4,8,
17,20,23,
25 129:1
132:25

**volleys** 8:8
30:2,8
32:13
93:15
100:10
107:16

**voluntary**
20:13,15,
17

—————————

**W**

—————————

**W-A-L-S-H**
4:20

**wait** 119:13

**waited**
119:11
120:1

**walked** 111:6

**walking** 65:2

**Walsh** 4:4,
15,19

90:14
112:4

**wanted** 11:6
43:22
128:5
129:16,18

**warning**
74:11
107:25
108:11,21,
24

**warnings**
100:15

**warrant**
110:10
111:19

**watch** 104:10

**watching**
103:10

**ways** 63:21

**weapon** 7:19,
22,23 9:11
24:18 25:4
38:10 48:2
50:10,12
85:10,19,
24 86:4
98:9
102:2,6
117:23
118:2

**weapons** 8:24
25:2 29:1

**wearing** 8:23

13:7 124:2

**week** 12:22
18:16
19:24

**weeks** 106:12

**west** 38:19,
20 39:7,12
42:10 44:2
51:8 52:16
61:10
64:10
78:1,2
79:17 80:2
83:3 87:16
94:7
102:11
103:3,10,
20 104:18
114:25
116:2,7
130:13
132:2

**westerly**
83:5 94:12

**whereabouts**
33:11

**whistle**
48:8,10

**white** 17:19

**wielding**
8:24

**wind** 114:25

**witnessed**
75:21

**woman**
132:18,21

**wondering**
32:2 46:3
47:15 75:5
93:3
103:22
113:2

**word** 21:7,
13

**words** 21:13
34:9 48:12
52:24
53:19 56:7
72:19 95:4
115:18
119:20
123:24

**work** 11:11
24:8,19,24
84:23

**worked** 28:8

**working**
23:16
24:13 26:2
28:5,6,11
99:6,16
119:16

**worry** 11:23

**worth** 27:16

**wrong** 123:12

—————————

**Y**

—————————

**Yaamava'**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Michael Walsh on 03/21/2025                    Index: yards..Zoom

```
  23:19,21

yards  46:14
  54:10 61:7
  70:12
  88:15
  92:20 93:7
  109:11
  110:10
  111:7
  125:3

year  6:7
  13:5 24:15
  99:18

years  5:15
  6:6 27:16
  28:10,12
  131:7

yell  88:21

younger
  131:7
```

———————————
            **Z**
———————————

```
Zoom  31:12
```

# EXHIBIT 23

# EXHIBIT 23

**Delia Flores**

---

| | |
|---|---|
| **From:** | Lawrence D. Marks <lawrence@garolaw.com> |
| **Sent:** | Wednesday, May 14, 2025 10:02 AM |
| **To:** | Kayleigh Andersen |
| **Subject:** | RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ |

Yes.  Thanks.

---

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Wednesday, May 14, 2025 9:47 AM
**To:** Lawrence D. Marks <lawrence@garolaw.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning,

No problem. Yes, I can give you a call at noon. Should I call your office again?


**Kayleigh Andersen**
Partner

 MANNING | KASS

801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

---

**From:** Lawrence D. Marks <lawrence@garolaw.com>
**Sent:** Wednesday, May 14, 2025 9:46 AM
**To:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Sorry I missed your call.

How about noon?  Or anytime after.

---

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Wednesday, May 14, 2025 8:17 AM
**To:** Lawrence D. Marks <lawrence@garolaw.com>; Garo Mardirossian <garo@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>

**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning,

Not a problem. I am available now until 10. Let me know what time works for you and what is the best number to call.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

**From:** Lawrence D. Marks <lawrence@garolaw.com>
**Sent:** Wednesday, May 14, 2025 8:15 AM
**To:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>; Garo Mardirossian <garo@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning, Kayleigh:

Thanks for your patience. I was out of the Country for a couple weeks, and upon my return, I took yesterday off for illness....

I am back in the office today and available most of the day.

Let me know what time works best for you.

Thanks

Larry

---

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Tuesday, May 13, 2025 9:12 AM
**To:** Lawrence D. Marks <lawrence@garolaw.com>; Garo Mardirossian <garo@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning Mr. Marks,

I just called your office and spoke with Daniel on the phone who advised that that you are out sick today. I called based on our email exchange below. As I understand from my talk with Daniel, you will not be objecting to any timeliness for the meet and confer for the MSJ based on our continued efforts to set up this call. I am available tomorrow as follows: 8-10 and 12-1, so please let me know what works best for you. I look forward to our call, and I hope you feel better.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

---

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Monday, May 12, 2025 2:53 PM
**To:** Lawrence D. Marks <lawrence@garolaw.com>; Garo Mardirossian <garo@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good afternoon,

I already met and conferred with Ben last week. I can be available at 9:00 a.m. tomorrow if that works for you. Please let me know what number works best to call at that time.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

**From:** Lawrence D. Marks <lawrence@garolaw.com>
**Sent:** Monday, May 12, 2025 2:52 PM
**To:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>; Garo Mardirossian <garo@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

I am available most of the day tomorrow. Please confirm a time with Ben, and I will make my calendar work...

Thanks.

Larry

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Monday, May 12, 2025 2:49 PM
**To:** Garo Mardirossian <garo@garolaw.com>; Lawrence D. Marks <lawrence@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good afternoon Larry and Thor,

I am reaching out to set up a time to meet and confer regarding the MSJ either today or tomorrow. Please provide a time as soon as possible.

Thank you,
Kayleigh

## Kayleigh Andersen
Partner

 MANNING | KASS

801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Wednesday, May 7, 2025 10:22 AM
**To:** garo@garolaw.com; Lmarks@garolaw.com; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning Thor,

Thank you for your call a few minutes ago to let me know that Mr. Marks is not available in any capacity for a meet and confer phone call until Monday or Tuesday next week. You also advised that there are not any other attorneys to handle the meet and confer phone call for this case before next week. Upon his return, we will touch base to set up the meet and confer.

Thank you,
Kayleigh

## Kayleigh Andersen
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Wednesday, May 7, 2025 8:56 AM
**To:** garo@garolaw.com; Lmarks@garolaw.com; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** RE: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good morning Larry, Thor, and team,

I am following up on my emails below requesting to meet and confer. Is anyone available to meet and confer this morning at 10:30 a.m. on behalf of plaintiffs S.L. and Carolyn Campbell? If not, please provide an alternate date/time between today and Friday.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this

communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Tuesday, May 6, 2025 3:10 PM
**To:** Benjamin Levine <blevine@galipolaw.com>
**Cc:** DALEKGALIPO@yahoo.com; Santiago Laurel <slaurel@galipolaw.com>; garo@garolaw.com; Lmarks@garolaw.com; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** Re: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Thank you, Ben.

Is anyone available on behalf of the remaining plaintiffs? I believe it would also be easier to conduct one meet and confer together, but I can schedule another time within my availability as needed.

Thank you,
Kayleigh


**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

On May 6, 2025, at 9:09 AM, Benjamin Levine <blevine@galipolaw.com> wrote:


Hi Kayleigh,

Thank you for the clarification. 10:30am on Wednesday works and we can pencil that in, though if the other plaintiffs' counsel are available at a different time you provided, I think it would make sense to just do a single call for everyone. If it ends up just being you and me, you can reach me at our office at (818) 347-3333.

Ben

eco

**Benjamin S. Levine, Associate Attorney** | **The Law Offices of Dale K. Galipo** | 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367 | Office: +1.818.347.3333 | Fax: +1.818.347.4118 | Email: blevine@galipolaw.com  www.GalipoLaw.com

CONFIDENTIALITY NOTICE:
This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message.

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Monday, May 5, 2025 3:43 PM
**To:** Benjamin Levine <blevine@galipolaw.com>
**Cc:** DALEKGALIPO@yahoo.com <DALEKGALIPO@yahoo.com>; Santiago Laurel <slaurel@galipolaw.com>; garo@garolaw.com <garo@garolaw.com>; Lmarks@garolaw.com <Lmarks@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>; Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** Re: Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good afternoon Ben,

How about 10:30 AM on Wednesday? I can give you a call at that time. Please let me know what would be the best number to call.

With respect to point number one, the minor plaintiffs do not have standing based on information obtained during discovery. Specific to plaintiff V. L., there has been no proof offered despite multiple requests, that she is the biological daughter of the decedent, or that she had any relationship with the decedent that would qualify her as an heir. I am happy to discuss further on Wednesday.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner



801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

On May 5, 2025, at 3:37 PM, Benjamin Levine <blevine@galipolaw.com> wrote:

Hi Kayleigh,

I am available on behalf of Plaintiff V.L. at any of the times listed on Wednesday or Friday.

In the meantime, could you please clarify what is meant in point #1 by "causes of actions brought by S.L. and V.L., their respective guardians ad litem, because each lacks standing ..."? Based on the phrasing, I am not sure whether this is referring to the minor plaintiffs, or to their guardians ad litem, or both.

Ben

**Benjamin S. Levine, Associate Attorney** | **The Law Offices of Dale K. Galipo** | 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367 | Office: +1.818.347.3333 | Fax: +1.818.347.4118 | Email: blevine@galipolaw.com www.GalipoLaw.com

CONFIDENTIALITY NOTICE:
This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message.

---

**From:** Kayleigh Andersen <Kayleigh.Andersen@manningkass.com>
**Sent:** Monday, May 5, 2025 12:52 PM
**To:** Benjamin Levine <blevine@galipolaw.com>; DALEKGALIPO@yahoo.com <DALEKGALIPO@yahoo.com>; Santiago Laurel <slaurel@galipolaw.com>; garo@garolaw.com <garo@garolaw.com>; Lmarks@garolaw.com <Lmarks@garolaw.com>; Thor Dockweiler <thor@garolaw.com>; Daniel Diaz <daniel@garolaw.com>
**Cc:** Eugene P. Ramirez <Eugene.Ramirez@manningkass.com>; Lynn Carpenter <Lynn.Carpenter@manningkass.com>; Sheila Templeton <Sheila.Templeton@manningkass.com>; Delia Flores <Delia.Flores@manningkass.com>; Shanika Linear <Shanika.Linear@manningkass.com>; Angela Thompson <Angela.Thompson@manningkass.com>
**Subject:** Llamas (PC) Request to Meet and Confer re Defendants' MSJ

Good afternoon all,

I am reaching out to set up a time to meet and confer regarding defendants' Motion for Summary Judgment. I can be available to meet and confer as follows: Wednesday 5/7 between 10 and 3, Thursday 5/8 between 10 and 12, and Friday 5/9 between 8 and 10 and then 2:30 to 4:00.

As a starting point, here is a very brief outline of the defendants' anticipated MSJ:

1. Defendants are entitled to summary judgment on the first, second, third, fourth, fifth, sixth, seventh, and eighth causes of actions brought by S.L. and V.L., their respective guardians ad litem, because each lacks standing to bring any wrongful death and survivorship claims.

2. Defendants are entitled to summary judgment on the third, fourth, fifth, sixth, seventh, and eighth causes of actions brought by Decedent's mother, Carolyn Campbell because she lacks standing to bring any wrongful death and survivorship claims.

3. Defendants Hubacheck and McGuire are entitled to judgment on Plaintiff's first cause of action under 42 U.S.C. § 1983, brought by S.L and V.L., for excessive force in violation of the Fourth Amendment. First, the undisputed facts demonstrate that the force used was reasonable under the totality of the circumstances. Further, Defendants Hubacheck and McGuire are entitled to qualified immunity because there is no evidence that the use of force violated any clearly-established law.

4. Defendants Hubacheck and McGuire are entitled to judgment on Plaintiff's second of action under 42 U.S.C. § 1983, brought by S.L and V.L., for denial of medical care.

5. Defendants Hubacheck and McGuire are entitled to judgment on Plaintiff's third cause of action under 42 U.S.C. § 1983, brought by all Plaintiffs, for loss of familial relationship under the First and Fourteenth Amendments.

6. The County of Riverside is entitled to judgment on Plaintiffs' fourth and fifth causes of action under Municipal Liability. First, the undisputed facts demonstrate that the force used was reasonable under the totality of the circumstances. Second, there is no evidence of an unconstitutional policy, practice, or custom, as well as no evidence of failure to train that caused any alleged constitutional violation.

7. Defendants are entitled to summary judgment on the sixth and seventh causes of action (battery and negligence) under California state law. First, the undisputed facts demonstrate that the force used was reasonable under the totality of the circumstances. Second, there are no underlying wrongful acts to impose vicarious liability to the County and the County cannot be directly liable under a negligent hiring, training, or supervision theory. Cal. Gov. Code § 815.2. Munoz v. City of Union City, 120 Cal. App. 4th 1077, 1113 (2004), overruled in part on other grounds by Hayes, 57 Cal. 4th 622.

8. Defendants are entitled to summary judgment on the eighth cause of action under the Bane Act for the reasons above.

Defendants reserve the right to expand on the above.

Please provide the date and time that work best for you to meet and confer by phone or Zoom.

Thank you,
Kayleigh

**Kayleigh Andersen**
Partner

MK MANNING | KASS

801 S. Figueroa St., 15th Floor
Los Angeles, CA 90017
Main: (213) 624-6900 | Ext.: 2447
Direct: (213) 553-2447
Kayleigh.Andersen@manningkass.com | manningkass.com

Dallas | Los Angeles | New York | Orange County | Phoenix | San Diego | San Francisco

Note: This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521 and is legally privileged. The information transmitted in or with this message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material and is protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any retransmission, dissemination, distribution, copying or other use of, or the taking of any action in reliance upon, this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting the material from your computer. Thank you. Manning & Kass, Ellrod, Ramirez, Trester, LLP

# EXHIBIT 24

# EXHIBIT 24

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CASE NO.: 5:24-cv-00249-CAS(SPx)

---------------------x

Johnny Ray Llamas,

      Plaintiffs,

V.

County of Riverside,

      Defendants.

---------------------x

                October 23rd, 2024

                Deposition via Zoom.



Page 2

```
 1              A P P E A R A N C E S

 2   Appearing on behalf of the plaintiff and the witness:

 3   BY:  LAWRENCE MARKS, ESQ

 4

 5   Appearing on behalf of the defendants:

 6   BY:  KAYLEIGH ANDERSEN, ESQ

 7

 8   Appearing on behalf of Plaintiff V.L.:

 9   BY:  SHANNON LEAP, ESQ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 3

1                          I N D E X

2

3    WITNESS                     EXAMINATION            PAGE

4    S.L.                        DIRECT EXAMINATION

5                                BY MS. ANDERSEN          7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1

2

3

4

5

6

7

8    THE VIDEOGRAPHER:  We are now on the record.  This

9    begins Videotape number 1 in the deposition of S.L.

10   in the matter of Johnny Ray Llamas vs. County of

11   Riverside in the United States District Court,

12   Central District of California.  Today is October

13   23rd, 2024.  The case number is

14   5:24-cv-00249-CAS(SPx).  The time is 10:04 a.m.

15   This deposition is being taken remotely at the

16   request of Manning & Kass.  The videographer is

17   Victor Salcedo (phonetic) of Magna Legal Services,

18   and the court reporter is Kathleen McLaughlin of

19   Magna Legal Services.

20   Will Counsel and all parties present state their

21   appearances and whom they represent.

22            MR. MARKS:  Lawrence Marks, I represent

23   the plaintiffs.

24            MS. LEAP:  Shannon Leap on behalf of

25   plaintiff V.L.



Page 5

```
 1              MS. ANDERSEN:  Kayleigh Andersen on
 2    behalf of the defendants.
 3              THE VIDEOGRAPHER:  Will the court
 4    reporter please swear in the witness.
 5              MR. MARKS:  Not (inaudible) yet, but
 6    you'd have to raise your hand.
 7              THE COURT REPORTER:  Yes.  Would you
 8    please raise your hand.
 9              MR. MARKS:  That's you, yes.
10              THE COURT REPORTER:  May I ask, do you
11    know the difference between telling the truth and
12    telling a lie?
13              S.L.:  Yeah.
14              THE COURT REPORTER:  Will you promise
15    today that everything you say will be the truth?
16              THE WITNESS:  Yes.
17              (Whereupon, the witness was duly sworn.)
18              THE COURT REPORTER:  Thank you.
19              MS. ANDERSEN:  All right.  Good morning.
20    My name is Kayleigh.  I have some questions that I
21    want to ask you today.  I don't want to take up too
22    much of your time but if you need a break at any
23    time to use the bathroom, get a drink of water, talk
24    to your mom or your guardian, anything like that,
25    you just let me know.  Okay?
```



Page 6

1              THE WITNESS:  Okay.

2              MS. ANDERSEN:  So the court reporter who

3    just swore you in, she's going to be creating what's

4    called a transcript of my questions to you and your

5    responses today.  So you're doing a good job so far.

6    So just continue to answer questions out loud as

7    opposed to like shaking your head or nodding.  Okay?

8    Is that okay?

9              THE WITNESS:  Yeah.

10             MS. ANDERSEN:  Okay.  Great.  Thank you.

11   So the court reporter asked you when she was -- she

12   asked you to raise your hand if you know the

13   difference between a truth and a lie.  Do you know

14   the difference between a truth and a lie?

15             THE WITNESS:  Yeah.

16             MS. ANDERSEN:  Okay.  So today I only

17   want you to tell the truth.  Just do your best to

18   answer the questions I ask of you.  Okay?

19             THE WITNESS:  Okay.

20             MS. ANDERSEN:  If you don't understand

21   my question, can you let me know?

22             THE WITNESS:  Mm-hmm.

23             MS. ANDERSEN:  Okay.  And I'll -- I'll

24   do my best for -- to rephrase it or ask it another

25   way.  Does that make sense?



Page 7

```
 1              THE WITNESS:  Yeah.

 2              MS. ANDERSEN:  Great.  Okay.  So in the

 3  room with you, I believe is your guardian?

 4              THE WITNESS:  Mm-hmm.  Yeah.

 5              MS. ANDERSEN:  Okay.  What -- what do

 6  you call her?

 7              THE WITNESS:  Mom.

 8              MS. ANDERSEN:  Mom.  Okay.  So your mom,

 9  and then there's the attorney in the room with you.

10  Is that -- is that everybody in the room with you?

11              THE WITNESS:  Yeah.

12              MS. ANDERSEN:  Okay.  Thank you very

13  much.  All right.  So one more thing about like the

14  ground rules for my questions for you today.  I

15  don't want you to guess about anything.  Okay?  So

16  if you don't know the answer to my question, feel

17  free to let me know that.  Okay?

18              THE WITNESS:  Okay.

19              MS. ANDERSEN:  Great.  Thank you.

20  Whereupon,

21              S.L.,

22  having been first duly sworn, was examined and testified

23  as follows:

24  DIRECT EXAMINATION

25  BY MS. ANDERSEN:
```



Page 8

1     Q.   How old are you?

2     A.   Eleven.

3     Q.   Eleven.  Okay.  What -- what -- what's your

4   date of birth?  Your birthday?

5     A.   Oh, my birthday, July 8th.

6     Q.   July 8th of what year?

7     A.   2023 -- I mean, 2013.

8     Q.   Okay.  Thank you.  What grade are you in?

9     A.   Sixth.

10    Q.   Sixth grade.  Okay.  Have you ever spoken

11  with anyone who's like a police officer about your

12  dad at any time?

13    A.   Well, not a police officer.

14    Q.   Okay.  Thank you.  What's your dad's name?

15    A.   Johnny.

16    Q.   Okay.  Do you remember the last time you saw

17  your dad?

18    A.   Yeah, no, not really.

19    Q.   Okay.  Do you know how old you were when you

20  last saw your dad?

21    A.   No, I don't.

22    Q.   Okay.  Do you know the last time you talked

23  to your dad?

24    A.   Like, I want to say like 2020 probably.

25    Q.   Okay.  Do you know if you saw your dad at any



Page 9

1    time after 2020 like in person?

2       A.   No.

3       Q.   Okay.  What grade were you in back in -- in

4    2020, if you can remember?

5       A.   I don't remember.

6            MR. MARKS:  You didn't know there was

7    going to be math questions today, did you.

8    BY MS. ANDERSEN:

9       Q.   So if I'm doing the math right, you were born

10   in 2013, in 2020 you would've turned seven.  Does

11   that sound right?

12      A.   Yeah.

13      Q.   Okay.

14      A.   Probably.

15      Q.   So maybe when you were about seven was the

16   last time you -- you actually saw your dad?

17      A.   Yeah.

18      Q.   Okay.  And -- and also the last time you

19   maybe you spoke to him was when you were seven.

20   Does that sound right?

21      A.   Yeah.

22      Q.   Okay.  Do you remember living in the same

23   house with house with your dad at any time?

24      A.   Yeah, he lived with us.

25      Q.   Okay.  Do you know what age you were when he



Page 10

1   lived with you?

2       A.   I don't remember.

3       Q.   Okay.  Was it before you were seven, I

4   assume?

5       A.   Yeah.

6       Q.   Okay.  Do you know if your dad always lived

7   with you, like as far back as you can remember until

8   the time you were seven?

9       A.   He -- I don't remember when he --

10      Q.   That's okay.  That's okay.  Can you tell me

11  what kind of things you liked to do with your dad?

12      A.   Walk to the store with him, talk to him, play

13  with him.

14      Q.   Okay.  Other than your mom, have you ever

15  talked about your dad with anyone else since --

16  since 2020?

17      A.   Yeah, I've talked about him.

18      Q.   Who -- who did you talk to other than your

19  mom and also the -- the man sitting in the room with

20  you, your attorney?

21      A.   My grandma, my cousin, my aunt, my uncle, and

22  my sister.

23      Q.   Okay.  What's your sister's name?

24      A.   Sariah (phonetic).  And then there's two so,

25  Sariah and Carolyn.



Page 11

```
 1    Q.  Okay.  And then you said your grandma, do you

 2  know your grandma's name?

 3    A.  Yeah, Carolyn.

 4    Q.  Was that your dad's mom?

 5    A.  Yeah.

 6    Q.  Okay.  And then I think you said aunt that

 7  you also talked to?

 8    A.  Yeah.

 9    Q.  Do you know her name?

10    A.  Yeah, Michelle (phonetic).

11    Q.  Okay.  And then I think you also said uncle.

12  What -- what's his name?

13    A.  Clint (phonetic).

14    Q.  Okay.  Other than those people that you just

15  named, is there anyone else that you've spoken to

16  about your dad?

17    A.  No, I can't remember anyone else.

18    Q.  Have you ever spoken to anyone at school

19  about your dad?

20    A.  Yeah, my friends.

21    Q.  Your friends.  Have you ever talked to like a

22  teacher or a counselor about your dad at school?

23    A.  A counselor, yeah.  But that was in fifth

24  grade.

25    Q.  Okay.  Back in fifth grade?
```



Page 12

```
 1      A.   Mm-hmm.
 2      Q.   Okay.  Since that -- since talking about your
 3 dad with that school counselor back in fifth grade,
 4 have you talked to anyone while you've been in sixth
 5 grade at school about your dad?
 6      A.   No.
 7      Q.   Okay.  What about before you were in fifth
 8 grade, did you talk to any counselor or teacher at
 9 school about your dad?
10      A.   No.
11      Q.   Do you remember the name of the counselor you
12 spoke to in -- in fifth grade?
13      A.   No, I can't remember.
14      Q.   Okay.  What school was that at?  Do you know
15 -- do you know the name of the school you were at in
16 fifth grade?
17      A.   Yeah, I was at Machado.
18      Q.   And what city is that in?
19      A.   Lake Elsinore.
20      Q.   Okay.  Do you still live in Lake Elsinore?
21      A.   Yeah.
22      Q.   Have you always lived in Lake Elsinore?
23      A.   Yeah.
24      Q.   Okay.  Do you go to a different school now
25 that you're in sixth grade?
```



Page 13

1    A.  Yeah.

2    Q.  What's the name of your current school?

3    A.  Terra Cotta.

4    Q.  Terra Cotta.  Is that a middle school?

5    A.  Yeah.

6    Q.  Okay.  So I asked you about last time you

7  talked to your dad.  What about like either text

8  messages or letters or cards, since 2020, have you

9  sent your dad any text messages or cards or anything

10  like that?

11    A.  Well, I have, I haven't like texted him or

12  nothing, I have a whiteboard that I wrote on, like,

13  I love you on it, and he wrote back to me on it.

14    Q.  Okay.  When -- when was that?

15    A.  That was like about a year ago.  A year ago,

16  yeah.

17    Q.  Okay.  And where is that whiteboard?  Do --

18  do you have it like in your room?

19        MR. MARKS:  We have it in the room with

20  -- with us today.

21        MS. ANDERSEN:  Oh.

22        MR. MARKS:  She brought it with her

23  today.  I could show it to the screen if you want to

24  see it.

25        MS. ANDERSEN:  Sure.  That -- that's



Page 14

1    fine.  You want to do that.

2              MR. MARKS:  Sure.

3    BY MS. ANDERSEN:

4       Q.  So it says, I love you kid and I miss you so

5    much; is that right?

6       A.  Mm-hmm.

7       Q.  Is that what it says?  Okay.  And then it

8    says your name, I won't say it on the record, but it

9    says your name on there too at the top; is that

10   right?

11      A.  Yeah.

12      Q.  Okay.  Because you're under 18, we refer to

13   you as S.L.  Okay.  So I just -- so there's no

14   confusion, I just don't want to say your -- your

15   real name.  Okay.  And so has that been like in your

16   room that he wrote that on for you?

17      A.  Yeah, I found it after he passed away.

18      Q.  Okay.  Okay.  Do you know when he wrote that

19   then if you found it after he passed away?

20      A.  Well, I don't know the exact date, but I -- I

21   don't really know.

22      Q.  Okay.  But you didn't see that until after he

23   had passed away; is that right?

24      A.  Yeah.

25      Q.  Okay.  So you don't know where that was



Page 15

1    before he passed away; is that true?

2       A.  Yeah, but I think it was hanging up on my

3    grandma's wall.

4       Q.  Oh, okay.  And your grandma Carolyn?

5       A.  Yeah.

6       Q.  Okay.  And then other than that whiteboard,

7    do you have any other, let's say, did you send him

8    any letters or text messages between 2020 and when

9    he passed away?

10      A.  I used to call him, like, he used to call me

11   through the jail and we -- we used to send cards to

12   each other.  I'd send them -- I'd send him cards,

13   he'd send me back.

14      Q.  Okay.  So since 2020, did you talk to him

15   while he was in jail before he passed?

16      A.  No.

17      Q.  Okay.  Would it have been before 2020 when

18   you would speak to him when he was in jail?

19      A.  Yeah.

20      Q.  Okay.  And then, let's see, did you receive

21   any, like, letters or cards or text messages or

22   anything like that from him since 2020?

23      A.  Yeah.  Well, not since, but I have old cards

24   of his.

25      Q.  Would that -- would they have been before



Page 16

1  2020 then?

2      A.  Yeah.

3      Q.  Okay.  What kind of cards did he send you?

4      A.  He sent me, like, he would send them random,

5  but he'd send some, like that would say, oh, I love

6  and I miss you kid.  And he goes -- and he used to

7  say, I can't wait until I get to go home so I can

8  hug you.  And he -- if there was like a Halloween --

9  if it was Halloween, Thanksgiving holidays, he'd

10  send me like little, like a Easter card and like

11  Halloween cards and just mostly holiday cards.

12      Q.  Okay.  After he got out of jail, did you get

13  to see him?

14      A.  Before 2020, yeah.  After, no.

15      Q.  Okay.  I see.  Did you ever go visit him in

16  jail before 2020?

17      A.  No, I didn't.

18      Q.  Okay.  What kind of things did you talk to

19  your dad about?

20      A.  My friends, school, mostly like bugs.  What

21  kind of -- because like what kind of candy we'd like

22  or what we were going to do when we got home, or

23  what should we play.  Yeah, mostly those things.

24      Q.  Do you like bugs then?

25      A.  Yeah.



Page 17

1     Q.  Okay.  Is there a type of bug that you like
2  the most?
3     A.  Not really a type of bug, but if I had to
4  choose it would be a little primantis.
5           MS. ANDERSEN:  That's cute.  Okay.
6  Well, I actually don't think I have any more
7  questions for you today.
8           I don't know if Mr. Marks, your
9  attorney, has any questions for you?
10          MR. MARKS:  Not today.
11          MS. ANDERSEN:  Okay.  Well, thank you so
12  much for your time, you did a -- you did a great
13  job.
14          MR. MARKS:  All right.  Very good.  So
15  we're done with the first one.
16          THE VIDEOGRAPHER:  Are we ready to
17  conclude the deposition, Counsel.
18          MS. ANDERSEN:  Yeah.  We should go off
19  the record and then we'll come back.  Does that
20  work.
21          MR. MARKS:  Yes.
22          THE VIDEOGRAPHER:  This concludes the
23  deposition --
24          THE COURT REPORTER:  I just want to --
25  if I -- if I could just interject, would you give



Page 18

1    some indication then, some kind of name of the

2    witness?  We -- nothing was stated on the record.

3              MS. ANDERSEN:  S.L.

4              THE COURT REPORTER:  Thank you.

5              MS. ANDERSEN:  Mm-hmm.

6              THE COURT REPORTER:  Thank you.

7              And Mr. Marks -- Mr. Marks, do you want

8    to order a copy?

9              MR. MARKS:  Please.

10             THE COURT REPORTER:  Thank you?

11             Go ahead, Victor.

12             THE VIDEOGRAPHER:  Perfect.  Thank you

13   very much.  This concludes the deposition of S.L.

14   We're off the record at 10:19 a.m.

15             (Whereupon, the deposition was concluded

16   at 10.19 a.m.)

17

18

19

20

21

22

23

24

25



Page 19

1                  CERTIFICATE OF TRANSCRIPTION

2      I STEPHEN SIMPSON, TRANSCRIBER, DO HEREBY CERTIFY; THAT

3      I WAS AUTHORIZED TO AND DID TRANSCRIBE THE AUDIO FILE;

4       AND THAT THE FOREGOING PAGES ARE A TRUE AND CORRECT

5                   TRANSCRIPTION OF MY NOTES.

6      I FURTHER CERTIFY THAT I AM NOT AN ATTORNEY OR COUNSEL

7       OF ANY OF THE PARTIES, NOR AM I A RELATIVE OR EMPLOYEE

8      OF ANY ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED WITH

9        THE ACTION, NOR AM I FINANCIALLY INTERESTED IN THE

10                          ACTION.

11     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

12       APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

13     UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

14                  CERTIFYING TRANSCRIBER.

15           DATED THIS 3RD DAY OF DECEMBER 2024

16                  *Stephen Simpson*

17           STEPHEN SIMPSON, TRANSCRIBER

18

19

20

21

22

23

24

25



# Magna
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



**A**

**a.m**
4:14 18:14,16
**ACTION**
19:9,10
**age**
9:25
**ago**
13:15,15
**ahead**
18:11
**AND/OR**
19:13
**Andersen**
2:6 3:5 5:1,1,19 6:2
6:10,16,20,23 7:2,5
7:8,12,19,25 9:8
13:21,25 14:3 17:5
17:11,18 18:3,5
**answer**
6:6,18 7:16
**appearances**
4:21
**Appearing**
2:2,5,8
**APPLY**
19:12
**asked**
6:11,12 13:6
**assume**
10:4
**attorney**
7:9 10:20 17:9 19:6,8
**AUDIO**
19:3
**aunt**
10:21 11:6
**AUTHORIZED**
19:3

**B**

**back**
9:3 10:7 11:25 12:3
13:13 15:13 17:19
**bathroom**

5:23
**begins**
4:9
**behalf**
2:2,5,8 4:24 5:2
**believe**
7:3
**best**
6:17,24
**birth**
8:4
**birthday**
8:4,5
**born**
9:9
**break**
5:22
**brought**
13:22
**bug**
17:1,3
**bugs**
16:20,24

**C**

**C**
2:1
**California**
1:2 4:12
**call**
7:6 15:10,10
**called**
6:4
**candy**
16:21
**card**
16:10
**cards**
13:8,9 15:11,12,21
15:23 16:3,11,11
**Carolyn**
10:25 11:3 15:4
**case**
1:3 4:13
**Central**
1:2 4:12

**CERTIFICATE**
19:1
**CERTIFICATION**
19:11
**CERTIFY**
19:2,6
**CERTIFYING**
19:14
**choose**
17:4
**city**
12:18
**Clint**
11:13
**come**
17:19
**conclude**
17:17
**concluded**
18:15
**concludes**
17:22 18:13
**confusion**
14:14
**CONNECTED**
19:8
**continue**
6:6
**CONTROL**
19:13
**copy**
18:8
**CORRECT**
19:4
**Cotta**
13:3,4
**Counsel**
4:20 17:17 19:6,8
**counselor**
11:22,23 12:3,8,11
**County**
1:8 4:10
**court**
1:4 4:11,18 5:3,7,10
5:14,18 6:2,11
17:24 18:4,6,10

**cousin**
10:21
**creating**
6:3
**current**
13:2
**cute**
17:5

**D**

**D**
3:1
**dad**
8:12,17,20,23,25
9:16,23 10:6,11,15
11:16,19,22 12:3,5
12:9 13:7,9 16:19
**dad's**
8:14 11:4
**date**
8:4 14:20
**DATED**
19:15
**DAY**
19:15
**DECEMBER**
19:15
**defendants**
1:9 2:5 5:2
**deposition**
1:13 4:9,15 17:17,23
18:13,15
**difference**
5:11 6:13,14
**different**
12:24
**DIRECT**
3:4 7:24 19:13
**DIRECTION**
19:13
**District**
1:1,2 4:11,12
**doing**
6:5 9:9
**drink**
5:23



duly
5:17 7:22

**E**

E
2:1,1 3:1
Easter
16:10
either
13:7
Eleven
8:2,3
Elsinore
12:19,20,22
EMPLOYEE
19:7
ESQ
2:3,6,9
everybody
7:10
exact
14:20
EXAMINATION
3:3,4 7:24
examined
7:22

**F**

far
6:5 10:7
feel
7:16
fifth
11:23,25 12:3,7,12
12:16
FILE
19:3
FINANCIALLY
19:9
fine
14:1
first
7:22 17:15
follows
7:23
FOREGOING

19:4,11
found
14:17,19
free
7:17
friends
11:20,21 16:20
FURTHER
19:6

**G**

give
17:25
go
12:24 16:7,15 17:18
18:11
goes
16:6
going
6:3 9:7 16:22
good
5:19 6:5 17:14
grade
8:8,10 9:3 11:24,25
12:3,5,8,12,16,25
grandma
10:21 11:1 15:4
grandma's
11:2 15:3
great
6:10 7:2,19 17:12
ground
7:14
guardian
5:24 7:3
guess
7:15

**H**

Halloween
16:8,9,11
hand
5:6,8 6:12
hanging
15:2
head

6:7
holiday
16:11
holidays
16:9
home
16:7,22
house
9:23,23
hug
16:8

**I**

inaudible
5:5
indication
18:1
INTERESTED
19:9
interject
17:25

**J**

jail
15:11,15,18 16:12,16
job
6:5 17:13
Johnny
1:5 4:10 8:15
July
8:5,6

**K**

Kass
4:16
Kathleen
4:18
Kayleigh
2:6 5:1,20
kid
14:4 16:6
kind
10:11 16:3,18,21,21
18:1
know
5:11,25 6:12,13,21

7:16,17 8:19,22,25
9:6,25 10:6 11:2,9
12:14,15 14:18,20
14:21,25 17:8

**L**

Lake
12:19,20,22
Lawrence
2:3 4:22
Leap
2:9 4:24,24
Legal
4:17,19
let's
15:7,20
letters
13:8 15:8,21
lie
5:12 6:13,14
liked
10:11
little
16:10 17:4
live
12:20
lived
9:24 10:1,6 12:22
living
9:22
Llamas
1:5 4:10
loud
6:6
love
13:13 14:4 16:5

**M**

Machado
12:17
Magna
4:17,19
man
10:19
Manning
4:16



**Marks**
2:3 4:22,22 5:5,9 9:6
    13:19,22 14:2 17:8
    17:10,14,21 18:7,7
    18:9
**math**
9:7,9
**matter**
4:10
**McLaughlin**
4:18
**mean**
8:7
**MEANS**
19:12
**messages**
13:8,9 15:8,21
**Michelle**
11:10
**middle**
13:4
**Mm-hmm**
6:22 7:4 12:1 14:6
    18:5
**mom**
5:24 7:7,8,8 10:14,19
    11:4
**morning**
5:19

**N**
**N**
2:1 3:1
**name**
5:20 8:14 10:23 11:2
    11:9,12 12:11,15
    13:2 14:8,9,15 18:1
**named**
11:15
**need**
5:22
**nodding**
6:7
**NOTES**
19:5
**number**

4:9,13

**O**
**October**
1:12 4:12
**officer**
8:11,13
**oh**
8:5 13:21 15:4 16:5
**okay**
5:25 6:1,7,8,10,16,18
    6:19,23 7:2,5,8,12
    7:15,17,18 8:3,8,10
    8:14,16,19,22,25
    9:3,13,18,22,25
    10:3,6,10,10,14,23
    11:1,6,11,14,25
    12:2,7,14,20,24
    13:6,14,17 14:7,12
    14:13,15,18,18,22
    14:25 15:4,6,14,17
    15:20 16:3,12,15,18
    17:1,5,11
**old**
8:1,19 15:23
**opposed**
6:7
**order**
18:8

**P**
**P**
2:1,1
**PAGE**
3:3
**PAGES**
19:4
**parties**
4:20 19:7
**PARTY**
19:8
**passed**
14:17,19,23 15:1,9
    15:15
**people**
11:14

**Perfect**
18:12
**person**
9:1
**phonetic**
4:17 10:24 11:10,13
**plaintiff**
2:2,8 4:25
**plaintiffs**
1:6 4:23
**play**
10:12 16:23
**please**
5:4,8 18:9
**police**
8:11,13
**present**
4:20
**primantis**
17:4
**probably**
8:24 9:14
**promise**
5:14

**Q**
**question**
6:21 7:16
**questions**
5:20 6:4,6,18 7:14
    9:7 17:7,9

**R**
**R**
2:1
**raise**
5:6,8 6:12
**random**
16:4
**Ray**
1:5 4:10
**ready**
17:16
**real**
14:15
**really**

8:18 14:21 17:3
**receive**
15:20
**record**
4:8 14:8 17:19 18:2
    18:14
**refer**
14:12
**RELATIVE**
19:7
**remember**
8:16 9:4,5,22 10:2,7
    10:9 11:17 12:11,13
**remotely**
4:15
**rephrase**
6:24
**reporter**
4:18 5:4,7,10,14,18
    6:2,11 17:24 18:4,6
    18:10
**represent**
4:21,22
**REPRODUCTION**
19:12
**request**
4:16
**responses**
6:5
**right**
5:19 7:13 9:9,11,20
    14:5,10,23 17:14
**Riverside**
1:8 4:11
**room**
7:3,9,10 10:19 13:18
    13:19 14:16
**rules**
7:14

**S**
**S**
2:1
**S.L**
3:4 4:9 5:13 7:21
    14:13 18:3,13



Salcedo
4:17
Sariah
10:24,25
saw
8:16,20,25 9:16
says
14:4,7,8,9
school
11:18,22 12:3,5,9,14
    12:15,24 13:2,4
    16:20
screen
13:23
see
13:24 14:22 15:20
    16:13,15
send
15:7,11,12,12,13
    16:3,4,5,10
sense
6:25
sent
13:9 16:4
Services
4:17,19
seven
9:10,15,19 10:3,8
shaking
6:7
Shannon
2:9 4:24
show
13:23
SIMPSON
19:2,17
sister
10:22
sister's
10:23
sitting
10:19
sixth
8:9,10 12:4,25
sound
9:11,20

speak
15:18
spoke
9:19 12:12
spoken
8:10 11:15,18
state
4:20
stated
18:2
States
1:1 4:11
STEPHEN
19:2,17
store
10:12
Sure
13:25 14:2
swear
5:4
swore
6:3
sworn
5:17 7:22

**T**

take
5:21
taken
4:15
talk
5:23 10:12,18 12:8
    15:14 16:18
talked
8:22 10:15,17 11:7
    11:21 12:4 13:7
talking
12:2
teacher
11:22 12:8
tell
6:17 10:10
telling
5:11,12
Terra
13:3,4

testified
7:22
text
13:7,9 15:8,21
texted
13:11
thank
5:18 6:10 7:12,19 8:8
    8:14 17:11 18:4,6
    18:10,12
Thanksgiving
16:9
thing
7:13
things
10:11 16:18,23
think
11:6,11 15:2 17:6
time
4:14 5:22,23 8:12,16
    8:22 9:1,16,18,23
    10:8 13:6 17:12
today
4:12 5:15,21 6:5,16
    7:14 9:7 13:20,23
    17:7,10
top
14:9
TRANSCRIBE
19:3
TRANSCRIBER
19:2,14,17
transcript
6:4 19:11
TRANSCRIPTION
19:1,5
true
15:1 19:4
truth
5:11,15 6:13,14,17
turned
9:10
two
10:24
type
17:1,3

**U**

uncle
10:21 11:11
understand
6:20
United
1:1 4:11
use
5:23

**V**

V
1:7
V.L
2:8 4:25
Victor
4:17 18:11
videographer
4:8,16 5:3 17:16,22
    18:12
Videotape
4:9
visit
16:15
vs
4:10

**W**

wait
16:7
Walk
10:12
wall
15:3
want
5:21,21 6:17 7:15
    8:24 13:23 14:1,14
    17:24 18:7
water
5:23
way
6:25
we'll
17:19
we're
17:15 18:14


MAGNA
LEGAL SERVICES

**whiteboard**
13:12,17 15:6
**witness**
2:2 3:3 5:4,16,17 6:1
  6:9,15,19,22 7:1,4,7
  7:11,18 18:2
**work**
17:20
**would've**
9:10
**wrote**
13:12,13 14:16,18

---
### X
**x**
1:4,10 3:1

---
### Y
**yeah**
5:13 6:9,15 7:1,4,11
  8:18 9:12,17,21,24
  10:5,17 11:3,5,8,10
  11:20,23 12:17,21
  12:23 13:1,5,16
  14:11,17,24 15:2,5
  15:19,23 16:2,14,23
  16:25 17:18
**year**
8:6 13:15,15

---
### Z
**Zoom**
1:13

---
### 0

---
### 1
**1**
4:9
**10.19**
18:16
**10:04**
4:14
**10:19**
18:14
**18**

---
14:12

---
### 2
**2013**
8:7 9:10
**2020**
8:24 9:1,4,10 10:16
  13:8 15:8,14,17,22
  16:1,14,16
**2023**
8:7
**2024**
1:12 4:13 19:15
**23rd**
1:12 4:13

---
### 3
**3RD**
19:15

---
### 4

---
### 5
**5:24-cv-00249-CA...**
1:3 4:14

---
### 6

---
### 7
**7**
3:5

---
### 8
**8th**
8:5,6

---
### 9



# EXHIBIT 25

# EXHIBIT 25

V.L.                                                    October 24, 2024

Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case No. 5:24-cv-00249-CAS(SPx)

S.L., a minor by and through the )
Guardian ad Litem Kristine        )
Llamas-Leyva, individually and    )
as successor-in-interest to       )
JOHNNY RAY LLAMAS, deceased;      )
V.L, by and through the           )
Guardian ad Litem Amber           )
Sietsinger, individually and as   )
successor-in-interest to JOHNNY   )
RAY LLAMAS, deceased; and         )
CAROLYN  CAMPBELL, individually,  )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       )
                                  )
COUNTY OF RIVERSIDE and           )
DOES 1-10, inclusive,             )
                                  )
                Defendants.       )
_____)

REMOTE VIDEOTAPED DEPOSITION OF V.L.
Thursday, October 24, 2024
CONDUCTED VIA ZOOM VIDEO CONFERENCE

REPORTED BY:  KATHLEEN S. McLAUGHLIN
              Certified Shorthand Reporter
              License No. 5845

Magna Legal Services
866-624-6221
www.MagnaLS.com

V.L.                                                    October 24, 2024

Page 2

 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4                   Case No. 5:24-cv-00249-CAS(SPx)

 5

 6   S.L., a minor by and through the )
     Guardian ad Litem Kristine        )
 7   Llamas-Leyva, individually and    )
     as successor-in-interest to       )
 8   JOHNNY RAY LLAMAS, deceased;      )
     V.L, by and through the           )
 9   Guardian ad Litem Amber           )
     Sietsinger, individually and as   )
10   successor-in-interest to JOHNNY   )
     RAY LLAMAS, deceased; and         )
11   CAROLYN  CAMPBELL, individually,  )
                                       )
12                      Plaintiffs,    )
                                       )
13              vs.                    )
                                       )
14   COUNTY OF RIVERSIDE and           )
     DOES 1-10, inclusive,             )
15                                     )
                        Defendants.    )
16   _____)

17

18

19

20            Remote videotaped deposition of V.L.

21   taken on behalf of Defendant beginning at 10:08 a.m.

22   on Thursday, October 24, 2024, remotely before

23   KATHLEEN S. McLAUGHLIN, Certified Shorthand Reporter

24   No. 5845, located in the City of Vista, County of

25   San Diego, State of California.

V.L.                                                        October 24, 2024

Page 3

1                    A P P E A R A N C E S

2

3      (All parties appeared via Zoom video conference)

4

5    FOR THE PLAINTIFFS V.L. by and through the Guardian

     ad Litem, Amber Snetsinger, individually and as

6    successor-in-interest to JOHNNY RAY LLAMAS,

     deceased:

7

8            SHANNON J. LEAP, ESQ.

9            LAW OFFICES OF DALE K. GALIPO

10           21800 Burbank Blvd.

11           Suite 310

12           Woodland Hills, California  92367-6479

13           818.347.3333

14           sleap@galipolaw.com

15

16   FOR THE PLAINTIFFS S.L. by and through the Guardian

     ad Litem, Kristine Llamas Leyva, individually and as

17   successor-in-interest to JOHNNY RAY LLAMAS,

     deceased, and CAROLYN CAMPBELL, individually:

18

19           LAWRENCE D. MARKS, ESQ.

20           MARDIROSSIAN AKARAGIAN, LLP

21           6311 Wilshire Blvd.

22           Los Angeles, California  90048-5001

23           323.653.6311

24           lmarks@garolaw.com

25                      (continued)

V.L.                                                    October 24, 2024

```
                                                          Page 4

 1                   A P P E A R A N C E S

 2                         (continued)

 3

 4     FOR THE DEFENDANT:

 5

 6              KAYLEIGH ANDERSEN, ESQ.

 7              MANNING & KASS

 8              ELLROD, RAMIREZ, TRESTER LLP

 9              801 S. Figueroa Street

10              15th Floor

11              Los Angeles, California  90017-3012

12              213.624.6900

13              kayleigh.andersen@manningkass.com

14

15

16     ALSO PRESENT:

17

18              BRAD BISSEGGER, VIDEOGRAPHER

19

20

21

22

23

24

25
```

V.L.                                                    October 24, 2024

                                                                Page 5

1                    I N D E X

2                Index of Examinations

3                                                               Page

4    Examination by Ms. Andersen                                  7

5

6

7          EXHIBITS MARKED FOR IDENTIFICATION

8                     (None)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

V.L.                                          October 24, 2024

Page 6

1            THURSDAY, OCTOBER 24, 2024

2                    10:08 A.M.

3

4            THE VIDEOGRAPHER:  We are now on the

5    record.  This begins the video deposition of V.L. in

6    the matter of Johnny Ray Llamas versus County of

7    Riverside, et al. in the United States District

8    Court, Central District of California, case

9    5:24-cv-00249-CAS(SPx).

10           Today is October 24th, 2024, and the time

11   is 10:08 a.m. Pacific Daylight Time.

12           This deposition is being taken via Zoom at

13   the request of Manning & Kass, Ellrod, Ramirez,

14   Trester LLP for the defendant.

15           The videographer is Brad Bissegger of Magna

16   Legal Services, and the court reporter is Kathleen

17   McLaughlin of Magna Legal Services.

18           Will counsel for the parties please state

19   their appearances and whom they represent.

20           MS. LEAP:  Shannon Leap on behalf of

21   plaintiff V.L., who is also the witness.

22           MR. MARKS:  Lawrence Marks on behalf of

23   plaintiff S.L. and plaintiff Carolyn Campbell.

24           MS. ANDERSEN:  Kayleigh Andersen on behalf

25   of the defendants.

V.L.                                              October 24, 2024

Page 7

 1           THE VIDEOGRAPHER:  Thank you.  The court

 2    reporter may now swear in the witness.

 3

 4                         V.L.,

 5           Called as a witness by and on behalf of the

 6    Defendant, and having been first duly sworn by the

 7    Deposition Officer, was examined and testified as

 8    follows:

 9

10                      EXAMINATION

11    BY MS. ANDERSEN:

12       Q    Good morning, V.L.  I'm going to refer to

13    you as V.L. because you're a minor in this case.  I

14    know that's not your name.  Those are your

15    initials.

16           But I'm going to be asking you some

17    questions today.  First I want to just kind of

18    explain what this process is so we both understand

19    and have a smoother transcript and deposition today.

20           A deposition is a question-and-answer

21    session.  So I'm going to be asking you questions,

22    and you do your best to provide your answer or your

23    best answer.

24           Does that make sense?

25       A    Yes.

V.L.                                                    October 24, 2024

Page 8

1    Q    Okay.

2         So the court reporter who just swore you in

3    is going to take down everything that's said today

4    and put it all into what's called a transcript.

5         So in order to make that transcript clear

6    and legible, I'd just ask that you continue giving

7    verbal responses, like you have been, as opposed to,

8    you know, nodding your head or shaking your head or

9    saying uh-uh in response to my questions.

10        Does that make sense?

11   A    Yes.

12   Q    Okay.

13        If you need a break at any time today, just

14   let me know.  I don't anticipate having too many

15   questions for you.  But if you do need a break, just

16   let me know; okay?

17   A    Yes.

18   Q    At no time today do I want you to make any

19   guesses.  So if you don't know the response to my

20   question, you can certainly go ahead and say, "I

21   don't know."

22        Are you comfortable with that?

23   A    Yes.

24   Q    Okay.

25        Have you looked at anything in preparation

V.L.                                              October 24, 2024

Page 9

1    for your deposition today?

2         A    What do you mean?

3         Q    Have you looked at any documents, videos,

4    you know, listened to any audio in order to prepare

5    for your deposition right now?

6         A    No.  I don't think so, no.

7         Q    Okay.

8              And just to make it clear, I don't want you

9    to tell me anything that you've discussed with your

10   attorneys in this case; okay?

11        A    Okay.

12        Q    So if you had communication with Ms. Leap

13   here who is on the Zoom with us or anyone from her

14   office, I don't want to know about that.

15             Do you understand that?

16        A    Yes.

17        Q    Okay.

18             Have you ever spoken to any police officers

19   or cops about your dad?

20        A    No.

21        Q    Okay.  What's your birthday?

22        A    8-20-2011.

23        Q    So you would currently be 13 years old.  Is

24   that right?

25        A    Yes.

V.L.                                                        October 24, 2024

Page 10

1      Q      What grade are you in?

2      A      Eighth grade.

3      Q      Do you go to middle school?

4      A      Yes.

5      Q      What's the name of your middle school?

6      A      Mangum Middle School.

7      Q      Can you say that again?

8      A      Mangum Middle School.

9      Q      Okay.  And where do you live?

10     A      In Mangum, Oklahoma.

11     Q      Who do you live with right now?

12     A      My mom and my siblings.

13     Q      Okay.  How many siblings do you have that

14  live with you?

15     A      (Unintelligible.)

16            (Reporter interrupts for

17            clarification of the record.)

18            (Record read as follows:

19               "Q  How many siblings do you

20            have that live with you?")

21            THE WITNESS:  Three.

22  BY MS. ANDERSEN:

23     Q      Do you know their ages?

24     A      I think 11 and nine and two.

25     Q      Do you guys all have the same mom?

V.L.                                                    October 24, 2024

Page 11

```
 1      A    Yes.

 2      Q    Okay.  Is it just your mom and your

 3  siblings that you live with?

 4      A    Yes.

 5      Q    When did you move to Oklahoma?

 6      A    I think two or three years ago.

 7      Q    Two or three years ago?  Were you living in

 8  Oklahoma when your dad died?

 9      A    Yes.

10      Q    Okay.

11           What's your dad's name?

12      A    Johnny Llamas.

13      Q    And what's your mom's name?

14      A    Amber Snetsinger.

15      Q    Without telling me your first name, what's

16  your last name?

17      A    Llamas.

18      Q    Do any of your siblings share the same dad

19  as you?

20      A    No.  (Unintelligible.)

21           THE COURT REPORTER:  I'm sorry.  I need to

22  go off the record a moment.  I need to fix the

23  audio.

24           THE VIDEOGRAPHER:  Off the record at

25  10:14 a.m.
```

V.L.                                        October 24, 2024

Page 12

1              (Off the record.)

2              THE VIDEOGRAPHER:  Back on the record at

3    10:19 a.m.

4    BY MS. ANDERSEN:

5       Q    So we just took a brief break to switch

6    rooms.  I think we have much better sound now.  So

7    thank you, V.L., for that.

8              So before we took that very brief break, I

9    was asking you about your siblings.  You have three

10   siblings that you currently live with; correct?

11      A    Yes, ma'am.

12      Q    Can you speak up a little bit?  I'm sorry.

13      A    Yes, ma'am.

14      Q    Okay.

15             MS. ANDERSEN:  Can the court reporter hear

16   that?

17             (Discussion off the record.)

18   BY MS. ANDERSEN:

19      Q    I understand you have more siblings than

20   just the three that you live with.

21             Is that correct?

22      A    Yes.

23      Q    Okay.

24             How many siblings do you have from your

25   dad?

V.L.                                                                October 24, 2024

Page 13

```
 1      A     One.

 2      Q     And without telling me her name --

 3    actually, how about if I just ask it this way.  Is

 4    the first initial of her first name S?

 5      A     Yes.

 6      Q     Okay.  And she lives in California;

 7    correct?

 8      A     Yes.

 9      Q     Yes?

10      A     Yes.

11      Q     Sorry.  You have to, like, speak a lot

12    louder.  I know it's hard.

13      A     Yes.

14      Q     Thank you.

15            And so you and S.L. -- is what I'll call

16    your sister on your dad's side -- you guys have the

17    same dad, Johnny Llamas?

18      A     Yes.

19      Q     Do you know the last time you saw S.L.?

20      A     This summer.

21      Q     Summer of 2024, so like a few months ago?

22    Does that sound right?

23      A     No.  Wait.  Not this summer because I

24    didn't go to California this summer.  It was the

25    summer before that.
```

V.L.                                                    October 24, 2024

Page 14

1      Q      Okay.  Summer of 2023?

2      A      Yes.

3      Q      Okay.

4             Do you recall the last time you lived with

5      your dad?

6      A      I don't know.

7      Q      Do you know if you ever lived with your

8      dad?

9      A      I don't think so.

10     Q      Before you moved to Oklahoma where did you

11     live?

12     A      In Perris, California.

13     Q      Okay.

14            And had you lived there pretty much your

15     entire life as far back as you can remember?

16     A      Yes.

17     Q      Yes?

18     A      Yes.

19     Q      Okay.

20            MS. LEAP:  V.L., if you can just wait for

21     her to finish asking her question, it's easier for

22     the court reporter.

23            THE WITNESS:  Sorry.

24     BY MS. ANDERSEN:

25     Q      I know this is a very weird process, and

V.L.                                              October 24, 2024

Page 15

1    it's over Zoom which makes it even weirder.  But

2    just do your best to wait.  Even though you know

3    what I'm asking you, just let me finish my question

4    and then you can go ahead and give your answer;

5    okay?

6        A    Okay.

7        Q    Continue to keep your voice up.  You're

8    very soft-spoken.  But keep your voice up; okay?

9        A    Okay.

10       Q    Thank you.

11            So you're in eighth grade.  Have you ever

12   talked to a counselor or anybody at your middle

13   school about your dad?

14       A    Yes.

15       Q    Okay.

16            Do you remember the name of the school

17   counselor you spoke to about your dad?

18       A    It wasn't really a school counselor.  I got

19   recommended to this counselor by my school

20   counselor, but she wasn't a school counselor.  She

21   was a camp counselor.

22       Q    Okay.  Just a therapist who is not at your

23   school?  Does that sound right?

24       A    Yes.

25       Q    Okay.  Do you know her name?

V.L.                                                    October 24, 2024

Page 16

1       A    No.

2       Q    When was the last time you saw her?

3       A    I think -- I can't remember the last time I

4   saw her.

5       Q    Do you know about how many times you saw

6   that therapist or counselor?

7       A    I know I saw -- I went there, like, two

8   times a week every -- I was there for, like, a

9   month.  I keep going, like, a month.  So I don't

10  know.

11      Q    Okay.

12           So about two times a week for a month?  Is

13  that what you said?

14      A    Yes.

15      Q    Okay.

16           Would that have been when you were -- let's

17  see.  If you're in eighth grade now, in sixth or

18  seventh grade?

19      A    Yes.  Seventh.

20      Q    Seventh grade?

21      A    Yes.

22      Q    Okay.

23           Other than that therapist or counselor that

24  you saw outside of school, have you seen anybody

25  else, any type of therapist or counselor since your

V.L.                                                    October 24, 2024

Page 17

1    dad's passing?

2         A    No.

3         Q    Do you remember the last time that you

4    actually saw your dad in person?

5         A    No, I don't remember.

6         Q    Okay.

7              Do you know -- did he ever come to visit

8    you in Oklahoma?

9         A    No.

10        Q    Okay.

11             Did you ever -- since you moved to

12   Oklahoma, did you ever go back to California to

13   visit him?

14        A    No.  I mean, I went back to California, but

15   I didn't visit him.

16        Q    Okay.

17             Do you remember anytime in your entire life

18   that you saw your dad in person?

19        A    No.

20        Q    Okay.

21             Did you -- since moving to Oklahoma, did

22   you ever speak to your dad on the phone?

23        A    Yes.

24        Q    Okay.

25             When was the last time you spoke with him

V.L.                                          October 24, 2024

Page 18

1    on the phone?  If you can remember.

2        A    Two months -- two or one months before he

3    died.

4        Q    What kind of things did you talk about with

5    him on that phone call?

6        A    Just about, like, what we were going to do

7    when -- because we had plans for me to see him that

8    summer, and we just talked.  We got to know each

9    other and all that.

10       Q    You got to know each other on that phone

11   call or that was just where you were planning what

12   you were going to do during your visit?

13       A    In that phone call.  And then we, like,

14   planned stuff.

15       Q    Okay.

16            Was that the first time you spoke to him on

17   the phone?

18       A    No.

19       Q    How often would you speak to your dad on

20   the phone?

21       A    Not that often but it was, like, sometimes.

22       Q    Do you have a good estimate, like maybe how

23   many times a week, how many times a month, a year?

24       A    He'd go, like, a couple months without

25   talking to me, and then, like, he'll text me and

V.L.                                              October 24, 2024

Page 19

1    then call me.  And then he'd go, like, a couple

2    months and then he'd text me and call me.

3         Q    Okay.

4              And when he texted you, was it on a cell

5    phone that you had or was he texting through your

6    mom?

7         A    Through my mom.

8         Q    Okay.

9              Did you ever talk to him via text on a

10   phone that you have?

11        A    No.

12        Q    Other than when you guys were planning,

13   like, what you guys were going to do during your

14   visit to California, what other things did you talk

15   about with your dad on the phone?

16        A    Mainly just like what my favorite color

17   was, my favorite food.  Just like some questions,

18   like, to get to know me more.

19        Q    Okay.

20             What about during the other phone calls you

21   had with him?  What kind of things would you guys

22   talk about?

23        A    The same thing.  He just kept asking more

24   and more questions.

25        Q    Okay.

V.L.                                                    October 24, 2024

Page 20

1          So these might be tough questions to

2     answer.  I know you're 13, but you can do your best

3     to give your answer.

4          How has your dad's passing affected you at

5     school?

6     A    It's -- it's, like, affected me a lot in

7     school.  I don't know how to really answer, like,

8     how it -- I know how it affected me but it's -- I

9     don't -- sorry.

10    Q    You don't have to apologize.  You can do

11    whatever you're comfortable with explaining of how

12    it's affected you, whether it's inside or outside of

13    school.

14    A    Like, I mean, I mainly feel distant from my

15    family.  And then it's kind of hard for me to kind

16    of make friends and -- yeah.  It was just harder.

17    Q    Okay.

18         And you're saying that you didn't have

19    those kinds of problems or didn't think you had

20    those kinds of problems before your dad's passing?

21    A    I didn't have those problems.

22    Q    Okay.

23         Did you ever ask your mom to see your dad

24    in person before I guess it would have been summer

25    of 2023?

V.L.                                        October 24, 2024

Page 21

1      A    I mean, every time we'd call, he'd always

2    say we were going to meet.  So, like, I had -- but

3    then we never ended up really doing it.

4           And then -- I don't know.  We had plans to

5    before the month before he died too, but it didn't

6    end up coming through, and that was the last time.

7      Q    Other than your mom and your -- I'm sorry.

8    Other than your attorneys in this case and the

9    school counselor, have you talked with anybody else

10   about losing your dad?

11     A    Not -- like, no.  No.

12     Q    Did you ever talk to your mom about it?

13     A    No, not really.  I kind of keep that to

14   myself.  Like my feelings about that.

15     Q    Okay.

16          Well, I don't have any other questions for

17   you.  I know that was pretty fast.  But I don't know

18   if your attorney has any questions for you.

19          MS. LEAP:  No.  Not today.

20          MS. ANDERSEN:  Okay.  Thank you, V.L.

21   Maybe you go get your mom.  You are done, though.

22          THE WITNESS:  I'll go get her; okay?

23          MS. ANDERSEN:  Okay.

24          MS. LEAP:  Okay.

25          THE VIDEOGRAPHER:  Kathleen, do you need

V.L.                                        October 24, 2024

Page 22

1    transcript orders before we go off?

2            THE COURT REPORTER:  Yes, I do.

3            Ms. Leap, did you want to order a copy?

4            MS. LEAP:  Not at this time, but I can

5    reply to your email that you sent yesterday.

6            THE COURT REPORTER:  Thank you.  That's it.

7            THE VIDEOGRAPHER:  This concludes today's

8    deposition.  The time is 10:29 a.m.  The date is

9    October 24th, 2024.  We are off the record.

10            (The deposition concluded at 10:29 a.m.)

11            (END OF PROCEEDINGS.  DECLARATION UNDER

12    PENALTY OF PERJURY ON THE FOLLOWING PAGE HEREOF.)

13

14

15

16

17

18

19

20

21

22

23

24

25

V.L.                                                    October 24, 2024

Page 23

1          I, V.L., do hereby declare under penalty of

2    perjury that I have read the foregoing transcript;

3    that I have made any corrections as appear noted in

4    ink initialed by me or, in the alternative, changes

5    have been noted to an electronic version and

6    conveyed; that my testimony as contained herein, as

7    corrected, is true and correct.

8          EXECUTED THIS _____ day of _____.

9    20___, at _____, _____.
                    (City)              (State)

10

11                          _____
                                       V.L.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

V.L.                                                    October 24, 2024

```
                                                              Page 24

  1                        ERRATA SHEET

  2                      (Correction List)

  3    PAGE      LINE                   CHANGE

  4    _____     _____    _____

  5    _____     _____    _____

  6    _____     _____    _____

  7    _____     _____    _____

  8    _____     _____    _____

  9    _____     _____    _____

 10    _____     _____    _____

 11    _____     _____    _____

 12    _____     _____    _____

 13    _____     _____    _____

 14    _____     _____    _____

 15    _____     _____    _____

 16    _____     _____    _____

 17    _____     _____    _____

 18    _____     _____    _____

 19    _____     _____    _____

 20    _____     _____    _____

 21    _____     _____    _____

 22    _____     _____    _____

 23    _____     _____    _____

 24    _____     _____    _____

 25    _____     _____    _____
```

V.L.                                                    October 24, 2024

Page 25

1                        CERTIFICATE OF

2            CALIFORNIA CERTIFIED SHORTHAND REPORTER

3

4            I, Kathleen S. McLaughlin, a Certified

5    Shorthand Reporter in the State of California,

6    Certificate No. 5845, do hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, Certificate

9    No. 5845 issued by the Court Reporters Board of

10   California and which is in full force and effect.

11   (Business & Professions Section 8016).

12           I am not financially interested in this

13   action and am not a relative or employee of any

14   attorney of the parties or of any of the parties.

15   (California Code of Civil Procedure Section

16   2025.320[a]).

17           I am authorized to administer oaths or

18   affirmations pursuant to California Code of Civil

19   Procedure Section 2093(b) and, prior to being

20   examined, the deponent was first placed under oath

21   or affirmation by me.  (California Code of Civil

22   Procedure Sections 2025.320, 2025.540[a]).

23           I am the deposition officer that

24   stenographically recorded the testimony in the

25   foregoing deposition, sworn statement or

V.L.                                              October 24, 2024

Page 26

1    declaration, and the foregoing transcript is a true

2    record of the testimony given.  (California Code of

3    Civil Procedure Section 2025.540[a]).

4            The foregoing proceedings were taken

5    before me at the time herein set forth.  Every

6    attempt was made to ensure a verbatim record of the

7    remote proceedings, which inherently have technical

8    interference, audio interruptions and transmission

9    issues.

10           Such transcript was created by me using

11   machine shorthand which was thereafter transcribed

12   under my direction.

13           Reading and signing was requested.

14           IN WITNESS WHEREOF, I have this date

15   subscribed my name.  My certificate to the original

16   may be attached to certified copies electronically.

17

18   Dated: January 10, 2025    _____

                                KATHLEEN S. McLAUGHLIN

19                              CSR No. 5845

20

21

22

23

24

25

V.L.                                          October 24, 2024

Page 27

1                    CERTIFICATE OF

2        CALIFORNIA CERTIFIED SHORTHAND REPORTER

3         (California Code of Civil Procedure

4                 Section 2025.520[e])

5

6         I, Kathleen S. McLaughlin, a Certified

7    Shorthand Reporter in the State of California,

8    Certificate No. 5845, do hereby certify:

9         I am the deposition officer that

10   stenographically recorded the testimony in the

11   foregoing proceeding.

12        Written notice pursuant to California Code

13   of Civil Procedure Section 2025.520[a] having been

14   sent, the deponent took the following action within

15   the allotted period with respect to the transcript

16   of the proceeding:

17        (  )   In person, at the office of the

18   deposition officer, made the changes set forth on

19   the original of the transcript and signed the

20   transcript.  The parties attending the proceeding

21   have been notified of said changes.

22        (  )   Approved the transcript by signing

23   it.

24        (  )   Declined to approve the transcript by

25   not signing it.

V.L.                                                    October 24, 2024

```
                                                        Page 28

  1              (   )   By means of a signed letter, made the

  2    changes and approved or declined to approve the

  3    transcript as set forth therein.  Said letter has

  4    been attached to the original transcript and copies

  5    thereof mailed to all parties attending the

  6    proceeding.

  7              (   )   Failed to approve the transcript

  8    within the allotted time period.

  9

 10    Dated: January 10, 2025    Kathleen S. McLaughlin

                                  KATHLEEN S. McLAUGHLIN

 11                               CSR No. 5845

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

V.L.                                                    October 24, 2024

## A

**action**
25:13 27:14
**ad**
1:6,9 2:6,9 3:5,16
**administer**
25:17
**affirmation**
25:21
**affirmations**
25:18
**ages**
10:23
**ago**
11:6,7 13:21
**ahead**
8:20 15:4
**AKARAGIAN**
3:20
**al**
6:7
**allotted**
27:15 28:8
**alternative**
23:4
**Amber**
1:9 2:9 3:5 11:14
**Andersen**
4:6 5:4 6:24,24 7:11
   10:22 12:4,15,18
   14:24 21:20,23
**Angeles**
3:22 4:11
**answer**
7:22,23 15:4 20:2,3,7
**anticipate**
8:14
**anybody**
15:12 16:24 21:9
**anytime**
17:17
**apologize**
20:10
**appear**
23:3
**appearances**
6:19
**appeared**

3:3
**approve**
27:24 28:2,7
**approved**
27:22 28:2
**asking**
7:16,21 12:9 14:21
   15:3 19:23
**attached**
26:16 28:4
**attempt**
26:6
**attending**
27:20 28:5
**attorney**
21:18 25:14
**attorneys**
9:10 21:8
**audio**
9:4 11:23 26:8
**authorized**
25:17
**a.m**
2:21 6:2,11 11:25
   12:3 22:8,10

## B

**back**
12:2 14:15 17:12,14
**beginning**
2:21
**begins**
6:5
**behalf**
2:21 6:20,22,24 7:5
**best**
7:22,23 15:2 20:2
**better**
12:6
**birthday**
9:21
**Bissegger**
4:18 6:15
**bit**
12:12
**Blvd**
3:10,21
**Board**
25:9

**Brad**
4:18 6:15
**break**
8:13,15 12:5,8
**brief**
12:5,8
**Burbank**
3:10
**Business**
25:11

## C

**C**
3:1 4:1
**California**
1:2 2:2,25 3:12,22
   4:11 6:8 13:6,24
   14:12 17:12,14
   19:14 25:2,5,8,10
   25:15,18,21 26:2
   27:2,3,7,12
**call**
13:15 18:5,11,13
   19:1,2 21:1
**called**
7:5 8:4
**calls**
19:20
**camp**
15:21
**Campbell**
1:11 2:11 3:17 6:23
**Carolyn**
1:11 2:11 3:17 6:23
**case**
1:4 2:4 6:8 7:13 9:10
   21:8
**cell**
19:4
**Central**
1:2 2:2 6:8
**certainly**
8:20
**certificate**
25:1,6,8 26:15 27:1,8
**certified**
1:22 2:23 25:2,4,7
   26:16 27:2,6
**certify**

25:6 27:8
**CHANGE**
24:3
**changes**
23:4 27:18,21 28:2
**City**
2:24 23:9
**Civil**
25:15,18,21 26:3
   27:3,13
**clarification**
10:17
**clear**
8:5 9:8
**Code**
25:15,18,21 26:2
   27:3,12
**color**
19:16
**come**
17:7
**comfortable**
8:22 20:11
**coming**
21:6
**communication**
9:12
**concluded**
22:10
**concludes**
22:7
**CONDUCTED**
1:20
**conference**
1:20 3:3
**contained**
23:6
**continue**
8:6 15:7
**continued**
3:25 4:2
**conveyed**
23:6
**copies**
26:16 28:4
**cops**
9:19
**copy**

V.L.

October 24, 2024

22:3
**correct**
12:10,21 13:7 23:7
**corrected**
23:7
**Correction**
24:2
**corrections**
23:3
**counsel**
6:18
**counselor**
15:12,17,18,19,20,20
  15:21 16:6,23,25
  21:9
**County**
1:14 2:14,24 6:6
**couple**
18:24 19:1
**court**
1:1 2:1 6:8,16 7:1 8:2
  11:21 12:15 14:22
  22:2,6 25:9
**created**
26:10
**CSR**
26:19 28:11
**currently**
9:23 12:10

───────── **D** ─────────

**D**
3:19 5:1
**dad**
9:19 11:8,18 12:25
  13:17 14:5,8 15:13
  15:17 17:4,18,22
  18:19 19:15 20:23
  21:10
**dad's**
11:11 13:16 17:1
  20:4,20
**DALE**
3:9
**date**
22:8 26:14
**Dated**
26:18 28:10
**day**

23:8
**Daylight**
6:11
**deceased**
1:8,10 2:8,10 3:6,17
**declaration**
22:11 26:1
**declare**
23:1
**declined**
27:24 28:2
**defendant**
2:21 4:4 6:14 7:6
**defendants**
1:15 2:15 6:25
**deponent**
25:20 27:14
**deposition**
1:18 2:20 6:5,12 7:7
  7:19,20 9:1,5 22:8
  22:10 25:23,25 27:9
  27:18
**died**
11:8 18:3 21:5
**Diego**
2:25
**direction**
26:12
**discussed**
9:9
**Discussion**
12:17
**distant**
20:14
**District**
1:1,2 2:1,2 6:7,8
**documents**
9:3
**doing**
21:3
**duly**
7:6 25:7

───────── **E** ─────────

**E**
3:1,1 4:1,1 5:1
**easier**
14:21
**effect**

25:10
**eighth**
10:2 15:11 16:17
**electronic**
23:5
**electronically**
26:16
**Ellrod**
4:8 6:13
**email**
22:5
**employee**
25:13
**ended**
21:3
**ensure**
26:6
**entire**
14:15 17:17
**ERRATA**
24:1
**ESQ**
3:8,19 4:6
**estimate**
18:22
**et**
6:7
**Examination**
5:4 7:10
**Examinations**
5:2
**examined**
7:7 25:20
**EXECUTED**
23:8
**EXHIBITS**
5:7
**explain**
7:18
**explaining**
20:11

───────── **F** ─────────

**Failed**
28:7
**family**
20:15
**far**
14:15

**fast**
21:17
**favorite**
19:16,17
**feel**
20:14
**feelings**
21:14
**Figueroa**
4:9
**financially**
25:12
**finish**
14:21 15:3
**first**
7:6,17 11:15 13:4,4
  18:16 25:20
**fix**
11:22
**Floor**
4:10
**following**
22:12 27:14
**follows**
7:8 10:18
**food**
19:17
**force**
25:10
**foregoing**
23:2 25:25 26:1,4
  27:11
**forth**
26:5 27:18 28:3
**friends**
20:16
**full**
25:10

───────── **G** ─────────

**GALIPO**
3:9
**give**
15:4 20:3
**given**
26:2
**giving**
8:6
**go**

8:20 10:3 11:22
13:24 15:4 17:12
18:24 19:1 21:21,22
22:1
**going**
7:12,16,21 8:3 16:9
18:6,12 19:13 21:2
**good**
7:12 18:22
**grade**
10:1,2 15:11 16:17
16:18,20
**Guardian**
1:6,9 2:6,9 3:5,16
**guess**
20:24
**guesses**
8:19
**guys**
10:25 13:16 19:12,13
19:21

**H**
**hard**
13:12 20:15
**harder**
20:16
**head**
8:8,8
**hear**
12:15
**HEREOF**
22:12
**he'll**
18:25
**Hills**
3:12

**I**
**IDENTIFICATION**
5:7
**inclusive**
1:14 2:14
**Index**
5:2
**individually**
1:7,9,11 2:7,9,11 3:5
3:16,17
**inherently**

26:7
**initial**
13:4
**initialed**
23:4
**initials**
7:15
**ink**
23:4
**inside**
20:12
**interested**
25:12
**interference**
26:8
**interruptions**
26:8
**interrupts**
10:16
**issued**
25:9
**issues**
26:9

**J**
**J**
3:8
**January**
26:18 28:10
**Johnny**
1:8,10 2:8,10 3:6,17
6:6 11:12 13:17

**K**
**K**
3:9
**Kass**
4:7 6:13
**Kathleen**
1:21 2:23 6:16 21:25
25:4 26:18 27:6
28:10
**Kayleigh**
4:6 6:24
**kayleigh.andersen...**
4:13
**keep**
15:7,8 16:9 21:13
**kept**

19:23
**kind**
7:17 18:4 19:21
20:15,15 21:13
**kinds**
20:19,20
**know**
7:14 8:8,14,16,19,21
9:4,14 10:23 13:12
13:19 14:6,7,25
15:2,25 16:5,7,10
17:7 18:8,10 19:18
20:2,7,8 21:4,17,17
**Kristine**
1:6 2:6 3:16

**L**
**LAW**
3:9
**Lawrence**
3:19 6:22
**Leap**
3:8 6:20,20 9:12
14:20 21:19,24 22:3
22:4
**Legal**
1:24 6:16,17
**legible**
8:6
**letter**
28:1,3
**let's**
16:16
**Leyva**
3:16
**License**
1:22
**life**
14:15 17:17
**LINE**
24:3
**List**
24:2
**listened**
9:4
**Litem**
1:6,9 2:6,9 3:5,16
**little**
12:12

**live**
10:9,11,14,20 11:3
12:10,20 14:11
**lived**
14:4,7,14
**lives**
13:6
**living**
11:7
**Llamas**
1:8,10 2:8,10 3:6,16
3:17 6:6 11:12,17
13:17
**Llamas-Leyva**
1:7 2:7
**LLP**
3:20 4:8 6:14
**lmarks@garolaw.c...**
3:24
**located**
2:24
**looked**
8:25 9:3
**Los**
3:22 4:11
**losing**
21:10
**lot**
13:11 20:6
**louder**
13:12

**M**
**machine**
26:11
**Magna**
1:24 6:15,17
**mailed**
28:5
**Mangum**
10:6,8,10
**Manning**
4:7 6:13
**MARDIROSSIAN**
3:20
**MARKED**
5:7
**Marks**
3:19 6:22,22

matter
6:6
ma'am
12:11,13
**McLAUGHLIN**
1:21 2:23 6:17 25:4
  26:18 27:6 28:10
mean
9:2 17:14 20:14 21:1
means
28:1
meet
21:2
middle
10:3,5,6,8 15:12
minor
1:6 2:6 7:13
mom
10:12,25 11:2 19:6,7
  20:23 21:7,12,21
moment
11:22
mom's
11:13
month
16:9,9,12 18:23 21:5
months
13:21 18:2,2,24 19:2
morning
7:12
move
11:5
moved
14:10 17:11
moving
17:21

**N**

N
3:1 4:1 5:1
name
7:14 10:5 11:11,13
  11:15,16 13:2,4
  15:16,25 26:15
need
8:13,15 11:21,22
  21:25
never
21:3

nine
10:24
nodding
8:8
noted
23:3,5
notice
27:12
notified
27:21

**O**

oath
25:20
oaths
25:17
October
1:19 2:22 6:1,10 22:9
office
9:14 27:17
officer
7:7 25:23 27:9,18
officers
9:18
**OFFICES**
3:9
okay
8:1,12,16,24 9:7,10
  9:11,17,21 10:9,13
  11:2,10 12:14,23
  13:6 14:1,3,13,19
  15:5,6,8,9,15,22,25
  16:11,15,22 17:6,10
  17:16,20,24 18:15
  19:3,8,19,25 20:17
  20:22 21:15,20,22
  21:23,24
Oklahoma
10:10 11:5,8 14:10
  17:8,12,21
old
9:23
opposed
8:7
order
8:5 9:4 22:3
orders
22:1
original

26:15 27:19 28:4
outside
16:24 20:12

**P**

P
3:1,1 4:1,1
Pacific
6:11
Page
5:3 22:12 24:3
parties
3:3 6:18 25:14,14
  27:20 28:5
passing
17:1 20:4,20
penalty
22:12 23:1
period
27:15 28:8
perjury
22:12 23:2
Perris
14:12
person
17:4,18 20:24 27:17
phone
17:22 18:1,5,10,13
  18:17,20 19:5,10,15
  19:20
placed
25:20
plaintiff
6:21,23,23
**Plaintiffs**
1:12 2:12 3:5,16
planned
18:14
planning
18:11 19:12
plans
18:7 21:4
please
6:18
police
9:18
preparation
8:25
prepare

9:4
**PRESENT**
4:16
pretty
14:14 21:17
prior
25:19
problems
20:19,20,21
**Procedure**
25:15,19,22 26:3
  27:3,13
proceeding
27:11,16,20 28:6
proceedings
22:11 26:4,7
process
7:18 14:25
**Professions**
25:11
provide
7:22
pursuant
25:18 27:12
put
8:4

**Q**

qualified
25:7
question
8:20 14:21 15:3
questions
7:17,21 8:9,15 19:17
  19:24 20:1 21:16,18
question-and-answ...
7:20

**R**

R
3:1 4:1
Ramirez
4:8 6:13
Ray
1:8,10 2:8,10 3:6,17
  6:6
read
10:18 23:2
**Reading**

26:13
**really**
15:18 20:7 21:3,13
**recall**
14:4
**recommended**
15:19
**record**
6:5 10:17,18 11:22
  11:24 12:1,2,17
  22:9 26:2,6
**recorded**
25:24 27:10
**refer**
7:12
**relative**
25:13
**remember**
14:15 15:16 16:3
  17:3,5,17 18:1
**remote**
1:18 2:20 26:7
**remotely**
2:22
**reply**
22:5
**REPORTED**
1:21
**reporter**
1:22 2:23 6:16 7:2
  8:2 10:16 11:21
  12:15 14:22 22:2,6
  25:2,5,8 27:2,7
**Reporters**
25:9
**represent**
6:19
**request**
6:13
**requested**
26:13
**respect**
27:15
**response**
8:9,19
**responses**
8:7
**right**

9:5,24 10:11 13:22
  15:23
**Riverside**
1:14 2:14 6:7
**rooms**
12:6

---

**S**

S
1:21 2:23 3:1 4:1,9
  13:4 25:4 26:18
  27:6 28:10
**San**
2:25
**saw**
13:19 16:2,4,5,7,24
  17:4,18
**saying**
8:9 20:18
**school**
10:3,5,6,8 15:13,16
  15:18,19,20,23
  16:24 20:5,7,13
  21:9
**Section**
25:11,15,19 26:3
  27:4,13
**Sections**
25:22
**see**
16:17 18:7 20:23
**seen**
16:24
**sense**
7:24 8:10
**sent**
22:5 27:14
**Services**
1:24 6:16,17
**session**
7:21
**set**
26:5 27:18 28:3
**seventh**
16:18,19,20
**shaking**
8:8
**Shannon**
3:8 6:20

**share**
11:18
**SHEET**
24:1
**shorthand**
1:22 2:23 25:2,5,7
  26:11 27:2,7
**siblings**
10:12,13,19 11:3,18
  12:9,10,19,24
**side**
13:16
**Sietsinger**
1:9 2:9
**signed**
27:19 28:1
**signing**
26:13 27:22,25
**sister**
13:16
**sixth**
16:17
**sleap@galipolaw.c...**
3:14
**smoother**
7:19
**Snetsinger**
3:5 11:14
**soft-spoken**
15:8
**sorry**
11:21 12:12 13:11
  14:23 20:9 21:7
**sound**
12:6 13:22 15:23
**speak**
12:12 13:11 17:22
  18:19
**spoke**
15:17 17:25 18:16
**spoken**
9:18
**state**
2:25 6:18 23:9 25:5,8
  27:7
**statement**
25:25
**States**

**share**
1:1 2:1 6:7
**stenographically**
25:24 27:10
**Street**
4:9
**stuff**
18:14
**subscribed**
26:15
**successor-in-interest**
1:7,10 2:7,10 3:6,17
**Suite**
3:11
**summer**
13:20,21,23,24,25
  14:1 18:8 20:24
**swear**
7:2
**switch**
12:5
**swore**
8:2
**sworn**
7:6 25:25
**S.L**
1:6 2:6 3:16 6:23
  13:15,19

---

**T**

**take**
8:3
**taken**
2:21 6:12 26:4
**talk**
18:4 19:9,14,22
  21:12
**talked**
15:12 18:8 21:9
**talking**
18:25
**technical**
26:7
**tell**
9:9
**telling**
11:15 13:2
**testified**
7:7
**testimony**

23:6 25:24 26:2
27:10
**text**
18:25 19:2,9
**texted**
19:4
**texting**
19:5
**thank**
7:1 12:7 13:14 15:10
21:20 22:6
**therapist**
15:22 16:6,23,25
**thereof**
28:5
**thing**
19:23
**things**
18:4 19:14,21
**think**
9:6 10:24 11:6 12:6
14:9 16:3 20:19
**three**
10:21 11:6,7 12:9,20
**Thursday**
1:19 2:22 6:1
**time**
6:10,11 8:13,18
13:19 14:4 16:2,3
17:3,25 18:16 21:1
21:6 22:4,8 26:5
28:8
**times**
16:5,8,12 18:23,23
**today**
6:10 7:17,19 8:3,13
8:18 9:1 21:19
**today's**
22:7
**tough**
20:1
**transcribed**
26:11
**transcript**
7:19 8:4,5 22:1 23:2
26:1,10 27:15,19,20
27:22,24 28:3,4,7
**transmission**

26:8
**Trester**
4:8 6:14
**true**
23:7 26:1
**two**
10:24 11:6,7 16:7,12
18:2,2
**type**
16:25

---
**U**
---
**uh-uh**
8:9
**understand**
7:18 9:15 12:19
**Unintelligible**
10:15 11:20
**United**
1:1 2:1 6:7

---
**V**
---
**verbal**
8:7
**verbatim**
26:6
**version**
23:5
**versus**
6:6
**video**
1:20 3:3 6:5
**videographer**
4:18 6:4,15 7:1 11:24
12:2 21:25 22:7
**videos**
9:3
**videotaped**
1:18 2:20
**visit**
17:7,13,15 18:12
19:14
**Vista**
2:24
**voice**
15:7,8
**vs**
1:13 2:13
**V.L**

1:8,18 2:8,20 3:5 6:5
6:21 7:4,12,13 12:7
14:20 21:20 23:1,11

---
**W**
---
**wait**
13:23 14:20 15:2
**want**
7:17 8:18 9:8,14 22:3
**wasn't**
15:18,20
**way**
13:3
**week**
16:8,12 18:23
**weird**
14:25
**weirder**
15:1
**went**
16:7 17:14
**WHEREOF**
26:14
**Wilshire**
3:21
**witness**
6:21 7:2,5 10:21
14:23 21:22 26:14
**Woodland**
3:12
**Written**
27:12
**www.MagnaLS.com**
1:25

---
**X**
---
**X**
5:1

---
**Y**
---
**yeah**
20:16
**year**
18:23
**years**
9:23 11:6,7
**yesterday**
22:5

---
**Z**
---
**Zoom**
1:20 3:3 6:12 9:13
15:1

---
**1**
---
**1-10**
1:14 2:14
**10**
26:18 28:10
**10:08**
2:21 6:2,11
**10:14**
11:25
**10:19**
12:3
**10:29**
22:8,10
**11**
10:24
**13**
9:23 20:2
**15th**
4:10

---
**2**
---
**20**
23:9
**2023**
14:1 20:25
**2024**
1:19 2:22 6:1,10
13:21 22:9
**2025**
26:18 28:10
**2025.320**
25:22
**2025.320[a**
25:16
**2025.520[a**
27:13
**2025.520[e**
27:4
**2025.540[a**
25:22 26:3
**2093(b)**
25:19
**213.624.6900**

V.L.                                          October 24, 2024

4:12
**21800**
3:10
**24**
1:19 2:22 6:1
**24th**
6:10 22:9

**3**

**310**
3:11
**323.653.6311**
3:23

**5**

**5:24-cv-00249-CA...**
1:4 2:4 6:9
**5845**
1:22 2:24 25:6,9
26:19 27:8 28:11

**6**

**6311**
3:21

**7**

**7**
5:4

**8**

**8-20-2011**
9:22
**801**
4:9
**8016**
25:11
**818.347.3333**
3:13
**866-624-6221**
1:24

**9**

**90017-3012**
4:11
**90048-5001**
3:22
**92367-6479**
3:12