**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118

*Attorneys for Plaintiff V.L.*

Garo Mardirossian, Esq., #101812
garo@garolaw.com
Lawrence D. Marks, Esq., #153460
Lmarks@garolaw.com
**MARDIROSSIAN AKARAGIAN, LLP**
6311 Wilshire Boulevard
Los Angeles, CA 90048-5001
Telephone (323) 653-6311 / Facsimile (323) 651-5511

*Attorneys for Plaintiffs S.L. and CAROLYN CAMPBELL*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.L., a minor by and through the Guardian Ad Litem Kristine Llamas Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., by and through the Guardian Ad Litem Amber Snetsinger, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; and CAROLYN CAMPBELL, individually,<br><br>                Plaintiffs,<br><br>        v.<br><br>COUNTY OF RIVERSIDE; SHAWN HUBACHEK; JIMMIE MCGUIRE; and DOES 3-10, inclusive,<br><br>                Defendants. | Case No. 5:24-cv-00249-CAS-SP<br><br>*Honorable Christina A. Snyder*<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION; MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT**<br><br>*[Filed concurrently with Plaintiffs' Separate Statement of Facts; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto; Declaration of Roger Clark]*<br><br>Date:        June 23, 2025<br>Time:        10:00 a.m.<br>Courtroom: 8D |

1

# **TABLE OF CONTENTS**

2

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

3

I.      INTRODUCTION ................................................................................. 1
II.     STATEMENT OF FACTS ..................................................................... 1

4

    A.   DEPUTIES LOCATE MR. LLAMAS, WHO APPROACHES THE INCIDENT SCENE

5

         HOLDING A GUN TO HIS HEAD ............................................................ 1
    B.   DEADLY FORCE .................................................................................. 2

6

    C.   TACTICS, TRAINING, AND DEADLY FORCE PRINCIPLES ..................... 3
    D.   V.L.    ..................................................................................... 5

7

    E.   S.L.    ..................................................................................... 5
    F.   CAROLYN CAMPBELL ......................................................................... 6

8

III.    LEGAL STANDARD .......................................................................... 6

9

IV.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ....... 7

10

    A.   DEFENDANTS' USE OF DEADLY FORCE WAS UNREASONABLE UNDER THE

11

         FOURTH AMENDMENT ...................................................................... 7
        1.   Severity of Crime Not Dispositive ................................... 7

12

        2.   No Immediate Threat ........................................................ 8

13

        3.   No Forcible Resistance .................................................... 12
        4.   No Warning ...................................................................... 12

14

        5.   Other Options Available .................................................. 12

15

        6.   Indications of Mental Crisis ............................................ 13
    B.   THE FOURTH AMENDMENT VIOLATION WAS CLEARLY ESTABLISHED ......... 13

16

    C.   DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE, VIOLATING

17

         CLEARLY ESTABLISHED FOURTEENTH AMENDMENT LAW .......................... 16
V.      DEFENDANTS VIOLATED THE BANE ACT ....................................... 17

18

VI.   DEFENDANTS COMMITTED BATTERY ........................................... 18

19

VII.  DEFENDANTS WERE NEGLIGENT ................................................. 18
VIII. PLAINTIFFS HAVE STANDING .................................................. 19

20

    A.   WRONGFUL DEATH .......................................................................... 19

21

    B.   SURVIVORSHIP ................................................................................. 20
    C.   FOURTEENTH AMENDMENT .............................................................. 20

22

IX.    CONCLUSION .................................................................................. 21

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Kraft*,
  828 F.Supp.2d 1090 (N.D. Cal. 2011)..................................................................8

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011)................................................................................13

*B.B. v. County of Los Angeles*,
  25 Cal.App.5th 115 (2018)........................................................................17

*Barnes v. Felix*,
  605 U.S. —, 2025 WL 1401083 (2025)...............................................................7

*Bordegaray v. County of Santa Barbara*,
  2:14-cv-08610-CAS-JPR, 2016 WL 7223254 (C.D. Cal. Dec. 12, 2016)..............15

*Brosseau v. Haugen*,
  543 U.S. 194 (2004)..............................................................................13

*Bryan v. MacPherson*,
  630 F.3d 805 (9th Cir. 2010) .....................................................................12

*Calonge v. City of San Jose*,
  104 F.4th 39 (9th Cir. 2024) .......................................................................8

*Chaudhry v. City of Los Angeles*,
  751 F.3d 1096 (9th Cir. 2014) ....................................................................21

*Chew v. Gates*,
  27 F.3d 1432 (9th Cir. 1994) ......................................................................8

*Curnow v. Ridgecrest Police*,
  952 F.2d 321 (9th Cir. 1991) ...........................................................10, 14, 15

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) .................................................................8, 13

*Drummond v. City of Anaheim*,
  343 F.3d 1052 (9th Cir. 2003) ...........................................................10, 14, 16

*Estate of Aguirre v. County of Riverside*,
  29 F.4th 624 (9th Cir. 2022) ...........................................................7, 9, 11, 12

*Estate of Lopez v. Gelhaus*,
  871 F.3d 998 (9th Cir. 2017) ............................................................10, 14, 15

*Ewolski v. City of Brunswick*,
  287 F.3d 492 (6th Cir. 2002) .....................................................................16

*Galindo v. City of S.F.*,
  718 F.Supp.3d 1121 (N.D. Cal. 2024).............................................................20

*Garcia v. City of Azusa*,
  No. CV 22-3457-MWF (JPRx), 2023 WL 9420513 (C.D. Cal. Dec. 1, 2023).....18

*George v. Morris*,
  736 F.3d 829 (9th Cir. 2013) ................................................................passim

*Glenn v. Washington County*,
   673 F.3d 864 (9th Cir. 2011) ......................................................................... 13

*Gonzalez v. City of Anaheim*,
   747 F.3d 789 (9th Cir. 2014) ...................................................................... 7,8

*Graham v. Connor*,
   490 U.S. 386 (1989) ................................................................................. 7, 8

*Greer v. City of Hayward*,
   229 F.Supp.3d 1091 (N.D. Cal. 2017) .......................................................... 16

*Harris v. Roderick*,
   126 F.3d 1189 (9th Cir. 1997) ................................................................ 9, 15

*Hayes v. County of San Diego*,
   736 F.3d 1223 (9th Cir. 2013) ................................................... 8, 9, 16, 20

*Hernandez v. City of Los Angeles*,
   No. 21-55994 (9th Cir. June 2, 2025) ........................................................... 11

*Holloway v. City of Pasadena*,
   No. 2:15-cv-03867-CAS-JC, 2018 WL 8799884 (C.D. Cal. Nov. 8, 2018)...10, 15

*Holloway v. Horn*,
   2021 WL 3929972 (9th Cir. Sept. 2, 2021) ................................................... 11

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ............................................................................ 13, 15

*In re Richard M.*,
   14 Cal.3d 783 (1975) ............................................................................ 19, 20

*Jason P. v. Daniell S.*,
   9 Cal.App.5th 1000 (2017) .......................................................................... 19

*Kirkpatrick v. County of Washoe*,
   843 F.3d 784 (9th Cir. 2016) ....................................................................... 21

*Kosakoff v. City of San Diego*,
   2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) ............................................... 16

*Lake Nacimiento Ranch Co. v. San Luis Obispo County*,
   841 F.2d 872 (9th Cir. 1987) ........................................................................ 6

*Lehr v. Robertson*,
   483 U.S. 248 (1983) .................................................................................... 21

*Lennox v. City of Sacramento*,
   2024 WL 3845378 (E.D. Cal. Aug. 16, 2024) .............................................. 17

*Liston v. County of Riverside*,
   120 F.3d 965 (9th Cir. 1997) ........................................................................ 6

*Llera v. LVMPD*,
   2023 WL 6393092 (D. Nev. Sept. 30, 2023) ................................................ 15

*Lowry v. City of San Diego*,
   858 F.3d 1248 (9th Cir. 2017) ...................................................................... 8

*Mattos v. Agorano,*
    661 F.3d 433 (9th Cir. 2011) ........................................................................ 8
*Moreland v. LVMPD,*
    159 F.3d 365 (9th Cir. 1998) ................................................................. 16, 20
*Murillo v. City of Los Angeles,*
    707 F.Supp.3d 947 (C.D. Cal. 2023) ......................................................... 11
*Nehad v. Browder,*
    929 F.3d 1125 (9th Cir. 2019) ................................................................ 7, 12
*Nelson v. City of Davis,*
    685 F.3d 867 (9th Cir. 2012) ..................................................................... 13
*Orn v. City of Tacoma,*
    949 F.3d 1167 (9th Cir. 2020) ................................................................... 13
*Porter v. Osborn,*
    546 F.3d 1131 (9th Cir. 2008) ................................................................... 16
*Reese v. County of Sacramento,*
    888 F.3d 1030 (9th Cir. 2018) ................................................................... 18
*Reyes v. City of Santa Ana,*
    832 F. App'x 487 (9th Cir. 2020) .............................................................. 18
*Rios v. City of Los Angeles,*
    No. 2:21-cv-05341-RGK-MAA, 2022 WL 17219086 (C.D. Cal. Aug. 25, 2022) 18
*Robertson v. County of Los Angeles,*
    No. 16-cv-02761-BRO-SK, 2017 WL 5643179 (C.D. Cal. Oct. 17, 2017) .......... 11
*Santos v. Gates,*
    287 F.3d 846 (9th Cir. 2002) ....................................................................... 6
*Schmidt v. County of San Diego,*
    2023 WL 8812877 (S.D. Cal. Dec. 20, 2023) ........................................... 20
*Scott v. Harris,*
    550 U.S. 372 (2007) ...................................................................................... 9
*Scott v. Henrich,*
    39 F.3d 912 (9th Cir. 1994) ......................................................................... 7
*Singh v. City of Phoenix,*
    124 F.4th 746 (9th Cir. 2024) ...................................................................... 8
*Smith v. City of Hemet,*
    394 F.3d 689 (9th Cir. 2005) ..................................................................... 12
*Soderberg v. City of Los Angeles,*
    2020 WL 6540511 (C.D. Cal. Sept. 30, 2020) ........................................... 8
*Tabares v. City of Huntington Beach,*
    988 F.3d 1119 (9th Cir. 2021) ................................................................... 19
*Tan Lam v. City of Los Banos,*
    976 F.3d 986 (9th Cir. 2020) ....................................................................... 9

*Tennessee v. Garner*,
    471 U.S. 1 (1985)..........................................................................................12
*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ......................................................................7
*Vargas v. City of Los Angeles*,
    No. 19-cv-3279-PSG-AS, 2021 WL 248668 (C.D. Cal. Jan. 5, 2021) ................11
*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ...........................................................7, 8, 13
*Wheeler v. City of Santa Clara,*
    894 F.3d 1046 (9th Cir. 2018*)* ....................................................................21
*White v. Pauly*,
    580 U.S. 73 (2017)........................................................................................13
*Willis v. City of Fresno*,
    520 F. App'x 590 (9th Cir. 2013) ..........................................................16, 17
*Yount v. City of Sacramento*,
    43 Cal.4th 885 (2004) ..................................................................................18
*Zion v. County of Orange*,
    874 F.3d 1072 (9th Cir. 2017) ...............................................................11, 17

## STATUTES
Cal. Code Civ. P. § 377.30 ....................................................................................20
Cal. Fam. Code § 7611(d)............................................................................19, 20

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Summary judgment should be denied. Viewing the facts and drawing permissible inferences in Plaintiffs' favor, Defendants Jimmie McGuire and Shawn Hubachek's use of deadly force was unreasonable. Although the deputies claim Mr. Llamas was turning and aiming a gun toward them when they fired, video evidence clearly contradicts this. Nor are Defendants entitled to qualified immunity: The unlawfulness of using deadly force against Mr. Llamas, without warning, when he had his back turned and held a gun to his own head—not moving it or aiming it toward anyone—and was not approaching anyone, as well as when he was crawling on the ground having already been shot, was clear. Additional evidence supports Plaintiffs' state law claims, including Defendants' negligent conduct.[1]

## II.    STATEMENT OF FACTS

### A. Deputies Locate Mr. Llamas, Who Approaches the Incident Scene Holding a Gun to His Head

On April 14, 2023, Riverside Sheriff's ("RCSD") deputies were attempting to locate and arrest Johnny Llamas. [Defs.' Fact ("DF")-1, 5-6.] Deputies initially pursued him on the highway but lost him, then began searching a large, rural area. [DF-6-7, 9.] Two hours later, deputies sent a dog ahead, into a tree line, to search. [Pls.' Fact ("PF")-1.] The dog bit Mr. Llamas repeatedly. [PF-2.] One gunshot was heard, and the dog did not return; no deputy was hit. [PF-3.]

A police helicopter with an infrared camera located Mr. Llamas past the tree line. [PF-4.] Mr. Llamas moved northeast, then northward along a driveway which

---

[1] Plaintiffs voluntarily dismiss their Denial of Medical Care and Municipal Liability claims (Counts 2, 4, 5). [Dkt. 34.] Plaintiff Carolyn Campbell voluntarily dismisses her Battery, Negligence, and Bane Act claims (Counts 6-8). [*Id.*]

ran toward and perpendicular to River Road, which ran east to west. [PF-5.] He held a gun to his head. [PF-6.]

By radio, the helicopter advised deputies of Mr. Lllamas's whereabouts and that he held the gun to his head. [PF-7.] Lieutenant Michael Walsh and Defendants Shawn Hubachek and Jimmie McGuire positioned on River Road, 30-50 yards west of where the southern driveway reached River Road. [PF-8.] They faced east and had two vehicles available as cover. [PF-9.] Additional deputies were on River Road, east of the driveway, opposite Lt. Walsh and Defendants. [PF-10.] Mr. Llamas walked onto River Road, holding the gun to his head. [PF-11.] He continued northward, directly across River Road, toward another driveway running northward onto another property. [PF-12.]

**B. Deadly Force**

The property north of River Road contained a blue house on its western end. [PF-13.] Defendant McGuire claimed that, 2-3 hours earlier, he observed two men there but did not attempt to speak with or evacuate them. [PF-14.] The deputies had no information the northern portion of the property was occupied. [PF-15.] They were on River Road for a few minutes before Mr. Llamas reached it from the south. [PF-16.] However, they did not barricade the northern driveway or take other measures to block Mr. Llamas from accessing that driveway—which was beyond a designated containment line—even as they blocked him from going east or west along River Road, funneling him northward. [PF-17.]

As Mr. Llamas proceeded north, the deputies lost sight of him. [PF-18.] They moved eastward toward the driveway, where they regained sight of him. [PF-19.] Lt. Walsh exited his vehicle and the deputies stood in a line, near the vehicle. [PF-20.] Mr. Llamas continued north, parallel to the blue house. [PF-21.] Apart from momentarily glancing right, then left, Mr. Llamas did not turn his head or body away from the north. [PF-22.] While he was still facing and moving north, the gun to his head, and his back to the deputies, Defendant Hubachek fired one shot and

Defendant McGuire fired three shots from 40-50 yards away. [PF-23.] Mr. Llamas was struck from behind, in the buttocks, and fell down. [PF-24.]

Mr. Llamas landed on his right side, his right arm underneath him, and raised his empty left hand. [PF-25.] He then pulled his right elbow back and further underneath him and began crawling westward, turning his head west. [PF-26.] He reached westward with his left hand, and his left shoulder came southward over his torso, which faced the ground as his right arm pulled underneath his body to the north, away from the deputies. [PF-27.] While he was in this position, Defendant McGuire fired four more shots, striking him in the head. [PF-28.] When McGuire began firing the second volley of shots, Lt. Walsh said, "Jimmie…," indicating he did not understand why McGuire was still shooting. [PF-29.] During this time, Defendant Hubachek did not see Mr. Llamas holding or pointing the gun, or believe Mr. Llamas was an immediate threat, or fire again. [PF-30.] Lt. Walsh never fired his weapon. [PF-31.] Mr. Llamas never fired his gun after the deputies saw him on River Road. [PF-32.] At least twenty officers were on scene. [PF-33.]

Mr. Llamas died from his wounds. [PF-34.] He sustained two gunshot wounds: one to his buttock, with a partial back-to-front trajectory, and one to his head, with a partial upward and rightward trajectory. [PF-35.]

### C. Tactics, Training, and Deadly Force Principles

Defendants McGuire and Hubachek never issued Mr. Llamas any commands or verbally warned him that they would shoot. [PF-37-36.] Mr. Llamas did not approach deputies or any other person leading up to the shooting. [PF-38.] He never pointed his gun at any person, made any gesture indicating he was about to do so, or verbally threatened anyone. [PF-39-40.] The deputies had no information any civilians were in the direction Mr. Llamas was moving. [PF-41.] Immediately before shooting, the deputies could have moved behind Lt. Walsh's vehicle or its open door, which would have provided cover if Mr. Llamas had turned or pointed the gun toward them, but they did not. [PF-42.] The deputies had long-range less-lethal

weapons accessible but did not retrieve them. [PF-43.] From the time the deputies were positioned on River Road until the shooting, they did not discuss any tactical plan, including how to approach Mr. Llamas, what to do if he removed the gun from his head, or what to do if he approached an occupied area. [PF-44.] Before the shooting, upon seeing Mr. Llamas holding the gun to his head, Lt. Walsh thought he may have been suicidal. [PF-45.]

RCSD deputies receive extensive training in tactics, use of cover, and deadly force. [PF-46.] They are trained to "tactically reposition" away from individuals holding weapons when possible, including using cover, to gain time and protection. [PF-47.] They are trained to identify individuals who may be suicidal and that they cannot use deadly force against someone based on the danger he poses to himself, in accordance with written policy. [PF-48.] They are trained that police dogs are a less-lethal weapon or tool and are physical property. [PF-49.]

Deputies are trained to give commands in a loud, clear voice. [PF-50.] Deputies are trained to issue verbal warnings before using deadly force, when feasible, to give individuals a final opportunity to comply. [PF-51.] They are trained that deadly force is the highest level of force and is only permissible when an individual poses an immediate or imminent threat of death or serious bodily injury, which is also in RCSD policy. [PF-52.] They are trained, and RCSD policy provides, that such a threat is "imminent" when a reasonable deputy would believe the subject has the present ability, opportunity, *and* apparent intent to immediately cause death or serious bodily injury. [PF-53.] They are trained, and RCSD policy provides, that fear of *future* harm is insufficient, no matter how great the fear or likelihood of harm. [PF-54.] They are trained to control their fear and that belief in the necessity of deadly force must be based on objective factors, not subjective fear. [PF-55.] They are trained that they are responsible for justifying every shot fired and to reassess any threat a subject poses between shots. [PF-56.] They are not trained that they may shoot someone simply because he is holding a gun. [PF-57.] In

deposition, the deputies agreed that under their training, it would not have been appropriate to shoot Mr. Llamas while running away or holding the gun to his head if he did not turn toward or aim the gun toward them. [PF-58.] Plaintiffs' expert opined that Defendants' use of deadly force was inappropriate and violated law enforcement standards and training, including because Mr. Llamas was not turning or aiming the gun toward anyone other than himself when Defendants fired. [PF-59.]

**D. V.L.**

V.L. is Mr. Llamas's daughter. [PF-60.] When V.L. was born, Mr. Llamas was incarcerated, so he was not listed on her birth certificate. [PF-61.] When Mr. Lllamas was first released from incarceration, V.L. lived with him for a month. [PF-62.] Before V.L. and her mother moved away, Mr. Llamas's incarceration prevented him from seeing V.L. in person. [PF-63.] He sent her mother money to assist with expenses for V.L., including while incarcerated. [PF-64.] When incarcerated, he would pass messages to V.L. and check on her via her mother. [PF-65.] When not incarcerated, he would call, text, and video chat with V.L., and they spoke weekly in the months until his death. [PF-66.] The last time he and V.L.'s mother spoke, one month before his death, he expressed how excited he was to see V.L. and prove himself a good father to her, following his incarceration. [PF-67.] V.L. made plans to visit him in summer 2023, but he died in April. [PF-68.] V.L. was devastated by his death and withdrew, saw a therapist, her social life ended, her grades dropped, and she became detached from family. [PF-69.]

**E. S.L.**

S.L. is Mr. Llamas's daughter. [PF-70.] He lived with her for extended periods and, when incarcerated, left a message saying he loved and missed her. [PF-71.] While incarcerated, he would speak with S.L. via phone and sent letters and cards. [PF-72.] When not incarcerated, he provided money to care for S.L. and brought supplies for her care. [PF-73.] He celebrated every birthday with her when

not incarcerated. [PF-74.] S.L. did not see him in prison because she was not allowed to, but repeatedly asked to speak with him. [PF-75.] S.L. enjoyed walking, talking, and playing with her father. [PF-76.] S.L. was devastated by his death and erected a memorial with her mother, and has dealt with anger issues, self-isolated, and her grades dropped. [PF-77.]

### F. Carolyn Campbell

Carolyn Campbell is Mr. Llamas's mother. [PF-78.] He frequently resided with her when not incarcerated and tended to her when she was ill. [PF-79.] They would speak about music and life, and he would tell her she was beautiful, nice, and sweet. [PF-80.] When he was incarcerated, they spoke almost every day, and he sent mail. [PF-81.] When not incarcerated, they saw each other several times weekly, including the night before his death. [PF-82.] She was devastated by his death, obtained mental health treatment, and was diagnosed with depression. [PF-83.] Before his death, he would visit and make her feel better when she felt down; now, she feels scared and alone. [PF-84.]

## III.  **LEGAL STANDARD**

At summary judgment, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant. *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir. 1987). Even where key facts are undisputed, summary judgment should be denied if reasonable minds could differ on what inferences to draw. *Id.*

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions," summary judgment "in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We have held repeatedly that the reasonableness of force used is ordinarily a question … for the jury."). "Deadly force cases pose a particularly difficult problem because the officer defendant[s]" are often "the only surviving eyewitness[es]." *Gonzalez v. City*

1  *of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc) (alteration adopted).

2  Accordingly, courts "must ensure that the officer is not taking advantage of the fact

3  that the witness most likely to contradict his story—the person shot dead—is unable

4  to testify," *id.* at 795, and "must carefully examine all the evidence." *Scott v.*

5  *Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

6  **IV.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY**

7  **A. Defendants' Use of Deadly Force Was Unreasonable Under the Fourth**

8  **Amendment**

9  Fourth Amendment claims for excessive force are judged by "whether the

10  officers' actions [we]re 'objectionably reasonable'" given "the facts and

11  circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

12  Government interest factors to weigh against "nature and quality of the intrusion"

13  include "(1) the severity of the crime," "(2) whether the suspect poses an immediate

14  threat," and "(3) whether he is actively resisting" or "attempting to evade arrest." *Id.*

15  at 396. Additional factors include (4) "whether proper warnings were given" and (5)

16  "whether the suspect has exhibited signs of mental illness." *Vos v. City of Newport*

17  *Beach*, 892 F.3d 1024, 1033-34 & n.9 (9th Cir. 2018); *see Nehad v. Browder*, 929

18  F.3d 1125, 1137-38 (9th Cir. 2019). "Only information known to the officer at the

19  time" is relevant. *Id.* at 1132.

20  "The intrusiveness of … deadly force is unmatched," *Graham*, 490 U.S. at

21  397, "because, once deceased, an individual [cannot] have his guilt and punishment

22  determined." *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir.

23  2022) (cleaned up). Although "officers are often forced to make split-second

24  judgments," "[n]ot all errors in perception or judgment ... are reasonable." *Torres v.*

25  *City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (cleaned up).

26  **1.  Severity of Crime Not Dispositive**

27  The "severity of the crime" factor relates to the initial crime prompting a

28  police response. *Barnes v. Felix*, 605 U.S. —, 2025 WL 1401083, at *4 (2025)

(describing factor as "severity of the crime prompting the stop") (cleaned up); *see Vos*, 892 F.3d at 1031 & n.6; *Soderberg v. City of Los Angeles*, 2020 WL 6540511, at *9 n.11 (C.D. Cal. Sept. 30, 2020) (citing *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) (en banc)). Although Defendants claim they were pursuing Mr. Llamas based on warrants for prior alleged crimes, the most recent allegedly occurred a week earlier. This is not a case where the pursuit commenced following a crime that was just committed, mitigating this factor's weight. *See Singh v. City of Phoenix*, 124 F.4th 746, 752 (9th Cir. 2024) ("Even when a suspect has … committed a serious crime, … a jury could discount the severity of the suspect's purported crimes when the suspect is … not engaged in felonious conduct when the officer arrives.") (cleaned up). Further, "the severity of the crime is mitigated by the fact that [Mr. Llamas] was outnumbered [more than] five to one by law enforcement officers" when deadly force was used. *Adams v. Kraft*, 828 F.Supp.2d 1090, 1109-10 (N.D. Cal. 2011) (citing *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994)).

### 2. No Immediate Threat

"[T]he most important *Graham* factor is whether the suspect posed an immediate threat" to anyone's safety. *Mattos v. Agorano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (cleaned up). Use of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious bodily harm to himself or others. *See Gonzalez*, 747 F.3d at 793; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). A "statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

A deputy's "desire to resolve quickly a potentially dangerous situation" does not justify deadly force. *Id.* Nor does "[t]he mere fact that a suspect possesses a weapon." *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); *see Calonge v. City of San Jose*, 104 F.4th 39, 48 (9th Cir. 2024) ("We have held over

1  and over that a suspect's possession of a gun does not itself justify deadly force."); 

2  *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement 

3  officials may not kill suspects who do not pose an immediate threat to their safety or 

4  to the safety of others simply because they are armed."). Rather, the circumstances 

5  must be such that a reasonable officer would believe the suspect would immediately 

6  use the weapon to inflict death or serious bodily harm if deadly force were not used. 

7  *See Aguirre*, 29 F.4th at 628 (deadly force not justified where, on plaintiffs' facts, 

8  subject holding "bat-like object" was not facing officer, "coming 'on the attack,'" or 

9  approaching bystanders); *George*, 736 F.3d at 838 (deadly force not justified where, 

10  on plaintiffs' facts, subject armed with gun did not turn and point gun at deputies); 

11  *Hayes*, 736 F.3d at 1234. Even where a suspect injures an officer with a weapon— 

12  which did not occur here—use of subsequent force is unreasonable if the suspect no 

13  longer poses an immediate threat. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1002 

14  (9th Cir. 2020) (collecting cases). 

15       Incredibly, despite videos showing that Mr. Llamas had his back toward them 

16  and the gun to his head when Defendants McGuire and Hubachek opened fire (Def. 

17  Ex. 1 47:15-47:31; Def. Ex. 6 00:10-00:16; Plt. Ex. 14; Plt. Ex. 15), the deputies 

18  claim McGuire and Hubachek shot because Mr. Llamas was turning toward them 

19  with the gun—first pointing it toward the blue house he was passing, then turning 

20  further to aim the gun behind him. (Plt. Ex. 1 at 33:1-12, 37:11-38:13, 41:10-42:11, 

21  44:14-45:8; Plt. Ex. 3 at 15:25-16:8, 41:18-42:11; Plt. Ex. 4 at 61:14-62:23, 63:14-

22  64:11, 67:3-23.) Defendants' motion expressly relies on this claim. (Mot. at 8 ("The 

23  most dispositive fact is that Llamas oriented the gun towards deputies.").) But as 

24  Defendants recognize, the Court cannot credit "visible fiction" when one version of 

25  events is "blatantly contradicted by the record"; it must instead "view[] the facts in 

26  the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); 

27  (Mot. at 6). 

28

Viewing the evidence in Plaintiffs' favor, when Defendants fired, Mr. Llamas was 150 feet away, moving and facing directly away from them, with his back turned. He pointed the gun at his head, not toward anyone else, and was not moving or manipulating it. He was moving north, past the blue house, and toward an area where no people were known to be. The deputies significantly outnumbered him. He had not pointed the gun at any person or verbally threatened anyone. The first gunshot to strike him struck him from behind, in the buttocks. By McGuire's second volley, Mr. Llamas was crawling on the ground, already shot, looking west, with the gun underneath him.

A reasonable deputy would have understood Mr. Llamas posed no immediate threat of death or serious bodily harm to anyone. Nothing about his conduct from the time they first saw him on River Road indicated he was attempting to or intended to aim his gun at anyone. Indeed, the deputies acknowledge that, based on their training, *it would have been inappropriate to shoot him had he kept the gun to his head and not turned around* [PF-58], which is precisely what the videos show. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) (whether officers violate training in using force is relevant to whether force is excessive). He was 150 feet away. Accordingly, a jury could conclude Mr. Llamas posed no immediate threat. *See Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1010-11 (9th Cir. 2017) (no immediate threat even where teenager carrying apparent AK-47 turned toward officer with gun and raised it slightly); *George*, 736 F.3d at 832-33, 838 (no immediate threat where man came onto balcony holding handgun but whether he "turned and pointed" it at officers was disputed); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-25 (9th Cir. 1991) (no immediate threat where armed man never pointed gun at officers and was not directly facing them when they fired); *Holloway v. City of Pasadena*, 2:15-cv-03867-CAS-JC, 2018 WL 8799884, at *8-9 (C.D. Cal. Nov. 8, 2018) (denying summary judgment where whether plaintiff ever turned and pointed gun toward officer was disputed), *aff'd sub nom. Holloway v. Horn*, 2021

WL 3929972 (9th Cir. Sept. 2, 2021); *cf. Aguirre*, 29 F.4th at 628 (no immediate threat where man holding bat was 15 feet away, not facing or approaching deputy).

Likewise, a jury could conclude Mr. Llamas posed no immediate threat when Defendant McGuire fired when Mr. Llamas was on the ground, crawling and facing westward, already shot, and could infer he was simply attempting to crawl aside to avoid being shot again. *See Hernandez v. City of Los Angeles*, No. 21-55994, slip op. at 20-22 (9th Cir. June 2, 2025) (en banc) (denying summary judgment where decedent was shot while on the ground, having already been shot, and "was rolling away"); *Zion v. County of Orange*, 874 F.3d 1072, 1075-76 (9th Cir. 2017); *Murillo v. City of Los Angeles*, 707 F.Supp.3d 947, 964 (C.D. Cal. 2023); *Vargas v. City of Los Angeles*, 19-cv-3279-PSG-AS, 2021 WL 248668, at *2, 8 (C.D. Cal. Jan. 5, 2021) (denying summary judgment where whether decedent was already on ground at time of shots or was pulling gun from waistband were disputed); *Robertson v. County of Los Angeles*, 16-cv-02761-BRO-SK, 2017 WL 5643179, at *9 (C.D. Cal. Oct. 17, 2017) (denying summary judgment where decedent was shot on ground while holding gun, but video created dispute regarding "the direction of Decedent's firearm," "whether he would have physically been able to fire it in the Deputies' direction given the position of his arms and body," and "whether any members of the public were in immediate danger").[2]

_____

[2] As an alternative to the *Graham* analysis, deadly force can also be justified "to prevent [the] escape" of someone whom officers have probable cause to believe has committed a crime "inflict[ing] or threaten[ing] infliction of serious physical harm" and "poses a threat of serious physical harm" to others. *Harris*, 126 F.3d at 1202 ("[O]fficers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, *or* is fleeing and his escape will result in a serious threat of injury to persons.") (emphasis added). But Defendants make no such argument (Mot. at 6-9), which is therefore waived. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Whitaker v. Astrue*, 2016 WL 146069, at *2 n.1 (N.D. Cal. Jan. 13, 2016) (citing *Nev. Dep't of Corr. v. Greene*, 648 F.3d 1014, 1020 (9th (footnote continued)

### 3. No Forcible Resistance

"Resistance" is not "a binary state," "either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Mr. Llamas never used, or attempted to use, force against the deputies to resist. The Ninth Circuit has recognized that even where an individual "continually ignored" commands to show his hands and remain outside his home and "physically resisted" officers, his level of resistance "provided little support for a use of significant force." *Id.* (quoting *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005)). It has likewise found that an individual's erratic behavior and "failure to comply" was "a far cry from actively struggling with an officer" and did not support use of significant force. *Id.*

### 4. No Warning

"Before using deadly force," deputies "must, 'where feasible,' issue a warning." *Aguirre*, 29 F.4th at 628 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). Neither Defendant warned Mr. Llamas they would shoot unless he complied. A warning feasible, since Mr. Llamas was moving in a straight line, with his back turned, and was not turning or manipulating the gun, which was against his head, and the deputies had a clear view of him.

### 5. Other Options Available

Deputies also must "consider what other tactics if any were available" to effect an arrest, including "less intrusive methods." *Bryan*, 630 F.3d at 831 & n.15 (cleaned up); *see Nehad*, 929 F.3d at 1135. The deputies failed to discuss any plan for what to do if Mr. Llamas crossed the containment line at River Road, even as

---

Cir. 2011)); *United States v. Sardie*, 191 F.Supp.2d 1117, 1127 (C.D. Cal. 2000). Even assuming this argument were not waived, it would not apply due to the absence of a serious threat.

they blocked him from turning left or right there. Plaintiffs' expert has opined that they should have barricaded the northern driveway. [PF-17.] The deputies also had less-lethal weapons available, but did not attempt to use them. Had Defendants considered these alternatives, the shooting may not have occurred. *See Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012).

### 6. Indications of Mental Crisis

Where someone displays "indications of mental illness," "the government's interest in using deadly force [i]s diminished." *Vos*, 892 F.3d at 1034; *see Glenn v. Washington County*, 673 F.3d 864, 875 (9th Cir. 2011); *Deorle*, 272 F.3d at 1282-83. Mr. Llamas holding the gun to his head would have led a reasonable deputy to consider he may be suicidal, as Lt. Walsh did. *See Glenn*, 673 F.3d at 872-73 (suicidal threats weigh against reasonableness of significant force); *cf. Deorle*, 272 F.3d at 1283 ("[W]hen an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished").

Accordingly, a reasonable jury could deem Defendants' use of deadly force unreasonable.

### B. The Fourth Amendment Violation Was Clearly Established

Qualified immunity does not apply where official "violate[s] clearly established … constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017). The touchstone is whether "officers [had] fair notice of the illegality of their conduct" at the time. *Orn v. City of Tacoma*, 949 F.3d 1167, 1178 (9th Cir. 2020); *see Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). Although this ordinarily requires "cases relevant to the situation [officers] confronted," *Brosseau*, 543 U.S. at 200, it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Hope*, 536 U.S. at 740 (qualified immunity should be denied even "despite notable factual distinctions …, so long as the prior decisions

1  gave reasonable warning that the conduct then at issue violated constitutional

2  rights"). Training on use of force can also provide notice that force is unreasonable.

3  *Drummond*, 343 F.3d at 1062.

4        Viewing the facts and drawing inferences in Plaintiffs' favor, existing

5  precedent clearly established the unlawfulness of deadly force. In *George*, deputies

6  responded to a "domestic disturbance involving a firearm," and were told a man was

7  on the back patio "with his gun." 736 F.3d at 832 (9th Cir. 2013). They deputies set

8  up a perimeter. *Id.* The man came out onto a balcony, and the deputies identified

9  themselves and ordered him to show his hands. *Id.* He was holding a gun and,

10  according to one deputy, "turn[ed] ... and raise[d]" it and "point[ed] it directly at

11  [him]," such that the deputy could "see[] the ... black hole [of] the barrel," and the

12  deputy fired. *Id.* at 833 n.4. The plaintiff, however, testified the man held the gun

13  "with the barrel pointing down." *Id.* at 832. Given the dispute regarding whether the

14  officer fired "without objective provocation" while the man's "gun [was] trained on

15  the ground," the Ninth Circuit denied summary judgment because "a reasonable

16  fact-finder" could find the "use of force ... excessive." *Id.* at 838-39.

17        *In Lopez*, deputies attempted to stop a teenager who was carrying an apparent

18  AK-47 and walking away from them, toward "several houses," with "a few

19  individuals outside." 871 F.3d at 1002-03 (9th Cir. 2017). A deputy testified that the

20  teenager "glance[d] backwards" before "rotat[ing] his body clockwise," and he "saw

21  the gun come around" toward him, "with the barrel ... coming up." *Id.* He fired,

22  striking the teenager in the chest. *Id.* at 1003. Other testimony, however, disputed

23  whether the teenager ever glanced backwards or raised the gun. *Id.* at 1002-03. Due

24  to factual disputes, "most importantly, ... the movement of [the] gun," and the

25  deputy's failure to issue any warning, summary judgment was denied. *Id.* at 1007-

26  13.

27        In *Curnow*, officers encountered a man apparently beating a woman in a

28  home, next to a rifle. 952 F.2d at 323 (9th Cir. 1991). They claimed that, as they

attempted to break down the door, he grabbed the gun and, after an officer then shot him, pointed it at the officer, who shot again. *Id.* The court denied summary judgment because the woman claimed the man had not reached for the gun before the officer's first shot, which she said struck him in the back, and only grabbed the gun by the muzzle before the second shot. *Id.* at 323-25.

By 2023, these cases clearly established that shooting someone who is holding a gun but does not take threatening action with it, even where he is facing officers and fails to comply with commands, and even where officers are responding to what they believe is a crime in progress, constitutes excessive force. *See also Harris*, 126 F.3d at 1202-04 (9th Cir. 1997) (denying summary judgment where officer, without warning, shot suspect who made no threatening movement but was believed to have killed FBI agent day before); *Lopez*, 871 F.3d at 1018 (deeming law clearly established by *George*, *Curnow*, and *Harris*); *Holloway*, 2021 WL 3929972, at *2 (citing *Lopez* and *Curnow*); *Llera v. LVMPD*, 2023 WL 6393092, at *9-11 (D. Nev. Sept. 30, 2023) (citing *Harris*).

Although unnecessary, *Aguirre* further establishes that officers may not shoot someone who is armed with a weapon without warning, even if he ignores commands and has already engaged in violent, threatening conduct, where he is not facing the officer, approaching bystanders, or taking action indicating he is about to attack. 29 F.4th at 626-29 (holding unconstitutionality was "obvious" even absent similar precedent); *see also Hope*, 536 U.S. at 741 (general prohibitions on objectively unreasonable force and use of deadly force against individuals who pose no immediate threat may "giv[e] fair and clear warning" and "apply with obvious clarity" to specific conduct); *Bordegaray v. County of Santa Barbara*, 2:14-cv-08610-CAS-JPR, 2016 WL 7223254, at *8 (C.D. Cal. Dec. 12, 2016) (denying qualified immunity because *Garner* "'clearly established' that 'where the suspect poses no immediate threat …, the harm resulting from failing to apprehend him does not justify the use of deadly force'"; factual disputes could lead jury to "find that a

reasonable officer … would not have believed" anyone "was in imminent danger").[3] The same is true of Defendants' training that deadly force may only be used against individuals who have the present ability, opportunity, and apparent intent to inflict death or serious bodily injury. *See Drummond*, 343 F.3d at 1062; [PF-53]. Accordingly, qualified immunity should be denied.

### C. Defendants Acted with Deliberate Indifference, Violating Clearly Established Fourteenth Amendment Law

Official action violates due process when it "shocks the conscience." *Hayes*, 736 F.3d at 1230. Where "deliberation is practical" before using force, only "deliberate indifference" must be shown. *Id.* In situations "that escalate so quickly" the deputy cannot deliberate, plaintiffs must show "a purpose to harm unrelated to legitimate law enforcement objectives." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Deliberate indifference" applies where deputies can evaluate the threat an individual poses, *see Willis v. City of Fresno*, 520 F. App'x 590, 592 (9th Cir. 2013); *Kosakoff v. City of San Diego*, 2010 WL 1759455, at *11-12 (S.D. Cal. Apr. 29, 2010), or where officers use force following a standoff with time to create a plan, *Ewolski v. City of Brunswick*, 287 F.3d 492, 511 (6th Cir. 2002). "Purpose to harm" applies where unforeseen changes, or clear, immediate, deadly threats allow only split seconds to make decisions. *E.g.*, *Hayes*, 736 F.3d at 1230; *Moreland v. LVMPD*, 159 F.3d 365, 372 (9th Cir. 1998). Where pertinent facts are disputed, only the jury can determine which standard applies. *Greer v. City of Hayward*, 229 F.Supp.3d 1091 (N.D. Cal. 2017).

---

[3] Although later-decided, *Calonge* further confirms the law was clearly established. 104 F.4th at 42-48 (unconstitutionality of shooting man armed with apparent gun in back, where man disregarded commands and walked away from officers, and where whether man appeared to draw gun or approach civilians was disputed, clearly established by precedent including *George* and *Lopez*); *see Lam*, 976 F.3d at 1001-02 (citing *Curnow*, 952 F.2d at 325 & n.***); *see also Hernandez*, slip op. at 22-27.

Defendants had time to deliberate. Well before they saw Mr. Llamas, the helicopter advised he was walking northward, holding the gun to his head. Although they could have prepared for his approach and taken measures to maintain the containment line, including by blocking the obvious path across it and onto the driveway, they did not. *Cf. Lennox v. City of Sacramento*, 2024 WL 3845378, at *25 (E.D. Cal. Aug. 16, 2024) ("[A] trier of fact could also find that defendants … had time to deliberate regarding their use of force because they had predicted in advance that the decedent would run toward the door and preemptively stepped up in that direction to prevent him from doing so."). This was despite Deputy McGuire's claim that he saw two men at the blue house hours earlier, which the deputies did not discuss as they waited for Mr. Llamas. There was no need for a "snap judgment." *Willis*, 520 F. App'x at 592. This is further shown by the deputies' own testimony claiming that, had Mr. Llamas continued up the northern driveway with the gun to his head and not turned around or moved the gun, they would not have deemed it appropriate to shoot and instead would have pursued him further to attempt to apprehend him without using deadly force. [PF-58]; *see Lennox*, 2024 WL 3845378, at *26 & n.21 (applying deliberate indifference standard based on "genuine dispute as to whether deliberation was feasible," and denying qualified immunity based on disputes regarding whether shooting man who ran toward officers with knife constituted deliberate indifference).

Even under purpose-to-harm, summary judgment must be denied because the deputies first fired at Mr. Llamas's back, when he posed no threat, and McGuire continued shooting when Mr. Llamas was already down, not facing or aiming the gun toward deputies. *See Zion*, 874 F.3d at 1077.

## V. <u>DEFENDANTS VIOLATED THE BANE ACT</u>

Under the Bane Act, beyond showing a civil rights violation, plaintiffs must only show the defendant acted with specific intent to violate an individual's rights. *See B.B. v. County of Los Angeles*, 25 Cal.App.5th 115, 129-33 (2018) (requisite

1  showing of "threats, intimidation, or coercion" need not be independent from

2  "coercion" inherent in underlying civil rights violation), *rev'd on other grounds*, 10

3  Cal.5th 1 (2020); *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir.

4  2018). A "reckless disregard for a person's constitutional rights is evidence of

5  specific intent to deprive [him] of those rights." *Id.* at 1045.

6      Defendants violated Mr. Llamas's right to be free from excessive force and,

7  viewing the facts in Plaintiffs' favor, demonstrated reckless disregard. There was no

8  immediate threat when they fired; Mr. Llamas was moving away with his back

9  turned, did not point the gun at anyone besides himself, and was not manipulating or

10  beginning to aim it toward deputies. The deputies provided no warning even though

11  it was feasible. Although they claim Mr. Llamas was turning and pointing the gun in

12  their direction—claims Plaintiffs dispute—they made no attempt to utilize available

13  cover before shooting. These factors show Defendants "at least recklessly

14  disregarded whether" the force was "more than necessary under the circumstances."

15  *Rios v. City of Los Angeles*, 2:21-cv-05341-RGK-MAA, 2022 WL 17219086, at *4

16  (C.D. Cal. Aug. 25, 2022); *see Garcia v. City of Azusa*, CV 22-3457-MWF (JPRx),

17  2023 WL 9420513, at *8 (C.D. Cal. Dec. 1, 2023).

18  **VI.**    **DEFENDANTS COMMITTED BATTERY**

19      Under California law, claims against police for battery are analyzed under the

20  Fourth Amendment standard. *Reyes v. City of Santa Ana*, 832 F. App'x 487, 491

21  (9th Cir. 2020) (citing *Yount v. City of Sacramento*, 43 Cal.4th 885, 902 (2004)).

22  Viewing the facts in Plaintiffs' favor, Defendants used unreasonable force when

23  they fired, without warning, at Mr. Llamas's back, when he was not turning or

24  moving the gun. Defendant McGuire used unreasonable force when he fired,

25  without warning, while Mr. Llamas was on the ground, wounded, crawling and

26  facing west, not aiming or moving the gun toward anyone.

27  **VII.**    **DEFENDANTS WERE NEGLIGENT**

28      California negligence law is "broader" than Fourth Amendment law and

considers officers' pre-shooting tactics and decisions. *Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1125-26 (9th Cir. 2021). Defendants' pre-shooting tactics further demonstrate that they were negligent. Although the deputies designated River Road as a line of containment, they never discussed a plan regarding what to do if Mr. Llamas crossed it, even as they allowed him to do so by blocking him from turning left or right, without blocking his northward egress. This particularly demonstrates negligence given their claimed belief that civilians may be present on the western portion of the property where the shooting occurred, based on McGuire having allegedly seen two men there hours earlier. Defendants never issued commands, warned they would shoot, attempted to utilize available cover, or utilized available less-lethal weapons. For these reasons, in addition to those addressed regarding the Fourth Amendment, the facts viewed in Plaintiffs' favor show Defendants were negligent.

## VIII.  <u>PLAINTIFFS HAVE STANDING</u>

### A. Wrongful Death

Children may pursue wrongful death claims by showing "the presumed parent receive[d] the child into their home and openly h[eld] out the child as their natural child." Fam. Code § 7611(d). Although "receipt of the child into the home must be sufficiently unambiguous as to constitute a clear declaration regarding the nature of the relationship, … it need not be for any specific duration." *Jason P. v. Daniell S.*, 9 Cal.App.5th 1000, 1022 (2017); *see In re Richard M.*, 14 Cal.3d 783, 794 (1975) ("receiv[ed]" construed liberally). Regarding the "openly h[eld] out" requirement, "courts look for conduct manifesting the father's desire to establish and maintain a paternal relationship." *Id.* at 799.

V.L. lived with Mr. Llamas for one month, and S.L. lived with him repeatedly, satisfying the "receipt" requirement. *See Richard M.*, 14 Cal.3d at 795 (collecting cases); *Jason P.*, 9 Cal.App.5th at 1022. The primary reason V.L. did not spend more time with him before his death was his incarceration. [PF-63.] His

"conduct in relation to [the children]" also demonstrated his "desire to establish and maintain a paternal relationship," *Schmidt v. County of San Diego*, 2023 WL 8812877, at *2 (S.D. Cal. Dec. 20, 2023); *Richard M.*, 14 Cal.3d at 794, and he "openly h[e]ld" them out "as [his] natural child[ren]." F.C. § 7611(d). He maintained relationships with V.L.'s mother and S.L.'s guardian as co-parents, sending money and providing supplies even while incarcerated. He celebrated all of S.L.'s birthdays when not incarcerated. They would call, text, and video chat until his death; he sent letters and cards; and he was eager to renew his parental role toward V.L. before his death. Although Defendants contend S.L. was legally adopted, such that his parental rights were terminated, no documentation has been adduced. For a child with a strong relationship with her father to be denied the ability to pursue remedies for his death, through no fault of her own, would work injustice.

### B. Survivorship

A cause of action that survives an individual's death "passes to the decedent's successor in interest," who may bring the action. C.C.P. § 377.30. "[T]o proceed as a decedent's 'successor in interest,'" plaintiffs must 'execute and file … a declaration under penalty of perjury.'" *Galindo v. City of S.F.*, 718 F.Supp.3d 1121, 1131 (N.D. Cal. 2024). V.L. and S.L. complied with this requirement via declarations filed on their behalf by their Guardians *ad Litem* [Dkt. 8, 12], and may bring survivorship claims. *See* C.C.P. § 377.32.

### C. Fourteenth Amendment

Plaintiffs have standing to pursue Fourteenth Amendment claims based on unlawful interference with their relationships with their father and son, Mr. Llamas.[4] *See Hayes*, 736 F.3d at 1229-30; *Moreland*, 159 F.3d at 371; *see also Chaudhry v.*

---

[4] Defendants have not argued otherwise as to Plaintiffs V.L. and Campbell. (*See* Mot. at 17-21.) Such argument is therefore waived. (*See supra*, n.2.)

*City of Los Angeles*, 751 F.3d 1096, 1106 (9th Cir. 2014) (Fourteenth Amendment claim distinct from wrongful death claim). Whereas biological connection alone is insufficient, "enduring" relationships "reflect[ing] some assumption 'of parental responsibility'" confer standing. *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 789 (9th Cir. 2016) (quoting *Lehr v. Robertson*, 483 U.S. 248, 260 (1983)). Although *Wheeler v. City of Santa Clara* held there was no standing where the plaintiff's mother surrendered him for adoption and had minimal contact throughout his childhood, the court expressly "confined [its] holding" to the facts of that case. 894 F.3d 1046, 1058 (9th Cir. 2018). Moreover, Mr. Llamas maintained frequent contact with and a parental role toward S.L., and there is no evidence he voluntarily surrendered her or intended to give up that role.[5] The evidence also clearly shows Ms. Campbell had the requisite "emotional attachments" deriving from a consistent, loving relationship with her son to maintain standing. *Lehr*, 483 U.S. at 261.

## IX.    CONCLUSION

Plaintiffs respectfully request the Court deny Defendants' Motion.

DATED:  June 2, 2025           LAW OFFICES OF DALE K. GALIPO


                               By_____/s/ Benjamin S. Levine_____
                                  Dale K. Galipo
                                  Benjamin S. Levine
                                  Attorneys for Plaintiff V.L.


DATED:  June 2, 2025           MARDIROSSIAN AKARAGIAN, LLP


                               By_____/s/ Lawrence D. Marks_____
                                  Garo Mardirossian
                                  Lawrence D. Marks
                                  Attorneys for Plaintiffs S.L. and Carolyn
                                  Campbell

---

[5] *Wheeler* does not apply to V.L., whom Defendants do not contend was adopted.

**CERTIFICATION OF COMPLIANCE WITH WORD LIMIT (L.R. 11-6.1)**

The undersigned, counsel of record for Plaintiff V.L., certifies that this brief contains **6,984** words, which complies with the word limit of L.R. 11-6.1.

DATED:  June 2, 2025                    LAW OFFICES OF DALE K. GALIPO


                                        By_____/s/ Benjamin S. Levine_____
                                           Dale K. Galipo
                                           Benjamin S. Levine
                                           Attorneys for Plaintiff V.L.