**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118
*Attorneys for Plaintiff V.L.*

Garo Mardirossian, Esq., #101812
garo@garolaw.com
Lawrence D. Marks, Esq., #153460
Lmarks@garolaw.com
**MARDIROSSIAN AKARAGIAN, LLP**
6311 Wilshire Boulevard
Los Angeles, CA  90048-5001
Telephone (323) 653-6311 / Facsimile (323) 651-5511
*Attorneys for Plaintiffs S.L. and CAROLYN CAMPBELL*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.L. a minor by and through the Guardian Ad Litem Kristine Llamas Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., by and through the Guardian Ad Litem Amber Snetsinger, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; and CAROLYN CAMPBELL, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF RIVERSIDE; SHAWN HUBACHEK; JIMMIE MCGUIRE; and DOES 3-10, inclusive, <br><br> Defendants. | Case No.: 5:24-cv-00249-CAS-SP <br><br> *Honorable Christina A. Snyder* <br><br> **PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS** <br><br> *[Filed concurrently with Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto; Declaration of Roger Clark]* <br><br> Date:    June 23, 2025 <br> Time:    10:00 a.m. <br> Courtroom: 8D |

1        Case No.: 5:24-cv-00249-CAS-SP

| Defendants' Allegedly Undisputed Fact and Evidence | Plaintiffs' Response and Supporting Evidence |
|---|---|
| 1. On April 14, 2023, ("subject incident") Riverside County Sheriffs Dispatch advised the Northern Perris County Unit, that a suspect named Johnny Llamas ("Llamas") was armed and driving a blue Chevy Tahoe (license plate 7BUC580). Per a 911 call, he was known to be staying at or near 22635 Shaw Court in Perris, California.<br><br>**EVIDENCE:**<br>Ex. 2 (00:00 02:53).<br>Ex. 3, at 3:1-6:5.<br>Ex. 4 (00:00 00:59).<br>Ex. 5, at 2:1-4:6 | **Undisputed.** |
| 2. The 911 call came from a reporting party who wished to remain anonymous. This person understood law enforcement was looking for Llamas and advised that he was likely carrying a gun.<br><br>**EVIDENCE:**<br>Ex. 2 (00:00 02:53).<br>Ex. 3, at 3:1-6:5. | **Undisputed**. |
| 3. Two weeks prior, Llamas ran from law enforcement after officers visited the same Shaw Court address in relation to stolen property.<br><br>**EVIDENCE:**<br>Ex. 2 (00:00 02:53).<br>Ex. 3, at 3:1-6:5.<br>Ex. 4 (01:52 04:33).<br>Ex. 5, at 3:11-20-5:18. | **Undisputed.** |
| 4. On the day of the subject incident, Llamas was on probation and had felony warrants out for his arrest for | **Undisputed.** |

| | |
|---|---|
| charges that included child molestation and armed robbery. The child was his thirteen-year-old niece.<br><br>**EVIDENCE:**<br>Ex. 13 (01:51 04:20).<br>Ex. 14, at 4:21-8:6.<br>Ex. 17, at 17:7-19.<br>Ex. 21, at 43:23 44:2.<br>Ex. 22 at 129:4-130:3. | |
| 5. Officers were dispatched, including the Star 9 helicopter, to the Shaw address and cautioned that Llamas was known to carry weapons.<br><br>**EVIDENCE:**<br>Ex. 5, at 2:1-4:6. | **Undisputed.** |
| 6. Not far from Shaw Court, officers located Llamas driving the described vehicle heading westbound towards Highway 74. Llamas did not stop for law enforcement. Therefore, officers attempted spikes in his vehicle's path.<br><br>**EVIDENCE:**<br>Ex. 4 (07:00-08:00).<br>Ex. 5, 7:1-8:25. | **Undisputed.** |
| 7. Llamas continued on Highway 74, onto River Road, However, officers on the ground lost sight of him near Robert Street.<br><br>**EVIDENCE:**<br>Ex. 4 (08:01-11:07).<br>Ex. 5, 7:16-9:18. | **Undisputed.** |
| 8. Thereafter, Officer Wheeler reported that Llamas was seen with a female running near the back side of 22305 River Road at about 4:45 pm.<br><br>**EVIDENCE:** | **Undisputed.** |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | | |
|---|---|---|
| 1 | Ex. 12, at 1-2, 14. | |
| 2<br>3<br>4<br>5<br>6<br>7<br>8 | 9. A reporting party, an elderly woman, who lived on River Road spoke directly to officers on the scene. This resident described seeing a male matching Llamas' description with a female. They were fleeing across the resident's property and believed that he was possibly armed.<br><br>**EVIDENCE:**<br>Ex. 22. at 130:4-133:3 | **Undisputed.** |
| 9<br>10<br>11<br>12<br>13<br>14<br>15<br>16 | 10. After attempting to hide in a shed, Llamas and the female found a place to hide in the general vicinity off the River Road address from about 4:50 pm to about 7 pm.<br><br>**EVIDENCE:**<br>Ex. 12, at 1-5 | **Disputed.** The cited evidence does not show that Mr. Llamas ever attempted to hide in a shed or that he "found a place to hide" during the referenced time period. Rather, it indicates that a 911 caller stated that Mr. Llamas was seen heading in the direction of a shed and that she assumed he would attempt to hide in it, and indicates that officers merely were unaware of Mr. Llamas's location during the referenced time period. |
| 17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 11. During this time period, Sgt. McFadden (leader of fugitive apprehension squad) and Deputy Devine (case agent) led a tactical briefing prior to the search of property commenced. Sgt. Hubachek and Deputy McGuire, with the County of Riverside, were present during this briefing. This discussion included topics of Llamas' extensive criminal history which included previous contacts with firearms and that Llamas was wanted for either rape or child molestation or both. He was actively being pursued for those crimes.<br><br>**EVIDENCE:** | **Undisputed.** |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| Ex. 22, at 113:25-116:8, 129:4-130:3. Ex. 21, at 43:23-44:2. | |
| 12. Thereafter, K-9 Officers, including Deputy Day and his police service dog, Rudy, came upon Llamas, hiding in a tree.<br><br>**EVIDENCE:**<br>Ex. 10, (01:24:00-01:31:25).<br>Ex. 11, at 7:2-25.<br>Ex. 12, at 5.<br>Ex. 20, at 25:1-7 | **Disputed.** The cited evidence does not show that any law enforcement officer encountered or "came upon" Mr. Llamas at this time. Rather, the cited portion of Deputy Day's body-worn camera footage (Defense Exhibit 10) shows the police dog run away from a group of officers and toward a wooded area, while the officers remain a considerable distance from the wooded area without ever seeing Mr. Llamas. While in the wooded area, the dog bit Mr. Llamas multiple times, in the face, neck, and armpit/shoulder. Lt. Michael Walsh testified in deposition that at the time the shot rang out that was later determined to have struck the police dog, the deputies "couldn't see [Mr. Llamas]."<br><br>Plt. Ex. 10 at 3.<br>Plt. Ex. 4 at 47:2-48:7, 125:8-22.<br>Declaration of Roger A. Clark ("Clark Decl.") ¶ 16. |
| 13. At about 7:15 pm, Llamas shot his gun towards K-9 Rudy and other deputies close by. No human officers were struck by that bullet. However, Llamas killed police service dog, Rudy, with that gunshot.<br><br>**EVIDENCE:**<br>Ex. 10,<br>(01:25:00-01:34:29).<br>Ex. 11, at 7:2-25, 8:6-13.<br>Ex. 12, p. 5.<br>Ex. 20, at 22:20-23:14, 27:1-15. | **Disputed** that Mr. Llamas ever "shot his gun towards … deputies." At or around the referenced time, one gunshot was allegedly heard by deputies (though it is not captured on any audio recording). Deputies allegedly believed, and later determined, that this gunshot had struck the police dog. Deputies did not know whether Mr. Llamas had aimed this shot toward deputies or had any intention of striking them. Further, neither of the individual defendant deputies were in the vicinity when this allegedly occurred and they only |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | | |
|---|---|---|
| | | allegedly learned this from other deputies. |
| | | Plt. Ex. 2 at 10:34-11:23.<br>Plt. Ex. 3 at 25:10-26:22.<br>Plt. Ex. 4 at 48:16-49:21, 125:8-22.<br>Clark Decl. ¶ 16. |
| | | The gunshot was fired from very close range, as shown by the fact that the dog bit Mr. Llamas multiple times before the shot, in the face, neck, and shoulder/armpit. Plaintiffs' expert has opined that it is unlikely that the bullet, after passing through and exiting the dog's body, would have continued any significant distance downrange. Under these circumstances, it is not a fair inference to conclude that Mr. Llamas was aiming at deputies. |
| | | Plt. Ex. 10 at 3.<br>Clark Decl. ¶ 16. |
| 14. At about 7:20 pm, Llamas was seen hunkering down in some brush in the field with a female.<br><br>**EVIDENCE:**<br>Ex. 1, (39:32-44:00).<br>Ex.12, at 5. | | **Undisputed**, except to extent it implies it was the defendant deputies who saw this. The cited evidence shows this was seen from the air by the helicopter. |
| 15. The two exited the brush. Then ran.<br><br>**EVIDENCE:**<br>Ex. 1, (44:03-44:40).<br>Ex. 12, at 5. | | **Undisputed**, except to extent it implies it was the defendant deputies who saw this. The cited evidence shows this was seen from the air by the helicopter. |
| 16. Llamas ran ahead of the female with a gun in his left hand, arriving back near 22305 River Road.<br><br>**EVIDENCE:** | | **Disputed** that Mr. Llamas was holding a gun in his left hand. The cited video evidence does not show in which hand he held a gun. The cited portion of the call detail report simply asserts that |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| Ex. 1, (44:40-44:57).<br>Ex.12, at 5. | Mr. llamas "ha[d an] item in his left hand" but does not purport to specify what the item was. |
| 17. As Llamas walked down the dirt road, gun still in his hand, he headed towards River Road,<br><br>**EVIDENCE:**<br>Ex. 1, (45:00-45:06).<br>Ex. 12, at 5-6. | **Undisputed.** |
| 18. He began moving the gun to his head, then back down again.<br><br>**EVIDENCE:**<br>Ex. 1, (45:06-45:19).<br>Ex. 12, at 6. | **Disputed** to extent it implies that Mr. Llamas pointed the gun away from his head at this time. The cited portion of video evidence shows Mr. Llamas pointing a gun at his own head throughout the referenced period. Although the cited portion appears to show Mr. Llamas's elbow moving down somewhat while he briefly turned to look behind him, it does not show that the gun pointed away from his head. |
| 19. Llamas then looked around. During which, he moved the gun in an upward movement near his head while he walked toward the gate.<br><br>**EVIDENCE:**<br>Ex. 1, (45:19-45:36).<br>Ex. 12, at 6. | **Disputed** to extent it implies that Mr. Llamas pointed the gun away from his head at this time. The cited portion of video evidence shows Mr. Llamas pointing a gun at his own head throughout the referenced period. |
| 20. Once at the gate, Llamas walked and crawled around the barrier, with the gun still in his hand.<br><br>**EVIDENCE:**<br>Ex. 1, (45:36-45:58).<br>Ex. 12, at 6. | **Undisputed.** |
| 21. When Llamas was crawling, the gun was not continuously pointed at his head, but continuously in his hand. | **Disputed** that "the gun was not continuously pointed at his head." The cited portion of the video evidence |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| **EVIDENCE:**<br>Ex. 1, (46:03-46:18).<br>Ex. 12, at 6. | shows that Mr. Llamas continuously pointed the gun at his own head. |
| 22. Then, Llamas got up and moved forward. He had his left arm in the air and right hand holding onto the gun. Helicopter footage shows at this point the gun was not pointed at his head.<br><br>**EVIDENCE:**<br>Ex. 1 (46:19-46:25).<br>Ex. 12, at 6. | **Disputed.** The cited portion of the video evidence shows that Mr. Llamas continuously pointed the gun at his own head. |
| 23. Helicopter officers issued commands to Llamas to surrender and drop his weapon.<br><br>**EVIDENCE:**<br>Ex. 20, at 17:11-18:7<br>Ex. 22 at 34:17-35:8 | **Undisputed**, except to extent it implies Mr. Llamas heard such commands or that they were intelligible to him, which is not established by the cited evidence. |
| 24. Llamas continued toward the perpendicular road (River road), adjacent to a residential home, switching the gun from his left hand to his right hand.<br><br>**EVIDENCE:**<br>Ex. 1 (46:26-46:33).<br>Ex. 7. at 2:3-13<br>Ex. 12, at 6.<br>Ex. 22 at 41:16-24 | **Disputed** that Mr. Llamas was "adjacent to a residential home" at this time. When Mr. Llamas approached River Road at this time, he was approaching it from the south. The cited portion of the video evidence and overhead images of the area all show that there are no structures, including any residential home, along the stretch of driveway (to the south of River Road) that runs between the gate Mr. Llamas had already crossed and River Road.<br><br>Plt. Ex. 4 at 41:2-13, 42:1-19, 43:17-19, 45:13-18, & Ex. 1 thereto. Plt. Ex. 11. |
| 25. Once he reached River Road, he put his left arm in the air with the right hand still holding onto the gun in an upward motion near his head. | **Disputed** that Mr. Llamas was "holding onto the gun in an upward motion." Throughout this period, including during the cited portion of the video evidence, Mr. Llamas was |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| **EVIDENCE:**<br>Ex. 1 (46:34-46:52). | pointing the gun directly at his own head. Lt. Walsh also confirmed in his deposition testimony that for the entirety of the period when Mr. Llamas was crossing River Road, Mr. Llamas continuously pointed the gun at his own head.<br><br>Plt. Ex. 4 at 53:6-24. |
| 26. Lt. Walsh, Sgt. Hubachek and Deputy McGuire first observed Llamas as he was heading north on the dirt road, they were positioned to the west of Llamas with some cover behind a vehicle, which was facing east.<br><br>**EVIDENCE:**<br>Ex. 20, at 17:11-18:7, 19:2-20:16<br>Ex. 21, at 20:14 21:2.<br>Ex. 22, at 39:2 40:17. | **Undisputed**, except to clarify that the referenced "dirt road" was the same previously referenced driveway running from south to north toward River Road.<br><br>Plt. Ex. 4 at 41:2-13, 42:1-19, 43:17-19, 45:13-18. |
| 27. On the day of the incident, Lieutenant Walsh was in charge of the overall command of the scene. As such, he supervised Sgt. Hubachek and Deputy McGuire, who are employed by Defendant County of Riverside,<br><br>**EVIDENCE:**<br>Ex. 10, at ¶ 10.<br>Ex. 22, at 26:1-14;<br>27:4-6. | **Undisputed**, though the citation to paragraph 10 of Exhibit 10 appears to be in error; Exhibit 10 is a video recording and thus does not contain paragraphs. |
| 28. Hubachek functioned as a team lead with Riverside County Sheriff's Department Emergency Services , McGuire was a part of a Chevy Tahoe unit. He was near Sgt. Hubachek and Lieutenant Michael Walsh.<br><br>**EVIDENCE:**<br>Ex. 20, at 10:21-25;<br>19:9-20:16; | **Undisputed**, except to clarify the phrase, "McGuire was part of a Chevy Tahoe unit," which is vague. The cited evidence establishes that the term "unit" refers to a discrete vehicle, that Defendant McGuire's vehicle was a Chevy Tahoe, and that the three deputies had cover behind the Tahoe. |

9

Case No.: 5:24-cv-00249-CAS-SP

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| Ex. 22, at 26:1-11, 27:1-3 | |
| 29. Upon seeing Llamas, Walsh yelled, "drop the gun!"<br><br>**EVIDENCE:**<br>Ex. 8, at 10:12-10:28<br>Ex. 9, at 6:14-8:1 | **Undisputed**, except to extent it implies Lt. Walsh said this immediately upon seeing Mr. Llamas. The cited video evidence shows that Lt. Walsh waited until Mr. Llamas had reached the center dividing line of River Road before making this statement. |
| 30. At this point, Hubachek was aware that shots had been fired and that someone in the K-9 unit, possibly a dog, had been hit.<br><br>**EVIDENCE:**<br>Ex. 20, at 22:9-16, 26:2-19. | **Disputed** that any deputy was aware "that shots had been fired," insofar as the plural "shots" is used, as only one shot had been fired.<br><br>Plt. Ex. 3 at 22:9-25.<br>Plt. Ex. 4 at 48:4-7, 76:3-5, 125:8-12, 125:23-126:4.<br><br>**Further disputed** that at this time, Defendant Hubachek believed that any officer had been shot, as is implied by the phrasing "that someone in the K-9 unit, possibly a dog, had been hit." In the cited portion of Defendant Hubachek's deposition transcript, he testified that after this shot was fired, the K-9 officer, Deputy Day, stated to Hubachek that Day believed the dog had been shot. Additionally, prior to the deputies seeing Mr. Llamas at River Road, it was confirmed to deputies via radio broadcast that no deputy had been struck by this shot.<br><br>Plt. Ex. 2 at 11:21-23. |
| 31. Walsh again instructed Llamas to drop his weapon and to get on the ground. Llamas did not comply.<br><br>**EVIDENCE:** | **Undisputed**, except to extent it implies Mr. Llamas heard such command or that it was intelligible to him, which is not established by the cited evidence. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| Ex. 8, at 10:29-10:38.<br>Ex. 9, at 6:14-8:1 | |
| 32. Walsh gives a third command for Llamas to drop his weapon immediately and to get on the ground. Llamas did not comply.<br><br>**EVIDENCE:**<br>Ex. 8, at 10:39-10:41.<br>Ex. 9, at 6:14-8:1 | **Undisputed**, except to extent it implies Mr. Llamas heard such command or that it was intelligible to him, which is not established by the cited evidence. |
| 33. Walsh then gave a fourth verbal command for Llamas to drop the gun immediately and to get on the ground.<br><br>**EVIDENCE:**<br>Ex. 8, at 10:42-10:48.<br>Ex. 9, at 6:14-8:1 | **Undisputed**, except to extent it implies Mr. Llamas heard such command or that it was intelligible to him, which is not established by the cited evidence. |
| 34. Instead of complying, Llamas turned off of River Road, and moved towards the telephone poles, with the gun still in his hand.<br><br>**EVIDENCE:**<br>Ex. 1, (46:54-47:05).<br>Ex. 8, at 10:50-11:10.<br>Ex. 12, at 6. | **Disputed** that Mr. Llamas "turned off" of River Road; the cited helicopter video shows that Mr. Llamas proceeded straight forward across River Road and then along a driveway that ran south to north from River Road.<br><br>Plt. Ex. 4 at 51:16-23. |
| 35. As a result, Llamas moved out of Hubachek and McGuire's visual path, but the helicopter aided in tracking Llamas' movements and giving verbal commands.<br><br>**EVIDENCE:**<br>Ex. 8, at 10:50-11:10.<br>Ex. 20, at 31:19-32:8, 32:23-33:4<br>Ex. 22, at 33:4-12 | **Undisputed**, except to extent it implies Mr. Llamas heard such commands or that they were intelligible to him, which is not established by the cited evidence. |
| 36. Walsh heard the helicopter broadcast in his radio ear piece, including the verbal commands given by the helicopter and updates on Llamas' movements. | **Undisputed.** |

| | |
|---|---|
| **EVIDENCE:** Ex. 22 at 33:14-34:14 | |
| 37. Once he reached just past the telephone poles, he started to run again, with the gun still in his hand pointed upwards towards his head.<br><br>**EVIDENCE:**<br>Ex. 1 at 47:06-47:20.<br>Ex. 12, at 6. | **Undisputed.** |
| 38. Llamas moved north, as Lt. Walsh, Sgt. Hubachek, and Deputy McGuire moved east to try to cut him off. Llamas then pointed the gun outward from his body.<br><br>**EVIDENCE:**<br>Ex. 1, (47:21-47:28).<br>Ex. 20, at 30:2-17. | **Disputed.** The cited portion of the video evidence clearly shows that Mr. Llamas kept the gun pointed to his own head continuously during this period, contrary to the assertion that he "pointed the gun outward from his body," which did not occur.<br><br>Plt. Ex. 14. |
| 39. Reflected in the transcript of the body cam video worn by Hubachek, a deputy indicated a gun was pointed in their direction,<br><br>**EVIDENCE:**<br>Ex. 6, at (00:00-00:13)<br>Ex. 7, at 2:14-18.<br>Ex. 20, at 41:24-42:11 | **Disputed** to extent it implies this actually occurred. Video footage from the helicopter and from Defendant Hubachek's body-worn camera-- including the portion of his body-worn camera video cited by Defendants-- show that from the time Mr. Llamas crossed River Road until he was shot, he never pointed the gun toward deputies or even ceased to point it at his own head.<br><br>Def. Ex. 1 at 47:00-47:30.<br>Def. Ex. 6 at 00:09-00:15.<br>Plt. Ex. 14.<br>Plt. Ex. 15. |
| 40. Llamas was moving towards a home that was an occupied dwelling. On that property there was a carport where McGuire observed two shadows. He believed those shadows to | **Disputed.** The property to the north of River Road, containing the driveway on which Mr. Llamas was moving, contained a blue house on the western portion of the property. The driveway |

be two humans because earlier that day he had spoken to two older men who were sitting on the porch attached to that same property.

**EVIDENCE:**
Ex. 21, at 25:23-28:2.

led to a fork/roundabout, at which point if one turned left, the driveway would lead west, toward the blue house, and if one went right/straight, a separate portion of the driveway would lead north, parallel to and past the blue house. Mr. Llamas was moving and facing north along the rightward portion of the driveway, not toward the blue house, and never turned left to go in the direction of the blue house. The house where Deputy McGuire allegedly saw two men earlier that day was the blue house. In deposition, McGuire described the house where he allegedly saw the two men as a "blue house." Photographs of the scene show that the western house is blue. Thus, in moving north along the right portion of the driveway following the fork/roundabout, when the deputies regained sight of him and shot him, Mr. Llamas was not moving toward the house where McGuire allegedly saw two men earlier that day, which was to Mr. Llamas's left as he was moving northward. The deputies had no information that the northern portion of the property, in the direction Mr. Llamas was moving, was occupied, and the only information they had regarding any possible residents on the property was that McGuire allegedly saw the two men at the blue house on the western portion of the property, hours earlier that day.

Def. Ex. 1 at 47:00-47:30.
Plt. Ex. 1 at 25:22-26:3, 26:15-21, 27:13-23, 28:7-17.

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| | Plt. Ex. 4 at 71:4-9, 79:14-80:4, 82:17-83:7.<br>Plt. Ex. 11.<br><br>**Further disputed** to the extent it implies McGuire had legitimate reason to believe the "shadows" he saw at this time were men; he did not state that anything distinctive about the shadows suggested they were people other than their proximity to where he allegedly saw two men earlier that day.<br><br>Plt. Ex. 1 at 26:15-28:2.<br><br>**Further disputed** to the extent it implies deputies other than McGuire, including Defendant Hubachek, had reason to believe there were two men outside of the western house at the time, as McGuire did not share his alleged sighting of the two shadows with the other deputies before the shots were fired.<br><br>Plt. Ex. 1 at 29:1-6.<br>Plt. Ex. 4 at 71:16-72:8, 103:15-105:18. |
| 41. Shortly after, Sgt. Hubachek and Deputy McGuire saw Llamas again. He was in front of them, about 40- 50 yards away.<br><br>**EVIDENCE:**<br>Ex. 20, at 35:6- 36:11. | **Undisputed.** |
| 42. Llamas turned towards Sgt. Hubachek and Deputy McGuire and the gun was oriented in the direction of deputies. | **Disputed.** The infrared helicopter video of the incident shows that from 47:15-47:30 in the video file, Mr. Llamas's body was continuously oriented forward, facing the north, and |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| **EVIDENCE:** | he was continuously pointing the gun at the right side of his head with his right hand. At 47:20, it shows Mr. Llamas turn his head to the right, approximately to a 3 o'clock position, with his chest and hips still facing to the north, before turning his head to face north again at 47:21. Then, at 47:24, it shows Mr. Llamas turn his head to the left, approximately to a 10 o'clock position, with his chest and hips still facing forward to the north, and with the gun still pointed at his own head, before turning his head to face north again at 47:25. The video shows that Mr. Llamas then continued to proceed northward, without turning his head again or ever pointing the gun away from the right side of his head, until he fell forward at 47:29, having been struck by the deputies' first volley of shots. That Mr. Llamas did not turn is also shown in Defendant Hubachek's body-worn camera video.

Def. Ex. 1 at 47:15-47:30.
Def. Ex. 6 at 00:09-00:15.
Plt. Ex. 14.
Plt. Ex. 15.

Although whether Mr. Llamas turned to the left at all immediately before the shots is disputed by the foregoing video evidence, Lt. Walsh also testified in deposition that he witnessed the entirety of this encounter and that, at the time the first volley of shots was fired, Mr. Llamas's head was at most turned to a 9 or 10 o'clock position, Mr. Llamas's chest was facing primarily forward, |
|---|---|
| Ex. 1, (47:23-47:28).
Ex. 20 at 41:24 – 42:11
Ex. 21, at 33:3-15,
37:11 – 38:13 | |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| | his hips and legs were facing directly forward, and Mr. Llamas had not pointed the gun at any person other than himself. The first volley of shots struck Mr. Llamas in the buttocks. Deputy McGuire also testified that at least a portion of Mr. Llamas's back and buttocks were exposed to the deputies at the time these shots were fired.<br><br>Plt. Ex. 1 at 50:10-20.<br>Plt. Ex. 4 at 64:17-65:3, 66:6-25, 68:5-70:3, 70:18-71:3, 75:5-10, 121:10-20, 123:10-124:21.<br>Plt. Ex. 10 at 1-3. |
| 43. At about 7:29 pm, Sgt. Hubachek and Deputy McGuire discharged their weapons due to the threat of Llamas' actions. Llamas then, fell to the ground.<br><br>**EVIDENCE:**<br>Ex. 1, (47:29-47:30).<br>Ex. 12, at 6.<br>Ex. 20, at 41:21-42:11, 48:5-13, 48:20-49:9<br>Ex. 21, at 37:11-38:13. | **Disputed** that "Llamas' actions" posed a "threat" at the time the deputies fired or that such purported "threat" justified shooting Mr. Llamas. As noted above in response to Defendants' Allegedly Undisputed Fact No. 42, Mr. Llamas was not turning at all or manipulating the gun at the time these shots, but rather continued to face north with his entire body while moving north, with the gun pointed toward his own head and with his back facing the deputies.<br><br>Clark Decl. ¶¶ 13, 14(a-d) |
| 44. Hubachek shot one volley, McGuire shot two volleys.<br><br>**EVIDENCE:**<br>Ex. 22, at 73:12-24 | **Undisputed.** |
| 45. Walsh did not discharge his weapon and testified that at the time of the first volley, Hubachek and McGuire had a better view of Llamas. | **Disputed** that Defendants Hubachek and McGuire actually had a better view of Mr. Llamas than Lt. Walsh did at this time. Lt. Walsh testified that at the time of the first shots, he |

| | |
|---|---|
| **EVIDENCE:**<br>Ex. 6, (00:00-00:16)<br>Ex. 8, (11:14-11:17)<br>Ex. 22, at 28:24-29:4; 118:17-119:10. | was standing in a line next to Hubachek and McGuire facing north, and that nothing obstructed his view of Mr. Llamas from the time he exited his vehicle through the time the first volley of shots was fired.<br><br>Plt. Ex. 4 at 68:23-70:3. |
| 46. Hubachek was about 40 to 50 yards from Llamas when he aimed at the thoracic area of Llamas' body, near his chest and stomach area. During which, Sgt. Hubachek was stationary while Llamas was moving.<br><br>**EVIDENCE:**<br>Ex. 20, at 15:4-16:13 | **Disputed** to the extent "he aimed at the thoracic area of Llamas's body, near his chest and stomach area" implies that Hubachek fired at the front or side of Mr. Llamas's body. At the time this volley of shots occurred, Mr. Llamas's entire body was facing north, his back was to the officers, and he was struck in the buttocks.<br><br>Def. Ex. 1 at 47:15-47:30.<br>Def. Ex. 6 at 00:09-00:15.<br>Plt. Ex. 10 at 1-3.<br>Plt. Ex. 14.<br>Plt. Ex. 15. |
| 47. Likewise, McGuire aimed at Llamas' torso.<br><br>**EVIDENCE:**<br>Ex. 1 at 47:30 – 47:40<br>Ex. 21, at 52:3-20 | **Disputed** to the extent "McGuire aimed at Llamas's torso" implies that McGuire fired at the front or side of Mr. Llamas's body during the first volley of shots. At the time this volley of shots occurred, Mr. Llamas's entire body was facing north, his back was to the officers, and he was struck in the buttocks.<br><br>Def. Ex. 1 at 47:15-47:30.<br>Def. Ex. 6 at 00:09-00:15.<br>Plt. Ex. 10 at 1-3.<br>Plt. Ex. 14.<br>Plt. Ex. 15. |
| 48. After the first volley, Llamas' face was oriented in McGuire's direction. Llamas continued to move on the | **Disputed** that while on the ground after being shot by the first volley, Mr. Llamas was "lifting the gun and |

ground, including lifting the gun and holding it in the direction of the deputies. McGuire moved up to where he was about 35 to 45 yards away from Llamas and shot a second volley.

**EVIDENCE:**
Ex. 1 at 47:30 – 47:40
Ex. 21, at 52:3-20

holding it in the direction of the deputies." The infrared helicopter video of the incident shows that at 47:29 in the video file, Mr. Llamas fell forward to the ground after being struck by the first volley of shots, and landed on his right side, with his right arm underneath him. At 47:32, it shows Mr. Llamas raise his empty left hand into the air above him, while his right arm is not moving or manipulating the gun, which is not pointed toward the deputies. From 47:34 until 47:38, it shows Mr. Llamas pulling his right elbow back and further underneath his body in order to use it to begin crawling westward along the ground, as he lifts and turns his face westward, away from the deputies. At 47:39, it shows Mr. Llamas reaching to the west with his empty left hand to continue crawling westward, with his left shoulder coming southward and over his body and his torso turning downward to face the ground, as his right arm is pulled further underneath his body. It does not show Mr. Llamas manipulating the gun or aiming it to the south, toward deputies. Mr. Llamas is in this same position when, at 47:40, it shows shots from Defendant McGuire's second volley begin striking the dirt around Mr. Llamas, and at 47:41 it shows a flash near Mr. Llamas's head, after which Mr. Llamas ceases to move, having been struck again by McGuire's second volley.

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| | Def. Ex. 1 at 47:29-47:42.<br>Plt. Ex. 14.<br><br>**Further disputed** that McGuire "was about 35 to 45 yards away from Llamas" when he fired the second volley of shots. McGuire and Lt. Walsh testified that Mr. Llamas was 40-50 yards away from the deputies at the time the first shot from the first volley was fired. Video from the helicopter shows, and Lt. Walsh testified, that as Mr. Llamas was being shot by the first volley, he continued moving forward before falling forward to the ground, travelling up to a few yards further north. Body-worn camera video footage shows the deputies taking a couple or a few steps forward between the first and second volleys, but not covering any substantial distance, so the evidence does not support them having closed their distance away from Mr. Llamas to 35 yards.<br><br>Def. Ex. 1 at 47:25-47:31.<br>Def. Ex. 6 at 00:14-00:28.<br>Plt. Ex. 1 at 36:5-9.<br>Plt. Ex. 4 at 70:9-12, 88:11-18. |
| 49. Afterward, Hubachek, Walsh, and McGuire immediately moved towards Llamas and soon after administered medical care, as confirmed by helicopter and Lt. Walsh's body worn camera footage<br><br>**EVIDENCE:**<br>Ex. 1, (47:32-48:12);<br>(51:34-54:41).<br>Ex. 8, (11:18-22:19) | **Undisputed.** |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| Ex. 9, 13:19-23. 16:10- 18:4 Ex. 22 at 58:15-59:13. | |
| 50. However, Llamas ultimately succumbed to his injuries.<br><br>**EVIDENCE:**<br>Ex. 16, at ¶ 3. | **Undisputed.** |
| 51. Riverside County Sheriff's Department, Policy 300.4 (a), states that a deputy may use deadly force to protect himself or others from what he reasonably believes to be a threat of death or serious bodily injury.<br><br>**EVIDENCE:**<br>Ex. 15, at p. 5.<br>Ex. 21, at 71:3-17. | **Disputed.** The referenced portion of the policy provides that the deputy must "<u>reasonably believe [deadly force] is necessary</u>" in order "to protect him/herself or others from what he/she reasonably believes is an <u>imminent</u> threat of death or serious bodily injury to the deputy or another person." (Emphasis added.) The terms emphasized here are material but were omitted from the portion of the RCSD policy on deadly force paraphrased in this Allegedly Undisputed Fact. Further, the RCSD policy on deadly force goes on to define "imminent" as follows:<br><br>    An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable deputy in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the deputy or another person. A deputy's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention. |

| | The policy also clarifies that "[d]eputies shall not use deadly force against a person based on the danger that person poses to him/herself, if an objectively reasonable deputy would believe the person does not pose an imminent threat of death or serious bodily injury to the deputy or to another person." |
|---|---|
| | Def. Ex. 15 at 6 (citing Cal. Pen. Code § 835a). |
| 52. Riverside County Sheriff's Department, Policy 300.4 (b), states that a deputy may use deadly force to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the deputy reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended.<br><br>**EVIDENCE:**<br>Ex. 15, at p. 5. | **Undisputed.** |
| 53. Plaintiff, S.L. was born on July 8, 2013.<br><br>**EVIDENCE:**<br>Ex. 24, at 8:3-7. | **Undisputed.** |
| 54. Plaintiff, S.L.'s guardian ad litem, Kristina Rose Llamas Leyva, is her legal mother and biological aunt. Ms. Leyva is Llamas' sister.<br><br>**EVIDENCE:**<br>Ex. 17, at 13:16-19.<br>Ex. 18, at 10:11-12. | **Undisputed.** |
| 55. S.L. was adopted at 10 months old, by Ms. Leyva and has lived with her | **Undisputed**, except insofar as it implies Mr. Llamas or S.L. consented to the alleged termination of parental |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| ever since. The rights of her biological parents were terminated.<br><br>**EVIDENCE:**<br>Ex. 18, at 9:25-10:4, 29:8-20; 54:12-17. | rights, which is not established by the cited evidence. |
| 56. Johnny Llamas never had legal custody of S.L. She was nine years old when he died.<br><br>**EVIDENCE:**<br>Ex. 18, at 16:22-25, 49:25-50:3. | **Undisputed**, except insofar as it implies Mr. Llamas or S.L. consented to the alleged deprivation of legal custody, which is not established by the cited evidence. |
| 57. From the time of S.L.'s birth in 2013 to 2020, Ms. Leyva stated that Llamas occasionally stayed a few nights for short periods of time. However, Ms. Leyva maintained it was pretty much a place for him to store his belongings as "he was pretty much homeless."<br><br>**EVIDENCE:**<br>Ex. 18, at 10:13-11:6. | **Disputed.** Kristine Llamas Leyva testified that Mr. Llamas lived with them on several occasions for months at a time.<br><br>Plt. Ex. 7 at 12:6-19.<br><br>S.L. testified that he lived with her, without caveat.<br><br>Plt. Ex. 8 at 9:22-24. |
| 58. Plaintiff claims Llamas sent a pandemic stimulus check to S.L. These were nominal amounts and not clearly for specific items for S.L.<br><br>**EVIDENCE:**<br>Ex. 18, at 25:14-28:2 | **Disputed.** The cited testimony does not specify the amount of the stimulus check. Mr. Llamas also provided money on other occasions for S.L.'s care, as well as household items for S.L.'s care.<br><br>Plt. Ex. 7 at 25:14-28:24. |
| 59. S.L. does not know the last time she saw Llamas. She never visited him in jail and did not see him after he got out of incarceration.<br><br>**EVIDENCE:**<br>Ex. 24, at 8:16-21, 15:17-16:17. | **Disputed** to the extent it implies S.L. had not seen Mr. Llamas recently or chose not to visit him in jail. She saw him around April 2020, before he went to jail, and he died shortly after his release. The reason she did not visit him in jail was because her guardian would not allow her to. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| | |
|---|---|
| | Plt. Ex. 7 at 41:13-42:3. |
| 60. Plaintiff V.L. was born on August 20, 2011, to Amber Snetsinger who testified Llamas is V.L.'s biological father. However, he is not listed on V.L.'s birth certificate.<br><br>**EVIDENCE:**<br>Ex. 19, at 13:19-23.<br>Ex. 25, at 9:21-22. | **Undisputed**, except to clarify that, as Ms. Snetsinger testified in deposition, the reason Mr. Llamas was not listed on the birth certificate was that he was incarcerated at the time of V.L's birth and thus could not be present, and presence of the father is required for the father to be listed on the birth certificate.<br><br>Plt. Ex. 5 at 13:25-14:4. |
| 61. V.L.'s mother and Llamas were never married. In fact, Llamas never married.<br><br>**EVIDENCE:**<br>Ex. 17, at 13:20-14:1<br>Ex. 19, at 14:21-22. | **Undisputed.** |
| 62. Ms. Snetsinger claimed she was in a relationship with Llamas at the time she got pregnant with V.L. but that the relationship ended because he became incarcerated.<br><br>**EVIDENCE:**<br>Ex. 19, at 14:25-15:6 | **Undisputed.** |
| 63. At no time after he was released did Ms. Snetsinger make the effort to add Llamas to V.L.'s birth certificate, nor, has she ever initiated any legal proceedings with respect to parental rights and visitation for V.L, including child support.<br><br>**EVIDENCE:**<br>Ex. 19, at 14:1-20. | **Disputed**. Ms. Snetsinger did open a child support case.<br><br>Plt. Ex. 12.<br><br>**Further disputed** insofar as it implies initiation of legal proceedings were necessary for visitation or child support purposes. Ms. Snetsinger's and V.L.'s deposition testimony establish that, even after Mr. Llamas was incarcerated, Ms. Snetsinger and Mr. Llamas maintained an amicable relationship, facilitating the |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | | |
|---|---|---|
| | | maintenance of his relationship with V.L. V.L. visited with, would have video calls with, and receive updates from Mr. Llamas, and Mr. Llamas provided financial support for V.L. to Ms. Snetsinger, without any need for initiation of legal proceedings or court orders. Ms. Snetsinger's testimony further establishes that V.L. maintained a relationship with Mr. Llamas's relatives after he died.<br><br>Plt. Ex. 5 at 16:25-17:21, 18:1-19:1, 19:17-20, 22:16-23:12, 26:3-28:6. Plt. Ex. 6 at 17:21-19:24. |
| | 64. V.L. has never lived with Decedent<br><br>**EVIDENCE:**<br>Ex. 19, at 15:7-9.<br>Ex. 25, at 14:4-9. | **Disputed.** V.L. lived with Mr. Llamas for approximately one month at his apartment in Lake Elsinore.<br><br>Plt. Ex. 5 at 18:3-17. |
| | 65. V.L. only spoke to Llamas a handful of times in her life.<br><br>**EVIDENCE:**<br>Ex. 19, at 22:16-20;<br>27:4-12<br>Ex. 25, at 18:19-21 | **Disputed.** V.L. lived with Mr. Llamas for approximately a month. She also had numerous calls and video calls with him, and he communicated with her through Ms. Snetsinger while he was incarcerated.<br><br>Plt. Ex. 5 at 18:3-17, 19:17-20, 22:16-20, 27:4-28:2.<br>Plt. Ex. 6 at 17:21-19:24. |
| | 66. V.L. did not remember the last time she saw decedent in person and believed she has never seen him in person.<br><br>**EVIDENCE:**<br>Ex. 25, at 17:3-19 | **Disputed.** The cited testimony from V.L.'s deposition only establishes that she did not personally remember seeing him in person, not that she believed she had never seen him in person. |
| | 67. The only time V.L. spent physical time with Llamas was when she was 11 months old. She stayed with him for a month because he had just gotten out of | **Disputed** that "[t]his was the last time she saw him." V.L. continued to see her father during video calls. |

| | |
|---|---|
| jail. This was the last time she saw him.<br><br>**EVIDENCE:**<br>Ex. 19, at 18:1-13, 25:14-21<br>Ex. 25, at 17:17-19 | Plt. Ex. 5 at 18:18-22, 19:17-20. |
| 68. V.L. only spoke with Llamas a handful of times but never when he was incarcerated.<br><br>**EVIDENCE:**<br>Ex. 19, at 22:16-20; 27:4-12<br>Ex. 25, at 18:19-21 | **Disputed** that "V.L. only spoke with Llamas a handful of times." She had numerous calls and video calls with him, and he communicated with her through Ms. Snetsinger while he was incarcerated.<br><br>Plt. Ex. 5 at 18:18-22, 19:17-20, 22:16-20, 27:4-28:2.<br>Plt. Ex. 6 at 17:21-19:24. |
| 69. Plaintiff Carolyn Campbell is the biological mother to Llamas, and was not financially dependent on him. Between 2020 and 2023, Decedent would periodically live with Campbell at her residence for about a year. However he was not living there at the time of his death in April 2023.<br><br>**EVIDENCE:**<br>Ex. 17, at 11:6-13:6 | **Undisputed.** |
| 70. Plaintiff Campbell testified that Plaintiffs, S.L. and V.L. are Llamas' children, and thus brings her claims under an individual capacity.<br><br>**EVIDENCE:**<br>Ex. 16.<br>Ex. 17, at 14:2-8 | **Undisputed.** |
| 71. There is no evidence that Plaintiff Campbell complied with the personal representative requirements mandated by statute, § 377.60. | **Undisputed.** |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | EVIDENCE:<br>Ex. 16, at ¶ 7, 88, 96. | |
|---|---|---|

### **PLAINTIFFS' ADDITIONAL UNDISPUTED FACTS**

| | **Plaintiffs' Undisputed Fact** | **Evidence** |
|---|---|---|
| 1. | Approximately two hours later, while searching a large parcel for Mr. Llamas, deputies sent a police dog ahead of them, into a tree line, to search for him. | Def. Ex. 10, (01:24:00-01:31:25).<br>Plt. Ex. 4 at 47:2-48:7. |
| 2. | There, the dog bit Mr. Llamas multiple times, in the face, neck, and shoulder area. | Plt. Ex. 10 at 3. |
| 3. | A single gunshot was heard, and the dog did not return, though no deputy was hit. | Def. Ex. 10, (01:24:00-01:31:25).<br>Plt. Ex. 3 at 25:10-26:22.<br>Plt. Ex. 4 at 47:2-47:14, 49:7-21. |
| 4. | From the air, a police helicopter equipped with an infrared thermal camera then located Mr. Llamas a short distance past the tree line. | Def. Ex. 1 at 39:50-41:30. |
| 5. | Mr. Llamas began moving northeast before reaching a driveway leading northward from that property, toward and perpendicular to River Road, which ran from east to west. | Def. Ex. 1 at 41:30-46:30.<br>Plt. Ex. 4 at 33:4-12, 35:9-36:22, 38:16-39:4. |
| 6. | Mr. Llamas was holding a gun, pointed at his own head. | Def. Ex. 1 at 41:30-46:30.<br>Plt. Ex. 4 at 37:5-22. |
| 7. | Deputies were being advised of Mr. Lllamas's whereabouts and of the fact that he was pointing the gun to his head by radio from the helicopter. | Plt. Ex. 4 at 33:4-34:2, 35:9-37:22. |
| 8. | During this time, Lieutenant Michael Walsh, Defendant Shawn Hubachek, and Defendant Jimmie McGuire took positions together on River Road, 30-50 | Plt. Ex. 4 at 38:16-39:9, 45:13-47:1. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL
UNDISPUTED MATERIAL FACTS

| Plaintiffs' Undisputed Fact | Evidence |
|---|---|
| yards west of where the driveway reached River Road from the south. | |
| 9. The deputies faced east, toward the driveway, and had at least two RCSD vehicles available there as cover. | Def. Ex. 8 at 09:56-10:20. Plt. Ex. 4 at 39:5-9, 39:21-40:11. |
| 10. Additional deputies were also positioned on River Road to the east of the driveway, opposite Lt. Walsh and the defendant deputies. | Def. Ex. 6 at 00:00-00:07. Def. Ex. 8 at 10:07-10:26. Plt. Ex. 1 at 76:10-19. |
| 11. A few minutes later, Mr. Llamas walked onto River Road from the southern driveway, holding the gun to his head in his right hand. | Def. Ex. 1 at 46:30-46:50. Plt. Ex. 4 at 39:10-19, 40:3-22, 45:13-46:11, 52:3-53:18. |
| 12. Mr. Llamas continued northward, toward another driveway that ran from south to north onto another property, directly across River Road from where he had emerged. | Def. Ex. 1 at 46:35-47:10. Plt. Ex. 4 at 51:16-52, 58:10-18. |
| 13. The property to the north of River Road contained a blue house on the western end of the property. | Plt. Ex. 1 at 26:15-21, 27:9-23, 36:17-37:4, 38:14-39:14. Plt. Ex. 4 at 103:15-21. Plt. Ex. 11. |
| 14. Defendant McGuire claimed that, approximately two to three hours earlier, he observed two men outside of the blue house but did not attempt to speak with them or evacuate them. | Plt. Ex. 1 at 25:22-26:3, 26:15-27:12, 28:3-22. Plt. Ex. 2 at 9:15-23. |
| 15. The deputies did not have any information indicating that the northern portion of the property was occupied. | Plt. Ex. 4 at 79:21-80:4. |
| 16. The deputies were positioned at River Road for a few minutes before Mr. Llamas reached it from the south. | Plt. Ex. 4 at 39:10-19, 40:18-22. |
| 17. However, they did not set up a barricade at the northern driveway or take other measures to block Mr. | Def. Ex. 1 at 46:25-47:10. Def. Ex. 6 at 00:00-00:07. Def. Ex. 8 at 09:56-10:26. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | Llamas from accessing that driveway—which was beyond a designated containment line—even as they blocked Mr. Llamas from going east or west along River Road, thereby funneling him northward toward the northern property. Plaintiffs' expert has opined that the deputies should have barricaded the northern driveway. | Plt. Ex. 1 at 76:10-19. Plt. Ex. 2 at 9:15-18, 13:10-13, 30:4-17. Plt. Ex. 4 at 38:16-39:9, 39:21-40:11, 45:13-47:1, 104:23-105:12. Clark Decl. ¶ 15(a). |
| 18. | As Mr. Llamas proceeded onto the northern property along its driveway, Lt. Walsh and the defendant deputies briefly lost sight of him. | Plt. Ex. 4 at 51:21-52:2, 56:11-19, 58:10-14. Def. Ex. 8 at 10:40-11:12. |
| 19. | The three deputies moved eastward along River Road toward the driveway, with Lt. Walsh driving his vehicle forward, where they regained sight of Mr. Llamas. | Def. Ex. 6 at 00:00-00:13. Def. Ex. 8 at 10:48-11:12. Plt. Ex. 1 at 24:6-25:21. Plt. Ex. 3 at 29:13-30:10, 33:19-24, 34:17-35:9. Plt. Ex. 4 at 58:10-59:13, 60:10-15. |
| 20. | Lt. Walsh exited the vehicle and the deputies stood in a line, close to the vehicle. | Def. Ex. 6 at 00:10-00:15. Def. Ex. 8 at 11:09-11:17. Plt. Ex. 4 at 60:13-20, 68:6-69:3. |
| 21. | Mr. Llamas continued north, parallel to the blue house on the west end of the property. | Def. Ex. 1 at 47:10-47:30. Def. Ex. 6 at 00:11-00:14. Plt. Ex. 1 at 32:14-33:5, 36:17-37:4, 38:14-39:14. Plt. Ex. 4 at 64:17-65:3, 66:12-25. Plt. Ex. 11. Plt. Ex. 14. Plt. Ex. 15. |
| 22. | Apart from briefly glancing to the right and then left for less than one second, Mr. Llamas did not turn his head or body away from the north. | Def. Ex. 1 at 47:15-47:30. Plt. Ex. 14. Plt. Ex. 15. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| 23. | While Mr. Llamas was still facing and moving north, with the gun still pointed at his head, and with his back to the deputies, Defendant Hubachek fired one shot and Defendant McGuire fired three shots from 40-50 yards to his south. | Def. Ex. 1 at 47:15-47:30.<br>Def. Ex. 6 at 00:11-00:15.<br>Def. Ex. 8 at 11:12-11:17.<br>Plt. Ex. 1 at 17:22-25, 18:8-18, 50:18-20, 57:11-17.<br>Plt. Ex. 3 at 35:6-9, 35:18-21, 39:23-40:3, 44:12-14.<br>Plt. Ex. 4 at 64:2-5, 64:17-65:3, 70:9-12.<br>Plt. Ex. 14.<br>Plt. Ex. 15. |
| 24. | Mr. Llamas was struck from behind, in the buttocks, and took one or two steps before falling forward to the ground. | Def. Ex. 1 at 47:15-47:31.<br>Def. Ex. 6 at 00:11-00:15.<br>Plt. Ex. 1 at 57:18-58:25.<br>Plt. Ex. 3 at 50:10-17.<br>Plt. Ex. 4 at 120:24-121:12.<br>Plt. Ex. 10 at 1, 3.<br>Plt. Ex. 15.<br>Plt. Ex. 14. |
| 25. | Mr. Llamas landed on his right side, with his right arm underneath him, and raised his empty left hand into the air. | Def. Ex. 1 at 47:30-47:34. |
| 26. | Mr. Llamas then pulled his right elbow back and further underneath his body to begin crawling westward along the ground, turning his head to face west. | Def. Ex. 1 at 47:36-47:38. |
| 27. | Crawling, Mr. Llamas reached westward with his empty left hand, and his left shoulder came southward over his torso, which faced the ground as his right arm pulled further underneath his body to the north, away from the deputies. | Def. Ex. 1 at 47:37-47:40. |
| 28. | While Mr. Llamas was in this position, Defendant McGuire fired a second volley of four shots, striking him in the head. | Def. Ex. 1 at 47:39-47:43.<br>Plt. Ex. 1 at 17:22-25, 18:8-11, 52:21-23, 59:1-4, 66:12-17<br>Plt. Ex. 4 at 120:10-121:12, 128:22-25. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | | Plt. Ex. 10 at 1-3. |
| 29. | When Defendant McGuire began firing the second volley of shots, Lt. Walsh said, "Jimmie...," expressing that he did not understand why McGuire was continuing to fire. | Plt. Ex. 1 at 65:21-66:17. Plt. Ex. 2 at 17:29-30. Plt. Ex. 4 at 99:16-100:5. |
| 30. | During this time, Defendant Hubachek did not see Mr. Llamas holding or pointing the gun, or believe Mr. Llamas was an immediate threat, or fire again. | Plt. Ex. 3 at 44:12-21, 51:7-24, 73:10-74:22, 77:17-20. |
| 31. | Lt. Walsh did not fire his weapon during the incident. | Plt. Ex. 4 at 85:19-21. |
| 32. | Mr. Llamas never fired his gun at any time after the deputies saw him on River Road. | Plt. Ex. 3 at 35:22-36:1, 47:1-3. Plt. Ex. 4 at 102:1-8. |
| 33. | At the time of the shooting, at least twenty officers were on scene. | Plt. Ex. 3 at 28:19-21. |
| 34. | Mr. Llamas died from his gunshot wounds. | Plt. Ex. 10 at 1-3. |
| 35. | An autopsy revealed two gunshot wounds: one to his buttock, with a partial back-to-front trajectory, and one to his head, with a partial upward and rightward trajectory. | Plt. Ex. 10 at 2-3. |
| 36. | Prior to shooting, Defendants McGuire and Hubachek did not issue any commands to Mr. Llamas. | Plt. Ex. 1 at 19:24-20:1. Plt. Ex. 3 at 40:4-9, 42:22-43:3. Plt. Ex. 4 at 56:20-24, 74:4-8. |
| 37. | Defendants McGuire and Hubachek also did not verbally warn Mr. Llamas that they would shoot before either volley of shots. | Plt. Ex. 1 at 20:10-12. Plt. Ex. 3 at 40:10-12. Plt. Ex. 4 at 74:9-13. |
| 38. | Mr. Llamas did not approach deputies or any other person in the leadup to the shooting. | Def. Ex. 1 at 46:30-47:41. |
| 39. | Mr. Llamas did not point his gun at any | Def. Ex. 1 at 46:30-47:41. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | person or make any gesture indicating he was about to do so. | Plt. Ex. 14. |
| 40. | Mr. Llamas did not verbally threaten anyone. | Plt. Ex. 4 at 75:15-19. |
| 41. | The deputies did not have information that any civilians were in the direction Mr. Llamas was moving. | Def. Ex. 1 at 47:17-47:41.<br>Plt. Ex. 4 at 79:21-80:4. |
| 42. | Immediately before shooting, the deputies had the ability to move behind Lt. Walsh's vehicle or its open door, which would have provided cover if Mr. Llamas had turned around or pointed the gun toward them, but they did not do so. | Def. Ex. 8 10:57-11:17.<br>Plt. Ex. 1 at 25:12-26:14, 29:9-16.<br>Plt. Ex. 4 at 60:13-20, 68:6-69:3.<br>Clark Decl. ¶¶ 11(a), 15(d). |
| 43. | The deputies had long-range less-lethal weapons accessible but did not retrieve them. | Plt. Ex. 2 at 25:14-22.<br>Plt. Ex. 3 at 21:2-19.<br>Plt. Ex. 4 at 117:15-118:4.<br>Clark Decl. ¶¶ 14(e, g), 15(e). |
| 44. | From the time the deputies were positioned on River Road until the shooting, they did not discuss any tactical plan, including regarding how to approach Mr. Llamas, what to do if he removed the gun from his head, or what to do if he approached an occupied area. | Plt. Ex. 1 at 47:24-48:7.<br>Plt. Ex. 4 at 102:9-105:18.<br>Clark Decl. ¶ 15(e). |
| 45. | Prior to the shooting, upon seeing Mr. Llamas holding the gun to his head, Lt. Walsh considered that he may have been suicidal. | Plt. Ex. 4 at 55:1-22. |
| 46. | RCSD deputies receive extensive training in tactics, use of cover, and deadly force. | Plt. Ex. 1 at 22:11-25, 43:11-15, 46:4-16, 71:3-25, 72:4-6.<br>Plt. Ex. 3 at 43:21-44:9, 57:10-59:12, 77:21-78:6.<br>Plt. Ex. 4 at 106:22-113:13. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| 47. | Deputies are trained to maneuver or "tactically reposition" away from subjects holding a weapon when possible, including using cover, to gain time and protection. | Plt. Ex. 3 at 57:10-19. Plt. Ex. 4 at 112:14-113:13. Clark Decl. ¶ 11(a). |
| 48. | Deputies are trained to identify individuals who may be suicidal and that they may not use deadly force against someone based on the danger the person poses to themselves, in accordance with written RCSD policy. | Def. Ex. 15 at 4, 7. Clark Decl. ¶ 11(b). |
| 49. | Deputies are trained that police dogs are considered a type of less-lethal weapon or tool and are physical property of the RCSD. | Plt. Ex. 2 at 22:18-25. Plt. Ex. 4 at 85:8-18. |
| 50. | Deputies are trained to give commands in a loud, clear voice. | Plt. Ex. 3 at 57:20-58:1. Clark Decl. ¶ 11(d). |
| 51. | Deputies are trained to issue verbal warnings before using deadly force, when feasible, to give the person a final opportunity to comply deadly force is used against him. | Plt. Ex. 3 at 58:20-22. Plt. Ex. 4 at 107:24-108:25. Clark Decl. ¶ 10(d). |
| 52. | Deputies are trained that deadly force is the highest level of force they can use and is only permissible when an individual poses an immediate or imminent threat of death or serious bodily injury, which is also stated in RCSD policy. | Def. Ex. 15 at 6. Plt. Ex. 1 at 71:3-12. Plt. Ex. 3 at 58:2-6. Plt. Ex. 4 at 107:1-11. Clark Decl. ¶¶ 10(a-c, f). |
| 53. | Deputies are trained, and RCSD policy provides, that such a threat is "imminent" when a reasonable deputy would believe a subject has the present ability, opportunity, and apparent intent to immediately cause death or serious | Def. Ex. 15 at 7. Plt. Ex. 1 at 71:13-17. Plt. Ex. 3 at 58:7-16. Clark Decl. ¶ 10(g). |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | bodily injury. | |
| 54. | Deputies are further trained, and RCSD policy provides, that fear of future harm is insufficient, no matter how great the fear or likelihood of harm. | Def. Ex. 15 at 7. Clark Decl. ¶ 10(e). |
| 55. | Deputies are trained any belief in the necessity of deadly force must be based on objective factors and not subjective fear, and are trained to control their fear. | Def. Ex. 15 at 7. Clark Decl. ¶ 10(e). |
| 56. | Deputies are trained they are responsible for justifying every shot fired and to reassess any threat a subject poses between shots. | Plt. Ex. 1 at 72:4-6. Plt. Ex. 3 at 58:17-19. Plt. Ex. 4 at 107:12-18. Clark Decl. ¶ 10(i). |
| 57. | They are not trained that they may shoot someone based only on the fact that the person is holding a gun. | Plt. Ex. 1 at 22:11-25. Plt. Ex. 3 at 12:7-9, 77:21-78:6. Plt. Ex. 4 at 109:1-110:22, 111:21-112:7. Clark Decl. ¶¶ 12, 14(c) |
| 58. | In deposition, the deputies agreed that under their training, it would not have been appropriate to shoot Mr. Llamas while running away or holding the gun to his head if he did not turn toward or aim the gun toward the deputies. They further testified that had he not turned or aimed the gun toward them, they would not have fired and instead would have pursued him further to try to apprehend him without using deadly force. | Plt. Ex. 1 at 43:11-18, 46:4-16. Plt. Ex. 3 at 18:8-15, 42:12-21, 58:23-59:12, 77:21-78:6. Plt. Ex. 4 at 76:16-25, 80:5-84:19. Clark Decl. ¶¶ 12, 13, 14(c). |
| 59. | Plaintiffs' expert has opined that the deputies' use of deadly force was inappropriate and violated law enforcement standards and training, | Clark Decl. ¶ 12. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | including because Mr. Llamas was not turning or aiming the gun toward anyone other than himself when the deputies fired. | |
| 60. | Plaintiff V.L. is Mr. Llamas's daughter. | Plt. Ex. 5 at 13:17-20. Plt. Ex. 6 at 11:11-17, 13:15-18. Plt. Ex. 7 at 13:24-14:4. Plt. Ex. 9 at 14:2-8. |
| 61. | When V.L. was born, Mr. Llamas was incarcerated, so he then could not be listed on her birth certificate. | Plt. Ex. 5 at 13:25-14:4. |
| 62. | When Mr. Lllamas was first released from incarceration, when V.L. was young, her mother took her to live with Mr. Llamas for a month. | Plt. Ex. 5 at 18:1-17. |
| 63. | Before V.L. and her mother moved away from California, Mr. Llamas's incarceration prevented him from seeing V.L. in person. | Plt. Ex. 5 at 18:9-19:1. |
| 64. | During V.L.'s childhood, Mr. Llamas sent money to her mother to assist with expenses for V.L., and he had his sister help him do so during periods of incarceration. | Plt. Ex. 5 at 16:25-17:21. Plt. Ex. 9 at 24:11-23. |
| 65. | When Mr. Llamas was incarcerated, he would pass messages to V.L. and check on her through her mother. | Plt. Ex. 5 at 22:16-20. |
| 66. | When Mr. Llamas was not incarcerated, he would call, text, and video chat with V.L., and the two spoke weekly in the months leading up to his death. | Plt. Ex. 5 at 18:18-22, 19:17-20, 27:4-28:6. Plt. Ex. 6 at 17:21-19:24. Plt. Ex. 13. |
| 67. | The last time Mr. Llamas and V.L.'s mother spoke, one month before his death, their conversation was about how excited he was to see V.L. again and | Plt. Ex. 5 at 18:23-19:1, 26:3-27:2. |

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | how eager he was to prove himself as a good father to her, following his periods of incarceration. | |
| 68. | V.L. had made plans to visit Mr. Llamas in summer 2023, but he died in April. | Plt. Ex. 7 at 15:10-20. |
| 69. | V.L. was devastated by Mr. Llamas's death and experienced withdrawal, saw a therapist, her social life ended, her grades in school dropped, and she became detached from the rest of her family. | Plt. Ex. 5 at 28:23-29:10, 30:5-14, 30:23-31:18. Plt. Ex. 6 at 15:11-16:14, 20:1-21. |
| 70. | Plaintiff S.L. is Mr. Llamas's daughter. | Plt. Ex. 8 at 8:14-15, 11:1-5. Plt. Ex. 9 at 14:2-8. |
| 71. | Mr. Llamas lived with S.L. for extended periods and, when he was incarcerated, left a message saying he loved and missed her. | Plt. Ex. 7 at 9:5-12, 10:13-11:6, 12:6-19, 18:3-8. Plt. Ex. 8 at 9:22-24, 13:6-14:17. |
| 72. | When incarcerated, Mr. Llamas would speak with S.L. via phone and sent letters and holiday cards. | Plt. Ex. 7 at 24:17-25, 41:13-25. Plt. Ex. 8 at 15:6-13, 15:17-24, 16:3-11. |
| 73. | When not incarcerated, Mr. Llamas provided money to care for S.L. including for diapers and groceries, and brought supplies for her care. | Plt. Ex. 7 at 25:11-28:24. |
| 74. | Mr. Llamas celebrated every birthday with S.L. when not incarcerated. | Plt. Ex. 7 at 29:21-31:4. |
| 75. | S.L. did not see Mr. Llamas in prison because she was not allowed to, but repeatedly asked to speak with him. | Plt. Ex. 7 at 41:13-22, 50:11-25. Plt. Ex. 8 at 16:15-17. |
| 76. | S.L. enjoyed going on walks with her father, and talking and playing with him. | Plt. Ex. 8 at 10:10-13, 16:18-25. |
| 77. | S.L. was devastated by Mr. Llamas's death and erected a memorial cross with | Plt. Ex. 7 at 45:9-47:16, 48:6-49:23. |

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS

| | Plaintiffs' Undisputed Fact | Evidence |
|---|---|---|
| | her mother, though has dealt with anger issues, self-isolated, and her grades dropped. | Plt. Ex. 8 at 10:14-22, 11:18-24.<br>Plt. Ex. 9 at 42:4-22. |
| 78. | Plaintiff Carolyn Campbell is Mr. Llamas's mother. | Plt. Ex. 9 at 11:5-9. |
| 79. | Mr. Llamas frequently resided with Ms. Campbell when not incarcerated and tended to her when she was ill. | Plt. Ex. 7 at 18:9-17, 39:2-7.<br>Plt. Ex. 9 at 12:13-13:3, 21:20-22:2. |
| 80. | Mr. Llamas and Ms. Campbell would speak about music and life, and he would tell her she was beautiful, nice, and sweet. | Plt. Ex. 9 at 44:19-24. |
| 81. | When Mr. Llamas was incarcerated, he and Ms. Campbell spoke by phone almost every day, and he sent her mail. | Plt. Ex. 9 at 28:20-24, 30:18-31:1. |
| 82. | When not incarcerated, Mr. Llamas and Ms. Campbell saw each other several times per week, including the night before his death. | Plt. Ex. 9 at 21:20-22:2, 31:2-7. |
| 83. | Ms. Campbell was devastated by her son's death, and she obtained mental health treatment afterward and was diagnosed with depression. | Plt. Ex. 9 at 34:23-35:2, 35:17-22, 38:2-39:8, 44:13-45:13. |
| 84. | Before Mr. Llamas's death, he would visit and make Ms. Campbell feel better when she felt down, but now that he is gone, she feels scared and alone. | Plt. Ex. 9 at 45:2-13. |

DATED:  June 2, 2025          **LAW OFFICES OF DALE K. GALIPO**


_____/s/ Benjamin S. Levine_____
Dale K. Galipo
Benjamin S. Levine
*Attorneys for Plaintiff V.L.*

PLAINTIFFS' STATEMENT GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL UNDISPUTED MATERIAL FACTS