Exhibit 1

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    S.L., a minor by and through the        )
     Guardian Ad Litem Kristine Llamas       )
5    Leyva, individually and as successor-   )
     in-interest to JOHNNY RAY LLAMAS,       )
6    deceased; V.L., by and through the      )
     Guardian Ad Litem Amber Snetsinger,     )
7    individually and as successor-in        )
     interest to JOHNNY RAY LLAMAS,          )
8    deceased; and CAROLYN CAMPBELL,         )
     individually,                           )
9                                            )
                     Plaintiffs,             )
10                                           )
                     vs.                     ) Case No.
11                                           ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10,     )
12   inclusive,                              )
                                             )
13                   Defendants.             )
     _____)

14

15

16       REMOTE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                        JIMMIE MCGUIRE

18                   FRIDAY, DECEMBER 20, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  125233

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 17

 1   you fired three shots at that time?

 2       A.   Correct, sir.

 3       Q.   Was it -- what weapon did you fire those shots

 4   from?

 5       A.   From my duty rifle and four rifle, sir.

 6       Q.   Was that a 556?

 7       A.   223, sir.

 8       Q.   How about the rifle that you fired from in this

 9   case?

10       A.   Same rifle, sir.

11       Q.   And the shooting on the 215 Freeway, was that the

12   June shooting or the December shooting?

13       A.   June, sir.

14       Q.   And the December shooting, did you fire from the

15   same weapon, also?

16       A.   Correct, sir.

17       Q.   How many shots in that case?

18       A.   20, sir.

19       Q.   And in the case we're here to talk about, how many

20   shots total, if you know?

21       A.   Seven, sir.

22       Q.   Do you believe that you fired three rounds in the

23   first volley and four rounds in the second volley in this

24   case?

25       A.   To my knowledge, that's correct, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 18

1    Q.    Do you have an estimate as to how much time passed

2    in between the two volleys in this case?

3        A.    Approximately six seconds.

4        Q.    Is that something you estimated or timed just from

5    reviewing it?

6        A.    My estimate was six to ten, and when I viewed it I

7    confirmed it was about six to seven seconds, approximately.

8        Q.    And when you reviewed it, could you also make out

9    the number of shots?  Did it seem consistent with the three

10    in the first volley and the four in the second volley?

11        A.    That's correct.

12        Q.    Do you have an estimate of the distance you were

13    from the -- and I'm talking, again, back in this case, the

14    distance you were from the individual when you fired your

15    first volley of shots?

16        A.    Yes, sir.  Approximately 40 to 50 yards.

17        Q.    So just doing some simple math, a 120 to 150 feet?

18        A.    That's correct.

19        Q.    And were you at about the same distance from the

20    individual when you fired the second volley of shots?

21        A.    I was approximately five yards closer.

22            So I would estimate approximately 35 to 45 yards,

23    sir.

24        Q.    For the second volley?

25        A.    Correct.

Page 19

1    Q.   Was there any litigation, if you know, with either

2    of your prior shootings?

3         MR. RAMIREZ:  I'll object as to relevance.  It may

4    invade his personnel privileges, but you may without waiving

5    those, you may answer.

6         THE WITNESS:  No, sir.  There were no -- you know

7    what, can you rephrase the question?

8         I want to make sure I'm saying the right yes or no.

9    BY MR. GALIPO:

10   Q.   Okay.  Of course.

11        Do you know if any law -- civil lawsuits were filed

12   related to your first two shootings?

13   A.   No, sir.  There were zero.

14   Q.   To your knowledge, is this the first time that a

15   civil lawsuit has been filed related to one of your

16   shootings?

17   A.   To my knowledge, yes, sir.

18   Q.   The weapon that you were firing, was it in a

19   semiautomatic mode?

20   A.   That's correct, sir.

21   Q.   And would that weapon -- would you need to press the

22   trigger for each shot?

23   A.   Correct, sir.

24   Q.   Did you yourself give any commands to Mr. Llamas in

25   the ten seconds before the first volley?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 20

1    A.    That first volley I did not.

2          I believe Lieutenant Walsh did.

3    Q.    Did you give any verbal warning that you were going

4    to use deadly force?

5    A.    I think for about three hours there were verbal

6    warnings from Star 9, our BearCat, our units, as well as K-9

7    announcements and surrender announcements.

8          So I was well aware that announcements had been

9    given for a long period of time, sir.

10   Q.    I'm just wondering whether you, yourself, gave any

11   verbal warning that you were going to use deadly force.

12   A.    No, sir.  At that time I don't feel like it was

13   feasible due to circumstances and time of the situation.

14   Q.    Where was Mr. Llamas when you first saw him?

15   A.    He was approximately 40 yards to the west of my

16   location.  I was parked facing eastbound on River Road, and I

17   would be facing the driveway that he walked out onto for --

18   when he walked out onto River Road, the driveway that he came

19   from.

20   Q.    And what, if anything, did he appear to be doing

21   when you saw him at that point?

22   A.    He appeared to be doing two things.

23          Number one, he had a firearm pointed to his head,

24   and number two, he was looking left and right, left and

25   right, which from my training and experience shows me that he

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 22

1    to that time, had you seen suspects with guns in their hand

2    before?

3        A.    I have a good amount of times.  Yes, sir.

4        Q.    Can you give me an estimate, even a range of how

5    many times you've seen a suspect with a gun in their hand

6    before?

7        A.    Less than ten.

8        Q.    Would you be comfortable somewhere between five and

9    ten?

10        A.    Yes, sir.

11        Q.    Were you trained that you can shoot someone merely

12    for seeing a gun in their hand, that fact alone?

13        A.    No, sir.  In fact, I've been in a situation on EST

14    where I had a subject who is wanted felon for a violent

15    felony crime against his significant other, and he was

16    driving his vehicle five miles an hour with a gun pointed to

17    his head, and I was on top of our armored vehicle.

18              I was the -- I was assigned to my lethal -- the

19    lethal option for that scenario, and he drove for about 30

20    seconds in front of us, 15 feet from me because we were right

21    next to him on the vehicle, and the gun was to his head the

22    whole time.

23              He never oriented the gun to me or anyone else, and

24    I did not fire or shoot in that situation.  So yes.  I'm

25    trained that and been in that situation in the real world.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 24

1    Q.    And if you know, were there any other officers

2    nearby?

3          When I say nearby, that you could actually see?

4    A.    Lieutenant Walsh to my left and Sergeant Hubacheck,

5    Shawn Hubacheck was to my left as well.

6    Q.    At some point did Mr. Llamas go out of your view?

7    A.    Yes, sir.

8    Q.    And was he essentially running northbound at that

9    point?

10   A.    Correct.

11   Q.    And when he started running northbound, did he go

12   out of your view?

13   A.    For a brief moment in time, yes, he did.

14   Q.    Can you tell me approximately for how long he went

15   out of your view?

16   A.    From the time that it took Sergeant Hubacheck and I

17   to run to the mouth of that driveway.  So less than ten

18   seconds.

19   Q.    When he went out of your view, meaning, Mr. Llamas,

20   running north, you and the sergeant decided so run to the

21   mouth of the driveway; is that a fair statement?

22   A.    That's correct.

23   Q.    And you're approximating it took you about ten

24   seconds to get there?

25   A.    I would guess less -- or sorry.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 25

1          I would estimate less than.

2     Q.   Okay.  I always get nervous when you say guess, so

3   estimate is good.

4          And how far of a distance did you have to run to get

5   to the mouth of the driveway?

6     A.   It was approximately 35 to 40 yards.

7     Q.   And is that when Mr. Llamas came into your view

8   again?

9     A.   Yes, sir.

10    Q.   Shortly after getting to the driveway?

11    A.   Correct.

12    Q.   Were you ware at some point that the lieutenant had

13   pulled his car up?

14          MR. RAMIREZ:  Objection.  Vague and ambiguous as to

15   time.

16          If you understand, you may respond.

17   BY MR. GALIPO:

18    Q.   Yeah.  Any point in time.

19          It could have been before the shooting or after the

20   shooting, but at some point did you become aware of that?

21    A.   I was aware of that, yes.

22    Q.   When did you first become aware of that?

23    A.   I was behind my driver door for cover as well as

24   Lieutenant Walsh, and when Llamas went out of sight, he was

25   running towards an occupied dwelling, and I knew for a fact

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 26

1   it was occupied, a third-party residents, two older men

2   around the porch when I got to the scene earlier in the day

3   at 4:45, 5:00.

4           So when Llamas took off running that way, I knew

5   that I needed to sacrifice my safety because Walsh,

6   Lieutenant Walsh said, "Hey, let's pull our --" in less

7   words, he said, "I'm going to pull my truck up for cover,"

8   and Sergeant Hubacheck and I didn't feel like we had the

9   ability to use cover at that time.  We needed to sacrifice

10  our safety and run to the driveway to get eyes back on Llamas

11  or reassess what his actions were at the time.

12          So yes.  I was aware that vehicle was moving up for

13  cover, but I chose to sacrifice that safety and move up to

14  the mouth of the driveway.

15      Q.   Let me just follow up on a few things that you said.

16           The -- I think you referenced two men on a porch?

17      A.   That's correct, sir.

18      Q.   It sounds like you saw them earlier in the day?

19      A.   I did see them earlier in the day, and I did point

20  that out to the Lieutenant Walsh that the blue house at that

21  driveway was occupied.  That's where I first arrived on-scene

22  to start getting the tactical plan.  And then I arrived where

23  Llamas came out of the bushes prior to Sergeant Hubacheck or

24  Lieutenant Walsh, and according to the radio traffic Star 9

25  put out, Llamas wasn't close to the road yet, but he was

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 27

```
 1   coming towards River Road.  So had a brief moment of time to
 2   do a 360, get some intel and make a tactical plan of my
 3   surroundings.
 4           During that time I saw two shadows under a carport
 5   from my location which is where that house was where I've
 6   seen two older gentlemen earlier in the day knowing that that
 7   was an occupied dwelling.  So I knew that they were still at
 8   the house if that makes sense.
 9       Q.   I'm just trying to figure out how much earlier in
10   the day did you see them there.
11       A.   I saw them around 1700.  So whenever I had gone on
12   scene, I'm guessing -- sorry -- estimating 1700 hours.
13           I saw them in broad daylight two elderly white male
14   adults on a porch of that property, and then in the minute
15   that you're saying I saw Llamas that we're estimating I saw
16   Llamas coming out on the River Road, about ten seconds or 20
17   seconds before Llamas broke the tree line to get on the River
18   Road, I saw the shadows of two adult looking individuals at
19   that same property, the blue house that I speak of, that
20   driveway where Llamas was shot, there were two individuals
21   under the carport kind of doing the lookie-loo thing that I
22   could see their shadows under the carport near the vehicles
23   of that house.
24           So 30 seconds before the shooting with Llamas, I was
25   aware that there where were still humans, not sure if they
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 28

1    were the same gentlemen or not, but adult humans at that

2    property.

3        Q.    What time was it about when you saw Mr. Llamas for

4    that first approximate minute?

5        A.    I honestly have no idea what the time stamp on that

6    would be, sir.

7        Q.    So if you first saw the two men at 5 o'clock, I'm

8    just trying to figure out, was it an hour later, two hours

9    later that you see Llamas?

10            I'm just trying to get some estimate.

11       A.    Approximately two hours.  And my original 5 o'clock,

12   the time stamp could be off on that.  When I first landed

13   on-scene it's available on evidence under the CAD call,

14   whatever time that is, that's when I saw the two gentlemen.

15            Outside of that, I would say two to three hours

16   transpired between when I saw them originally and when I

17   located Llamas with the gun to his head.

18       Q.    Did you take any steps to try to evacuate those

19   gentlemen from their home?

20       A.    The terrain did not allow or dictate me to do that.

21       Q.    Did -- sorry.

22       A.    No.  That's it.  Yes, sir.

23       Q.    Did you talk about that with everyone, anybody, the

24   possibility of whether we should evacuate these people?

25       A.    We did not.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 29

1    Q.    And then the two shadows that you saw, did you share

2    that with anyone when you saw them?

3    A.    The second time I saw them, no.

4          The first time I saw them, yes.  I shared that with

5    Lieutenant Walsh who helped make the tactical plan for the

6    day.

7    Q.    Okay.  He was the supervisor on-scene?

8    A.    Correct, sir.

9    Q.    So then the other part of what you said, you heard

10   Lieutenant Walsh say that he was going to pull his vehicle

11   forward for cover?

12   A.    Yes.

13   Q.    And did you actually see or hear the vehicle

14   moving?

15   A.    Yes.  I was standing next to the door when he

16   started to drive forward.

17   Q.    So was it your impression that as you and sergeant

18   was running to the mouth of the driveway, the Lieutenant's

19   vehicle was close behind you?

20   A.    I'm not sure of the exact location.  I knew he was

21   heading to where I ran to, but I wasn't sure of the exact

22   location of his unit or his vehicle.

23   Q.    Did you ever look to see and where it was just to

24   see if he had the option to take cover before moving

25   forward?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 32

1    Q.    And so would you have generally been looking north

2    when you, again, acquired a visual on Mr. Llamas?

3    A.    Yes, sir.

4    Q.    And do you recall when you initially saw Mr. Llamas

5    where the sergeant was in relation to you?

6    A.    He was off to my left approximately five feet.

7    Q.    Did you have an understanding or appreciation where

8    the lieutenant was?

9    A.    I knew he was driving his vehicle up, and then at

10   some point he was off to my right shoulder.

11   Q.    Would it be fair to say that all three of you at

12   some point were near each other on the driveway?

13   A.    Yes, sir.

14   Q.    And then when you reacquired a visual on Mr. Llamas,

15   would he have been moving to your right to left?

16   A.    That would be east to west.  He was running south to

17   north, and then he started to veer to the west.

18         So northwest if that makes sense.

19   Q.    Let me break it down a little bit.

20         I'm trying to -- I'm remembering what the sergeant

21   said on Wednesday, and I don't want to get confused.  I want

22   to get your recollection independently of the sergeant's.

23         When you regained a visual on Mr. Llamas, was he

24   stationary, walking, running, or any words you want to use.

25   A.    He was sprinting.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 33

1    Q.    And were you looking generally north at that time?

2    A.    That's correct.

3    Q.    And which direction was Mr. Llamas sprinting when

4    you regained a visual on him?

5    A.    South to north, but he was drifting to the west.

6    Q.    Were you initially looking at his back?

7    A.    Initially, I saw his back, and then I saw him turn

8    towards me.  So I could see left profile of his face, and

9    then he turned again with firearm not at his head anymore,

10   and I could see full left profile of his body and the side of

11   the firearm orienting towards myself, Sergeant Hubacheck,

12   Lieutenant Walsh, and all the deputies that were two to three

13   hundred yards behind us working on K-9 Rudy who had lethal

14   wound.  So they were all behind us where Llamas was first

15   initially spotted.

16   Q.    Okay.  Let me try to break that down a little bit.

17   A.    Yes, sir.

18   Q.    When you initially saw Mr. Llamas running from south

19   to north when you reacquired him in the driveway, how far was

20   he from you, approximately?

21   A.    25 yards, sir, approximately.

22   Q.    How many?  I'm sorry.  You broke up.

23   A.    25, approximately.

24   Q.    25, thank you.  And when he was running from south

25   to north, was he increasing the distance for some time?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 36

1  look and the second?

2      A.   You know what, counting off in my head, I would

3  estimate probably between two and five seconds, but closer to

4  two to three seconds, and that's a complete estimate.

5      Q.   And how about the distance separate from the time?

6           It started out at 25 yards at the first look.

7           What would you estimate the distance at the second

8  look?

9      A.   40 to 50 yards, sir.

10     Q.   So there is a portion of your statement that I'm

11  sure you've reviewed recently, and if you want I can show it

12  to you.

13          MR. GALIPO:  Maybe, Shannon, can we put the bottom

14  of Page 16 up for the deputy so he can see this portion of

15  his statement.

16  BY MR. GALIPO:

17     Q.   Before we do that, where was the -- this house that

18  you referred to earlier where you saw the gentlemen earlier

19  and the shadows, where was that in relation to Mr. Llamas

20  just before the first volley of shots occur?

21     A.   Before -- before the first volley of shots, it was

22  like at the first volley, or before the first volley?

23     Q.   Let's say at the first volley.

24     A.   Okay.  The house was approximately 15 yards directly

25  east.  So the driveway comes up, has a circle drive, and then

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 37

1    on the east side of that circle kind of roundabout, it's all

2    DG pack like the DG gravel.  On the -- on the east side or

3    looking north the left side of that driveway is the blue

4    house set off at a 45-degree angle.

5        Q.    Are you still looking north from your position?

6        A.    Correct.

7        Q.    And at just before the second volley, is Mr. Llamas

8    running still, or is he walking, or doing something else?

9        A.    He is -- before the second volley --

10       Q.    No.  Before the -- I misspoke.  I'm sorry.

11             Immediately before the first volley when he gained

12    this distance to 40 or 50 yards, is he still sprinting, or

13    does he slow down at some point?

14       A.    He slows down enough that I could see him turning

15    his body about 90 degrees.  He is starting to turn to 180,

16    and the gun now broke off of his head meaning that he removed

17    the firearm from his head, and it's near his left arm or

18    shoulder, and it's orienting in our direction.

19             So it's orients towards house, passed the house, and

20    it starts to come in myself, Sergeant Hubacheck, and

21    Lieutenant Walsh's direction, but it's not at his head

22    anymore.  It's now starting to point towards us so much so

23    that with my three time magnifier, I could start to see the

24    opening of the barrel of the firearm because there's a silver

25    firearm.  So the barrel looks black if that makes sense.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 38

1      Q.    So --

2      A.    You can see the barrel stood out on the -- on the

3    pistol.

4      Q.    So right before he made that movement, were you

5    looking for at his back?

6      A.    Before he started to spin towards myself, Sergeant

7    Hubacheck, and Lieutenant Walsh, that's correct.  He was

8    running away.  He had given us a 90-degree turn once, give or

9    take, 90 degrees estimation, and then he continued another

10   20-ish yards estimating, and then he started do that same

11   orientation, but the gun was at his -- at his head this time.

12   It had come off his head and was more chest level orienting

13   towards us.

14     Q.    But right before he made that second movement that

15   you're describing, he would have been generally facing

16   northbound?

17     A.    He was running northbound favoring to the west.

18     Q.    Okay.

19     A.    Drifting to the west.

20     Q.    Okay.  And then where -- where would the house be in

21   relation to --

22     A.    Directly east.  If he were to cut -- so directly

23   east -- sorry, forgive me -- directly west of his location.

24     Q.    Okay.  That's where I got confused --

25     A.    I think -- I think misspoke earlier and said east.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 39

1          So 20 minutes later -- I apologize.

2          The house was west of where Llamas.

3     Q.    Okay.  That helps me because when you said east,

4   that confused me a little bit.

5          But it would be west; is that correct?

6     A.    Yes, sir, Dale.  My apologies.

7     Q.    That's okay.  It doesn't take much for me to get

8   confused, so I appreciate that --

9          MR. RAMIREZ:  -- started.  Go ahead.

10   BY MR. GALIPO:

11     Q.    So as he is moving north, the house would be to his

12   west which would be to his left.

13          Do I have that generally correct?

14     A.    That's correct, sir.

15     Q.    And you and the other officers would have been to

16   the south?

17     A.    Correct, sir.

18     Q.    So I just want to show you one portion of your

19   statement, and then we'll take our first break.

20          MR. GALIPO:  Can we put the bottom of Page 16 up,

21   please.

22   BY MR. GALIPO:

23     Q.    Just take a moment.  First of all, can you see that

24   on your screen, and do you need it to be enlarged a little

25   bit --

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 41

1    BY MR. GALIPO:

2        Q.    **That a yes?**

3        A.    That was a yes.   Sorry.

4        Q.    **That's okay.**

5        A.    -- talking.

6        Q.    **And then you say as he spun, the gun went towards**

7    **the house.**

8          **Do you see that?**

9        A.    I do see that.

10        Q.    **And did you see the gun go towards the house at some**

11    **point?**

12        A.    Well, it would have had to because Line 40 when he

13    continued to spin, it like I don't know, in our world

14    flagging means the gun like flagged by something, like it put

15    something in danger of that gun if it had gone off, not

16    meaning that he was going to shoot at the house, just in

17    general.

18          So as he did that, the house was flagged, and then

19    he continued pass the house towards us, and I think that's

20    where Line 39 and 40 kind of pick up.   So yes, I see where

21    you're saying.

22        Q.    Okay.   I'm still on Line -- so the gun went towards

23    the house.   You then say he is looking at the house again

24    where the gentlemen are, and now he is starting to turn

25    towards myself and my two partners Lieutenant Walsh and

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 42

1    Sergeant Hubacheck, and that's when I engaged approximately

2    three rounds.

3              Do you see that?

4        A.   I do, yes, sir.

5        Q.   And the three rounds you're talking about is the

6    first volley of shots?

7        A.   Correct, sir.

8        Q.   In this portion of your statement, do you ever say

9    that the gun was coming in your direction specifically?

10       A.   I guess in theory, I don't, but that's what I

11   meant.

12       Q.   Okay.  Did you ever say at this portion of you're

13   statement that you could see the barrel of the gun?

14       A.   Somewhere later in the report, to my knowledge.

15       Q.   I'm just --

16       A.   Right here, no, it's not.  I'm sorry.

17            No, it's not, sir.

18       Q.   And when you reviewed the FLIR video from the

19   airship, do you -- can you see in looking at that the gun

20   pointed towards the house just before the first volley of

21   shots?

22       A.   I don't know if you reviewed the FLIR footage, but

23   at that point Star 9 zooms out pretty far.  So to me it does

24   look like the gun is orienting from the house towards my

25   position, but like I said, the FLIR zoomed out about ten or

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 43

```
 1   20 power.  So it's very hard to make that out at that moment.

 2          You can see his body orienting in our way, but it's

 3   so far zoomed out that it's hard to see where the gun is

 4   exactly oriented from Star 9's angle and the FLIR footage.

 5       Q.   And then my follow-up question is whether you could

 6   see the gun coming in your direction in the FLIR footage

 7   before the first volley, before the first volley of shots.

 8       A.   From the television I viewed the Star 9 footage on,

 9   it's hard to tell exactly where the gun is, but you can see

10   it starting to orient towards my location.

11       Q.   Based on your training and experience as of that

12   time, did you think it was appropriate to shoot Mr. Llamas

13   when you first saw him when he had the gun to his head?

14       A.   I saw him for a minute and a half and never shot,

15   sir.  So the answer to that is no.

16       Q.   And did you think it was appropriate to shoot him

17   when he started running away initially?

18       A.   Just for running away at that time, no.

19       Q.   And then when you saw him initially in the driveway

20   moving north initially before the second time he looked in

21   your direction and turned, did you think it was appropriate

22   to shoot him?

23       A.   He was a fleeing felon for a multiple violent crimes

24   with multiple victims including sexual assault on a minor

25   which was his family member with violence and force as well
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 44

1    as armed robbery where he pistol-whipped the suspect who

2    needed to go to the hospital for great bodily injury.

3            So I knew he was a fleeing felon.  He had the

4    ability, the intent, and the opportunity to do harm to

5    others.  So at that moment in time, it was something that

6    crossed my head telling myself, man, I hope I don't have to

7    shoot at this guy if he doesn't orient his gun in my

8    direction which in my report it states that.

9            And then it says approximately two seconds later

10   from that thought crossing my brain, his gun started to

11   orient in my direction.

12           MR. GALIPO:  Okay.  We can take that down, Shannon.

13   BY MR. GALIPO:

14       Q.   So are you saying that you were considering shooting

15   him even before the gun started orienting in your

16   direction?

17       A.   I wouldn't use the word considering.

18           In what we do, we always have a tactical checklist

19   of how we need to solve a problem with the least amount of

20   force necessary in order to keep myself, my partners, and

21   other civilians safe from harm or death or serious bodily

22   injury.

23           So at that moment it was something -- a checklist

24   that had gone through my brain, what if this happens, what if

25   this happens.  As a tactical operator, we're constantly

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 45

1   thinking what if this happens, what if that happens.

2           At the moment it's something that went through my

3   mind.  It's in my report, that's correct.  We train that all

4   the time.  Our bread and butter is hostage rescue, so we do

5   train that.  But at the moment in time with Llamas, that

6   wasn't the case Even though that thought had crossed through

7   my head, he started to turn his body orienting towards me

8   with a firearm and towards my partners as well as the

9   partners 300 yards behind us that were still working on Rudy

10  after Rudy was shot.

11      Q.   So you're saying that you -- when you had this

12  checklist in your head, did you check it yes or no in regards

13  to --

14      A.   No, that's not how -- I'm sorry to interrupt you,

15  Dale.  That's not how it works.  It's not a yes or no thing.

16  It -- it operates in theory that that could happen, and if it

17  did happen, that that would be a really hard incident for us

18  to solve.  So as I said, it's just like -- it's like the

19  stock market spins across the -- it's like a bar where all

20  the Dow Jones spins across the market for the day.

21          It's just something that our brains are trained to

22  do and try to see how this situations is going to unfold if

23  that makes sense.

24      Q.   Let me just ask -- it does.

25          Let me just ask you this last question, and then

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 46

1    we'll take our break.

2           MR. GALIPO:  I'm sorry it went so long, Jinna.

3    BY MR. GALIPO:

4        Q.    If he had not turned towards you or oriented the gun

5    towards your partners, would you have fired?

6           MR. RAMIREZ:  Calls for speculation; lacks

7    foundation; assumes facts not in evidence.

8           But you can answer if you know.

9           THE WITNESS:  From my training and experience in my

10   incidents, Dale, I do not think I would have fired.  I think

11   would have sprinted towards him putting my safety even

12   further trying to close the gap from him getting to that

13   house 15 yards away if that was the path he chose which was

14   the last path there was, I would have sprinted and put myself

15   in even more jeopardy and closed the gap trying to see if we

16   can get him to surrender peacefully without using force.

17       Q.    Okay.  All right.  Thank you for that.

18          MR. GALIPO:  Is this a good time for a ten-minute

19   break?

20          I can take longer, Jinna, if you want.

21          COURT REPORTER:  No, that's okay.

22          MR. GALIPO:  Okay.  So how about ten minutes.

23          Does that sound good, Gene?

24          MR. RAMIREZ:  That sounds good.

25          And then you should have the Star 9 video.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 47

1          MR. GALIPO:  Okay.  Thank you so much, Gene.

2          MR. RAMIREZ:  Thank you.

3          THE VIDEOGRAPHER:  And off the record at 2:44 p.m.

4          (Recess taken.)

5          THE VIDEOGRAPHER:  And going back on the record at

6    2:59 p.m.

7    BY MR. GALIPO:

8          Q.   Okay.  So let's go back on the record.

9               When you fired your first volley of shots, was

10   Mr. Llamas still moving north?

11         A.   His travel pattern was the same as I mentioned

12   earlier.  North -- south to north, drifting to the west.

13         Q.   And would you say he was till running during the

14   first volley?

15         A.   I don't recall if he was -- he had gone between like

16   a -- I guess you would call it a trot, a sprint and a trot.

17              I don't remember at that time I think he had slowed

18   down a pinch to turn -- well, when he started to orient

19   towards myself, but I don't recall a 100 percent.

20         Q.   So he would have either been running or trotting,

21   but still moving in the direction you indicated?

22         A.   Correct.  He hadn't stopped and surrendered at the

23   point.

24         Q.   Did anyone as far as the tactical plan discuss that

25   if Mr. Llamas is seen running towards one of those houses,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 48

1    that he should be shot?

2        A.    No.

3        Q.    Did anyone tell you that at any time that if he runs

4    towards that house, we should shoot him?

5        A.    No.

6        Q.    Was that your mind frame at any time?

7        A.    Never.

8        Q.    And in terms of your -- the magnifier or the

9    magnification that you talked about earlier, was that

10   something that is customary with your weapon or something you

11   added?

12       A.    We all have that capability.  It's removable.

13             Some guys don't like it, some guys do.  It works

14   great out in the open.  It's not so good if you're clearing a

15   house.  Some guys keep theirs off and put it on if they think

16   they need, and then some guys will keep it on and then take

17   it off if they don't want it.  I choose the latter.

18       Q.    And did you mention to anyone on-scene that you were

19   using your magnification?

20       A.    That's not something we would ever mention with each

21   other.  It's just --

22       Q.    How about at -- I'm sorry.  Go ahead.

23       A.    Sorry.  I was far back.

24             That's not something we would ever talk about

25   on-scene.

Page 50

1   and standing facing northbound or north to the north.

2        Q.   Were you using your sights?

3        A.   I was.

4        Q.   And where were you aiming on Mr. Llamas' body from

5   your perspective during the first volley?

6        A.   His torso.

7        Q.   When you say his torso, you mean between his neck

8   and waist essentially?

9        A.   Correct.

10       Q.   And what part of his torso was exposed to you during

11   the first volley?

12       A.   It would have been his left shoulder, left ribs, his

13   glutes were at an angle, his back was at an angle, he was

14   starting to orient his body this way.  So it would have been

15   really between the time we engaged and the time we stopped on

16   the initial volley it would have been left torso, back

17   glutes, left shoulder.

18       Q.   Was his buttocks exposed to you during the first

19   volley of shots?

20       A.   At an angle, yes, it was.

21       Q.   Did you observe any movement as you described his

22   rotation during the shots, or was that more observed before

23   the first shot?

24       A.   I was focused on his -- he was rotating because I

25   could see the firearm through my magnification coming towards

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 52

 1  because he immediately went down to the ground?

 2      A.   He fell to the ground, yes.

 3      Q.   And you said about six or seven seconds expired

 4  between the first volley and the second volley?

 5      A.   Correct.

 6      Q.   And you moved up, I think, you said about five

 7  yards?

 8      A.   Approximately.

 9      Q.   So you estimated you were 35 to 45 yards from him

10  for the second volley, approximately?

11      A.   Approximately.

12      Q.   And what part of his body were you aiming at for the

13  second volley of shots?

14      A.   His head.

15      Q.   And what part of his head was oriented towards you

16  at that time?

17           Would it be the front, the side, the back, what

18  part?

19      A.   His face, his eyes, mouth, nose, his whole front

20  side of his face.

21      Q.   So you were attempting to strike him in the face

22  area essentially for the second volley?

23      A.   Correct.

24      Q.   And you said you were able to see a magnification to

25  some extent of his face before you fired the second volley?

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Jimmie McGuire on 12/20/2024

Page 57

1      A.    A few feet.

2      Q.    And in what direction?

3      A.    To the west.

4      Q.    And just so we're clear, a little while ago, you

5   said the house to the east, but I think you meant the west.

6      A.    That's correct.   We clarified that.

7            You're right.

8      Q.    Okay.   And to your knowledge, are you the only one

9   who fired during the second volley?

10     A.    Yes, sir.

11     Q.    Do you have an understanding as to how many shots

12   the sergeant fired altogether?

13     A.    I think just from charting and looking at documents,

14   it was one.

15     Q.    And is it your understanding that was some time

16   during the first group of shots?

17     A.    That's correct.

18     Q.    You mentioned earlier that you had reviewed autopsy

19   report fairly carefully?

20     A.    I reviewed it.   I don't know how careful or detailed

21   you want to go, but yes, I have reviewed the autopsy

22   report.

23     Q.    I don't want to go too detailed, but did you look to

24   see where he was shot?

25     A.    I did, yes, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 58

1      Q.    And what is your understanding from reviewing the

2    report?

3      A.    He was shot in the right upper glute.

4            Bullet traveled from the left to the right which

5    would correlate that initial volley From Sergeant Hubacheck

6    and myself as he's spinning towards us, you can still see the

7    top of his glutes, the left side of his shoulder and the rib

8    cage on the left and his left side of his head and eyes as

9    the gun is orienting towards us and aiming for the torso that

10   would make complete sense that the 223 round entered his

11   buttocks from the left traveling to the right side of his

12   right buttocks, and then the second shot looked like it

13   entered the left nostril and went back and into his brain at

14   some point.

15     Q.    So your understanding he was struck by two shots?

16     A.    That's correct.

17     Q.    And your belief based on being there at the time and

18   reviewing the autopsy report is the shots to the buttocks

19   would have happened in the first volley?

20     A.    That's my assumption.

21     Q.    Based on what you already explained?

22     A.    His buttocks was not facing my direction at the time

23   of the second volley.  So my assumption is bullets can do

24   weird things, but my assumption is he was struck in the right

25   buttocks from left to right on the initial volley.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 59

1    Q.   And then the second volley would be the shot to the

2    face, and I think you've already told us that's where you

3    were aiming?

4    A.   Yes, sir.

5    Q.   And do you recall whether it was the left buttocks

6    or the right buttocks that was struck?

7    A.   It was the right side, left side of the right

8    buttocks, and the bullet traveled from the left to the right

9    of the buttocks.  So it entered from the left side of the

10   right buttocks upper buttocks if that's makes sense.

11        And I'm no doctor or coroner, but that's what the

12   report states.

13   Q.   Okay.  And do you recall whether that bullet exited

14   the body or stayed in the body?

15   A.   I did extensive medical blood sweeps on Llamas, and

16   I never saw any exit wounds from that entry wound.

17   Q.   Do you recall -- you might not know this, but do you

18   know whether the buttock shot was fatal or not?

19   A.   No idea, sir.  I would assume the --

20        MR. RAMIREZ:  You've already answered.

21   BY MR. GALIPO:

22   Q.   Yeah.  If you don't know, it's okay.

23        Sometimes the report indicate that, and that's all

24   right.  I realize that's not your specific area of expertise.

25        You mentioned that there was a left-to-right

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 65

1  was looking at all the vehicles trying to get -- point them

2  at every car passing, trying to inside of those cars.

3       And then once the car stopped and they were too far

4  away from him to get to, he started orienting his body

5  towards the left swinging his gun in the same motion towards

6  honestly that Llamas did towards my direction, and I engaged

7  one that day on the 215, which three shots.

8       Q.   Do you know if that person survived or not?

9       A.   Initially, he did, but he died later at the

10  hospital.

11       Q.   And your other shooting you were involved in, do you

12  know if that person survived?

13       A.   He did not.  And I was not the only shooter in

14  that.

15       Q.   So the 215 you were the only shooter, but the other

16  call there were multiple shooters?

17       A.   That's incorrect.  There was a second shooter on the

18  215, but I was one of the shooters.

19       Q.   Okay.  Thank you.

20       A.   Yes, sir.

21       Q.   Shortly after the second volley of shots, did

22  Lieutenant Walsh say something to the effect, you know, "Stop

23  shooting" or "Why are you shooting?"

24       A.   I don't really recall.  And looking at the video

25  evidence, I can't really make out what he said at the time.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 66

1        I just heard him say my name.  He was my sergeant

2    prior to him being our lieutenant.  So him and I had a very

3    extensive working background, and I knew exactly what -- when

4    his tone, certain words he can put tones on.  I know that he

5    means something, and I just heard my name Jimmie with the

6    tone he said, and that was him probably -- I don't know --

7        MR. RAMIREZ:  You've answered --

8        THE WITNESS:  I'm assuming.  So yeah, I just heard

9    him say my name Jimmie.  I think he said some more, but I

10   don't know what it was.  Sorry.

11   BY MR. GALIPO:

12       Q.   That's okay.  Because in your statement at some

13   point you say, "I engaged I think four more rounds, I aimed

14   at his head.  I remember Walsh saying my name almost like why

15   are shooting."

16            Is that what you said --

17       A.   At the time that was my assumption.

18       Q.   Okay.  That was your impression at the time?

19       A.   At that moment in time I assumed, and that's when my

20   response was, "He's pointing a gun at us, the gun is -- he

21   had a gun in his hand, it's pointing at us."

22       Q.   Okay --

23       A.   At that point I realized they could not see what I

24   could see.

25       Q.   Now, prior to shooting Mr. Llamas, did you have any

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 71

1   in custody with no force, no damage, no injures to deputies,

2   suspects, civilians.  That's always our goal.

3        Q.   And in terms of your deadly force training, are you

4   essentially trained that deadly force should only be used if

5   there is an immediate or imminent threat of serious bodily

6   injury?

7        A.   That's correct.

8        Q.   And obviously, the training would be generally

9   speaking if there is not an immediate or imminent threat of

10  death or serious bodily injury, then deadly force should not

11  be used?

12       A.   That's correct.

13       Q.   I think you told me earlier that based on the

14  training, the person has to have the opportunity, ability,

15  and apparent intent to immediately cause death or serious

16  bodily injury?

17       A.   That's correct, sir.

18       Q.   And I think we also discussed that a weapon in

19  someone's hand like a firearm, that fact alone is not enough;

20  there needs to be more than that; is that fair?

21       A.   That's incorrect.  If you recall, I talked about

22  that suicidal subject that I have been on a few calls like

23  that.  So yes, a 100 percent.

24       Q.   Did you think --

25       A.   You can't shoot someone in that situation.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
Jimmie McGuire on 12/20/2024

Page 72

1    Q.   Did you think Mr. Llamas was potentially suicidal

2    when he was running with the gun to his head?

3    A.   I did not, sir.

4    Q.   And you're trained that you're responsible to

5    justify each shot; is that fair?

6    A.   Every shot, sir.

7    Q.   Okay.  We're going to just look quickly at I think

8    the video footage from the helicopter, and we're going to

9    mark it I think as Exhibit 3 going in order.

10         MR. GALIPO:  Is that right, Shannon?

11         We had Exhibit 1 and 2 with the sergeant's

12   deposition, so that's why we're going to mark it as 3.

13         (Exhibit 3 was marked for identification.)

14   BY MR. GALIPO:

15   Q.   I'm going to try to show a portion of it, and we'll

16   watch it through, and then I'll have Shannon stop it then we

17   might look at it again, and I might ask you a few questions

18   about it.

19   A.   Sure.

20   Q.   Okay.  So before we start, we see a white figure in

21   the frame.

22         Is that supposed to be Mr. Llamas, if you know?

23   A.   I can't answer that.  I know there is a female from

24   what I viewed.  I would have to see more of the video to give

25   you that answer, sir.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 76

1    away.  So That was three hours, two to three hours worth of

2    announcements in English and Spanish.  In hindsight Llamas

3    spoke English.  So that wasn't an issue anyways, and there

4    were multiple announcements with his name, Johnny Llamas, we

5    know you're armed, we know you have a handgun, we need you to

6    come out with your hands up in the air and nothing in your

7    hands.  So yes, he knew a 100 percent that police and

8    deputies, law enforcement was on-scene.

9        Q.    Okay.  Thank you for that.  I was -- my question was

10    poor.  I was trying to ask you during this time frame that he

11    came out during this approximate 60 seconds with the gun to

12    his head, whether he ever looked in your direction during

13    that time.

14        A.    He did, yes, sir.

15        Q.    So you had the impression he knew you were there

16    during that time?

17        A.    He looked in my direction, and he looked to the east

18    where there were other deputies stationed further down, and

19    you could see him look at them, and turn the other way.

20            So he knew a 100 percent that law enforcement was

21    on-scene on River Road.

22        Q.    And during this approximate 60 seconds, I guess up

23    to two minutes that you observed him at this point with the

24    gun to his head, did he ever at any time during that time

25    frame point the gun at you or any of the officers?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Jimmie McGuire on 12/20/2024**

Page 84

```
 1                     CERTIFICATE

 2                          OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 20, 2024.

23          _____

24          Jinna Grace Kim, CSR No. 14151

25
```