Exhibit 3

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    S.L., a minor by and through the       )
     Guardian Ad Litem Kristine Llamas      )
5    Leyva, individually and as successor-  )
     in-interest to JOHNNY RAY LLAMAS,      )
6    deceased; V.L., by and through the     )
     Guardian Ad Litem Amber Snetsinger,    )
7    individually and as successor-in       )
     interest to JOHNNY RAY LLAMAS,         )
8    deceased; and CAROLYN CAMPBELL,        )
     individually,                          )
9                                           )
                  Plaintiffs,               )
10                                          )
                  vs.                       ) Case No.
11                                          ) 5:24-CV-00249-CAS-SP
     COUNTY OF RIVERSIDE; and DOES 1-10,    )
12   inclusive,                             )
                                            )
13                Defendants.               )
     _____)

14

15

16       REMOTE VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                     SHAWN HUBACHECK

18               TUESDAY, DECEMBER 18, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116557

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 12

```
 1        Q.   Okay.  So before the date of the incident, had you

 2   ever seen a suspect with a gun in their hand before?

 3        A.   Yes, sir, I have.

 4        Q.   Do you have an estimate or a range as to how many

 5   times?

 6        A.   I would say a couple dozen.

 7        Q.   Were you trained that you could shoot someone merely

 8   for seeing a gun in their hand, that fact alone?

 9        A.   No, sir, I was not trained that.

10        Q.   And I'm sure you've seen other weapons in suspect's

11   hands before; knives and other objects?

12        A.   Yes, sir.

13        Q.   Prior to the date of the shooting we're here to talk

14   about, had you ever been present for an officer-involved

15   shooting before?

16             MR. RAMIREZ:  I'll object as to relevance.  It may

17   invade his police personnel privileges.

18             But he can answer yes or no at this point.

19             THE WITNESS:  Yes.

20   BY MR. GALIPO:

21        Q.   Have you -- had you been involved -- and this is

22   just a yes or no at this point -- in officer-involved

23   shootings before?

24             MR. RAMIREZ:  I'll object same objections.

25             But you may answer yes or no.
```

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 15

1     Q.   It has the way you can make it fully automatic, but

2   it was set on semiautomatic?

3     A.   Yes, sir.

4     Q.   When you fired your shots in the case we're here to

5   talk about, were you shooting at a particular person?

6     A.   Yes, sir.

7     Q.   And who was that person, if you know?

8     A.   Mr. Llamas.

9     Q.   And when you fired your shot, do you have an

10  estimate as to the distance between you and Mr. Llamas?

11    A.   I believe 40 to 50 yards.

12    Q.   And I know we're in football season, but doing some

13  simple math, are we talking a 120 to 150 feet?

14    A.   Yes, sir.  Roughly.

15    Q.   I only asked you because in my last case, the

16  officer kept getting confused between yards and feet, and he

17  happened to be an ex-football player.

18         So I was joking with him about that.

19         MR. RAMIREZ:  Right.  I think he has a CTE,

20  possibly.

21         MR. GALIPO:  Right.

22  BY MR. GALIPO:

23    Q.   And what part of -- I'll let you take your sip.

24    A.   Sorry.

25    Q.   That's okay.  What part of Mr. Llamas' body were you

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 16

1    aiming at when you fired your one shot?

2         A.    His upper thoracic area, upper body.

3         Q.    And from your perspective was that his front, his

4    back, or some other part?

5         A.    I believe it was the front of his body.

6         Q.    So would you have been aiming at his chest-stomach

7    area?

8         A.    Correct.

9         Q.    Were you stationary or moving when you fired?

10        A.    I was stationary.

11        Q.    And was Mr. Llamas stationary or moving when you

12   fired?

13        A.    He was moving.

14        Q.    And in what manner was he his body moving?

15        A.    I'm not sure I understand what you're asking.

16        Q.    It's not a clear question.

17              So that was a good point.

18              Was he walking or running as far as his legs?

19        A.    He was walking.

20        Q.    And which direction was he walking?

21        A.    In a westerly direction.

22        Q.    And would that be walking away from you, towards

23   you, or in some other way?

24        A.    I would say kind of like perpendicular to us.

25              He's 50 yards in the front, walking towards my left

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 18

1    his head?

2         A.    During the time that he had the weapon to his head,

3    he was in the street in front of me, and there was commands

4    given to him.  He was looking in our direction, and then at

5    one point Mr. Llamas kind of pointed to the ground, like, you

6    know, you want me to give you up here, but as he did that, he

7    still had the weapon to his head.

8         Q.    During any of the time he had the weapon to his

9    head, did you think based on your training and experience it

10   was appropriate to shoot him?

11        A.    No, sir.

12        Q.    And is that essentially because with the gun to his

13   head, it was not an immediate threat of death or serious

14   bodily injury to others?

15        A.    To myself or others.  Yes, sir, that's correct.

16        Q.    So am I understanding you correctly that at one

17   point when he had the gun to his head, it looked like he was

18   gesturing towards the ground near him as if to say, do you

19   want me to get down here?

20        A.    That's just an assumption based on what I saw from

21   the distance that I was at, but yes, he did kind of point to

22   the ground, and it appeared to me like, you know, you want me

23   to lay down here, but he did not lay down.

24        Q.    And when he pointed to the ground, would he have

25   pointed with his left hand?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 21

```
 1      A.   That's correct.

 2      Q.   Did any one of the three of you, if you know, have

 3   less-lethal with them or out?

 4      A.   With it -- there's two different things.

 5           With them or out?

 6      Q.   Another good point.  Let's start with them.

 7           Do you know if there was any less-lethal in the

 8   units?

 9      A.   I know there was less-lethal in the units, yes.

10      Q.   And what less-lethal were you aware of?

11      A.   Pepper spray, 40-millimeter impact munitions.

12           I carry some steam ball grenades, flash bangs.

13           That's all I could think of off the top of my

14   head.

15      Q.   Was anyone assigned less-lethal at that point?

16      A.   During that -- you're talking about the same point

17   that observations of the gun, you said?

18      Q.   Yes.

19      A.   No, sir.  Nobody was assigned less-lethal.

20      Q.   And when did you shoot in relation to this

21   approximate 60-second window that you observed him with the

22   gun to his head?

23      A.   So after Mr. Llamas pointed to the ground, he fled

24   north from his location.  And then we -- Deputy McGuire and I

25   ended up going on foot to -- Mr. Llamas ran down a dirt
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 22

1  driveway of an address located at 22240 River Road.

2          So Deputy McGuire and I ran on foot to that -- the

3  threshold of the street and the driveway, and then that's

4  where the deputy-involved shooting occurred.

5      Q.    So would it be correct that there were no shots

6  fired before he started running north on the driveway?

7      A.    To be clear, there were no shots fired from law

8  enforcement.  That's correct.

9      Q.    Okay.  You heard a shot earlier?

10     A.    I did not physically hear the gunshot, but I was

11 aware of a shot being fired, yes.

12     Q.    How did you become aware of it?

13     A.    Over my -- my unit radio.

14     Q.    Did someone communicate that they heard a shot

15 fired?

16     A.    Yes, sir.

17     Q.    And there had been a K-9 deployed?

18          MR. RAMIREZ:  I would say it's vague and ambiguous.

19          But you may respond if you understand.

20          THE WITNESS:  I'm -- it depends on what you're

21 asking me.  I'm aware of a K-9 being deployed now, but when I

22 heard the shot report as being fired, I was not aware of the

23 K-9 having been deployed yet.  If that's makes sense.

24 BY MR. GALIPO:

25     Q.    Okay.  Yeah, that does.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 25

1    Q.    Sure.  It's my general understanding that some K-9s

2    are like search dogs, some K-9s can bite and hold on command.

3          I didn't know if you had an understanding as to the

4    K-9's capabilities that was involved?

5    A.    So this particular dog is a -- we call it police

6    service dog or Sheriff's service dogs.

7          So if it locates a suspect, yes, it may bite them.

8    Q.    And at some point you saw the dog deployed?

9    A.    Yes, sir.

10    Q.    And if I'm understanding your testimony, you did not

11    hear a gunshot, but you heard a communication over the radio

12    after that, that a gunshot had been fired?

13    A.    So I think I need to clarify again.  The deployment

14    of the dog that I personally witnessed was at the extreme

15    southwest corner of this large containment that we had.

16    After I witnessed that dog deployment, we kind of reallocated

17    our resources.  There was a separate deployment of the K-9

18    and the shot fired that I was not a witness to.

19    Q.    Okay.

20    A.    If that makes sense.

21    Q.    That does.  Thank you for that clarification.

22          I guess what I'm wondering, did you have knowledge

23    or information that after the shot had been fired, that the

24    K-9 handler tried to call his dog back, and the dog did not

25    come back?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 26

1      A.   Yes, sir, I am.

2      Q.   So one of the possibilities I'm sure you considered

3    is that the dog may have been shot?

4      A.   It was a consideration, yes.

5      Q.   Was there any communication about that possibility

6    that you recall over the police radio?

7           MR. RAMIREZ:  Vague and ambiguous.

8           But you may respond if you understand.

9    BY MR. GALIPO:

10     Q.   In other words, maybe he had shot the dog, or words

11   to that effect?

12     A.   Over the radio I don't recall any communication over

13   the radio, no.

14     Q.   Was there any communication about that that was not

15   over the radio that you remember?

16     A.   I don't remember if the words used were shot, but I

17   spoke to Deputy Day after the shots were fired, and he was

18   extremely upset that his dog was not recalling like he

19   typically would.

20          So -- but I don't remember if he said something

21   along the lines of, you know, my dog's been shot or something

22   like that.

23     Q.   Can you spell --

24     A.   I'm sorry?

25     Q.   No.  I'm sorry.  I cut you off.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 28

1  physically?

2      A.    That so that was inside of our containment which is

3  a pretty large containment, 20-plus acres, and it was near a

4  old dilapidated boat, and it was near where K-9 Rudy was

5  deployed by the tree line, if that makes any sense.

6      Q.    So did you yourself ever see the female at any time

7  before you fired your shot?

8      A.    No, sir, I did not.

9      Q.    And was the first time that you saw Mr. Llamas that

10  day when you saw him with the gun to his head, or had you

11  seen him previously?

12      A.    The first time I saw him was when he came out of the

13  tree line on the pavement side with the gun to his head.

14          That was the first time I physically saw him.

15      Q.    And how long approximately had you been out in that

16  location before you actually saw him?

17      A.    I personally was there for approximately two

18  hours.

19      Q.    Do you have an estimate as to how many officers

20  altogether were on-scene as of the time of the shooting?

21      A.    I mean it was a lot.  I would say at least 20.

22      Q.    And were they mostly all from your department, the

23  SWAT?

24      A.    That's two questions.  My department or SWAT.

25          My team is part of the Sheriff's Department.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 29

1          So most of them were Riverside County Sheriff, but

2     there were a number of them that were not part of SWAT.

3          Q.    So I would like to go back to the time frame

4     immediately after this 60 seconds approximately when

5     Mr. Llamas, I think, you told me was running northbound.

6          A.    That's correct.

7          Q.    And do you have an estimate as to how far he ran

8     northbound, approximately?

9          A.    Again, I would say 40 to 50 yards.

10         Q.    And to your knowledge, were any shots fired as he

11    was running northbound?

12         A.    To my knowledge, no, sir.

13         Q.    Did you think based on your training and experience,

14    it was appropriate to shoot him as he was running

15    northbound?

16             MR. RAMIREZ:  Vague and ambiguous; incomplete

17    hypothetical; lacks foundation.

18             But you can answer if you can.

19             THE WITNESS:  As Mr. Llamas ran north from us, I

20    couldn't physically see him at that time.

21    BY MR. GALIPO:

22         Q.    Okay.  Is that the entire time he was running north,

23    or just part of it?

24         A.    I would say the entire time because my first visual

25    of him after he ran, he went out of sight because of the

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 30

1    bushes and trees and things like that.

2            So when I crested the threshold of the driveway was

3    when I saw him again, and he was no longer running.

4    Q.   Do you have an estimate as to how much time he was

5    out of your view before coming back into view?

6    A.   Less than 30 seconds.

7    Q.   And during that time frame, you were running I

8    assume also northbound?

9    A.   No, sir.  I ran eastbound.

10           I ran east to the threshold of the driveway.

11   Q.   And what distance do you think you ran approximately

12   to get to the threshold of the driveway?

13   A.   Again, 40 to 50 yards.

14   Q.   And is this where the driveway meets the street?

15   A.   Correct.

16   Q.   And do you recall the name of the street?

17   A.   River Road.

18   Q.   And you gave me an address earlier.

19           Was that the address to that residence?

20   A.   I'm pretty sure it is, yes, sir.  22240.

21   Q.   Was there an airship overhead during this time

22   frame?

23           MR. RAMIREZ:  Vague and ambiguous as to what time

24   frame.

25           MR. GALIPO:  Well, the time frame we have been

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 33

1    information about the gun to his head and his mouth.

2              And then once he was street side, and we saw him, I

3    don't recall any communications from the helicopter at that

4    point.

5         Q.    What do you recall hearing about the female?

6         A.    Just that she was fleeing in a direction different

7    from him.  He fled more in a northerly direction from where

8    the shots were fired.

9              She fled kind of like easterly direction.

10        Q.    So you're running to the mouth of the driveway, and

11   there is another officer running near you?

12        A.    Yes, sir.

13        Q.    Can you remind me of the other officer's name

14   again?

15        A.    Deputy Jimmie McGuire.

16        Q.    Okay.  I couldn't read my own writing.

17             So thank you.

18        A.    That's all right.

19        Q.    Do you have happen to remember as you were

20   approaching this driveway, whether Deputy McGuire was ahead

21   of you, behind you, or to one of your sides as you were

22   running?

23        A.    I believe he was off to my left side basically equal

24   with me, not in front of or not really behind.

25        Q.    And so you had some information of the direction of

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 34

1    travel of Mr. Llamas from the airship?

2        A.   At which point?

3        Q.   Well, I think you said they said he was running

4    north?

5        A.   So again, he ran, that I know of, two different

6    times.  After the shot was fired in the tree line, he fled

7    north to the paved road of River Road.  That's where we saw

8    him.

9             And then he fled again.  Both times -- I'm sorry --

10   both times he fled was mostly in a northerly direction.

11       Q.   Did the -- when he fled the second time in a

12   northerly direction when you and Deputy McGuire were running

13   towards the driveway, was the airship continuing to broadcast

14   where he was?

15       A.   I'm sure they were, but I don't recall specifically

16   what was said from them.

17       Q.   Now, at some point he comes in view again; is that

18   correct?

19       A.   That's correct.

20       Q.   And where were you in relation to the street or the

21   mouth of the driveway when he came back into view?

22       A.   I was in the mouth of the driveway probably ten feet

23   north of the actual pavement, the paved roadway.

24       Q.   So you're actually in the driveway?

25       A.   Yes, sir.

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 35

1    Q.    About ten feet from the street?

2    A.    Ten feet north of the pavement if that makes sense

3  because it's -- the driveway's dirt.

4    Q.    And was Deputy McGuire still to your left?

5    A.    I believe he was at this time, yes.

6    Q.    And then when you see Mr. Llamas again, where is

7  he?

8    A.    Directly in front of me to the north about 40 to 50

9  yards north of me.

10    Q.    I have a lot of 40 to 50 yards estimates.

11    A.    I know.

12    Q.    But if that's what it is, that's what it is.

13    A.    That's my best estimate to be honest.

14    Q.    If I watch a football game and the announcer says

15  this part I usually punts between 40 and 50 yards, I'm going

16  to remember this deposition.

17    A.    All right.  All right.

18    Q.    Okay.  So how much time passed from you seeing

19  Mr. Llamas again in the driveway and you firing your shot?

20    A.    I would say 15 seconds or less.

21         It was fairly quick.

22    Q.    Did you hear other than -- I'm not talking about the

23  shot that might have possibly be fired at the K-9, but when

24  you were in the driveway, did you hear any shots being fired

25  before your shot?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 36

1    A.    Not before.

2    Q.    Did you stop at some point in the driveway before

3    you fired?

4    A.    Yes, sir.  It was right around that ten-foot mark is

5    where I stopped.

6    Q.    And you're saying you were stopped there for

7    approximately 15 seconds or so?

8    A.    It was less than that.  As soon as I crested the

9    mouth of the driveway and I turned to face north, is when I

10   saw Mr. Llamas in front of me.

11         And I took maybe a couple steps, and then stopped.

12   Q.    So I just want to make sure I'm understanding you.

13         When you see him again, so he comes in your vision

14   again to the -- in the driveway to the time you fire your

15   shot, how much time passed between those two points?

16   A.    Again, I would say less -- it was pretty quick.

17         So I think I initially said 15 seconds.

18         It was probably less than that.

19   Q.    Okay.

20   A.    It was pretty quick.

21   Q.    Did you hear Mr. Llamas say anything in that time

22   frame between seeing him and firing your shot?

23   A.    No, I did not.

24   Q.    What was he initially doing when you first saw him

25   in the driveway?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 39

1    A.   Yes, sir.  At the time the direction from my command

2    was from Sheriff's Administration that our team was exempted

3    from policy regarding body-worn cameras on SWAT operations.

4    And at the time we had implemented that sergeants would wear

5    them, and deputies at the time were not wearing them.

6        Q.   Is that still the same now, or is that policy

7    changed?

8             MR. RAMIREZ:  I'll object to relevance.

9             But you may respond.

10            THE WITNESS:  Our policy has now changed.

11   BY MR. GALIPO:

12       Q.   And is it changed so that everyone has body-worn

13   cameras, or is it changed so that the sergeants don't

14   either?

15       A.   It's changed to where everybody wears one.

16       Q.   Okay.  So going back to the driveway when he comes

17   back into view, it sounds like you stopped in that position

18   you talked about, ten feet from the roadway?

19       A.   Yes, sir.

20       Q.   And that Deputy McGuire, I think, would be somewhere

21   to your left?

22       A.   That's correct.

23       Q.   And at this point when Mr. Llamas comes back into

24   your view, he is like 40 or 50 yards from you?

25       A.   That's correct.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 40

1    Q.    And initially, when you see him he is walking, and

2    he still has the gun to the right side of his head?

3        A.    Yes, sir.

4    Q.    Do you give him any commands in between seeing him

5    and you firing your shot?

6        A.    No, I do not.

7    Q.    Do you know if Deputy McGuire gave him any commands

8    in that time frame?

9        A.    I don't believe so.

10    Q.    Did either one of you give him any verbal warning

11    that you were going to shoot him?

12        A.    No, I did not.

13        Q.    Di you know if the airship was giving him any

14    commands after you saw him in the driveway?

15        A.    I'm unaware of him given commands at that point.

16        Q.    Which compass direction would you have been facing

17    when you were in the driveway as you described?

18        A.    Basically northerly direction.

19        Q.    And when you first saw him you said he was walking;

20    correct?

21        A.    Correct.

22        Q.    Which direction compass-wise was Mr. Llamas

23    walking?

24        A.    In a westerly direction.

25        Q.    So he would be walking from your right-to-left.

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 41

```
 1              Do I have that correct?
 2      A.    That's correct.
 3      Q.    And for how long of a period of time did you see the
 4   gun to his head after he reappeared, but before you fired
 5   your shot?
 6      A.    Just a couple of seconds.
 7              Again, it was very, very quick.
 8      Q.    So when you told me 15 seconds earlier, that
 9   probably was a little bit on the long side?
10      A.    Absolutely.  The time that I reacquired Mr. Llamas
11   in the mouth of the driveway to the time that I fired was
12   very, very fast.  I don't know the exact time frame.
13      Q.    Okay.  Obviously, I'm not expecting exact, but can
14   you give me like a range?
15              Are we talking like two to three seconds?
16              I mean when you say very fast, what do you think?
17      A.    I would say five seconds or less.
18      Q.    Okay.  And during some of that time frame, you saw
19   the gun to his head?
20      A.    That's correct.
21      Q.    And did you see the gun move from that position at
22   some point?
23      A.    Yes, sir, I did.
24      Q.    And how did you see the gun move?
25      A.    As Mr. Llamas was walking in a westerly direction,
```

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 42

1  he kind of bladed his upper body towards Mr. Deputy McGuire

2  and I, towards our location, and the gun dropped from

3  basically this to more this where he's pointed it directly at

4  our position.

5      Q.   Okay.  So when you say bladed, would he -- are you

6  saying he kind of turned slightly to his left?

7      A.   That's correct.

8      Q.   And you're saying the gun came from a position on

9  the right side of his head, and it lowered down so it was

10  coming in your direction?

11     A.   That's correct.

12     Q.   Based -- again, based on your training and

13  experience, do you think it would have been appropriate to

14  shoot Mr. Llamas in the driveway if the gun had stayed up to

15  the right side of his head?

16     A.   If Mr. Llamas had kept the gun just pointed at his

17  head, no, it would not have been appropriate to fire.

18     Q.   And is that for the same reasons we discussed

19  earlier, because you wouldn't have an immediate threat of

20  death or serious bodily injury if that was the case?

21     A.   Yes, sir.

22     Q.   You don't recall any commands given to Mr. Llamas to

23  drop it, meaning, drop the gun after you saw him in the

24  driveway?

25     A.   There were commands given to him to drop the weapon

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 43

1   before he fled north again, but when we reacquired him when I

2   was in the driveway, there were not additional commands,

3   no.

4        Q.   Okay.  Now your weapon that you had, are you

5   familiar with that weapon?

6        A.   Are you talking about the weapon I used for the

7   actual shooting?  Because I was in possession of two weapons

8   at the time.

9        Q.   Yeah.  The one used for the shooting.

10       A.   Yes, sir.  I'm familiar with it.

11       Q.   Did you also have a handgun?

12       A.   That's correct.

13       Q.   What caliber was that?

14       A.   9-millimeter.

15       Q.   Okay.  I'm sure you are familiar with both weapons;

16   is that fair?

17       A.   Yes, sir.

18       Q.   And have you taken the 556 to the shooting range

19   before?

20       A.   Absolutely.  Yes, sir.

21       Q.   And given your knowledge of that weapon, do you have

22   an understanding as to how many shots in a second you can

23   fire from that weapon?

24       A.   I'm trained on that, yes, sir.

25       Q.   And what is your understanding of the capability of

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 44

1    the weapon?

2         A.    Of how many rounds I can round per second?

3         Q.    Yes.

4         A.    I would say between six and eight rounds per

5    second.

6         Q.    And is that something you know from actual training

7    and experience?

8         A.    Yes, sir.  And that's accurate rounds, not just

9    pulling the trigger.

10        Q.    Accurate rounds?

11        A.    That's correct.

12        Q.    And in this case you're saying you only fired one

13    round?

14        A.    That's correct.

15        Q.    And why did you only fire one round?

16        A.    When I fired my one round Mr. Llamas immediately

17    went down.  As he went down I could see that he was still

18    moving around, but I could no longer see the weapon.

19              I couldn't see his hands or anything like that.

20              So I no longer could see that he was an immediate

21    threat to myself or anybody else at that moment.

22        Q.    And were you still standing in this position in the

23    driveway you described?

24        A.    That's correct.

25        Q.    And Deputy McGuire was still generally to your

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 47

1    Q.   So would it be correct to say you never had the

2    impression that Mr. Llamas was firing at you?

3    A.   That's correct.

4    Q.   At some point you became aware that Deputy McGuire

5    was firing?

6    A.   I knew that Deputy McGuire and I -- when I fired,

7    Deputy McGuire fired pretty much simultaneous to me.

8    Q.   And so with respect to Deputy McGuire, there would

9    have been two volleys of shots?

10   A.   That's correct.

11   Q.   And how much time would you estimate separated the

12   first volley of shots from Deputy McGuire to the second

13   volley?

14   A.   Two to three seconds.

15   Q.   And during that two to three seconds was Mr. Llamas

16   on the ground?

17   A.   Yes, sir.

18   Q.   And he was still 40 to 50 yards away?

19   A.   That's correct.

20   Q.   Is your vision pretty good as far as you know?

21   A.   Yes, sir.  It's pretty good.

22        MR. RAMIREZ:  As far as he can see.

23   BY MR. GALIPO:

24   Q.   Do you wear or are you required to wear corrective

25   lenses?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 50

1    BY MR. GALIPO:

2         Q.   So three to four in the first volley by Deputy

3    McGuire, and also approximately three to four in the second

4    volley?

5         A.   That's correct.

6         Q.   Was anything said by either you or Deputy McGuire to

7    Mr. Llamas between Deputy McGuire's first volley and second

8    volley?

9         A.   No, sir.

10        Q.   And you would have observed Mr. Llamas go to the

11   ground?

12        A.   I would have observed?  I saw --

13        Q.   No.  You did observe that?

14        A.   I did.

15        Q.   Was it your impression that he was struck by at

16   least one of the shots when he went to the ground?

17        A.   Yes, sir.

18        Q.   And then how did his body position end up on the

19   ground?

20             In other words, was he on his back, his chest-down,

21   or in some other position?

22        A.   I didn't have a clear visual of Mr. Llamas at this

23   point when he was down.  Just I could see that he was kind of

24   moving around.  I could see like his body movement.

25             I couldn't see his actual positioning whether it was

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 51

1   prone or on his back or anything.  I couldn't see that.

2       Q.   What part of his body could you see?

3       A.   Like I could see his knees for sure kind of moving

4   around.

5       Q.   Do you know if you could see his head or face?

6       A.   I could not.

7       Q.   Were you looking at him when he was on the ground

8   immediately after he went down?

9       A.   Yes, sir.

10      Q.   And was your gun still pointed in his direction?

11      A.   General direction, yes.

12      Q.   Did you see him pointing a gun at you or Deputy

13  McGuire after he went to the ground?

14      A.   I did not see that, no.

15      Q.   Did you see a gun in his hand after he went to the

16  ground and before Deputy McGuire fired his second volley?

17      A.   No, sir.

18      Q.   Did you see any gun in his hand or around Mr. Llamas

19  during the time frame Deputy McGuire fired his second

20  volley?

21      A.   Can you restate the question?

22      Q.   Sure.  During the shots, so during the second volley

23  of shots, did you see Mr. Llamas with a gun in his hand?

24      A.   No, sir.

25      Q.   At any time on-scene after the shooting, did you

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 57

1    Q.    How long did you stay on-scene after the shooting?

2    A.    This is a rough estimate, 20 to 30 minutes-ish.

3          I don't recall.  I had to assist patrol with a

4    couple of things, and I honestly I would say 20 to 30

5    minutes.

6    Q.    And you indicated, I think, that you have seen some

7    of the video footage, and you were permitted to watch some of

8    it before you gave your interview?

9    A.    The interview after, yes, sir.

10   Q.    In terms of your training on tactics, are you

11   generally trained if you believe someone's armed with a

12   firearm, to try to have access to positions of cover if you

13   can?

14   A.    If the situation allows for it, yes.

15         It's obviously ideal to have some position of cover

16   and concealment.

17   Q.    Is that one of the reasons you were using the car

18   for some partial cover earlier in the incident?

19   A.    Yes, sir.

20   Q.    In terms of commands, are you generally trained to

21   give commands in a loud, clear voice if you can?

22   A.    Yes, sir.

23   Q.    And are you trained to give the person an

24   opportunity to comply with the commands if you can safely do

25   so?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 58

1          A.    Yes, sir.

2          Q.    With respect to deadly force, are you generally

3    trained that deadly force should only be used if there is an

4    immediate or imminent threat of death or serious bodily

5    injury?

6          A.    That's correct.

7          Q.    And as part of that training, are you trained that

8    that essentially means that the person has the ability,

9    opportunity, and apparent intent to immediately cause death

10   or serious bodily injury?

11         A.    Yes, sir.  That's correct.

12         Q.    And are you generally trained if those requirements

13   are not there, in other words, there is not an immediate

14   threat of death or serious bodily injury, then deadly force

15   should not be used?

16         A.    That's correct.

17         Q.    And are you trained that officers have to be able to

18   justify each shot when using deadly force?

19         A.    We're trained to, yes, sir.

20         Q.    Are you trained that a verbal warning that you're

21   going to use deadly force should be given when feasible?

22         A.    When feasible, yes, sir.

23         Q.    And I think you've already told me this, but you

24   would agree under the facts of this case based on your

25   training, it would not have been appropriate to shoot

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 59

1    Mr. Llamas for running away with and holding the gun to his

2    head if it had stayed in that position?

3           MR. RAMIREZ:  Asked and answered.

4           But you may respond.

5           THE WITNESS:  That's correct.  Based on what your

6    question is, if he had just kept the gun in his head, that in

7    and of itself would not have allowed for deadly force.

8    BY MR. GALIPO:

9       Q.   And running away in and of itself under these facts

10   would not have been sufficient based on your training to

11   shoot him; is that fair?

12      A.   I would say that's fair.

13      Q.   Okay.

14           MR. GALIPO:  We're going to try, Gene, just to show

15   a few of these videos.

16           MR. RAMIREZ:  Okay.

17           MR. GALIPO:  And I'm going to have Ms. Shannon Leap

18   help me with that.

19           Hopefully, this will show, so everybody could see

20   it.

21           Which one you want to start with, Shannon?

22           MS. LEAP:  I have the overhead one ready to go if

23   you want to start with that.

24           MR. GALIPO:  Okay.  We'll mark that as Exhibit 1.

25           I think, Sergeant, this is the overhead view from

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 73

1  him?

2      A.   I was under the impression he was struck by gunfire,

3  yes.  Whether it was mine, that, I don't know that.

4      Q.   And when he was on the ground, you continued to

5  maintain a visual on him?

6      A.   That's correct.

7      Q.   And he still would have been this 120 to 150 feet

8  away?

9      A.   Correct.

10      Q.   And at that point when he was on the ground, you're

11  saying you did not see a gun or a gun pointed in your

12  direction or coming in your direction; is that fair?

13          MR. RAMIREZ:  Misstates his testimony.

14          But you may respond.

15          THE WITNESS:  When he is on the ground, I did not

16  see the weapon going towards me.  Prior to the shooting, I

17  did see the weapon moving towards me.

18  BY MR. GALIPO:

19      Q.   Right.  But when he was on the ground after the

20  first group of shots, did you see a weapon at all in his hand

21  whether it was pointed towards you, moving towards you, or

22  just in his hand?

23      A.   At which point?

24          Maybe I misunderstood your question.

25      Q.   That's okay.  So after the first -- after your shot

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 74

1    and Deputy McGuire's shot, he goes to the ground, and for the

2    next five seconds, ten seconds you're maintaining a visual on

3    him; correct?

4         A.   Yes.

5         Q.   During that next five or ten seconds, did you see a

6    gun in his hand at all?

7         A.   So I believe I stated that the time lapse between my

8    first volley and the second volley was two to three

9    seconds.

10        Q.   Right.  Now I'm moving forward to when he was on the

11   ground.

12        A.   Okay.

13        Q.   So let me break it down.  After he went to the

14   ground, but before you heard the second volley two or three

15   seconds later, did you see any gun in his hand?

16        A.   No.

17        Q.   During the second volley did you see any gun in his

18   hand?

19        A.   No, sir.

20        Q.   Immediately after the second volley, did you see any

21   gun in his hand?

22        A.   Not immediately after, no, sir.

23        Q.   And are you saying from the distance you were at

24   after he went to the ground, you could not tell what position

25   he was on the ground?

S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Shawn Hubacheck on 12/18/2024

Page 77

1    coming in your direction.

2            Did I misunderstand you?

3        A.    I think you're misunderstanding my second with what

4    Mr. Ramirez just asked me, is when I fired my round, the

5    weapon was not directly pointed at me.

6            It was the muzzle of the weapon was moving towards

7    our direction.  After all shots were fired and we approached

8    him, that's when I saw the weapon in his hand and the muzzle

9    pointed straight at us.

10       Q.    Okay.  Did you ever see the gun pointed at you

11   before you fired?

12       A.    Not directly at me, no, sir.

13       Q.    Did you ever see the gun pointed at you during the

14   first volley of shots including your shot and Deputy

15   McGuire's shots?

16       A.    Not directly at me, no, sir.

17       Q.    And I think you already told me this, but you didn't

18   see the gun pointed at you during the second volley; is that

19   correct?

20       A.    That's correct.

21       Q.    And if I also understand your testimony, you're

22   saying that him having the gun to his head or running away

23   based on your training would not justify shooting him; there

24   had to be more than that?

25       A.    In a hypothetical, yes.  But in this particular

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

Page 78

1  situation we did have more than that, but the gun to his head

2  alone is not justification for lethal force.

3       Q.   And you're saying if the gun was not moving in your

4  direction, then based on your training and experience you

5  would not have shot?

6       A.   I would not have shot, no.

7       Q.   Okay.

8            MR. GALIPO:  Gene, did you have any further

9  follow-up?

10           MR. RAMIREZ:  Yes.

11                          EXAMINATION

12  BY MR. RAMIREZ:

13       Q.   When the lieutenant -- when Mr. Galipo asked you

14  about the lieutenant saying tag him or something of that

15  nature, did you take that as an order that you have to shoot

16  right then and there?

17       A.   No, sir.

18       Q.   Do you still have to make the individual decision as

19  to why you can press the trigger and shoot someone?

20       A.   Yes, sir.  It's up to each individual officer to

21  justify when they pull the trigger.

22            They cannot be given the order to do so.

23       Q.   And are you trained that you have to allow the

24  suspect to shoot at you before you're allowed to defend

25  yourself with deadly force?

**S.L., a minor by and through the Guardian, ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Shawn Hubacheck on 12/18/2024**

```
 1                      CERTIFICATE

 2                          OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 18, 2024.

23

24   _____
             Jinna Grace Kim, CSR No. 14151
25
```