Exhibit 4

```
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                           --oOo--

 4

 5  S.L., a minor by and through the
    Guardian Ad Litem Kristine Llamas
 6  Leyva, individually and as successor-
    in-interest to JOHNNY RAY LLAMAS,
 7  deceased; V.L., by and through the
    Guardian Ad Litem Amber Snetsinger,
 8  individually and as successor-in-interest
    to JOHNNY RAY LLAMAS, deceased;
 9  and CAROLYN CAMPBELL, individually

10          Plaintiff,

11  v.                    Case No.  5:24-cv-00249-CAS-SP

12   COUNTY OF RIVERSIDE; and
    DOES 1-10, inclusive,
13
            Defendants.
14  _____/

15

16         STENOGRAPHIC REPORTER'S TRANSCRIPT OF

17             DEPOSITION OF MICHAEL WALSH

18                 FRIDAY, MARCH 21, 2025

19

20

21  Reported Stenographically by:

22  KIMBERLY D'URSO, CSR 11372, RPR

23  Job No.  00113800

24

25
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 25

1      A.    Case-by-case.  And sometimes private venues

2    don't allow weapons inside their venues, so we adhere to

3    their rules.

4      Q.    Okay.  Have you discharged a weapon in your

5    current position at any time?

6          MR. RAMIREZ:  Objection as to relevance.

7          But you may respond "yes" or "no."

8          THE WITNESS:  Other than in range training?

9    BY MR. LEVINE:

10     Q.    Other than range training.

11     A.    I have not.

12     Q.    And then I think you said you were retired from

13   the Riverside Sheriff's Department; is that correct?

14     A.    That's correct, sir.

15     Q.    Okay.  What was your rank on the date of this

16   incident?

17     A.    I was a Sheriff's lieutenant.

18     Q.    And did you have an assignment or position that

19   was separate from your rank at the time?

20     A.    I was assigned to our special enforcement

21   bureau, and I was one of two lieutenants that oversaw

22   our emergency services team, which is our SWAT

23   personnel, our canine team, which includes not only

24   apprehension dogs, but it includes bloodhound or

25   tracking dogs, and then our bomb squad.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 26

1    Q.   And were you the -- were Deputies Jimmie

2    McGuire and Sean Hubachek working with you on the date

3    of the incident?

4    A.   They were, sir.

5    Q.   Were they essentially a part of your team?

6    A.   Yes.

7    Q.   Were you their supervisor?

8    A.   I'm their supervisor, but the sergeant is

9    generally under some circum- -- under most, not always,

10   but under most circumstances the team leader in charge

11   of tactics employed.

12   Q.   As a lieutenant, were you senior to or a higher

13   rank than a sergeant?

14   A.   Yes.

15   Q.   So you essentially had some type of authority

16   over a sergeant as a higher-ranking deputy?

17   A.   That is correct, sir.

18   Q.   But despite you being the higher-ranking

19   deputy, the sergeant would have still been the team

20   leader; is that what you're saying?

21   A.   Under most circumstances.

22   Q.   How about under these circumstances?

23   A.   Sergeant McFadden, which I'll sure we'll get to

24   later, he was actually leading the apprehension efforts

25   prior to the shooting.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 29

1    their weapons during this incident?

2        A.    Yes, sir.

3        Q.    Would that be Jimmie McGuire and Sean Hubachek?

4        A.    Yes, sir.

5        Q.    Do you know how many shots each of those

6    deputies fired during this incident?

7        A.    I can give you an approximate, but I don't know

8    the actual round count.

9        Q.    Sure.  An approximate is fine.  Let's start

10    with Deputy McGuire.

11        A.    Six to eight.

12        Q.    And how about Deputy Hubachek?

13        A.    One to two, maybe three.

14        Q.    I'm sorry.  I didn't --

15        A.    Maybe three.  One, two, or three, maybe, for

16    Hubachek.

17        Q.    But you never, as part of any sort of

18    debriefing following this incident, gained specific

19    understanding as to exactly how many shots each of these

20    deputies fired?

21        A.    I did not.

22        Q.    During the incident, did you hear these shots

23    while they were being fired?

24        A.    I did.

25        Q.    Did you have any understanding as to whether

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 33

1   were you and your team essentially tracking Johnny Llamas

2   to try to take him into custody?

3       A.   We were.

4       Q.   Was there a helicopter overhead during that

5   approximate five- to ten-minute period, prior to the

6   first shot?

7       A.   Yes.

8       Q.   Were you -- during that approximate five- to

9   ten-minute period, prior to the first shot, were you

10  receiving broadcasts from the helicopter, regarding

11  Mr. Llamas's whereabouts and movements?

12      A.   We were.

13      Q.   Were you receiving those broadcasts over a

14  police radio that you had?

15      A.   Yes, sir.

16      Q.   Was that radio attached to your uniform or on

17  your person somewhere?

18      A.   It was -- there's hearing -- there is a hearing

19  device attached to my helmet, like ear cups that it

20  comes through there.

21      Q.   So you had essentially some kind of earpiece

22  that the broadcast is being piped into your ear through?

23      A.   Yes.

24      Q.   And so you're hearing any broadcasts that are

25  being made from the police helicopter as they're being

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 34

1    made during that five- to ten-minute period?

2        A.   Yes.  I'm also hearing verbal announcements

3    from the helicopter, as well, because they have a PA --

4    an audible PA system on the helicopter where they can

5    make announcements to people on the ground.

6        Q.   Okay.  Are those verbal announcements separate

7    from the broadcasts that you're hearing?

8        A.   They are.

9        Q.   In other words, the broadcasts are directed

10   towards other law enforcement officers, whereas the

11   verbal announcements over the PA are directed to people

12   on the ground who may or may not be law enforcement

13   officers?

14       A.   That is correct, sir.

15       Q.   Okay.  Was it your understanding that the --

16   well, let me back up.

17            During the five to ten minutes, approximately,

18   prior to the first shots being fired, did you distinctly

19   hear any of the PA broadcasts being made to the ground

20   from the helicopter?

21       A.   I did.

22       Q.   Could you tell if they were being directed

23   towards Mr. Llamas?

24       A.   They were, sir.

25       Q.   Okay.  Were they essentially giving him

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 35

1    directions or commands from the helicopter,

2    instructions?

3        A.    Commands, directly to him, yes.  Correct.

4        Q.    Could you hear what some of those were?

5        A.    Based on my distance, some of it I couldn't

6    discern, but then some of it was -- and I'm

7    paraphrasing, of course, just, "You need to put the

8    firearm down and surrender."

9        Q.    Okay.  And then I think we discussed that in

10   addition to hearing those PA broadcasts, you're also

11   hearing radio broadcasts through your earpiece, from

12   officers or deputies who are in the helicopter?

13       A.    That is correct, sir.

14       Q.    Okay.  And are they essentially sort of

15   reporting Mr. Llamas's location to you and the other

16   deputies who are on ground via the radio?

17       A.    They are.  In addition, it's corroborated by

18   their positioning overhead, that you can see how they're

19   oriented then.  Using all five senses to include hearing

20   and seeing, we could see the positioning of the

21   helicopter overhead, and then their directed

22   announcements, and then what's being broadcast via the

23   police radio.

24       Q.    Okay.  So you're saying that there were

25   multiple sources of information you had for where

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 36

1    Mr. Llamas was at a given time during that five- to

2    ten-minute period, both from what you're hearing over

3    the radio as well as seeing the location of the

4    helicopter overhead?

5        A.    Correct.

6        Q.    Just focusing on the information right now that

7    you were getting over the police radio as opposed to the

8    location of the helicopter, were you essentially being

9    told over the radio that Mr. Llamas was proceeding

10   northward in the direction of a street called

11   River Road?

12       A.   He was.  That was part of his direction of

13   travel, yes.

14       Q.   Okay.  Was there some other separate part of

15   his direction of travel, prior to him reaching

16   River Road to the south, during that five- to ten-minute

17   period?

18       A.   He was initially fleeing through -- this was a

19   large open space, an open field, essentially open field,

20   but there were structures on it.  He was fleeing

21   eastbound; and then it was more northeast; and then it

22   was more oriented north, towards River Road.

23       Q.   Okay.  Understood.

24            During the period where he started proceeding

25   northeast and then northward towards River Road, was

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 37

1  there a period of time during that period where you're

2  hearing broadcasts about his movement and locations, but

3  you're not able to personally see him, yourself?

4      A.   That is correct, sir.

5      Q.   Okay.  And then during that time when he's

6  proceeding northeast and then northward toward

7  River Road, but you can't personally see him, were you

8  told by any radio broadcasts that deputies in the

9  helicopter saw Mr. Llamas holding a gun to his own head?

10     A.   Correct.  And I believe -- I'm not sure if some

11  of that radio traffic was coming from the deputies that

12  were further east on River Road.  I'm not sure what they

13  could see at the moment, but I'm not -- I'm not sure --

14  I'm not sure if that broadcast came -- it was a

15  combination of broadcasts that came from the helicopter

16  and others, as well.

17     Q.   I understand.  But either way, there's a period

18  of time while he's heading northward towards River Road,

19  where you can't, yourself, see him, but you're receiving

20  information that he's moving northward and holding a gun

21  to his head?

22     A.   Yes.

23     Q.   During that time --

24          (Reporter clarification.)

25  BY MR. LEVINE:

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 38

1      Q.   During that time before you saw him, while
2   you're receiving this information that he is moving
3   northward toward River Road, did you receive any
4   information as to which hand he was holding the gun
5   with, as he pointed it to his head?
6      A.   I don't recall that descriptive of what hand it
7   was in, but it was -- it wasn't -- the radio reports
8   also indicated that the gun wasn't always oriented
9   towards his head, but he was in -- just in possession of
10  the weapon.
11     Q.   So before you saw him, you were receiving
12  information that at least part of the time he was
13  holding the gun to his head, but may have been orienting
14  it in other directions, too?
15     A.   Correct.
16     Q.   And at some point around when you were hearing
17  this information, did you and some of the other deputies
18  take a position on a portion of River Road, itself, that
19  ran from east to west?
20     A.   We did.  We positioned ourselves west of where
21  he was.
22     Q.   Was there essentially -- at some point while
23  he's moving north, did you have information that he was
24  moving along a driveway that ran from south to north,
25  toward River Road?

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 39

1    A.    Yes.

2    Q.    Was your understanding that driveway was

3    essentially perpendicular to River Road?

4    A.    Yes, sir.

5    Q.    And so you're saying that the position that you

6    and some of the other deputies took on River Road was

7    somewhere to the west of where that driveway would have

8    intersected with River Road; is that right?

9    A.    Yes.

10    Q.    Do you have a time estimate for approximately

11    how long before the first shot was fired it was, that

12    you took that position to the west of the driveway on

13    River Road?

14        MR. RAMIREZ:  Vague and ambiguous as to time.

15        But if you understand, you may respond.

16        THE WITNESS:  Probably by the time we actually

17    got on River Road and stopped and exited our vehicles, it

18    was probably five minutes or less until the

19    deputy-involved shooting occurred.

20  BY MR. LEVINE:

21    Q.    And at the time that -- were you in a vehicle

22    when you arrived at that position?

23    A.    I was, sir.

24    Q.    Did you get out of that vehicle or exit that

25    vehicle pretty soon after stopping in that position in

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 40

1    your vehicle?

2         A.   I did.

3         Q.   And when you stepped out of the vehicle, could

4    you see Mr. Llamas at that time?

5         A.   Not at that very moment.  And we positioned

6    ourselves along the north curb line to maximize our

7    visual acquisition of the mouth of that driveway.

8         Q.   When you're standing there just after you've

9    exited your vehicle, are you more or less facing to the

10   east?

11        A.   Yes, sir.

12        Q.   And then at some point while you're positioned

13   there facing to the east, sort of in the direction of

14   that driveway that runs south to north towards

15   River Road, at some point did Mr. Llamas come into view

16   for you?

17        A.   He did.

18        Q.   Do you have a time estimate for how long it was

19   between the time you stopped and exited your vehicle and

20   when Mr. Llamas came into view from the south?

21        A.   My best estimate is probably within a minute.

22   Within a minute or two, tops.

23        Q.   Do you, for example, have any estimate as to

24   whether it was more or less than 30 seconds?

25        A.   It may have been that short of a timeframe

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 41

1   before he came into view.

2      Q.   And when Mr. Llamas came into view, did you see

3   him proceeding north from that driveway that was to the

4   south of River Road?

5      A.   I did.

6      Q.   And was he essentially moving north at that

7   time when you saw him come into view?

8      A.   North, across River View [sic], from the south

9   curb line to the north curb line.

10     Q.   Okay.  But just to clarify, I thought I heard

11  you say "River View" right there.  Is the street called

12  "River Road" or "River View"?

13     A.   River Road.  I'm sorry.

14     Q.   That's okay.  I just want to make sure for the

15  record that we have it straight.

16          And then just jumping ahead a little bit, when

17  the deputy-involved shooting occurred, do you know what

18  the actual address was of the property where that took

19  place?

20     A.   I do not.

21     Q.   Okay.  Do you know if it was at 22240

22  River Road?  Does that ring a bell for you, one way or

23  the other?

24     A.   That does sound -- that does sound accurate.

25     Q.   Okay.  Just one moment here.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 42

1              Just to kind of help get on the same page, I'm

2      going to show an image on my computer here.

3              Can you see this image?

4          A.   I can, sir.

5          Q.   Does this appear to be a Google maps overhead

6      view of the incident location?

7          A.   It does, sir.

8          Q.   Okay.  And do you see what's marked as -- a

9      street that's labeled as "River Road," running from east

10     to west, along sort of the bottom third of this image?

11         A.   I do, sir.

12         Q.   Okay.  And then do you see running from south

13     to north, to the south of River Road, a driveway in the

14     bottom third of this image?

15         A.   I do, sir.

16         Q.   Does that appear to be the driveway that

17     Mr. Llamas was coming from when he first came into view

18     for you while you were positioned on River Road?

19         A.   I believe so.

20         Q.   And then, essentially, directly across

21     River Road, from the mouth of that southern driveway,

22     does there appear to be another driveway to the north of

23     River Road?

24         A.   There does.

25         Q.   And does that driveway -- is it your

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 43

1    understanding that driveway is part of the property on

2    which the deputy shooting occurred during this incident?

3        A.   It looks like the property, yes.

4        Q.   Okay.  Do you see where, towards the top of

5    this image, at least Google has labeled this property as

6    being at the address 22240 River Road?

7        A.   I see that, yes.

8        Q.   Okay.  Do you have any reason to doubt the

9    accuracy that that is the address?

10       A.   I do not, sir.

11       Q.   Okay.  You just don't have any independent

12   knowledge to confirm or deny that that's the correct

13   address?

14       A.   It sounds correct, but I can't be absolutely

15   certain.

16       Q.   Okay.  All right.

17            And just -- I'll go ahead and mark this

18   overhead image as Exhibit 1.

19            (Exhibit Number 1 was marked.)

20   BY MR. LEVINE:

21       Q.   I don't know that this is particularly

22   important.  I just wanted to make sure we're kind of on

23   the same page talking about the geography here, and I

24   thought this may be the easiest way to do it.

25            Okay.  So -- one moment here.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 45

1    Q.    Did the deputy who relayed this information to

2    you say anything about whether he or she had had any

3    communications with the individuals who were observed on

4    the property at that time?

5    A.    I don't recall if they ever had a conversation

6    with those individuals.

7    Q.    Okay.  So your knowledge, as far as you know,

8    essentially, the deputy, whoever it was, saw some

9    individuals, but didn't necessarily say anything to them

10   or hear them say anything to the deputy?

11   A.    They may have.  I just don't recall that part

12   of the conversation.

13   Q.    Okay.  When Mr. Llamas was approaching

14   River Road from the south and when he first came into

15   your view, was it your understanding that he was moving

16   northward along that driveway that we discussed that

17   runs south to north, to the south of River Road?

18   A.    That is correct, sir.

19   Q.    And then when you first saw him, could you tell

20   if he was still on that driveway or if he had already

21   stepped out onto River Road itself?

22   A.    I believe when we first saw him, his -- a

23   portion of that driveway isn't visible.  More or less

24   than the last 1 percent of that driveway as it

25   intersects with the asphalt is visual -- is -- is -- you

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 46

1    can see it or view it from our position.  So it's just a

2    very small portion that you can't view.

3         Q.   Right.  I guess what I'm wondering is, when you

4    first saw Mr. Llamas, could you tell if he was still on

5    the driveway versus on River Road, itself?

6         A.   I believe that he was in the driveway, but the

7    last -- it had to be the last 5 or 10 feet of that

8    driveway.

9         Q.   Okay.  So 5 or 10 feet away from the road, you

10   mean?

11        A.   Give or take, yes.

12        Q.   And then when you first saw him at that time,

13   approximately how far away was he from you?

14        A.   Probably 30 to 40 yards, 50 tops, yards away.

15        Q.   And at the time he first came into your view on

16   River Road there, where were Deputies McGuire and

17   Hubachek relative to your position?

18        A.   They were -- I don't recall who was to my left

19   or to my right, but they were nearby with their patrol

20   cars, very close to me.

21        Q.   Would you estimate that they were essentially

22   the same distance away from Mr. Llamas at that time,

23   more or less?

24        A.   As I was?

25        Q.   As you were, yes.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 47

1        A.    Yes.

2        Q.    At any time prior to you seeing Mr. Llamas come

3    from the south, onto that driveway and then onto

4    River Road, did you have any information that he had

5    pointed a firearm at any person that day?

6        A.    Prior to seeing him?

7        Q.    Prior to seeing him, while you were on

8    River Road there.

9        A.    To my knowledge, he shot a police dog, but I

10   couldn't tell you if the -- his intentions were to shoot

11   us and the police dog got in the way.  I don't know the

12   answer to that question, because we couldn't see him at

13   that point when that incident occurred, prior to the

14   actual deputy-involved shooting.

15       Q.    Okay.  I guess I'm just wondering whether you

16   had information that he had pointed a firearm at any

17   human at any time that day before you saw him step out

18   onto River Road?

19       A.    That includes law enforcement, as well, I'm

20   assuming?

21       Q.    I think of law enforcement as humans, so, yes.

22            MR. RAMIREZ:  I kind of like to think so.

23            THE WITNESS:  Yeah.

24   BY MR. LEVINE:

25       Q.    Certainly.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 48

1      A.   I can only assume that he did, based on dog

2   positioning, and when he fired his weapon, and based on

3   the sound of that -- that -- when we heard the gunfire.

4      Q.   When you heard that shot, could you see him?

5      A.   I could not see him.

6      Q.   Could you see his gun when you heard that shot?

7      A.   I could not see his gun.

8      Q.   Did you hear the shot, like, whistle past your

9   ear or anything like that?

10      A.   It did whistle past us.

11      Q.   Do you have any sense of how far away the shot

12   traveled past you?  In other words, whether it was, you

13   know, 1 inch away from you versus 20 or more feet away

14   from you?

15      A.   I don't know.

16      Q.   Okay.  So would it be fair to say that you

17   don't -- you didn't know at that time whether, in firing

18   that shot, he had pointed his gun at an officer, a human

19   officer?

20      A.   Based -- I was basing that on not only sound,

21   but the direction the dog entered the tree line.  So the

22   dog was entering from the direction we were looking.

23          So looking at this with, like, some -- I was

24   deduct- -- I was using deductive reasoning, thinking of

25   the dog, from our direction, and based on the sound

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 49

1    rapport from the gunfire, it appeared to be coming in

2    our direction.

3        Q.    Okay.  But so you -- based on just what you saw

4    and heard, you didn't know for sure whether he was

5    aiming the gun at any human at that time?

6        A.    That's fair.  Yes, sir.

7        Q.    Was it -- did you gain some understanding at

8    that time or shortly after that the -- a police dog had

9    been shot?

10        A.    Back to when we heard the gunfire?

11        Q.    Yes.

12        A.    We suspected it.

13        Q.    Okay.  When you were suspecting that the police

14    dog had been shot at that time -- and I realize this is

15    prior to the officer shooting that we've been

16    discussing -- was it -- did you form the impression that

17    he had been aiming his shot at the dog?

18        A.    I hadn't formed that impression.  It was either

19    he was attempting to shoot us and the dog got in the

20    line of fire, or he was intentionally shooting just the

21    dog.  I don't know the answer to that question.

22        Q.    Okay.  You didn't have any kind of hunch, or

23    anything like that, as to whether he was aiming at the

24    dog at that time?

25        A.    I suspected that the dog got in the way his of

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 51

1    asked you before the break was about the period of time

2    leading up to when Mr. Llamas first came into your view

3    from the south while you were on River Road.

4         Do you recall that?

5    A.   I do, sir.

6    Q.   So relatedly, at any time before you saw

7    Mr. Llamas come onto River Road from the south, while

8    you were positioned to the west on River Road, did you

9    have information that Mr. Llamas had verbally threatened

10   to harm anybody that day?

11   A.   I did not have any information.

12   Q.   And at that time, did you have any information

13   that Mr. Llamas had physically harmed any human that

14   day?

15   A.   That day?  No.

16   Q.   After Mr. Llamas stepped out from the south

17   onto River Road, did he essentially continue northward,

18   going across River Road, towards the property to the

19   north of the road, that we discussed earlier?

20   A.   Yes.

21   Q.   And at some point did he then move from the

22   road onto the driveway of that property to the north?

23   A.   He did.

24   Q.   And was there a point, soon after he crossed

25   from River Road onto the property to the north, where

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 52

1   you lost sight of him again?

2        A.   I did.

3        Q.   So I'm just sort of focused on -- in my next

4   few questions, on the period of time from when you first

5   saw him come out from the south onto the driveway, right

6   to the south of River Road, until the time he crossed

7   and you lost sight of him to the north again.

8             Do you have that sort of interval in your mind?

9        A.   I do.

10       Q.   All right.  So during that period, could you

11  see if Mr. Llamas was holding a gun?

12       A.   I could.

13       Q.   Could you see with which hand he was holding it

14  during that time?

15       A.   It appeared to be the right hand.

16       Q.   Was his -- given that you were to the west of

17  him and he was moving from the south to the north, was

18  his left side essentially facing you or exposed to you?

19       A.   It was, but he was posturing slightly different

20  as he crossed and traversed across the roadway, so I

21  could see the firearm in the other hand.

22       Q.   Okay.  I see.  Does that refresh your

23  recollection as to he was holding it in his right hand?

24  In other words, the hand that was on the other side of

25  his torso from where you were?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 53

1    A.    Yes.

2       Q.    Could you see, during that time, whether he was

3    holding a gun to his head?

4       A.    At times, it did appear that he was holding the

5    gun to his head.

6       Q.    During that time, did you see him take the gun

7    away from his head at any point?

8       A.    I saw, more or less, the gun -- not necessarily

9    take the muzzle away from his head, but drop his elbow,

10   supporting the firearm, so the firearm was more pointed

11   in an upward trajectory -- in an upward direction, if

12   that makes sense?

13      Q.    I think so.  But was it your impression that

14   when he dropped his elbow like that, that the muzzle of

15   the firearm was still pointed generally towards his own

16   head?

17      A.    Based on my distance, yes, and what I could

18   see.

19      Q.    So, in other words, he continued to point -- as

20   it appeared to you, he continued to point the muzzle of

21   the gun towards his own head, from the time you first

22   saw him at the south side of the road near the driveway,

23   until the time you lost sight of him again to the north?

24      A.    Yes.

25      Q.    And so during that period, you didn't see him

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 55

1        Q.    When you saw him during that period holding the

2   gun to his head, did you know whether or not he was

3   suicidal?

4              MR. RAMIREZ:  May call for speculation, and

5   lacks foundation.  May call for a medical opinion.

6              But you may respond.

7              THE WITNESS:  I don't recall if he was

8   suicidal, if that was your question.

9   BY MR. LEVINE:

10       Q.    I guess I'm asking whether you had any

11   knowledge as to whether he was suicidal or not at the

12   time?

13             MR. RAMIREZ:  Same objections as before.

14             But you may respond, if you can.

15             THE WITNESS:  Other than pointing the firearm

16   towards his own body, that would be our only indication

17   that he is potentially suicidal, or doing that to provide

18   a delay.

19   BY MR. LEVINE:

20       Q.    Right.  So it was at least a possibility in

21   your mind?

22       A.    It was possible, yes.

23       Q.    But you didn't know for certain, one way or the

24   other?

25       A.    That's correct.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 56

1      Q.   During the period of time when he's crossing

2   from the south end of River Road to the north and onto

3   the driveway where you lost sight of him, was the

4   distance between you and him essentially the same

5   throughout that period?

6      A.   Yes, sir.

7      Q.   In other words, he didn't move dramatically any

8   distance further away from you or closer to you during

9   that period?

10     A.   That is correct.

11     Q.   Do you have a time estimate for how long it --

12   how much time passed from when you first saw him

13   stepping out from that southern driveway onto River Road

14   until the time that you lost the visual of him again as

15   he went north onto the property, north of River Road?

16     A.   A minute, maybe less.

17     Q.   Okay.  So as long as -- up to 60 seconds?

18     A.   It may be slightly longer than 60, but I

19   believe it was less.

20     Q.   During that period, that interval from when you

21   first saw him to the south and when you lost sight of

22   him again to the north, did you hear Deputies McGuire or

23   Hubachek issue any verbal commands to Mr. Llamas?

24     A.   I don't recall them issuing verbal commands.

25     Q.   Did you hear them say anything else besides

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 58

1    efforts.  They briefed us on the plan -- the tactile

2    plan.  And in addition to that, if we do make commands

3    or make contact, does he speak English?

4        Q.   So the source of information you had for

5    Mr. Llamas speaking English was Sergeant McFadden?

6        A.   And his case agent, I believe Deputy Devine.

7        Q.   Okay.  Had you ever heard Mr. Llamas speak

8    prior to seeing him there on River Road?

9        A.   I had not.

10       Q.   And then, so we discussed at some point, I

11   think you said that Mr. Llamas crossed River Road and

12   went -- proceeded northwards, and you lost sight of him;

13   is that correct?

14       A.   That's correct.

15       Q.   Was it your understanding at that time that he

16   had moved onto that property that was to the north of

17   River Road at -- I think it was 22240?

18       A.   That is correct.

19       Q.   And at that point, did you and the other

20   deputies you were with move up closer to the driveway

21   leading onto that property?

22       A.   We did.

23       Q.   Did the three of you move up together, more or

24   less?

25       A.   Yes, sir.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 59

1    Q.   Were you -- when you covered that distance from

2   where you had positioned to get closer to the driveway

3   to the north, were you in your vehicle or on foot?

4    A.   I was in my vehicle.

5    Q.   How about Deputies McGuire and Hubachek; were

6   they on foot or in a vehicle?

7    A.   Sergeant Hubachek and Deputy McGuire were

8   on-foot.

9    Q.   Okay.  Were they more or less keeping pace with

10   you in covering that distance while you were in your

11   vehicle and they were on foot?

12    A.   Yes.  I was more or less keeping pace with

13   them.

14    Q.   Okay.  You didn't want to speed off and leave

15   them eating your dust?

16    A.   No, sir.

17    Q.   And then when you -- when -- at some point you

18   stopped your vehicle again, I take it?

19    A.   Yes, sir.

20    Q.   Were you pretty much at the level of the

21   driveway when you stopped?

22        (Reporter clarification.)

23        THE WITNESS:  The driveway to the north.  I did

24   pull my vehicle into a portion of the mouth of the

25   driveway.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 60

1   BY MR. LEVINE:

2       Q.   Okay.  So did you make something of a partial

3   left turn, then, so that you're partially in the mouth

4   of the driveway?  Is that accurate?

5       A.   Yes, sir.

6       Q.   So would your vehicle, then, have been facing

7   essentially to the northeast, more or less, at that

8   time?

9       A.   That would be accurate, yes.

10      Q.   Okay.  When you stopped your vehicle there, did

11  you exit the vehicle again?

12      A.   I did.

13      Q.   At the time you exited your vehicle, did you

14  regain sight of Mr. Llamas to the north?

15      A.   I did.

16      Q.   Was that while you were still in your vehicle

17  or after he stepped out that you saw him again for the

18  first time?

19      A.   It was after I stepped out and regained visual

20  acquisition, after losing him entering the property.

21      Q.   Do you have a time estimate for how much time

22  passed between when you lost sight of him, when he

23  proceeded northward onto that property, until you

24  regained sight of him after stepping out of your

25  vehicle, after you drove forward?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 61

```
 1        A.   I would say approximately 30 seconds, give or
 2   take.
 3        Q.   And then after you stepped out of your vehicle
 4   again, near the mouth of that driveway, to the north,
 5   and regained a visual of Mr. Llamas, how far away was he
 6   from you?
 7        A.   About 40 or 50 yards.
 8        Q.   Would you say that it was a comparable distance
 9   to how far away he had been from you when you had been
10   further to the west on River Road and first saw him come
11   out from the driveway to the south?
12        A.   Similar, yes.
13        Q.   Do you have any -- scratch that.
14             When you saw him to the north again after you
15   exited your vehicle at that driveway, could you see the
16   gun?
17        A.   I could see the firearm, yes.
18        Q.   Was he still holding it in his hand?
19        A.   Yes.
20        Q.   Was he still holding it in his right hand?
21        A.   It appeared so, yes.
22        Q.   Was he still holding it to his head?
23        A.   No, sir.
24        Q.   How was he holding it?
25        A.   Well, as he was running -- because he was
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 62

1    moving, the pistol was -- this is just prior to the

2    deputy-involved shooting.  The pistol was moving in more

3    or less three dimensions, including pointing -- at some

4    point, it looked like it was pointing up towards the

5    helicopter, towards the people that were occupying the

6    residence at 22240, potentially oriented towards us, the

7    three of us.  And then there were deputies to the east

8    of the mouth of that driveway on River Road.  And at

9    some point, it even appeared it may have be oriented in

10   the their general direction.

11       Q.    So my question is just really about when you

12   first -- that moment when you first saw him again, after

13   you stepped out the your vehicle and regained visual

14   contact.

15            Do you have that moment in mind?

16       A.    I do.

17       Q.    And at that time, could you tell how the

18   firearm was positioned in his hand?

19       A.    It looked like it was in his right hand.  And

20   again, he was moving -- moving with -- moving fast, like

21   he had a purpose, and that firearm was -- in fractions

22   of a second, the muzzle was passing people near the

23   residence, coming in our general direction, moving

24   towards the sky above.

25            Just as he was moving and driving his arms,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 63

1    what his intention was, I don't know, but...

2            All that happened very, very fast, as you can

3    imagine, in moving fast.

4        **Q.   How much time passed from when you first**

5    **regained the visual of Mr. Llamas again, to the north of**

6    **River Road, and when the first shot was fired by a**

7    **deputy?**

8        A.   Probably under ten seconds by the time I saw

9    him, more or less --

10           (Simultaneous speakers.)

11   BY MR. LEVINE:

12       **Q.   I'm sorry.**

13       A.   More or less.  I'm sorry.

14       **Q.   During that period between when you regained a**

15   **visual of Mr. Llamas and the first deputy's shot was**

16   **fired, do you at any time see him holding the gun to his**

17   **head?**

18       A.   I did not.

19       **Q.   So during that approximately ten seconds, the**

20   **gun was in -- you saw the gun positioned in lots of**

21   **different ways, besides being held to his head, but you**

22   **did not see it held to his head?**

23       A.   That is correct.

24       **Q.   Did you feel at the time that you had a**

25   **relatively clear view of Mr. Llamas and of the gun?**

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 64

1      A.   I did.

2      Q.   When you first saw Mr. Llamas after regaining a

3   visual of him while he's on that driveway, was his back

4   towards you?

5      A.   A portion of it, more or less; his oblique.

6      Q.   Could you explain what you mean?  Was it the

7   left or right oblique, for example?

8      A.   It appeared to be, like, the left oblique, as

9   like, he was as he was rotating his torso towards --

10   starting from the north, rotating it towards the west,

11   and then rotating it towards the south.

12      Q.   So he appeared to be turning left?

13      A.   Turning his torso.  Not necessarily his hips,

14   but his torso.

15      Q.   His torso?

16      A.   Or a portion of his flank.

17      Q.   How about his hips?  Were his hips facing more

18   or less to the north still?

19      A.   His hips -- based on the way that driveway

20   slightly curves, it was -- his hips appeared to be

21   oriented towards the north, northeast and northwest.

22      Q.   So his hips were continuing to be oriented up

23   the driveway; is that accurate?

24      A.   I'm sorry.  I'm sorry.  Yes.

25      Q.   And were -- how about his legs?  Did he -- were

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 65

1   his legs -- was he still moving forward up the driveway,

2   walking, or trotting, or however you put it?

3        A.   Running.  And, yes, up the driveway.

4        Q.   Okay.  So it was his torso and upward that

5   appeared to be turning to the left at that time?

6        A.   Yes, sir.

7        Q.   And then after seeing him -- as you saw him

8   turn to the left, turn his torso to the left, did you

9   see him, like, look over his shoulder with his head?

10       A.   He appeared to be -- yes.  It appeared to be he

11  was looking -- not necessarily completely over his

12  shoulder, but over a portion of his shoulder --

13       Q.   In addition to turning his torso to the left,

14  he turned his head to the left, too?

15       A.   Looking to move his head to the left.  And I'm

16  not sure if he was looking for us in the helicopter or

17  both.

18       Q.   Did you see him look up at that time?

19       A.   Not necessarily his head moving up, but I

20  couldn't tell you if his eyes were moving up, based on

21  the distance we were at.

22       Q.   Did you see his face at that time?

23       A.   Saw glimpses of it, because the lighting and

24  distance.  But I did see portions of his face -- like,

25  the left side -- sorry -- the left side of his face.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 66

1      Q.    When you saw the left side of his face, was it

2    kind of in profile, like you're seeing the left side of

3    his only?

4      A.    Generally, yes, the profile of it, the left

5    side.

6      Q.    At any the between when you first regained the

7    visual of Mr. Llamas again, to the north of River Road

8    and when the first shot was fired, could you ever see

9    enough of his face that you could see both of his eyes?

10      A.    I don't recall seeing both of his eyes or a

11    portion of it.

12      Q.    And then you've been describing how when you

13    first saw him after regaining the visual of him, his

14    hips and legs were oriented up the driveway still, to

15    the north or northeast, and he's kind of turning his

16    torso and shoulders and head to the left.

17          After you saw him turning his torso and

18    shoulders that way, did you ever see him then turn back

19    to face forward again, prior to the shots being -- the

20    first round of shots being fired?

21      A.    I don't recall his torso reorienting towards

22    the north.  His hips and his legs were, because he was

23    moving in that direction.  But you can only turn so far

24    to the left with the torso when the hips are driving in

25    another direction.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 67

1        But I don't recall him trying to reset and

2    almost position his entire body going north again.

3        Q.   So was he essentially still in that position

4    where his hips are facing forwards, but his torso, head,

5    and shoulders are turned to left when the first deputy's

6    shot was fired?

7        A.   Turned or turning to the left.

8        Q.   Okay.  But I guess part of what I'm asking,

9    too, is there was a single position.  So essentially

10   you're saying that when you regained a visual of

11   Mr. Llamas to the north, he is already in the process of

12   starting to turn to the left, and he's still in that

13   left turning motion when the first shots are fired;

14   correct?

15       A.   That's the best of my recollection, yes.

16       Q.   Okay.  And during that period between when you

17   first regained a visual of him and heard the first

18   deputy's shots fired, you never saw a gun held to his

19   own head during that time; correct?

20       A.   Correct.

21       Q.   And, in fact, you could tell that the gun was

22   not to his head at any point during that time; correct?

23       A.   Yes, that is correct.

24       Q.   When the first shot from a deputy was fired at

25   that time, could you tell which deputy it was who fired

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 68

1    that first shot, McGuire or Hubachek?

2        A.    My best estimate would have been

3    Sergeant Hubachek, because he was -- Deputy McGuire was

4    to my left and Sergeant Hubachek was to his left.

5        Q.    Okay.  And let me ask you about that.

6              So when you stepped out of your vehicle again,

7    just -- and then regained a visual of Mr. Llamas as he's

8    proceeding north on that property to the north of

9    River Road, what's the -- what are the positions of the

10   other deputies relative to you?  Are you basically kind

11   of a in a line, left to -- right to left, or describe

12   that for me, if you would?

13       A.    As I get out of my vehicle, they're more or

14   less oriented to the left of my left headlight, with --

15   in line with one another, almost not quite shoulder to

16   shoulder, but their shoulders are in line with one

17   another.

18             And Sergeant Hubachek is to the left as I'm

19   looking at them.  I'm looking at their backs now, and

20   Deputy McGuire is to his right.  And I positioned myself

21   to the right of Deputy McGuire, putting McGuire to my

22   left and Hubachek to his left.

23       Q.    Okay.  So after you positioned yourself to the

24   right of Deputy McGuire, the three of you are basically

25   in a line of the three of you, where you're on the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 69

1   right, and then to your left is McGuire, and to his left

2   is Hubachek; is that correct?

3        A.    Correct, sir.

4        Q.    And when the first shot was fired by one of

5   those deputies, were you already in that position in a

6   line there, where you're to the right of Deputy McGuire?

7        A.    I believe I was just getting to my -- for lack

8   of a better term -- position, to Deputy McGuire's right

9   when that shot -- when the shots began.

10       Q.    Okay.  But you could -- you still had a visual

11  of Mr. Llamas throughout that time, when you're moving

12  from behind the two officers to that position to the

13  right of Deputy McGuire?

14       A.    My truck was slightly to their right.  So as I

15  exited my vehicle, as we were discussing, I exited --

16  when I exited, they weren't necessarily obstructing my

17  view, because of my vehicle positioning versus their

18  positioning.  But to get to their right, I had to move

19  slightly right of them, because now we were standing in

20  front of -- essentially standing in front of my truck,

21  or at least the left portion of it.

22       Q.    Right.  I understand that.  I guess I'm just

23  asking whether during that time when you're getting into

24  that position to the right of Deputy McGuire, and that

25  sort of line we discussed, while you're moving into that

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 70

1   position, are you maintaining visual contact of

2   Mr. Llamas throughout that time?

3       A.   Yes, sir.

4       Q.   And that's the same time as we discussed where

5   you're describing seeing the -- him pointing the gun in

6   various directions and turning his torso and shoulders

7   and head towards the left?

8       A.   Yes, sir.

9       Q.   And when the first shot was fired, how far away

10  was Mr. Llamas from where you and the other deputies

11  were?

12      A.   40 to 50 yards.

13      Q.   And when that first shot was fired, was

14  Mr. Llamas still kind of twisted in that left position

15  where his torso and shoulders and head are facing to the

16  left?

17      A.   That's what I saw; yes, sir.

18      Q.   If -- thinking about, like, the hands on a

19  clock, where if Mr. Llamas was facing the exact same

20  direction you were, such that his head -- the back of

21  his head was exposed to you, and that would be 12:00

22  o'clock, what position on the clock was his head angled

23  at when the first shot was fired?

24      A.   To the best of my recollection, it was probably

25  oriented towards 9:00, 10:00 o'clock.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 71

1      Q.   Okay.  So either directly to his left or

2   slightly forward, relative to that?

3      A.   Yes.

4      Q.   Okay.  At the time that first shot was fired,

5   did you know whether there were any people to

6   Mr. Llamas's left?

7      A.   When that first -- well, we had knowledge, that

8   we previously discussed, that there were residents at

9   that home.  And then once the subject was -- these

10  folks -- once the subject was down and we could expand

11  our visual acuity of the entire field in front of us,

12  you could see the folks outside their home.

13     Q.   So you saw them there after all the shots were

14  fired?

15     A.   That would be fair to say.

16     Q.   And I think you said earlier that there was a

17  period of approximately one hour from when you had first

18  heard that there were people seen there until the

19  shooting; is that accurate?

20     A.   I believe you're talking hour, hour and a half,

21  somewhere in there.

22     Q.   Hour, hour and a half?  Okay.

23          Did you -- during that interval of an hour or

24  an hour and a half when you got that information and

25  when the shooting occurred, did you gain any information

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 72

1   as to whether they were still on the property or had

2   left the property, those people?

3        A.   I did not have information either way, whether

4   they had left the property or whether they were still

5   present.

6        Q.   Or whether they had remained on the property,

7   but moved to a different location on the property?

8        A.   That's correct.

9        Q.   And I think you said that you thought that the

10  first shot was fired by Deputy Hubachek; is that

11  correct?

12       A.   Sergeant Hubachek, yes.  I believe he was the

13  first.

14       Q.   Excuse me.  Sergeant Hubachek.

15            And I think you said that that was because he

16  was opposite Deputy McGuire from you, and so was a

17  little further away.  Is that accurate?

18       A.   Based on the audio or the report of the rifle.

19       Q.   In other words, you formed that impression

20  because it sounded like -- the sounds of the rapport of

21  his rifle was a little further away than the rapport

22  would have been if it was coming from Deputy McGuire's

23  rifle?

24       A.   Yes, sir.

25       Q.   Okay.  Did you hear -- within a few seconds of

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 74

1    you heard and saw at that time, that both of those two

2    deputies were firing during the first volley?

3        A.    Yes.

4        Q.    In the ten seconds, let's say, prior to the

5    first volley of shots fired by Deputy McGuire and

6    Sergeant Hubachek, did you hear either of those deputies

7    issue any verbal commands to Mr. Llamas?

8        A.    I did not.

9        Q.    During that time, that ten seconds before the

10   first volley of shots was fired, did you hear either of

11   the deputies issue any verbal warning to Mr. Llamas that

12   they would shoot him?

13       A.    I did not.

14       Q.    Prior to that first volley of shots being

15   fired, had you ever seen Mr. Llamas point that gun at

16   any human, other than himself?

17       A.    Prior -- just prior to the shooting?

18       Q.    Prior to the first volley of shots.

19       A.    Just prior -- if we're talking just seconds

20   prior -- I'm not sure of the time frame we're speaking

21   of.

22       Q.    At any time in your life, prior to the first

23   volley of shots.

24       A.    Other than just prior to the shots, that was

25   the only time I had seen the firearm pointed in a

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 75

1    different direction, other than his head, that is.

2        Q.    Right.  I guess I'm asking -- my question is

3    just a little different, and maybe I asked it poorly.

4    I'm sorry, if I did.

5             I'm wondering whether prior to the moment you

6    heard the first deputy's shot being fired toward

7    Mr. Llamas, had you ever seen Mr. Llamas point that gun

8    at any human being?

9        A.    I had not.  Including law enforcement, I

10   assume, because we're humans, I had not.

11       Q.    Yes, definitely including law enforcement being

12   humans, unless have you some secret you're holding out

13   on me with.  I'll remind you you're under oath.

14       A.    No, sir.  I'm a human.

15       Q.    And prior to the -- excuse me -- prior to that

16   first volley of shots being fired, had you ever seen --

17   excuse me -- had you ever heard Mr. Llamas make any

18   verbal threats to anybody?

19       A.    I had not.

20       Q.    Prior to that first volley of shots being

21   fired, had you ever witnessed Mr. Llamas physically harm

22   any human, including officers?

23       A.    Only what we discussed earlier, where he was

24   maybe attempting to harm us by shooting towards us, but

25   the dog was in the line of fire, or it was his intent to

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 76

1    just shoot the dog.  I don't know the answer to that

2    question.

3        Q.    When that earlier shot that you're describing

4    was fired, was any human struck by it?

5        A.    No humans were struck by it.

6        Q.    So, yeah, my question is really limited to

7    whether you had seen Mr. Llamas physically harm any

8    human prior to the first volley of the deputies' shots

9    being fired?

10       A.    No, sir.

11       Q.    Have you ever personally been on that property,

12   prior to entering the driveway area a few seconds before

13   the first volley of shots were fired?

14       A.    I had -- no, I had not.  I had not personally

15   been there.

16       Q.    When you first saw Mr. Llamas from that

17   position at the mouth of the driveway, while he's still

18   moving north, running north, as I think you said, and

19   starting to turn to the left -- I know you said it was a

20   fluid motion -- but at the point he's starting that

21   turn, do you think that it would have been appropriate

22   to shoot him at that time, just for running away?

23       A.    Just for running away?  Not necessarily.  Not

24   absolute, but not necessarily.  But the position of the

25   firearm, yes.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 79

```
 1  evidence.
 2          But you may respond, if you can.
 3          THE WITNESS:  If he's running towards what I
 4  have knowledge of is an occupied dwelling where there's
 5  other people that he's potentially putting in grave
 6  danger, based on distance, terrain, obstacles between him
 7  and them, it could be a justified shooting; versus him
 8  running into open space and we're at distance, and we
 9  have cover, it may not be applicable under those
10  circumstances.
11          I bring in the third party as some of the --
12  not all, but some of the deciding factor.
13  BY MR. LEVINE:
14      Q.  Did you -- and I know you mentioned that you
15  had some information from an hour or an hour and a half
16  earlier that there was some other individuals on the
17  property, essentially to the left or the west of
18  Mr. Llamas's position when the first shots were fired;
19  is that correct?
20      A.  That's correct.
21      Q.  Did you also have any information that there
22  were any individuals on the property to his north?
23      A.  I didn't have information whether there were or
24  were not people to the north.
25      Q.  Okay.  So for all you knew, the only people on
```

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 80

1    the property, other than him, were possibly those two

2    who were to his west, assuming they were still on the

3    property and in that same location; correct?

4        A.    Correct.

5        Q.    Okay.  So I guess, you know, going back to my

6    hypothetical, he's got his -- he's located in the same

7    place, in terms of where his feet are, as he was when

8    you saw him, except again his back is to you, the gun is

9    to his head, he's still running northward or forward

10   along that driveway, which I guess you said was maybe a

11   bit more northeast than north.  You would believe that

12   you would have been justified if you had shot him at

13   that time, under those circumstances, based on him

14   running forward along the driveway?

15           MR. RAMIREZ:  Incomplete hypothetical.  Assumes

16   facts not in evidence.  Misstates the prior testimony of

17   the witness.

18           However, you may respond, if you can.

19           THE WITNESS:  Is the -- the hypothetical you're

20   proposing, is there a third-party residence involved?

21   BY MR. LEVINE:

22       Q.    The information that you have about

23   third-parties is the same as the information you had at

24   the time of this actual incident.  The only difference

25   in my hypothetical versus what you've testified to

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 81

 1    already is the positioning of Mr. Llamas's body.

 2        A.    It may be applicable and it may not be.    For

 3    me, personally, I may not have sought lethal force as

 4    the option at that very moment, based on my distance,

 5    his posture, his orientation, and the available cover to

 6    us, based on that change, where the firearm positioning

 7    was.

 8        Q.    And why do you think you would not have fired

 9    under those circumstances, under my hypothetical?

10        A.    Believing that his attempt was just not to --

11    not necessarily to do harm to others, but it gives the

12    appearance that his attempt is just to flee.    But in the

13    actual circumstances, there was two intentions, in my

14    mind:    The intention to flee and the intention to maybe

15    do harm at the -- at the same time, in order to

16    facilitate his escape.

17        Q.    Okay.    So as I understand it, again, under my

18    hypothetical -- I realize that you're testifying that

19    you saw something different happen that day.    But under

20    my hypothetical, you're saying that if his only apparent

21    intention was to flee, as demonstrated by his back

22    remaining toward you and the gun remaining to his head

23    as he's running northward or northeastward, you would

24    not have felt it was appropriate to shoot under those

25    circumstances, based only on him fleeing?

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 82

1          MR. RAMIREZ:  Objection.  Incomplete

2  hypothetical.  Lacks foundation.  Assumes facts not in

3  evidence.

4          (Reporter clarification.)

5          MR. RAMIREZ:  He may respond, if he can.

6          THE WITNESS:  I'm not saying I wouldn't

7  absolutely not deploy lethal force, but it -- again, it's

8  hard on the hypothetical if you're not smelling it,

9  tasting it, touching it, and feeling it all at the same

10  time at that time of day and seeing that may change my

11  course of action.  Not necessarily everybody else's, but

12  again, my course of action.

13          But I can't give you an absolute that I would

14  do this and I would not do that kind of thing, if that

15  makes sense?

16  BY MR. LEVINE:

17      Q.    Do you think that, under my hypothetical, it

18  would be appropriate to shoot him for running away,

19  based on the knowledge you had at the time, including

20  having no information that there was anybody to his

21  north on that property?

22          MR. RAMIREZ:  Same objections.

23          But you may respond.

24          THE WITNESS:  It could.  You could deploy

25  lethal force under some circum- -- depending on -- again,

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 83

1  the pistol orientation is to his head.  But the slight

2  movement of the pistol, whether forward or backward of

3  his head, put people -- if they're to his west and he's

4  running to his north, and the pistol muzzle is pointed on

5  the right side of his head, which is in a westerly

6  direction, just a slight movement of the pistol could put

7  people in grave danger that are at that address of 22240.

8           And if I can see that or discern that occurring

9  or even understand that's likely to occur, based on

10  movement, then the application of lethal force could be

11  justified under those circumstances.

12  BY MR. LEVINE:

13      Q.   Okay.  Let's assume that under my hypothetical

14   you cannot discern such movement, and it appears that

15   the muzzle of the pistol is remaining more or less fixed

16   at his -- the side of his head.  Does that change

17   anything in your response?

18           MR. RAMIREZ:  Same objection.

19           But you may respond.

20           THE WITNESS:  I might pursue him -- physically

21  pursue him a little bit longer before -- but lethal force

22  is still an option that could be deployed, but I may

23  pursue him a little bit further.

24  BY MR. LEVINE:

25      Q.   Under my hypothetical, do you think that you

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 84

1   would have been justified in shooting Mr. Llamas at that

2   time, based on your belief that he had shot a police dog

3   earlier that day?

4         MR. RAMIREZ:  Same objections.

5         But you may respond, if you can.

6         THE WITNESS:  The police dog being shot doesn't

7  necessarily have any bearing on the application of my use

8  of force, but it does -- does lend to the fact that

9  there's also violent behavior, whether it's towards

10  animal or human, for that matter.  And the dog is

11  obviously a police dog with labeling on his dollar.

12         But it just shows -- for me, it illustrates

13  intention -- some intention by the subject.  So I

14  wouldn't necessarily say I would just dismiss the

15  information, but it wouldn't -- it would be part of my

16  decision.

17         But I'm going to still continue to pursue the

18  subject a little bit longer, based on what you describe

19  as the "orientation of the pistol."

20  BY MR. LEVINE:

21    Q.  You've received some training during your

22  career from the Riverside Police Department; correct?

23        MR. RAMIREZ:  Objection.  He doesn't work for

24  Riverside Police Department.

25  BY MR. LEVINE:

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 85

1      Q.    Excuse me.  From the Riverside Sheriff's

2    Department?

3      A.    Yes, sir.

4            MR. RAMIREZ:  They're two rivalries.  I want to

5    make sure we get it right.

6            MR. LEVINE:  I'm sorry.  I misspoke.

7    BY MR. LEVINE:

8      Q.    Based on your training and experience, is a

9    police dog or a canine considered a type of less lethal

10   weapon?

11     A.    It is.

12     Q.    Is a police dog or a canine considered

13   essentially a tool that deputies have at their disposal?

14     A.    It is considered a tool, yes.

15     Q.    Is a police dog or canine considered essential,

16   even though it's a dog, a type of physical property?

17     A.    It's property of the Sheriff's Department.  You

18   are correct.

19     Q.    Okay.  Did you fire your weapon at all during

20   this incident?

21     A.    I did not.

22     Q.    And when you saw, as you say, Mr. Llamas again,

23   after regaining a visual of him, and you saw him turning

24   to the left and manipulating his weapon in the same

25   direction, why did you not fire at that time?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 88

1    Q.    How about his legs or his feet?

2    A.    His feet, if I recall, were -- the bottom of

3    his feet were more or less pointed in a southeasterly

4    direction or more to the east.

5    Q.    Could you tell if his -- when he fell, was his

6    body sort of extended, or was he curled up to some

7    degree or twisted around or -- what position was his

8    body in, generally, as far as you could tell?

9    A.    Extended, but not -- maybe his knees slightly

10    bent.

11    Q.    When he went to the ground after that first

12    volley of shots, was he further away from you than he

13    had been when the first shot was fired?

14    A.    Probably a couple of feet, or, if not, a couple

15    of yards further.

16    Q.    And that would be further to the north or the

17    northeast?

18    A.    Yes, sir.

19    Q.    After the first volley of shots was fired, did

20    you hear another deputy say, "Hold, hold, hold"?

21    A.    I did hear someone yell, "Hold, hold, hold."

22    Q.    Did you know who that was at the time who said

23    that?

24    A.    I did not.

25    Q.    As you sit here today, do you know who that was

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 99

1  that Deputy McGuire gave or heard him say anything to

2  indicate that he thought you were kind of essentially

3  saying, "Why are you still shooting?" when you said,

4  that?  That that's what he understood you to mean?

5      A.  No, sir.

6      Q.  Had you and Deputy McGuire been working

7  together for a long time prior to this incident?

8          MR. RAMIREZ:  Vague and ambiguous as to the

9  term "long time."

10         But you may respond.

11         THE WITNESS:  Yes, since he, more or less, came

12 on the SWAT team.

13         MR. LEVINE:  And I think your attorney was

14 right that that was a vague question.

15 BY MR. LEVINE:

16     Q.  How long, approximately, had you been working

17 together by that point?

18     A.  Year and a half, maybe.

19     Q.  Okay.  Had you had a lot of operations together

20 out in the field where you're communicating with one

21 another verbally?

22     A.  Yes.

23     Q.  And based on that experience that you had

24 together, did you feel like you could understand what he

25 meant when he said certain things to you, based on the

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 100

1    intonation or tone in his voice?

2        A.    Yes.

3        Q.    And did you have the impression that he felt

4    the same way about you?

5        A.    Yes.

6            MR. RAMIREZ:  May call for speculation.

7            But you may respond.

8            THE WITNESS:  Yes.

9    BY MR. LEVINE:

10        Q.    Before the first and second volleys of shots

11    being fired, did you hear Deputies McGuire or Hubachek

12    issue any verbal commands?

13        A.    I did not.

14        Q.    During that time, did you hear them issue any

15    verbal warnings that they were going to shoot?

16        A.    No, sir.

17            MR. LEVINE:  I think it might be a good time

18    for our next break, and I think this might be the last

19    one, at least for me.  I don't have a ton left, but I've

20    got a little bit, and I just want to go over my notes.

21            So would another ten minutes be good for

22    everybody?

23            MR. RAMIREZ:  That's fine.

24            MR. MARKS:  Sure.

25            MR. LEVINE:  Sounds good.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 102

1      Q.   Did you ever form any impression that

2   Mr. Llamas had fired his weapon at any time while on

3   that driveway to the north of River Road?

4      A.   Not that I'm aware of.

5      Q.   Did you ever learn afterwards that he had fired

6   his weapon at any point during that time?

7      A.   I never actively pursued the information, but I

8   believe that he never fired it.

9      Q.   Okay.  Was there -- when -- from the time that

10  you and Deputies Hubachek and McGuire are taking the

11  position on River Road, to the west of those two

12  driveways we discussed earlier, from around that period

13  until the time of the shooting itself, did the three of

14  you ever discuss any kind of tactical plan for how to

15  approach Mr. Llamas, and what to do if he ever took the

16  gun away from his head, or pointed it in a particular

17  direction?  Anything like that?

18     A.   The only tactical -- a lot of these things come

19  down to training with high-risk suspects, so a lot of

20  this is already predesignated, in some respect.  But

21  what's not predesignated is establishing who is going to

22  provide lethal force if it becomes necessary; and we

23  want to make sure we make those designations very clear.

24     Q.   During that time that I just asked about, did

25  any of the three of you have any discussion regarding

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 103

1    the fact that there were possibly occupants on the

2    property at that time, potentially in some position to

3    the west of where Mr. Llamas ultimately fell down and

4    was shot?

5        A.   You mean during the time we were on the road,

6    itself, on River Road?

7        Q.   Yes, or immediately before or after.

8        A.   After -- before or after the shots were fired?

9        Q.   Before or after, while you were positioned on

10   the road there to the west, watching Mr. Llamas cross

11   the road to the north?

12       A.   I don't recall any of the discussion talking

13   about the -- in detail, the actual residents being

14   inside a home over there.

15       Q.   And I guess I remember you saying earlier that

16   maybe an hour or an hour and a half before the shooting,

17   you had received some information from a deputy, you

18   couldn't remember who, that he believed there were a

19   couple of occupants in a structure that was essentially

20   to the west of where Mr. Llamas ended up; correct?

21       A.   Correct.

22       Q.   And I guess I'm wondering, was there ever any

23   discussion by or among the three of you, yourself and

24   deputies Hubachek and McGuire, regarding those residents

25   and any time thereafter, before the shots were fired?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 104

1    A.   I don't recall a conversation related to that

2    in that moment on the street.  But I did allude to,

3    earlier that day, Deputy McGuire might have been the one

4    who gave me the information of the occupants being home

5    about an hour, hour and a half earlier.

6    Q.   Okay.  But there wasn't, for example, any

7    conversation or discussion as Mr. Llamas is proceeding

8    north, either crossing River Road or going on to the

9    property at 22240, where any of you said anything like,

10    "Oh, well, we've got to watch out because there might be

11    two occupants on that property," or anything like that?

12    A.   Not at that moment, other than after the shots

13    were fired.

14    Q.   And there wasn't -- before any of the shots

15    were fired -- any discussion of, "Given that there are

16    these occupants who were seen on the property an hour or

17    an hour and a half ago, if Mr. Llamas turns left or

18    points the gun to the west, we've got to shoot him or do

19    anything in particular in response to that, because it

20    might be threatening some occupants of the property"?

21    A.   I don't recall us having that conversation just

22    prior to.

23    Q.   Okay.  Would you say that you had, in the 30 to

24    45 minutes before the shots were fired, any kind of --

25    anything that you would consider to be a tactical

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 105

1   discussion with the other deputies pertaining to these

2   potential occupants on the property?

3        A.   We had a tactical discussion 30 to 45 minutes,

4   even an hour, about setting containment, and then we

5   always know from our experience that breaking any -- any

6   time suspect breaks containment lines, that now they're

7   dealing with dwellings that are potentially occupied or

8   inhabited, hadn't been evacuated.

9             So that is -- again, that's a thing we train

10  and train often, is that we try to keep them within our

11  containment lines because of the risk once they're

12  outside containment.

13       Q.   But this particular property or the suspected

14  occupants of that property were not part of that

15  discussion; correct?

16       A.   No.  Not except for that 60 minutes to 90

17  minutes earlier where it was discussed that people would

18  be on the property -- or were.

19       Q.   Okay.  I just have a few questions sort of

20  about your training that I'll shift you away from this

21  particular incident itself.

22            We talked a little bit earlier about how you

23  went to the police academy.  I take it you received

24  training in the academy?

25       A.   Yes, sir.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 106

1    Q.   And then did you receive additional training

2  after graduating from the academy, while you were at the

3  Riverside Sheriff's Department as a sworn deputy?

4    A.   I did.

5    Q.   Did that include field training?

6    A.   It did.

7    Q.   Did you have a field training officer assigned

8  to you for a period of time?

9    A.   Several, I did.

10   Q.   For how long of a period of time was it that

11  you had field training officers assigned to you?

12   A.   About 12 to 13 weeks.

13   Q.   And then did you continue to receive additional

14  training from the Riverside Sheriff's Department after

15  completing your field training with the assigned field

16  training officers?

17   A.   Yes.

18   Q.   And was that continued training essentially

19  ongoing throughout your career at the Riverside

20  Sheriff's Department?

21   A.   Yes, sir.

22   Q.   Between all that training that we've just

23  discussed, did you receive training from the Riverside

24  Sheriff's Department on the use of deadly force?

25   A.   Yes.

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 107

1      Q.   Were you trained that deadly force is the

2   highest level of force that officers can use or

3   deputies?

4      A.   Yes, sir.

5      Q.   Were you trained that deadly force can only be

6   used to defend against an imminent or immediate threat

7   of death or serious bodily harm?

8      A.   Yes -- generally, yes, for law enforcement and

9   innocent people.

10      Q.   Is that what you meant by "generally"?

11      A.   Yes, human life.  Human life.

12      Q.   Were you trained that deputies are responsible

13   to justify each shot they fire when using deadly force?

14      A.   Yes.

15      Q.   Were you trained that deputies need to assess,

16   as best they can in between shots or volleys, the need

17   for continued force?

18      A.   Yes.

19          MR. RAMIREZ:  Object as vague and ambiguous,

20   the term "assess."

21          But you may respond.

22          THE WITNESS:  Yes.

23   BY MR. LEVINE:

24      Q.   Were you trained that deputies are required to

25   issue a verbal warning prior to using deadly force, if

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 108

1   feasible?

2        A.   If feasible and prudent, yes.

3        Q.   Is "prudent" separate from "feasible," in your

4   mind?

5        A.   No, sir, a little more detail.

6        Q.   Are those kind of two synonyms, as far as you

7   think of them?

8        A.   Yes.

9        Q.   Okay.  Were you -- was part of your training

10  that -- or -- the reason or at least the main reason for

11  why deputies should issue a verbal warning before

12  shooting, is to give the suspect or subject a final

13  opportunity to comply before deadly force is used

14  against them?

15           MR. RAMIREZ:  Object to the term "final

16  opportunity."

17           But if you understand, you may respond.

18           THE WITNESS:  If feasible -- if feasible, yes,

19  they -- in the hopes of surrender, a peaceful surrender.

20  BY MR. LEVINE:

21       Q.   Were you trained that where a warning is given,

22  prior to using deadly force, the subject or suspect

23  should be given an opportunity to comply with that

24  warning before deadly force is used, if feasible?

25       A.   If feasible, yes.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 109

1    Q.   Were you trained that it is justifiable to use

2    deadly force against somebody just for having a gun in

3    their hand, based on that fact alone?

4         MR. RAMIREZ:   Objection.   Incomplete

5    hypothetical.   Lacks foundation.   Assumes facts not in

6    evidence.

7         But you may respond, if you can.

8         THE WITNESS:   Based on a lot of circumstances.

9    You can be in a 10 by 15 room with a subject with a

10   firearm and you're in grave danger.   You could be in open

11   space or 100 yards away with a subject with a firearm in

12   his hand and it might be a different set of

13   circumstances.

14   BY MR. LEVINE:

15   Q.   So you were trained that there are some

16   circumstances where, based only the fact of a subject

17   holding a gun in their hand alone, you can shoot them?

18        MR. RAMIREZ:   Incomplete hypothetical.

19   Misstates his testimony.   Lacks foundation.

20        But you may respond, if you can.

21        THE WITNESS:   The environment that's occurring

22   in is crucial to that decision.

23   BY MR. LEVINE:

24   Q.   Right.   I understand that there -- you know,

25   there might often be other factors in play and various

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 110

1    situations.  I'm just asking about your training and

2    whether you were ever trained that if you see someone

3    with a gun in their hand, go ahead and shoot them,

4    that's enough?

5        A.   Not necessarily.

6        Q.   And you say "Not necessarily," you mean there

7    would need to be more than that?

8        A.   The totality of circumstances, more than just

9    possessing a firearm.  Possessing a firearm, again, at

10    100 yards in an open space, it might not warrant lethal

11    force yet.

12        Q.   Okay.

13        A.   Might not.  It's hard to get away from the

14    details surrounding someone in mere possession.  There's

15    always more to it than that.

16        Q.   And so given that there are more details, you

17    were not trained that just this one thing, without any

18    other details being present or given to you is enough to

19    shoot standing alone; correct?  You were not trained

20    that?

21        A.   We're not trained that.  Totality of the

22    circumstances is what we're trained.  All details.

23        Q.   And then similarly, I -- were you trained that

24    if you have somebody who's holding a gun to their own

25    head, that fact alone is enough to shoot them?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 111

1          MR. RAMIREZ:  Incomplete hypothetical.  Lacks

2   foundation.  Assumes facts not in evidence.

3          But you may respond, if you can.

4          THE WITNESS:  That's situational dependent.  If

5   the subject's holding a firearm to his head in a 10 by 15

6   room and you just walked into it, because you had to do a

7   rescue of some sort, or someone 100 yards away from you

8   in an open space with a firearm and you have cover

9   between you and the subject.  Again, different set of

10  circumstances.

11  BY MR. LEVINE:

12      Q.   So where you trained there are some

13  circumstances where, depending how close you are to

14  them, if they've got a gun to their own head, you can go

15  ahead and fire?  Is that what you're --

16          (Simultaneous speakers.)

17          (Reporter clarification.)

18      A.   There are circumstances based on distance,

19  proximity, third-party presence, that it may warrant

20  lethal force.

21      Q.   Right.  And you know, I'm not -- we're not --

22  I'm not talking about any third parties being present

23  here.  I'm just asking whether you were trained that,

24  based on that fact standing alone, without anything else

25  going on, that you can shoot somebody for holding a gun

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 112

1    to their own head?

2        A.    Not necessarily.

3        Q.    Okay.  So that wasn't training that you were

4    provided?  No trainer ever said to you, "Deputy Walsh,

5    if you see someone holding a gun to their head and

6    that's all you got, go ahead and shoot them"?

7        A.    You're correct, sir.  No trainer did that.

8        Q.    Okay.  And then have you -- you received

9    training regarding tactics, as well?

10       A.    Yes, sir.

11       Q.    Did that include training on communication with

12   other deputies during operations?

13       A.    Yes.

14       Q.    And did it include training on the use of cover

15   and concealment, as well?

16       A.    Yes.

17       Q.    Is part of that training to take cover, if you

18   can, if someone poses a potential deadly threat toward

19   you?

20            MR. RAMIREZ:  Objection.  Incomplete

21   hypothetical lacks foundation.  Assumes facts not in

22   evidence.

23            But you may respond, if you can.

24            THE WITNESS:  Depending on the circumstances

25   and the availability of cover and it's proximity to you.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 113

1  BY MR. LEVINE:

2      Q.   I guess I'm just more generally wondering were

3  you trained on using cover, when possible, if you're

4  faced with a deadly threat?  Was that a subject of your

5  training?

6          MR. RAMIREZ:  Same objection.

7          But you may respond.

8          THE WITNESS:  If you can sir, yes.

9  BY MR. LEVINE:

10     Q.   Okay.  So you were trained that if you can use

11  cover when faced with a deadly threat, you should use

12  cover?  Is that what you're saying?

13     A.   If you can, and if it's feasible.

14     Q.   Did -- at the time of the -- well, I'll scratch

15  that.

16          MR. LEVINE:  I think that's all I have for

17  right now, in terms of my question.

18          And I will turn it over to Larry, in case Larry

19  has any questions for you.

20          MR. MARKS:  I have a few.

21                    EXAMINATION

22  BY MR. MARKS:

23     Q.   First of all, good afternoon.  I just have a

24  couple questions to follow-up with you.

25          I think you said earlier that there was a

Page 117

1    those designated roles was when we actually got onto

2    River Road.  There was a designation there.

3           Now, that was just from my position the

4    designation took place.  But you also had deputies and

5    personnel to the east of the driveway where the subject

6    appeared from, and what their designations were there, I

7    don't know.

8           Q.   Okay.  So let's talk about you and your group.

9    That was -- who was part of your group when you -- when

10   you decided about the designations at that time?

11          A.   Deputy McGuire and Sergeant Hubachek.

12          Q.   And who made the decision as to the

13   designations for the three of you?

14          A.   I did.

15          Q.   What were the specific designations between the

16   three of you?

17          A.   That they were responsible for lethal coverage,

18   Sergeant Hubachek and Deputy McGuire, and I would take

19   more -- take an active role in leading the group, and

20   then if -- deploying less lethal, if necessary, and

21   providing verbal commands to the subject.

22          Q.   When you say "less lethal," at the time that

23   the shots were fired, you were holding lethal weapon;

24   correct?

25          A.   Sure was.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 118

1     Q.   Was there ever a time you were holding a less

2     lethal weapon?

3     A.   It was in my vehicle, and I had less lethal on

4     my person.

5     Q.   And when you say that the designation was for

6     lethal cover, what does that mean?

7     A.   So if lethal force needed to be used or it

8     became necessary, the ones that are designated or -- and

9     they're in a position to do so, they're the ones that

10    would apply it as the designated folks for that

11    assignment, for that task.

12    Q.   If there was only three of you there, why would

13    you designate lethal cover to two of them and not keep

14    lethal cover for yourself, as well?

15    A.   I can use them to protect myself based on my

16    positioning.

17    Q.   Okay.  At the time of the initial volley of

18    shots, the three of you were essentially lined up

19    together; correct?

20    A.   Yes.

21    Q.   Fair to say that not one of you had a better

22    view of Mr. Llamas at the time of the first volley of

23    shots?

24    A.   I would say that Sergeant Hubachek and Deputy

25    McGuire probably had the better view because they were

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 120

1      Q.   And how long would you have waited to find out

2   if they were going to actually use lethal force before

3   you, yourself, did?

4           MR. RAMIREZ:  Calls for speculation.  Lacks

5   foundation.  Assumes facts not in evidence.

6           But you may respond.

7           THE WITNESS:  Not very long, sir.

8   BY MR. MARKS:

9      Q.   I wouldn't think so.

10          The first volley of shots, can you tell me how

11  many shots in total there were?

12     A.   In that first volley, total, again I believe it

13  was anywhere from three to five.

14     Q.   Do you know how many of those three to five

15  actually his Mr. Llamas?

16     A.   I do not.

17     Q.   Do you know where on Mr. Llamas's body any of

18  those shots hit?

19     A.   After making contact with him?

20     Q.   At any time, whenever you might have learned?

21     A.   After making contact, I could see what I

22  believed were two impacts, but there could be exit --

23  they could be exits at the same time.

24     Q.   Where were the -- where do you believe -- after

25  leaving the scene, where do you believe that the first

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 121

1    volley of shots struck Mr. Llamas?

2        A.    One was towards his hip or his buttocks, and

3    one was, I believe, in his -- just below his nose.

4    Somewhere in his face.

5        Q.    You believe that the first volley of shots hit

6    him in the face?

7        A.    Based on the way he was moving after the first

8    volley, I would -- deductive reasoning says no, he was

9    not hit in the face after the first volley.

10        Q.    Okay.  So you think that the first volley would

11    have only hit him in the hip or butt?

12        A.    That's my belief, yes.

13        Q.    Okay.  And I guess I want to understand what

14    you mean by "the hip or the butt."  Are you saying it

15    would be somewhere forward on the front side of his

16    body, the side of his body, or the back part of his

17    body?

18        A.    Kind of like a portion of the side and back,

19    not necessarily the front.  But again, it could have

20    been an exit and I just didn't locate the entrance.

21        Q.    And I think you said that you saw Mr. Llamas go

22    down to the ground after the first round of shots?

23        A.    Yes, sir.

24        Q.    And you were able to continue to see Mr. Llamas

25    holding his gun after the first volley of shots?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 123

1    looking at a clock and 12:00 o'clock would be looking

2    straight ahead, I think you said that his head was aimed

3    more towards about 9:00 or 10:00 o'clock, for the first

4    volley?

5        A.   Is this while he's -- so 12:00 o'clock being

6    north?

7        Q.   Correct.

8        A.   And so -- and are you speaking when he fell to

9    the ground?

10       Q.   No.  I'm talking about a millisecond before the

11   first shots were fired.  I think you said -- and you can

12   correct me if I'm wrong -- that immediately before the

13   first volley of shots, Mr. Llamas's head was looking in

14   the direction of, say, 9:00 or 10:00 o'clock?

15       A.   Yes, sir.

16       Q.   And at that moment where his head was looking

17   at between 9:00 and 10:00 o'clock, could you see any

18   portion of Mr. Llamas's chest, or could you only see his

19   back?

20       A.   I could see more or less his -- maybe a profile

21   of his chest or his torso, where you're capturing, like,

22   his left shoulder, a portion of his back, and maybe just

23   a portion of his chest.

24       Q.   So in other words, you would see, essentially,

25   his left shoulder?

Page 124

1      A.    Left shoulder.

2      Q.    Assuming that he was not wearing a shirt, fair

3   to say you would not be able to see either of his

4   nipples?

5      A.    Fair to say.

6      Q.    And at that time immediately prior to the first

7   volley of shots, Mr. Llamas was moving in a northbound

8   direction; is that right?

9      A.    Yes, sir.

10     Q.    He was not moving towards the residence, was

11  he?

12     A.    His hips and his leg were driving him north,

13  but his torso was turning to the left and back to our

14  clock analogy, turning towards the 10:00 and 9:00

15  o'clock position, when the residence was towards the

16  9:00 and 10:00 o'clock position.

17     Q.    But even though his head was looking towards

18  the 9:00 or 10:00 o'clock position, he was still running

19  in a 12:00 o'clock direction; correct?

20     A.    Still running in a 12:00 clock direction, but

21  his torso and head were 9:00 and 10:00.

22     Q.    Gotcha.

23          Can you tell me approximately the distance

24  between Mr. Llamas and that residence at the time of the

25  first shot?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 125

1     A.   This would be just an estimate.

2     Q.   Sure.

3     A.   30 yards, maybe.

4     Q.   So the distance between Mr. Llamas and the

5     residence was less than the distance between you and

6     Mr. Llamas at the time of the first shots?

7     A.   Yes, sir, approximately.  Approximately.

8     Q.   Okay.  I want to ask you a couple questions

9     about the shooting of the canine.  Fair to say that you

10    did not see Mr. Llamas at the time the shot was fired

11    that hit the canine?

12    A.   That's correct, sir.

13    Q.   Fair to say you don't know what Mr. Llamas was

14    aiming at when the canine was shot?

15    A.   That's correct, sir.

16    Q.   Fair to say you do not know how close the

17    canine ever got to Mr. Llamas?

18    A.   That's correct, sir.

19    Q.   Fair to say you do not know the distance

20    between Mr. Llamas and the canine at the time of the

21    shooting of the canine?

22    A.   That's correct.

23    Q.   When did you learn that the canine had actually

24    been shot?

25    A.   I knew the canine had entered a brush line, and

S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.
Michael Walsh on 03/21/2025

Page 126

1    then shortly thereafter was the gunshot.  And when I

2    asked the handler had he attempted to recall his dog, he

3    said he already did.  And the belief was the dog was

4    shot.

5         Q.   When did you learn, in fact, the dog had been

6    hit?

7         A.   With gunfire?

8         Q.   Yes, sir.

9         A.   It wasn't until -- well, I don't know if you

10   could say it's factual, because the dog wouldn't return.

11        Q.   Well, there could be other reasons the dog

12   didn't return, right?

13        A.   There could be.

14        Q.   Let me ask you a little differently.  Did you

15   know that the dog had been shot before the first round

16   of shots towards Mr. Llamas?

17        A.   Suspected of being shot?  I don't recall having

18   direct knowledge like the handler.  But at some point,

19   the handler went in the brush and grabbed him.  I don't

20   know when that occurred and when the rapport was related

21   to the first shooting we had -- first volley.  I'm

22   sorry.

23        Q.   Is it your best recollection that you learned

24   that the canine had been actually shot prior to the

25   first round of shots at Mr. Llamas?

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 128

1  BY MR. MARKS:

2       Q.   That's just the second round I'm talking about.

3       A.   Oh, you mean in total?

4       Q.   No.  I'm only talking about the second volley

5   of shots.  I wanted to know how many each of the

6   deputies shot?

7       A.   Oh.  I'm not sure Sergeant Hubachek engaged in

8   a second volley.  It might have been just Deputy

9   McGuire, and it was anywhere from two to four.

10      Q.   At the time of the second round of shots, did

11  you consider firing, yourself?

12      A.   At the -- yes.

13      Q.   And the reason you did not fire is because one

14  of the other deputies already did; is that right?

15      A.   That is right, sir.

16      Q.   Did you ever ask Deputy McGuire why he fired

17  the second round -- or the second volley?

18      A.   I did not.

19      Q.   Did you ever ask Deputy Hubachek why he did not

20  fire the second volley?

21      A.   I did not.

22      Q.   Do you have an understanding as to where

23  Mr. Llamas was hit with the second volley?

24      A.   My assumption would be that he was struck in

25  the face on the second volley.

**S.L., ET AL. vs COUNTY OF RIVERSIDE, ET AL.**
**Michael Walsh on 03/21/2025**

Page 134

1   STATE OF CALIFORNIA)
                        ) ss:
2   COUNTY OF BUTTE    )

3

            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6   deposition was present remotely and duly sworn to testify

7   to the truth in the within-entitled action on the day and

8   date and at the time and place therein specified;

9           That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 28th day of March, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25