**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118
*Attorneys for Plaintiff V.L.*

Garo Mardirossian, Esq., #101812
garo@garolaw.com
Lawrence D. Marks, Esq., #153460
Lmarks@garolaw.com
**MARDIROSSIAN AKARAGIAN, LLP**
6311 Wilshire Boulevard
Los Angeles, CA 90048-5001
Telephone (323) 653-6311 / Facsimile (323) 651-5511
*Attorneys for Plaintiffs S.L. and CAROLYN CAMPBELL*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.L., a minor by and through the Guardian Ad Litem Kristine Llamas Leyva, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; V.L., by and through the Guardian Ad Litem Amber Snetsinger, individually and as successor-in-interest to JOHNNY RAY LLAMAS, deceased; and CAROLYN CAMPBELL, individually, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF RIVERSIDE; SHAWN HUBACHEK; JIMMIE MCGUIRE; and DOES 3-10, inclusive, <br><br> Defendants. | Case No. 5:24-cv-00249-CAS-SP <br><br> *Honorable Christina A. Snyder* <br><br> **DECLARATION OF ROGER A. CLARK IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> *[Filed concurrently with Plaintiffs' Memorandum of Points and Authorities; Plaintiffs' Separate Statement of Facts; Plaintiffs' Objections to Evidence; Declaration of Benjamin S. Levine and Exhibits thereto]* <br><br> Date: June 23, 2025 <br> Time: 10:00 a.m. <br> Courtroom: 8D |

Case No. 5:24-cv-00249-CAS-SP
DECLARATION OF ROGER A. CLARK

# DECLARATION OF ROGER A. CLARK

I, Roger A. Clark, declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department. I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training ("P.O.S.T.") Advanced Certificate, and I am a graduate of the P.O.S.T. Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the P.O.S.T. accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the P.O.S.T. syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently

occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer involved shootings.

8. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, use of force issues, and bullet casings in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

9. In forming my opinions in this matter, I have reviewed the photographs, police reports, videos, deposition transcripts, recorded interviews, and other related material prior to forming my opinions in this case.

10. **<u>At the time of this incident involving Mr. Lllamas on April 14, 2023, police officer training on deadly force included the following</u>**:

    a. Deadly force is the highest level of force.

    b. Deadly force should only be used as a last resort.

    c. Deadly force should only be used in the direst of circumstances when all other options have been exhausted and no other reasonable measures are available.

    d. When feasible, a warning should be given before using deadly force.

    e. Deadly force is only justified on the basis of an "objectively reasonable" belief that the suspect poses an immediate threat of death or serious bodily injury; in other words, a subjective fear is not enough. Likewise, a fear of future harm is not enough. Deputies are also trained to control their fear.

    f. Deadly force can only be used in an "immediate defense of life" situation; in other words, in defense of immediate or imminent death or serious bodily injury.

      g. For a threat of death or serious bodily injury to be "imminent," the individual must have the present ability, opportunity, and apparent intent to immediately inflict death or serious bodily injury.

      h. The decision to use deadly force must be guided by the reverence for human life.

      i. An officer must justify every shot he or she fires.

      j. An overreaction in using deadly force is excessive force.

11. Officer training also provided that:

      a. Officers should maneuver or tactically reposition away from individuals who may be armed with a weapon when feasible, including by using cover, to gain additional time and protection.

      b. Officers should attempt to identify individuals who may be suicidal, and cannot use deadly force against someone based only on the danger an individual poses to himself or herself.

      c. Police dogs are a type of less-lethal weapon or tool available to officers and, in the law enforcement context, are considered physical property. Police dogs are not law enforcement officers.

      d. Officers should give commands in a loud and clear voice.

12. Under the facts of this case, the deputies could not justify using deadly force against Mr. Llamas simply because Mr. Llamas was running away and holding a gun, and the officers could not shoot at Mr. Llamas under the fleeing felon theory. Police officers are trained that they can only shoot a fleeing felon where (1) the officer has information that the suspect has committed an atrocious felony involving the infliction of injury or death, AND (2) the suspect poses an immediate threat of death or serious bodily injury. Mr. Llamas did not injure anyone other than himself on the day of the shooting, and at the time of the shooting, he was not in the process of attacking or attempting to attack any person. P.O.S.T., Learning Domain 20, Chapter 3—Use of Deadly Force, set forth four requirements that, if all satisfied, would make

it reasonable for an officer to use deadly force against a fleeing subject escaping on foot. Multiple requirements were not met in this case. These four requirements are:

    a. "... if the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm [or death] ..."

    b. "... probable cause to believe that the subject poses a threat of death or serious physical harm, either to the officer or others ..."

    c. "... .probable cause to believe that the use of deadly force is reasonably necessary ..." [to prevent escape]

    d. "... some warning be given prior to the use of deadly force where feasible..."

13. **Police officers are trained that they can only use deadly force in an immediate defense of life situation, in other words, when there is an immediate or imminent threat of death or serious bodily injury.** There was no immediate defense of life situation when Deputies McGuire and Hubachek fired their lethal shots at Mr. Llamas. Mr. Llamas was passing by the house on the western portion of the property, and the deputies had no information that the area in which Mr. Llamas was moving was occupied. The deputies had no information that Mr. Llamas had injured any person other than himself that day. As seen on the videos, when Deputies McGuire and Hubachek started to fire their lethal shots, Mr. Llamas's back was to them, he was not turning, and he held the gun to his own head. As also seen on video, when Deputy McGuire fired his second volley of shots, Mr. Llamas was on the ground, crawling, not facing the deputies, and not pointing the gun. At the time of the lethal shots, Mr. Llamas did not have the present ability to inflict death or serious bodily harm. At the time of all of the lethal shots, Mr. Llamas was not approaching any person, aiming the gun at any person, and was not in the process of attacking or attempting to attack anyone. Based on the deposition testimony and video evidence, Mr. Llamas was approximately one hundred and fifty

feet from the deputies at the time of the lethal shots.

14. From the standpoint of police practices and basic police training, **the use of deadly force by Deputies McGuire and Hubachek was contrary to POST, improper, and inappropriate**, including (but not limited to) for the following reasons:

　　a. There was **no Immediate Defense of Life Situation** as explained above.

　　b. **Deputies McGuire and Hubachek Could not shoot Mr. Llamas for running away**. The deputies could not shoot Mr. Llamas for running away or trying to escape, or under the fleeing felon theory.

　　c. **Deputies McGuire and Hubachek could not shoot Mr. Llamas for having a gun**. Under the facts of this case, Deputies McGuire and Hubachek cannot justify shooting at Mr. Llamas simply because Mr. Llamas had a gun. There has to be an immediate threat of death or serious bodily injury with no other reasonable alternative measures. Because Mr. Llamas was not turning toward deputies with the gun or manipulating or aiming the gun at anyone, there was no immediate threat.

　　d. **No verbal threats**. Mr. Llamas never verbally threatened to harm anyone.

　　e. **Other reasonable alternative measures available**. Sheriff's deputies are trained that they can only use deadly force in a "last resort" situation. Shooting was not a "last resort" in this case. Other reasonable alternative measures were available, including giving a verbal warning before using deadly force, pursuing Mr. Llamas further, or utilizing less-lethal weapon systems.

　　f. **No warning regarding deadly force**. Sheriff's deputies are

trained to give a verbal warning that deadly force will be used when feasible. Deputies McGuire and Hubachek failed to issue a verbal warning prior to using deadly force, even though it would have been feasible to do so under this set of facts.

g. **Not the direst of circumstances**. Sheriff's deputies are trained that they can only use deadly force in the direst of circumstances. This was not the "direst of circumstances." The deputies on scene vastly outnumbered Mr. Llamas, had air support overhead as well as other tactical support on scene including a bearcat, and had less-lethal weapons at their disposal.

h. **Subjective fear is insufficient to justify a use of deadly force**. Basic police training requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." In this case, the record does not support any objectively reasonable explanation that Mr. Llamas posed an immediate threat of death or serious bodily injury at the time that any of the shots were fired.

i. **No reverence for human life**. Sheriff's deputies are trained that they must show a reverence for human life. Deputies McGuire and Hubachek showed no reverence for human life when they shot Mr. Llamas when his back was turned and he was not turning or manipulating the gun, and when he was already shot and on the ground and not facing deputies or aiming the gun, and without issuing a verbal warning that deadly force would be used.

j. **The number of shots (8) was excessive**. Deputies are trained to reassess when they are firing lethal shots. Here, the deputies fired eight shots total, including shots fired as Mr. Llamas was already

on the ground. Deputy McGuire should have reassessed during his shots rather than continuing to fire. Deputies are required to justify every shot they fire, and here, there is no justification for any of the shots.

k. **Mr. Llamas appeared to be experiencing a potential mental health crisis.** Deputies are trained to de-escalate a situation involving a person who is experiencing a mental crisis, including a person who may be suicidal. The deputies in this case ignored their training when they escalated, rather than de-escalated, the situation involving Mr. Llamas.

15. **The deputies, including Lt. Walsh, engaged in improper and inappropriate tactics.**

   a. The deputies failed to maintain their designated perimeter at River Road, including by blocking Mr. Llamas's most obvious path of egress across that perimeter, which was directly across the road to the north, from the southern driveway toward the northern driveway. By leaving this path open while blocking Mr. Llamas from turning left or right, the deputies in essence funneled Mr. Llamas northward, across their perimeter.

   b. The deputies failed to discuss or address the potential presence of civilians at the house on the western portion of the property where the shooting occurred, given Deputy McGuire's claim that he had observed two men there hours earlier. Upon learning via radio from the helicopter that Mr. Llamas was walking northward toward River Road, the deputies should have taken steps to secure their perimeter and reassess whether civilians may have been present at the property, and evacuated them if necessary.

  c. The deputies failed to discuss a tactical plan to address a situation where Mr. Llamas proceeded northward across River Road, despite the deputies funneling him in that direction as noted above, or otherwise approached an area they believed may have been occupied.

  d. The deputies failed to discuss a tactical plan for the use of available cover, including Lt. Walsh's vehicle, when they proceeded eastward along River Road toward the northern driveway, where Mr. Llamas was expected to be. They also failed to

  e. The deputies failed to have less-lethal options at the ready when they were setting up along River Road, knowing that Mr. Llamas was walking toward River Road from the south, or utilize less-lethal options, if such options were necessary.

  f. The deputies failed to give Mr. Llamas any verbal warnings before using deadly force, even though it would have been feasible to do so.

16. Given the close proximity of Mr. Llamas to the police dog at the time the dog was shot, as evident from the presence of dog bite wounds as noted on the autopsy report, it is unlikely that the bullet would, after passing through the dog's body, travel a significant distance downrange, as some deputies have claimed.

I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on June 2, 2025, at Santee, California.

_____
Roger A. Clark

-8-
Case No. 5:24-cv-00249-CAS-SP
DECLARATION OF ROGER A. CLARK